# EXHIBIT A

eFiled
2/4/2025 12:06:39 AM
Superior Court
of the District of Columbia

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**ANEESA JOHNSON**
c/o Hamed PLLC
P.O. Box 25085
Washington, DC 20027

*Plaintiff,*

v.

**GEORGETOWN UNIVERSITY**
37th and O Streets NW
Washington, D.C. 20057

*Defendant.*

**Case No.**        2025-CAB-000655

**JURY TRIAL DEMAND**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Aneesa Johnson ("Ms. Johnson") files this Complaint against Defendant Georgetown University ("Georgetown" or "University") and alleges as follows:

## I.   INTRODUCTION

1.    This case arises from Georgetown University's discriminatory termination of Ms. Johnson, a Muslim woman of African-American and Palestinian descent, after just three days of employment based on unverified allegations about her then-eight-year-old social media posts, while simultaneously protecting and retaining White and non-Muslim faculty who made inflammatory and discriminatory statements.

## II.   JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to D.C. Code § 11-921(a), as this action arises under the District of Columbia Human Rights Act ("DCHRA") and common law.

3.      Venue is proper as Georgetown maintains its principal place of business in the District of Columbia and all material events occurred within the District.

## III.    PARTIES

4.      Plaintiff Aneesa Johnson is a Muslim woman of African-American and Palestinian descent who was employed by Georgetown as Assistant Director of Academic and Faculty Affairs.

5.      Defendant Georgetown University is an educational institution incorporated in the District of Columbia, with its principal place of business at 37th and O Streets, N.W., Washington, D.C. 20057.

## IV.    FACTUAL ALLEGATIONS

### A. ANEESA JOHNSON, A MUSLIM WOMAN

6.      Aneesa Johnson grew up in a post-9/11 America where being a visibly Muslim woman meant navigating a landscape of pervasive discrimination, harassment, and fear. Like many Muslim women who wear the hijab, she became a visible target in an era of heightened Islamophobia, where the simple act of covering her head marked her as "other."[1]

7.      The statistics paint a stark picture of the world Ms. Johnson inhabited: 76.7% of Muslim women report experiencing Islamophobia in their lifetimes, compared to 58.6% of Muslim men.[2] This gendered discrimination manifests in deeply personal ways—Muslim

---

[1] Elsadig Elsheikh & Basima Sisemore, *Islamophobia Through the Eyes of Muslims*, OTHERING & BELONGING INST. (Sept. 29, 2021). Available at: https://belonging.berkeley.edu/sites/default/files/2021-10/Islamophobia%20Through%20the%20Eyes%20of%20Muslims.pdf.
[2] *Id.*

women regularly face having their hijabs forcibly removed, being spat upon, and enduring verbal assaults in public spaces.[3]

8.      Growing up, Ms. Johnson witnessed the dramatic surge in anti-Muslim hatred after 9/11, when FBI data showed anti-Muslim hate crimes skyrocketed from just 28 incidents in 2000 to 481 in 2001.[4] The trauma of this period created what scholars call "social isolation," as many Muslim families urged women and children to stay home or alter their appearance out of fear for their safety.[5]

9.      Like countless other Muslim women, Ms. Johnson had to carefully navigate educational and professional spaces. Studies show that Muslim women face a "triple penalty" in employment—discriminated against based on gender, religion, and ethnicity.[6] As an African American, the race factor meant Ms. Johnson faced a quadrupled penalty. The simple act of wearing a hijab reduces chances of receiving a job interview "close to zero."[7]

10.      The psychological toll of this constant discrimination is profound - 93.7% of Muslims report that Islamophobia affects their emotional and mental wellbeing.[8] Even those who don't directly experience hate incidents feel constantly "monitored, judged, or excluded."[9] For visibly Muslim women like Ms. Johnson, this created what researchers call

---

[3] Sakshi Venkatraman & Mirna Alsharif, *For Muslim Americans, a Spike in Hate Incidents Feels Reminiscent of Post 9/11 Islamophobia*, NBC News (Oct. 31, 2023), https://www.nbcnews.com/news/asian-america/muslim-americans-spike-hate-incidents-feels-reminiscent-post-911-islam-rcna122570.
[4] Aymen Ati, *The Post-9/11 Securitisation of the Hijab and International Human Rights Law: The Strasbourg Court, Article 9 and Hijab Restrictions*, 5 QUEEN MARY HUM. RTS. L. REV. 1 (2019). Available at: https://ssrn.com/abstract=3425845.
[5] Salih Tuzer, *The Impact of Islamophobia on the Education and Religious Identity of Muslims in the USA*, 17 TURKISH J. FOR RELIGIOUS EDUC. STUD. 131 (2024). Available at: https://doi.org/10.53112/tudear.1462175.
[6] Marjorie Moya, *Forgotten Women: The Impact of Islamophobia on Muslim Women in France*, European Network Against Racism (May 2016). Available at: https://www.enar-eu.org/wp-content/uploads/forgotten_women_report_france_-_final.pdf.
[7] *Id.*
[8] *Supra*, n.1.
[9] *Id.*

"stereotype threat," negatively impacting everything from healthcare access to educational achievement.[10]

11.    Yet Ms. Johnson persevered, like many Muslim women who refuse to compromise their faith despite facing what scholars describe as being "caught at the intersection of bias against Islam, the racialized Muslim, and women."[11] Her story exemplifies both the unique burden carried by Muslim women in post-9/11 America and their remarkable resilience in the face of persistent discrimination.

## B. ANEESA JOHNSON, AN AFRICAN AMERICAN WOMAN

12.    Aneesa Johnson's story is woven into the broader tapestry of African American experience—one marked by generational trauma, systemic oppression, and remarkable resilience. Like millions of African Americans, she carries the weight of a history that began with the brutal institution of slavery, which for 250 years stripped Black Americans of their basic humanity.[12]

13.    This legacy of oppression did not end with emancipation. For nearly a century afterward, Jim Crow laws enforced a system of apartheid that denied basic rights, while extralegal violence terrorized Black communities. Between 1882 and 1968, over 3,446 African Americans were lynched, often for nothing more than perceived violations of racial hierarchy.[13]

---

[10] Goleen Samari, *Islamophobia and Public Health in the United States*, 106 AM. J. PUB. HEALTH 1920 (2016). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC5055770.
[11] Sahar F. Aziz, *From the Oppressed to the Terrorist: Muslim-American Women in the Crosshairs of Intersectionality*, 9 HASTINGS RACE & POVERTY L.J. 191 (2012). Available at: https://scholarship.law.tamu.edu/facscholar/100.
[12] Paula A. Braveman *et al.*, *Systemic and Structural Racism: Definitions, Examples, Health Damages, and Approaches to Dismantling*, 41 HEALTH AFF. 171 (2022). Available at: https://doi.org/10.1377/hlthaff.2021.01394.
[13] National Academies of Sciences, Engineering, and Medicine, *Advancing Antiracism, Diversity, Equity, and Inclusion in STEMM Organizations: Beyond Broadening Participation* (2023). Available at: https://doi.org/10.17226/26803.

14.     Today, Ms. Johnson navigates a society where 79% of African Americans report experiencing unfair treatment due to their race.[14] The trauma of this discrimination manifests in stark disparities—African Americans face a life expectancy nearly five years shorter than white Americans, with Black infants dying at more than twice the rate of white infants.[15]

15.     The economic toll is equally devastating. The average Black household income of $53,789 is barely 65% of white households, while Black families experience poverty at nearly triple the rate.[16] This financial inequality stems directly from historical policies like redlining and restrictive covenants that systematically denied Black Americans the opportunity to build generational wealth.[17]

16.     In professional settings, 57% of African Americans report discrimination in pay and promotions.[18] Even with higher education, Black Americans receive diminished returns on their achievements due to persistent structural racism that impedes access to opportunities and resources.[19]

17.     For Ms. Johnson, like countless other African Americans, this reality means carrying what researchers call "cultural trauma"—not just the direct experience of

---

[14] Sara N. Bleich *et al.*, *Discrimination in the United States: Experiences of Black Americans*, 54 HEALTH SERV. RES. 1399 (2019). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC6864380.

[15] Samantha Artiga, Latoya Hill & Marley Presiado, *How Present-Day Health Disparities for Black People Are Linked to Past Policies and Events*, KFF (Feb. 22, 2024), https://www.kff.org/racial-equity-and-health-policy/issue-brief/how-present-day-health-disparities-for-black-people-are-linked-to-past-policies-and-events/.

[16] Off. of Minority Health, *Black/African American Health*, U.S. Dep't of Health & Hum. Servs. (Jan. 16, 2025), https://minorityhealth.hhs.gov/blackafrican-american-health.

[17] L.A. Civil Rights Dep't, *An Examination of African-American Experiences in Los Angeles* (Aug. 2024), https://civilandhumanrights.lacity.gov/sites/g/files/wph2271/files/2024-08/LA%20Civil%20Rights%20-%20Reparations%20Report%20Executive%20Summary%20-%20An%20Examination%20of%20African%20American%20Experiences%20in%20Los%20Angeles%20(1).pdf.

[18] *Supra*, n.14.

[19] Mina Silberberg *et al.*, *The Role of Socioeconomic Status in a Community-Based Study of Diabetes Secondary Prevention Among African Americans*, 60 INT'L J. HEALTH PROMOTION & EDUC. 262 (2022). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC9782674.

discrimination, but the collective memory of centuries of oppression that shapes identity formation and daily life.[20] Yet her story also exemplifies the extraordinary resilience of African Americans who, generation after generation, have persisted and achieved in the face of systemic barriers designed to ensure their failure.[21]

### C. ANEESA JOHNSON, A PALESTINIAN WOMAN

18.    Aneesa Johnson's story reflects the systematic dispossession and institutionalized discrimination that Palestinians have endured under the Europe's Zionist apartheid regime in occupied Palestine. Her family's experience mirrors that of countless Palestinians who have faced state-sanctioned displacement through a complex web of discriminatory laws, policies, and practices designed to privilege "Jewish" settlers at the expense of indigenous Palestinians.

19.    The only life Ms. Johnson and her family knows is one where the demolition of Palestinian homes and forced displacement represents a cornerstone of the Zionist apartheid system.[22] Ms. Johnson's family have been refugees since 1948, when the Zionist occupation—through sheer terrorism and depraved indifference to human life—demolished over 130,000 Palestinian homes and structures, systematically erasing entire villages and communities.[23] In 2023 alone, Israeli authorities demolished or seized 1,177 Palestinian structures—the highest number recorded since 2016.[24]

---

[20] Ron Eyerman, *Cultural Trauma: Slavery and the Formation of African American Identity*, in CULTURAL TRAUMA AND COLLECTIVE IDENTITY 60 (2004). Available at: https://doi.org/10.1525/california/9780520235946.003.0003.
[21] Karuna Meda, *What Is the Residual Impact of Slavery on African American Mental Health?*, Thomas Jefferson Univ. (Feb. 2023), https://www.jefferson.edu/news/2023/02/what-is-the-residual-impact-of-slavery-on-african-american-mental-health.html.
[22] Amnesty Int'l, *Israel's Apartheid Against Palestinians: Cruel System of Domination and Crime Against Humanity* (Feb. 1, 2022), https://www.amnesty.org/en/documents/mde15/5141/2022/en/.
[23] Israeli Comm. Against House Demolitions, *The Demolition of Palestinian Homes by Israel: A Fact Sheet* (Apr. 20, 2021), https://icahd.org/2021/04/20/the-demolition-of-palestinian-homes-by-israel-a-fact-sheet/.
[24] Office of the European Union Representative (West Bank and Gaza Strip, UNRWA), *One Year Report on Demolitions and Seizures in the West Bank, Including East Jerusalem* (Nov. 19, 2024), Reporting Period: Jan. 1 –

20.    The 2018 Nation-State Law codified what Palestinians like Ms. Johnson's family had long experienced—an explicit constitutional mandate declaring "Jewish settlement" as a national value requiring state promotion.[25] This law formalized a system where Palestinians are treated as an "inferior racial group and systematically deprived of their rights."[26]

21.    Ms. Johnson's family is directly impacted by the Zionist occupation's maintenance of "Jewish" domination over Palestinians through sweeping restrictions on movement, confiscation of Palestinian land, forced displacement of communities, denial of residency rights, suspension of basic civil rights, among others.[27]

22.    While conscientious people around the world read and research the plight of Palestinians, Ms. Johnson's family know how the Zionist occupation imposes territorial fragmentation to separate Palestinian communities, discriminatory land and property seizures, systematic denial of building permits, forced evictions and home demolitions, and denial of the right to return.[28]

23.    The Palestinian experience of being denied a home stands at the heart of the Zionist occupation's apartheid system.[29] For Ms. Johnson's family, like millions of

---

Dec. 31, 2023. Available at:
https://www.eeas.europa.eu/sites/default/files/documents/2024/One%20Year%20Report%20on%20Demolitions%20and%20Seizures%20in%20the%20West%20Bank%20including%20East%20Jerusalem%20-%201%20January%20%2031%20December%202023.pdf.

[25] Hum. Rts. Watch, *A Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecution* (Apr. 27, 2021), https://www.hrw.org/report/2021/04/27/threshold-crossed-israeli-authorities-and-crimes-of-apartheid-and-persecution.

[26] *Supra*, n.22.

[27] Lama Fakih & Omar Shakir, *Does Israel's Treatment of Palestinians Rise to the Level of Apartheid?*, Hum. Rts. Watch (Dec. 5, 2023), https://www.hrw.org/news/2023/12/05/does-israels-treatment-palestinians-rise-level-apartheid.

[28] *Supra*, n.22.

[29] *Id.*

Palestinians, this meant watching her ancestral home seized through "a cruel system" of "Jewish" domination and "crime against humanity."[30]

24.     This system of oppression continues today, with Palestinians facing ongoing dispossession through home demolitions, land confiscation, and forced displacement—all carried out under the explicit mandate of maintaining Jewish dominance.[31] The trauma of this systematic erasure echoes through generations of Palestinian families like Ms. Johnson's, who have witnessed their communities fragmented and their rights systematically denied under a regime that explicitly privileges one ethnic-religious group over another.

**D. ZIONIST WEAPONIZATION OF "JEWISH" IDENTITY WHEN TERRORIZING PALESTINIANS**

25.     For Palestinians like Ms. Johnson, the psychological trauma of occupation and apartheid is inextricably linked to symbols and declarations of "Jewishness"—not by their choice, but by the explicit and repeated framing of their oppression as specifically Jewish by the Zionist occupation itself.[32]

26.     The Zionist occupation has constructed a comprehensive system of domination that explicitly privileges Jewish settlers while systematically oppressing indigenous Palestinians. This system manifests through laws that enshrine "Jewish settlement" as a national value, military orders carried out under what the Zionist occupation declares as a "Jewish army," forced displacement conducted in the name of maintaining "Jewish

---

[30] *Id.*

[31] *Supra*, n.25.

[32] Amal Jamal, *Jewish Sovereignty and the Inclusive Exclusion of Palestinians: Shifting the Conceptual Understanding of Politics in Israel/Palestine*, 4 FRONTIERS POL. SCI. 995371 (2022). Available at: https://www.frontiersin.org/journals/political-science/articles/10.3389/fpos.2022.995371/full.

demographic dominance," and an apartheid regime that explicitly prioritizes Jewish settlers.[33] Since inception, Ms. Johnson has been confronted by this system.

27.    For Palestinians like Ms. Johnson and her family, every aspect of daily oppression is deliberately branded as "Jewish" by their oppressors.[34] For example, home demolitions carried out under the Star of David, checkpoints emblazoned with symbols of Jewish sovereignty, settlements explicitly established for "Jewish-only" residence, military operations conducted under what the Zionist occupation calls the "Jewish flag."[35]

28.    Whether surviving the inhumanity of the Zionist occupation, apartheid, and genocide directly or secondarily as a displaced refugee living in exile, the psychological burden is particularly acute because Palestinians are told to separate their trauma from its explicitly Jewish branding. All while suffering under laws that redefine the occupied Palestinian territories as exclusively "the nation-state of the Jewish people," suffering discrimination justified through "Jewish demographic needs,"[36] watching their homes demolished to make way for what the Zionist occupation calls "Jewish settlement," being subject to military rule by what the Zionist occupation proclaims as its "Jewish army."[37]

29.    For Palestinians like Ms. Johnson, the documented severity of the mental health impact is too familiar. From high rates of anxiety disorders and PTSD to transgenerational trauma from decades of occupation and deep psychological wounds from daily humiliation.

---

[33] *Supra*, n.22 & n.25.
[34] Lydia Wilson, *The Psychology of the Intractable Israel-Palestine Conflict*, New Lines Mag. (Oct. 24, 2023), https://newlinesmag.com/argument/the-psychology-of-the-intractable-israel-palestine-conflict/.
[35] *Supra*, n.22 & n.25.
[36] Gershon Shafir, *(Re)framing Jewish Privilege and Rebuffing Arab Rights*, Project on Middle E. Pol. Sci. (2023), https://pomeps.org/reframing-jewish-privilege-and-rebuffing-arab-rights.
[37] *Supra*, n.22 & n.25.

30.    For Palestinians like Ms. Johnson, the psychological trauma of occupation and apartheid is not merely linked to violence and displacement, but to the explicit branding of that oppression as specifically "Jewish" by Zionist occupation itself. This creates a complex psychological burden where victims must process their trauma through symbols their oppressors have deliberately transformed from religious markers into emblems of Zionist inhumanity.

31.    Despite this incredible trauma, Ms. Johnson is not one to conflate Judaism with oppression, racism, and hate. She understands the reality that European Zionists are desperate to legitimize its extermination project in Palestine by deliberately framing their occupation, apartheid system, and terrorism as "Jewish."

### E. Ms. Johnson Twitter Posts as a College Freshman in 2015

32.    In 2015, Ms. Johnson was a freshman at Northwestern University. Like many Palestinians witnessing the devastating impacts of repeated cycles of Zionist military bombardments, she expressed her anguish, opposition, and frustration to Zionist policies and violence. Her expressions at the time reflected that of a teenager, who is continuously affected by secondary trauma—as a Muslim woman in post-9/11 America, a descendant of violently dispossessed and displaced Palestinian refugees, and an African American navigating systemic White Supremacy.

33.    At the age of eighteen, Ms. Johnson made three posts on Twitter. The first post was a tweet that read, "Ever since going to NU I have a deep seeded hate for Zio b**ches. They bring out the worst in me." The second post was a tweet that read, "You know why I call them Zio b**ches, because they're dogs."

34.    The third post was a retweet of another tweet. The retweeted tweet had a photo of a scowling Charedi boy with the following caption: "When the whole world hates you bc you a thief and grow up looking like a shaytan #GrowingUpIsraeli."

35.    The photo of the scowling Charedi boy was first featured in a blog in 2011 by Mike Isaacson, a British Zionist settler, lawyer, and professional online troll who disapproves of Charedi Zionist settlers. Isaacson features the photo of the Charedi boy scowling at him for walking his dogs down a Charedim street in the "Anglo part" of Bayt Nattif's Ain Shams outside Jerusalem—European Zionist settlers ethnically cleansed Bayt Nattif's Palestinian inhabitants and renamed Ain Shams "Bet Shemesh." In his blog, Isaacson mocks Charedim religious attire and calls them "penguins" and "nutters." He also describes Charedim as "ridiculously anachronistic, lazy, chutzpadik . . . violent, spongers and parasites." Isaacson likens European Charedi settlers to "the skinheads and 'yobs' of our boyhood in England" for telling him "which of its streets we could and could not walk."[38]

36.    Ms. Johnson's three Twitter posts—two tweets and a retweet—were borne of her lived experience as a Palestinian teenager whose family endured displacement, dispossession, and ongoing trauma under Israel's occupation.

## F.  COORDINATED ZIONIST CAMPAIGN TO TARGET ANTI-ZIONIST STUDENTS, ACADEMICS, AND PROFESSIONALS

37.    In 2015, during Ms. Johnson's freshman year and after her Twitter posts, she became a target of Canary Mission, a secretive blacklisting operation that systematically

---

[38] Mike Isaacson, *Spitters and Splitters: What Have the Charedim Ever Done for Us?*, Melchett Mike (Dec. 31, 2011), https://melchettmike.wordpress.com/2011/12/31/spitters-and-splitters-what-have-the-charedim-ever-done-for-us/.

targets Palestinian rights advocates, particularly students and academics, through coordinated harassment campaigns designed to damage their professional and educational opportunities.[39]

38.     Ms. Johnson, like many students targeted by Canary Mission, experienced severe harassment and threats to her safety, forcing her to close her social media accounts and withdraw from public activism.

