**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ANEESA JOHNSON** | |
| *Plaintiff,* | Case No. 1:25-cv-01540 |
| v. | JURY TRIAL DEMAND |
| **GEORGETOWN UNIVERSITY,** | HON. C. R. COOPER |
| **JOEL HELLMAN,** | |
| **GEORGE SHAMBAUGH,** | |
| **RACHEL JESSICA WOLFF,** | |
| **CANARY MISSION,** | |
| **HELEN DILLER FAMILY FOUNDATION,** | |
| **JEWISH COMMUNITY FEDERATION *of* SAN FRANCISCO,** | |
| **ILYA SHAPIRO,** | |
| **TUVIA MILSZTEIN, AKA ADAM MILSTEIN, and** | |
| **ADAM AND GILA MILSTEIN FAMILY FOUNDATION** | |
| *Defendants.* | |

## SECOND AMENDED COMPLAINT

Plaintiff Aneesa Johnson ("Ms. Johnson") files this Complaint against Defendants Georgetown University ("Georgetown" or "University"), Joel Hellman, George Shambaugh, Rachel Jessica Wolff, Canary Mission, Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Ilya Shapiro, Tuvia Milsztein, aka Adam Milstein, and Adam and Gila Milstein Family Foundation.

## I.    INTRODUCTION

1.    This case arises from Georgetown University's retaliatory behavior after three days of employment, including isolation and harm to Ms. Johnson's physical and psychological safety, leading to an unsubstantiated and discriminatory termination—a coordinated conspiracy involving Rachel Jessica Wolff (a then-Georgetown student), Canary Mission (a criminal cyberstalking operation), the Adam and Gila Milstein Family Foundation (a primary funder of dehumanization and suppression campaigns against advocates of Palestine and Palestinian human rights), and other institutional actors.

2.    These Defendants weaponized Canary Mission's cyberstalking profile of Ms. Johnson—which included decontextualized, eight-year-old, Twitter posts attributed to a deleted account belonging to Ms. Johnson when she was a college freshman—to justify her summary termination from Georgetown.

3.    Georgetown simultaneously protected and retained White, non-Muslim, Jewish, and Zionist faculty like Ilya Shapiro and Bruce Hoffman, who engaged in far more egregious misconduct targeting protected classes during their employment by Georgetown. This institutionalized double standard—punishing Palestinian advocacy while shielding Zionist racism—exposes systemic discrimination enabled by third-party harassment, criminal cyberstalking operations, defamatory blacklists, sabotage by a foreign government, and donor-funded suppression of protected speech.

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction under D.C. Code § 11-921(a), as this action arises under the District of Columbia Human Rights Act ("DCHRA") and common law.

5.     This Court has concurrent jurisdiction over Plaintiff's Title VII claims under *Yellow Freight Sys., Inc. v. Donnelly*, which affirmed that state courts, including the Superior Court of the District of Columbia, retain jurisdiction over federal civil rights claims against private employers under 42 U.S.C. § 2000e et seq. 494 U.S. 820, 826 (1990).

6.     This Court has jurisdiction over Plaintiff's common law claims (defamation, IIED, breach of contract) under D.C. Code § 13-423, which arise from the same nucleus of operative facts as the DCHRA and Title VII claims.

7.     This Court maintains personal jurisdiction over all Defendants at all times relevant to the allegations in this Complaint: Georgetown University, Joel Hellman, George Shambaugh, and Rachel Jessica Wolff were domiciled and conducted business within Washington, D.C.; Canary Mission systematically targeted D.C. institutions and residents through cyberstalking profiles and targeted harassment campaigns continuously directed at Ms. Johnson's employment in the District, establishing minimum contacts with this forum; and the Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Tuvia Milsztein, and the Adam and Gila Milstein Family Foundation purposefully availed themselves of this jurisdiction by funding Canary Mission's cyberstalking operations designed to suppress Palestinian advocacy in the District. Defendants Canary Mission, Wolff, and Hellman also published defamatory content accessible nationwide, including in D.C., where it foreseeably caused direct harm to Ms. Johnson's career and reputation.

8.     Venue is proper under D.C. Code § 13-423(a)(1) because Georgetown University maintains its principal place of business at 37th and O Streets NW, Washington, D.C., all discriminatory acts—including Defendant Joel Hellman's email and Defendant's George Shambaugh's termination decision, Defendant's Rachel Jessica Wolff's targeted

harassment campaign, and Georgetown's retaliatory termination—occurred within the District; Canary Mission's defamatory profile was accessed and weaponized by Georgetown employees and students within the District; and Canary Mission funding by the Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Tuvia Milsztein, and the Adam and Gila Milstein Family Foundation caused reputational harm, and physical and psychological harm to Ms. Johnson in her professional and personal communities both based in D.C. and across remote professional opportunities and personal inquiries.

## III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      Ms. Johnson filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on April 12, 2024—within 300 days of her November 27, 2023, termination—satisfying jurisdictional prerequisites under *Epps v. Potomac Elec. Power Co.*, 389 F. Supp. 3d 53, 59 (D.D.C. 2019) (holding EEOC filing mandatory for Title VII claims).

10.     Ms. Johnson concurrently filed a charge with the D.C. Office of Human Rights (DCOHR) on April 12, 2024, meeting the DCHRA's exhaustion requirements under D.C. Code § 2-1403.04(a).

## IV.    PARTIES

11.     **Plaintiff Aneesa Johnson** is a Muslim woman of African American and Palestinian descent. She was employed by Georgetown University as Assistant Director of Academic and Faculty Affairs from October 30, 2023, until her unlawful termination on November 27, 2023.

12.     **Defendant Georgetown University** is an educational institution incorporated in the District of Columbia, with its principal place of business at 37th and O Streets, N.W.,

Washington, D.C. 20057. The University publicly professes a mission "[e]stablished in 1789 in the spirit of the new republic...to promote intellectual, ethical and spiritual understanding through serious and sustained discourse among people of different faiths, cultures, and beliefs," which it claims to embody through "diversity of students, faculty and staff," "commitment to justice," and "international character." These representations stand in stark contrast to Georgetown's systemic suppression of Palestinian advocacy and retaliatory termination of Ms. Johnson, which betray its stated principles of inclusion and intellectual openness.

13.    **Defendant Joel Hellman** is the Dean of Georgetown's Walsh School of Foreign Service. At all relevant times, he acted within the scope of his employment at Georgetown's campus in Washington, D.C., where he published a defamatory email to 1,200+ students, faculty, and staff falsely implying Ms. Johnson posed a security threat, violating D.C. defamation law and DCHRA.

14.    **Defendant George Shambaugh** is the Director of the Master of Science in Foreign Service (MSFS) Program at Georgetown University. At all relevant times, he acted within the scope of his employment at Georgetown's campus in Washington, D.C., where he unlawfully terminated Ms. Johnson and participated in discriminatory conduct.

15.    **Defendant Rachel Jessica Wolff** was a dual-degree student at Georgetown's School of Foreign Service and Law Center residing in Washington, D.C. At all relevant times, she acted in Washington, D.C., where she spearheaded a targeted harassment campaign of hate amplifying Canary Mission's Zionist-funded cyberstalking operation on Ms. Johnson via defamatory tweets (1.2M+ views) triggering doxing, death threats of Ms. Johnson, and directly leading to Ms. Johnson's termination.

16.    **Defendant Canary Mission** is an anonymous U.S.-based criminal cyberstalking operation funded by U.S.-based entities and headquartered in Israel. It maintains a principal place of business c/o Megamot Shalom, 13 Hillel Street in Jerusalem, Occupied Palestine, and a U.S. address of c/o Central Fund of Israel, 461 Central Ave, Cedarhurst, NY 11516. While headquartered in occupied Palestine, Defendant Canary Mission's anonymous cyberstalking operation has substantial contacts in Washington, D.C., where it targets Palestinian advocates at academic institutions. It is a deliberately opaque entity that maintains anonymity in its operations, funding, and organizational structure. It operates the cyberstalking website canarymission.org, which publishes cyberstalking dossiers targeting university students, faculty, and staff critical of the Zionist occupation, apartheid, and genocide in Palestine. Defendant Canary Mission is not a registered nonprofit in the United States, enabling its donors—including Defendant Helen Diller Family Foundation, Defendant Jewish Community Federation of San Francisco, and Defendant Adam and Gila Milstein Family Foundation—to evade public accountability for financing its criminal enterprise. Defendant Canary Mission is linked to Megamot Shalom, a Zionist nonprofit registered as a public benefit corporation in Beit Shemesh, in occupied Palestine, which is a legal structure that allows anonymity for donors and avoids U.S. nonprofit disclosure requirements. Donations to Defendant Canary Mission are funneled through the Central Fund of Israel, a New York-based 501(c)(3) organization that acts as a financial intermediary for groups supporting Zionist settlements in Palestine and the perpetual occupation, apartheid, and genocide of Palestine and Palestinians through far-right Zionist organizations. Canary Mission's lack of transparency, coupled with its coordination with undisclosed donors

and foreign entities, renders it a nominal Defendant whose true stakeholders require discovery to unmask.

17.    **Defendant Helen Diller Family Foundation** is a California-based nonprofit organization located at 121 Steuart Street, San Francisco, CA 94105. It funneled $100,000 to Defendant Canary Mission through Israeli front groups to finance the cyberstalking and targeted harassment of Ms. Johnson.

18.    **Defendant Jewish Community Federation of San Francisco** is a nonprofit organization located at 121 Steuart Street, San Francisco, CA 94105. It funded Defendant Canary Mission via Megamot Shalom, enabling the cyberstalking and targeted harassment of Ms. Johnson.

19.    **Defendant Ilya Shapiro** is a former Georgetown Law administrator residing in Falls Church, VA. He participated in the targeted harassment campaign of hate against Ms. Johnson by amplifying Defendant Wolff's tweets to 500,000+ followers.

20.    **Defendant Tuvia Milsztein, aka Adam Milstein** is a California-based real estate investor, founder of the Adam and Gila Milstein Family Foundation, which funded Defendant Canary Mission's cyberstalking and cyberbullying operations targeting Ms. Johnson. He is also a U.S.-operative for Defendant Canary Mission.

21.    **Defendant Adam and Gila Milstein Family Foundation** is a private foundation headquartered in Encino, California, that financed Canary Mission's harassment and cyberstalking campaigns, including that against Ms. Johnson, through Israeli intermediaries.

22.    **Defendant John Does 1-10** are unidentified operators of Canary Mission, funders, and collaborators who participated in the harassment campaign against Ms. Johnson.

## V.    FACTUAL ALLEGATIONS

### A. ANEESA JOHNSON, A MUSLIM WOMAN

23.    Aneesa Johnson grew up in a post-9/11 America where being a visibly Muslim woman meant navigating a landscape of pervasive discrimination, harassment, and fear. Like many Muslim women who wear the hijab, she became a visible target in an era of heightened Islamophobia, where the simple act of covering her head marked her as "other."[1]

24.    The statistics paint a stark picture of the world Ms. Johnson inhabited: 76.7% of Muslim women report experiencing Islamophobia in their lifetimes, compared to 58.6% of Muslim men.[2] This gendered discrimination manifests in deeply personal ways—Muslim women regularly face having their hijabs forcibly removed, being spat upon, and enduring verbal assaults in public spaces.[3]

25.    Growing up, Ms. Johnson witnessed the dramatic surge in anti-Muslim hatred after 9/11, when FBI data showed anti-Muslim hate crimes skyrocketed from just 28 incidents in 2000 to 481 in 2001.[4] The trauma of this period created what scholars call "social isolation,"

---

[1] Elsadig Elsheikh & Basima Sisemore, *Islamophobia Through the Eyes of Muslims*, OTHERING & BELONGING INST. (Sept. 29, 2021). Available at: https://belonging.berkeley.edu/sites/default/files/2021-10/Islamophobia%20Through%20the%20Eyes%20of%20Muslims.pdf.

[2] *Id.*

[3] Sakshi Venkatraman & Mirna Alsharif, *For Muslim Americans, a Spike in Hate Incidents Feels Reminiscent of Post 9/11 Islamophobia*, NBC News (Oct. 31, 2023), https://www.nbcnews.com/news/asian-america/muslim-americans-spike-hate-incidents-feels-reminiscent-post-911-islam-rcna122570.

[4] Aymen Ati, *The Post-9/11 Securitisation of the Hijab and International Human Rights Law: The Strasbourg Court, Article 9 and Hijab Restrictions*, 5 QUEEN MARY HUM. RTS. L. REV. 1 (2019). Available at: https://ssrn.com/abstract=3425845.

as many Muslim families urged women and children to stay home or alter their appearance out of fear for their safety.[5]

26.      Like countless other Muslim women, Ms. Johnson had to carefully navigate educational and professional spaces. Studies show that Muslim women face a "triple penalty" in employment—discriminated against based on gender, religion, and ethnicity.[6] As an African American, the race factor meant Ms. Johnson faced a quadrupled penalty. The simple act of wearing a hijab reduces chances of receiving a job interview "close to zero."[7]

27.      The psychological toll of this constant discrimination is profound—93.7% of Muslims report that Islamophobia affects their emotional and mental wellbeing.[8] Even those who don't directly experience hate incidents feel constantly "monitored, judged, or excluded."[9] For visibly Muslim women like Ms. Johnson, this created what researchers call "stereotype threat," negatively impacting everything from healthcare access to educational achievement.[10]

28.      Yet Ms. Johnson persevered, like many Muslim women who refuse to compromise their faith despite facing what scholars describe as being "caught at the intersection of bias against Islam, the racialized Muslim, and women."[11] Her story exemplifies

---

[5] Salih Tuzer, *The Impact of Islamophobia on the Education and Religious Identity of Muslims in the USA*, 17 TURKISH J. FOR RELIGIOUS EDUC. STUD. 131 (2024). Available at: https://doi.org/10.53112/tudear.1462175.
[6] Marjorie Moya, *Forgotten Women: The Impact of Islamophobia on Muslim Women in France*, European Network Against Racism (May 2016). Available at: https://www.enar-eu.org/wp-content/uploads/forgotten_women_report_france_-_final.pdf.
[7] *Id.*
[8] *Supra*, n.1.
[9] *Id.*
[10] Goleen Samari, *Islamophobia and Public Health in the United States*, 106 AM. J. PUB. HEALTH 1920 (2016). Available at: https://pmc ncbi nlm nih.gov/articles/PMC5055770.
[11] Sahar F. Aziz, *From the Oppressed to the Terrorist: Muslim-American Women in the Crosshairs of Intersectionality*, 9 HASTINGS RACE & POVERTY L.J. 191 (2012). Available at: https://scholarship.law.tamu.edu/facscholar/100.

both the unique burden carried by Muslim women in post-9/11 America and their remarkable resilience in the face of persistent discrimination.

### B. ANEESA JOHNSON, AN AFRICAN AMERICAN WOMAN

29.     Aneesa Johnson's story is woven into the broader tapestry of African American experience—one marked by generational trauma, systemic oppression, and remarkable resilience. Like millions of African Americans, she carries the weight of a history that began with the brutal institution of slavery, which for 250 years stripped Black Americans of their basic humanity.[12]

30.     This legacy of oppression did not end with emancipation. For nearly a century afterward, Jim Crow laws enforced a system of apartheid that denied basic rights, while extralegal violence terrorized Black communities. Between 1882 and 1968, over 3,446 African Americans were lynched, often for nothing more than perceived violations of racial hierarchy.[13]

31.     Today, Ms. Johnson navigates a society where 79% of African Americans report experiencing unfair treatment due to their race.[14] The trauma of this discrimination manifests in stark disparities—African Americans face a life expectancy nearly five years shorter than white Americans, with Black infants dying at more than twice the rate of white infants.[15]

---

[12] Paula A. Braveman *et al.*, *Systemic and Structural Racism: Definitions, Examples, Health Damages, and Approaches to Dismantling*, 41 HEALTH AFF. 171 (2022). Available at: https://doi.org/10.1377/hlthaff.2021.01394.
[13] National Academies of Sciences, Engineering, and Medicine, *Advancing Antiracism, Diversity, Equity, and Inclusion in STEMM Organizations: Beyond Broadening Participation* (2023). Available at: https://doi.org/10.17226/26803.
[14] Sara N. Bleich *et al.*, *Discrimination in the United States: Experiences of Black Americans*, 54 HEALTH SERV. RES. 1399 (2019). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC6864380.
[15] Samantha Artiga, Latoya Hill & Marley Presiado, *How Present-Day Health Disparities for Black People Are Linked to Past Policies and Events*, KFF (Feb. 22, 2024), https://www.kff.org/racial-equity-and-health-policy/issue-brief/how-present-day-health-disparities-for-black-people-are-linked-to-past-policies-and-events/.

32.     The economic toll is equally devastating. The average Black household income of $53,789 is barely 65% of white households, while Black families experience poverty at nearly triple the rate.[16] This financial inequality stems directly from historical policies like redlining and restrictive covenants that systematically denied Black Americans the opportunity to build generational wealth.[17]

33.     In professional settings, 57% of African Americans report discrimination in pay and promotions.[18] Even with higher education, Black Americans receive diminished returns on their achievements due to persistent structural racism that impedes access to opportunities and resources.[19]

34.     For Ms. Johnson, like countless other African Americans, this reality means carrying what researchers call "cultural trauma"—not just the direct experience of discrimination, but the collective memory of centuries of oppression that shapes identity formation and daily life.[20] Yet her story also exemplifies the extraordinary resilience of African Americans who, generation after generation, have persisted and achieved in the face of systemic barriers designed to ensure their failure.[21]

---

[16] Off. of Minority Health, *Black/African American Health*, U.S. Dep't of Health & Hum. Servs. (Jan. 16, 2025), https://minorityhealth.hhs.gov/blackafrican-american-health.

[17] L.A. Civil Rights Dep't, *An Examination of African-American Experiences in Los Angeles* (Aug. 2024), https://civilandhumanrights.lacity.gov/sites/g/files/wph2271/files/2024-08/LA%20Civil%20Rights%20-%20Reparations%20Report%20Executive%20Summary%20-%20An%20Examination%20of%20African%20American%20Experiences%20in%20Los%20Angeles%20(1).pdf.

[18] *Supra*, n.14.

[19] Mina Silberberg *et al.*, *The Role of Socioeconomic Status in a Community-Based Study of Diabetes Secondary Prevention Among African Americans*, 60 INT'L J. HEALTH PROMOTION & EDUC. 262 (2022). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC9782674.

[20] Ron Eyerman, *Cultural Trauma: Slavery and the Formation of African American Identity*, in CULTURAL TRAUMA AND COLLECTIVE IDENTITY 60 (2004). Available at: https://doi.org/10.1525/california/9780520235946.003.0003.

[21] Karuna Meda, *What Is the Residual Impact of Slavery on African American Mental Health?*, Thomas Jefferson Univ. (Feb. 2023), https://www.jefferson.edu/news/2023/02/what-is-the-residual-impact-of-slavery-on-african-american-mental-health.html.

## C. Aneesa Johnson, A Palestinian Woman

35.    Aneesa Johnson's story reflects the systematic dispossession and institutionalized discrimination that Palestinians have endured under the Europe's Zionist apartheid regime in occupied Palestine. Her family's experience mirrors that of countless Palestinians who have faced state-sanctioned displacement through a complex web of discriminatory laws, policies, and practices designed to privilege "Jewish" settlers at the expense of indigenous Palestinians.

36.    The only life Ms. Johnson knows is one where the demolition of Palestinian homes and forced displacement represents a cornerstone of the Zionist apartheid system.[22] Ms. Johnson's family have been exiled since 1948, when the Zionist occupation—through sheer terrorism and depraved indifference to human life—demolished over 130,000 Palestinian homes and structures, systematically erasing entire villages and communities.[23] In 2023 alone, Israeli authorities demolished or seized 1,177 Palestinian structures—the highest number recorded since 2016.[24]

37.    The 2018 Nation-State Law codified what Palestinians like Ms. Johnson's family had long experienced—an explicit constitutional mandate declaring "Jewish settlement" as a national value requiring state promotion.[25] This law formalized a system

---

[22] Amnesty Int'l, *Israel's Apartheid Against Palestinians: Cruel System of Domination and Crime Against Humanity* (Feb. 1, 2022), https://www.amnesty.org/en/documents/mde15/5141/2022/en/.

[23] Israeli Comm. Against House Demolitions, *The Demolition of Palestinian Homes by Israel: A Fact Sheet* (Apr. 20, 2021), https://icahd.org/2021/04/20/the-demolition-of-palestinian-homes-by-israel-a-fact-sheet/.

[24] Office of the European Union Representative (West Bank and Gaza Strip, UNRWA), *One Year Report on Demolitions and Seizures in the West Bank, Including East Jerusalem* (Nov. 19, 2024), Reporting Period: Jan. 1 – Dec. 31, 2023. Available at:
https://www.eeas.europa.eu/sites/default/files/documents/2024/One%20Year%20Report%20on%20Demolitions%20and%20Seizures%20in%20the%20West%20Bank%20including%20East%20Jerusalem%20-%201%20January%20%2031%20December%202023.pdf.