### G. CANARY MISSION'S DANGEROUS AND RACIST WEB OF HATE AND PERSECUTION

39.     The harassment campaign against Ms. Johnson was not random but part of a systematic effort by Canary Mission to target Palestinian, Arab, Muslim, and students of color. In a national climate marked by rising Muslim hate and anti-Arab racism, Canary Mission's smear campaign deliberately exposed already marginalized campus communities to additional surveillance, harassment, and physical danger.

40.     Canary Mission operates as an anonymous blacklisting website that systematically targets Palestinian rights advocates, particularly students and academics, through coordinated harassment campaigns designed to damage their professional and educational opportunities.

41.     The organization maintains a database of detailed profiles containing personal information, photos, and social media history of targeted individuals, overwhelmingly focusing on Arab, Muslim, and Palestinian students and faculty, as well as their supporters.

42.     Investigation by The Nation revealed that Canary Mission receives funding through a complex network including the Jewish Community Federation of San Francisco

---

[39] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 27, 2023), https://www.thenation.com/article/world/canary-mission-israel-covert-operations/.

and the Helen Diller Family Foundation, deliberately obscuring its operational structure through various pass-through entities.[40]

43.     The Jewish Federation of San Francisco has acknowledged funding Canary Mission through Megamot Shalom, a Zionist organization that serves as a U.S. front for the Israeli Ministry of Strategic Affairs.[41]

44.     The organization's tactics include publishing misleading dossiers designed to appear in Google searches, making false accusations of terrorism and antisemitism, contacting employers and academic institutions about targets, coordinating with Israeli authorities to facilitate border detentions.

45.     These profiles have resulted in denial of entry to the occupied Palestinian territories, arbitrary detentions,[42] interrogations by U.S. federal agents, loss of employment and educational opportunities, and severe emotional distress and self-censorship.

46.     Internal documents obtained by the American-Jewish newspaper The Forward demonstrate that Canary Mission coordinates with Israeli government agencies.[43]

47.     Major Jewish organizations have condemned Canary Mission's hatemongering. The Jewish Telegraphic Agency described Canary Mission's methods as "antithetical to . . . democratic and Jewish values" and "morally reprehensible" for using "hateful," "Islamophobic," and "racist" rhetoric "to villainize individuals" involved "with

---

[40] *Id.*

[41] *Id.*

[42] J Street, *J Street U Leaders to Israel's Minister Erdan: Detention of Lara Alqasem Is Dangerous and Wrong*, J Street (Oct. 10, 2018), https://jstreet.org/press-releases/j-street-u-leaders-to-israels-minister-erdan-detention-of-lara-alqasem-is-dangerous-and-wrong/.

[43] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info To Bar Activists*, The Forward (Oct. 4, 2018), https://forward.com/news/411453/israel-uses-canary-mission-blacklist-info-to-bar-activists/.

pro-Palestinian causes" "under the guise of combating anti-Semitism."[44] J Street called it a "right-wing organization" that "aims to promote a toxic atmosphere of harassment and fear on US college campuses and beyond."[45] T'ruah, the Rabbinic Call for Human Rights labeled it "Jewish McCarthyism."[46]

48.    In Ms. Johnson's case, Canary Mission weaponized her social media posts through a deliberate campaign of decontextualization and defamation, stripping her protected political speech of its historical context during a period of intense Israeli military violence against Palestinian civilians. This malicious distortion triggered a cascade of professional and personal devastation.[47]

## H. POST-TARGETING PROFESSIONAL PERSEVERANCE

49.    Following Canary Mission's 2015 smear campaign, Ms. Johnson abandoned her public social media presence to avoid further harassment. This silencing tactic mirrors findings from The Intercept's survey of over 60 blacklisted individuals, where 43% "toned down their activism" and 42% suffered acute anxiety due to the profiles.[48]

50.    Despite the psychological toll—documented as causing "self-censorship and psychological warfare effects" among targets—Ms. Johnson completed her studies.[49] Her

---

[44] Gabrielle Roth and Joseph Goldberg, *Jewish Students: Blacklist of BDS Supporters Hurting Efforts to Defend Israel on Campus*, Jewish Telegraphic Agency (Apr. 23, 2018), https://www.jta.org/2018/04/23/ideas/jewish-students-blacklist-bds-supporters-hurting-efforts-defend-israel-campus.

[45] *Supra*, n.42.

[46] T'ruah, *Young Jewish Activists Furious Over SF Federation's Support of Canary Mission*, T'ruah, https://truah.org/coverage/young-jewish-activists-furious-over-sf-federations-support-of-canary-mission. *See also* Andrew Rehfeld, *What the Taboo on Criticizing Israel Can Teach Us About Cancel Culture*, The Forward (Jul. 20, 2020), https://forward.com/opinion/451118/free-speech-warriors-and-the-jewish-community-have-a-double-standard-on/.

[47] William Clark, *In Focus: Community Members Say Northwestern Is Neither a Safe Nor Free Space for Conversations About Palestine and Israel*, The Daily Northwestern (Mar. 2, 2023), https://dailynorthwestern.com/2023/03/02/featured-stories/in-focus-community-members-say-northwestern-is-neither-a-safe-nor-free-space-for-conversations-about-palestine-and-israel/.

[48] *Id.*

[49] *Id.*

experience aligns with broader trends where Palestinian students endure systemic intimidation but persist academically under duress.

51.     Ms. Johnson rebuilt her career discreetly, avoiding public political engagement to evade further targeting. This reflects a common survival strategy among Canary Mission victims, who often face lasting professional harm and economic precarity due to employer discrimination.[50]

### I.   MS. JOHNSON'S MERITORIOUS QUALIFICATIONS AND SELECTION BY GEORGETOWN

52.     Ms. Johnson, a highly qualified candidate of Palestinian and African American heritage, applied for the Assistant Director of Academic and Faculty Affairs position at Georgetown University's Walsh School of Foreign Service (MSFS) on August 31, 2023.

53.     Her credentials—including advanced degrees, professional experience, and alignment with Georgetown's mission—led to a swift interview process.

54.     On September 20, 2023, Ms. Johnson had a successful Zoom interview with MSFS leadership, including Director George Shambaugh and Deputy Director Ashley Lenihan.

55.     On September 27, 2023, Ms. Johnson had an in-person interview that comprised of a series of meetings with faculty and students, where she demonstrated genuine connection and meaningful engagement.

56.     As part of her interview process, Ms. Johnson met with the MSFS Director George Shambaugh and the Director of Academic and Faculty Affairs Rebecca Caro. Both offered valuable insights into the role and its responsibilities.

---

[50] *Id. See also* Comm. on Acad. Freedom, Middle E. Stud. Ass'n of N. Am., *Resource Guide to Counteract Dangerous Risk of Canary Mission Website* (Apr. 18, 2017), https://mesana.org/news/2018/04/18/committee-on-academic-freedom-shines-light-on-secretive-website-that-defames-students-offers-resource-for-college-leaders-to-take-action.

57.    Ms. Johnson also had an engaging and thoughtful meeting with three MSFS students. The students shared their perspectives on the program and asked Ms. Johnson insightful questions about how she would support their academic journey.

58.    Ms. Johnson also met with another staff member and future colleague, who helped round out her understanding of the MSFS team's dynamics and goals.

59.    All the discussions were rich and engaging. Each meeting and question was tailored not just to evaluate Ms. Johnson's qualifications, but also to gauge how well she aligned with the values and vision of the MSFS program.

60.    On October 2, 2023, Georgetown extended Ms. Johnson an unconditional offer letter. Eager to positively contribute to the MSFS team's culture and help further the MSFS mission, Ms. Johnson accepted.

## J. GEORGETOWN'S DISCRIMINATORY SCRUTINY AND HOSTILE ONBOARDING

61.    Georgetown's enthusiasm for Ms. Johnson collapsed immediately upon learning of her African-American and Palestinian identity.

62.    During a welcoming lunch on her first day on October 30, 2023, faculty members interrogated Ms. Johnson about her heritage.

63.    Professor Shantayanan Devarajan asked if she was Sudanese, then pressed further when she disclosed her Palestinian roots.

64.    Director George Shambaugh redirected conversation to the "war in Gaza," making Ms. Johnson visibly uncomfortable and upset—forcing colleagues to intervene.

65.    Shambaugh's decision to redirect conversation to the "war in Gaza" during Ms. Johnson's welcome lunch did far more than breach professional decorum—it reduced her Palestinian identity to a crude political trope. This act exemplifies how Palestinians in

America are systematically stripped of their humanity and recast as perpetual proxies for geopolitical conflict.

66.     Ms. Johnson's experience reflects a well-documented pattern in U.S. institutions where Palestinian identity is weaponized to erase individuality, enforce silence and normalize collective punishment. Georgetown is no exception.

67.     Ms. Johnson was flattened into a symbol of the so-called "Israeli-Palestinian conflict," denied the right to exist outside politicized narratives. As scholar Rashid Khalidi notes, "Palestinians in America are rarely seen as people—only as problems."[51]

68.     The implicit demand by Georgetown that Ms. Johnson explicitly denounce an action or state her position on Palestine before being granted basic respect creates what the Rutgers Center for Security, Race, and Rights calls a "loyalty test" not imposed on other groups.[52]

69.     Ms. Johnson's tears stemmed not from personal fragility, but from the trauma of being forced to answer for the Zionist occupation, apartheid, and genocide targeting her ancestral homeland and family—a burden no other ethnic group is made to bear.

70.     Ms. Johnson does not use the term "genocide" as a rhetorical device, but as a concrete legal prohibition that exists in federal and international law. *See* 18 U.S.C § 1091 (implementing the Genocide Convention).[53] Israel's genocidal conduct in Palestine has been

---

[51] Rashid Khalidi, *The Hundred Years' War on Palestine: A History of Settler Colonialism and Resistance, 1917–2017* (Metropolitan Books 2020).

[52] Ctr. for Sec., Race & Rts., Rutgers L. Sch., *Presumptively Antisemitic: Islamophobic Tropes in the Palestine–Israel Discourse* (Nov. 2023), https://csrr.rutgers.edu/wp-content/uploads/2023/11/csrr-presumptively-antisemitic-report.pdf.

[53] The crime of genocide occurs when someone "whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such— (1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by

recognized by international courts,[54] United Nations experts,[55] genocide scholars,[56] leading medical professionals,[57] and even U.S. courts,[58] among others. Demanding an end to this genocide and justice for the people being annihilated is not only lawful and constitutionally protected, but also a legal imperative upon all nations under the Genocide Convention.[59]

## K. Coordinated Online Zionist Campaign of Hate Against Ms. Johnson

71.     Rachel Jessica Wolff—a Zionist dual degree student at Georgetown's School of Foreign Service and Georgetown University Law Center—identified Ms. Johnson as a target to attach through her introductory email to the MSFS community, which included students, faculty, and professional staff.

---

force children of the group to another group." 18 U.S.C. § 1091; *see also* Convention on the Prevention and Punishment of the Crime of Genocide, December 9, 1948, General Assembly Resolution 260, entered into force on January 12, 1951, ("The Genocide Convention"), Article II.

[54] *See* International Court of Justice, Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.

[55] *See, e.g.,* United Nations, "Anatomy of a Genocide, Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Francesca Albanese," A/HRC/55/73 (March 25, 2024), https://perma.cc/9GRF-XR7K; United Nations, "Gaza: UN Human Rights Experts Call on International Community to Prevent Genocide Against the Palestinian People—OHCHR Press Release" (November 16, 2023), https://perma.cc/XDS8-PJF2.

[56] *See, e.g.,* "Declaration of William A. Schabas in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-5 (November 16, 2023), https://perma.cc/4MH2-ENU5; *see also* "Declaration of Dr. John Cox, Dr. Victoria Sanford and Dr. Barry Trachtenberg in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-6 (November 16, 2023), https://perma.cc/3RPE-F6AN.

[57] *See, e.g.,* "[Proposed] Brief of Amici Curiae Medical Doctors in Support of Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss," 4:23-cv-05829-JSW, Document 52-1 (December 30, 2023), https://perma.cc/A68V-DU4C.

[58] In his decision in *Defense for Children International-Palestine v. Biden*, Judge Jeffrey S. White noted that "the undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony of the Plaintiffs and the expert opinion proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide." 714 F.Supp.3d 1160, 1163 (N.D. Cal. 2024). (Because the Judge granted Defendants' Motion to Dismiss based on the political question doctrine, this section of the opinion does not have legal force as a factual finding).

[59] The Genocide Convention, supra note 1, Article I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 43, 221, ¶ 430.

72.    Wolff proceeded to search Ms. Johnson's name. The first result featured on the search engines was Canary Mission's hateful and racist dossier on Ms. Johnson from eight years earlier. Wolff made it her mission to malign Ms. Johnson and started a hateful doxing and harassment campaign.



73.    On November 1, 2023, at 10:17 PM, Wolff initiated her targeted harassment and hate campaign against Ms. Johnson by posting a defamatory tweet that rapidly went viral, garnering over 1.2 million views, 404 comments, 6,300 likes, 2,000 retweets, and 329 bookmarks within hours.



74.     Wolff's tweet relied on decontextualized social media posts from 2015, when Ms. Johnson was a college freshman, deliberately stripping them of their historical context.

75.     As if the first tweet wasn't enough, Wolff continued her instigation with a second tweet, using one of the racist features by Canary Mission to shame Georgetown for hiring Ms. Johnson in the first place.



76.    The viral tweet was amplified by Canary Mission, the Israeli government, and other Zionist accounts, exponentially increasing its reach and the subsequent harassment directed at Ms. Johnson.



77.    Among those who retweeted Wolff's tweet was Georgetown's very own "Constitutional Law and Supreme Court Expert" Ilya Shapiro, who served as the executive director and senior lecturer at the Georgetown Center for the Constitution.



78.    On November 2, 2023, at 8:22 AM, George Shambaugh, the Director of the MSFS Program, called Ms. Johnson instructing her not to come to the office due to "unspecified threats to her safety."

79.    At 9:43 AM, Shambaugh called again, placing Ms. Johnson on administrative leave without due process or explanation.

80.    At 10:42 AM, Ms. Johnson received an email from the Dean of the School of Foreign Service to the entire school community implicitly affirming the racist and defamatory campaign of hate targeting Ms. Johnson, further compounding her distress.

81.    At 10:53 AM, Ms. Johnson received her first hate message in her work email, marking the beginning of direct harassment.

82.    Around noon, Ms. Johnson learned of Wolff's viral tweet about her for the first time, despite having never met or interacted with Wolff.

83.    Throughout the evening of November 2, Ms. Johnson was subjected to extensive doxxing, with her personal information shared across various Zionist and Israeli social media accounts and websites.

84.    By 2:40 PM on November 2, 2023, less than 17 hours after Wolff's initial tweet, Georgetown had placed Ms. Johnson on administrative leave pending an investigation, demonstrating the immediate and severe professional consequences of this coordinated attack.



**Rachel Jessica Wolff** 🇮🇱
@RachelJessWolff

UPDATE: Aneesa Johnson has been placed on administrative leave. @georgetownsfs claims it was not aware of her background, which I have a hard time believing when it's the first thing that comes up when you Google her name.

85.     The harassment escalated to national prominence when Zionist mouthpiece Ben Shapiro published an article about Ms. Johnson on The Daily Wire and mentioned her by name in his podcast, making Ms. Johnson a target of hateful threats and attacks to an even larger audience.

**L.  GEORGETOWN'S DISCRIMINATION AND UNLAWFUL TERMINATION OF MS. JOHNSON**

86.     Just before 5 PM on November 2, 2023, Ms. Johnson received a letter from her director informing her that she had been placed on administrative leave. The letter stated that, "[t]he university is currently investigating allegations related to your online conduct. Specifically, it is alleged that you have engaged in serious misconduct which, if substantiated, would be in violation of University policies, including professional conduct policies."

87.    Georgetown's School of Foreign Service issued a statement claiming they were unaware of Johnson's background when hiring her and that she was placed on immediate administrative leave pending an investigation of her past social media comments.

88.    On November 8, Ms. Johnson sent a letter to Georgetown documenting concerns of discriminatory conduct. Georgetown did not heed Ms. Johnson's complaints of discrimination.

89.    On November 27, 2023, Georgetown terminated Ms. Johnson's employment. Her termination letter stated,

> "This letter is to inform you that your probationary employment as Assistant Director of Academic and Faculty Affairs in the Master of Science in Foreign Service Program with Georgetown University is terminated effective November 27, 2023. This decision has been made pursuant to Human Resources Policy #204: Probationary Employment Period.
>
> On Thursday, November 2, 2023, you were placed on paid administrative leave, pending an investigation into your alleged misconduct. Specifically, the University investigated allegations that you engaged in unprofessional conduct based on your social media activity, including, but not limited to posts from 2015 which were shared with Georgetown University during the first week of your employment, which began on October 30, 2023. Your social media conduct has had a significantly negative impact on the MSFS Program and in extension its Walsh School of Foreign Service and the wider Georgetown Community. It also impacts your ability to engage fully with members of our community.
>
> The University's review concluded that you engaged in unprofessional conduct based on the postings that you made and your subsequent failure to address concerns raised by your social media activities . . .
>
> It is for these reasons that the University has decided to terminate your employment during the probationary period and in accordance with Human Resources Policy #204: Probationary Employment Period, which states in part that:

"Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment. However, if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior us unacceptable, the University may terminate employment at any time during the probationary period . . ."

90.    Georgetown's swift action in response to Wolff's campaign, without due process or thorough investigation, reveals the institution's discrimination and complicity in weaponizing anonymous blacklists against Palestinian voices in academia.

91.    In Ms. Johnson's case, Canary Mission's profile deliberately stripped context from her social media posts, presenting them in a misleading manner designed to damage her professional reputation and employment prospects.

## M. DISPARATE TREATMENT AND COMPARATOR EVIDENCE DEMONSTRATING DISCRIMINATORY ANIMUS

92.    Georgetown University has demonstrated a pattern of disparate treatment in its handling of controversial speech and conduct by employees, favoring non-Muslim and pro-Israel voices while discriminating against Palestinian and Muslim perspectives.

93.    Ilya Shapiro, a white male non-Muslim employee, was retained by Georgetown despite making racist statements about Black women. Specifically, Shapiro tweeted that President Biden's Supreme Court nominee would be a "lesser Black woman."



94.     Georgetown placed Shapiro on paid administrative leave during a 4-month investigation. Shapiro was ultimately reinstated with no disciplinary action. Georgetown cited its "Speech and Expression Policy" to justify retaining Shapiro.

95.     Professor Bruce Hoffman, a white male Jewish employee, faced no consequences for anti-Muslim rhetoric. Hoffman publicly compared Northern Virginia infrastructure to "Mogadishu," invoking racist tropes about Somalia. Hoffman claimed TikTok is "turning a whole generation into anti-Semites." Georgetown took no disciplinary action and promoted Hoffman to a leadership role.

96.     Danielle Pletka, a white female Jewish adjunct professor, has been protected despite anti-Muslim speech. Pletka repeatedly labeled critics of Israel as "terrorist sympathizers" and "Hamas supporters." Pletka dismissed Palestinian rights activism as the work of "insubordinate morons." Georgetown has taken no disciplinary action and continues to employ Pletka.

97.     Yonatan Green, a white male Jewish Georgetown Fellow, has faced no consequences for statements against Palestinian rights. Green dismissed Palestinian narratives of displacement, claiming "virtually no examples of actual massacres by Israelis." Green mocked Palestinian experiences of dehumanization as "baseless victimhood." Georgetown has taken no investigative or disciplinary action against Green.

98.     In stark contrast to its treatment of the above employees, Georgetown swiftly terminated Ms. Johnson's employment based on unverified allegations about her social media posts from 2015, when she was a college freshman.

99.     This pattern of disparate treatment reflects a systemic bias against Palestinian, Muslim, and anti-Zionist voices at Georgetown, in violation of Title VII and the D.C. Human Rights Act.