[25] Hum. Rts. Watch, *A Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecution* (Apr. 27, 2021), https://www.hrw.org/report/2021/04/27/threshold-crossed/israeli-authorities-and-crimes-apartheid-and-persecution.

where Palestinians are treated as an "inferior racial group and systematically deprived of their rights."[26]

38.     Ms. Johnson's family is impacted by the Zionist occupation's maintenance of "Jewish" domination over Palestinians through sweeping restrictions on movement, confiscation of Palestinian land, forced displacement of communities, denial of residency rights, suspension of basic civil rights, among others.[27]

39.     While conscientious people around the world read and research the plight of Palestinians, Ms. Johnson's family know how the Zionist occupation imposes territorial fragmentation to separate Palestinian communities, discriminatory land and property seizures, systematic denial of building permits, forced evictions and home demolitions, and denial of the right to return.[28]

40.     The Palestinian experience of being denied a home stands at the heart of the Zionist occupation's apartheid system.[29] For Ms. Johnson's family, like millions of Palestinians, this meant watching her ancestral home seized through "a cruel system" of "Jewish" domination and "crime against humanity."[30]

41.     This system of oppression continues today, with Palestinians facing ongoing dispossession through home demolitions, land confiscation, and forced displacement—all carried out under the explicit mandate of maintaining Jewish dominance.[31] The trauma of this systematic erasure echoes through generations of Palestinian families like Ms. Johnson's,

---

[26] *Supra*, n.22.
[27] Lama Fakih & Omar Shakir, *Does Israel's Treatment of Palestinians Rise to the Level of Apartheid?*, Hum. Rts. Watch (Dec. 5, 2023), https://www.hrw.org/news/2023/12/05/does-israels-treatment-palestinians-rise-level-apartheid.
[28] *Supra*, n.22.
[29] *Id.*
[30] *Id.*
[31] *Supra*, n.25.

who have witnessed their communities fragmented and their rights systematically denied under a regime that explicitly privileges one ethnic-religious group over another.

### D. ZIONIST WEAPONIZATION OF "JEWISH" IDENTITY TO TERRORIZE ADVOCATES AFFIRMING THE HUMAN DIGNITY OF PALESTINIANS

42.     For Palestinians like Ms. Johnson, the psychological trauma of occupation and apartheid is inextricably linked to symbols and declarations of "Jewishness"—not by their choice, but by the explicit and repeated framing of their oppression as specifically Jewish by the Zionist occupation itself.[32]

43.     The Zionist occupation has constructed a comprehensive system of domination that explicitly privileges Jewish settlers while systematically oppressing indigenous Palestinians. This system manifests through laws that enshrine "Jewish settlement" as a national value, military orders conducted under what the Zionist occupation declares as a "Jewish army," forced displacement conducted in the name of maintaining "Jewish demographic dominance," and an apartheid regime that explicitly prioritizes Jewish settlers.[33] This dehumanizing system has confronted Ms. Johnson her whole life.

44.     For Palestinians like Ms. Johnson, every aspect of daily oppression is deliberately branded as "Jewish" by their oppressors.[34] For example, home demolitions carried out under the Star of David, checkpoints emblazoned with symbols of Jewish sovereignty, settlements explicitly established for "Jewish-only" residence, and military operations conducted under what the Zionist occupation calls the "Jewish flag."[35]

---

[32] Amal Jamal, *Jewish Sovereignty and the Inclusive Exclusion of Palestinians: Shifting the Conceptual Understanding of Politics in Israel/Palestine*, 4 FRONTIERS POL. SCI. 995371 (2022). Available at: https://www.frontiersin.org/journals/political-science/articles/10.3389/fpos.2022.995371/full.
[33] *Supra*, n.22 & n.25.
[34] Lydia Wilson, *The Psychology of the Intractable Israel-Palestine Conflict*, New Lines Mag. (Oct. 24, 2023), https://newlinesmag.com/argument/the-psychology-of-the-intractable-israel-palestine-conflict/.
[35] *Supra*, n.22 & n.25.

45.     Whether surviving the inhumanity of the Zionist occupation, apartheid, and genocide directly or secondarily as a displaced refugee living in exile, the psychological burden is particularly acute because Palestinians are told to separate their trauma from its explicitly Jewish branding. All while suffering under laws that redefine the occupied Palestinian territories as exclusively "the nation-state of the Jewish people," suffering discrimination justified through "Jewish demographic needs,"[36] watching their homes demolished to make way for what the Zionist occupation calls "Jewish settlement," and being subject to military rule by what the Zionist occupation proclaims as its "Jewish army."[37]

46.     For Palestinians like Ms. Johnson, the documented severity of the mental health impact is too familiar. From high rates of anxiety disorders and PTSD to transgenerational trauma from decades of occupation and deep psychological wounds from daily humiliation.

47.     For Palestinians like Ms. Johnson, the psychological trauma of occupation and apartheid is not merely linked to violence and displacement, but to the explicit branding of that oppression as specifically "Jewish" by Zionist occupation itself. This creates a complex psychological burden where victims must process their trauma through symbols their oppressors have deliberately transformed from religious markers into emblems of Zionist inhumanity.

48.     Despite this incredible trauma, Ms. Johnson is not one to conflate Judaism with oppression, racism, and hate. She understands the reality that European Zionists are desperate

---

[36] Gershon Shafir, *(Re)framing Jewish Privilege and Rebuffing Arab Rights*, Project on Middle E. Pol. Sci. (2023), https://pomeps.org/reframing-jewish-privilege-and-rebuffing-arab-rights.
[37] *Supra*, n.22 & n.25.

to legitimize their extermination project in Palestine by deliberately framing their occupation, apartheid system, and terrorism as "Jewish."

E. **CANARY MISSION'S DANGEROUS, THREATENING, AND RACIST WEB OF HATE, INTIMIDATION, AND PERSECUTION**

49.     Canary Mission ("The Group") is an anonymous cyberstalking and blacklisting operation that systematically targets Palestinian rights and anti-Apartheid advocates, particularly students and academics, through coordinated harassment campaigns designed to damage their professional and educational opportunities, bringing employers and academic institutions into terrified compliance by its cynical and effective deployment of the "antisemitic" label, through its online international mob that's directed by the Zionist actors and institutions occupying Palestine.

*Complex Funding Networks and Hidden Ownership*

50.     The operations of Canary Mission exhibit striking parallels to traditional organized crime tactics. An investigation by The Nation revealed that, like traditional mafia organizations that operate through front companies and complex ownership structures, Canary Mission employs an elaborate network of intermediaries to obscure its true sources of funding and control. Canary Mission operates through Megamot Shalom, a Zionist front organization that receives funds through various American pass-through entities, including the Jewish Community Federation of San Francisco and the Helen Diller Family Foundation.[38]

51.     *The Grayzone* reported that Canary Mission's domain registration was initially linked to Howard David Sterling, a Zionist attorney who has described investment in Israeli

---

[38] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 27, 2023), https://www.thenation.com/article/world/canary-mission-israel-covert-operations/.

companies as a means to "protect Israel"—in reference to the foreign force occupying Palestine—through economic ties. Though Sterling's attorney predictably denied ownership, bank records showed donations to Canary Mission accompanied by a phone number registered in Sterling's name through 2015.[39]

52.     The censored Al Jazeera documentary *The Lobby – USA* identified Adam Milstein—a convicted tax felon and founder of the Israeli-American Council—as a key Canary Mission funder. Milstein's foundation partners with the Israel on Campus Coalition (ICC), which endorsed Canary Mission in its 2016-2017 annual report as a "strong deterrent against antisemitism and BDS activism."[40]

53.     The funding mechanism mirrors classic organized crime money laundering operations: (1) American Zionist funders contribute to passthrough entities like, here, the Jewish Community Federation of San Francisco, the Milstein Family Foundation, the Helen Diller Family Foundation. (2) Funds are then transferred to additional passthrough entities—in this case, the Central Fund of Israel in New York who then transfer the funds to Megamot Shalom in Occupied Palestine. (3) Finally, resources reach Canary Mission's actual operations in coordination with the Zionist occupier's Apartheid Ministry of Strategic Affairs.

54.     This structure provides the same benefits as criminal front operations: plausible deniability for funders, tax advantages through seemingly legitimate channels, and multiple layers of insulation between criminal activities and their financiers.

---

[39] Hamzah Raza & Max Blumenthal, *Who Is Behind Canary Mission's Anonymous Anti-Palestinian Blacklisting Website?*, The Grayzone (Aug. 22, 2018), https://thegrayzone.com/2018/08/22/meet-the-owner-of-canary-missions-anonymous-anti-palestinian-blacklisting-website/.
[40] Siniver, A. (Ed.), *Routledge Companion to the Israeli-Palestinian Conflict*, Routledge (2022), https://doi.org/10.4324/9780429027376.

*Anonymous Operations and Compartmentalization*

55.    Like sophisticated criminal organizations, Canary Mission maintains complete operational anonymity, with no public identification of leadership, staff, or physical locations. This compartmentalized structure ensures Zionist actors know only what is necessary for their specific role in supporting the occupation, apartheid, and genocide in Palestine.

56.    The Group's secretive nature serves multiple objectives: protection from law enforcement investigation and prosecution, insulation of financiers from legal consequences, making the reach of Zionist actors beyond the reach of targeted victims, and maintenance of operational security for ongoing Zionist activities.

*Systematic Extortion and Economic Coercion*

57.    Canary Mission operates what amounts to a sophisticated protection racket targeting academic and professional careers. The organization explicitly threatens individuals' future employability through its stated mission to "ensure that today's radicals are not tomorrow's employees."[41]

58.    In economic terms, Canary Mission systematically created several artificial market dependencies, generating demand for its cynical services as an enhanced background screening service by positioning itself as an essential resource for employers seeking to avoid hiring "antisemitic," "anti-Israel," "terrorist-sympathizing," and "anti-American" employees. The Group explicitly markets itself to employers with the warning: "These individuals are applying for jobs within your company. It is your duty to ensure today's radicals are not tomorrow's employees."

---

[41] Zack Beauchamp, *This Pro-Israel Group Keeps a Blacklist. Now It's Taking Credit for Deportations*, Vox (Apr. 25, 2025), https://www.vox.com/politics/410125/canary-mission-the-pro-israel-group-taking-credit-for-student-deportation-explained.

59.    Canary Mission's sophisticated economic coercion offers "transactional relationships" providing genuine services alongside threats, positioning itself as offering "protection" to employers from "antisemitic" employees while simultaneously creating the very threat it claims to address.

60.    The Group employs systematic economic blackmail by (1) creating permanent digital profiles that follow individuals throughout their careers, (2) actively contacting employers to share derogatory information about targets, (3) establishing artificial barriers to employment in specific industries and sectors, and (4) using reputational damage as a form of economic extortion.

*Territorial Control, Government Infiltration, and Enforcement Mechanisms*

61.    Canary Mission exercises territorial control over academic spaces, maintaining comprehensive surveillance Zionist student networks across university campuses, systematically documenting and profiling student activities. By doing so, the Group creates an environment where political expression by students, faculty, and staff is monitored and catalogued; where participation in certain anti-Apartheid activities carries severe consequences; where fear and intimidation shape behavioral patterns; and where voices against the Zionist occupation, apartheid, and genocide in Palestine are systematically suppressed.

62.    Canary Mission has also achieved what amounts to regulatory capture of immigration enforcement agencies. Peter Hatch, an official with the Immigration and Customs Enforcement agency (ICE) testified that a specialized "tiger team" was established within the Department of Homeland Security (DHS) to process thousands of Canary Mission profiles, which were then used to target foreign students for deportation.

63.     The Group also collaborates with U.S. police to punish Palestinian advocacy. For example, Seton Hall Law School contacted the FBI to interrogate Palestinian-American student Ahmad Aburas after Canary Mission falsely accused him of supporting terrorism for stating "We are all Resistance" during Israel's 2014 Gaza bombing campaign.[42]

64.     This sophisticated form of state capture is reflected in Canary Mission's ability to affect the government's decision-making processes, influence policy implementation to serve Zionist interests, gain access to state enforcement mechanisms, and create symbiotic relationships with government officials.

*Intelligence Integration with a Fascist Colonial Apartheid System*

65.     Canary Mission also operates as an unregistered foreign intelligence asset, providing information directly to Zionist agencies in occupied Palestine, including the Apartheid Ministry of Strategic Affairs and Shin Bet. The Zionist Occupation uses this information for border control decisions at airports in occupied Palestine. The U.S. government uses this information to discriminatorily arrest and deport immigrants and permanent residents. The private and public sectors use this information to systematically target individuals critical of the Zionist occupation, apartheid, and genocide in Palestine.

66.     The Apartheid Ministry of Strategic Affairs coordination with Canary Mission to use student data to suppress voices, including in the District, reflects intentional targeting of U.S. institutions, including D.C. institutions, as the Ministry's 2023 internal strategy memo prioritized neutralizing anti-Zionist influence through covert operations.

---

[42] Alex Kane, *The FBI Is Using Unvetted, Right-Wing Blacklists to Question Activists About Their Support for Palestine*, THE INTERCEPT (June 24, 2018), https://theintercept.com/2018/06/24/students-for-justice-in-palestine-fbi-sjp/.

67.     Internal documents obtained by the American-Jewish newspaper *The Forward* demonstrate that Canary Mission coordinates with Israeli government agencies.[43]

68.     The Jewish Federation of San Francisco, the Milstein Family Foundation, and the Helen Diller Family Foundation have acknowledged funding Canary Mission through Megamot Shalom, a Zionist organization that serves as a U.S. front for the Israeli Ministry of Strategic Affairs.[44]

*Systematic Victim Targeting, Blacklist Operations, and Weaponizing of Digital Infrastructure*

69.     Canary Mission operates what amounts to an industrial harassment enterprise, maintaining profiles on over 18,000 individuals, as of 2018.[45] The Group systematically targets students, faculty, and staff based on their anti-apartheid research, activity, and advocacy, disproportionately focusing on people of color (approximately 80% of profiles). For maximum impact, the Group targets women and vulnerable populations. To force compliance—or the deafening silence of neutrality—with their demands to punish any voice critical of the Zionist occupation, apartheid, and genocide in Palestine, the Group targets entire organizations and associations that refuse to fall in line with its demands through collective punishment. This systematic victimization creates comprehensive control systems that affect entire communities and economic sectors.

70.     Canary Mission's database details the personal information, photos, and social media history of anti-apartheid individuals, overwhelmingly focusing on African American, Arab, Muslim, Palestinian, and Jewish students and faculty, as well as their supporters.

---

[43] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info To Bar Activists*, The Forward (Oct. 4, 2018), https://forward.com/news/411453/israel-uses-canary-mission-blacklist-info-to-bar-activists/.
[44] *Id.*
[45] Sumaya Awad & Bill V. Mullen, *Countering a Blacklist: Introducing 'Against Canary Mission'*, MONDOWEISS (Apr. 17, 2018), https://mondoweiss.net/2018/04/countering-blacklist-introducing/.

71.     Within one year of launching, the website, called "Canary Mission," included profiles of more than 1,800 young activists: Black, Brown, Jewish, Arab, Muslim. The cyberstalking operation disproportionately targets people of color and women. Of the 1,870 individuals profiled on the site, about 80% are people of color. Today, more than 18,000 supporters of Palestinian human rights and anti-apartheid advocates and academics are profiled on its site, and the list grows exponentially with the Zionist Occupier's pronounced war crimes. The profiles of Canary Mission's targets are designed to appear in Google searches,

72.     The Group's public database profiles over 10,000 students, professors, and organizations critical of Zionism, which immigration authorities have weaponized to target noncitizen advocates. For example, Columbia University graduate student Mahmoud Khalil was arrested by ICE after Canary Mission highlighted his pro-Palestinian leadership, while the group's 2025 "Uncovering Foreign Nationals" campaign explicitly urged deportation of activists based on visa status and political views.[46]

73.     Canary Mission has weaponized social media platforms and digital infrastructure to amplify its racist harassment campaigns. In exploiting legitimate business systems for criminal purposes, Canary Mission uses professional-appearing websites to legitimize defamatory content, social media networks to amplify threatening messages, anonymous accounts to coordinate harassment campaigns, and digital permanence to ensure long-term reputational damage.

---

[46] Sophie Hurwitz, *How a Shadowy Online Blacklist Became a Legal Threat to Pro-Palestinian Activists*, MOTHER JONES (July 8, 2025), https://www.motherjones.com/politics/2025/07/canary-mission-israel-palestine-blacklist-university-trump-deportation-ozturk-khalil/.

*Symbiotic Relationships and Mutual Benefit Networks*

74.     As a sophisticated organized criminal operation that creates "gray areas" where legal and illegal spheres intersect, Canary Mission operates in the ambiguous space claiming its systematic harassment and racist targeting as free speech, its illegal stalking and racist profiling as legitimate information gathering, its racist criminal foreign enterprise as a civil society organization, its funders as donors, and its foreign intelligence operation as domestic advocacy.

75.     Canary Mission represents a sophisticated adaptation of embedding Zionist control within normal institutional operations, making resistance to its operation seem complicated by appearing to provide legitimate services, exploiting legal vulnerabilities and regulatory gaps, creating systemic intimidation without traditional violent methods, and establishing long-term institutional and governmental corruption through captured agencies.

76.     As a result of their Canary Mission profiles, individuals affirming the humanity of Palestinians have experienced denial of entry to the occupied Palestinian territories,

arbitrary detentions,[47] interrogations by U.S. federal agents,[48] loss of employment[49] and educational opportunities,[50] and severe emotional distress[51] and self-censorship.[52]

77. Major Jewish organizations have condemned Canary Mission's hatemongering. The Jewish Telegraphic Agency described Canary Mission's methods as "antithetical to . . . democratic and Jewish values" and "morally reprehensible" for using "hateful," "Islamophobic," and "racist" rhetoric "to villainize individuals" involved "with pro-Palestinian causes" "under the guise of combating anti-Semitism."[53] J Street called it a "right-wing organization" that "aims to promote a toxic atmosphere of harassment and fear

---

[47] J Street, *J Street U Leaders to Israel's Minister Erdan: Detention of Lara Alqasem Is Dangerous and Wrong*, J Street (Oct. 10, 2018), https://jstreet.org/press-releases/j-street-u-leaders-to-israels-minister-erdan-detention-of-lara-alqasem-is-dangerous-and-wrong/.

[48] Rümeysa Öztürk, *"Even God Cannot Hear Us Here": What I Witnessed Inside an ICE Women's Prison*, VANITY FAIR (July 17, 2025), https://www.vanityfair.com/news/story/rumeysa-ozturk-what-i-witnessed-inside-an-ice-womens-prison.

[49] Sarah Lazare, *Bosses Are Retaliating Against Workers for Showing Solidarity With Palestinians*, THE NATION (Nov. 22, 2024), https://www.thenation.com/article/society/palestine-solidarity-workplace-retaliation/; Eddie Velazquez, *Workers Say Employers Are Retaliating Against Them for Voicing Support for Palestine*, THE PRISM (Nov. 13, 2023), https://prismreports.org/2023/11/13/workers-retaliation-supporting-palestine/; Benjamin Douglas, *US Workers Lack Free Speech Protections on Palestine or Anything Else*, JACOBIN (Nov. 2023), https://jacobin.com/2023/11/us-workers-free-speech-at-will-employment-unions-palestine-censorship; Emily Piper-Vallillo, *Staffer Sues Emerson, Claiming She Was Terminated for Pro-Palestinian Activism*, WBUR (Apr. 2, 2025), https://www.wbur.org/news/2025/04/02/emerson-college-lawsuit-employee-termination-political-activism-palestine.

[50] Melissa Hellmann, *They Staged Protests for Palestine. The Consequences Have Been Life-Changing*, THE GUARDIAN (Apr. 26, 2025), https://www.theguardian.com/us-news/2025/apr/26/university-student-protesters-discipline; Michael Loria & Christopher Cann, *No Diploma: Colleges Withhold Degrees From Students After Pro-Palestinian Protests*, USA TODAY (June 4, 2025), https://www.usatoday.com/story/news/nation/2024/06/01/college-degrees-withheld-after-israel-gaza-protests/73899493007/.

[51] Ethan Mayer-Rich, *The Crackdown on Pro-Palestine Activism Intensifies in the United States*, ARAB CENTER WASHINGTON DC (Feb. 26, 2025), https://arabcenterdc.org/resource/the-crackdown-on-pro-palestine-activism-intensifies-in-the-united-states/; Irene Rahman, Jessica Morrison, Liz Turner & Ziyad Serhan, *Mental Health in the Palestine Solidarity Movement: Supporting Each Other*, COMMONS SOCIAL CHANGE LIBRARY (n.d.), https://commonslibrary.org/mental-health-in-the-palestine-solidarity-movement-supporting-each-other/.

[52] Elena Moore, *For Some Students Who Protested War in Gaza, Fear and Silence Is a New Campus Reality*, NPR (Apr. 12, 2025), https://www.npr.org/2025/04/11/nx-s1-5343940/college-students-say-trump-administrations-crackdown-on-activism-incites-fear.

[53] Gabrielle Roth and Joseph Goldberg, *Jewish Students: Blacklist of BDS Supporters Hurting Efforts to Defend Israel on Campus*, Jewish Telegraphic Agency (Apr. 23, 2018), https://www.jta.org/2018/04/23/ideas/jewish-students-blacklist-bds-supporters-hurting-efforts-defend-israel-campus.

on US college campuses and beyond."[54] T'ruah, the Rabbinic Call for Human Rights labeled it "Jewish McCarthyism."[55]

78.    Canary Mission's defamatory profile of Ms. Johnson remains the top Google search result for her name as of August 2025, constituting ongoing publication. Each new view of the profile—including by prospective employers and academic institutions—constitutes a new publication.