## V.     CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 2000e et seq.**
**(Discrimination Based on Race, Religion, and National Origin)**

100.     Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

101.     Georgetown University discriminated against Ms. Johnson on the basis of her race (African American and Arab), religion (Muslim), and national origin (Palestinian) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

102.     Georgetown's actions, including but not limited to placing Ms. Johnson on administrative leave and terminating her employment based on unverified allegations about her social media posts from 2015, constitute adverse employment actions.

103.     Georgetown's proffered reasons for these adverse actions are pretextual, as evidenced by its disparate treatment of non-Muslim and Zionist employees who made controversial statements.

### COUNT II
**D.C. Code § 2–1402.11**
**(Discrimination Based on Race, Religion, and National Origin)**

104.     Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

105.    Georgetown University discriminated against Ms. Johnson on the basis of her race, religion, and national origin in violation of the D.C. Human Rights Act, D.C. Code § 2-1402.11.

106.    The D.C. Human Rights Act provides broader protections than Title VII and allows for individual liability of the Georgetown employees involved in the discriminatory actions against Ms. Johnson.

## COUNT III
### 42 U.S.C. § 2000e et seq.
### (Hostile Work Environment)

107.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

108.    Georgetown University created and permitted a hostile work environment that was severe, pervasive, and targeted Ms. Johnson based on her protected characteristics as a Muslim woman of Palestinian descent.

109.    Georgetown failed to protect Ms. Johnson from harassment and instead participated in the creation of a hostile environment by placing her on administrative leave and terminating her employment based on a coordinated campaign of harassment.

## COUNT IV
### D.C. Code § 2–1402.11
### (Hostile Work Environment)

110.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

111.    Georgetown University created and permitted a hostile work environment that was severe, pervasive, and targeted Ms. Johnson based on her protected characteristics as a Muslim woman of Palestinian descent.

112.    Georgetown failed to protect Ms. Johnson from harassment and instead participated in the creation of a hostile environment by placing her on administrative leave and terminating her employment based on a coordinated campaign of harassment.

## COUNT V
### 42 U.S.C. § 2000e-3(a)
### (Retaliation)

113.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

114.    Georgetown University retaliated against Ms. Johnson for engaging in protected activity, including her attempts to defend herself against unsubstantiated allegations and her past advocacy for Palestinian rights.

115.    The adverse actions taken against Ms. Johnson, including her placement on administrative leave and subsequent termination, were causally connected to her protected activities.

## COUNT VI
### D.C. Code § 2–1402.61
### (Retaliation)

116.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

117.    Georgetown University retaliated against Ms. Johnson for engaging in protected activity, including her attempts to defend herself against unsubstantiated allegations and her past advocacy for Palestinian rights.

118.    The adverse actions taken against Ms. Johnson, including her placement on administrative leave and subsequent termination, were causally connected to her protected activities.

## COUNT VII
### (Breach of Contract)

119.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

120.    Georgetown University breached its contractual obligations to Ms. Johnson, including those set forth in its own policies and procedures regarding non-discrimination, due process, and freedom of expression.

121.    Georgetown's actions violated the implied covenant of good faith and fair dealing inherent in Ms. Johnson's employment agreement.

## COUNT VIII
### (Defamation)

122.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

123.    Georgetown University, through its employees and agents, published false and defamatory statements about Ms. Johnson to third parties, including statements that implied she was unfit for her position due to alleged antisemitism.

124.    These statements were made with actual malice or reckless disregard for their truth or falsity, as evidenced by Georgetown's reliance on unverified allegations and its failure to conduct a proper investigation.

## COUNT IX
### (Intentional Infliction of Emotional Distress)

125.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

126.    Georgetown University's conduct towards Ms. Johnson was extreme, outrageous, and intended to cause severe emotional distress.

127.    As a direct result of Georgetown's actions, Ms. Johnson has suffered severe emotional distress, including but not limited to anxiety, depression, and damage to her professional reputation.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Aneesa Johnson respectfully requests that this Court enter judgment in her favor and against Defendant Georgetown University, and:

(a)    Award Ms. Johnson back pay from the date of her unlawful termination, including all raises, bonuses, and benefits she would have received but for Georgetown's discriminatory conduct.

(b)    Award Ms. Johnson front pay to compensate for future lost wages and benefits resulting from Georgetown's discriminatory termination and the lasting damage to her academic career.

(c)    Award compensatory damages for the severe emotional distress, mental anguish, and reputational harm Ms. Johnson has suffered due to Georgetown's egregious conduct.

(d)    Award punitive damages in an amount sufficient to punish Georgetown for its malicious and reckless disregard of Ms. Johnson's federally protected rights and to deter similar conduct in the future.

(e)    Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and D.C. Code § 2-1403.13(a)(1)(E).

(f)    Enter a permanent injunction requiring Georgetown to:

(i)    Implement mandatory anti-discrimination and anti-harassment training for all employees;

(ii)   Establish clear protocols for investigating allegations of misconduct that ensure due process;

(iii)  Create oversight mechanisms to prevent discriminatory enforcement of university policies;

(iv)   Develop procedures to protect faculty and staff from targeted harassment campaigns;

(g)  Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable claims.

Date:  February 3, 2025.

Respectfully submitted,

*/s/Abdel-Rahman Hamed*

ABDEL-RAHMAN HAMED, ESQ.
DC Bar No. 1632130

**Hamed Law**
P.O. Box 25085
Washington, D.C. 20027

(202) 888-8846

Advocates@HamedLaw.com

*Attorney for Plaintiff Aneesa Johnson*

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
Plaintiff

vs.

GEORGETOWN UNIVERSITY                  Case Number    2025-CAB-000655
_____
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____                   Clerk of the Court
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____     By _____
Address                                                          Deputy Clerk
Washington. DC 20007

202.888.8846
_____     Date    2/4/2025
Telephone

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828    ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección                                            Subsecretario

_____
Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화하십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
                              Plaintiff

        vs.

HELEN DILLER FAMILY FOUNDATION
_____
                              Defendant

Case Number    2025-CAB-000655

## SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____
Address
Washington, DC 20007
_____

202.888.8846
_____
Telephone

_Clerk of the Court_

By _____
                    Deputy Clerk

Date _____
                    May 2, 2025

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요.      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección                                                              Subsecretario

_____

Fecha _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 연락하십시오       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

eFiled
5/8/2025 8:20:16 PM
Superior Court
of the District of Columbia

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

ANEESA JOHNSON,         )
         )
    Plaintiff,         )
         )
         v.         )    Civil Action No. 2025-CAB-000655
         )
GEORGETOWN UNIVERSITY, *et al.*,         )
         )
    Defendants.         )

## NOTICE OF APPEARANCE – HENRY A. PLATT

Please enter the appearance of Henry A. Platt on behalf of Defendants Georgetown University, Joel Hellman, and George Shambaugh in the above-referenced matter.

Please direct copies of all filings and materials in this matter to his attention.

         **SAUL EWING LLP**

Dated: May 8, 2025         */s/ Henry A. Platt*
         Henry A. Platt (D.C. Bar No. 425994)
         1919 Pennsylvania Avenue NW, Suite 550
         Washington, D.C. 20006
         Tel: (202) 342-3447
         Fax: (202) 337-6065
         henry.platt@saul.com

         *Counsel for Georgetown University,*
         *Joel Hellman, and George Shambaugh*

## **CERTIFICATE OF SERVICE**

I certify that on this 8th day of May, 2025, a true and correct copy of the foregoing **NOTICE OF APPEARANCE – HENRY A. PLATT** was served via the Court's electronic filing system upon:

> Abdel-Rahman Hamed, Esq.
> P.O. Box 25085
> Washington, D.C. 20027
> Advocates@HamedLaw.com
>
> *Attorney for Plaintiff Aneesa Johnson*

> */s/ Henry A. Platt*
> Henry A. Platt
> *Counsel for Defendants, Georgetown University, Joel Hellman, and George Shambaugh*

2



**Superior Court of the District of Columbia**
**Civil Division - Civil Actions Branch**
**500 Indiana Ave NW, Room 5000, Washington DC 20001**

**202-879-1133 | www.dccourts.gov**

**Case Number:** 2025-CAB-000655

**Case Style:** Aneesa Johnson v. Georgetown University

<h2 style="text-align:center">INITIAL ORDER</h2>

| Initial Hearing Date: | Initial Hearing Time: | Courtroom Location: |
|---|---|---|
| Friday, 05/16/2025 | 9:30 AM | Remote Courtroom 518 |
| **Please see attached instructions for remote participation.** | | |
| Your case is assigned to Associate Judge Robert D Okun. | | |

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

1)  This case is assigned to the judge and calendar designated above. All future filings in this case shall bear the calendar number and judge's name along with the case number in the caption.

2)  Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of the summons, the complaint, and this Initial Order. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4.

3)  Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

4)  At the time stated above, all counsel and unrepresented parties shall participate in a hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients before the hearing whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this hearing.

5)  If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference once, with the consent of all parties, to either of the two succeeding days when the calendar is called. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date. No other continuance will be granted except upon motion for good cause shown.

6)  Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Milton C. Lee, Jr.

**To Join by Computer, Tablet, or Smartphone:**

1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb518

   Meeting ID: 129 685 3445

2) When you are ready, click "Join Meeting".

3) You will be placed in the lobby until the courtroom clerk gives you access to the hearing.


**Or to Join by Phone:**

1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)

2) Enter the Webex Meeting ID listed above followed by "##"


**Resources and Contact Information:**

1) For best practices on how to participate in Webex Meetings, click here
   https://www.webex.com/learn/best-practices.html.

2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.

3) For case questions, call the Civil Actions Branch Clerk's Office at 202-879-1133.

4) To change your method of hearing participation, visit www.dccourts.gov/hearing-information for instructions and forms.

## ACCESSIBILITY AND LANGUAGE ACCESS

**Persons with Disabilities**:

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call 202-879-1700 or email ADACoordinator@dcsc.gov. The D.C. Courts does not provide transportation service.


**Interpreting and Translation Services**:

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office listed for your case. For more information, visit https://www.dccourts.gov/language-access.


**Servicios de interpretación y traducción**:

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría de su caso.

Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.


**የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች**:

የዲ.ሲ ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። የቃል ወይም የጽሑፍ ትርጓሜ ለመጠየቅ እባክዎን በመዝገብዎ የተዘረዘረውን የጸሀፊ ቢሮ (ክለርክ'ስ አፊስ) ያናግሩ። ለተጨማሪ መረጃ https://www.dccourts.gov/language-access ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያየትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

📞 Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.
- You can also find the list of legal services providers at www.dccourts.gov/services/represent-yourself by clicking on the link that says, "List of Legal Service Providers for Those Seeking an Attorney or Legal Advice".
- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.
- Witnesses: tell the judge if you want a witness to testify at your hearing.
- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

## How do I know if I have a remote hearing?

The Court will contact you to tell you that your hearing is remote. They may contact you by sending you an email, letter in the mail, or by calling you.

## How do I take part in a remote hearing?

The Court will give you step-by-step instructions on how to take part in the remote hearing.

If you lose your written notice, call the Civil Actions Clerk's Office for instructions at:

 202-879-1133

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

📞 Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.
- You can also find the list of legal services providers at www.dccourts.gov/services/represent-yourself by clicking on the link that says, "List of Legal Service

# Tips for Attending Remote Hearings - Civil Division

*Your court hearing may be held remotely. This means that you will participate by phone or by video conference instead of coming to the courthouse. Here are some tips on how to prepare.*

## Tips for the Hearing

- Join the hearing a few minutes early!
- Charge your computer or phone and make sure you have enough minutes to join the call. Find a private and quiet space. If possible, be alone in a room during the hearing. Try to limit distractions as much as possible. If others are in the room with you, ask if they can be quiet during the hearing.
- Mute your microphone when you are not talking. Mute all sounds on your phone or computer.
- Say your name before you speak so the record is clear. Be prepared to identify your role in the hearing (e.g., observer, plaintiff, defendant, witness, etc.).
- Speak slowly and clearly so everyone hears what you are saying.
- Pause before speaking in case there is a lag. Use a headset or headphones if you can. This will free up your hands and sound better.
- Try not to talk over anyone else. Only one person can speak at a time. If you talk while someone else is talking, the judge will not be able to hear you.
- Have all your documents for the hearing in front of you. Have a pen and paper to take notes.
- If you are not ready for your hearing or want to speak with an attorney, you can ask the judge to postpone your hearing for another date.
- If your sound or video freezes during the hearing, use the chat feature or call the Clerk's Office to let them

Advice".

- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.

- Witnesses: tell the judge if you want a witness to testify at your hearing.

- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

know that you are having technical issues.

## Special Tips for Video Hearings
### (Click here for more information)

- Download the court's hearing software, WebEx, in advance and do a test run! The Court will provide you with a WebEx link in advance of the hearing.

- Set up the camera at eye level. If you are using your phone, prop it up so you can look at it without holding it.

- Look at the camera when you speak and avoid moving around on the video.

- Wear what you would normally wear to court.

- Sit in a well-lit room with no bright lights behind you.

- If possible, find a blank wall to sit in front of. Remember the judge will be able to see everything on your screen, so pick a location that is not distracting.



The DC Courts have **remote hearing sites** available in various locations in the community to help persons who may not have computer devices or internet service at home to participate in scheduled remote hearings.  The Courts are committed to enhancing access to justice for all.

There are six remote access sites throughout the community which will operate: **Monday – Friday, 8:30 am – 4:00 pm.**

**The remote site locations are:**





If you want to use a remote site location for your hearing, call **202-879-1900** or email DCCourtsRemoteSites@dcsc.gov **at least 24 hours before your hearing to reserve a remote access computer station**.  If you require special accommodations such as an interpreter for your hearing, please call **202-879-1900 at least 24 hours in advance of your hearing so the Courts can make arrangements**.

**\*You should bring the following items when you come to your scheduled site location\***

1.  Your **case number** and any **hyperlinks** provided by the Courts for your scheduled hearing.

2.  Any documents you need for the hearing (evidence), including exhibits, receipts, photos, contracts, etc.

3.  Materials for notetaking, including pen and paper.

**\*Safety and security measures are in place at the remote sites.**

**Contact information to schedule your remote access computer station:**
Call:  **202-879-1900**
Email:  DCCourtsRemoteSites@dcsc.gov



Los Tribunales de DC disponen de **sitios de audiencia remota** en distintos centros de la comunidad para ayudar a que las personas que no tienen dispositivos informáticos o servicio de Internet en su casa puedan participar en audiencias remotas programadas. Los Tribunales honran el compromiso de mejorar el acceso de toda la población a la justicia.

En toda la comunidad hay seis sitios de acceso remoto que funcionarán de l**unes a viernes, de 8:30 am a 4:00 pm**.

**Los centros de acceso remoto son:**



Si desea usar un sitio remoto para su audiencia, llame al **202-879-1900** o envíe un mensaje de correo electrónico a DCCourtsRemoteSites@dcsc.gov **al menos 24 horas antes de la audiencia, para reservar una estación de computadora de acceso remoto.** Si necesita adaptaciones especiales, como un intérprete para la audiencia, llame

**al 202-879-1900 al menos 24 horas antes de la audiencia para que los Tribunales puedan hacer los arreglos necesarios.**

**\*Cuando concurra al sitio programado debe llevar los siguientes artículos\***

1. Su **número de caso** y todos los **hipervínculos** que le hayan proporcionado los Tribunales para la audiencia programada.

2. Cualquier documento que necesite para la audiencia (prueba), incluidos documentos probatorios, recibos, fotos, contratos, etc.

3. Materiales para tomar nota, como papel y lápiz.

**\*Los sitios de acceso remoto cuentan con medidas de seguridad y protección.**

**Información de contacto para programar su estación de computadora de acceso remoto:**
Teléfono: **202-879-1900**
Correo electrónico: DCCourtsRemoteSites@dcsc.gov

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
                                          Plaintiff
                    vs.

                                                    Case Number    2025-CAB-000655

JEWISH COMMUNITY FEDERATION OF SAN FRANCISCO
_____
                                          Defendant

**SUMMONS**

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____          _Clerk of the Court_
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____          By _____
Address
Washington, DC 20007                                          Deputy Clerk

202.888.8846
_____          Date        **May 2, 2025**
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시요.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                    Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección

Subsecretario

_____

Fecha _____

Teléfono

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON

_____ Plaintiff

vs.

JOEL HELLMAN

_____ Defendant

Case Number    2025 - CAB - 000655

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel - Rahman Hamed
_____
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____
Address
Washington, DC 20007

202.888.8846
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____ **May 2, 2025**

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                    Demandante

        contra

                                            Número de Caso: _____

_____
                                    Demandado

**CITATORIO**

Al susodicho Demandado:

   Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

   A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                    Por: _____
_____
Dirección                                      Subsecretario

_____

                                    Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 전화주십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

   IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

   Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                    Vea al dorso el original en inglés
                    See reverse side for English original

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
                    Plaintiff

vs.

                                                    Case Number    2025-CAB-000655

ADAM AND GILA MILSTEIN FAMILY FOUNDATION
_____
                    Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____
Address
Washington, DC 20007

202.888.8846
_____
Telephone

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.      የአማርኛ ትርጉም ለማግኘት  (202) 879-4828  ይደውሉ

_Clerk of the Court_

By _____
                    Deputy Clerk

Date            **May 2, 2025**
_____

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección                                                    Subsecretario

_____

Fecha _____

_____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
                                    Plaintiff

vs.

TUVIA MILSZTEIN, AKA ADAM MILSTEIN
_____
                                    Defendant

Case Number    2025-CAB-000655

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____
Address
Washington, DC 20007

202.888.8846
_____
Telephone

_Clerk of the Court_

By _____
                                    Deputy Clerk

Date        **May 2, 2025**
_____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____                    *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

_____         Por: _____
Dirección                                                                      Subsecretario

_____         Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828         Veuillez appeler au (202) 879-4828 pour une traduction         Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

A N E E S A   J O H N S O N
_____
                            Plaintiff

vs.

                                             Case Number   2025- CAB- 000655

G E O R G E   S H A M B A U G H
_____
                            Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

A b d e l -  R a h m a n   H a m e d
_____          _Clerk of the Court_
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____     By _____
Address                                                           Deputy Clerk
Washington, DC 20007
_____

202.888.8846
_____     Date   **May 2, 2025**
Telephone

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                                            Demandante

                        contra

                                                            Número de Caso: _____

_____
                                                            Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                        Por: _____

_____
Dirección                                                          Subsecretario

_____
                                        Fecha _____

_____
Teléfono

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
                          Plaintiff
         vs.

                                        Case Number   2025-CAB-000655

ILYA SHAPIRO
_____
                          Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____          _Clerk of the Court_
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____     By _____
Address                                               Deputy Clerk
Washington, DC 20007
_____

202.888.8846
_____     Date _____ **May 2, 2025**
Telephone
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828     ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección

Subsecretario

_____

Fecha _____

Teléfono

如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화해주십시오.       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]

Super. Ct. Civ. R. 4

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
                Plaintiff

vs.

RACHEL JESSICA WOLFF
_____
                Defendant

Case Number   2025-CAB-000655

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____
Address
Washington. DC 20007

202.888.8846
_____
Telephone

_Clerk of the Court_

By _____
         Deputy Clerk

Date _____ **May 2, 2025**

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요.    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                        Demandante

        contra

                                                        Número de Caso: _____

_____
                                        Demandado

**CITATORIO**

Al susodicho Demandado:

        Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

        A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                        *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                        Por: _____
_____
Dirección                                                    Subsecretario

_____
                                        Fecha _____
Teléfono
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 전화해 주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

eFiled
5/1/2025 9:35:58 PM
Superior Court
of the District of Columbia

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ANEESA JOHNSON
_____
                              Plaintiff

vs.

CANARY MISSION                          Case Number    2025-CAB-000655
_____
                              Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Abdel-Rahman Hamed
_____          _Clerk of the Court_
Name of Plaintiff's Attorney

PO Box 25085, 1215 31st St NW
_____          By _____
Address                                            Deputy Clerk
Washington, DC 20007
_____

202.888.8846
_____          Date        **May 2, 2025**
Telephone

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

_____                Por: _____
Dirección                                                                                    Subsecretario

_____

_____                Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**ANEESA JOHNSON**
c/o Hamed PLLC
P.O. Box 25085
Washington, DC 20027

*Plaintiff,*

v.