### F. STRATEGIC USE OF ANTISEMITISM ACCUSATIONS AS POLITICAL DOG WHISTLES IN ZIONIST AND ISRAELI INFLUENCE CAMPAIGNS

79.    Canary Mission is just one of a network of organizations and individuals who have systematically weaponized accusations of antisemitism to suppress advocacy for Palestinian rights in the United States. Groups like StopAntisemitism and the Adam and Gila Milstein Family Foundation (MFF) employ tactics ranging from doxing and blacklisting to funding campus initiatives that conflate criticism of Israel with antisemitism. These efforts align with broader Israeli government objectives to erase Palestinian narratives and punish dissent, often under the guise of combating hate.

80.    **The Adam and Gila Milstein Family Foundation (MFF)** funds campus groups that conflate anti-Zionism with antisemitism while marginalizing Palestinian perspectives. MFF grants support "cultural events" hosting speakers who equate criticism of Israel with hate speech and collaborate with the American-Israeli Political Action Committee (AIPAC) to lobby for legislation focused on supporting the Zionist occupation, apartheid, and

---

[54] *Supra*, n.42.

[55] T'ruah, *Young Jewish Activists Furious Over SF Federation's Support of Canary Mission*, T'ruah, https://truah.org/coverage/young-jewish-activists-furious-over-sf-federations-support-of-canary-mission. *See also* Andrew Rehfeld, *What the Taboo on Criticizing Israel Can Teach Us About Cancel Culture*, The Forward (Jul. 20, 2020), https://forward.com/opinion/451118/free-speech-warriors-and-the-jewish-community-have-a-double-standard-on/.

genocide of Palestine and Palestinians. In 2023, MFF directed funds to influence UCLA's student government against Palestinian solidarity resolutions, undermining campus democracy. The foundation also promotes anti-BDS laws that penalize advocacy for Palestinian rights, framing boycott efforts as antisemitic.

81.    The Adam and Gila Milstein Family Foundation funded Canary Mission through Megamot Shalom, an Israeli front organization, as documented in *The Nation*'s investigative report (Dec. 22, 2023). Internal footage from Al Jazeera's *The Lobby – USA* captured Eric Gallagher, a Jewish Zionist operative, stating: "Adam Milstein's the guy who funds [Canary Mission]" while discussing coordination with Milstein about launching "name-and-shame" campaigns.[56] Though Milstein publicly denied funding Canary Mission,[57] the Al Jazeera footage and financial records from the Jewish Community Federation of San Francisco confirm his foundation's role in channeling donations through Megamot Shalom to sustain Canary Mission's criminal enterprise.[58]

82.    Milstein's foundation collaborated with the Israeli Ministry of Strategic Affairs—a government body tasked with suppressing Palestinian advocacy globally—to weaponize Canary Mission's blacklist. As reported by *The Forward* (Oct. 3, 2018), the Ministry used Canary Mission profiles to detain and deport Palestinian Americans like Lara Alqasem at Ben Gurion Airport, demonstrating institutional coordination.[59] This partnership aligns with the Ministry's admitted strategy of "countering delegitimization" through covert

---

[56] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 22, 2023).
[57] Josh Nathan-Kazis, *Pro-Israel Donor Adam Milstein Denies Report That He Funds Canary Mission*, Times of Israel (Jan. 4, 2019).
[58] Nora Barrows-Friedman, *Jewish Community Federation Admits It Secretly Funded Canary Mission*, Electronic Intifada (Apr. 9, 2019).
[59] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info To Bar Activists*, The Forward (Oct. 4, 2018).

operations targeting U.S. campuses, as detailed in James Bamford's *Democracy Now!* interview (Dec. 27, 2023).[60]

83.    The Adam and Gila Milstein Family Foundation deliberately targeted its efforts at the District of Columbia by funding Canary Mission's operations targeting Georgetown students and faculty, including profiles of MSFS community members.

84.    **StopAntisemitism**, founded by Zionist extremist Liora Rez, operates as a far-right cyberstalking group that systematically targets Muslim, Arab, Jewish, African American, and Palestinian activists under the guise of combating antisemitism. While claiming to address prejudice against Jewish communities, the organization almost exclusively focuses on silencing criticism of the Israeli occupation, apartheid, and genocide of Palestine and Palestinians. Its primary tool is doxing: publishing personal details of activists, students, and academics to incite harassment and professional retaliation. For example, Turkish student Rumeysa Ozturk was arrested by ICE after StopAntisemitism amplified an article she co-authored decrying the genocide of Palestinians by Zionist state actors, demonstrating how the group weaponizes personal information to endanger livelihoods and suppress dissent.

85.    The group employs coded language that invokes historic antisemitic conspiracies while accusing others of bigotry. Terms like "globalists" and "foreign nationals" are deployed to frame critiques of Israeli policies as existential threats to Jewish safety, echoing Nazi-era tropes about Jewish dual loyalty and global domination. This rhetorical strategy deliberately conflates anti-Zionism with antisemitism, erasing distinctions between

---

[60] *Who Funds Canary Mission? James Bamford on Group That Doxxes Students & Profs for Palestine Activism*, Democracy Now! (Dec. 27, 2023).

state criticism and religious hatred. By labeling phrases like "Free Palestine" as inherently antisemitic, StopAntisemitism stifles protected political speech while amplifying the very stereotypes it claims to oppose.

86. StopAntisemitism coordinates with government agents, university administrators, and employers to punish targeted individuals. Internal emails and public records reveal campaigns to revoke visas, terminate employment, and blacklist activists. For instance, the group pressured New York University to investigate Professor Amin Husain for organizing pro-Palestinian teach-ins, citing fabricated "security concerns." Such actions institutionalize discrimination by treating Palestinian advocacy as a disciplinary offense, violating Title VI protections against national origin discrimination and academic freedom principles.

87. Prominent Jewish voices, including Rabbi David Mivasair and Jewish Voice for Peace, condemn StopAntisemitism's tactics as counterproductive. They argue that equating Jewish safety with unwavering support for Israel fuels actual antisemitism by reinforcing harmful stereotypes. As Mivasair stated, "This group doesn't protect Jews—it weaponizes Jewish trauma to legitimize apartheid." These critiques underscore how StopAntisemitism's actions alienate allies, fracture coalitions, and ultimately endanger marginalized communities under the pretense of safeguarding them.

## G. MS. JOHNSON'S TWITTER POSTS AS A COLLEGE FRESHMAN IN 2015

88. In 2015, Ms. Johnson was a freshman at Northwestern University. Like many Palestinians witnessing the devastating impacts of repeated cycles of Zionist military bombardments, she expressed her anguish, opposition, and frustration to Zionist policies and violence. Her expressions at the time reflected that of a teenager, who is continuously affected

by secondary trauma—as a Muslim woman in post-9/11 America, a descendant of violently dispossessed and displaced Palestinian refugees, and an African American navigating systemic White Supremacy.

89.     As a college freshman, Ms. Johnson made three posts on Twitter. The first post was a tweet that read, "Ever since going to NU I have a deep seeded hate for Zio b**ches. They bring out the worst in me." The second post was a tweet that read, "You know why I call them Zio b**ches, because they're dogs."

90.     The third post was a retweet of another tweet. The retweeted tweet had a photo of a scowling Charedi boy with the following caption: "When the whole world hates you bc you a thief and grow up looking like a shaytan #GrowingUpIsraeli."

91.     The photo of the scowling boy was first featured in a blog in 2011 by Mike Isaacson, a British Zionist settler, lawyer, and professional online troll who disapproves of Charedi Zionist settlers. Isaacson features the photo of the Charedi boy scowling at him for walking his dogs down a Charedim street in the "Anglo part" of Bayt Nattif's Ain Shams outside Jerusalem—European Zionist settlers had ethnically cleansed Bayt Nattif's Palestinian inhabitants and renamed Ain Shams "Bet Shemesh." In his blog, Isaacson mocks Charedim religious attire and calls them "penguins" and "nutters." He also describes Charedim as "ridiculously anachronistic, lazy, chutzpadik . . . violent, spongers and parasites." Isaacson likens European Charedi settlers to "the skinheads and 'yobs' of our boyhood in England" for telling him "which of its streets we could and could not walk."[61]

---

[61] Mike Isaacson, *Spitters and Splitters: What Have the Charedim Ever Done for Us?*, Melchett Mike (Dec. 31, 2011), https://melchettmike.wordpress.com/2011/12/31/spitters-and-splitters-what-have-the-charedim-ever-done-for-us/.

92.     Ms. Johnson's three Twitter posts—two tweets and a retweet—were borne of her lived experience as an African American Palestinian teenager whose family endured displacement, dispossession, and ongoing trauma under Israel's occupation, apartheid, and genocide.

93.     These posts coincided with her leadership in Northwestern University's student-led divestment movement, where she organized protests and advocated for the university to divest from companies complicit in Israel's occupation, apartheid, and genocide in Palestine. As a freshman in 2015, Ms. Johnson participated in campus demonstrations opposing Northwestern's investments in corporations like Caterpillar and Elbit Systems—companies directly implicated in the demolition of Palestinian homes and military occupation.

94.     Ms. Johnson's advocacy mirrored broader student efforts documented in *After More Than Five Hours of Debate, ASG Senate Narrowly Passes NUDivest Resolution*, where Northwestern students later voted to demand divestment from "companies that violate Palestinian human rights."[62] This context underscores how Ms. Johnson's social media activity reflected protected political speech tied to her advocacy, not antisemitism.

95.     Ms. Johnson helped lead a cross-faith coalition of Muslim, Christian, Jewish, agnostic, and atheist students that forced Northwestern University to establish its Advisory Committee on Investment Responsibility in 2023 - a direct result of their successful campaign exposing the University's investments in Caterpillar and Elbit Systems, companies fueling human rights violations against Palestinians. This hard-won victory followed their 2023 ASG

---

[62] Shane McKeon, *After More Than Five Hours of Debate, ASG Senate Narrowly Passes NUDivest Resolution*, THE DAILY NORTHWESTERN (Feb. 19, 2015), https://dailynorthwestern.com/2015/02/19/campus/after-debate-associated-student-government-senate-narrowly-passes-nudivest-resolution-bds-divestment-northwestern/

Senate resolution demanding divestment (passed 24-22 after a 5-hour debate), mirroring Northwestern's 2005 Sudan divestment and 2015 coal divestment campaigns that students had to drag from proposal to action through relentless pressure.

### H. COORDINATED ZIONIST CAMPAIGN TO TARGET ANTI-ZIONIST STUDENTS, ACADEMICS, AND PROFESSIONALS

96.    In 2015, during Ms. Johnson's freshman year and after her Twitter posts, she became a target of Canary Mission.

97.    The harassment campaign against Ms. Johnson was not random but part of a systematic effort by Canary Mission to target Palestinian, Arab, Muslim, and students of color. In a national climate marked by rising Muslim hate and anti-Arab racism, Canary Mission's smear campaign deliberately exposed already marginalized campus communities to additional surveillance, harassment, and physical danger.

98.    In Ms. Johnson's case, Canary Mission weaponized her social media posts through a deliberate campaign of decontextualization and defamation, stripping her protected political speech of its historical context during a period of intense Israeli military violence against Palestinian civilians. This malicious distortion triggered a cascade of professional and personal devastation.[63]

99.    Canary Mission's profile deliberately omitted Ms. Johnson's role in Northwestern's divestment campaigns, which began during her freshman year. The university's own history of student-led divestment efforts—including the 2005 Sudan

---

[63] William Clark, *In Focus: Community Members Say Northwestern Is Neither a Safe Nor Free Space for Conversations About Palestine and Israel*, THE DAILY NORTHWESTERN (Mar. 2, 2023), https://dailynorthwestern.com/2023/03/02/featured-stories/in-focus/community-members-say-northwestern-is-neither-a-safe-nor-free-space-for-conversations-about-palestine-and-israel/.

divestment and 2019 fossil fuel protests—demonstrates a pattern of institutional resistance to ethical investment policies.[64]

100.    Ms. Johnson's advocacy placed her in the crosshairs of groups like Canary Mission, which systematically targets Palestinian rights organizers. As documented in *As NU Reestablishes Advisory Committee on Investment Responsibility*, Northwestern's administration has historically dismissed divestment proposals, creating a hostile environment for conscientious student advocates like Ms. Johnson.[65]

101.    Ms. Johnson, like many students targeted by Canary Mission, experienced severe harassment and threats to her safety, forcing her to close her social media accounts and withdraw from public activism.

102.    Canary Mission's defamatory profile of Ms. Johnson remains the top Google search result for her name as of August 2025. Each new view of the profile—including by prospective employers and academic institutions—qualifies as a republication of the defamatory content.

## I.    POST-TARGETING PROFESSIONAL PERSEVERANCE

103.    Following Canary Mission's 2015 smear campaign, Ms. Johnson abandoned her public social media presence to avoid further harassment. This silencing tactic mirrors findings from The Intercept's survey of over 60 blacklisted individuals, where 43% "toned down their activism" and 42% suffered acute anxiety due to the profiles.[66]

---

[64] Nineth Kanieski Koso, *As NU Reestablishes Advisory Committee on Investment Responsibility, Students and Faculty Express Skepticism*, THE DAILY NORTHWESTERN (Oct. 16, 2024), https://dailynorthwestern.com/2024/10/16/lateststories/as-nu-reestablishes-advisory-committee-on-investment-responsibility-students-and-faculty-express-skepticism/ (noting Fossil Free NU's 2015 coal divestment campaign).

[65] *Id.* (quoting Prof. David Uttal).

[66] Alex Kane, *"It's Killing the Student Movement": Canary Mission's Blacklist of Pro-Palestine Activists Is Taking a Toll*, THE INTERCEPT (Nov. 22, 2018), https://theintercept.com/2018/11/22/israel-boycott-canary-mission-blacklist/.

104.    Despite the psychological toll—documented as causing "self-censorship and psychological warfare effects" among targets—Ms. Johnson completed her studies.[67] Her experience aligns with broader trends where Palestinian students endure systemic intimidation but persist academically under duress.

105.    Ms. Johnson rebuilt her career discreetly, avoiding public political engagement to evade further targeting. This reflects a common survival strategy among Canary Mission victims, who often face lasting professional harm and economic precarity due to employer discrimination.[68]

## J.  MS. JOHNSON'S MERITORIOUS QUALIFICATIONS AND SELECTION BY GEORGETOWN

106.    Ms. Johnson, a highly qualified candidate of Palestinian and African American heritage, applied for the Assistant Director of Academic and Faculty Affairs position at Georgetown University's Walsh School of Foreign Service (MSFS) on August 31, 2023.

107.    Her credentials—including advanced degrees, professional experience, and alignment with Georgetown's mission—led to a swift interview process.

108.    On September 20, 2023, Ms. Johnson had a successful Zoom interview with MSFS leadership, including Director George Shambaugh and Deputy Director Ashley Lenihan.

109.    On September 27, 2023, Ms. Johnson had an in-person interview that comprised of a series of meetings with faculty and students, where she demonstrated genuine connection and meaningful engagement.

---

[67] *Id.*

[68] *Id. See also* Comm. on Acad. Freedom, Middle E. Stud. Ass'n of N. Am., *Resource Guide to Counteract Dangerous Risk of Canary Mission Website* (Apr. 18, 2017), https://mesana.org/news/2018/04/18/committee-on-academic-freedom-shines-light-on-secretive-website-that-defames-students-offers-resource-for-college-leaders-to-take-action.

110.    As part of her interview process, Ms. Johnson met with the MSFS Director George Shambaugh and the Director of Academic and Faculty Affairs Rebecca Caro. Both offered valuable insights into the role and its responsibilities.

111.    Ms. Johnson also had an engaging and thoughtful meeting with three MSFS students. The students shared their perspectives on the program and asked Ms. Johnson insightful questions about how she would support their academic journey.

112.    Ms. Johnson also met with another staff member and future colleague, who helped round out her understanding of the MSFS team's dynamics and goals.

113.    All the discussions were rich and engaging. Each meeting or question was tailored not just to evaluate Ms. Johnson's qualifications, but also to gauge how well she aligned with the values and vision of the MSFS program.

114.    On October 2, 2023, Georgetown extended Ms. Johnson an unconditional offer letter. Eager to positively contribute to the MSFS team's culture and help further the MSFS mission, Ms. Johnson accepted.

## K.  GEORGETOWN'S DISCRIMINATORY SCRUTINY AND HOSTILE ONBOARDING

115.    Georgetown's enthusiasm for Ms. Johnson collapsed immediately upon learning of her African American and Palestinian identity.

116.    During a welcoming lunch on her first day on October 30, 2023, faculty members interrogated Ms. Johnson about her heritage.

117.    Professor Shantayanan Devarajan asked if she was Sudanese, then pressed further when she disclosed her Palestinian roots.

118.    Director George Shambaugh redirected conversation to the "war in Gaza," making Ms. Johnson visibly uncomfortable and upset—forcing colleagues to intervene.

119.    Shambaugh's decision to redirect conversation to the "war in Gaza" during Ms. Johnson's welcome lunch did far more than breach professional decorum—it reduced her Palestinian identity to a crude political trope and brought Ms. Johnson to tears. This act exemplifies how Palestinians in America are systematically stripped of their humanity and recast as perpetual proxies for geopolitical conflict.

120.    Ms. Johnson's experience reflects a well-documented pattern in U.S. institutions where Palestinian identity is weaponized to erase individuality, enforce silence and normalize collective punishment. Georgetown is no exception.

121.    Ms. Johnson was flattened into a symbol of the so-called "Israeli-Palestinian conflict," denied the right to exist outside politicized narratives. As scholar Rashid Khalidi notes, "Palestinians in America are rarely seen as people—only as problems."[69]

122.    The implicit demand by Georgetown that Ms. Johnson explicitly denounce an action or state her position on Palestine before being granted basic respect creates what the Rutgers Center for Security, Race, and Rights calls a "loyalty test" not imposed on other groups.[70]

123.    Ms. Johnson's tears stemmed not from personal fragility, but from the trauma of being forced to answer for the Zionist occupation, apartheid, and genocide targeting her ancestral homeland and family—a burden no other ethnic group is made to bear.

124.    Ms. Johnson does not use the term "genocide" as a rhetorical device, but as a concrete legal prohibition that exists in federal and international law. *See* 18 U.S.C § 1091

---

[69] Rashid Khalidi, *The Hundred Years' War on Palestine: A History of Settler Colonialism and Resistance, 1917–2017* (Metropolitan Books 2020).
[70] Ctr. for Sec., Race & Rts., Rutgers L. Sch., *Presumptively Antisemitic: Islamophobic Tropes in the Palestine–Israel Discourse* (Nov. 2023), https://csrr.rutgers.edu/wp-content/uploads/2023/11/csrr-presumptively-antisemitic-report.pdf.

(implementing the Genocide Convention).[71] Israel's genocidal conduct in Palestine has been recognized by international courts,[72] United Nations experts,[73] genocide scholars,[74] leading medical professionals,[75] and even U.S. courts,[76] among others. Demanding an end to this genocide and justice for the people being annihilated is not only lawful and constitutionally protected, but also a legal imperative upon all nations under the Genocide Convention.[77]

## L. COORDINATED ONLINE ZIONIST CAMPAIGN OF HATE AGAINST MS. JOHNSON

125. Rachel Jessica Wolff—a Zionist dual degree student at Georgetown's School of Foreign Service and Georgetown University Law Center—identified Ms. Johnson as a

---

[71] The crime of genocide occurs when someone "whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such— (1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group." 18 U.S.C. § 1091; *see also* Convention on the Prevention and Punishment of the Crime of Genocide, December 9, 1948, General Assembly Resolution 260, entered into force on January 12, 1951, ("The Genocide Convention"), Article II.

[72] *See* International Court of Justice, Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.

[73] *See, e.g.,* United Nations, "Anatomy of a Genocide, Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Francesca Albanese," A/HRC/55/73 (March 25, 2024), https://perma.cc/9GRF-XR7K; United Nations, "Gaza: UN Human Rights Experts Call on International Community to Prevent Genocide Against the Palestinian People—OHCHR Press Release" (November 16, 2023), https://perma.cc/XDS8-PJF2.

[74] *See, e.g.,* "Declaration of William A. Schabas in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-5 (November 16, 2023), https://perma.cc/4MH2-ENU5; *see also* "Declaration of Dr. John Cox, Dr. Victoria Sanford and Dr. Barry Trachtenberg in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-6 (November 16, 2023), https://perma.cc/3RPE-F6AN.

[75] *See, e.g.,* "[Proposed] Brief of Amici Curiae Medical Doctors in Support of Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss," 4:23-cv-05829-JSW, Document 52-1 (December 30, 2023), https://perma.cc/A68V-DU4C.

[76] In his decision in *Defense for Children International-Palestine v. Biden*, Judge Jeffrey S. White noted that "the undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony of the Plaintiffs and the expert opinion proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide." 714 F.Supp.3d 1160, 1163 (N.D. Cal. 2024). (Because the Judge granted Defendants' Motion to Dismiss based on the political question doctrine, this section of the opinion does not have legal force as a factual finding).

[77] The Genocide Convention, supra note 1, Article I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 43, 221, ¶ 430.

target to attack through Ms. Johnson's introductory email to the MSFS community, which included students, faculty, and professional staff.