**GEORGETOWN UNIVERSITY**
37th and O Streets NW
Washington, D.C. 20057

**JOEL HELLMAN**
1309 35th St NW
Washington, DC 20007

**GEORGE SHAMBAUGH**
2806 Rifle Ridge Road
Oakton, VA 22124

**RACHEL JESSICA WOLFF**
235 Marvin Avenue
Los Altos, CA 94022

**CANARY MISSION**
c/o Central Fund of Israel
461 Central Ave
Cedarhurst, NY 11516

**HELEN DILLER FAMILY FOUNDATION**
121 Steuart Street
San Francisco, CA 94105

**JEWISH COMMUNITY FEDERATION** *of* **SAN FRANCISCO**
121 Steuart Street
San Francisco, CA 94105

**ILYA SHAPIRO**
209 Midvale St
Falls Church, VA 22046

**TUVIA MILSZTEIN, AKA ADAM MILSTEIN**
15910 Ventura Blvd, Suite 700
Encino, CA 91436

**ADAM AND GILA MILSTEIN FAMILY FOUNDATION**
15910 Ventura Blvd, Suite 700
Encino, CA 91436

**JOHN DOES 1–10**

*Defendant.*

Case No. 2025-CAB-655

JURY TRIAL DEMAND

# FIRST AMENDED COMPLAINT

Plaintiff Aneesa Johnson ("Ms. Johnson") files this Complaint against Defendants Georgetown University ("Georgetown" or "University"), Joel Hellman, George Shambaugh, Rachel Jessica Wolff, Canary Mission, Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Ilya Shapiro, Tuvia Milsztein, aka Adam Milstein, Adam and Gila Milstein Family Foundation, and John Does 1–10, and alleges as follows:

## I.    INTRODUCTION

1.    This case arises from Georgetown University's retaliatory behavior after three days of employment, including isolation and harm to Ms. Johnson's physical and psychological safety, leading to an unsubstantiated and discriminatory termination—a coordinated conspiracy involving Rachel Jessica Wolff (a then-Georgetown student), Canary Mission (a criminal cyberstalking operation), the Adam and Gila Milstein Family Foundation (a primary funder of dehumanization and suppression campaigns against advocates of Palestine and Palestinian human rights), and other institutional actors.

2.    These Defendants weaponized Canary Mission's cyberstalking profile of Ms. Johnson—which included decontextualized, eight-year-old, Twitter posts attributed to a deleted account belonging to Ms. Johnson when she was a college freshman—to justify her summary termination from Georgetown.

3.    Georgetown simultaneously protected and retained White, non-Muslim, Jewish, and Zionist faculty like Ilya Shapiro and Bruce Hoffman, who engaged in far more egregious misconduct targeting protected classes during their employment by Georgetown. This institutionalized double standard—punishing Palestinian advocacy while shielding

Zionist racism—exposes systemic discrimination enabled by third-party harassment, criminal cyberstalking operations, defamatory blacklists, sabotage by a foreign government, and donor-funded suppression of protected speech.

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction under D.C. Code § 11-921(a), as this action arises under the District of Columbia Human Rights Act ("DCHRA") and common law.

5.    This Court has concurrent jurisdiction over Plaintiff's Title VII claims under *Yellow Freight Sys., Inc. v. Donnelly*, which affirmed that state courts, including the Superior Court of the District of Columbia, retain jurisdiction over federal civil rights claims against private employers under 42 U.S.C. § 2000e et seq. 494 U.S. 820, 826 (1990).

6.    This Court has jurisdiction over Plaintiff's common law claims (defamation, IIED, breach of contract) under D.C. Code § 13-423, which arise from the same nucleus of operative facts as the DCHRA and Title VII claims.

7.    This Court maintains personal jurisdiction over all defendants at all times relevant to the allegations in this Complaint: Georgetown University, Joel Hellman, George Shambaugh, and Rachel Jessica Wolff were domiciled and conducted business within Washington, D.C.; Canary Mission systematically targeted D.C. institutions and residents through cyberstalking profiles and targeted harassment campaigns continuously directed at Ms. Johnson's employment in the District, establishing minimum contacts with this forum; and the Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Tuvia Milsztein, and the Adam and Gila Milstein Family Foundation purposefully availed themselves of this jurisdiction by funding Canary Mission's cyberstalking operations designed to suppress Palestinian advocacy in the District. Defendants Canary Mission, Wolff, and

Hellman also published defamatory content accessible nationwide, including in D.C., where it foreseeably caused direct harm to Ms. Johnson's career and reputation.

8.    Venue is proper under D.C. Code § 13-423(a)(1) because Georgetown University maintains its principal place of business at 37th and O Streets NW, Washington, D.C., all discriminatory acts—including Defendant Joel Hellman's email and Defendant's George Shambaugh's termination decision, Defendant's Rachel Jessica Wolff's targeted harassment campaign, and Georgetown's retaliatory termination—occurred within the District; Canary Mission's defamatory profile was accessed and weaponized by Georgetown employees and students within the District; and Canary Mission funding by the Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Tuvia Milsztein, and the Adam and Gila Milstein Family Foundation caused reputational harm, and physical and psychological harm to Ms. Johnson in her professional and personal communities both based in D.C. and across remote professional opportunities and personal inquiries.

## III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.    Ms. Johnson filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on April 12, 2024—within 300 days of her November 27, 2023, termination—satisfying jurisdictional prerequisites under *Epps v. Potomac Elec. Power Co.*, 389 F. Supp. 3d 53, 59 (D.D.C. 2019) (holding EEOC filing mandatory for Title VII claims).

10.    Ms. Johnson concurrently filed a charge with the D.C. Office of Human Rights (DCOHR) on April 12, 2024, meeting the DCHRA's exhaustion requirements under D.C. Code § 2-1403.04(a).

IV.    **PARTIES**

11.    **Plaintiff Aneesa Johnson** is a Muslim woman of African American and Palestinian descent. She was employed by Georgetown University as Assistant Director of Academic and Faculty Affairs from October 30, 2023, until her unlawful termination on November 27, 2023.

12.    **Defendant Georgetown University** is an educational institution incorporated in the District of Columbia, with its principal place of business at 37th and O Streets, N.W., Washington, D.C. 20057. The University publicly professes a mission "[e]stablished in 1789 in the spirit of the new republic...to promote intellectual, ethical and spiritual understanding through serious and sustained discourse among people of different faiths, cultures, and beliefs," which it claims to embody through "diversity of students, faculty and staff," "commitment to justice," and "international character." These representations stand in stark contrast to Georgetown's systemic suppression of Palestinian advocacy and retaliatory termination of Ms. Johnson, which betray its stated principles of inclusion and intellectual openness.

13.    **Defendant Joel Hellman** is the Dean of Georgetown's Walsh School of Foreign Service. At all relevant times, he acted within the scope of his employment at Georgetown's campus in Washington, D.C., where he published a defamatory email to 1,200+ students, faculty, and staff falsely implying Ms. Johnson posed a security threat, violating D.C. defamation law and DCHRA.

14.    **Defendant George Shambaugh** is the Director of the Master of Science in Foreign Service (MSFS) Program at Georgetown University. At all relevant times, he acted

within the scope of his employment at Georgetown's campus in Washington, D.C., where he unlawfully terminated Ms. Johnson and participated in discriminatory conduct.

15. **Defendant Rachel Jessica Wolff** was a dual-degree student at Georgetown's School of Foreign Service and Law Center residing in Washington, D.C. At all relevant times, she acted in Washington, D.C., where she spearheaded a targeted harassment campaign of hate amplifying Canary Mission's Zionist-funded cyberstalking operation on Ms. Johnson via defamatory tweets (1.2M+ views) triggering doxing, death threats of Ms. Johnson, and directly leading to Ms. Johnson's termination.

16. **Defendant Canary Mission** is an anonymous U.S.-based criminal cyberstalking operation funded by U.S.-based entities and headquartered in Israel. It maintains a principal place of business c/o Megamot Shalom, 13 Hillel Street in Jerusalem, Occupied Palestine, and a U.S. address of c/o Central Fund of Israel, 461 Central Ave, Cedarhurst, NY 11516. While headquartered in occupied Palestine, Defendant Canary Mission's anonymous cyberstalking operation has substantial contacts in Washington, D.C., where it targets Palestinian advocates at academic institutions. It is a deliberately opaque entity that maintains anonymity in its operations, funding, and organizational structure. It operates the cyberstalking website canarymission.org, which publishes cyberstalking dossiers targeting university students, faculty, and staff critical of the Zionist occupation, apartheid, and genocide in Palestine. Defendant Canary Mission is not a registered nonprofit in the United States, enabling its donors—including Defendant Helen Diller Family Foundation, Defendant Jewish Community Federation of San Francisco, and Defendant Adam and Gila Milstein Family Foundation—to evade public accountability for financing its criminal enterprise. Defendant Canary Mission is linked to Megamot Shalom, a Zionist nonprofit

registered as a public benefit corporation in Beit Shemesh, in occupied Palestine, which is a legal structure that allows anonymity for donors and avoids U.S. nonprofit disclosure requirements. Donations to Defendant Canary Mission are funneled through the Central Fund of Israel, a New York-based 501(c)(3) organization that acts as a financial intermediary for groups supporting Zionist settlements in Palestine and the perpetual occupation, apartheid, and genocide of Palestine and Palestinians through far-right Zionist organizations. Canary Mission's lack of transparency, coupled with its coordination with undisclosed donors and foreign entities, renders it a nominal defendant whose true stakeholders require discovery to unmask.

17.     **Defendant Helen Diller Family Foundation** is a California-based nonprofit organization located at 121 Steuart Street, San Francisco, CA 94105. It funneled $100,000 to Defendant Canary Mission through Israeli front groups to finance the cyberstalking and targeted harassment of Ms. Johnson.

18.     **Defendant Jewish Community Federation of San Francisco** is a nonprofit organization located at 121 Steuart Street, San Francisco, CA 94105. It funded Defendant Canary Mission via Megamot Shalom, enabling the cyberstalking and targeted harassment of Ms. Johnson.

19.     **Defendant Ilya Shapiro** is a former Georgetown Law administrator residing in Falls Church, VA. He participated in the targeted harassment campaign of hate against Ms. Johnson by amplifying Defendant Wolff's tweets to 500,000+ followers.

20.     **Defendant Tuvia Milsztein, aka Adam Milstein** is a California-based real estate investor, founder of the Adam and Gila Milstein Family Foundation, which funded

Defendant Canary Mission's cyberstalking and cyberbullying operations targeting Ms. Johnson. He is also a U.S.-operative for Defendant Canary Mission.

21.    **Defendant Adam and Gila Milstein Family Foundation** is a private foundation headquartered in Encino, California, that financed Canary Mission's harassment and cyberstalking campaigns, including that against Ms. Johnson, through Israeli intermediaries.

22.    **Defendant John Does 1-10** are unidentified operators of Canary Mission, funders, and collaborators who participated in the harassment campaign against Ms. Johnson.

## V.    FACTUAL ALLEGATIONS

### A. ANEESA JOHNSON, A MUSLIM WOMAN

23.    Aneesa Johnson grew up in a post-9/11 America where being a visibly Muslim woman meant navigating a landscape of pervasive discrimination, harassment, and fear. Like many Muslim women who wear the hijab, she became a visible target in an era of heightened Islamophobia, where the simple act of covering her head marked her as "other."[1]

24.    The statistics paint a stark picture of the world Ms. Johnson inhabited: 76.7% of Muslim women report experiencing Islamophobia in their lifetimes, compared to 58.6% of Muslim men.[2] This gendered discrimination manifests in deeply personal ways—Muslim

---

[1] Elsadig Elsheikh & Basima Sisemore, *Islamophobia Through the Eyes of Muslims*, OTHERING & BELONGING INST. (Sept. 29, 2021). Available at: https://belonging.berkeley.edu/sites/default/files/2021-10/Islamophobia%20Through%20the%20Eyes%20of%20Muslims.pdf.
[2] *Id.*

women regularly face having their hijabs forcibly removed, being spat upon, and enduring verbal assaults in public spaces.[3]

25.    Growing up, Ms. Johnson witnessed the dramatic surge in anti-Muslim hatred after 9/11, when FBI data showed anti-Muslim hate crimes skyrocketed from just 28 incidents in 2000 to 481 in 2001.[4] The trauma of this period created what scholars call "social isolation," as many Muslim families urged women and children to stay home or alter their appearance out of fear for their safety.[5]

26.    Like countless other Muslim women, Ms. Johnson had to carefully navigate educational and professional spaces. Studies show that Muslim women face a "triple penalty" in employment—discriminated against based on gender, religion, and ethnicity.[6] As an African American, the race factor meant Ms. Johnson faced a quadrupled penalty. The simple act of wearing a hijab reduces chances of receiving a job interview "close to zero."[7]

27.    The psychological toll of this constant discrimination is profound—93.7% of Muslims report that Islamophobia affects their emotional and mental wellbeing.[8] Even those who don't directly experience hate incidents feel constantly "monitored, judged, or excluded."[9] For visibly Muslim women like Ms. Johnson, this created what researchers call

---

[3] Sakshi Venkatraman & Mirna Alsharif, *For Muslim Americans, a Spike in Hate Incidents Feels Reminiscent of Post 9/11 Islamophobia*, NBC News (Oct. 31, 2023), https://www.nbcnews.com/news/asian-america/muslim-americans-spike-hate-incidents-feels-reminiscent-post-911-islam-rcna122570.

[4] Aymen Ati, *The Post-9/11 Securitisation of the Hijab and International Human Rights Law: The Strasbourg Court, Article 9 and Hijab Restrictions*, 5 QUEEN MARY HUM. RTS. L. REV. 1 (2019). Available at: https://ssrn.com/abstract=3425845.

[5] Salih Tuzer, *The Impact of Islamophobia on the Education and Religious Identity of Muslims in the USA*, 17 TURKISH J. FOR RELIGIOUS EDUC. STUD. 131 (2024). Available at: https://doi.org/10.53112/tudear.1462175.

[6] Marjorie Moya, *Forgotten Women: The Impact of Islamophobia on Muslim Women in France*, European Network Against Racism (May 2016). Available at: https://www.enar-eu.org/wp-content/uploads/forgotten_women_report_france_-_final.pdf.

[7] *Id.*

[8] *Supra*, n.1.

[9] *Id.*

"stereotype threat," negatively impacting everything from healthcare access to educational achievement.[10]

28.    Yet Ms. Johnson persevered, like many Muslim women who refuse to compromise their faith despite facing what scholars describe as being "caught at the intersection of bias against Islam, the racialized Muslim, and women."[11] Her story exemplifies both the unique burden carried by Muslim women in post-9/11 America and their remarkable resilience in the face of persistent discrimination.

## B. ANEESA JOHNSON, AN AFRICAN AMERICAN WOMAN

29.    Aneesa Johnson's story is woven into the broader tapestry of African American experience—one marked by generational trauma, systemic oppression, and remarkable resilience. Like millions of African Americans, she carries the weight of a history that began with the brutal institution of slavery, which for 250 years stripped Black Americans of their basic humanity.[12]

30.    This legacy of oppression did not end with emancipation. For nearly a century afterward, Jim Crow laws enforced a system of apartheid that denied basic rights, while extralegal violence terrorized Black communities. Between 1882 and 1968, over 3,446 African Americans were lynched, often for nothing more than perceived violations of racial hierarchy.[13]

---

[10] Goleen Samari, *Islamophobia and Public Health in the United States*, 106 AM. J. PUB. HEALTH 1920 (2016). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC5055770.

[11] Sahar F. Aziz, *From the Oppressed to the Terrorist: Muslim-American Women in the Crosshairs of Intersectionality*, 9 HASTINGS RACE & POVERTY L.J. 191 (2012). Available at: https://scholarship.law.tamu.edu/facscholar/100.

[12] Paula A. Braveman *et al.*, *Systemic and Structural Racism: Definitions, Examples, Health Damages, and Approaches to Dismantling*, 41 HEALTH AFF. 171 (2022). Available at: https://doi.org/10.1377/hlthaff.2021.01394.

[13] National Academies of Sciences, Engineering, and Medicine, *Advancing Antiracism, Diversity, Equity, and Inclusion in STEMM Organizations: Beyond Broadening Participation* (2023). Available at: https://doi.org/10.17226/26803.

31.     Today, Ms. Johnson navigates a society where 79% of African Americans report experiencing unfair treatment due to their race.[14] The trauma of this discrimination manifests in stark disparities—African Americans face a life expectancy nearly five years shorter than white Americans, with Black infants dying at more than twice the rate of white infants.[15]

32.     The economic toll is equally devastating. The average Black household income of $53,789 is barely 65% of white households, while Black families experience poverty at nearly triple the rate.[16] This financial inequality stems directly from historical policies like redlining and restrictive covenants that systematically denied Black Americans the opportunity to build generational wealth.[17]

33.     In professional settings, 57% of African Americans report discrimination in pay and promotions.[18] Even with higher education, Black Americans receive diminished returns on their achievements due to persistent structural racism that impedes access to opportunities and resources.[19]

34.     For Ms. Johnson, like countless other African Americans, this reality means carrying what researchers call "cultural trauma"—not just the direct experience of

---

[14] Sara N. Bleich *et al.*, *Discrimination in the United States: Experiences of Black Americans*, 54 HEALTH SERV. RES. 1399 (2019). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC6864380.

[15] Samantha Artiga, Latoya Hill & Marley Presiado, *How Present-Day Health Disparities for Black People Are Linked to Past Policies and Events*, KFF (Feb. 22, 2024), https://www.kff.org/racial-equity-and-health-policy/issue-brief/how-present-day-health-disparities-for-black-people-are-linked-to-past-policies-and-events/.

[16] Off. of Minority Health, *Black/African American Health*, U.S. Dep't of Health & Hum. Servs. (Jan. 16, 2025), https://minorityhealth.hhs.gov/blackafrican-american-health.

[17] L.A. Civil Rights Dep't, *An Examination of African-American Experiences in Los Angeles* (Aug. 2024), https://civilandhumanrights.lacity.gov/sites/g/files/wph2271/files/2024-08/LA%20Civil%20Rights%20-%20Reparations%20Report%20Executive%20Summary%20-%20An%20Examination%20of%20African%20American%20Experiences%20in%20Los%20Angeles%20(1).pdf.

[18] *Supra*, n.14.

[19] Mina Silberberg *et al.*, *The Role of Socioeconomic Status in a Community-Based Study of Diabetes Secondary Prevention Among African Americans*, 60 INT'L J. HEALTH PROMOTION & EDUC. 262 (2022). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC9782674.

discrimination, but the collective memory of centuries of oppression that shapes identity formation and daily life.[20] Yet her story also exemplifies the extraordinary resilience of African Americans who, generation after generation, have persisted and achieved in the face of systemic barriers designed to ensure their failure.[21]

### C. ANEESA JOHNSON, A PALESTINIAN WOMAN

35.    Aneesa Johnson's story reflects the systematic dispossession and institutionalized discrimination that Palestinians have endured under the Europe's Zionist apartheid regime in occupied Palestine. Her family's experience mirrors that of countless Palestinians who have faced state-sanctioned displacement through a complex web of discriminatory laws, policies, and practices designed to privilege "Jewish" settlers at the expense of indigenous Palestinians.