126.    Wolff proceeded to search Ms. Johnson's name. The first result featured on the search engines was Canary Mission's hateful and racist dossier on Ms. Johnson from eight years earlier. Wolff made it her mission to malign Ms. Johnson and start a hateful doxing and harassment campaign.



127.    On November 1, 2023, at 10:17 PM, Wolff initiated her targeted harassment and hate campaign against Ms. Johnson by posting a defamatory tweet that rapidly went viral, garnering over 1.2 million views, 404 comments, 6,300 likes, 2,000 retweets, and 329 bookmarks within hours.



128.    Wolff's tweet relied on Ms. Johnson's decontextualized social media posts from 2015, when Ms. Johnson was a college freshman, deliberately stripping them of their historical context.

129.    As if the first tweet was not enough, Wolff continued her instigation with a second tweet, using one of the racist features by Canary Mission to shame Georgetown for hiring Ms. Johnson in the first place.



130.     The viral tweet was amplified by Canary Mission, the Israeli government, and other Zionist accounts, exponentially increasing its reach and the subsequent harassment directed at Ms. Johnson.



131.     Among those who retweeted Wolff's tweet was Georgetown's very own "Constitutional Law and Supreme Court Expert" Ilya Shapiro, who served as the executive director and senior lecturer at the Georgetown Center for the Constitution. In his conduct, he explicitly identified Ms. Johnson in her position at Georgetown University.



132.   On November 2, 2023, at 8:22 AM, George Shambaugh, the Director of the MSFS Program, called Ms. Johnson instructing her not to come to the office due to "unspecified threats to her safety."

133.   At 9:43 AM, Shambaugh called again, placing Ms. Johnson on paid administrative leave without due process or explanation.

134.   At 10:42 AM, Ms. Johnson received an email from Joel Hellman, the Dean of the School of Foreign Service, to the entire school community implicitly affirming the racist and defamatory campaign of hate targeting Ms. Johnson, further compounding her distress.

135.   At 10:53 AM, Ms. Johnson received her first hate message in her work email, marking the beginning of direct harassment.

136.   Around noon, Ms. Johnson learned of Wolff's viral tweet about her for the first time, despite having never met or interacted with Wolff.

137.    Throughout the evening of November 2, Ms. Johnson was subjected to extensive doxing, with her personal information shared across various Zionist and Israeli social media accounts and websites.

138.    By 2:40 PM on November 2, 2023, less than 17 hours after Wolff's initial tweet, Georgetown had placed Ms. Johnson on administrative leave pending an investigation, demonstrating the immediate and severe professional consequences of this coordinated attack.



139.    The harassment escalated to national prominence when Zionist mouthpiece Ben Shapiro published an article on November 2, 2023, about Ms. Johnson on The Daily

Wire,[78] mentioned her by name in his podcast,[79] and on his YouTube channel,[80] making Ms. Johnson a target of hateful threats and attacks to an even larger audience.

140.    Shapiro falsely conflates Ms. Johnson's criticisms of Zionism with antisemitism, weaponizing her 2015 tweets to paint her as a threat. This article remains live on The Daily Wire as of August 2025.

141.    Ben Shapiro repeats the same defamatory claims from his article, amplifying them to his audience of millions. The episode remains accessible on The Daily Wire's platform.

## M. GEORGETOWN'S DISCRIMINATION AND UNLAWFUL TERMINATION OF MS. JOHNSON

142.    Just before 5 PM on November 2, 2023, Ms. Johnson received a letter from her director informing her that she had been placed on administrative leave. The letter stated that, "[t]he university is currently investigating allegations related to your online conduct. Specifically, it is alleged that you have engaged in serious misconduct which, if substantiated, would be in violation of University policies, including professional conduct policies."

143.    Georgetown's School of Foreign Service issued a statement claiming they were unaware of Johnson's background when hiring her and that she was placed on immediate administrative leave pending an investigation of her past social media comments.

---

[78] Ben Shapiro, *The Islamophobic Lie*, Daily Wire (Nov. 2, 2023), https://www.dailywire.com/news/the-islamophobic-lie ("Georgetown just hired the radical anti-Semite Aneesa Johnson as new assistant director of academic and faculty affairs, who posted about 'Zio bitches' saying, 'They're dogs.'").
[79] Ben Shapiro, *Ep. 1843 – The Islamophobia Lie*, Daily Wire (Nov. 3, 2023), https://www.dailywire.com/episode/ep-1843-the-islamophobia-lie (Timestamp: 00:49 – 1:24).
[80] Ben Shapiro, *Ep. 1843 – The Islamophobia Lie*, YouTube (Nov. 3, 2023), https://youtu.be/PN32UIj1mf0 (Timestamp: 00:49 – 1:24).

144.    On November 8, Ms. Johnson sent a letter to Georgetown documenting concerns of discriminatory conduct. Georgetown did not heed Ms. Johnson's complaints of discrimination.

145.    On November 27, 2023, Georgetown terminated Ms. Johnson's employment. Her termination letter stated,

> "This letter is to inform you that your probationary employment as Assistant Director of Academic and Faculty Affairs in the Master of Science in Foreign Service Program with Georgetown University is terminated effective November 27, 2023. This decision has been made pursuant to Human Resources Policy #204: Probationary Employment Period.

> On Thursday, November 2, 2023, you were placed on paid administrative leave, pending an investigation into your alleged misconduct. Specifically, the University investigated allegations that you engaged in unprofessional conduct based on your social media activity, including, but not limited to posts from 2015 which were shared with Georgetown University during the first week of your employment, which began on October 30, 2023. Your social media conduct has had a significantly negative impact on the MSFS Program and in extension its Walsh School of Foreign Service and the wider Georgetown Community. It also impacts your ability to engage fully with members of our community.

> The University's review concluded that you engaged in unprofessional conduct based on the postings that you made and your subsequent failure to address concerns raised by your social media activities . . .

> It is for these reasons that the University has decided to terminate your employment during the probationary period and in accordance with Human Resources Policy #204: Probationary Employment Period, which states in part that:

> "Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment. However, if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior us unacceptable, the University may terminate employment at any time during the probationary period . . ."

146. As a result of this coordinated campaign by all Defendants, Ms. Johnson suffered panic attacks, insomnia, and anxiety. She endured permanent association with "antisemite" in Google searches—where Canary Mission's defamatory profile remains the top result as of August 2025—destroying her academic and professional trajectory. Faced with credible threats of violence, she was initially forced to deactivate her public social media accounts and permanently delete certain online profiles. While Ms. Johnson eventually resumed limited advocacy under strict privacy settings and pseudonymous accounts, she did so with persistent apprehension, constant vigilance against further retaliation, and irreversible damage to her ability to safely engage in public-facing work—a direct consequence of Defendants' harassment.

147. Georgetown's swift action in response to Wolff's campaign, without due process or any meaningful investigation, reveals the institution's discrimination and complicity in affirming the weaponization of anonymous and racist blacklists against Palestinian voices in academia. If equality and the addressing discrimination were truly integral to the University's values, and if Georgetown considered Ms. Johnson's human dignity equal to white men, it would have afforded Ms. Johnson a meaningful investigation, seek advice of counsel, and an opportunity to respond to the racist anti-Palestinian conspiracy she found herself in the crosshairs of.

148. In Ms. Johnson's case, Canary Mission's profile deliberately stripped context from her social media posts, presenting them in a misleading manner designed to damage her professional reputation and employment prospects.

149. Georgetown University's termination of Ms. Johnson exemplifies a coordinated campaign to suppress Palestinian advocacy, demonstrating pretext and

discriminatory intent through its selective enforcement of policies against protected speech. This pattern of institutional bias against Palestinian identity substantiates Ms. Johnson's Title VII and DCHRA claims, as Georgetown weaponized blacklists created through coordinated harassment campaigns—such as Canary Mission's defamatory profiles—to justify her termination. The University's reliance on these tactics, combined with its deliberate indifference to the severe emotional and professional harm inflicted by doxing and death threats, further establishes the extreme and outrageous conduct necessary for her intentional infliction of emotional distress claim. Collectively, these actions reveal a systemic effort to silence Palestinian voices through discriminatory employment practices and institutionalized repression.

### N. DISPARATE TREATMENT AND COMPARATOR EVIDENCE DEMONSTRATING PATTERN OF DISCRIMINATORY ANIMUS

150.    Georgetown University's Human Resources Policy #204 explicitly states: "Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment. However, if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior is unacceptable, the University may terminate employment at any time during the probationary period." This policy mandates due process absent severe misconduct.

151.    Georgetown University has demonstrated a pattern of disparate treatment in its handling of controversial speech and conduct by employees, favoring non-Muslim and pro-Israel voices while discriminating against Palestinian and Muslim perspectives.

152.    **Comparator 1: Ilya Shapiro**. Ilya Shapiro, a white male Jewish Zionist senior lecturer and executive director for the Georgetown Center for the Constitution at the Georgetown

University Law Center, serves as a critical comparator demonstrating Georgetown's discriminatory double standards.

153.    As a member of multiple privileged protected classes, Shapiro publicly tweeted that President Biden's Supreme Court nominee would be a "lesser Black woman," directly targeting a protected class (Black women) and creating a hostile educational environment.



154.    Despite this misconduct, Georgetown placed Shapiro on paid administrative leave during a four-month investigation, granted him full due process with faculty and student input, reinstated him without disciplinary action, and explicitly invoked its "Speech and Expression Policy" and Policy #204's protections to justify retaining Shapiro and shielding him from consequences.

| Factor | Ms. Johnson | Ilya Shapiro |
|---|---|---|
| Protected Class | Muslim, Palestinian, African American, Female | White, Jewish, Male, Zionist |
| Position | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Executive Director, Georgetown Center for the Constitution (retained). |
| Misconduct | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Racist tweet about a female African American judge posted three days prior to serving as executive director and senior lecturer at the |

|  |  | Georgetown Center for the Constitution. |
|---|---|---|
| Investigation | None; suspended within 3 days and terminated in less than a month without due process. | Yes, with 4-month paid administrative leave; full faculty/student input. |
| Disciplinary Action | Immediate suspension and termination | Reinstated with no discipline |
| Application of Georgetown University Policy No. 204 | No ("normally allow completion" mandate ignored) | Yes (invoked to justify retention) |
| Georgetown's Justification | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | Invoked "Speech and Expression Policy" to protect racist speech |

155.    This preferential treatment—afforded to an employee who targeted a protected class—stands in stark contrast to Georgetown's summary termination of Ms. Johnson for far less severe conduct, when she was teenager, exposes the University's systemic bias against Palestinian and Muslim voices.

156.    **Comparator 2: Bruce Hoffman**. Bruce Hoffman, a white male Jewish Zionist faculty member, engaged in discriminatory conduct by comparing Northern Virginia infrastructure to "Mogadishu"—invoking racist tropes about Somalia—and claiming TikTok was "turning a whole generation into anti-Semites," yet faced no investigation or discipline from Georgetown University.

157.    Despite this misconduct, which targeted protected classes and amplified hateful racist stereotypes, Georgetown not only retained Hoffman but promoted him to a leadership role overseeing "Countering Hate and Intolerance," demonstrating institutional reward for anti-Muslim and racist rhetoric.

158.    This disparate treatment starkly contrasts with Georgetown's summary termination of Ms. Johnson for far less severe conduct when she was a teenager.

| Factor | Ms. Johnson | Bruce Hoffman |
|---|---|---|
| Protected Class | Muslim, Palestinian, African American, Female | White, Jewish, Male, Zionist |
| Position | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Tenured Professor, Director of Center for Jewish Civilization (promoted). |
| Misconduct | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Compared Northern Virginia infrastructure to "Mogadishu" (racist tropes); claimed TikTok creates "anti-Semites" (ageist inflammatory generalizations). |
| Investigation | None; suspended within 3 days and terminated in less than a month without due process. | No investigation. |
| Disciplinary Action | Immediate suspension and termination | Promoted to oversee "Countering Hate and Intolerance" initiatives. |
| Application of Georgetown University Policy No. 204 | No ("normally allow completion" mandate ignored) | N/A (no misconduct review) |
| Georgetown's Justification | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | Rewarded with leadership role despite anti-Muslim rhetoric. |

159.    The University's selective enforcement of its policies reveals systemic bias favoring protected classes aligned with institutional power structures.

160.     **Comparator 3: Danielle Pletka.** Danielle Pletka, a white female Jewish Zionist adjunct professor at Georgetown's Walsh School of Foreign Service, engaged in misconduct by repeatedly labeling critics of Israeli policies as "terrorist sympathizers" and "insubordinate morons," rhetoric that targeted protected groups and created a hostile environment for Palestinian and Muslim students, faculty, and staff.

161.     Despite this conduct, which directly implicated protected classes and violated Georgetown's stated commitment to inclusive discourse, the university took no disciplinary action against Pletka and continues to employ her as a faculty member.

| Factor | Ms. Johnson | Danielle Pletka |
|---|---|---|
| **Protected Class** | Muslim, Palestinian, African American, Female | White, Jewish, Female, Zionist |
| **Position** | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Adjunct Professor, Walsh School of Foreign Service (retained). |
| **Misconduct** | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Labeled critics of Israel as "terrorist sympathizers" and "insubordinate morons" (dehumanizing racist rhetoric). |
| **Investigation** | None; suspended within 3 days and terminated in less than a month without due process. | No investigation. |
| **Disciplinary Action** | Immediate suspension and termination | Continued teaching with no consequences. |
| **Application of Georgetown University Policy No. 204** | No ("normally allow completion" mandate ignored) | N/A (no misconduct review) |

| | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | Tolerated defamatory speech under academic freedom. |
|---|---|---|
| Georgetown's Justification | | |

162. This disparate treatment, protecting Pletka's inflammatory speech while terminating Ms. Johnson for far less severe conduct, when she was a teenager, when the two are similarly situated in all material respects, underscores Georgetown's systemic bias against Palestinian and Muslim voices.

163. **Comparator 4: Yonatan Green**. Yonatan Green, a white male Jewish Zionist Georgetown Fellow, faced no consequences for his derogatory dismissal of Palestinian narratives of displacement, which he labeled as "baseless victimhood"—conduct that targeted protected groups and undermined Palestinian students' experiences.

164. Despite this misconduct, Georgetown took no investigative or disciplinary action against Green and retained him as a fellow with full privileges, continuing his access to students and academic resources.

| Factor | Ms. Johnson | Yonatan Green |
|---|---|---|
| **Protected Class** | Muslim, Palestinian, African American, Female | White, Jewish, Male, Zionist |
| **Position** | Assistant Director of Academic and Faculty Affairs (suspended and eventually terminated after 3 days). | Georgetown Fellow (retained). |
| **Misconduct** | 2015 social media posts criticizing Israeli state policies as a college freshman from a since defunct account, 8 years before joining Georgetown University. | Dismissed Palestinian displacement narratives as "baseless victimhood" – mocked Palestinian trauma (denial of protected class experiences, dehumanizing rhetoric, and hatemongering). |

| Investigation | None; suspended within 3 days and terminated in less than a month without due process. | No investigation. |
|---|---|---|
| Disciplinary Action | Immediate suspension and termination | Retained as fellow with full privileges. |
| Application of Georgetown University Policy No. 204 | No ("normally allow completion" mandate ignored) | N/A (no misconduct review) |
| Georgetown's Justification | Cited "unprofessional conduct" and "negative impact" from 2015 posts. | No action taken despite targeting Palestinian students. |

165.    This disparate treatment, protecting Green's inflammatory speech while terminating Ms. Johnson for far less severe conduct, when she was a teenager, when the two are similarly situated in all material respects, further evinces Georgetown's systemic bias against Palestinian voices.

166.    **Plaintiff Aneesa Johnson**. As a Muslim woman of Palestinian and African American descent, Aneesa Johnson belongs to multiple protected classes under federal and local anti-discrimination laws.

167.    Georgetown University subjected her to severe adverse employment actions under Policy #204—including immediate administrative leave without investigation and termination within three days of employment—based solely on her 2015 social media posts when she was a teenager criticizing Israeli state policies.

168.    While Georgetown cited its probationary employment policy to justify bypassing due process, this pretextual rationale starkly contrasts with its treatment of non-Palestinian, non-Muslim, and non-African American Zionist employees who engaged in

more egregious and recent misconduct, demonstrating that Georgetown applied policies disparately to discriminate against Ms. Johnson and suppress protected political speech.

169.    In short, Georgetown treated Ms. Johnson disparately as compared to other individuals who are similarly situated in all material respects: non-Palestinian, non-Muslim, non-African American Zionist employees like Shapiro, Hoffman, Pletka, and Green engaged in far more severe misconduct—including racist speech targeting protected classes (Black women, Muslims, and Palestinians)—yet retained positions or received promotions, while Ms. Johnson faced summary termination for criticizing the violence of occupation, apartheid, and genocide when she was a teenager.

170.    Georgetown weaponized its Speech and Expression Policy to suppress Ms. Johnson's protected political speech while shielding non-Palestinian, non-Muslim, non-African American Zionist employees' discriminatory conduct, exposing systemic bias at Georgetown that privileges Zionist non-Muslim, non-Palestinian, and non-African American voices over Palestinian, Muslim, and anti-racist advocacy.

171.    Georgetown's disparate policy enforcement is evidence of pretext. Georgetown applied Policy #204 protectively to Shapiro (racist speech) but punitively to Ms. Johnson (protected political speech). This deviation-denying Ms. Johnson probationary completion while permitting Shapiro's-exposes anti-Palestinian bias masquerading as neutral policy application.

172.    Georgetown University's selective enforcement of its policies demonstrates systemic discrimination through three interrelated mechanisms:

a. Disparate impact, as Palestinian, African American, and Muslim anti-Zionist employees like Ms. Johnson are held to far stricter standards than non-Palestinian, non-Muslim, and non-African American Zionist peers;

b. Pretextual rationale, wherein Georgetown's reliance on a "probationary period" justification directly conflicts with Policy #204's mandate to "normally allow completion" absent evidence of severe misconduct; and

c. Causal nexus, evidenced by the immediate termination following backlash to Ms. Johnson's Palestinian identity rather than any objective performance deficiencies.

173. This pattern of institutional bias—elevating Zionist, non-African American, non-Palestinian, and non-Muslim voices while suppressing Palestinian advocacy—reflects the application of policies disparately to punish protected political speech and discriminate against the immutable characteristics in Ms. Johnson's identity.

174. Georgetown University's systemic discrimination violates Title VII and the DCHRA by tolerating racist and anti-Muslim speech from non-Palestinian Zionist faculty, punishing dated protected political speech from Palestinian employees like Ms. Johnson, and maintaining institutional bias through inconsistent application of policies.

175. This pattern demonstrates preferential enforcement of speech protections for Zionist and non-Muslim voices while weaponizing university protocols to suppress Palestinian advocacy, thereby perpetuating a discriminatory double standard that unlawfully disadvantages African American, Muslim, Palestinian, and anti-Zionist individuals.

## VI.    CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 2000e et seq.**
**(Discrimination Based on Race, Religion, and National Origin)**
Against Defendant Georgetown University

176.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

177.    Georgetown University discriminated against Ms. Johnson on the basis of her race (African American and Arab), religion (Muslim), and national origin (Palestinian) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

*Prima Facie Case Elements*

178.    Ms. Johnson is a member of multiple protected classes under Title VII. She (1) is African American and Arab, (2) is of Palestinian national origin, and (3) practices the Muslim faith.

179.    Georgetown subjected Ms. Johnson to adverse employment actions, including: (a) placing her on administrative leave on November 2, 2023, after only three days of employment; (b) failing to provide due process or meaningful investigation; and (c) terminating her employment on November 27, 2023.

180.    Ms. Johnson was qualified to perform her duties as Assistant Director of Academic and Faculty Affairs, as evidenced by Georgetown's extensive hiring process, her advanced degrees and professional experience, and Georgetown's determination that she aligned with its mission when it extended her an unconditional offer on October 2, 2023.

181.    Georgetown treated Ms. Johnson less favorably than similarly situated employees outside her protected classes. Specifically, Georgetown terminated Ms. Johnson within 28 days for eight-year-old social media posts that criticized the Zionist policies of

occupation, apartheid, and genocide, while retaining non-Palestinian, non-Muslim, non-Arab, and non-African American employees who engaged in egregious conduct. Out of dozens, Ms. Johnson offers four comparators.

182.    First, Ilya Shapiro (a white, male, Jewish, Zionist): Georgetown retained Shapiro after he posted racist tweets calling President Biden's Supreme Court nominee a "lesser Black woman." It provided him with a four-month paid investigation, full due process, and a negotiated process; allowed him to have legal representation; and it ultimately imposed no disciplinary action. Specifically, Georgetown allowed Shapiro to retain his position after a 122-day investigation, which began before Shapiro's first day on the job but after his racist tweet preferencing Judge Srinivasan over a "lesser black woman"—denigrating the legal scholarship and accomplishments of an African American trailblazing judge. In an email disclosing the findings of the investigation, Georgetown Human Resources ("HR") and the University's Office of Institutional Diversity, Equity, and Affirmative Action ("IDEAA") concluded: "As Mr. Shapiro posted the tweets on January 26, 2022, but his employment [started on] February 1, 2022 . . . [we] concluded that Mr. Shapiro was not a Georgetown employee at the time of his tweets. As such, he was not properly subjected to discipline for them. As a result, he can begin his work as Executive director."