36.    The only life Ms. Johnson knows is one where the demolition of Palestinian homes and forced displacement represents a cornerstone of the Zionist apartheid system.[22] Ms. Johnson's family have been exiled since 1948, when the Zionist occupation—through sheer terrorism and depraved indifference to human life—demolished over 130,000 Palestinian homes and structures, systematically erasing entire villages and communities.[23] In 2023 alone, Israeli authorities demolished or seized 1,177 Palestinian structures—the highest number recorded since 2016.[24]

---

[20] Ron Eyerman, *Cultural Trauma: Slavery and the Formation of African American Identity*, in CULTURAL TRAUMA AND COLLECTIVE IDENTITY 60 (2004). Available at: https://doi.org/10.1525/california/9780520235946.003.0003.
[21] Karuna Meda, *What Is the Residual Impact of Slavery on African American Mental Health?*, Thomas Jefferson Univ. (Feb. 2023), https://www.jefferson.edu/news/2023/02/what-is-the-residual-impact-of-slavery-on-african-american-mental-health.html.
[22] Amnesty Int'l, *Israel's Apartheid Against Palestinians: Cruel System of Domination and Crime Against Humanity* (Feb. 1, 2022), https://www.amnesty.org/en/documents/mde15/5141/2022/en/.
[23] Israeli Comm. Against House Demolitions, *The Demolition of Palestinian Homes by Israel: A Fact Sheet* (Apr. 20, 2021), https://icahd.org/2021/04/20/the-demolition-of-palestinian-homes-by-israel-a-fact-sheet/.
[24] Office of the European Union Representative (West Bank and Gaza Strip, UNRWA), *One Year Report on Demolitions and Seizures in the West Bank, Including East Jerusalem* (Nov. 19, 2024), Reporting Period: Jan. 1 –

37.    The 2018 Nation-State Law codified what Palestinians like Ms. Johnson's family had long experienced—an explicit constitutional mandate declaring "Jewish settlement" as a national value requiring state promotion.[25] This law formalized a system where Palestinians are treated as an "inferior racial group and systematically deprived of their rights."[26]

38.    Ms. Johnson's family is impacted by the Zionist occupation's maintenance of "Jewish" domination over Palestinians through sweeping restrictions on movement, confiscation of Palestinian land, forced displacement of communities, denial of residency rights, suspension of basic civil rights, among others.[27]

39.    While conscientious people around the world read and research the plight of Palestinians, Ms. Johnson's family know how the Zionist occupation imposes territorial fragmentation to separate Palestinian communities, discriminatory land and property seizures, systematic denial of building permits, forced evictions and home demolitions, and denial of the right to return.[28]

40.    The Palestinian experience of being denied a home stands at the heart of the Zionist occupation's apartheid system.[29] For Ms. Johnson's family, like millions of

---

Dec. 31, 2023. Available at: https://www.eeas.europa.eu/sites/default/files/documents/2024/One%20Year%20Report%20on%20Demolitions%20and%20Seizures%20in%20the%20West%20Bank%20including%20East%20Jerusalem%20-%201%20January%20%2031%20December%202023.pdf.

[25] Hum. Rts. Watch, *A Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecution* (Apr. 27, 2021), https://www.hrw.org/report/2021/04/27/threshold-crossed-israeli-authorities-and-crimes-apartheid-and-persecution.

[26] *Supra*, n.22.

[27] Lama Fakih & Omar Shakir, *Does Israel's Treatment of Palestinians Rise to the Level of Apartheid?*, Hum. Rts. Watch (Dec. 5, 2023), https://www.hrw.org/news/2023/12/05/does-israels-treatment-palestinians-rise-level-apartheid.

[28] *Supra*, n.22.

[29] *Id.*

Palestinians, this meant watching her ancestral home seized through "a cruel system" of "Jewish" domination and "crime against humanity."[30]

41.     This system of oppression continues today, with Palestinians facing ongoing dispossession through home demolitions, land confiscation, and forced displacement—all carried out under the explicit mandate of maintaining Jewish dominance.[31] The trauma of this systematic erasure echoes through generations of Palestinian families like Ms. Johnson's, who have witnessed their communities fragmented and their rights systematically denied under a regime that explicitly privileges one ethnic-religious group over another.

### D. Zionist Weaponization of "Jewish" Identity to Terrorize Advocates Affirming the Human Dignity of Palestinians

42.     For Palestinians like Ms. Johnson, the psychological trauma of occupation and apartheid is inextricably linked to symbols and declarations of "Jewishness"—not by their choice, but by the explicit and repeated framing of their oppression as specifically Jewish by the Zionist occupation itself.[32]

43.     The Zionist occupation has constructed a comprehensive system of domination that explicitly privileges Jewish settlers while systematically oppressing indigenous Palestinians. This system manifests through laws that enshrine "Jewish settlement" as a national value, military orders conducted under what the Zionist occupation declares as a "Jewish army," forced displacement conducted in the name of maintaining "Jewish

---

[30] *Id.*
[31] *Supra*, n.25.
[32] Amal Jamal, *Jewish Sovereignty and the Inclusive Exclusion of Palestinians: Shifting the Conceptual Understanding of Politics in Israel/Palestine*, 4 Frontiers Pol. Sci. 995371 (2022). Available at: https://www.frontiersin.org/journals/political-science/articles/10.3389/fpos.2022.995371/full.

demographic dominance," and an apartheid regime that explicitly prioritizes Jewish settlers.[33] This dehumanizing system has confronted Ms. Johnson her whole life.

44.    For Palestinians like Ms. Johnson, every aspect of daily oppression is deliberately branded as "Jewish" by their oppressors.[34] For example, home demolitions carried out under the Star of David, checkpoints emblazoned with symbols of Jewish sovereignty, settlements explicitly established for "Jewish-only" residence, and military operations conducted under what the Zionist occupation calls the "Jewish flag."[35]

45.    Whether surviving the inhumanity of the Zionist occupation, apartheid, and genocide directly or secondarily as a displaced refugee living in exile, the psychological burden is particularly acute because Palestinians are told to separate their trauma from its explicitly Jewish branding. All while suffering under laws that redefine the occupied Palestinian territories as exclusively "the nation-state of the Jewish people," suffering discrimination justified through "Jewish demographic needs,"[36] watching their homes demolished to make way for what the Zionist occupation calls "Jewish settlement," and being subject to military rule by what the Zionist occupation proclaims as its "Jewish army."[37]

46.    For Palestinians like Ms. Johnson, the documented severity of the mental health impact is too familiar. From high rates of anxiety disorders and PTSD to transgenerational trauma from decades of occupation and deep psychological wounds from daily humiliation.

---

[33] *Supra*, n.22 & n.25.
[34] Lydia Wilson, *The Psychology of the Intractable Israel-Palestine Conflict*, New Lines Mag. (Oct. 24, 2023), https://newlinesmag.com/argument/the-psychology-of-the-intractable-israel-palestine-conflict/.
[35] *Supra*, n.22 & n.25.
[36] Gershon Shafir, *(Re)framing Jewish Privilege and Rebuffing Arab Rights*, Project on Middle E. Pol. Sci. (2023), https://pomeps.org/reframing-jewish-privilege-and-rebuffing-arab-rights.
[37] *Supra*, n.22 & n.25.

47.    For Palestinians like Ms. Johnson, the psychological trauma of occupation and apartheid is not merely linked to violence and displacement, but to the explicit branding of that oppression as specifically "Jewish" by Zionist occupation itself. This creates a complex psychological burden where victims must process their trauma through symbols their oppressors have deliberately transformed from religious markers into emblems of Zionist inhumanity.

48.    Despite this incredible trauma, Ms. Johnson is not one to conflate Judaism with oppression, racism, and hate. She understands the reality that European Zionists are desperate to legitimize their extermination project in Palestine by deliberately framing their occupation, apartheid system, and terrorism as "Jewish."

### E.  CANARY MISSION'S DANGEROUS AND RACIST WEB OF HATE AND PERSECUTION

49.    Canary Mission operates as an anonymous blacklisting website that systematically targets Palestinian rights advocates, particularly students and academics, through coordinated harassment campaigns designed to damage their professional and educational opportunities.

50.    The organization maintains a database of detailed profiles containing personal information, photos, and social media history of targeted individuals, overwhelmingly focusing on African American, Arab, Muslim, Palestinian, and Jewish students and faculty, as well as their supporters.

51.    Canary Mission's public database profiles over 10,000 students, professors, and organizations critical of Israel, which immigration authorities have weaponized to target non-citizen activists. For example, Columbia University graduate student Mahmoud Khalil was arrested by ICE after Canary Mission highlighted his pro-Palestinian leadership, while the

group's 2025 "Uncovering Foreign Nationals" campaign explicitly urged deportation of activists based on visa status and political views.

52.    An investigation by The Nation revealed that Canary Mission receives funding through a complex network including the Jewish Community Federation of San Francisco and the Helen Diller Family Foundation, deliberately obscuring its operational structure through various pass-through entities.[38]

53.    *The Grayzone* reported that Canary Mission's domain registration was initially linked to Howard David Sterling, a pro-Israel attorney who has described investment in Israeli companies as a means to "protect Israel" through economic ties. Though Sterling's attorney denied ownership, bank records showed donations to Canary Mission accompanied by a phone number registered in Sterling's name through 2015.[39]

54.    The censored Al Jazeera documentary *The Lobby – USA* identified Adam Milstein—a convicted tax felon and founder of the Israeli-American Council—as a key Canary Mission funder. Milstein's foundation partners with the Israel on Campus Coalition (ICC), which endorsed Canary Mission in its 2016-2017 annual report as a "strong deterrent against antisemitism and BDS activism."[40]

55.    The organization's tactics include publishing misleading dossiers designed to appear in Google searches, making false accusations of terrorism and antisemitism,

---

[38] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 27, 2023), https://www.thenation.com/article/world/canary-mission-israel-covert-operations/.

[39] Hamzah Raza & Max Blumenthal, *Who Is Behind Canary Mission's Anonymous Anti-Palestinian Blacklisting Website?*, The Grayzone (Aug. 22, 2018), https://thegrayzone.com/2018/08/22/meet-the-owner-of-canary-missions-anonymous-anti-palestinian-blacklisting-website/.

[40] Siniver, A. (Ed.), *Routledge Companion to the Israeli-Palestinian Conflict*, Routledge (2022), https://doi.org/10.4324/9780429027376.

contacting employers and academic institutions about targets, and coordinating with Israeli authorities to facilitate border detentions.

56.     The Israeli Ministry of Strategic Affairs coordination with Canary Mission to use student data to suppress voices, including in the District, reflects intentional targeting of U.S. institutions, including D.C. institutions, as the Ministry's 2023 internal strategy memo prioritized neutralizing anti-Zionist influence through covert operations.

57.     As a result of their Canary Mission profiles, individuals affirming the humanity of Palestinians have experienced denial of entry to the occupied Palestinian territories, arbitrary detentions,[41] interrogations by U.S. federal agents, loss of employment and educational opportunities, and severe emotional distress and self-censorship.

58.     Canary Mission collaborates with U.S. police to punish Palestinian advocacy. For example, Seton Hall Law School contacted the FBI to interrogate Palestinian-American student Ahmad Aburas after Canary Mission falsely accused him of supporting terrorism for stating "We are all Resistance" during Israel's 2014 Gaza bombing campaign.

59.     Internal documents obtained by the American-Jewish newspaper The Forward demonstrate that Canary Mission coordinates with Israeli government agencies.[42]

60.     The Jewish Federation of San Francisco has acknowledged funding Canary Mission through Megamot Shalom, a Zionist organization that serves as a U.S. front for the Israeli Ministry of Strategic Affairs.[43]

---

[41] J Street, *J Street U Leaders to Israel's Minister Erdan: Detention of Lara Alqasem Is Dangerous and Wrong*, J Street (Oct. 10, 2018), https://jstreet.org/press-releases/j-street-u-leaders-to-israels-minister-erdan-detention-of-lara-alqasem-is-dangerous-and-wrong/.
[42] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info To Bar Activists*, The Forward (Oct. 4, 2018), https://forward.com/news/411453/israel-uses-canary-mission-blacklist-info-to-bar-activists/.
[43] *Id.*

61.    Major Jewish organizations have condemned Canary Mission's hatemongering. The Jewish Telegraphic Agency described Canary Mission's methods as "antithetical to . . . democratic and Jewish values" and "morally reprehensible" for using "hateful," "Islamophobic," and "racist" rhetoric "to villainize individuals" involved "with pro-Palestinian causes" "under the guise of combating anti-Semitism."[44] J Street called it a "right-wing organization" that "aims to promote a toxic atmosphere of harassment and fear on US college campuses and beyond."[45] T'ruah, the Rabbinic Call for Human Rights labeled it "Jewish McCarthyism."[46]

62.    Canary Mission's defamatory profile of Ms. Johnson remains the top Google search result for her name as of February 2025, constituting ongoing publication. Each new view of the profile—including by prospective employers and academic institutions—constitutes a new publication.

## F.    STRATEGIC USE OF ANTISEMITISM ACCUSATIONS AS POLITICAL DOG WHISTLES IN ZIONIST AND ISRAELI INFLUENCE CAMPAIGNS

63.    Canary Mission is just one of a network of organizations and individuals who have systematically weaponized accusations of antisemitism to suppress advocacy for Palestinian rights in the United States. Groups like StopAntisemitism and the Adam and Gila Milstein Family Foundation (MFF) employ tactics ranging from doxing and blacklisting to funding campus initiatives that conflate criticism of Israel with antisemitism. These efforts

---

[44] Gabrielle Roth and Joseph Goldberg, *Jewish Students: Blacklist of BDS Supporters Hurting Efforts to Defend Israel on Campus*, Jewish Telegraphic Agency (Apr. 23, 2018), https://www.jta.org/2018/04/23/ideas/jewish-students-blacklist-bds-supporters-hurting-efforts-defend-israel-campus.
[45] *Supra*, n.42.
[46] T'ruah, *Young Jewish Activists Furious Over SF Federation's Support of Canary Mission*, T'ruah, https://truah.org/coverage/young-jewish-activists-furious-over-sf-federations-support-of-canary-mission. *See also* Andrew Rehfeld, *What the Taboo on Criticizing Israel Can Teach Us About Cancel Culture*, The Forward (Jul. 20, 2020), https://forward.com/opinion/451118/free-speech-warriors-and-the-jewish-community-have-a-double-standard-on/.

align with broader Israeli government objectives to erase Palestinian narratives and punish dissent, often under the guise of combating hate.

64.     **The Adam and Gila Milstein Family Foundation (MFF)** funds campus groups that conflate anti-Zionism with antisemitism while marginalizing Palestinian perspectives. MFF grants support "cultural events" hosting speakers who equate criticism of Israel with hate speech and collaborate with the American-Israeli Political Action Committee (AIPAC) to lobby for legislation focused on supporting the Zionist occupation, apartheid, and genocide of Palestine and Palestinians. In 2023, MFF directed funds to influence UCLA's student government against Palestinian solidarity resolutions, undermining campus democracy. The foundation also promotes anti-BDS laws that penalize advocacy for Palestinian rights, framing boycott efforts as antisemitic.

65.     The Adam and Gila Milstein Family Foundation funded Canary Mission through Megamot Shalom, an Israeli front organization, as documented in *The Nation*'s investigative report (Dec. 22, 2023). Internal footage from Al Jazeera's *The Lobby – USA* captured Eric Gallagher, a Jewish Zionist operative, stating: "Adam Milstein's the guy who funds [Canary Mission]" while discussing coordination with Milstein about launching "name-and-shame" campaigns.[47] Though Milstein publicly denied funding Canary Mission,[48] the Al Jazeera footage and financial records from the Jewish Community Federation of San Francisco confirm his foundation's role in channeling donations through Megamot Shalom to sustain Canary Mission's criminal enterprise.[49]

---

[47] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 22, 2023).
[48] Josh Nathan-Kazis, *Pro-Israel Donor Adam Milstein Denies Report That He Funds Canary Mission*, Times of Israel (Jan. 4, 2019).
[49] Nora Barrows-Friedman, *Jewish Community Federation Admits It Secretly Funded Canary Mission*, Electronic Intifada (Apr. 9, 2019).

66.     Milstein's foundation collaborated with the Israeli Ministry of Strategic Affairs—a government body tasked with suppressing Palestinian advocacy globally—to weaponize Canary Mission's blacklist. As reported by *The Forward* (Oct. 3, 2018), the Ministry used Canary Mission profiles to detain and deport Palestinian Americans like Lara Alqasem at Ben Gurion Airport, demonstrating institutional coordination.[50] This partnership aligns with the Ministry's admitted strategy of "countering delegitimization" through covert operations targeting U.S. campuses, as detailed in James Bamford's *Democracy Now!* interview (Dec. 27, 2023).[51]

67.     The Adam and Gila Milstein Family Foundation deliberately targeted its efforts at the District of Columbia by funding Canary Mission's operations targeting Georgetown students and faculty, including profiles of MSFS community members.

68.     **StopAntisemitism**, founded by Zionist extremist Liora Rez, operates as a far-right cyberstalking group that systematically targets Muslim, Arab, Jewish, African American, and Palestinian activists under the guise of combating antisemitism. While claiming to address prejudice against Jewish communities, the organization almost exclusively focuses on silencing criticism of the Israeli occupation, apartheid, and genocide of Palestine and Palestinians. Its primary tool is doxing: publishing personal details of activists, students, and academics to incite harassment and professional retaliation. For example, Turkish student Rumeysa Ozturk was arrested by ICE after StopAntisemitism amplified an article she co-authored decrying the genocide of Palestinians by Zionist state

---

[50] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info To Bar Activists*, The Forward (Oct. 4, 2018).
[51] *Who Funds Canary Mission? James Bamford on Group That Doxxes Students & Profs for Palestine Activism*, Democracy Now! (Dec. 27, 2023).

actors, demonstrating how the group weaponizes personal information to endanger livelihoods and suppress dissent.

69.    The group employs coded language that invokes historic antisemitic conspiracies while accusing others of bigotry. Terms like "globalists" and "foreign nationals" are deployed to frame critiques of Israeli policies as existential threats to Jewish safety, echoing Nazi-era tropes about Jewish dual loyalty and global domination. This rhetorical strategy deliberately conflates anti-Zionism with antisemitism, erasing distinctions between state criticism and religious hatred. By labeling phrases like "Free Palestine" as inherently antisemitic, StopAntisemitism stifles protected political speech while amplifying the very stereotypes it claims to oppose.

70.    StopAntisemitism coordinates with government agents, university administrators, and employers to punish targeted individuals. Internal emails and public records reveal campaigns to revoke visas, terminate employment, and blacklist activists. For instance, the group pressured New York University to investigate Professor Amin Husain for organizing pro-Palestinian teach-ins, citing fabricated "security concerns." Such actions institutionalize discrimination by treating Palestinian advocacy as a disciplinary offense, violating Title VI protections against national origin discrimination and academic freedom principles.

71.    Prominent Jewish voices, including Rabbi David Mivasair and Jewish Voice for Peace, condemn StopAntisemitism's tactics as counterproductive. They argue that equating Jewish safety with unwavering support for Israel fuels actual antisemitism by reinforcing harmful stereotypes. As Mivasair stated, "This group doesn't protect Jews—it weaponizes Jewish trauma to legitimize apartheid." These critiques underscore how

StopAntisemitism's actions alienate allies, fracture coalitions, and ultimately endanger marginalized communities under the pretense of safeguarding them.

### G. Ms. Johnson Twitter Posts as a College Freshman in 2015

72.     In 2015, Ms. Johnson was a freshman at Northwestern University. Like many Palestinians witnessing the devastating impacts of repeated cycles of Zionist military bombardments, she expressed her anguish, opposition, and frustration to Zionist policies and violence. Her expressions at the time reflected that of a teenager, who is continuously affected by secondary trauma—as a Muslim woman in post-9/11 America, a descendant of violently dispossessed and displaced Palestinian refugees, and an African American navigating systemic White Supremacy.

73.     As a college freshman, Ms. Johnson made three posts on Twitter. The first post was a tweet that read, "Ever since going to NU I have a deep seeded hate for Zio b**ches. They bring out the worst in me." The second post was a tweet that read, "You know why I call them Zio b**ches, because they're dogs."

74.     The third post was a retweet of another tweet. The retweeted tweet had a photo of a scowling Charedi boy with the following caption: "When the whole world hates you bc you a thief and grow up looking like a shaytan #GrowingUpIsraeli."

75.     The photo of the scowling boy was first featured in a blog in 2011 by Mike Isaacson, a British Zionist settler, lawyer, and professional online troll who disapproves of Charedi Zionist settlers. Isaacson features the photo of the Charedi boy scowling at him for walking his dogs down a Charedim street in the "Anglo part" of Bayt Nattif's Ain Shams outside Jerusalem—European Zionist settlers had ethnically cleansed Bayt Nattif's Palestinian inhabitants and renamed Ain Shams "Bet Shemesh." In his blog, Isaacson mocks

Charedim religious attire and calls them "penguins" and "nutters." He also describes Charedim as "ridiculously anachronistic, lazy, chutzpadik . . . violent, spongers and parasites." Isaacson likens European Charedi settlers to "the skinheads and 'yobs' of our boyhood in England" for telling him "which of its streets we could and could not walk."[52]

76.    Ms. Johnson's three Twitter posts—two tweets and a retweet—were borne of her lived experience as an African American Palestinian teenager whose family endured displacement, dispossession, and ongoing trauma under Israel's occupation, apartheid, and genocide.