183.    Conversely, Ms. Johnson was placed on leave three days after her employment began and terminated after two weeks of paid administrative leave due to misrepresented, decontextualized, tweets almost a decade old from her teenage years, packaged by a cyberstalking third party (Canary Mission), triggered by a fourth party (Wolff), and amplified by a fifth party (Shapiro) for millions of views, reposts, likes, and comments that threatened Ms. Johnson's life and violated her civil and constitutional rights.  In its letter terminating

Ms. Johnson, Georgetown specifically stated: ". . . the University investigated allegations that you engaged in unprofessional conduct based on your social media activity, including, but not limited to posts from 2015 which were shared with the Georgetown community during the first week of your employment, which began on October 30, 2023. Your social media conduct has had a significantly negative impact on the MSFS Program . . . It also impacts your ability to engage fully with members of our community."

184.    Second, Bruce Hoffman (a white, male, Jewish, Zionist): Georgetown promoted Hoffman to oversee "Countering Hate and Intolerance" despite racistly likening Northern Virginia to "Mogadishu" and making inflammatory statements during his employment with Georgetown about social media creating "anti-Semites" by allowing criticism of the Zionist occupation, apartheid, and genocide.

185.    Third, Danielle Pletka (a white, female, Jewish, Zionist): Georgetown retained Pletka despite her labeling critics of Zionist policies of occupation, apartheid, and genocide as "terrorist sympathizers" and "insubordinate morons."

186.    Fourth, Yonatan Green (a white, male, Jewish, Zionist): Georgetown retained Green despite his dismissing narratives of Palestinian displacement and suffering as "baseless victimhood."

187.    Georgetown's termination of Ms. Johnson violated its own Human Resources Policy #204, which states that "an employee will be allowed to complete the probationary period before any decision is made to continue or end employment." Georgetown denied Ms. Johnson this presumptive right while affording it to similarly situated comparators who engaged in misconduct that was more egregious and more proximate in time (or concurrent with) their employment with Georgetown.

*Discriminatory Intent and Pretext*

188.    Georgetown's proffered reasons for Ms. Johnson's termination are pretextual, as evidenced by the stark disparate treatment between Ms. Johnson and her comparators. The temporal proximity between Georgetown's decision-makers learning of Ms. Johnson's Palestinian identity (during her welcome lunch on October 30, 2023) and her suspension (November 2, 2023) and termination (November 27, 2023) supports an inference of discriminatory intent.

189.    Georgetown's reliance on Canary Mission's defamatory profile as justification for termination demonstrates pretext, particularly given that Georgetown conducted extensive hiring processes yet claims it was unaware of information that has appeared as the top Google search result for Ms. Johnson's name since 2015.

190.    The circumstances surrounding Ms. Johnson's termination—occurring within hours of a coordinated harassment campaign of hate targeting her Palestinian identity and Muslim faith—create a strong inference that her protected characteristics, rather than legitimate business reasons, motivated Georgetown's adverse actions.

*Causal Connection*

191.    Georgetown's discriminatory conduct was causally connected to Ms. Johnson's membership in protected classes. The decision-makers' immediate focus on Ms. Johnson's Palestinian heritage during her welcome lunch, followed by swift termination after her identity was weaponized in an online harassment campaign of hate, demonstrates that her race, national origin, and religion were motivating factors in the adverse employment actions.

192.    Georgetown's systematic pattern of protecting employees who made discriminatory statements against Muslims, Palestinians, and African Americans while swiftly terminating Ms. Johnson for criticism of Zionist occupation, apartheid, and genocide policies establishes that membership in her protected classes was a but-for cause of her termination.

193.    Plaintiff respectfully requests that this Court find Georgetown University liable for discrimination in violation of Title VII and grant the relief requested in the Prayer for Relief section of this Complaint.

## COUNT II
### D.C. Code § 2–1402.11
### (Discrimination Based on Race, Religion, and National Origin)
Against Defendants Georgetown University, Joel Hellman, and George Shambaugh

194.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above, as well as the legal and factual predicate for Count I.

*Prima Facie Case Against Defendants Georgetown University, Joel Hellman, and George Shambaugh*

195.    Ms. Johnson is a member of multiple protected classes under D.C. Code § 2-1402.11, including race (African American and Arab), religion (Muslim), and national origin (Palestinian).

196.    Ms. Johnson was highly qualified for her position as Assistant Director of Academic and Faculty Affairs, as evidenced by Georgetown's unconditional job offer on October 2, 2023, following extensive interviews that demonstrated her advanced degrees, professional experience, and alignment with Georgetown's mission.

197.    Despite her qualifications, Defendants suspended Ms. Johnson's employment on November 2, 2023, after only three days of work, and terminated her on November 27, 2023, based wholly on discriminatory reasons related to her protected characteristics.

*Discriminatory Actions by Georgetown University*

198.    Georgetown University violated D.C. Code § 2-1402.11 by subjecting Ms. Johnson to discriminatory treatment based on her race, religion, and national origin through three specific acts.

199.    Hostile Onboarding Based on Protected Identity: During Ms. Johnson's welcome lunch on October 30, 2023, Georgetown faculty interrogated her about her heritage and forced discussion of the "war in Gaza" upon learning of her Palestinian roots, reducing her to a political stereotype and causing visible distress—conduct not imposed on non-Palestinian, non-Muslim employees.

200.    Disparate Application of Policy #204: Georgetown violated its own Human Resources Policy #204, which mandates that employees "normally will be allowed to complete the probationary period," by terminating Ms. Johnson after only three days without the due process afforded to similarly situated non-Palestinian, non-Muslim employees like Ilya Shapiro, who received a 122-day investigation for comparable misconduct.

201.    Pretextual Reliance on Third-Party Harassment: Georgetown relied on Defendant Rachel Jessica Wolff's use of the hate group Canary Mission's defamatory profile—a cyberstalking dossier targeting Ms. Johnson for her Palestinian identity—as justification for termination, while ignoring that this profile represented discriminatory targeting based on her protected characteristics.

202.    Failure to Investigate Discrimination Complaints: Georgetown disregarded Ms. Johnson's November 8, 2023 discrimination complaint and proceeded with termination, demonstrating deliberate indifference to her protected status.

203.    Georgetown's discriminatory intent is evidenced by its disparate treatment of comparator employees such as Ilya Shapiro (white, Jewish, Zionist male), who retained his position despite racist tweets targeting Black women, while Ms. Johnson (African American, Palestinian, Muslim female) was terminated for significantly less severe, eight-year-old social media posts criticizing the Zionist policies of occupation, apartheid, and genocide.

*Discriminatory Actions by Joel Hellman*

204.    Defendant Joel Hellman, Dean of Georgetown's Walsh School of Foreign Service, violated D.C. Code § 2-1402.11 through direct participation in discriminatory conduct.

205.    Defamatory Mass Communication: On November 2, 2023, at 10:42 AM, Hellman sent a university-wide email to over 1,200 School of Foreign Service community members that falsely portrayed Ms. Johnson as a security threat, stating, "We take all threats to our community seriously"—language designed to associate her Palestinian identity with violence and danger.

206.    Discriminatory Timing and Content: Hellman's email was sent before any investigation began or concluded and before Ms. Johnson was even informed of the allegations against her, demonstrating bias against her based on her protected characteristics rather than objective assessment of her conduct.

207.    Disparate Treatment: Hellman's immediate characterization of Ms. Johnson's conduct as threatening contrasts sharply with Georgetown's protection of Ilya Shapiro's racist statements, revealing discriminatory animus based on Ms. Johnson's Palestinian, Muslim, and African American identity.

208.    Hellman's actions were motivated by discriminatory intent, as evidenced by his immediate adoption of racist anti-Palestinian narratives without investigation and his failure to afford Ms. Johnson the same presumption of innocence granted to non-Palestinian, non-Muslim employees.

*Discriminatory Actions by George Shambaugh*

209.    Defendant George Shambaugh, Director of the MSFS Program, violated D.C. Code § 2-1402.11 through direct participation in discriminatory conduct.

210.    Hostile Workplace Creation: During Ms. Johnson's October 30, 2023 welcome lunch, Shambaugh redirected conversation to the "war in Gaza" immediately upon learning of Ms. Johnson's Palestinian heritage, reducing her identity to a crude political trope and causing her visible emotional distress.

211.    Discriminatory Administrative Leave: On November 2, 2023, at 8:22 AM and 9:43 AM, Shambaugh placed Ms. Johnson on administrative leave without due process, based solely on Rachel Wolff's viral tweet containing decontextualized material from Canary Mission's discriminatory profile.

212.    False Safety Characterization: Shambaugh told colleagues that Ms. Johnson's social media posts posed "safety concerns," implying violent tendencies without factual basis and further ostracizing her based on anti-Palestinian and anti-Muslim stereotypes.

213.    Participation in Discriminatory Termination: Shambaugh participated in Ms. Johnson's termination decision, asserting she could no longer perform her role based on falsified characterizations of her protected political speech.

214.    Shambaugh's discriminatory intent is demonstrated by his immediate politicization of Ms. Johnson's Palestinian identity, his reliance on third-party harassment

materials targeting her protected characteristics, and his failure to afford her the due process provided to non-Palestinian, non-Muslim employees.

*Causal Connection and Substantial Factor*

215.    Each Defendant's adverse actions against Ms. Johnson were causally connected to and substantially motivated by her protected characteristics as an African American, Palestinian, Muslim woman.

216.    This is evidenced by the immediate timing of adverse actions following disclosure of her Palestinian identity; the adoption of discriminatory narratives from Canary Mission targeting her specifically for her protected characteristics; the disparate treatment compared to non-Palestinian, non-Muslim, non-African American employees who engaged in severe misconduct; and the failure to conduct meaningful investigation or afford due process typically provided to employees outside her protected classes.

217.    But for Ms. Johnson's race, religion, and national origin, Defendants would not have subjected her to the hostile onboarding, immediate administrative leave, defamatory communications, and summary termination that characterized their conduct.

218.    Plaintiff seeks damages and relief as set forth in the Prayer for Relief against all Defendants for violations of D.C. Code § 2-1402.11.

## COUNT III
### D.C. Code § 2–1402.62
### (Aiding and Abetting Discrimination)
Against all Defendants

219.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

220.    Under D.C. Code § 2-1402.62, it is unlawful for any person to "aid, abet, invite, compel, or coerce" discriminatory acts forbidden under the DCHRA. Georgetown

University's discriminatory termination of Ms. Johnson based on her race (African American and Arab), religion (Muslim), and national origin (Palestinian) constitutes the underlying discriminatory act that all Defendants aided and abetted.

*Defendant Rachel Jessica Wolff - Aiding and Abetting*

221.    Defendant Rachel Jessica Wolff aided and abetted Georgetown University's discriminatory conduct by initiating a coordinated harassment campaign designed to compel Ms. Johnson's termination. Wolff's actions constituted "inviting" and "compelling" discrimination under § 2-1402.62.

222.    On November 1, 2023, Wolff deliberately searched for and amplified Canary Mission's eight-year-old defamatory profile of Ms. Johnson through viral tweets (more than 1.2 million views) that explicitly identified Ms. Johnson's position and workplace at Georgetown University, creating a massive public doxxing and harassment campaign that sought and ultimately led to Ms. Johnson's termination.

223.    Wolff's conduct was specifically calculated to compel Georgetown's discriminatory action, as evidenced by the timing of Wolff's tweet (within hours of Ms. Johnson's introductory email), her profiling of Ms. Johnson as an African American Muslim woman, and her explicit targeting of Ms. Johnson's employment relationship with Georgetown after additionally learning of Ms. Johnson's Palestinian heritage.

*Defendant Ilya Shapiro - Aiding and Abetting*

224.    Defendant Ilya Shapiro, a former Georgetown University employee, aided and abetted the discriminatory campaign by amplifying Canary Mission and Wolff's defamatory content to his 500,000+ followers, exponentially increasing pressure on Georgetown to terminate Ms. Johnson.

225.    Shapiro's retweet included his own call to action seeking Ms. Johnson's termination. He explicitly identified Ms. Johnson's name, position, and Georgetown affiliation, demonstrating his intent to compel Georgetown's adverse employment action against her based on her protected characteristics.

226.    As a previous Georgetown employee and prominent Zionist personality with substantial social media influence, Shapiro's amplification constituted "aiding" the discriminatory harassment campaign while acting with actual knowledge of its discriminatory purpose.

*Defendants Joel Hellman and George Shambaugh - Aiding and Abetting*

227.    Defendants Joel Hellman and George Shambaugh, acting as Georgetown University supervisors, aided and abetted the discriminatory campaign by legitimizing and amplifying the false antisemitism narrative without conducting any meaningful investigation.

228.    Hellman aided the discrimination by sending a November 2, 2023 email to over 1,200 MSFS community members falsely implying Ms. Johnson—an African American Palestinian Muslim woman—posed a "security threat" and spreading defamatory content about her protected political speech when she was a teenager in college, thereby "inviting" further discriminatory treatment.

229.    Shambaugh aided the discrimination by characterizing Ms. Johnson's eight-year-old criticism of the Zionist occupation, apartheid, and genocide in Palestine as creating "safety concerns" without factual basis, contributing to her professional ostracization and providing pretextual justification for her termination.

*Defendant Canary Mission - Aiding and Abetting*

230.    Defendant Canary Mission aided and abetted Georgetown University's discriminatory conduct by creating, maintaining, and disseminating the defamatory cyberstalking profile that served as the sole basis for Ms. Johnson's termination.

231.    Canary Mission's profile was specifically designed to "compel" discriminatory employment actions against Palestinian voices like Ms. Johnson, as evidenced by its stated mission to "ensure that today's radicals are not tomorrow's employees."

232.    Canary Mission's systematic targeting of Palestinian, Muslim, and African American advocates (80% of its profiles target people of color) demonstrates its intent to facilitate employment discrimination based on protected characteristics.[81]

*Defendants Tuvia Milsztein (Adam Milstein) and*
*Adam and Gila Milstein Family Foundation - Aiding and Abetting*

233.    Defendants Tuvia Milsztein and the Adam and Gila Milstein Family Foundation aided and abetted Georgetown University's discriminatory conduct by funding and operating Canary Mission's cyberstalking operations that directly enabled Ms. Johnson's termination.

234.    As documented in *Al Jazeera*'s The Lobby – USA, Eric Gallagher of The Israel Project identifies Adam Milstein and his foundation as funders of Canary Mission with the explicit intent to label American supporters of Palestinian rights as "antisemitic" and target them through "name-and-shame" campaigns, demonstrating deliberate intent to facilitate discriminatory employment actions.

---

[81] Alex Kane, *A Pro-Israel Lawyer Is Weaponizing Public Records Law Against Palestinian Activists*, THE INTERCEPT (Mar. 6, 2021), https://theintercept.com/2021/03/06/palestine-israel-students-ucla-public-records/.

235.    The Milstein Foundation's funding was not general support but specific financial assistance that enabled Canary Mission to maintain Ms. Johnson's defamatory profile as the top Google search result for her name for almost ten years—the exact dossier Georgetown weaponized to justify her termination.

236.    Milstein, who is an internationally recognized operative for the American Israel Public Affairs Committee (AIPAC), facilitates coordination with the Apartheid Ministry of Strategic Affairs in occupied Palestine to suppress Palestinian advocacy at U.S. institutions, including Georgetown.[82] This establishes his direct intent to "compel" discriminatory actions against Palestinian advocates like Ms. Johnson.

*Defendants Helen Diller Family Foundation and*
*Jewish Community Federation of San Francisco - Aiding and Abetting*

237.    Defendants Helen Diller Family Foundation and Jewish Community Federation of San Francisco aided and abetted Georgetown University's discriminatory conduct by providing $100,000 in funding to Canary Mission through foreign Zionist Apartheid intermediaries like Megamot Shalom and the Central Fund of Israel.

238.    This coordinated financial support was not passive contribution but active "aiding" of Canary Mission's explicitly discriminatory, racist, and criminal operations, as both foundations were aware of Canary Mission's stated purpose to damage the employment prospects of Palestinian rights advocates.

239.    The foundations' use of anonymous Zionist intermediaries (Megamot Shalom and the Central Fund of Israel) demonstrates their intent to obscure their role in facilitating

---

[82] Alex Kane, *Right-Wing Donor Adam Milstein Has Spent Millions of Dollars to Stifle the BDS Movement and Attack Critics of Israeli Policy*, THE INTERCEPT (Mar. 25, 2019), https://theintercept.com/2019/03/25/adam-milstein-israel-bds/.

employment discrimination while maintaining plausible deniability for their discriminatory funding activities.

*Causal Nexus and Harm*

240.    Each Defendant's conduct directly contributed to Georgetown University's discriminatory termination of Ms. Johnson by: (a) creating or amplifying the defamatory content used to justify her termination (Wolff, Shapiro, Canary Mission); (b) providing institutional legitimacy to false accusations (Hellman, Shambaugh); and (c) funding the cyberstalking infrastructure that made the harassment campaign possible (Milstein entities, Diller Foundation, Jewish Community Federation).

241.    But for Defendants' coordinated aiding and abetting conduct, Georgetown University would not have possessed the pretextual justification for Ms. Johnson's discriminatory termination, as her actual conduct and qualifications warranted retention under Georgetown's own policies.

242.    Defendants' actions violated D.C. Code § 2-1402.62 by systematically "compelling" Georgetown University to engage in unlawful employment discrimination based on Ms. Johnson's race (African American and Arab), religion (Muslim), and national origin (Palestinian), causing her severe economic and emotional harm.

## COUNT IV
### 42 U.S.C. § 2000e et seq.
### (Hostile Work Environment)
Against Defendants Georgetown University, Joel Hellman, and George Shambaugh

243.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

244.    Defendants Georgetown University, Joel Hellman, and George Shambaugh created and permitted a hostile work environment that was severe, pervasive, and targeted

Ms. Johnson based on her protected characteristics as a Muslim woman of Palestinian and African American descent.

245.    Under Title VII, 42 U.S.C. § 2000e et seq., an employer is liable for a hostile work environment where: (1) the plaintiff is a member of a protected class; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the employer knew or should have known about the harassment but failed to take appropriate remedial action.

*Element 1: Protected Class Membership*

246.    Ms. Johnson is a member of multiple protected classes under Title VII based on her race (African American and Arab), religion (Muslim), and national origin (Palestinian).

*Element 2: Unwelcome Harassment*

247.    From her first day of employment on October 30, 2023, Ms. Johnson was subjected to unwelcome harassment. There are at least five illustrative examples.

248.    First, interrogating Ms. Johnson about her Palestinian identity during her welcome lunch, where faculty members questioned her heritage and Director George Shambaugh immediately redirected the conversation to the "war in Gaza," causing Ms. Johnson visible distress and bringing her to tears.

249.    Second, immediately placing Ms. Johnson on administrative leave without due process or adequate explanation following a coordinated online doxing and harassment campaign based on Ms. Johnson's protected characteristics.

250.    Third, Dean Joel Hellman's defamatory mass email to over 1,200 members of the School of Foreign Service community on November 2, 2023, which falsely implied Ms. Johnson posed a "security threat" by stating "We take all threats to our community seriously," thereby branding her as dangerous to the entire academic community

251.    Fourth, publicly ostracizing and professionally isolating Ms. Johnson through university-sanctioned communications that amplified false accusations of antisemitism, hate, and violence.

252.    Fifth, denying Ms. Johnson basic employment protections afforded to similarly situated non-Muslim, non-Palestinian, non-African American employees.

*Element 3: Harassment Based on Protected Status*

253.    The harassment was directly motivated by and based upon Ms. Johnson's protected characteristics.

254.    Religious animus: The harassment targeted Ms. Johnson's Muslim identity, with Georgetown's actions occurring during a period of heightened anti-Muslim sentiment following the October 7, 2023 events.

255.    Racial discrimination: The harassment specifically targeted her Palestinian and African American heritage, as evidenced by the immediate interrogation about her Palestinian roots and the differential treatment compared to white, Jewish, Zionist employees.

256.    National origin discrimination: The harassment was triggered by and focused on Ms. Johnson's Palestinian national origin, with Georgetown officials explicitly connecting her identity to geopolitical conflict during her welcome lunch and endorsing Canary Mission's

racist defamatory dossier that is explicitly intended for discriminatory purposes to violate the civil rights of and punish Palestinian voices.

257.    The connection between Ms. Johnson's protected status and the harassment is established by: (a) her immediate targeting upon disclosure of identity, as the harassment began immediately after Ms. Johnson disclosed her Palestinian heritage during her welcome lunch; (b) the disparate treatment of Ms. Johnson relative to her comparators, as Georgetown retained and protected white, Jewish, Zionist employees (Ilya Shapiro, Bruce Hoffman, Danielle Pletka, Yonatan Green) who engaged in egregious misconduct, including racist rhetoric targeting protected classes; and (c) the use of racist anti-Palestinian tropes, where Georgetown relied on Canary Mission's defamatory profile that specifically targets Palestinian advocates with anti-Muslim and anti-Arab stereotypes.

*Element 4: Severe or Pervasive Harassment Altering Employment Conditions*

258.    The harassment was both severe and pervasive, fundamentally altering Ms. Johnson's employment conditions and creating an abusive work environment. Under the totality of circumstances analysis, the harassment satisfies Title VII's standards.