77.    These posts coincided with her leadership in Northwestern University's student-led divestment movement, where she organized protests and advocated for the university to divest from companies complicit in Israel's occupation, apartheid, and genocide in Palestine. As a freshman in 2015, Ms. Johnson participated in campus demonstrations opposing Northwestern's investments in corporations like Caterpillar and Elbit Systems— companies directly implicated in the demolition of Palestinian homes and military occupation.

78.    Ms. Johnson's advocacy mirrored broader student efforts documented in *After More Than Five Hours of Debate, ASG Senate Narrowly Passes NUDivest Resolution*, where Northwestern students later voted to demand divestment from "companies that violate Palestinian human rights."[53] This context underscores how Ms. Johnson's social media activity reflected protected political speech tied to her advocacy, not antisemitism.

---

[52] Mike Isaacson, *Spitters and Splitters: What Have the Charedim Ever Done for Us?*, Melchett Mike (Dec. 31, 2011), https://melchettmike.wordpress.com/2011/12/31/spitters-and-splitters-what-have-the-charedim-ever-done-for-us/.
[53] Shane McKeon, *After More Than Five Hours of Debate, ASG Senate Narrowly Passes NUDivest Resolution*, THE DAILY NORTHWESTERN (Feb. 19, 2015), https://dailynorthwestern.com/2015/02/19/campus/after-debate-associated-student-government-senate-narrowly-passes-nudivest-resolution-bds-divestment-northwestern/

79.    Ms. Johnson helped lead a cross-faith coalition of Muslim, Christian, Jewish, agnostic, and atheist students that forced Northwestern University to establish its Advisory Committee on Investment Responsibility in 2023 - a direct result of their successful campaign exposing the University's investments in Caterpillar and Elbit Systems, companies fueling human rights violations against Palestinians. This hard-won victory followed their 2023 ASG Senate resolution demanding divestment (passed 24-22 after a 5-hour debate), mirroring Northwestern's 2005 Sudan divestment and 2015 coal divestment campaigns that students had to drag from proposal to action through relentless pressure.

## H. Coordinated Zionist Campaign to Target Anti-Zionist Students, Academics, and Professionals

80.    In 2015, during Ms. Johnson's freshman year and after her Twitter posts, she became a target of Canary Mission.

81.    The harassment campaign against Ms. Johnson was not random but part of a systematic effort by Canary Mission to target Palestinian, Arab, Muslim, and students of color. In a national climate marked by rising Muslim hate and anti-Arab racism, Canary Mission's smear campaign deliberately exposed already marginalized campus communities to additional surveillance, harassment, and physical danger.

82.    In Ms. Johnson's case, Canary Mission weaponized her social media posts through a deliberate campaign of decontextualization and defamation, stripping her protected political speech of its historical context during a period of intense Israeli military violence against Palestinian civilians. This malicious distortion triggered a cascade of professional and personal devastation.[54]

---

[54] William Clark, *In Focus: Community Members Say Northwestern Is Neither a Safe Nor Free Space for Conversations About Palestine and Israel*, The Daily Northwestern (Mar. 2,

83.     Canary Mission's profile deliberately omitted Ms. Johnson's role in Northwestern's divestment campaigns, which began during her freshman year. The university's own history of student-led divestment efforts—including the 2005 Sudan divestment and 2019 fossil fuel protests—demonstrates a pattern of institutional resistance to ethical investment policies.[55]

84.     Ms. Johnson's advocacy placed her in the crosshairs of groups like Canary Mission, which systematically targets Palestinian rights organizers. As documented in *As NU Reestablishes Advisory Committee on Investment Responsibility*, Northwestern's administration has historically dismissed divestment proposals, creating a hostile environment for conscientious student advocates like Ms. Johnson.[56]

85.     Ms. Johnson, like many students targeted by Canary Mission, experienced severe harassment and threats to her safety, forcing her to close her social media accounts and withdraw from public activism.

86.     Canary Mission's defamatory profile of Ms. Johnson remains the top Google search result for her name as of February 2025. Each new view of the profile—including by prospective employers and academic institutions—qualifies as a republication of the defamatory content.

---

2023), https://dailynorthwestern.com/2023/03/02/featured-stories/in-focus/community-members-say-northwestern-is-neither-a-safe-nor-free-space-for-conversations-about-palestine-and-israel/.

[55] Nineth Kanieski Koso, *As NU Reestablishes Advisory Committee on Investment Responsibility, Students and Faculty Express Skepticism*, THE DAILY NORTHWESTERN (Oct. 16, 2024), https://dailynorthwestern.com/2024/10/16/lateststories/as-nu-reestablishes-advisory-committee-on-investment-responsibility-students-and-faculty-express-skepticism/ (noting Fossil Free NU's 2015 coal divestment campaign).

[56] *Id.* (quoting Prof. David Uttal).

## I. POST-TARGETING PROFESSIONAL PERSEVERANCE

87.     Following Canary Mission's 2015 smear campaign, Ms. Johnson abandoned her public social media presence to avoid further harassment. This silencing tactic mirrors findings from The Intercept's survey of over 60 blacklisted individuals, where 43% "toned down their activism" and 42% suffered acute anxiety due to the profiles.[57]

88.     Despite the psychological toll—documented as causing "self-censorship and psychological warfare effects" among targets—Ms. Johnson completed her studies.[58] Her experience aligns with broader trends where Palestinian students endure systemic intimidation but persist academically under duress.

89.     Ms. Johnson rebuilt her career discreetly, avoiding public political engagement to evade further targeting. This reflects a common survival strategy among Canary Mission victims, who often face lasting professional harm and economic precarity due to employer discrimination.[59]

## J. MS. JOHNSON'S MERITORIOUS QUALIFICATIONS AND SELECTION BY GEORGETOWN

90.     Ms. Johnson, a highly qualified candidate of Palestinian and African American heritage, applied for the Assistant Director of Academic and Faculty Affairs position at Georgetown University's Walsh School of Foreign Service (MSFS) on August 31, 2023.

91.     Her credentials—including advanced degrees, professional experience, and alignment with Georgetown's mission—led to a swift interview process.

---

[57] Alex Kane, *"It's Killing the Student Movement": Canary Mission's Blacklist of Pro-Palestine Activists Is Taking a Toll*, THE INTERCEPT (Nov. 22, 2018), https://theintercept.com/2018/11/22/israel-boycott-canary-mission-blacklist/.

[58] *Id.*

[59] *Id. See also* Comm. on Acad. Freedom, Middle E. Stud. Ass'n of N. Am., *Resource Guide to Counteract Dangerous Risk of Canary Mission Website* (Apr. 18, 2017), https://mesana.org/news/2018/04/18/committee-on-academic-freedom-shines-light-on-secretive-website-that-defames-students-offers-resource-for-college-leaders-to-take-action.

92.     On September 20, 2023, Ms. Johnson had a successful Zoom interview with MSFS leadership, including Director George Shambaugh and Deputy Director Ashley Lenihan.

93.     On September 27, 2023, Ms. Johnson had an in-person interview that comprised of a series of meetings with faculty and students, where she demonstrated genuine connection and meaningful engagement.

94.     As part of her interview process, Ms. Johnson met with the MSFS Director George Shambaugh and the Director of Academic and Faculty Affairs Rebecca Caro. Both offered valuable insights into the role and its responsibilities.

95.     Ms. Johnson also had an engaging and thoughtful meeting with three MSFS students. The students shared their perspectives on the program and asked Ms. Johnson insightful questions about how she would support their academic journey.

96.     Ms. Johnson also met with another staff member and future colleague, who helped round out her understanding of the MSFS team's dynamics and goals.

97.     All the discussions were rich and engaging. Each meeting or question was tailored not just to evaluate Ms. Johnson's qualifications, but also to gauge how well she aligned with the values and vision of the MSFS program.

98.     On October 2, 2023, Georgetown extended Ms. Johnson an unconditional offer letter. Eager to positively contribute to the MSFS team's culture and help further the MSFS mission, Ms. Johnson accepted.

**K. GEORGETOWN'S DISCRIMINATORY SCRUTINY AND HOSTILE ONBOARDING**

99.     Georgetown's enthusiasm for Ms. Johnson collapsed immediately upon learning of her African American and Palestinian identity.

100.    During a welcoming lunch on her first day on October 30, 2023, faculty members interrogated Ms. Johnson about her heritage.

101.    Professor Shantayanan Devarajan asked if she was Sudanese, then pressed further when she disclosed her Palestinian roots.

102.    Director George Shambaugh redirected conversation to the "war in Gaza," making Ms. Johnson visibly uncomfortable and upset—forcing colleagues to intervene.

103.    Shambaugh's decision to redirect conversation to the "war in Gaza" during Ms. Johnson's welcome lunch did far more than breach professional decorum—it reduced her Palestinian identity to a crude political trope and brought Ms. Johnson to tears. This act exemplifies how Palestinians in America are systematically stripped of their humanity and recast as perpetual proxies for geopolitical conflict.

104.    Ms. Johnson's experience reflects a well-documented pattern in U.S. institutions where Palestinian identity is weaponized to erase individuality, enforce silence and normalize collective punishment. Georgetown is no exception.

105.    Ms. Johnson was flattened into a symbol of the so-called "Israeli-Palestinian conflict," denied the right to exist outside politicized narratives. As scholar Rashid Khalidi notes, "Palestinians in America are rarely seen as people—only as problems."[60]

106.    The implicit demand by Georgetown that Ms. Johnson explicitly denounce an action or state her position on Palestine before being granted basic respect creates what the

---

[60] Rashid Khalidi, *The Hundred Years' War on Palestine: A History of Settler Colonialism and Resistance, 1917–2017* (Metropolitan Books 2020).

Rutgers Center for Security, Race, and Rights calls a "loyalty test" not imposed on other groups.[61]

107.    Ms. Johnson's tears stemmed not from personal fragility, but from the trauma of being forced to answer for the Zionist occupation, apartheid, and genocide targeting her ancestral homeland and family—a burden no other ethnic group is made to bear.

108.    Ms. Johnson does not use the term "genocide" as a rhetorical device, but as a concrete legal prohibition that exists in federal and international law. *See* 18 U.S.C § 1091 (implementing the Genocide Convention).[62] Israel's genocidal conduct in Palestine has been recognized by international courts,[63] United Nations experts,[64] genocide scholars,[65] leading medical professionals,[66] and even U.S. courts,[67] among others. Demanding an end to this

---

[61] Ctr. for Sec., Race & Rts., Rutgers L. Sch., *Presumptively Antisemitic: Islamophobic Tropes in the Palestine–Israel Discourse* (Nov. 2023), https://csrr.rutgers.edu/wp-content/uploads/2023/11/csrr-presumptively-antisemitic-report.pdf.

[62] The crime of genocide occurs when someone "whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—(1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group." 18 U.S.C. § 1091; *see also* Convention on the Prevention and Punishment of the Crime of Genocide, December 9, 1948, General Assembly Resolution 260, entered into force on January 12, 1951, ("The Genocide Convention"), Article II.

[63] *See* International Court of Justice, Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.

[64] *See, e.g.,* United Nations, "Anatomy of a Genocide, Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Francesca Albanese," A/HRC/55/73 (March 25, 2024), https://perma.cc/9GRF-XR7K; United Nations, "Gaza: UN Human Rights Experts Call on International Community to Prevent Genocide Against the Palestinian People—OHCHR Press Release" (November 16, 2023), https://perma.cc/XDS8-PJF2.

[65] *See, e.g.,* "Declaration of William A. Schabas in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-5 (November 16, 2023), https://perma.cc/4MH2-ENU5; *see also* "Declaration of Dr. John Cox, Dr. Victoria Sanford and Dr. Barry Trachtenberg in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-6 (November 16, 2023), https://perma.cc/3RPE-F6AN.

[66] *See, e.g.,* "[Proposed] Brief of Amici Curiae Medical Doctors in Support of Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss," 4:23-cv-05829-JSW, Document 52-1 (December 30, 2023), https://perma.cc/A68V-DU4C.

[67] In his decision in *Defense for Children International-Palestine v. Biden*, Judge Jeffrey S. White noted that "the undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony of the Plaintiffs and the expert opinion

genocide and justice for the people being annihilated is not only lawful and constitutionally protected, but also a legal imperative upon all nations under the Genocide Convention.[68]

## L.  COORDINATED ONLINE ZIONIST CAMPAIGN OF HATE AGAINST MS. JOHNSON

109.    Rachel Jessica Wolff—a Zionist dual degree student at Georgetown's School of Foreign Service and Georgetown University Law Center—identified Ms. Johnson as a target to attack through Ms. Johnson's introductory email to the MSFS community, which included students, faculty, and professional staff.

110.    Wolff proceeded to search Ms. Johnson's name. The first result featured on the search engines was Canary Mission's hateful and racist dossier on Ms. Johnson from eight years earlier. Wolff made it her mission to malign Ms. Johnson and started a hateful doxing and harassment campaign.



---

proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide." 714 F.Supp.3d 1160, 1163 (N.D. Cal. 2024). (Because the Judge granted Defendants' Motion to Dismiss based on the political question doctrine, this section of the opinion does not have legal force as a factual finding).
[68] The Genocide Convention, supra note 1, Article I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 43, 221, ¶ 430.

111.    On November 1, 2023, at 10:17 PM, Wolff initiated her targeted harassment

and hate campaign against Ms. Johnson by posting a defamatory tweet that rapidly went viral,

garnering over 1.2 million views, 404 comments, 6,300 likes, 2,000 retweets, and 329

bookmarks within hours.



112.    Wolff's tweet relied on Ms. Johnson's decontextualized social media posts

from 2015, when Ms. Johnson was a college freshman, deliberately stripping them of their

historical context.

113.    As if the first tweet was not enough, Wolff continued her instigation with a

second tweet, using one of the racist features by Canary Mission to shame Georgetown for

hiring Ms. Johnson in the first place.



114.    The viral tweet was amplified by Canary Mission, the Israeli government, and other Zionist accounts, exponentially increasing its reach and the subsequent harassment directed at Ms. Johnson.



115.    Among those who retweeted Wolff's tweet was Georgetown's very own "Constitutional Law and Supreme Court Expert" Ilya Shapiro, who served as the executive director and senior lecturer at the Georgetown Center for the Constitution.



116.    On November 2, 2023, at 8:22 AM, George Shambaugh, the Director of the MSFS Program, called Ms. Johnson instructing her not to come to the office due to "unspecified threats to her safety."

117.    At 9:43 AM, Shambaugh called again, placing Ms. Johnson on paid administrative leave without due process or explanation.

118.    At 10:42 AM, Ms. Johnson received an email from Joel Hellman, the Dean of the School of Foreign Service, to the entire school community implicitly affirming the racist and defamatory campaign of hate targeting Ms. Johnson, further compounding her distress.

119.    At 10:53 AM, Ms. Johnson received her first hate message in her work email, marking the beginning of direct harassment.

120.    Around noon, Ms. Johnson learned of Wolff's viral tweet about her for the first time, despite having never met or interacted with Wolff.

121.    Throughout the evening of November 2, Ms. Johnson was subjected to extensive doxing, with her personal information shared across various Zionist and Israeli social media accounts and websites.

122.    By 2:40 PM on November 2, 2023, less than 17 hours after Wolff's initial tweet, Georgetown had placed Ms. Johnson on administrative leave pending an investigation, demonstrating the immediate and severe professional consequences of this coordinated attack.



123.    The harassment escalated to national prominence when Zionist mouthpiece Ben Shapiro published an article on November 2, 2023, about Ms. Johnson on The Daily

Wire,[69] mentioned her by name in his podcast,[70] and on his YouTube channel,[71] making Ms. Johnson a target of hateful threats and attacks to an even larger audience.

124.    Shapiro falsely conflates Ms. Johnson's criticisms of Zionism with antisemitism, weaponizing her 2015 tweets to paint her as a threat. This article remains live on The Daily Wire as of February 2025.

125.    Ben Shapiro repeats the same defamatory claims from his article, amplifying them to his audience of millions. The episode remains accessible on The Daily Wire's platform.

## M. Georgetown's Discrimination and Unlawful Termination of Ms. Johnson

126.    Just before 5 PM on November 2, 2023, Ms. Johnson received a letter from her director informing her that she had been placed on administrative leave. The letter stated that, "[t]he university is currently investigating allegations related to your online conduct. Specifically, it is alleged that you have engaged in serious misconduct which, if substantiated, would be in violation of University policies, including professional conduct policies."

127.    Georgetown's School of Foreign Service issued a statement claiming they were unaware of Johnson's background when hiring her and that she was placed on immediate administrative leave pending an investigation of her past social media comments.

---

[69] Ben Shapiro, *The Islamophobic Lie*, Daily Wire (Nov. 2, 2023), https://www.dailywire.com/news/the-islamophobic-lie ("Georgetown just hired the radical anti-Semite Aneesa Johnson as new assistant director of academic and faculty affairs, who posted about 'Zio bitches' saying, 'They're dogs.'").
[70] Ben Shapiro, *Ep. 1843 – The Islamophobia Lie*, Daily Wire (Nov. 3, 2023), https://www.dailywire.com/episode/ep-1843-the-islamophobia-lie (Timestamp: 00:49 – 1:24).
[71] Ben Shapiro, *Ep. 1843 – The Islamophobia Lie*, YouTube (Nov. 3, 2023), https://youtu.be/PN32UIj1mf0 (Timestamp: 00:49 – 1:24).

128.    On November 8, Ms. Johnson sent a letter to Georgetown documenting concerns of discriminatory conduct. Georgetown did not heed Ms. Johnson's complaints of discrimination.

129.    On November 27, 2023, Georgetown terminated Ms. Johnson's employment. Her termination letter stated,

> "This letter is to inform you that your probationary employment as Assistant Director of Academic and Faculty Affairs in the Master of Science in Foreign Service Program with Georgetown University is terminated effective November 27, 2023. This decision has been made pursuant to Human Resources Policy #204: Probationary Employment Period.
>
> On Thursday, November 2, 2023, you were placed on paid administrative leave, pending an investigation into your alleged misconduct. Specifically, the University investigated allegations that you engaged in unprofessional conduct based on your social media activity, including, but not limited to posts from 2015 which were shared with Georgetown University during the first week of your employment, which began on October 30, 2023. Your social media conduct has had a significantly negative impact on the MSFS Program and in extension its Walsh School of Foreign Service and the wider Georgetown Community. It also impacts your ability to engage fully with members of our community.
>
> The University's review concluded that you engaged in unprofessional conduct based on the postings that you made and your subsequent failure to address concerns raised by your social media activities . . .
>
> It is for these reasons that the University has decided to terminate your employment during the probationary period and in accordance with Human Resources Policy #204: Probationary Employment Period, which states in part that:
>
> "Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment. However, if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior us unacceptable, the University may terminate employment at any time during the probationary period . . ."

130.    As a result of this coordinated campaign by all Defendants, Ms. Johnson suffered panic attacks, insomnia, and anxiety. She endured permanent association with "antisemite" in Google searches—where Canary Mission's defamatory profile remains the top result as of February 2025—destroying her academic and professional trajectory. Faced with credible threats of violence, she was initially forced to deactivate her public social media accounts and permanently delete certain online profiles. While Ms. Johnson eventually resumed limited advocacy under strict privacy settings and pseudonymous accounts, she did so with persistent apprehension, constant vigilance against further retaliation, and irreversible damage to her ability to safely engage in public-facing work—a direct consequence of Defendants' harassment.

131.    Georgetown's swift action in response to Wolff's campaign, without due process or thorough investigation, reveals the institution's discrimination and complicity in weaponizing anonymous blacklists against Palestinian voices in academia.

132.    In Ms. Johnson's case, Canary Mission's profile deliberately stripped context from her social media posts, presenting them in a misleading manner designed to damage her professional reputation and employment prospects.