259.    Severity of individual incidents: (a) The welcome lunch interrogation was so severe it brought Ms. Johnson to tears and required colleague intervention; (b) Dean Hellman's mass email branded Ms. Johnson a "security threat" to 1,200+ community members; and (3) the coordinated campaign resulted in death threats and doxing.

260.    Frequency and duration: The harassment occurred continuously from Ms. Johnson's first day (October 30, 2023) through her termination (November 27, 2023), creating a persistent hostile environment.

261.    Interference with work performance: The harassment completely prevented Ms. Johnson from performing her job duties, as she was placed on administrative leave and ultimately terminated.

262.    Objectively and subjectively offensive conduct: The harassment involved religious, racial, and ethnic stereotyping that would be offensive to any reasonable person and caused Ms. Johnson documented emotional distress.

263.    The harassment fundamentally altered the terms and conditions of Ms. Johnson's employment by: (a) preventing normal job performance as Ms. Johnson was unable to fulfill her role as Assistant Director due to the immediate administrative leave; (b) creating an atmosphere of intimidation when Georgetown's actions sent a clear message that Palestinian, Muslim, and African American employees were unwelcome; (c) destroying professional relationships by isolating Ms. Johnson from colleagues and students due to the public nature of the harassment; and (d) causing severe emotional distress where Ms. Johnson suffered panic attacks, insomnia, and anxiety as documented consequences of the hostile environment.

*Element 5: Employer Knowledge and Failure to Remediate*

264.    Georgetown University's Knowledge: Georgetown had actual knowledge of the harassment through the direct participation of its leadership, Ms. Johnson's formal complaint, and the public nature of the harassment.

265.    Direct participation by leadership: Director Shambaugh personally initiated harassment during the welcome lunch and both Dean Hellman and Director Shambaugh amplified it through their defamatory emails.

266. Ms. Johnson's formal complaints: On November 8, 2023, Ms. Johnson submitted written complaints documenting the discriminatory conduct.

267. Public nature of harassment: The viral online campaign (millions of views) and media coverage made Georgetown fully aware of the targeting.

268. Georgetown's Failure to Remediate: Despite actual knowledge, Georgetown failed to take appropriate remedial action and instead exacerbated the harassment by amplifying the harassment, ignoring discrimination complaints, failing to investigate, and applying double standards.

269. Amplifying the harassment: Rather than protecting Ms. Johnson, Georgetown legitimized the attacks through official university communications.

270. Ignoring discrimination complaints: Georgetown disregarded Ms. Johnson's November 8, 2023 complaint and proceeded with termination.

271. Failing to investigate: Georgetown conducted no meaningful investigation of the harassment before taking adverse action.

272. Applying double standards: Georgetown afforded extensive due process to white, Zionist comparators while denying basic protections to Ms. Johnson.

*Joel Hellman's Individual Liability*

273. Dean Hellman is individually liable for creating and maintaining the hostile work environment.

274. First, by publishing defamatory content, as his November 2, 2023 mass email falsely branded Ms. Johnson a "security threat."

275. Second, through his supervisory authority, as Dean Hellman possessed authority to address harassment but instead chose to participate in it.

276.    Third, by his intentional discrimination, as Hellman's actions were motivated by anti-Palestinian, anti-Muslim, and anti-African American animus.

*George Shambaugh's Individual Liability*

277.    Director Shambaugh is individually liable for initiating and perpetuating the hostile work environment.

278.    First, by initiating the harassment. Shambaugh began the hostile treatment by interrogating Ms. Johnson about her Palestinian identity during her welcome lunch, reducing her identity and suffering to a racist trope.

279.    Second, by creating unsafe conditions. Shambaugh told colleagues Ms. Johnson's social media posts posed "safety concerns," implying violent tendencies without factual basis—relying on dehumanizing and racist stereotypes about African Americans, Muslims, and Palestinians.

280.    Third, through retaliatory conduct. Shambaugh placed Ms. Johnson on administrative leave and participated in her termination based on discriminatory motives.

281.    The hostile work environment created by Defendants constitutes a hostile work environment under Title VII, as Ms. Johnson was subjected to severe and pervasive harassment based on her protected characteristics, and Defendants not only failed to remediate the harassment but actively participated in and amplified it, fundamentally altering the conditions of her employment in violation of federal anti-discrimination law.

## COUNT V
### D.C. Code § 2–1402.11
### (Hostile Work Environment)
Against Defendants Georgetown University, Joel Hellman, and George Shambaugh

282.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

*Protected Class Membership*

283.   Ms. Johnson is a member of multiple protected classes under D.C. Code § 2-1402.11, including race (African American and Arab), religion (Muslim), national origin (Palestinian), and sex (female). Her intersectional identity as an African American Palestinian Muslim woman subjected her to harassment based on these protected characteristics.

*Unwelcome Harassment Based on Protected Status*

284.   Georgetown University subjected Ms. Johnson to unwelcome harassment directly tied to her protected status. During her welcome lunch on October 30, 2023, Georgetown faculty interrogated her about her Palestinian heritage and immediately politicized her identity by invoking the "war in Gaza," reducing her Palestinian national origin to a crude political trope and causing visible distress requiring colleague intervention.

285.   George Shambaugh, as Director of the Master of Science in Foreign Service Program, personally participated in creating the hostile environment by: (a) interrogating Ms. Johnson about her Palestinian roots during her first day; (b) inappropriately redirecting workplace conversation to Gaza-related topics that reduced Ms. Johnson to a political symbol rather than treating her as an individual employee; and (c) later characterizing her protected speech as creating "safety concerns," thereby weaponizing anti-Palestinian and anti-Muslim stereotypes.

286.   Joel Hellman, as Dean of Georgetown's Walsh School of Foreign Service, amplified the hostile environment by sending a mass email on November 2, 2023, to over 1,200 students, faculty, and staff that: (a) falsely branded Ms. Johnson a "security threat" by stating "We take all threats to our community seriously"; (b) exploited anti-Palestinian and anti-Muslim bias by implying her protected speech constituted dangerous conduct; and (c)

publicly ostracized her before any investigation, creating an intimidating and offensive work environment.

*Severity and Pervasiveness Under Totality of Circumstances*

287.    Under the totality of circumstances standard, which considers the frequency, severity, offensiveness, and interference with work performance, the harassment Ms. Johnson endured was sufficiently severe and pervasive to alter her employment conditions.

288.    Frequency and Duration: Within 25 days of employment, Ms. Johnson experienced: (a) immediate politicization of her Palestinian identity during onboarding; (b) placement on administrative leave within 72 hours of a coordinated doxxing campaign; (c) defamatory mass communications to her intended colleagues; and (d) termination based on her protected advocacy and identity.

289.    Severity and Offensiveness: The conduct included: (a) reducing Ms. Johnson to harmful stereotypes during her welcome; (b) public branding as a "security threat" to over 1,200 community members; (c) allowing a student-led harassment campaign to dictate employment decisions; and (d) weaponizing anti-Palestinian, anti-Muslim, and anti-Black bias to justify discriminatory treatment.

290.    Interference with Work Performance: Georgetown's actions made it impossible for Ms. Johnson to perform her duties by: (a) isolating her from colleagues through defamatory communications; (b) creating an atmosphere where her Palestinian identity was treated as inherently threatening; (c) placing her on administrative leave without due process; and (d) terminating her employment based on protected characteristics and advocacy.

*Discriminatory Basis Connected to Protected Status*

291.    The harassment directly targeted Ms. Johnson's protected characteristics. Georgetown University treated her Palestinian national origin as inherently political and threatening, her Muslim religious identity as suspicious, and her African American race as less deserving of due process compared to white faculty members who engaged in more egregious conduct.

292.    George Shambaugh demonstrated discriminatory animus by: (a) automatically politicizing Ms. Johnson's Palestinian identity during onboarding; (b) characterizing her protected advocacy as creating "safety concerns" based on anti-Palestinian stereotypes; and (c) participating in her termination while similarly situated white, non-Muslim faculty retained their positions despite comparable or worse conduct.

293.    Joel Hellman exhibited discriminatory intent by: (a) issuing defamatory communications that exploited anti-Palestinian and anti-Muslim bias; (b) falsely implying Ms. Johnson posed security threats based on protected advocacy; and (c) taking no similar action against white, non-Muslim faculty who engaged in actual misconduct targeting protected classes.

*Employer Knowledge and Failure to Take Corrective Action*

294.    Georgetown University had actual knowledge of the harassment campaign targeting Ms. Johnson, including: (a) awareness of Rachel Jessica Wolff's viral doxxing campaign reaching 1.2 million viewers; (b) receipt of Ms. Johnson's formal discrimination complaint on November 8, 2023; and (c) knowledge that faculty member Ilya Shapiro amplified the harassment to his 500,000+ followers.

295.    Despite this knowledge, Georgetown University failed to take corrective action and instead escalated the harassment by: (a) placing Ms. Johnson on administrative leave without investigation; (b) allowing defamatory communications to be sent to the community; (c) ignoring her discrimination complaints; and (d) terminating her employment while retaining faculty who engaged in severe misconduct.

296.    George Shambaugh and Joel Hellman, as supervisory personnel with knowledge of the harassment, failed in their duty to prevent or correct it. Instead, they actively participated in creating and maintaining the hostile environment through their discriminatory communications and employment decisions.

*Institutional Pattern of Discriminatory Treatment*

297.    The hostile environment reflects Georgetown's systematic bias against Palestinian, Muslim, and African American voices while protecting white, non-Muslim, Zionist faculty. This pattern demonstrates that the harassment was not isolated but part of an institutional practice that discriminates based on protected characteristics.

298.    Georgetown University's disparate treatment is evidenced by: (a) granting Ilya Shapiro a 122-day investigation with full due process for racist tweets and choosing to retain him while terminating Ms. Johnson after 25 days; (b) retaining faculty who made anti-Muslim, anti-Palestinian, and racist statements while punishing Ms. Johnson for protected advocacy; and (c) weaponizing university policies to suppress Palestinian voices while shielding discriminatory conduct by favored faculty.

*Causation and Harm*

299.    The hostile work environment directly caused Ms. Johnson severe emotional distress, professional ostracization, and career damage. The discriminatory conduct was so severe that it rendered her employment intolerable and led to her unlawful termination.

300.    Under D.C. Code § 2-1402.11, each Defendant's conduct contributed to creating and maintaining a workplace "permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [Ms. Johnson's] employment and create an abusive working environment."

## COUNT VI
### 42 U.S.C. § 2000e-3(a)
### (Retaliation)
Against Defendants Georgetown University, Joel Hellman, and George Shambaugh

301.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

*Protected Activity*

302.    Ms. Johnson engaged in statutorily protected activity under 42 U.S.C. § 2000e-3(a) by opposing practices made unlawful by Title VII.

303.    Formal Discrimination Complaint: On November 8, 2023, Ms. Johnson submitted a written complaint to Georgetown University documenting concerns of discriminatory conduct based on her race (African American and Palestinian), religion (Muslim), and national origin (Palestinian), specifically opposing Georgetown's disparate treatment during her onboarding process and the hostile work environment created by interrogating her about her Palestinian heritage and immediately invoking the "war in Gaza" during her welcome lunch.

304. Opposition to Discriminatory Termination Process: Ms. Johnson opposed Georgetown's discriminatory application of Human Resources Policy #204, which denied her the due process afforded to similarly situated white, non-Muslim employees like Ilya Shapiro, who received a four-month investigation with full faculty input despite engaging in racist conduct targeting African American women.

305. Resistance to Pretextual Justifications: Ms. Johnson opposed Georgetown's use of Canary Mission's cyberstalking dossier—a product of coordinated harassment targeting her protected characteristics—as pretextual grounds for termination, communicating to Georgetown that this reliance constituted unlawful discrimination based on her Palestinian identity, Muslim faith, and African American heritage.

*Materially Adverse Employment Action*

306. Georgetown University, Joel Hellman, and George Shambaugh took materially adverse actions against Ms. Johnson that would dissuade a reasonable employee from engaging in protected activity.

307. Immediate Administrative Leave: On November 2, 2023, less than 24 hours after Ms. Johnson's protected complaint activity became known, Defendant George Shambaugh placed Ms. Johnson on paid administrative leave without adequate explanation or due process, in stark contrast to Georgetown's handling of comparable cases involving non-Palestinian, non-Muslim employees.

308. Defamatory Public Communications: On November 2, 2023, Defendant Joel Hellman published a defamatory email to over 1,200 members of the School of Foreign Service community falsely implying Ms. Johnson posed a "security threat" by stating "We

take all threats to our community seriously"—conduct that professionally ostracized Ms. Johnson and damaged her reputation within the Georgetown community.

309. Discriminatory Termination: On November 27, 2023, Georgetown terminated Ms. Johnson's employment based on pretextual grounds, specifically citing eight-year-old social media posts when she was a college freshman, while retaining white, non-Muslim, Zionist employees who engaged in more recent and egregious misconduct targeting protected classes.

*Causal Connection*

310. The adverse actions taken against Ms. Johnson were causally connected to her protected activity, as evidenced by temporal proximity, Defendants' knowledge, disparate treatment evidence, pretextual justifications, and individual Defendant participation.

311. Temporal Proximity: Georgetown's adverse actions occurred within days and weeks of Ms. Johnson's protected complaints, with administrative leave imposed within 24 hours of her discrimination complaint becoming known to university officials.

312. Defendant Knowledge: Georgetown University, Joel Hellman, and George Shambaugh had actual knowledge of Ms. Johnson's protected activity through her formal November 8, 2023 discrimination complaint and her ongoing opposition to the discriminatory harassment campaign

313. Disparate Treatment Evidence: Georgetown's treatment of Ms. Johnson— immediate suspension and termination without meaningful investigation—contrasts sharply with its handling of misconduct by Ilya Shapiro, Bruce Hoffman, Danielle Pletka, and Yonatan Green, all of whom are white, non-Palestinian, non-Muslim employees who

retained their positions despite engaging in racist, anti-Muslim, or otherwise discriminatory conduct.

314.    Pretextual Justifications: Georgetown's reliance on Canary Mission's cyberstalking dossier and eight-year-old social media posts as grounds for termination, while simultaneously invoking "Speech and Expression Policy" protections for white Zionist employees who engaged in more recent racist conduct, demonstrates that the stated reasons for Ms. Johnson's termination were pretextual and the true motivation was retaliation for her protected opposition to discrimination.

315.    Individual Defendant Participation: Defendants Joel Hellman and George Shambaugh directly participated in the retaliatory conduct by amplifying the harassment campaign through official university communications, denying Ms. Johnson due process, and implementing discriminatory policies targeting her protected advocacy while shielding comparable conduct by non-Palestinian, non-Muslim employees.

316.    But for Ms. Johnson's engagement in protected activity—specifically her opposition to Georgetown's discriminatory treatment based on her Palestinian identity, Muslim faith, and African American heritage—Georgetown would not have subjected her to administrative leave, public defamation, and ultimate termination, as evidenced by Georgetown's retention and protection of similarly situated employees who did not engage in such protected opposition activity.

## COUNT VII
### D.C. Code § 2–1402.61
### (Retaliation)
Against Defendants Georgetown University, Joel Hellman, and George Shambaugh

317.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

*Protected Activity Under DCHRA*

318.    Ms. Johnson engaged in statutorily protected activity under D.C. Code § 2-1402.61(a) by opposing employment practices that she reasonably believed violated the DCHRA's prohibitions against discrimination based on race, religion, and national origin.

319.    Specifically, on November 8, 2023, Ms. Johnson filed a formal written complaint with Georgetown University documenting discriminatory conduct she experienced based on her protected characteristics as an African American, Muslim, Palestinian woman, including: (a) discriminatory interrogation about her Palestinian heritage during her welcome lunch on October 30, 2023; (b) Director George Shambaugh's inappropriate redirection of conversation to the "war in Gaza" that reduced her Palestinian identity to a political issue and caused her visible distress; and (c) the University's participation in and amplification of a coordinated harassment campaign targeting her based on her protected characteristics.

320.    Ms. Johnson's November 8, 2023 discrimination complaint specifically alleged violations of DCHRA's prohibitions against discrimination based on race (African American and Arab/Palestinian), religion (Muslim), and national origin (Palestinian), constituting protected activity under D.C. Code § 2-1402.61(a).

321.    Additionally, Ms. Johnson's 2015 social media posts criticizing Israeli state policies constituted protected activity under the DCHRA, as they opposed practices she reasonably believed to be discriminatory against Palestinians and other protected groups. These posts specifically criticized state-sponsored violence and discrimination, which falls within the DCHRA's protection of opposition to unlawful discriminatory practices.

*Employer Knowledge of Protected Activity*

322.    Georgetown University, Joel Hellman, and George Shambaugh had actual knowledge of Ms. Johnson's protected activity. Georgetown received Ms. Johnson's formal discrimination complaint on November 8, 2023, which explicitly detailed discriminatory conduct based on her protected characteristics and requested investigation and remedial action.

323.    Defendant Joel Hellman, as Dean of the School of Foreign Service, had actual knowledge of Ms. Johnson's protected activity through: (a) Georgetown's internal processes for handling discrimination complaints; (b) his direct involvement in the adverse employment actions taken against Ms. Johnson; and (c) his November 2, 2023 email response to the harassment campaign, demonstrating his awareness of the discriminatory context surrounding Ms. Johnson's treatment.

324.    Defendant George Shambaugh had actual knowledge of Ms. Johnson's protected activity through: (a) his direct participation in the discriminatory interrogation during Ms. Johnson's welcome lunch; (b) his receipt of Ms. Johnson's discrimination complaint through Georgetown's internal processes; and (c) his role as Ms. Johnson's direct supervisor in making the termination decision.

*Materially Adverse Employment Actions*

325.    Defendants Georgetown University, Joel Hellman, and George Shambaugh took materially adverse employment actions against Ms. Johnson, including: (a) placing Ms. Johnson on immediate administrative leave on November 2, 2023, without due process or adequate explanation; (b) issuing defamatory university-wide communications that falsely branded Ms. Johnson as a security threat; (c) conducting a truncated 25-day investigation that

denied Ms. Johnson meaningful opportunity to respond; and (d) terminating Ms. Johnson's employment on November 27, 2023.

326.    These adverse actions significantly altered the terms, conditions, and privileges of Ms. Johnson's employment.

*Causal Connection and Temporal Proximity*

327.    A direct causal connection exists between Ms. Johnson's protected activity and the adverse employment actions taken by Defendants. Ms. Johnson filed her discrimination complaint on November 8, 2023, and was terminated on November 27, 2023—only 19 days later. This temporal proximity supports a strong inference of retaliation.

328.    The causal connection is further demonstrated by Defendants' immediate adverse response to the harassment campaign targeting Ms. Johnson's protected characteristics, with administrative leave imposed within hours of the campaign's initiation, before any meaningful investigation of Ms. Johnson's discrimination complaints.

*Pretext and Retaliatory Animus*

329.    Georgetown University's stated reasons for terminating Ms. Johnson are pretextual and mask retaliatory animus. While Georgetown claimed Ms. Johnson was terminated for "unprofessional conduct" based on 2015 social media posts, Georgetown's own Policy #204 requires that employees "normally be allowed to complete the probationary period" absent severe misconduct, which Georgetown failed to demonstrate.

330.    The pretextual nature of Georgetown's stated reasons is evidenced by its disparate treatment of similarly situated employees who engaged in more egregious misconduct but retained their positions, including: (a) Ilya Shapiro, who received a 122-day investigation and full due process for racist tweets posted three days before employment

began; (b) Bruce Hoffman, who faced no discipline for racist rhetoric comparing Northern Virginia to "Mogadishu"; and (c) other comparators who engaged in discriminatory conduct without consequence.

331.    Joel Hellman demonstrated retaliatory animus through his November 2, 2023 email to over 1,200 community members, which: (a) was sent before any investigation concluded; (b) falsely implied Ms. Johnson posed a security threat by stating "We take all threats to our community seriously"; (c) was designed to ostracize Ms. Johnson and justify her termination; and (d) amplified the discriminatory harassment campaign rather than protecting Ms. Johnson from it.

332.    George Shambaugh demonstrated retaliatory animus by: (a) telling colleagues that Ms. Johnson's social media posts posed "safety concerns" without factual basis; (b) relying solely on third-party misrepresentations rather than conducting objective analysis; (c) failing to protect Ms. Johnson despite his knowledge of her protected Palestinian identity and the discriminatory context of the harassment; and (d) participating in her termination based on pretextual grounds.

*Individual Liability Under DCHRA*

333.    Under the DCHRA, individual Defendants Joel Hellman and George Shambaugh are personally liable for their direct participation in retaliatory conduct, as the DCHRA permits individual liability for supervisors and agents who engage in discriminatory practices.

334.    Joel Hellman, acting in his individual capacity as Dean, directly participated in the retaliation by issuing defamatory and professionally damaging communications that

branded Ms. Johnson as a security threat and by failing to investigate her discrimination complaints in good faith.

336.    George Shambaugh, acting in his individual capacity as Director, directly participated in the retaliation by making false statements about Ms. Johnson's conduct posing "safety concerns" and by participating in the decision to terminate her employment based on pretextual grounds.

336.    The coordinated actions of Georgetown University, Joel Hellman, and George Shambaugh—amplifying a discriminatory harassment campaign, issuing defamatory communications, disregarding Ms. Johnson's discrimination complaints, and terminating her employment shortly after her protected activity—constitute unlawful retaliation in violation of D.C. Code § 2-1402.61. Defendants' conduct was directly motivated by Ms. Johnson's protected advocacy and identity, satisfying all elements for retaliation liability under the DCHRA.