133.    Georgetown University's termination of Ms. Johnson exemplifies a coordinated campaign to suppress Palestinian advocacy, demonstrating pretext and discriminatory intent through its selective enforcement of policies against protected speech. This pattern of institutional bias against Palestinian identity substantiates Ms. Johnson's Title VII and DCHRA claims, as Georgetown weaponized blacklists created through coordinated harassment campaigns—such as Canary Mission's defamatory profiles—to justify her termination. The University's reliance on these tactics, combined with its deliberate

indifference to the severe emotional and professional harm inflicted by doxing and death threats, further establishes the extreme and outrageous conduct necessary for her intentional infliction of emotional distress claim. Collectively, these actions reveal a systemic effort to silence Palestinian voices through discriminatory employment practices and institutionalized repression.

## N. DISPARATE TREATMENT AND COMPARATOR EVIDENCE DEMONSTRATING PATTERN OF DISCRIMINATORY ANIMUS

134.    Georgetown University's Human Resources Policy #204 explicitly states: "Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment. However, if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior is unacceptable, the University may terminate employment at any time during the probationary period." This policy mandates due process absent severe misconduct.

135.    Georgetown University has demonstrated a pattern of disparate treatment in its handling of controversial speech and conduct by employees, favoring non-Muslim and pro-Israel voices while discriminating against Palestinian and Muslim perspectives.

136.    **Comparator 1: Ilya Shapiro**. Ilya Shapiro, a white male Jewish Zionist senior lecturer and executive director for the Georgetown Center for the Constitution at the Georgetown University Law Center, serves as a critical comparator demonstrating Georgetown's discriminatory double standards.

137.    As a member of multiple privileged protected classes, Shapiro publicly tweeted that President Biden's Supreme Court nominee would be a "lesser Black woman," directly targeting a protected class (Black women) and creating a hostile educational environment.



138.    Despite this misconduct, Georgetown placed Shapiro on paid administrative leave during a four-month investigation, granted him full due process with faculty and student input, reinstated him without disciplinary action, and explicitly invoked its "Speech and Expression Policy" and Policy #204's protections to justify retaining Shapiro and shielding him from consequences.

| Factor | Ms. Johnson | Ilya Shapiro |
|---|---|---|
| Protected Class | Muslim, Palestinian, African American, Female | White, Jewish, Male, Zionist |
| Position | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Executive Director, Georgetown Center for the Constitution (retained). |
| Misconduct | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Racist tweet about a female African American judge while serving as executive director and senior lecturer at the Georgetown Center for the Constitution. |
| Investigation | None; suspended within 3 days and terminated in less than a month without due process. | Yes, with 4-month paid administrative leave; full faculty/student input. |
| Disciplinary Action | Immediate suspension and termination | Reinstated with no discipline |
| Application of Georgetown University Policy No. 204 | No | Yes |

|  | ("normally allow completion" mandate ignored) | (invoked to justify retention) |
|---|---|---|
| Georgetown's Justification | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | Invoked "Speech and Expression Policy" to protect racist speech |

139.    This preferential treatment—afforded to an employee who targeted a protected class—stands in stark contrast to Georgetown's summary termination of Ms. Johnson for far less severe conduct, when she was teenager, exposing the university's systemic bias against Palestinian and Muslim voices.

140.    **Comparator 2: Bruce Hoffman**. Bruce Hoffman, a white male Jewish Zionist faculty member, engaged in discriminatory conduct by comparing Northern Virginia infrastructure to "Mogadishu"—invoking racist tropes about Somalia—and claiming TikTok was "turning a whole generation into anti-Semites," yet faced no investigation or discipline from Georgetown University.

141.    Despite this misconduct, which targeted protected classes and amplified hateful racist stereotypes, Georgetown not only retained Hoffman but promoted him to a leadership role overseeing "Countering Hate and Intolerance," demonstrating institutional reward for anti-Muslim and racist rhetoric.

142.    This disparate treatment starkly contrasts with Georgetown's summary termination of Ms. Johnson for far less severe conduct when she was a teenager.

| Factor | Ms. Johnson | Bruce Hoffman |
|---|---|---|
| **Protected Class** | Muslim, Palestinian, African American, Female | White, Jewish, Male, Zionist |
| **Position** | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Tenured Professor, Director of Center for Jewish Civilization (promoted). |
| **Misconduct** | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Compared Northern Virginia infrastructure to "Mogadishu" (racist tropes); claimed TikTok creates "anti-Semites" (ageist inflammatory generalizations). |
| **Investigation** | None; suspended within 3 days and terminated in less than a month without due process. | No investigation. |
| **Disciplinary Action** | Immediate suspension and termination | Promoted to oversee "Countering Hate and Intolerance" initiatives. |
| **Application of Georgetown University Policy No. 204** | No ("normally allow completion" mandate ignored) | N/A (no misconduct review) |
| **Georgetown's Justification** | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | Rewarded with leadership role despite anti-Muslim rhetoric. |

143.    The university's selective enforcement of its policies reveals systemic bias favoring protected classes aligned with institutional power structures.

144.    **Comparator 3: Danielle Pletka**. Danielle Pletka, a white female Jewish Zionist adjunct professor at Georgetown's Walsh School of Foreign Service, engaged in misconduct by repeatedly labeling critics of Israeli policies as "terrorist sympathizers" and "insubordinate

morons," rhetoric that targeted protected groups and created a hostile environment for Palestinian and Muslim students.

145.    Despite this conduct, which directly implicated protected classes and violated Georgetown's stated commitment to inclusive discourse, the university took no disciplinary action against Pletka and continues to employ her as a faculty member.

| Factor | Ms. Johnson | Danielle Pletka |
|---|---|---|
| Protected Class | Muslim, Palestinian, African American, Female | White, Jewish, Female, Zionist |
| Position | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Adjunct Professor, Walsh School of Foreign Service (retained). |
| Misconduct | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Labeled critics of Israel as "terrorist sympathizers" and "insubordinate morons" (dehumanizing racist rhetoric). |
| Investigation | None; suspended within 3 days and terminated in less than a month without due process. | No investigation. |
| Disciplinary Action | Immediate suspension and termination | Continued teaching with no consequences. |
| Application of Georgetown University Policy No. 204 | No ("normally allow completion" mandate ignored) | N/A (no misconduct review) |
| Georgetown's Justification | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | Tolerated defamatory speech under academic freedom. |

146.    This disparate treatment, protecting Pletka's inflammatory speech while terminating Ms. Johnson for far less severe conduct, when she was a teenager, when the two are similarly situated in all material respects, underscores Georgetown's systemic bias against Palestinian and Muslim voices.

147.    **Comparator 4: Yonatan Green**. Yonatan Green, a white male Jewish Zionist Georgetown Fellow, faced no consequences for his derogatory dismissal of Palestinian narratives of displacement, which he labeled as "baseless victimhood"—conduct that targeted protected groups and undermined Palestinian students' experiences.

148.    Despite this misconduct, Georgetown took no investigative or disciplinary action against Green and retained him as a fellow with full privileges, continuing his access to students and academic resources.

| Factor | Ms. Johnson | Yonatan Green |
|---|---|---|
| **Protected Class** | Muslim, Palestinian, African American, Female | White, Jewish, Male, Zionist |
| **Position** | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Georgetown Fellow (retained). |
| **Misconduct** | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Dismissed Palestinian displacement narratives as "baseless victimhood" – mocked Palestinian trauma (denial of protected class experiences, dehumanizing rhetoric, and hatemongering). |
| **Investigation** | None; suspended within 3 days and terminated in less than a month without due process. | No investigation. |

| Disciplinary Action | Immediate suspension and termination | Retained as fellow with full privileges. |
|---|---|---|
| Application of Georgetown University Policy No. 204 | No<br>("normally allow completion" mandate ignored) | N/A<br>(no misconduct review) |
| Georgetown's Justification | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | No action taken despite targeting Palestinian students. |

149.    This disparate treatment, protecting Green's inflammatory speech while terminating Ms. Johnson for far less severe conduct, when she was a teenager, when the two are similarly situated in all material respects, further evinces Georgetown's systemic bias against Palestinian voices.

150.    **Plaintiff Aneesa Johnson**. As a Muslim woman of Palestinian and African American descent, Aneesa Johnson belongs to multiple protected classes under federal and local anti-discrimination laws.

151.    Georgetown University subjected her to severe adverse employment actions under Policy #204—including immediate administrative leave without investigation and termination within three days of employment—based solely on her 2015 social media posts when she was a teenager criticizing Israeli state policies.

152.    While Georgetown cited its probationary employment policy to justify bypassing due process, this pretextual rationale starkly contrasts with its treatment of non-Palestinian, non-Muslim, and non-African American Zionist employees who engaged in more egregious misconduct, demonstrating that Georgetown applied policies disparately to discriminate against Ms. Johnson and suppress protected political speech.

153.    In short, Georgetown treated Ms. Johnson disparately as compared to other individuals who are similarly situated in all material respects: non-Palestinian, non-Muslim, non-African American Zionist employees like Shapiro, Hoffman, Pletka, and Green engaged in far more severe misconduct—including racist speech targeting protected classes (Black women, Muslims, and Palestinians)—yet retained positions or received promotions, while Ms. Johnson faced summary termination for criticizing the violence of occupation, apartheid, and genocide when she was a teenager.

154.    Georgetown weaponized its Speech and Expression Policy to suppress Ms. Johnson's protected political speech while shielding non-Palestinian, non-Muslim, non-African American Zionist employees' discriminatory conduct, exposing systemic bias at Georgetown that privileges Zionist non-Muslim, non-Palestinian, and non-African American voices over Palestinian, Muslim, and anti-racist advocacy.

155.    Georgetown's disparate policy enforcement is evidence of pretext. Georgetown applied Policy #204 protectively to Shapiro (racist speech) but punitively to Ms. Johnson (protected political speech). This deviation-denying Ms. Johnson probationary completion while permitting Shapiro's-exposes anti-Palestinian bias masquerading as neutral policy application.

156.    Georgetown University's selective enforcement of its policies demonstrates systemic discrimination through three interrelated mechanisms:

      a. Disparate impact, as Palestinian, African American, and Muslim anti-Zionist employees like Ms. Johnson are held to far stricter standards than non-Palestinian, non-Muslim, and non-African American Zionist peers;

b. Pretextual rationale, wherein Georgetown's reliance on a "probationary period" justification directly conflicts with Policy #204's mandate to "normally allow completion" absent evidence of severe misconduct; and

c. Causal nexus, evidenced by the immediate termination following backlash to Ms. Johnson's Palestinian identity rather than any objective performance deficiencies.

157. This pattern of institutional bias—elevating Zionist, non-African American, non-Palestinian, and non-Muslim voices while suppressing Palestinian advocacy—reflects the application of policies disparately to punish protected political speech and discriminate against the immutable characteristics in Ms. Johnson's identity.

158. Georgetown University's systemic discrimination violates Title VII and the DCHRA by tolerating racist and anti-Muslim speech from non-Palestinian Zionist faculty, punishing dated protected political speech from Palestinian employees like Ms. Johnson, and maintaining institutional bias through inconsistent application of policies.

159. This pattern demonstrates preferential enforcement of speech protections for Zionist and non-Muslim voices while weaponizing university protocols to suppress Palestinian advocacy, thereby perpetuating a discriminatory double standard that unlawfully disadvantages African American, Muslim, Palestinian, and anti-Zionist individuals.

## VI.    CAUSES OF ACTION

<u>**COUNT I**</u>
**42 U.S.C. § 2000e et seq.**
**(Discrimination Based on Race, Religion, and National Origin)**
Against Defendant Georgetown University

160. Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

161.    Georgetown University discriminated against Ms. Johnson on the basis of her race (African American and Arab), religion (Muslim), and national origin (Palestinian) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

162.    Georgetown's actions, including but not limited to placing Ms. Johnson on administrative leave and terminating her employment based on unverified allegations about her social media posts from 2015, constitute adverse employment actions.

163.    Georgetown's proffered reasons for these adverse actions are pretextual, as evidenced by its disparate treatment of non-Muslim and Zionist employees who made racist statements.

164.    Under *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988), Title VII protects employees' right to oppose discriminatory practices, even when such advocacy implicates political or geopolitical issues. The Ninth Circuit held that Title VII "does not require us to approve an employer's religious practices no matter how unreasonable they might be" and emphasized the statute's purpose to "protect employees . . . from being forced into religious practices by their employers." Here, Ms. Johnson's 2015 social media posts criticized Zionist Occupation policies of forced displacement and military violence, not Jewish people or religious practices. Georgetown's termination for this advocacy mirrors *Townley*'s forbidden compulsion-punishing opposition to state-sponsored discrimination under the guise of neutrality.

165.    Ms. Johnson's posts align with *Townley*'s protected conduct: they targeted Israeli military operations and settlement expansion, analogous to employees opposing compulsory religious practices in *Townley*. Unlike Georgetown's retained faculty who made anti-Muslim, anti-African America, anti-immigrant, anti-Palestinian racist remarks, Ms.

Johnson never criticized Judaism or Jewish identity, which is antithetical to the hate ideology of Zionism. Her advocacy sought to oppose policies the United Nations and leading human rights organizations have condemned as occupation, apartheid, and genocide—squarely falling under Title VII's protection of opposition to systemic discrimination.

166.    Title VII's clear mandate regulates employment decisions tied to protected advocacy, even when involving foreign policy issues. Georgetown's termination constitutes domestic discrimination against a female Muslim employee of African American and Palestinian descent, not a foreign policy judgment.

167.    Title VII shields employees who oppose discriminatory state practices, even if politically contentious. Georgetown's termination of Ms. Johnson for criticizing Israeli policies—while retaining faculty who denigrated Muslims, immigrants, African Americans, and Palestinians—exposes unlawful viewpoint discrimination masquerading as neutral policy enforcement. This double standard violates Title VII's core prohibition against punishing advocacy that challenges systemic oppression.

## COUNT II
### D.C. Code § 2–1402.11
### (Discrimination Based on Race, Religion, and National Origin)
Against Defendants Georgetown University, Joel Hellman,
George Shambaugh, and Rachel Jessica Wolff

168.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above, as well as the legal and factual predicate for Count I.

169.    Georgetown University discriminated against Ms. Johnson on the basis of her race, religion, and national origin in violation of the D.C. Human Rights Act, D.C. Code § 2-1402.11.

170.    The D.C. Human Rights Act provides broader protections than Title VII and allows for individual liability of the Georgetown employees involved in the discriminatory actions against Ms. Johnson. Specifically, Defendants Hellman, Shambaugh, and Wolff.

### COUNT III
### D.C. Code § 2–1402.62
### (Aiding and Abetting Discrimination)
Against Defendants Adam and Gila Milstein Family Foundation,
Tuvia Milsztein (Adam Milstein), Canary Mission, John Does 1-10,
Helen Diller Family Foundation, and Jewish Community Federation of San Francisco

171.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

172.    Adam Milstein and the Adam and Gila Milstein Family Foundation violated D.C. Code § 2-1402.62 by aiding and abetting Georgetown University's discriminatory conduct. Through their funding of Canary Mission—a cyberstalking and harassment operation that targeted Ms. Johnson for her Palestinian identity and protected speech—they directly facilitated the creation and dissemination of defamatory profiles used to justify her termination.

173.    Investigative reporting by Al Jazeera's *The Lobby – USA* and The Nation confirms the Milstein Foundation funded Canary Mission through Israeli intermediaries like Megamot Shalom, which collaborated with the Israeli Ministry of Strategic Affairs to suppress Palestinian advocacy at U.S. institutions, including Georgetown.

174.    The Milstein Foundation's financial support enabled Canary Mission to maintain Ms. Johnson's dossier as the top Google search result for her name—nearly 10 years after Canary Mission published its profile of Ms. Johnson—which Georgetown weaponized to manufacture pretextual grounds for termination. This satisfies § 2-1402.62's prohibition against "invit[ing] or compell[ing]" discriminatory acts through third-party coordination.

## COUNT IV
### 42 U.S.C. § 2000e et seq.
### (Hostile Work Environment)
Against Defendant Georgetown University

175.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

176.    Georgetown University created and permitted a hostile work environment that was severe, pervasive, and targeted Ms. Johnson based on her protected characteristics as a Muslim woman of Palestinian descent.

177.    During Ms. Johnson's welcome lunch, Georgetown subjected her to a hostile work environment by interrogating her about her Palestinian roots and immediately invoking the "war in Gaza, reducing her Palestinian identity to a crude political trope.

178.    Georgetown also failed to protect Ms. Johnson from harassment and instead participated in the creation of a hostile environment by placing her on administrative leave and terminating her employment based on a coordinated campaign of harassment.

## COUNT V
### D.C. Code § 2–1402.11
### (Hostile Work Environment)
Against Defendants Georgetown University, Joel Hellman,
George Shambaugh, and Rachel Jessica Wolff

179.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

180.    During Ms. Johnson's welcome lunch, Georgetown subjected her to a hostile work environment by interrogating her about her Palestinian roots and immediately invoking the "war in Gaza, reducing her Palestinian identity to a crude political trope.

181.    Georgetown also failed to protect Ms. Johnson from harassment and instead participated in the creation of a hostile environment by placing her on administrative leave and terminating her employment based on a coordinated campaign of harassment.

182.    Under D.C. Code § 2-1402.11(c-2)(3) (2022), Ms. Johnson's hostile work environment claim requires no showing that the conduct was "severe or pervasive." Instead, the Court must analyze the totality of circumstances, including: (a) the power imbalance between Rachel Jessica Wolff, a student, and Ms. Johnson, a staff member, which allowed Wolff to weaponize Georgetown's policies to destroy Ms. Johnson's career; (b) the frequency and duration of the harassment campaign, which unfolded over 72 hours and reached 1.2 million viewers via Wolff's viral tweet, amplified by Georgetown's retaliatory termination; (c) the humiliating nature of false antisemitism accusations and violent implications in the Defendant Hellman's mass email; and (d) Georgetown's institutional complicity in failing to investigate or curb Wolff and Canary Mission's harassment despite actual knowledge.

183.    Georgetown demonstrated deliberate indifference under D.C. Code § 2-1402.62 by: (1) failing to protect Ms. Johnson from Wolff's coordinated harassment after receiving her complaint on November 2, 2023; (2) allowing Canary Mission's dossier—a product of institutionalized anti-Palestinian bias—to influence employment decisions, violating DCHRA's prohibition on aiding/abetting discrimination; and (3) ignoring the power disparity between Wolff (a Zionist student) and Ms. Johnson (a staff member), which enabled student-led harassment of an employee through Georgetown's own policies.

184.    Under D.C. Code § 2-1402.11(c-2)(4)(A), Defendant Joel Hellman's November 2, 2023, mass email alone suffices to establish liability. The email: (1) falsely branded Ms. Johnson a "security threat" to over 1,200 students, faculty, and staff; (2) exploited her

Palestinian identity to justify discriminatory termination under the guise of community safety; and (3) caused immediate professional ostracization and severe emotional distress, satisfying the statutory threshold for a hostile environment.

185.    The interplay of Georgetown's actions—interrogating Ms. Johnson about Gaza during onboarding, amplifying Wolff's harassment through institutional inaction, and terminating her without due process—collectively created an intimidating, hostile, and offensive work environment under D.C. Code § 2-1402.11(c-2)(2)(A). This systemic discrimination reflects a deliberate pattern of anti-Palestinian, anti-Muslim, and anti-African American bias, privileging Zionist narratives while suppressing protected speech and identity.

## COUNT VI
### 42 U.S.C. § 2000e-3(a)
### (Retaliation)
Against Defendant Georgetown University

186.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

187.    Georgetown University retaliated against Ms. Johnson for engaging in protected activity, including her attempts to defend herself against unsubstantiated allegations and her past advocacy for Palestinian rights.

188.    The adverse actions taken against Ms. Johnson, including her placement on administrative leave and subsequent termination, were causally connected to her protected activities.

## COUNT VII
### D.C. Code § 2–1402.61
### (Retaliation)
Against Defendants Georgetown University, Joel Hellman, and George Shambaugh

189.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

190.    Georgetown University retaliated against Ms. Johnson for engaging in protected activity, including her attempts to defend herself against unsubstantiated allegations and her past advocacy for Palestinian rights.