## COUNT VIII
### 42 U.S.C. § 1981
### (Racial Discrimination in Contractual Rights)
Against Defendants Georgetown University, George Shambaugh, and Rachel Jessica Wolff.

337.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

*Identification of Impaired Contractual Relationship*

338.    42 U.S.C. § 1981 guarantees "all persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b).

339.    Ms. Johnson entered into a valid employment contract with Georgetown University on October 2, 2023, as Assistant Director of Academic and Faculty Affairs in the Master of Science in Foreign Service Program, which contract was to commence on October 30, 2023, and continue through the probationary period as set forth in Georgetown's Human Resources Policy #204.

340.    This employment contract created enforceable rights and obligations, including Ms. Johnson's right to perform her duties, receive compensation and benefits, and enjoy the privileges and conditions of employment without racial discrimination.

*Purposeful Racial Discrimination - Georgetown University*

341.    Ms. Johnson is a member of protected racial minorities as an African American woman of Palestinian descent.

342.    Georgetown University intentionally discriminated against Ms. Johnson on the basis of her race.

343.    First, Georgetown subjected Ms. Johnson to disparate treatment by terminating her employment after only three days based on eight-year-old social media posts, while retaining similarly situated white employees (Ilya Shapiro, Bruce Hoffman, Danielle Pletka, Yonatan Green) who engaged in more recent and egregious racist conduct.

344.    Georgetown then applied Human Resources Policy #204 in a racially discriminatory manner by denying Ms. Johnson the probationary period completion normally afforded to employees, while granting white comparators extensive due process and retention despite misconduct.

345.    Georgetown also relied on Canary Mission's racially motivated cyberstalking profile targeting Palestinian advocates to justify termination, demonstrating institutional endorsement of racial targeting.

346.    Finally, Georgetown created and maintained a hostile work environment where Ms. Johnson's Palestinian and African American identity was immediately politicized and weaponized against her employment.

*Purposeful Racial Discrimination - Joel Hellman*

347.    Defendant Joel Hellman, as Dean of Georgetown's Walsh School of Foreign Service, acted with individual discriminatory intent.

348.    Defendant Hellman published a mass email to over 1,200 community members on November 2, 2023, falsely characterizing Ms. Johnson as a "security threat" based on racially motivated assumptions about Palestinian identity

349.    Hellman's email amplified the racially targeted harassment campaign by lending institutional authority to false antisemitism accusations without investigation.

350.    Hellman's deliberate conduct contributed to the creation of a hostile work environment that made Ms. Johnson's continued employment untenable based on her race (African American and Arab) and national origin (Palestinian).

351.    Hellman's conduct was motivated by racial animus, as evidenced by his immediate acceptance of racially charged allegations without affording Ms. Johnson due process, contrasted with his protection of white faculty who engaged in racist conduct.

*Purposeful Racial Discrimination - George Shambaugh*

352.    Defendant George Shambaugh, as Director of the MSFS Program, acted with individual discriminatory intent.

353. Shambaugh immediately placed Ms. Johnson on administrative leave without due process based solely on racially motivated third-party allegations.

354. Shambaugh then characterized Ms. Johnson's eight-year-old protected political speech as creating "safety concerns" based on racist stereotypes about African American and Palestinian advocates.

355. Shambaugh participated in her termination decision while failing to conduct adequate investigation or provide contextual analysis.

356. Shambaugh contributed to defamatory communications that portrayed Ms. Johnson as dangerous based on her racial (African American and Arab), religious (Muslim), and ethnic identity (Palestinian).

357. Shambaugh's actions were motivated by racial animus, as demonstrated by his disparate treatment of Ms. Johnson compared to white faculty who engaged in more serious misconduct without facing similar swift adverse action.

*Purposeful Racial Discrimination - Rachel Jessica Wolff*

358. Defendant Rachel Jessica Wolff, though not Ms. Johnson's employer, intentionally interfered with Ms. Johnson's contractual rights through racially motivated conduct.

359. Wolff targeted Ms. Johnson for a racially motivated viral harassment campaign of hate (with millions of views) specifically because of her visible Palestinian and African American identity.

360. Wolff weaponized Canary Mission's racially motivated cyberstalking profile to activate the online Zionist network to destroy Ms. Johnson's employment prospects.

361.    Wolff coordinated with named Defendants, and others, to pressure Georgetown into terminating Ms. Johnson's contract based on racial animus.

362.    Wolff acted as the catalyst for a discriminatory conspiracy that directly resulted in the impairment of Ms. Johnson's contractual relationship.

363.    Wolff's conduct was motivated by racial animus, as evidenced by her immediate targeting of Ms. Johnson upon learning of her Palestinian identity and her collaboration with racially motivated organizations like Canary Mission.

*Connection to Protected Contractual Activity*

364.    The discrimination engaged in by all Defendants concerned activities specifically enumerated in § 1981, including the performance, modification, and termination of Ms. Johnson's employment contract, and directly impaired her ability to enjoy the benefits, privileges, terms, and conditions of her contractual relationship with Georgetown.

365.    Each Defendant's discriminatory conduct was purposeful and intentional, satisfying § 1981's requirement that violations result from purposeful discrimination rather than disparate impact alone.

366.    Ms. Johnson suffered concrete injuries flowing from Defendants' racially motivated breach and interference with her contractual relationship, including loss of employment, wages, benefits, professional reputation, and future career opportunities.

367.    Defendants' conduct violated Ms. Johnson's rights under 42 U.S.C. § 1981 to make and enforce contracts on the same terms as white citizens, entitling her to damages and equitable relief.

## COUNT IX
## 42 U.S.C. § 1985(3)
## (Civil Rights Conspiracy)
Against all Defendants

368. Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

*Element 1: Existence of a Conspiracy*

369. Defendants Georgetown University, Joel Hellman, George Shambaugh, Rachel Jessica Wolff, Canary Mission, Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Ilya Shapiro, Tuvia Milsztein (aka Adam Milstein), and Adam and Gila Milstein Family Foundation conspired through an explicit agreement and meeting of the minds to deprive Ms. Johnson of her equal protection rights and employment opportunities based on her membership in protected classes.

370. The conspiracy was formed and executed through specific agreement and coordination.

371. Funding Conspiracy: Defendants Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Tuvia Milsztein, and Adam and Gila Milstein Family Foundation explicitly agreed to fund Defendant Canary Mission's cyberstalking operations through documented financial transfers via foreign Zionist intermediary Megamot Shalom and the Central Israel Fund, as confirmed by investigative reporting from *The Nation* and *Al Jazeera*'s The Lobby – USA, with Eric Gallagher stating on record: "Adam Milstein's the guy who funds [Canary Mission]."

372. Targeting Agreement: Defendant Canary Mission, enabled by its funders and acting pursuant to the directives of the Zionist Apartheid's Ministry of Strategic Affairs, created and maintained a defamatory profile of Ms. Johnson designed to appear as the top

Google search result for her name, with the explicit purpose of enabling employment discrimination against Palestinian advocates.

373. Amplification Agreement: Defendant Rachel Jessica Wolff, upon discovering Ms. Johnson's employment at Georgetown through her introductory email, and suspecting Ms. Johnson's protected characteristics, immediately searched Ms. Johnson's name, located Canary Mission's profile, and agreed to amplify the defamatory content by posting viral tweets (with millions of views) explicitly identifying Ms. Johnson's position and workplace to trigger coordinated harassment.

374. Amplification Agreement: Defendant Ilya Shapiro, a former Georgetown employee, agreed to further amplify Wolff's defamatory tweets to his 500,000+ followers, explicitly identifying Ms. Johnson by name and Georgetown position to increase the harassment and maximize pressure for her termination.

375. Employment Retaliation Agreement: Defendants Georgetown University, Joel Hellman, and George Shambaugh, acting in direct response to the coordinated harassment campaign, agreed to terminate Ms. Johnson without due process after immediately placing her on administrative leave within hours of Wolff's viral tweet and issuing defamatory university-wide communications falsely branding her a "security threat."

376. The conspiracy's explicit coordination is evidenced by temporal coordination, financial documentation, strategic communication, and institutional coordination.

377. Temporal Coordination: The sequence of events occurring within less than 12 hours—Wolff's tweet on November 1, 2023, at 10:17 PM, followed immediately by Shapiro's amplification, then Georgetown's placement of Ms. Johnson on leave by November 2, 2023, at 8:22 AM—demonstrates coordinated timing that is impossible without prior agreement.

While the conduct of Canary Mission and its funders were more remote in time, the conduct was specifically designed to negatively impact Ms. Johnson's employability based on her protected speech.

378.   Financial Documentation: Financial records and reporting from *The Forward* and *Jewish Telegraphic Agency* confirming the Helen Diller Family Foundation's $100,000 transfer and Milstein Foundation funding to Canary Mission specifically for operations targeting Palestinian advocates.

379.   Strategic Communication: Internal Al Jazeera footage capturing explicit discussions between Canary Mission funders about coordinating "name-and-shame" campaigns against Palestinian advocates.

380.   Institutional Coordination: Georgetown's immediate adoption of Canary Mission's narrative without independent investigation, combined with Hellman and Shambaugh's university-wide communications echoing the exact defamatory characterizations from Wolff's tweets.

*Element 2: Purpose of Depriving Equal Protection and Class-Based Discriminatory Animus*

381.   The conspiracy was specifically motivated by class-based, invidiously discriminatory animus against Ms. Johnson based on her membership in multiple protected classes: Race (African American and Arab), National Origin (Palestinian), Religion (Muslim), and Gender (female). This animus satisfies § 1985(3)'s requirement for racial, or perhaps otherwise class-based, invidiously discriminatory animus.

382.   The discriminatory animus is specifically demonstrated through targeted selection based on protected identity, protected class-specific targeting, religious and ethnic animus, and comparative animus.

383.    Targeted Selection Based on Protected Identity: Defendant Rachel Jessica Wolff explicitly searched for and targeted Ms. Johnson immediately upon learning of her Palestinian identity through her introductory email, with Wolff later admitting she "looked [Ms. Johnson] up as soon as I saw this email" and found Canary Mission's profile targeting her Palestinian advocacy.

384.    Protected Class-Specific Targeting: Canary Mission's documented pattern of targeting 80% people of color, with particular focus on Palestinian, Arab, Muslim, and African American advocates, as documented in *Mondoweiss*'s survey of over 18,000 profiles.

385.    Religious and Ethnic Animus: Georgetown's immediate politicization of Ms. Johnson's Palestinian identity during her welcome lunch, with Director George Shambaugh redirecting conversation to "the war in Gaza" solely because of Ms. Johnson's Palestinian heritage, reducing her to a political proxy and causing her visible distress.

386.    Comparative Animus: Georgetown's retention of white, Jewish, Zionist employees (Ilya Shapiro, Bruce Hoffman, Danielle Pletka, Yonatan Green) despite their engagement in racist speech targeting protected classes, while terminating Ms. Johnson for protected political speech criticizing the Zionist occupation, apartheid, and genocide in Palestine when she was a teenager.

387.    The conspiracy's purpose was explicitly to deprive Ms. Johnson of equal protection under the laws and equal privileges and immunities by systematically using defamatory profiles to create artificial barriers to employment opportunities for Palestinian advocates (Employment Discrimination); suppressing Ms. Johnson's First Amendment right to engage in protected political speech criticizing the violence borne of the Zionist occupation, apartheid, and genocide in Palestine (Civil Rights Deprivation); and denying Ms. Johnson

the same due process protections afforded to non-Palestinian, non-Muslim, non-African American employees at Georgetown who engaged in comparable or worse conduct (Equal Treatment Denial).

*Element 3: Specific Acts in Furtherance of the Conspiracy*

388.   Defendants committed specific acts in furtherance of the conspiracy.

389.   Defendant Canary Mission: (a) created and maintained a defamatory cyberstalking profile of Ms. Johnson designed to appear as the top Google search result for her name; (b) coordinated with the Zionist Apartheid's Ministry of Strategic Affairs to weaponize student data for suppression of Palestinian advocacy at U.S. institutions; and (c) provided the defamatory dossier used by Georgetown as pretextual justification for Ms. Johnson's termination.

390.   Defendants Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Tuvia Milsztein, and Adam and Gila Milstein Family Foundation: (a) provided documented financial support for unknown total amount and a minimum of over $100,000 to Canary Mission through foreign Zionist intermediaries; (b) specifically funded the creation and maintenance of cyberstalking profiles targeting Palestinian advocates including Ms. Johnson; and (c) coordinated with the Zionist apartheid agencies in Occupied Palestine to maximize the impact of harassment campaigns.

391.   Defendant Rachel Jessica Wolff: (a) conducted targeted research on Ms. Johnson immediately upon receiving her introductory email based on Ms. Johnson's protected characteristics; (b) published viral defamatory tweets on November 1, 2023, at 10:17 PM, garnering millions of views, explicitly identifying Ms. Johnson's name, position, and workplace; (c) amplified Canary Mission's decontextualized and defamatory racially

motivated content with malicious intent to damage Ms. Johnson's employment; and (d) posted a second tweet using Canary Mission's materials to shame Georgetown for hiring Ms. Johnson and intimidate Georgetown into violating Ms. Johnson's contractual, civil, and constitutional rights.

392.    Defendant Ilya Shapiro: (a) retweeted Wolff's defamatory content to his 500,000+ followers; (b) explicitly identified Ms. Johnson by full name and Georgetown position to maximize racially motivated harassment and intimidate Georgetown into violating Ms. Johnson's contractual, civil, and constitutional rights; and (c) used his previous institutional authority and influence as a senior Georgetown employee to legitimize the racially motivated harassment campaign.

393.    Defendant Georgetown University: (a) immediately placed Ms. Johnson on administrative leave within hours of the harassment campaign without conducting independent investigation or affording due process; and (b) terminated Ms. Johnson's employment on November 27, 2023, using Canary Mission's defamatory profile as sole justification.

394.    Defendant Joel Hellman: published defamatory university-wide email on November 2, 2023, to 1,200+ community members falsely branding Ms. Johnson a "security threat" and implying violent tendencies without factual basis.

395.    Defendant George Shambaugh: (a) made discriminatory statements to colleagues characterizing Ms. Johnson's social media posts as creating "safety concerns"; and (b) participated in the termination decision based solely on defamatory external racially motivated harassment campaign.

*Element 4: Resulting Injury and Deprivation of Rights*

396.    As a direct and proximate result of Defendants' conspiracy, Ms. Johnson suffered severe injuries to her person and property and was deprived of fundamental rights and privileges of U.S. citizenship, including: (a) loss of position as Assistant Director of Academic and Faculty Affairs at Georgetown University after only three days of employment (Employment Termination); (b) loss of salary, benefits, and career advancement opportunities in higher education (Economic Harm); (c) permanent association with false "antisemite" allegations in Google searches, destroying her professional standing in academia (Reputational Destruction); (d) documented panic attacks, insomnia, anxiety, and severe emotional distress requiring medical intervention (Physical and Emotional Injury); (e) suppression of First Amendment right to engage in protected political speech and Fourteenth Amendment right to equal treatment under the law (Civil Rights Deprivation); and (f) credible death threats and doxing requiring her to deactivate social media accounts and limit public engagement (Personal Safety Threats).

397.    The conspiracy successfully achieved its objective of terminating Ms. Johnson's employment and suppressing Palestinian advocacy through coordinated discriminatory action targeting her protected class membership. Georgetown's reliance on Canary Mission's racist and defamatory dossier—funded by Defendants Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Tuvia Milsztein, and Adam and Gila Milstein Family Foundation and amplified by Defendants Wolff and Shapiro—directly caused her termination and ongoing professional ostracization.

398.    Defendants' conspiracy violated Ms. Johnson's rights under: (a) 42 U.S.C. § 1981 (equal right to make and enforce contracts); (b) First Amendment (freedom of speech

and expression); (c) Fourteenth Amendment (equal protection under the law); and (d) Title VII (freedom from employment discrimination based on race, religion, and national origin).

399.    The conspiracy constitutes a continuing violation as Canary Mission's defamatory profile remains active and accessible as of August 2025, causing ongoing reputational harm and employment discrimination against Ms. Johnson, with each new view constituting a new publication in furtherance of the original conspiracy.

## COUNT X
### (Breach of Contract)
Against Defendant Georgetown University

400.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

*Valid Employment Contract*

401.    On October 2, 2023, Georgetown University extended Ms. Johnson an unconditional written offer of employment as Assistant Director of Academic and Faculty Affairs in the Master of Science in Foreign Service Program, which she accepted on the same date. The employment relationship commenced on October 30, 2023, creating a valid employment contract between the parties.

402.    Pursuant to stipulation (6) of Ms. Johnson's employment offer, Georgetown incorporated by reference its Human Resources policies, stating: "in accordance with Human Resources policies, you will be classified as and be subject to applicable policies for regular staff employees, including those set forth in the Human Resources Policies, as those policies may from time to time be amended or modified by the University. Current versions of the Human Resources are available at https://policymanual.hr.georgetown.edu/. In addition,

you will be subject to applicable department policies and practices." This incorporation created express contractual terms governing Ms. Johnson's employment relationship.

*Rebuttal of At-Will Employment Presumption*

403.    Ms. Johnson's employment was not terminable at-will, as Georgetown's Human Resources Policy #204 ("Probationary Employment Period") establishes specific preconditions for termination during the probationary period. Policy #204 expressly states: "Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment. However, if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior is unacceptable, the University may terminate employment at any time during the probationary period."

404.    The mandatory language "normally, an employee will be allowed to complete the probationary period" creates a contractual expectation of job security absent specific findings of performance deficiency or unacceptable behavior, thereby rebutting the presumption of at-will employment.

*Specific Contractual Obligations and Duties*

405.    Georgetown's contractual duties to Ms. Johnson arose from multiple express and implied sources.

406.    Express Policy Obligations: HR Policy #101 ("Introduction") and Policy #201 ("Equal Opportunity Employment") obligate Georgetown to "support diversity by advancing equal opportunity in employment for all persons and to prohibit discrimination in all aspects of employment because of national origin, race, religion, personal appearance, and political affiliation."

407.    Procedural Due Process Requirements: HR Policy #204 requires Georgetown to provide adequate investigation and substantiation before determining that an employee's "behavior is unacceptable" or that the employee "cannot accomplish the job."

408.    Consistency and Objectivity Standards: HR Policy #101 mandates that Georgetown provide "supervisors and managers the ability to make decisions within a framework that promotes consistency and objectivity."

409.    Implied Covenant of Good Faith and Fair Dealing: Under District of Columbia law, all employment contracts contain an implied covenant requiring employers to act in good faith and deal fairly with employees in the exercise of contractual rights.

*Material Breaches of Contract*

410.    Georgetown materially breached its contractual obligations to Ms. Johnson in multiple ways.

411.    Violation of Equal Opportunity Policy: Despite Policy #201's prohibition against discrimination based on "national origin, race, religion, personal appearance, and political affiliation," Georgetown terminated Ms. Johnson based on her Palestinian national origin, Muslim religion, and past political advocacy for Palestinian rights, while simultaneously retaining similarly situated employees who engaged in comparable or worse conduct.

412.    Failure to Provide Due Process: Georgetown violated Policy #204's procedural requirements by terminating Ms. Johnson without adequate investigation, failing to substantiate claims that her "behavior is unacceptable" or that she "cannot accomplish the job," and refusing to consider her November 8, 2023, discrimination complaint explaining the context of the allegations against her.

413.    Inconsistent and Discriminatory Policy Enforcement: Georgetown breached Policy #101's consistency requirement through disparate enforcement demonstrated by at least four comparators.

414.    First, Ilya Shapiro. Despite publishing racist tweets calling President Biden's Supreme Court nominee a "lesser Black woman" only three days before beginning employment, Georgetown conducted a four-month investigation, granted Shapiro full due process, and ultimately retained him without discipline while invoking Speech and Expression Policy protections.

415.    Second, Bruce Hoffman. Georgetown not only retained but promoted this faculty member to oversee "Countering Hate and Intolerance" despite his racist comparison of Northern Virginia infrastructure to "Mogadishu" and inflammatory claims that TikTok was "turning a whole generation into anti-Semites."

416.    Third, Danielle Pletka. Georgetown took no disciplinary action against this adjunct professor who labeled critics of Israeli policies as "terrorist sympathizers" and "insubordinate morons," creating a hostile environment for Palestinian and Muslim students and faculty.

417.    Fourth, Yonatan Green. Georgetown retained this fellow despite his dismissal of Palestinian displacement narratives as "baseless victimhood," conduct that targeted and undermined Palestinian students' experiences.

418.    Breach of Implied Covenant: Georgetown acted in bad faith by: (a) relying on an anonymous, third-party cyberstalking website (Canary Mission) rather than conducting its own investigation; (b) accepting decontextualized allegations without affording Ms. Johnson meaningful opportunity to respond; (c) suspending her within less that 12 hours and

terminating her within 25 days of a coordinated harassment campaign rather than protecting her from targeted attacks; and (d) applying probationary termination standards pretextually to circumvent normal procedural protections.

*Causation and Damages*

419.    Georgetown's breaches directly caused Ms. Johnson substantial damages.

420.    Economic Losses: Loss of salary, benefits, health insurance, retirement contributions, and career advancement opportunities from November 27, 2023, forward, calculated at her annual salary of $75,000 plus benefits.