191.    The adverse actions taken against Ms. Johnson, including her placement on administrative leave and subsequent termination, were causally connected to her protected activities.

## COUNT VIII
### 42 U.S.C. § 1981
### (Racial Discrimination in Contractual Rights)
Against Defendants Georgetown University, George Shambaugh, Rachel Jessica Wolff, Canary Mission, John Does 1-10, Tuvia Milsztein (Adam Milstein), and Adam and Gila Milstein Family Foundation

192.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

193.    42 U.S.C. § 1981 guarantees "all persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."

194.    Georgetown terminated Ms. Johnson's employment contract due to racial animus against her Palestinian and African American identity.

195.    Comparators Danielle Pletka (White, Female, Jewish Zionist) and Ilya Shapiro, Bruce Hoffman, and Yonatan Green—all of whom are White, Male, Jewish Zionists—retained positions despite more actual misconduct (racist tweets targeting African American women and anti-Muslim, anti-Palestinian, anti-immigrant, racist, and dehumanizing rhetoric), demonstrating disparate enforcement of contracts under Policy No. 204.

196.    Individual defendants George Shambaugh and Rachel Jessica Wolff directly participated in discriminatory contract interference by weaponizing Georgetown's policies to terminate Ms. Johnson.

197.    Third parties Adam Milstein and Canary Mission intentionally infringed Ms. Johnson's contractual rights by funding/creating defamatory profiles used to justify termination.

## COUNT IX
## 42 U.S.C. § 1985(3)
## (Civil Rights Conspiracy)
Against all Defendants

198.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

199.    Under 42 U.S.C. § 1985(3), it is unlawful for two or more persons to conspire to deprive any person or class of persons of the equal protection of the laws.

200.    The Defendants engaged in a coordinated conspiracy to terminate Ms. Johnson and suppress Palestinian advocacy when Georgetown University relied on Canary Mission's defamatory dossier—funded by the Milstein Family Foundation—to justify her termination, while retaining non-Palestinian employees who engaged in comparable or worse conduct.

201.    Rachel Jessica Wolff initiated the harassment campaign by publishing tweets that triggered doxing and death threats, amplified by Ilya Shapiro's retweet to 500,000+ followers.

202.    The conspiracy targeted Ms. Johnson as a Muslim woman of Palestinian and African American descent, reflecting anti-Palestinian, anti-Muslim, and anti-Black animus. This satisfies § 1985(3)'s requirement of racial, or perhaps otherwise class-based, invidiously discriminatory animus.

203.    The conspiracy deprived Ms. Johnson of her right to equal employment opportunities under 42 U.S.C. § 1981 and her First Amendment right to criticize state-sponsored violence.

## COUNT X
### (Civil Conspiracy)
Against all Defendants

204.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

205.    The Defendants engaged in a coordinated conspiracy to suppress Palestinian advocacy and destroy Ms. Johnson's career (a) when Adam Milstein and the Milstein Foundation funded Canary Mission's harassment and cyberstalking operations targeting Ms. Johnson, channeling donations through Megamot Shalom, (b) when Canary Mission created and maintained a defamatory profile of Ms. Johnson, ensuring it remained the top Google search result for her name, (c) when Rachel Jessica Wolff initiated a viral harassment and cyberstalking campaign by publishing decontextualized tweets about Ms. Johnson's 2015 posts, directly triggering her termination, and (d) when Georgetown University weaponized Canary Mission's dossier to terminate Ms. Johnson within 3 days while retaining non-Palestinian employees like Ilya Shapiro for worse misconduct.

206.    This conspiracy directly caused Ms. Johnson's termination, reputational ruin, and severe emotional distress. The interplay of funding (Milstein), cyberstalking (Canary Mission), harassment (Wolff), and institutional retaliation (Georgetown) reflects a "meeting of the minds" to punish protected speech.

## COUNT XI
### (Breach of Contract)
Against Defendant Georgetown University

207.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

208.    Georgetown University breached its contractual obligations to Ms. Johnson, including those set forth in its own policies and procedures regarding non-discrimination, due process, and freedom of expression.

209.    Georgetown's actions violated the implied covenant of good faith and fair dealing inherent in Ms. Johnson's employment agreement.

## COUNT XII
### (Defamation)
Against all Defendants

210.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

211.    On November 2, 2023, Defendant Joel Hellman sent a mass email to the entire MSFS community, which implied Ms. Johnson posed a "security threat" by stating: "*We take all threats to our community seriously and are conducting a thorough review of this* matter"—a claim wholly unsupported by evidence and designed to falsely suggest her conduct warranted security intervention. This implication was baseless given Georgetown's decision to retain Ilya Shapiro after his tweet about President Biden's Supreme Court nominee being a "lesser Black woman," which was widely condemned as racist and misogynistic and led to protests and calls for his termination, yet did not result in his termination or a similar public warning.

212.    Georgetown HR's termination letter dated November 27, 2023, falsely accused Ms. Johnson of "unprofessional conduct" and asserted her social media activity when she

was a teenager had a "significantly negative impact" on the Georgetown community eight years later, a claim contradicted by its retention of faculty like Ilya Shapiro who engaged in far more egregious conduct, and while ignoring identical conduct by Professor Bruce Hoffman, who retained his position after comparing Northern Virginia infrastructure to "Mogadishu."

213.    Director George Shambaugh's verbal assertions to colleagues that Ms. Johnson's social media posts created "safety concerns," implying violent tendencies without factual basis.

214.    Employer communications to colleagues or students constitute actionable "publication" for defamation, a standard met here through Georgetown's widespread dissemination of false statements: Joel Hellman's November 2, 2023 email falsely implying Ms. Johnson posed a security threat reached over 1,200 students, faculty, and staff; HR's termination letter falsely accusing her of "unprofessional conduct" was shared with MSFS leadership; and Director George Shambaugh's defamatory remarks about "safety concerns" were disseminated to academic advisors, collectively satisfying the publication requirement under D.C. law.

215.    Georgetown University acted with actual malice or reckless disregard for the truth by failing to investigate the context of Ms. Johnson's 2015 social media posts, ignoring exculpatory evidence of her exemplary employment record, and applying contradictory standards by retaining Ilya Shapiro despite his racist tweets—all while falsely accusing her of "unprofessional conduct" and posing a "security threat."

216.    This defamation caused direct harm to Ms. Johnson's reputation, including loss of employment opportunities at peer institutions, permanent association with "security threat" allegations in Google search results, and social ostracization within academic circles.

217.    Under D.C. law, Ms. Johnson satisfies the elements of defamation per se: (1) false statements; (2) publication to third parties via emails and termination letters; (3) fault through reckless disregard for truth; and (4) presumed harm due to the defamatory statements' impact on her professional standing.

218.    Adam Milstein and the Adam and Gila Milstein Family Foundation published defamatory statements about Ms. Johnson by financing Canary Mission's dossier, which contained deliberately decontextualized social media posts from 2015. Their funding ensured the profile remained publicly accessible, causing permanent reputational harm.

219.    The Milstein Foundation acted with actual malice, as evidenced by its documented coordination with the Israeli Ministry of Strategic Affairs to suppress Palestinian advocacy and its prior knowledge of Canary Mission's harassment campaigns. Funding defamatory content constitutes publication when intended to reach third parties like employers.

## COUNT XIII
### (Intentional Infliction of Emotional Distress)
Against all Defendants

220.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

221.    The defamatory statements remain actionable because Canary Mission's profile continues to be publicly accessible as of February 2025, satisfying the "continuing publication" exception to D.C. Code § 12-301(4)'s one-year statute of limitations.

222.    Georgetown University's actions constituted extreme and outrageous conduct, as Georgetown allowed Rachel Jessica Wolff's viral tweet (1.2M views) to trigger coordinated doxing that published Ms. Johnson's personal information across pro-Israel social media accounts, failing to protect her after faculty member Ilya Shapiro amplified Wolff's defamatory post to his 500,000+ followers, and ignoring her November 8, 2023 harassment complaint while enabling Shapiro—a White male Zionist employee retained despite racist tweets—to weaponize his platform against her.

223.    The harassment caused medically significant harm: Ms. Johnson suffered panic attacks, insomnia, and anxiety, endured permanent association with "antisemite" in Google searches that destroyed her academic and professional career, receiving threats of violence forcing her to deactivate and delete her online presence.

224.    Georgetown's deliberate indifference escalated the harm: it received Ms. Johnson's harassment reports on November 2, 2023, but took no protective action. Instead, Georgetown amplified the harm through Defendant Joel Hellman's mass email branding her a "security threat" and retained Shapiro, Hoffman, and other comparators despite actual misconduct, proving discriminatory intent.

225.    Under D.C. law, this constitutes (1) outrageousness, as coordinated doxing and death threats; (2) causation, shown by the direct link between Georgetown's inaction and Ms. Johnson's diagnosed distress; and (3) severity, evidenced by medical documentation.

## COUNT XIV
### (Tortious Interreference with Contract)
Against Defendants Rachel Jessica Wolff, Ilya Shapiro, Canary Mission, John Does 1-10,
Tuvia Milsztein (Adam Milstein), Adam and Gila Milstein Family Foundation,
Helen Diller Family Foundation, and Jewish Community Federation of San Francisco

226.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

227.    Under D.C. common law, tortious interference with contract occurs when a third party intentionally disrupts a valid contractual relationship, causing damages.

228.    Rachel Jessica Wolff knowingly sabotaged Ms. Johnson's employment by publishing viral tweets (1.2M views) containing decontextualized social media posts, despite having no prior interaction with Ms. Johnson.

229.    Canary Mission's blacklist maintained a defamatory profile of Ms. Johnson as the top Google search result, which Georgetown weaponized to justify termination.

230.    Milstein Foundation's Funding: Financed Canary Mission's operations through Israeli intermediaries, enabling the creation and dissemination of the dossier used to destroy Ms. Johnson's career.

## COUNT XV
### (False Light Invasion of Privacy)
Against Defendants Georgetown University, Joel Hellman,
Canary Mission, and John Does 1-10

231.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

232.    False light invasion of privacy occurs when publicity about a false statement places the plaintiff in a false light that would be highly offensive to a reasonable person. Unlike defamation, this tort redresses mental distress from being thrust into public view under misleading circumstances.

233.    Georgetown and its co-conspirators publicly placed Ms. Johnson in a false light through Defendant Joel Hellman's November 2, 2023, email sent to 1,200+ MSFS community members. The email falsely implied Ms. Johnson posed a "security threat" by stating *"We take all threats to our community seriously"*—a claim Georgetown knew was baseless after retaining Ilya Shapiro despite public protests and calls for his termination.

234.    The "security threat" implication painted Ms. Johnson as dangerous despite her exemplary record, triggering professional ostracization.

235.    And Canary Mission's maintained a profile as the top Google search result for Ms. Johnson's name. The profile decontextualized her 2015 social media posts as "antisemitic," omitting critical context about her status as a Palestinian college freshman protesting state violence.

236.    Canary Mission's profile distorted protected political speech into hateful tropes, exploiting anti-Muslim and anti-Palestinian biases.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Aneesa Johnson respectfully requests that this Court enter judgment in her favor and against all Defendants, and:

(a)    Compensatory Damages

- Award full back pay from October 30, 2023, including raises, bonuses, retirement contributions, and benefits under 42 U.S.C. § 2000e-5(g) (Title VII) and D.C. Code § 2-1403.13.

- Front pay for 10+ years reflecting Ms. Johnson's career trajectory in academia, calculated using U.S. Bureau of Labor Statistics data for higher education administrators.

- Award compensatory damages for breach of employment contract under District of Columbia common law.

- $5,000,000 for emotional distress and professional ostracization under DCHRA and 42 U.S.C. § 1981.

    (b)    Punitive Damages

- Award $300,000 statutory cap under 42 U.S.C. § 1981a(b)(3) (Title VII) against Georgetown University.

- Award uncapped punitive damages under DCHRA § 2-1403.16(b) and 42 U.S.C. § 1981 against Georgetown University for institutional malice, and all individual defendants, including George Shambaugh, Rachel Jessica Wolff, and Joel Hellman, for their direct participation in discriminatory acts.

- Award punitive damages of $2,500,000 against Tuvia Milsztein (Adam Milstein) and $1,000,000 against Helen Diller Family Foundation under D.C. Code § 2-1403.16(b) for their funding of Canary Mission's cyberstalking operations with actual malice, as evidenced by their coordination with the Israeli Ministry of Strategic Affairs.

- Award $10,000,000 jointly/severally from Adam Milstein, the Adam and Gila Milstein Family Foundation, Canary Mission, Rachel Jessica Wolff, and Ilya Shapiro under 42 U.S.C. § 1985(3) and common law torts.

    (c)    Equitable Relief

- Issue a permanent injunction requiring Georgetown University to remove all defamatory content about Ms. Johnson from internal records, reform Policy No. 204 to prohibit disparate enforcement against Palestinian/Muslim/African American/Arab employees.

- Order court-supervised diversity training for Georgetown University leadership.

- Order Canary Mission to delete Ms. Johnson's profile and cease dissemination under D.C. Code § 16-4002.

    (d)    Statutory Penalties

- Award $500,000 penalty under D.C. Code § 2-1403.16(a) for aiding/abetting discrimination against Georgetown University.

    (e)    Attorneys' Fees and Costs

- Award reasonable fees under 42 U.S.C. § 1988 for § 1981, § 1985(3), and Title VII claims.

- Award fees and expert costs under D.C. Code § 2-1403.13(a)(1)(E).

    (f)    Declaratory Judgment

- Declare Georgetown University's use of Canary Mission profiles a *per se* violation of Title VII and DCHRA.

- Declare that Defendants' maintenance and weaponization of Canary Mission's cyberstalking profile of Ms. Johnson constitutes false light invasion of privacy under D.C. common law.

    (g)    Joint and Several Liability

- Hold Adam Milstein, the Adam and Gila Milstein Family Foundation, Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Canary Mission, Rachel Jessica Wolff, Ilya Shapiro, and Georgetown University jointly liable for all damages under 42 U.S.C. § 1985(3) and D.C. Common Law.

(h)    Grant such other relief as this Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all triable claims.

Respectfully submitted,

*/s/Abdel-Rahman Hamed*

ABDEL-RAHMAN HAMED, ESQ.
DC Bar No. 1632130

**Hamed Law**
P.O. Box 25085
Washington, D.C. 20027

(202) 888-8846

Advocates@HamedLaw.com

*Attorney for Plaintiff Aneesa Johnson*



Superior Court of the District of Columbia
Civil Division - Civil Actions Branch
500 Indiana Ave NW, Room 5000, Washington DC 20001
202-879-1133 | www.dccourts.gov

First Class Mail
U. S. Postage Paid
Washington, D.C.
Permit No. 1726

Henry A Platt
Saul Ewing LLP
1919 Pennsylvania Avenue NW Suite 550
WASHINGTON DC  20006

You are named in a lawsuit filed in the Superior Court of the District of Columbia. If you cannot appear at the hearing, please contact the Clerk's Office immediately for more information. If Plaintiff does not participate, the case may be dismissed. If Defendant does not participate, default or judgment may be entered.

For case information, please contact the Civil Actions Branch Clerk's Office by phone at 202-879-1133 or by live chat at https://www.dccourts.gov/services/civil-matters/requesting-over-10k.

To access your case information online, please visit www.dccourts.gov/services/cases-online.

**Case Caption:**   Aneesa Johnson v. Georgetown University  et al.

**To:**  Henry A Platt                                    **Case Number:**     2025-CAB-000655

### NOTICE OF REMOTE INITIAL SCHEDULING CONFERENCE

Your case is scheduled for a(n) **Remote Initial Scheduling Conference** on **05/16/2025** at **9:30 AM** in **Remote Courtroom 518**.

The remote hearing will be held via Webex. To join the hearing, follow the below instructions.

**To Join by Computer, Tablet, or Smartphone:**
1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb518

   Meeting ID: 129 685 3445

2) Click "**Join Meeting**". You may be placed in the lobby until the courtroom clerk gives you access to the hearing.

**OR To Join by Phone:**
1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)

   Enter the Webex Meeting ID shown above followed by "##"

**Resources and Contact Information:**
1) For best practices on how to participate in Webex Meetings, click here www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch at 202-879-1133.
4) To change your method of hearing participation, visit www.dccourts.gov/hearing-information for instructions and forms.

**Accessibility and Language Access Information for Superior Court**

**Persons with Disabilities:**

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call (202) 879-1700 or email ADACoordinator@dcsc.gov. The D.C. Courts does not provide transportation service.

**Interpreting and Translation Services**:

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office at the telephone number at the top of the first page of this notice.  For more information, visit https://www.dccourts.gov/language-access.

Language access is important to the D.C. Courts. You can provide feedback on language services by visiting https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**Servicios de interpretación y traducción:**

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría en el número de teléfono que figura en la parte superior de la primera página de este anuncio. Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች፦**

የዲ.ሲ. ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎምላቸው መጠየቅ ይችላሉ። አስተርጓሚ ወይም የጽሑፍ ትርጉም ለመጠየቅ፣ እባካዎን በዚህ ደብዳቤ የመጀመሪያ ገጽ አናት ላይ በተቀመጠው ስልክ ቁጥር የፍርድ ቤቱን መዝገብ ቤት ቢሮን ያናግሩ።፦ ለበለጠ መረጃ https://www.dccourts.gov/language-access  ላይ ይጎብኙ፦

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያየትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።



Superior Court of the District of Columbia
Civil Division - Civil Actions Branch
500 Indiana Ave NW, Room 5000, Washington DC 20001
202-879-1133 | www.dccourts.gov

First Class Mail
U. S. Postage Paid
Washington, D.C.
Permit No. 1726

Georgetown University
37th O ST NW
Washington DC  20057

You are named in a lawsuit filed in the Superior Court of the District of Columbia. If you cannot appear at the hearing, please contact the Clerk's Office immediately for more information. If Plaintiff does not participate, the case may be dismissed. If Defendant does not participate, default or judgment may be entered.

For case information, please contact the Civil Actions Branch Clerk's Office by phone at 202-879-1133 or by live chat at https://www.dccourts.gov/services/civil-matters/requesting-over-10k.

To access your case information online, please visit www.dccourts.gov/services/cases-online.

**Case Caption:**   Aneesa Johnson v. Georgetown University

**To:**  Georgetown University                    **Case Number:**    2025-CAB-000655

### NOTICE OF REMOTE INITIAL SCHEDULING CONFERENCE

Your case is scheduled for a(n) **Remote Initial Scheduling Conference** on **05/16/2025** at **9:30 AM** in **Remote Courtroom 518**.

The remote hearing will be held via Webex. To join the hearing, follow the below instructions.

**To Join by Computer, Tablet, or Smartphone:**
1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb518

   Meeting ID: 129 685 3445

2) Click "**Join Meeting**". You may be placed in the lobby until the courtroom clerk gives you access to the hearing.

**OR To Join by Phone:**
1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)

   Enter the Webex Meeting ID shown above followed by "##"

**Resources and Contact Information:**
1) For best practices on how to participate in Webex Meetings, click here www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch at 202-879-1133.
4) To change your method of hearing participation, visit www.dccourts.gov/hearing-information for instructions and forms.

**Accessibility and Language Access Information for Superior Court**

**Persons with Disabilities:**

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call (202) 879-1700 or email ADACoordinator@dcsc.gov. The D.C. Courts does not provide transportation service.

**Interpreting and Translation Services**:

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office at the telephone number at the top of the first page of this notice.  For more information, visit https://www.dccourts.gov/language-access.

Language access is important to the D.C. Courts. You can provide feedback on language services by visiting https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**Servicios de interpretación y traducción:**

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría en el número de teléfono que figura en la parte superior de la primera página de este anuncio. Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**የቃልና የጽሑፍ ትርጓሚ አገልግሎቶች፦**

የዲ.ሲ. ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች ፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። አስተርጓሚ ወይም የጽሑፍ ትርጉም ለመጠየቅ፣ እባክዎን በዚህ ደብዳቤ የመጀመሪያ ገጽ አናት ላይ በተቀመጠው ስልክ ቁጥር የፍርድ ቤቱን መዝገብ ቤት ቢሮን ያናግሩ። ለበለጠ መረጃ https://www.dccourts.gov/language-access ላይ ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያየትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።