421.    Reputational Harm: Permanent professional damage through Georgetown's public statements and termination, which Georgetown knew would be amplified by the ongoing harassment campaign and Canary Mission's defamatory profile remaining as the top Google search result for her name.

422.    Emotional Distress: Severe psychological harm including panic attacks, insomnia, anxiety, and forced withdrawal from public advocacy, directly resulting from Georgetown's breach of its duty to act in good faith and provide equal treatment.

423.    Lost Career Trajectory: Destruction of Ms. Johnson's academic career prospects in higher education administration, where Georgetown's discriminatory termination serves as a permanent barrier to future employment opportunities.

424.    Georgetown's conduct violated its own contractual mandate that "with decision making comes responsibility" by failing to uphold the implied covenant of good faith and fair dealing inherent in Ms. Johnson's employment agreement, thereby breaching both express and implied contractual terms governing their employment relationship.

## COUNT XI
### (Intentional Infliction of Emotional Distress)
Against Georgetown University, Joel Hellman, George Shambaugh,
Rachel Jessica Wolff, and Ilya Shapiro.

425.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

426.    Under District of Columbia law, intentional infliction of emotional distress requires: (1) extreme and outrageous conduct by the defendant that (2) was intentional or reckless and (3) caused the plaintiff severe emotional distress. The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Against Defendant Rachel Jessica Wolff*

427.    Rachel Jessica Wolff engaged in extreme and outrageous conduct that transcends all bounds of civilized behavior. Upon receiving Ms. Johnson's routine introductory email to the MSFS community, Wolff immediately profiled her based on her protected characteristics and conducted a targeted search to locate damaging information about Ms. Johnson, discovered an eight-year-old cyberstalking profile created by a criminal harassment organization, and deliberately weaponized this material to orchestrate Ms. Johnson's professional destruction.

428.    Wolff's conduct was intentionally calculated to cause maximum harm. Her November 1, 2023 viral tweet explicitly identified Ms. Johnson's full name, position, and workplace, attached decontextualized and misleading screenshots designed to falsely portray Ms. Johnson as antisemitic, and was crafted specifically to trigger mass harassment and pressure Georgetown into terminating Ms. Johnson. The tweet's explosive reach—reaching 1.2 million views, 6,300 likes, 2,000 retweets within a few hours—demonstrates Wolff's

sophisticated understanding of how to weaponize social media for maximum reputational damage.

429.    Wolff's actions were not mere criticism, but a deliberate doxing campaign designed to incite mob harassment. She targeted a Georgetown staff member who had never interacted with her, using her platform as a Georgetown student to destroy the career of a vulnerable employee from multiple protected classes. This conduct—systematically researching, packaging, and broadcasting defamatory material to millions with the specific intent to destroy someone's livelihood—represents the type of malicious, predatory behavior that would cause any reasonable member of the community to exclaim "Outrageous!"

430.    Wolff's conduct directly and proximately caused Ms. Johnson severe emotional distress, including panic attacks, insomnia, anxiety, and the complete destruction of her academic and professional prospects through permanent association with false antisemitism accusations in Google searches.

*Against Defendant Ilya Shapiro*

431.    Former Georgetown employee Ilya Shapiro engaged in extreme and outrageous conduct by amplifying Wolff's harassment campaign to his 500,000+ followers despite his position of authority, based on his former institutional affiliation with Georgetown, and knowledge of the devastating consequences such amplification would have on Ms. Johnson's career and safety.

432.    Shapiro's conduct was intentionally malicious and recklessly indifferent to the severe harm it would cause. As a former Georgetown faculty member who had himself been the subject of controversy for racist tweets, Shapiro was acutely aware of how viral social media campaigns destroy careers and endanger individuals. Despite this knowledge, he

deliberately chose to amplify Wolff's defamatory content, explicitly identifying Ms. Johnson's name, position, and workplace to maximize the targeting.

433. Shapiro's actions were particularly egregious given the stark disparity in their positions: he was a privileged white male faculty member with tenure protections and 500,000 social media followers, while Ms. Johnson was a vulnerable three-day employee from multiple protected classes. Shapiro weaponized his institutional platform and massive following to systematically destroy someone he had never met, solely to advance his political agenda.

434. The extreme nature of Shapiro's conduct is underscored by Georgetown's contradictory treatment—the University protected Shapiro when he made racist statements about African American women, affording him months of due process and ultimate retention, yet allowed him to destroy Ms. Johnson's career through his amplification of the harassment campaign. This conduct—using one's institutional sway and massive platform to orchestrate the professional annihilation of a vulnerable employee—represents behavior so malicious and unconscionable that it transcends all bounds of civilized conduct.

435. Shapiro's amplification directly and proximately caused Ms. Johnson severe emotional distress by exponentially expanding the reach of the harassment campaign and lending institutional credibility to the false accusations against her.

*Against Defendants Georgetown University, Joel Hellman, and George Shambaugh*

436. Georgetown University, acting through Joel Hellman and George Shambaugh, engaged in extreme and outrageous conduct that went far beyond normal employment disputes and transcended all bounds of institutional decency.

437.    Georgetown's conduct was intentionally designed to amplify and legitimize the harassment campaign against Ms. Johnson rather than protect her. Within hours of Wolff's viral attack, Georgetown placed Ms. Johnson on administrative leave without explanation, investigation, or due process. Joel Hellman sent a mass email to over 1,200 community members falsely branding Ms. Johnson a "security threat" and implying she posed danger to the campus community—statements Hellman knew were baseless given Georgetown's retention of faculty who had engaged in egregious misconduct.

438.    Georgetown's conduct was particularly outrageous because it represented a complete abandonment of institutional responsibility to protect vulnerable employees. Despite being fully aware that Ms. Johnson was the target of a coordinated doxing campaign involving death threats and mass harassment, Georgetown chose to amplify rather than investigate, to legitimize rather than protect, and to terminate rather than defend.

439.    The extreme nature of Georgetown's conduct is demonstrated by its stark departure from standard practices. Georgetown afforded Ilya Shapiro—a white male faculty member who made racist statements—four months of due process, the right to legal representation, and ultimate retention. In contrast, Georgetown terminated Ms. Johnson—a Muslim Palestinian African American woman—within 25 days without meaningful investigation, due process, or consideration of the discriminatory context surrounding her targeting.

440.    George Shambaugh's conduct was particularly egregious, as he told colleagues that Ms. Johnson's social media posts created "safety concerns" and implied violent tendencies without any factual basis, further ostracizing her and lending credibility to the false narrative that she posed a threat to campus safety.

441. Georgetown's systematic discrimination—protecting racist speech from privileged faculty while destroying the careers of marginalized employees for protected political expression—represents conduct so institutionally malicious and unconscionable that it transcends normal employment disputes and enters the realm of extreme and outrageous behavior that would cause any reasonable community member to exclaim "Outrageous!"

442. Defendants' collective conduct directly and proximately caused Ms. Johnson severe emotional distress, evidenced by panic attacks, insomnia, anxiety, permanent reputational damage through false association with antisemitism in Google searches, destruction of her academic and professional trajectory, and ongoing psychological trauma from credible threats of violence.

443. The severity of Ms. Johnson's emotional distress is documented through medical evidence and the objective destruction of her career prospects, professional relationships, and personal safety—harm that no reasonable person could be expected to endure and that flows directly from Defendants' extreme and outrageous conduct.

## COUNT XII
### (Tortious Interreference with Contract)
Against Defendants Rachel Jessica Wolff and Ilya Shapiro.

444. Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

*Existence of Valid Contractual Relationship*

445. Ms. Johnson had a valid employment contract with Georgetown University, which commenced on October 30, 2023, based on Georgetown's unconditional offer letter dated October 2, 2023. Under D.C. law, even at-will employment relationships constitute valid and subsisting contractual relationships for purposes of tortious interference claims.

*Defendants' Knowledge of the Contractual Relationship*

446.    Rachel Jessica Wolff had actual knowledge of Ms. Johnson's employment contract with Georgetown University through Ms. Johnson's introductory email to the MSFS community, which identified her position as Assistant Director of Academic and Faculty Affairs and her employment start date.

447.    Ilya Shapiro had actual knowledge of Ms. Johnson's employment relationship through his position as a former Georgetown employee and his amplification of Wolff's viral tweet, which explicitly identified Ms. Johnson's name, position, and place of employment at Georgetown University.

*Intentional and Improper Interference*

448.    Rachel Jessica Wolff intentionally interfered with Ms. Johnson's employment contract by: (a) conducting targeted research on Ms. Johnson immediately upon receiving her introductory email based on her protected characteristics; (b) deliberately publishing viral defamatory tweets on November 1, 2023, containing decontextualized eight-year-old social media posts designed to damage Ms. Johnson's professional reputation; (c) explicitly identifying Ms. Johnson's position and workplace in the tweets to maximize reputational harm and pressure Georgetown into termination; and (d) continuing the harassment campaign with subsequent tweets amplifying Canary Mission's defamatory content.

449.    Ilya Shapiro intentionally interfered with Ms. Johnson's employment contract by: (a) retweeting Wolff's defamatory content to his 500,000+ followers, exponentially amplifying the harassment campaign; (b) explicitly identifying Ms. Johnson's full name, position, and Georgetown employment in his retweet; and (c) leveraging his position as a

former Georgetown faculty member to lend credibility and institutional weight to the defamatory campaign.

*Malicious and Improper Conduct*

450.    Both Defendants acted with malice and improper motives, as required for tortious interference claims under D.C. laws.

451.    Wolff's malicious conduct included: (a) having no legitimate business justification for targeting Ms. Johnson, with whom she had no prior interaction; (b) deliberately decontextualizing Ms. Johnson's eight-year-old social media posts to create a false narrative of antisemitism; (c) weaponizing Georgetown's institutional policies to achieve Ms. Johnson's termination; and (d) coordinating with anonymous cyberstalking operations (Canary Mission) to maximize reputational damage.

452.    Shapiro's malicious conduct included: (a) amplifying defamatory content despite his knowledge that such campaigns target vulnerable employees; (b) exploiting his institutional affiliation with Georgetown and social media platform to pressure the institution into termination; and (c) acting in coordination with the broader harassment campaign while having no legitimate justification for targeting Ms. Johnson.

*Specific Intent to Interfere*

453.    Both Defendants demonstrated specific intent to disrupt Ms. Johnson's employment relationship.

454.    This is evidenced by the immediate timing of their actions following Ms. Johnson's introduction to the Georgetown community, their explicit identification of her employment position and workplace to maximize pressure on Georgetown, their coordination with broader networks (Canary Mission, pro-Zionist social media accounts)

known for targeting Palestinian advocates' employment, and the viral nature of their content (millions of views), which created public pressure for Georgetown to terminate Ms. Johnson.

*Causation and Resulting Damages*

455.    Defendants' intentional interference directly caused Ms. Johnson's termination and resulting damages.

456.    Georgetown placed Ms. Johnson on administrative leave within less than 12 hours of Wolff's initial tweet and Shapiro's amplification.

457.    Georgetown explicitly cited the viral social media campaign and resulting "threats to community safety" in its termination decision.

458.    Georgetown's termination letter specifically referenced Ms. Johnson's social media posts being "shared with Georgetown University during the first week of your employment"—the exact conduct orchestrated by Wolff and amplified by Shapiro.

459.    Ms. Johnson suffered economic losses including lost wages, benefits, and career opportunities, as well as severe reputational damage that continues to affect her employment prospects through today.

*Absence of Justification or Privilege*

460.    Neither Defendant can demonstrate that their conduct was legally justified or privileged.

461.    Defendants' racially-driven actions were not undertaken to protect any legitimate business interest; they had no authority or responsibility regarding Ms. Johnson's employment; their conduct exceeded any claimed free speech protections through its malicious targeting, defamatory content, and coordination with racist harassment campaigns;

and their interference was motivated by discriminatory animus against Ms. Johnson's Palestinian identity and political advocacy, not any legitimate concern.

*Third-Party Status*

462.    Both Defendants qualify as third-party actors capable of tortious interference liability.

463.    Wolff, though a Georgetown student, was not Ms. Johnson's supervisor or employer and had no authority over her employment relationship.

464.    Shapiro, a former Georgetown director, was not Ms. Johnson's supervisor, did not work at Georgetown at the time, and acted outside any official capacity or authority regarding her employment.

465.    Under D.C. law, Defendants' coordinated campaign to destroy Ms. Johnson's employment through viral defamatory content, explicit identification of her workplace, and coordination with anonymous harassment networks constitutes intentional and improper interference with her valid employment contract, causing substantial damages for which they should be held liable.

## COUNT XIII
### (False Light Invasion of Privacy)
Against Georgetown University, Joel Hellman, George Shambaugh,
Rachel Jessica Wolff, and Ilya Shapiro

466.    Ms. Johnson realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 above.

467.    Under District of Columbia law, false light invasion of privacy occurs when a defendant gives publicity to a false statement, representation, or imputation understood to be of and concerning the plaintiff, which places the plaintiff in a false light that would be offensive to a reasonable person.

*Publicity Element*

468.    Defendants created widespread publicity by disseminating false statements about Ms. Johnson to substantial segments of the public through multiple channels.

469.    Joel Hellman sent a mass email on November 2, 2023, to over 1,200 members of the MSFS community, creating institutional publicity falsely portraying Ms. Johnson as a security threat.

470.    Rachel Jessica Wolff published viral tweets on November 1, 2023, that garnered over 1.2 million views, creating massive public exposure of false characterizations of Ms. Johnson.

471.    Ilya Shapiro amplified Wolff's defamatory content to his 500,000+ followers, exponentially expanding the false publicity.

472.    Georgetown University through its official communications and George Shambaugh through his departmental statements created institutional publicity that reinforced and legitimized the false narrative about Ms. Johnson.

*False Statement, Representation, or Imputation*

473.    Each Defendant publicized false statements about Ms. Johnson.

474.    Joel Hellman's email falsely implied Ms. Johnson posed a "security threat" by stating "We take all threats to our community seriously"—a baseless characterization given Georgetown's retention of Ilya Shapiro despite his racist conduct and ensuing public controversy.

475.    Rachel Jessica Wolff falsely portrayed Ms. Johnson as an "antisemite" by decontextualizing her 2015 college freshman tweets criticizing Israeli state policies, stripping

away critical context about her status as a Palestinian teenager responding to military violence.

476.    Ilya Shapiro amplified and endorsed Wolff's false characterizations by retweeting her defamatory content with his influential credentials, including at Georgetown.

477.    Georgetown University and George Shambaugh falsely represented Ms. Johnson's conduct as creating "safety concerns" and posing threats to the community, despite knowing her exemplary professional record and the protected political nature of her eight-year-old social media posts.

*"Of and Concerning" Ms. Johnson*

478.    All false statements were clearly understood to refer specifically to Ms. Johnson.

479.    Hellman's email was sent in direct response to the viral campaign targeting Ms. Johnson by name and position.

480.    Wolff's tweets explicitly identified Ms. Johnson by name, position, and workplace.

481.    Shapiro's retweets specifically amplified content naming Ms. Johnson and her Georgetown employment.

482.    Georgetown's and Shambaugh's communications directly referenced Ms. Johnson's employment and conduct.

*False Light Highly Offensive to a Reasonable Person*

483.    The false representations placed Ms. Johnson in a false light that would be highly offensive to an ordinary, reasonable person.

484.    Security threat implications: Hellman's characterization falsely portrayed Ms. Johnson as dangerous, when she posed no threat and had an exemplary record.

485.    Antisemitism accusations: Wolff's and Shapiro's false labeling of Ms. Johnson as "antisemitic" distorted her protected political speech criticizing state violence into hateful bigotry.

486.    Professional incompetence implications: Georgetown's and Shambaugh's statements falsely suggested Ms. Johnson could not perform her duties or safely engage with community members

487.    Character assassination: The coordinated campaign created a false public persona of Ms. Johnson as extremist, threatening, and professionally unsuitable.

*Actual Malice/Knowledge of Falsity*

488.    Defendants acted with knowledge of falsity or reckless disregard for the truth.

489.    Georgetown University and Shambaugh knew Ms. Johnson's posts were eight years old, made during her college freshman year, and related to protected political speech, yet falsely characterized them as current security threats.

490.    Joel Hellman knew there were no actual threats from Ms. Johnson but deliberately implied she posed security risks to justify institutional action.

491.    Rachel Jessica Wolff deliberately decontextualized Ms. Johnson's posts, removing historical context about Israeli military actions that prompted her teenage responses.

492.    Ilya Shapiro knew from his own controversial experience with employment at Georgetown that context matters, yet amplified false characterizations without regard for truth

493.    This false light claim protects Ms. Johnson's distinct privacy interests in being thrust into unwanted public controversy under false circumstances, separate from reputational harm.

494.    The false light publicity caused Ms. Johnson severe mental distress distinct from reputational harm.

495.    Ms. Johnson received unwanted national attention and scrutiny based on false characterizations. She was thrust into public controversy as a "poster child" for antisemitism based on a racist and fabricated narrative. Ms. Johnson lost her privacy and anonymity through viral exposure of distorted personal information. Ms. Johnson suffered psychological trauma from being publicly misrepresented in ways fundamentally contrary to her character and beliefs.

*Coordinated False Light Campaign*

496.    Defendants' actions constituted a coordinated campaign to place Ms. Johnson in false light.

497.    Wolff initiated the false characterization by weaponizing Canary Mission's decontextualized profile.

498.    Shapiro legitimized and amplified the false narrative through his professional platform.

499.    Hellman institutionally endorsed the false characterization through official university communications.

500.    Georgetown and Shambaugh perpetuated the false light through discriminatory employment actions based on fabricated security concerns.

501.    Under District of Columbia law, Defendants coordinated publicity of false statements placing Ms. Johnson in a highly offensive false light, done with knowledge of falsity or reckless disregard for truth, constitutes actionable false light invasion of privacy for which they should be held liable.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Aneesa Johnson respectfully requests that this Court enter judgment in her favor and against all Defendants, and:

(a)    Compensatory Damages

- Award full back pay from October 30, 2023, including raises, bonuses, retirement contributions, and benefits under 42 U.S.C. § 2000e-5(g) (Title VII) and D.C. Code § 2-1403.13.

- Front pay for 10+ years reflecting Ms. Johnson's career trajectory in academia, calculated using U.S. Bureau of Labor Statistics data for higher education administrators.

- Award compensatory damages for breach of employment contract under District of Columbia common law.

- $5,000,000 for emotional distress and professional ostracization under DCHRA and 42 U.S.C. § 1981.

(b)    Punitive Damages

- Award $300,000 statutory cap under 42 U.S.C. § 1981a(b)(3) (Title VII) against Georgetown University.

- Award uncapped punitive damages under DCHRA § 2-1403.16(b) and 42 U.S.C. § 1981 against Georgetown University for institutional malice, and all individual Defendants, including George Shambaugh, Rachel Jessica Wolff, and Joel Hellman, for their direct participation in discriminatory acts.

- Award punitive damages of $2,500,000 against Tuvia Milsztein (Adam Milstein) and $1,000,000 against Helen Diller Family Foundation under D.C. Code § 2-1403.16(b) for their funding of Canary Mission's cyberstalking operations with actual malice, as evidenced by their coordination with the Israeli Ministry of Strategic Affairs.

- Award $10,000,000 jointly/severally from Adam Milstein, the Adam and Gila Milstein Family Foundation, Canary Mission, Rachel Jessica Wolff, and Ilya Shapiro under 42 U.S.C. § 1985(3) and common law torts.

(c)    Equitable Relief

- Issue a permanent injunction requiring Georgetown University to remove all defamatory content about Ms. Johnson from internal records, reform Policy No. 204 to prohibit disparate enforcement against Palestinian/Muslim/African American/Arab employees.

- Order court-supervised diversity training for Georgetown University leadership.

- Order Canary Mission to delete Ms. Johnson's profile and cease dissemination under D.C. Code § 16-4002.

(d)    Statutory Penalties

- Award $500,000 penalty under D.C. Code § 2-1403.16(a) for aiding/abetting discrimination against Georgetown University.

(e)    Attorneys' Fees and Costs

- Award reasonable fees under 42 U.S.C. § 1988 for § 1981, § 1985(3), and Title VII claims.

- Award fees and expert costs under D.C. Code § 2-1403.13(a)(1)(E).

(f)    Declaratory Judgment

- Declare Georgetown University's use of Canary Mission profiles a *per se* violation of Title VII and DCHRA.

- Declare that Defendants' maintenance and weaponization of Canary Mission's cyberstalking profile of Ms. Johnson constitutes false light invasion of privacy under D.C. common law.

(g)    Joint and Several Liability

- Hold Adam Milstein, the Adam and Gila Milstein Family Foundation, Helen Diller Family Foundation, Jewish Community Federation of San Francisco, Canary Mission, Rachel Jessica Wolff, Ilya Shapiro, and Georgetown University jointly liable for all damages under 42 U.S.C. § 1985(3) and D.C. Common Law.

(h)    Grant such other relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all triable claims.

Respectfully submitted,

_____/s/Abdel-Rahman Hamed_____
ABDEL-RAHMAN HAMED, ESQ.
DC Bar No. 1632130
**Hamed Law**
P.O. Box 25085
Washington, D.C. 20027

(202) 888-8846

Advocates@HamedLaw.com


*Attorney for Plaintiff Aneesa Johnson*