# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Aneesa Johnson,

Plaintiff,

v.

Georgetown University, *et al.*,

Defendants.

Case No.   1:25-cv-01540

HON. CHRISTOPHER R. COOPER

## PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................... 1

II.  SUMMARY OF ARGUMENT ................................................................... 3

III. FACTUAL BACKGROUND ....................................................................... 9

   A.  MS. JOHNSON'S QUALIFICATIONS AND HIRING BY GEORGETOWN UNIVERSITY ........ 9
   B.  DISCRIMINATORY TREATMENT FROM FIRST DAY OF EMPLOYMENT ...................... 10
   C.  COORDINATED ZIONIST HARASSMENT CAMPAIGN TARGETING MS. JOHNSON ....... 10
   D.  GEORGETOWN'S IMMEDIATE ADVERSE ACTION WITHOUT DUE PROCESS .............. 14
   E.  COMPARATOR EVIDENCE: GEORGETOWN'S PROTECTION OF SIMILARLY SITUATED
   NON-BLACK AND NON-PALESTINIAN EMPLOYEES ........................................................ 16

IV.  LEGAL STANDARDS ............................................................................ 16

   A.  RULE 12(B)(2) MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION .......... 16
   B.  RULE 12(B)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM ..................... 17

V.   ARGUMENT ......................................................................................... 18

   A.  THIS COURT HAS PERSONAL JURISDICTION OVER OUT-OF-STATE DEFENDANTS ..... 18
      1.  *Personal Jurisdiction Over Milstein and San Francisco Defendants* ................................. 19
         a)  Funding and Support for Canary Mission Activities Targeting D.C. Institutions 19
         b)  Conspiracy Theory of Jurisdiction ................................................................. 21
      2.  *Personal Jurisdiction Over Ilya Shapiro* ........................................................................... 22
         a)  Former Georgetown Employment and Ongoing Contacts .............................. 22
         b)  Intentional Targeting of Georgetown Employment Relationship .................... 22
         c)  Conspiracy and Joint Action with District-Based Actor ................................. 23
   B.  MS. JOHNSON HAS ADEQUATELY STATED CLAIMS UNDER TITLE VII AND DCHRA 23
      1.  *Count I: Title VII Discrimination (Georgetown University)* ........................................... 23
         a)  Ms. Johnson Established Prima Facie Case of Race, Religion, and National
         Origin Discrimination ............................................................................................. 23
         b)  Georgetown's Proffered Reasons are Pretextual ............................................. 25
         c)  Georgetown's Inflammatory Mischaracterization of Ms. Johnson's Speech
         Evidences Discriminatory Bias ............................................................................... 27
         d)  Comparator Evidence Demonstrates Discriminatory Intent ............................ 29
      2.  *Count II: DCHRA Discrimination (Georgetown, Hellman, Shambaugh)* ....................... 36
         a)  DCHRA Permits Individual Liability for Supervisors ..................................... 36
         b)  Hellman and Shambaugh Directly Participated in Discrimination .................. 38
         c)  Ms. Johnson was "Similarly Situated" to Protected Comparators ................... 40
      3.  *Count III: DCHRA Aiding and Abetting (All Defendants)* ............................................. 41
         a)  Legal Standard for Aiding and Abetting Liability ........................................... 41
         b)  Wolff Aided and Abetted by Initiating Harassment Campaign ....................... 42
         c)  Shapiro Aided and Abetted by Amplifying Harassment Campaign ................. 45
         d)  Milstein and San Francisco Defendants Aided by Funding Canary Mission
         Infrastructure .......................................................................................................... 47
         e)  Georgetown Supervisors Aided by Legitimizing Discriminatory Narrative ...... 50

4.  *Count IV: Title VII Hostile Work Environment (Georgetown, Hellman, Shambaugh)*..... 54
   a)  Harassment was Severe and Pervasive ........................................................54
   b)  Harassment was Based on Protected Characteristics........................................57
   c)  Georgetown Had Actual Knowledge and Failed to Remediate .......................58
5.  *Count V: DCHRA Hostile Work Environment (Georgetown, Hellman, Shambaugh)*...... 60
   a)  Incorporates Title VII Analysis with DCHRA-Specific Elements....................60
   b)  Defendants Hellman and Shambaugh's Direct Participation............................60
6.  *Count VI: Title VII Retaliation (Georgetown, Hellman, Shambaugh)*...........................61
   a)  Ms. Johnson Engaged in Protected Activity ...................................................61
   b)  Adverse Employment Actions .......................................................................63
   c)  Causal Connection........................................................................................63
7.  *Count VII: DCHRA Retaliation (Georgetown, Hellman, Shambaugh)*...........................65
   a)  Incorporates Title VII Analysis with DCHRA-Specific Elements....................65
   b)  Defendants Hellman and Shambaugh's Direct Participation............................65
C.  Ms. JOHNSON HAS ADEQUATELY STATED FEDERAL CIVIL RIGHTS CLAIMS ............66
1.  *Count VIII: 42 U.S.C. § 1981 Race Discrimination (Georgetown Defendants, Wolff)*...... 66
   a)  Section 1981 Protects Against Discrimination in Contractual Relations ..........66
   b)  Ms. Johnson Alleged Racial Animus Sufficient for Section 1981....................67
   c)  Non-Employer Defendants are Proper Section 1981 Defendants.....................69
2.  *Count IX: 42 U.S.C. § 1985(3) Conspiracy (All Defendants)*......................................... 72
   a)  Ms. Johnson Alleged Agreement Among Co-Conspirators.............................72
   b)  Zionist Conspiracy Motivated by Racial Animus ..........................................73
   c)  Ms. Johnson Adequately Pled Overt Acts in Furtherance of Zionist Conspiracy 75
   d)  Zionist Conspiracy Resulted in Injury and Deprivation of Rights....................76
D.  Ms. JOHNSON HAS ADEQUATELY STATED CONTRACT CLAIMS ...............................77
1.  *Count X: Breach of Employment Contract and Implied Covenant of Good Faith and Fair Dealing (Georgetown University)*........................................................................................ 77
   a)  Valid Employment Contract Existed..............................................................77
   b)  Implied Covenant Arises from Employment Relationship ...............................78
   c)  Georgetown Breached Covenant Through Bad Faith Conduct ........................79
   d)  Georgetown Breached Contract by Terminating Without Just Cause..............81
   e)  "At-Will" Employment Does Not Bar Contract Claims Where University Policies Create Contractual Obligations ................................................................82
   f)  Causation and Damages................................................................................83
E.  Ms. JOHNSON HAS ADEQUATELY STATED TORT CLAIMS.......................................85
1.  *Count XI: Intentional Infliction of Emotional Distress (Georgetown Defendants, Shapiro, Wolff)*........................................................................................................................ 85
   a)  Defendants' Conduct was Extreme and Outrageous ......................................85
   b)  Conduct was Intentional and Reckless ..........................................................87
   c)  Ms. Johnson Suffered Severe Emotional Distress ..........................................88
   d)  First Amendment Not a Bar to IIED Claims Based on Discriminatory Harassment..................................................................................................89
2.  *Count XII: Tortious Interference with Contract (Shapiro, Wolff)*...................................91
   a)  Valid Employment Contract Existed..............................................................91
   b)  Wolff and Shapiro Had Knowledge of Contract.............................................92

       c)    Intentional and Improper Interference ........................................................93
       d)    Causation and Damages..............................................................................94
       e)    No Justification or Privilege .......................................................................95
       f)    Third-Party States Established ....................................................................97
    3.   *Count XIII: False Light Invasion of Privacy (Georgetown Defendants, Shapiro, Wolff)....* 98
       a)    Defendants Gave Publicity to False Representations ......................................98
       b)    False Light Highly Offensive to Reasonable Person........................................99
       c)    Defendants Acted with Knowledge of Falsity or Reckless Disregard .............101
  F.    DEFENDANTS' AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW....................103
    1.   *Statute of Limitations Does Not Bar Ms. Johnson's Claims..........................................103*
       a)    DCHRA Individual Liability Is Not Time-Barred .......................................103
       b)    Title VII Claims Are Properly Exhausted....................................................104
       c)    Tort claims are Timely ..............................................................................106
    2.   *Election of Remedies Doctrine Does Not Apply ........................................................107*
       a)    DCHRA Permits Dual Administrative and Judicial Remedies......................107
       b)    Ms. Johnson Did Not Elect Inconsistent Remedies .....................................109
    3.   *Communications Decency Act Does Not Shield Shapiro .............................................111*
    1.   *First Amendment Does Not Bar Ms. Johnson's Claims..............................................112*
       a)    Employment Discrimination is not Protected Speech ...................................112
       b)    Defamatory Falsehoods and Intentional Harassment Fall Outside First
Amendment Protection ........................................................................................114
       c)    Ms. Johnson's Claims Target Conduct, Not Protected Expression ................115
**VI.  CONCLUSION** ............................................................................... **117**

## I.     INTRODUCTION

This case presents a stark and compelling narrative of institutional discrimination, coordinated harassment, and retaliation targeting a highly qualified African American, Muslim woman of Palestinian descent for her protected political speech—orchestrated through a criminal cyberstalking enterprise, amplified by third-party actors, and ultimately validated by an educational institution's capitulation to false accusations.

Aneesa Johnson accepted an unconditional offer of employment as Assistant Director of Academic and Faculty Affairs at Georgetown University's Walsh School of Foreign Service on October 2, 2023. She commenced employment on October 30, 2023, with genuine enthusiasm and demonstrable qualifications. Three weeks later, she was terminated—not for any deficiency in her work performance, not for any unprofessional conduct during her employment, but because Georgetown University chose to weaponize a decade-old social media profile created by Canary Mission, a criminal cyberstalking operation explicitly designed to damage employment prospects of Palestinian rights advocates.

The facts alleged in Plaintiff's Second Amended Complaint reveal a coordinated conspiracy: Canary Mission, funded by California-based Zionist foundations (including the Adam and Gila Milstein Family Foundation, the Helen Diller Family Foundation, and the Jewish Community Federation of San Francisco), created and maintained Ms. Johnson's defamatory cyberstalking profile for nearly a decade. This profile was algorithmically optimized to appear as the top Google search result for her name, ensuring maximum employment-sabotaging impact. When a Georgetown law student, Rachel Jessica Wolff, discovered Ms. Johnson's hiring announcement, she immediately profiled Ms. Johnson and

weaponized the Canary Mission profile through viral tweets reaching 1.2 million users within hours. A former Georgetown faculty member, Ilya Shapiro, amplified these defamatory tweets to his 500,000 followers, lending his institutional credibility to the harassment campaign. Within less than twelve hours of the initial viral post, Georgetown placed Ms. Johnson on administrative leave without investigation, without due process, and without any opportunity to respond—despite having conducted an extensive hiring process that should have revealed these allegedly "disqualifying" eight-year-old posts if Georgetown had actually cared to discover them.

What Georgetown actually cared to discover became evident through comparative treatment. While Georgetown conducted a 122-day investigation of Ilya Shapiro—a white, Jewish, Zionist male who posted racist tweets about President Biden's Supreme Court nominee—and ultimately retained him without discipline, Georgetown conducted a truncated 25-day investigation of Ms. Johnson and terminated her without meaningful due process or investigation. While Georgetown retained Bruce Hoffman despite his racist rhetoric dog whistling the Somali diaspora in Northern Virginia, and retained Danielle Pletka despite labeling students and colleagues affirming the human dignity of Palestinians as "terrorist sympathizers," Georgetown terminated a Palestinian Muslim woman for the sin of criticizing the Zionist occupation in Palestine as a teenager, eight years before her employment.

The record reveals systematic, institutionalized double standards: criticism of Zionist occupation, apartheid, and genocide policies by a African American Muslim woman of Palestinian dissent constitutes disqualifying "unprofessional conduct" warranting immediate termination; racist statements targeting Black women by a white Jewish male

constitute matters of "academic freedom" warranting due process and retention. This inversion of institutional responsibility exposes the discriminatory animus that animated Georgetown's termination decision.

Ms. Johnson brings claims under Title VII of the Civil Rights Act of 1964, the District of Columbia Human Rights Act, 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and District of Columbia common law. She alleges discrimination based on race (African American and Arab), religion (Muslim), and national origin (Palestinian); aiding and abetting discrimination; hostile work environment; retaliation for opposing discrimination; conspiracy to deprive her of federal civil rights; breach of employment contract; tortious interference with contract; intentional infliction of emotional distress; and invasion of privacy through false light. Each claim flows logically from allegations of systematic institutional discrimination enabled by third-party harassment coordinated with offshore cyberstalking operations and domestic Zionist funding sources.

## II.   SUMMARY OF ARGUMENT

Ms. Johnson establishes a plausible claim for employment discrimination under all applicable legal standards. She satisfies every element required under Title VII, the DCHRA, and related federal and state law statutes. Defendants' motion to dismiss should be denied in its entirety.

**Personal Jurisdiction is Proper Over All Defendants.** The District of Columbia maintains jurisdiction over out-of-state funding Defendants through both the D.C. long-arm statute and the *Calder* effects test. Defendants Milstein, the Diller Foundation, and the Jewish Community Federation of San Francisco engaged in a persistent course of conduct by systematically funding Canary Mission's operations specifically targeting District of

Columbia residents and institutions. These Defendants knew their funding would support harassment campaigns designed to damage employment prospects of Palestinian advocates in D.C. institutions, including Georgetown. The funding Defendants' conduct is expressly aimed at the forum, causing harm they knew would be suffered in the District. Former Georgetown employee Ilya Shapiro similarly submits to jurisdiction through his intentional targeting of Ms. Johnson's Georgetown employment by tweeting defamatory content to his massive platform, explicitly identifying her by name and position at a District-based institution. All Defendants participated in a conspiracy that resulted in concrete harm in the District, establishing conspiracy jurisdiction over out-of-state actors.

**Ms. Johnson Establishes a Prima Facie Case of Discrimination Under Title**

**VII.** Ms. Johnson is an African American, Muslim woman of Palestinian descent—membership in multiple protected classes. Georgetown deemed her qualified through its unconditional written offer and extensive hiring process. Georgetown allowed her to work for three days before terminating her employment after only three weeks, placing her on administrative leave within nine hours of a viral social media campaign. Circumstances give rise to a compelling inference of discrimination: the temporal proximity between Georgetown's discovery of Ms. Johnson's Palestinian identity (October 30) and her suspension (November 2) is stark. Georgetown's reliance on a decade-old cyberstalking profile targeting Palestinian advocates, combined with its failure to conduct any meaningful investigation before terminating her, demonstrates systematic bias. The discriminatory intent is further established through Georgetown's disparate treatment of similarly situated employees. While Ilya Shapiro received 122 days of due process and retention after posting racist tweets, Ms. Johnson received summary termination within three weeks. This double

standard—protecting white, Jewish, Zionist employees despite egregious misconduct while terminating a Palestinian Muslim woman for protected political speech—exposes invidiously discriminatory animus.

**Defendants' Proffered Justification is Pretextual.** Georgetown claims Ms. Johnson was terminated for "unprofessional conduct" based on eight-year-old social media posts. This justification collapses under scrutiny. First, Georgetown violated its own Human Resources Policy 204, which mandates that employees "normally will be allowed to complete the probationary period." Ms. Johnson was terminated before completing three weeks of employment—departing from established practice without explanation. Second, Georgetown's investigation was demonstrably flawed. It relied almost exclusively on materials provided by Canary Mission—a criminal cyberstalking operation explicitly designed to target Palestinian advocates. Georgetown made no independent verification of context or accuracy. Third, Georgetown denied Ms. Johnson any meaningful opportunity to respond. Though she submitted a discrimination complaint documenting institutional bias, Georgetown disregarded it and proceeded directly to termination. Fourth, Georgetown's inflammatory mischaracterization of Ms. Johnson's protected political speech reveals discriminatory bias. Georgetown characterized teenage criticism of Zionist military policies as evidence of current antisemitism and professional incompetence—a characterization that would be rejected if applied to comparative employees from different backgrounds.

**Ms. Johnson Establishes Hostile Work Environment.** From her first day, Ms. Johnson was subjected to unwelcome harassment based on her protected characteristics. Director Shambaugh interrogated her about her Palestinian heritage during her welcome

lunch, then deliberately redirected conversation to the Gaza war—conduct not imposed on non-Palestinian employees. This conduct brought Ms. Johnson to tears and was so severe that colleagues were forced to intervene. Dean Hellman sent a mass email to 1,200 community members falsely branding Ms. Johnson a security threat, based on decontextualized teenage social media posts captured by Canary Mission. This email was sent before any alleged investigation began, demonstrating prejudgment and discriminatory animus. The harassment was severe, pervasive, and based on Ms. Johnson's protected status—religion (Muslim), race (Arab/African American), and national origin (Palestinian). Georgetown had actual knowledge through direct supervisory participation and Ms. Johnson's formal discrimination complaint, yet failed to remediate and instead exacerbated the harassment through official institutional communications.

**Ms. Johnson Engaged in Protected Activity and Was Retaliated Against.** Ms. Johnson filed a formal discrimination complaint on November 8, 2023, explicitly documenting discriminatory conduct based on her protected characteristics. This constitutes quintessential protected activity under Title VII. Georgetown's response was retaliatory: it terminated her nineteen days after her complaint, without any meaningful investigation, and based on pretextual grounds. The temporal proximity between the discrimination complaint and termination establishes a strong inference of retaliation. The pretextual nature of Georgetown's justification—relying on decade-old posts never questioned during the hiring process—further evidences that retaliation, not legitimate business concerns, motivated the termination.

**Ms. Johnson Establishes Section 1981 Discrimination and Conspiracy Claims.** Ms. Johnson had an enforceable employment contract with Georgetown

University. Georgetown breached this contract based on racial animus—specifically, Ms. Johnson's race (African American and Arab) and national origin (Palestinian). The discriminatory statements by decision-makers, the temporal proximity between disclosure of Ms. Johnson's Palestinian identity and termination, the disparate treatment of comparators, and Georgetown's reliance on a racist cyberstalking profile all constitute probative evidence of intentional racial discrimination. Non-employer Defendants Wolff and Shapiro are properly liable under Section 1981 for intentionally interfering with Ms. Johnson's contractual relationship through racially motivated conduct. Ms. Johnson also establishes a comprehensive conspiracy under 42 U.S.C. § 1985(3): she was targeted for her membership in protected classes (race, religion, national origin); the conspiracy was motivated by invidious discriminatory animus against Palestinians, Muslims, and African Americans; overt acts by multiple conspirators advanced the shared objective of depriving Ms. Johnson of employment; and the conspiracy resulted in concrete injury—termination, loss of income, reputational destruction, and severe emotional distress.

**Ms. Johnson Establishes Tort Claims for Intentional Infliction of Emotional Distress and Tortious Interference.** Defendants engaged in extreme and outrageous conduct that transcends bounds of civilized society. Within a coordinated twelve-hour period, they orchestrated: institutional emails falsely branding Ms. Johnson a security threat; doxing campaigns exposing her personal information to millions; viral harassment reaching 1.2 million users; and immediate employment termination without due process. This conduct was designed specifically to inflict severe emotional distress on a vulnerable employee from multiple protected classes. The First Amendment does not shield coordinated harassment campaigns targeting individuals for their protected characteristics.

Ms. Johnson suffered documented panic attacks, insomnia, anxiety, and permanent reputational damage. Both Wolff and Shapiro intentionally interfered with Ms. Johnson's employment contract through malicious conduct motivated by discriminatory animus, causing her termination and resulting damages.

**Ms. Johnson Establishes False Light Invasion of Privacy.** Defendants publicized false material placing Ms. Johnson in a highly offensive false light. They decontextualized her teenage political speech, mischaracterized protected advocacy as antisemitism, falsely implied she posed security threats, and created a false public persona as an extremist and danger to the community. These false portrayals would be highly offensive to any reasonable person and constitute major misrepresentations transcending minor inaccuracies. Defendants acted with knowledge of falsity or reckless disregard: they stripped historical context they knew existed, made institutional characterizations before any investigation, and relied on sources they knew were discriminatory blacklists.

**Defendants' Affirmative Defenses Fail.** The Communications Decency Act does not shield Shapiro because he created original defamatory content beyond mere republication. The First Amendment does not bar Ms. Johnson's claims because she challenges conduct—discriminatory harassment and employment retaliation—not protected speech. Ms. Johnson exhausted her administrative remedies by filing timely EEOC and DCOHR charges. Statute of limitations defenses fail because claims accrued upon termination and continue to accrue as reputational harm persists and employment remains impaired.

**Ms. Johnson Alleges Multiple Viable Claims Requiring Denial of Motions to Dismiss.** Under the applicable legal standards, all factual allegations are accepted as true

and all inferences are drawn in Ms. Johnson's favor. She has pleaded sufficient facts to state plausible claims for discrimination, hostile work environment, retaliation, conspiracy, breach of contract, tort claims, and privacy violations. Dismissal is inappropriate.

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss in their entirety.

## III.    FACTUAL BACKGROUND

### A.    Ms. Johnson's Qualifications and Hiring by Georgetown University

Ms. Johnson, a highly qualified candidate with advanced degrees, professional experience, and demonstrated alignment with Georgetown University's mission, applied for the Assistant Director of Academic and Faculty Affairs position at Georgetown's Walsh School of Foreign Service (MSFS) on August 31, 2023. SAC ¶¶ 106-107. Her credentials led to a swift and thorough interview process. On September 20, 2023, she participated in a successful Zoom interview with MSFS leadership, including Director George Shambaugh and Deputy Director Ashley Lenihan. SAC ¶ 108.

One week later, on September 27, 2023, Ms. Johnson attended an in-person interview consisting of a series of meetings with faculty and students. SAC ¶ 109. She met individually with MSFS Director George Shambaugh and Director of Academic and Faculty Affairs Rebecca Caro, both of whom offered valuable insights into the role and its responsibilities. SAC ¶ 110. She also had an engaging and thoughtful meeting with three MSFS students, as well as another staff member and future colleague. who shared their perspectives on the program and asked insightful questions about how Ms. Johnson would support their academic journey. SAC ¶¶ 111-12.

Impressed by her credentials and fit, as demonstrated through this series of meetings, Georgetown extended Ms. Johnson an unconditional offer letter on October 2, 2023, which

Ms. Johnson eagerly accepted. SAC ¶¶ 113-14. Her employment as Assistant Director of Academic and Faculty Affairs commenced on October 30, 2023. SAC ¶ 11.

### B.    Discriminatory Treatment from First Day of Employment

Georgetown's enthusiasm for Ms. Johnson collapsed immediately upon learning of her African American and Palestinian identity. SAC ¶ 115. During a welcoming lunch on her first day of employment—October 30, 2023—faculty members subjected Ms. Johnson to an interrogation about her heritage. SAC ¶ 116. Professor Shantayanan Devarajan first asked if she was Sudanese, then pressed further when she disclosed her Palestinian roots. SAC ¶ 117. Director George Shambaugh then redirected the conversation to the "war in Gaza," making Ms. Johnson visibly uncomfortable and upset to the point that colleagues were forced to intervene. SAC ¶ 118.

Shambaugh's decision to redirect the conversation to the "war in Gaza" did far more than breach professional decorum—it reduced Ms. Johnson's Palestinian identity to a crude political trope and brought her to tears. SAC ¶ 119. This act exemplifies how Palestinians in America are systematically stripped of their humanity and recast as perpetual proxies for geopolitical conflict. SAC ¶¶ 119-120. Ms. Johnson's tears stemmed not from personal fragility, but from the trauma of being forced to answer for the Zionist occupation, apartheid, and genocide targeting her ancestral homeland and family—a burden no other ethnic group is made to bear during a workplace welcome lunch. SAC ¶ 123.

### C.    Coordinated Zionist Harassment Campaign Targeting Ms. Johnson

#### *Canary Mission's Cyberstalking Infrastructure and Operations*

Canary Mission operates a cyberstalking website that publishes dossiers targeting university students, faculty, and staff critical of the Zionist occupation, apartheid, and

genocide in Palestine. SAC ¶ 16. The organization is not a registered nonprofit in the United States, enabling its donors to evade public accountability for financing its operations. *Id*. While headquartered in occupied Palestine at Megamot Shalom, 13 Hillel Street in Jerusalem, with a U.S. address of c/o Central Fund of Israel, 461 Central Ave, Cedarhurst, NY 11516, Canary Mission has substantial contacts in Washington, D.C., where it targets Palestinian advocates at academic institutions. SAC ¶16.

Canary Mission's public database profiles over 10,000 students, professors, and organizations critical of Zionism. SAC ¶ 72. The organization disproportionately targets people of color and women—of the 1,870 individuals profiled on the site, about 80% are people of color. SAC ¶ 71. Today, more than 18,000 supporters of Palestinian human rights and anti-apartheid advocates and academics are profiled on its site. *Id*. The profiles are designed to appear in Google searches and remain accessible to prospective employers and academic institutions. *Id*.

### *Financial Support from Milstein and San Francisco Defendants*

Defendant Tuvia Milsztein, aka Adam Milstein, is a California-based real estate investor, avowed Zionist, political operative for the American Israel Public Affairs Committee (AIPAC), and founder of the Adam and Gila Milstein Family Foundation. The Adam and Gila Milstein Family Foundation is a private foundation headquartered in Encino, California, that financed Canary Mission's harassment and cyberstalking campaigns, including that against Ms. Johnson, through Israeli intermediaries. SAC ¶ 21. The Adam and Gila Milstein Family Foundation funded Canary Mission through Megamot Shalom, an Israeli front organization. SAC ¶ 81. Eric Gallagher, a Zionist operative, was captured stating "Adam Milstein's the guy who funds Canary Mission" while discussing

coordination with Milstein about launching "name-and-shame" campaigns. *Id*. Financial records from the Jewish Community Federation of San Francisco additionally confirm Milstein's foundation's role in channeling donations through Megamot Shalom to sustain Canary Mission's operations. *Id*. Milstein is an internationally recognized operative for AIPAC and facilitates coordination with the Israeli Ministry of Strategic Affairs in occupied Palestine to suppress Palestinian advocacy at U.S. institutions, including Georgetown. SAC ¶ 236. Indeed, the Milstein Foundation provided specific financial assistance that enabled Canary Mission to maintain Ms. Johnson's defamatory profile as the top Google search result for her name for almost ten years—the exact dossier Georgetown weaponized to justify her termination. SAC ¶ 235. It deliberately targeted its efforts at the District of Columbia by funding Canary Mission's operations targeting Georgetown students and faculty, including profiles of MSFS community members. SAC ¶ 83.

Similarly, Defendants Helen Diller Family Foundation and Jewish Community Federation of San Francisco are California-based nonprofits organization that funneled money to Canary Mission through Israeli front groups to finance the cyberstalking and targeted harassment of Ms. Johnson. SAC ¶¶ 17-18. Both the Helen Diller Family Foundation and the Jewish Community Federation of San Francisco provided funding to Canary Mission through foreign intermediaries like Megamot Shalom and the Central Fund of Israel. SAC ¶ 237. This coordinated financial support was not passive contribution but active aiding of Canary Mission's explicitly discriminatory and criminal operations, as both foundations were aware of Canary Mission's stated purpose to damage the employment prospects of Palestinian rights advocates. SAC ¶ 238. The foundations' use of anonymous intermediaries demonstrates their intent to obscure their role in facilitating employment

discrimination while maintaining plausible deniability for their discriminatory funding activities. SAC ¶ 239.

### *Wolff's Initiation of Targeted Harassment Campaign*

Rachel Jessica Wolff—a Zionist dual-degree student at Georgetown's School of Foreign Service and Georgetown University Law Center—identified Ms. Johnson as a target to attack when Ms. Johnson sent an introductory email to the MSFS community, which included students, faculty, and professional staff. SAC ¶ 125. Wolff searched Ms. Johnson's name online; the first result was Canary Mission's hateful and racist dossier on Ms. Johnson from eight years earlier. SAC ¶ 126. Wolff made it her mission to malign Ms. Johnson and start a hateful doxing and harassment campaign. SAC ¶ 126.

On November 1, 2023, at 10:17 PM, Wolff initiated her targeted harassment and hate campaign against Ms. Johnson by posting a defamatory tweet that rapidly went viral, garnering over 1.2 million views, 404 comments, 6,300 likes, 2,000 retweets, and 329 bookmarks within hours. SAC ¶ 127. Wolff's tweet relied on Ms. Johnson's decontextualized social media posts from 2015—when Ms. Johnson was a college freshman—deliberately stripping them of their historical context. SAC ¶ 128. Wolff continued her instigation with a second tweet, using one of the racist features by Canary Mission to shame Georgetown for hiring Ms. Johnson in the first place. SAC ¶ 129.

The viral tweet was amplified by Canary Mission, the Israeli government, and other Zionist accounts, exponentially increasing its reach and the subsequent harassment directed at Ms. Johnson. SAC ¶ 130. Among those who retweeted Wolff's tweet was Georgetown's very own "Constitutional Law and Supreme Court Expert" Ilya Shapiro, who served as the executive director and senior lecturer at the Georgetown Center for the Constitution. SAC ¶

131. In his conduct, he explicitly identified Ms. Johnson in her position at Georgetown University, amplifying the harassment to his more than 500,000 followers. SAC ¶¶ 19, 131.

Throughout the evening of November 2, 2023, Ms. Johnson was subjected to extensive doxing, with her personal information shared across various Zionist and Israeli social media accounts and websites. SAC ¶ 137. The harassment escalated to national prominence when Zionist instigator Ben Shapiro published an article on November 2, 2023, about Ms. Johnson on *The Daily Wire*, mentioned her by name in his podcast, and discussed her on his YouTube channel, making Ms. Johnson a target of hateful threats and attacks to an even larger audience. SAC ¶ 139.

**D.    Georgetown's Immediate Adverse Action Without Due Process**

On November 2, 2023, at 8:22 AM—less than nine hours after Wolff's initial tweet and while the viral harassment campaign was still gaining momentum—George Shambaugh called Ms. Johnson instructing her not to come to the office due to "unspecified threats to her safety." SAC ¶ 132. At 9:43 AM, Shambaugh called again, placing Ms. Johnson on paid administrative leave without due process or explanation. SAC ¶ 133.

At 10:42 AM, Ms. Johnson received an email that Joel Hellman, the Dean of the School of Foreign Service, sent to the entire school community implicitly affirming the racist and defamatory campaign of hate targeting Ms. Johnson, further compounding her distress. SAC ¶ 134. At 10:53 AM, Ms. Johnson received her first hate message in her work email, marking the beginning of direct harassment. SAC ¶ 135. By 2:40 PM on November 2, 2023—less than 17 hours after Wolff's initial tweet—Georgetown had placed Ms. Johnson on administrative leave pending an investigation, demonstrating the immediate and severe professional consequences of this coordinated attack. SAC ¶ 138.

Just before 5:00 PM on November 2, 2023, Ms. Johnson received a formal letter from her director informing her that "the university is currently investigating allegations related to your online conduct," specifically alleging that she had "engaged in serious misconduct which, if substantiated, would be in violation of University policies, including professional conduct policies." SAC ¶ 142. Georgetown's School of Foreign Service issued a public statement claiming they were "unaware of Johnson's background when hiring her" and that she was placed on immediate administrative leave pending an investigation of her past social media comments. SAC ¶ 143.

On November 8, 2023, Ms. Johnson sent a letter to Georgetown documenting concerns of discriminatory conduct. Georgetown did not heed Ms. Johnson's complaints of discrimination. SAC ¶ 144. On November 27, 2023—only 25 days after being placed on administrative leave—Georgetown terminated Ms. Johnson's employment. SAC ¶ 145. Her termination letter stated: "This decision has been made pursuant to Human Resources Policy 204 Probationary Employment Period." SAC ¶ 145. The letter cited "posts from 2015 which were shared with Georgetown University during the first week of your employment, which began on October 30, 2023," and asserted that her "social media conduct has had a significantly negative impact on the MSFS Program and in extension its Walsh School of Foreign Service and the wider Georgetown Community." SAC ¶ 145.

Georgetown conducted a truncated 25-day investigation and denied Ms. Johnson a meaningful investigation, the opportunity to seek advice of counsel, and any meaningful opportunity to respond to the allegations against her. SAC ¶¶ 147, 325.

**E.    Comparator Evidence: Georgetown's Protection of Similarly Situated Non-Black and Non-Palestinian Employees**

Georgetown University's Human Resources Policy 204 explicitly states: "Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment." SAC ¶ 150. This policy mandates due process absent severe misconduct. Yet Georgetown has demonstrated a pattern of disparate treatment in its handling of controversial speech and conduct by employees, favoring non-Muslim and Zionist voices while discriminating against Palestinian and Muslim perspectives. SAC ¶ 151. For instance, Georgetown retained and did not discipline:

- Ilya Shapiro, a white, male, Jewish, Zionist senior lecturer and executive director for the Georgetown Center for the Constitution at Georgetown Law, who posted racist tweets on January 26, 2022—only three days before beginning employment on February 1, 2022—calling President Biden's Supreme Court nominee a "lesser Black woman." SAC ¶¶ 152, 182.

- Bruce Hoffman, a white, male, Jewish, Zionist faculty member, who engaged in discriminatory conduct by comparing Northern Virginia infrastructure to "Mogadishu"—invoking racist tropes about Somalia and the prominent presence of Somali diaspora—and claiming TikTok was "turning a whole generation into anti-Semites." SAC ¶ 156.

- Danielle Pletka, a white, female, Jewish, Zionist adjunct professor, who labeled critics of Zionist policies as "terrorist sympathizers" and "insubordinate morons." SAC ¶ 160.

- Yonatan Green, a white, male, Jewish, Zionist fellow, who dismissed narratives of Palestinian displacement and suffering as "baseless victimhood" and targeted Palestinian students. SAC ¶ 163-64.

## IV.    LEGAL STANDARDS

### A.    Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

When a defendant challenges personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that jurisdiction exists. Specific jurisdiction requires a nexus between a foreign defendant's particular contact with

the District of Columbia and the plaintiff's claims. *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 21 (D.D.C. 2014). Conversely, general jurisdiction permits the plaintiff to bring any sort of claim against a foreign defendant in D.C., regardless of whether the defendant's contacts give rise to the specific clain, so long as the defendant has 'sufficiently systematic and continuous contacts with the forum state' such that it is fair for the forum's courts to entertain any claim against the entity." *Id.* (citations omitted).

> **B.      Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

To survive a motion to dismiss under Rule 12(b)(6), which tests the legal sufficiency of a complaint, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. When evaluating a Rule 12(b)(6) motion, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

In this Circuit, the plausibility standard simply asks for "more than a sheer possibility that a defendant has acted unlawfully." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). The complaint must plead "enough facts to state a claim to relief that is plausible on its face" and move beyond "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Dismissal under Rule 12(b)(6) should be granted with prejudice only when it appears "beyond doubt that the plaintiff can prove no set of facts that would entitle [her] to relief."

Otherwise, dismissal should be without prejudice to allow amendment. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). District courts in the District of Columbia frequently grant plaintiffs leave to amend their complaints when deficiencies may be cured through additional factual allegations.

## V.    ARGUMENT

### A.    This Court has Personal Jurisdiction Over Out-of-State Defendants

Personal jurisdiction over nonresident defendants requires satisfaction of both the District of Columbia's long-arm statute and constitutional due process. *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 122 (D.D.C. 2010). The D.C. long-arm statute permits jurisdiction over a person who causes "tortious injury in the District of Columbia by an act or omission outside the District of Columbia" if the person "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4).

Under the due process analysis, defendants must have "minimum contacts" with the forum such that they "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). For intentional tort claims, jurisdiction exists when defendants: (1) commit an intentional act, (2) expressly aimed at the forum state, (3) causing harm the defendant knows is likely to be suffered in the forum. *Calder v. Jones*, 465 U.S. 783, 789-90 (1984).

### 1.    *Personal Jurisdiction Over Milstein and San Francisco Defendants*

a)    <u>Funding and Support for Canary Mission Activities Targeting D.C. Institutions</u>

Milstein Defendants and San Francisco Defendants are subject to this Court's personal jurisdiction under both D.C. Code § 13-423(a)(4) and the *Calder* effects test based on their substantial, purposeful funding of Canary Mission's operations targeting District of Columbia residents and institutions.

## Persistent Course of Conduct

Milstein and San Francisco Defendants engaged in a persistent course of conduct in the District by systematically funding Canary Mission's cyberstalking operations that specifically targeted D.C.-based individuals and institutions. SAC ¶¶ 81-83, 235-239. The Adam and Gila Milstein Family Foundation funded Canary Mission through Megamot Shalom, an Israeli front organization, and Adam Milstein has been described as "the guy who funds Canary Mission." SAC ¶ 81. The Helen Diller Family Foundation funneled $100,000 to Canary Mission through Israeli front groups. SAC ¶ 17. Both foundations provided funding with full knowledge that Canary Mission's stated purpose was to damage employment prospects of Palestinian rights advocates. SAC ¶¶ 237-238.

This Court's analysis in *Lewy v. Southern Poverty Law Center* is directly on point. There, this Court exercised jurisdiction over an Alabama-based nonprofit that raised over $3 million from D.C. residents and directly targeted them through solicitation programs. 723 F. Supp. 2d at 128. The Court found that "SPLC directly targets D.C. residents through its solicitation program" and that this "persistent course of conduct" was sufficient under § 13-423(a)(4).

Similarly, Milstein Defendants and San Francisco Defendants funded an operation that directly targets D.C. residents, like Ms. Johnson. The Milstein Foundation's funding enabled Canary Mission to maintain Ms. Johnson's defamatory profile as the top Google search result for her name for almost ten years—the exact dossier Georgetown weaponized to justify her termination. SAC ¶ 235. The foundations deliberately targeted the District by funding operations targeting Georgetown students and faculty, including over 148 individuals connected to D.C. institutions. SAC ¶¶ 71-72, 83; Declaration of Collin Poirot.

### Purposeful Direction Under *Calder*

The funding Defendants satisfy the *Calder* effects test because they: (1) committed intentional acts (funding cyberstalking operations), (2) expressly aimed at the District (targeting D.C. institutions and residents), and (3) caused harm they knew would be suffered in D.C. (employment discrimination). They knew this harm would be suffered because Canary Mission is explicit in its goal of interfering with individual's employment relationships based on their support of Palestine. SAC ¶¶ 57-60.

In *Wultz v. Islamic Republic of Iran*, this Court found that defendants who funded harmful operations targeting Americans had purposefully directed their activities toward the District, even when funding occurred through intermediaries. 755 F. Supp. 2d 1, 32-34 (D.D.C. 2010). The Court reasoned that "where a bank has knowledge that it is funding terrorists, . . . contacts created by such funding can support" jurisdiction. *Id.* at 34.

The D.C. Circuit confirmed in *Bernhardt v. Islamic Republic of Iran* that "it is enough to provide '(f)actual allegations that permit a reasonable inference that the defendant recognized the money it transferred would be received by the [harmful organization].'" 47 F.4th 856, 875 (D.C. Cir. 2022) (citation omitted). Milstein and San Francisco Defendants

recognized that funds provided to Canary Mission would target D.C. residents' employment prospects. SAC ¶¶ 237-238.

b)      Conspiracy Theory of Jurisdiction

Alternatively, this Court has jurisdiction under the conspiracy theory recognized by the D.C. Circuit and other circuits. "One conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator, even when the co-conspirator lacks such contacts itself." *re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 272 (2d Cir. 2023) (citing *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86 (2d Cir. 2018)).

Ms. Johnson has alleged a comprehensive conspiracy among all Defendants. SAC ¶¶ 368-399. The conspiracy includes: (1) the Milstein and San Francisco Defendants funding Canary Mission through intermediaries (SAC ¶3 71); (2) Canary Mission creating Ms. Johnson's defamatory profile (SAC ¶ 372); (3) Rachel Jessica Wolff (Georgetown student in D.C.) amplifying the profile through viral tweets (SAC ¶ 373); (4) Ilya Shapiro amplifying to 500,000+ followers (SAC ¶ 374); and (5) Georgetown Defendants terminating Ms. Johnson (SAC ¶ 375).

The District-based conspirators committed numerous overt acts within D.C., including Wolff's November 1, 2023 tweets, Shambaugh's November 2 placement of Ms. Johnson on administrative leave, and Hellman's November 2 defamatory mass email. SAC ¶¶ 127, 132-134. The temporal coordination—Wolff's 10:17 PM tweet followed by Georgetown's 8:22 AM suspension within 12 hours—demonstrates coordinated action impossible without prior agreement. SAC ¶ 377. The conspiracy could not have come to fruition had it not been for Milstein Defendants' and San Francisco Defendants' overt act of funding Canary Mission.

### 2.    *Personal Jurisdiction Over Ilya Shapiro*

This Court has personal jurisdiction over Ilya Shapiro under D.C. Code § 13-423(a)(3) and (a)(4), the *Calder* effects test, and conspiracy jurisdiction.

### a)    Former Georgetown Employment and Ongoing Contacts

Shapiro served as executive director and senior lecturer at Georgetown Law. SAC ¶¶ 19, 131, 152. His conduct is directly related to his former Georgetown employment—he used his institutional credibility as "Georgetown's very own 'Constitutional Law and Supreme Court Expert'" to amplify harassment targeting a current Georgetown employee. SAC ¶ 131.

### b)    Intentional Targeting of Georgetown Employment Relationship

Shapiro's conduct satisfies *Calder* because he: (1) committed intentional acts (retweeting defamatory content), (2) expressly aimed at D.C. (targeting Georgetown's employment decision), and (3) caused harm he knew would be suffered in D.C. (Ms. Johnson's termination and subsequent unemployability).

In cases like this one involving social media posts, courts assess whether defendants: (1) tagged forum state entities, (2) directed content at specific forum audiences, (3) included forum state-specific content, or (4) sought to influence forum state conduct. For instance, the Sixth Circuit in *Johnson v. Griffin* found jurisdiction over a California celebrity who published defamatory social media messages targeting a Tennessee CEO's employment at a Tennessee company, holding that "targeting Johnson and VisuWell in Tennessee, based exclusively on conduct in Tennessee, and urging action in response in Tennessee, 'tether[ed]' those effects to the forum." 85 F.4th 429, 435 (6th Cir. 2023). The court emphasized that the defendant had directly communicated with the Tennessee-based

employer by tagging it in tweets and then followed up with additional tweets demanding the company remove the CEO from its Board of Directors, warning that "the nation w[ould] remain vigilant" if it did not comply. *Id.* at 431, 435. Similarly, the Eastern District of Pennsylvania found jurisdiction over tweets targeting a Pennsylvania medical school professor and institution, holding that "Pennsylvania is the focal point both of the story and of the harm suffered." *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 453 (E.D. Pa. 2021) (noting that the defendant "refers to Penn Medicine in his tweets") (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

Here, Shapiro's tweets specifically named Georgetown and explicitly identified Ms. Johnson in her Georgetown position. SAC ¶ 131. Shapiro's conduct satisfies all four factors.

c) <u>Conspiracy and Joint Action with District-Based Actor</u>

This Court also has jurisdiction over Shapiro because of his involvement in the conspiracy that resulted in Ms. Johnson's termination. Shapiro participated in the coordinated campaign by amplifying Wolff's tweets to his 500,000+ followers, using "his previous institutional authority and influence as a senior Georgetown employee to legitimize the racially motivated harassment campaign." SAC ¶ 392. His insider knowledge of Georgetown's processes—gained through his own 122-day investigation—demonstrates purposeful targeting of Georgetown's employment relationship. SAC ¶¶ 152, 182.

**B.  Ms. Johnson has Adequately Stated Claims Under Title VII and DCHRA**

 ***1.  Count I: Title VII Discrimination (Georgetown University)***

 a) <u>Ms. Johnson Established Prima Facie Case of Race, Religion, and National Origin Discrimination</u>

Ms. Johnson has adequately pleaded a prima facie case of discrimination under Title VII. To establish a prima facie case, a plaintiff must show: (1) membership in a protected

class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination. *Dhuria v. Trustees of Univ. of D.C.*, 827 F. Supp. 818, 826 (D.D.C. 1993).

Ms. Johnson satisfies each element. First, she is African American, Arab, of Palestinian national origin, and Muslim—membership in multiple protected classes under Title VII. SAC ¶¶ 166, 178. Second, Georgetown deemed her qualified through its extensive hiring process, extending an unconditional offer of employment on October 2, 2023. SAC ¶ 180. Third, Georgetown terminated her employment on November 27, 2023, after placing her on administrative leave three days into her employment. SAC ¶¶ 145, 179.

Fourth, and most critically, the circumstances surrounding her termination give rise to a strong inference of discrimination. The temporal proximity between Georgetown's discovery of Ms. Johnson's Palestinian identity during her welcome lunch on October 30, 2023, and her suspension on November 2, 2023, supports an inference of discriminatory intent. SAC ¶ 188. Georgetown's reliance on a decade-old social media post—allegedly discovered through a cyberstalking website targeting Palestine advocates—as justification for immediate termination, while simultaneously conducting no meaningful investigation, further evidences discriminatory animus. SAC ¶¶ 189-190.

Moreover, Georgetown's own probationary employment policy mandates that employees will "*normally*...be allowed to complete the probationary period before any decision is made to continue or end employment." SAC ¶ 150. Georgetown violated this policy by terminating Ms. Johnson after only three days of active employment, demonstrating that her treatment deviated from standard practice in a manner that raises an inference of discrimination.

The inference of discrimination is particularly compelling given Georgetown's immediate acceptance of allegations from Canary Mission—a criminal cyberstalking operation that operates a website publishing defamatory dossiers targeting university students, faculty, and staff critical of the Zionist occupation, apartheid, and genocide in Palestine. SAC ¶¶ 16, 127, 189. Georgetown's failure to conduct any independent verification before acting on these allegations, combined with the rapidity of its adverse employment actions, demonstrates that Ms. Johnson's protected characteristics were a motivating factor in her termination.

b)      Georgetown's Proffered Reasons are Pretextual

Even assuming *arguendo* that Georgetown has articulated a legitimate, non-discriminatory reason for Ms. Johnson's termination, the evidence establishes that this proffered justification is pretextual and masks discriminatory animus.

Under the *McDonnell Douglas* burden-shifting framework, once an employer proffers a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate pretext. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). A plaintiff may establish pretext by showing "both that the reason was false, and that discrimination was the real reason." *Id.* Critically, evidence that an employer's investigation was "flawed" and "unfair" can support an inference that the stated reasons were pretextual. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006).

Georgetown's investigation was demonstrably flawed. First, Ms. Johnson was placed on administrative leave after only three days of active employment and terminated within approximately 25 days—a compressed timeline that Georgetown characterizes as a 'nearly month long investigation.' Georgetown Mot. at 2. This extraordinarily rapid sequence, in

which Ms. Johnson spent more time on investigatory leave than she spent actually employed, suggests the investigation was a pretext for a predetermined decision rather than a genuine fact-finding effort. The facts contradict Georgetown's characterization: an investigation cannot credibly be described as thorough or meaningful when the subject is removed from the workplace and terminated before the investigation is ostensibly complete. Second, Georgetown relied almost exclusively on materials provided by Canary Mission, a cyberstalking operation explicitly designed to target Palestinian advocates for employment discrimination. SAC ¶¶ 126-127, 189. Georgetown made no effort to independently verify the context, authenticity, or characterization of the social media posts at issue.

Third, and most tellingly, Georgetown afforded Ms. Johnson no meaningful opportunity to respond to the allegations. While Ms. Johnson attempted to address Georgetown's concerns through her November 8, 2023 letter documenting discriminatory conduct, Georgetown disregarded these complaints entirely. SAC ¶¶ 144, 202. Georgetown's termination letter explicitly faults Ms. Johnson for her "subsequent failure to address concerns raised by [her] social media activities," yet Georgetown created an impossible situation by denying her any genuine process to do so. SAC ¶ 145.

The inadequacy of Georgetown's investigation is further demonstrated by its internal inconsistencies. Georgetown claims it was "not aware of the alleged social media comments" when Ms. Johnson was hired, yet these same comments have appeared as the top Google search result for her name since 2015. SAC ¶ 189. Georgetown's failure to discover this allegedly disqualifying information during its "extensive hiring process" strains credulity and suggests the proffered justification was concocted *post hoc* to rationalize a discriminatory termination decision.

Courts have recognized that an employer's failure to follow its own policies and procedures, while not dispositive in and of itself, remains a relevant factor in assessing pretext. *Jeffries v. Barr*, 965 F.3d 843, 858 (D.C. Cir. 2020). Here, Georgetown violated its own Policy 204, which states that employees will "*normally*" be allowed to complete their probationary period. SAC ¶ 150. Georgetown offered no explanation for why Ms. Johnson's case warranted departure from this normal practice—a deviation that, when combined with the other deficiencies in Georgetown's process, strongly supports an inference of pretext.

> c)    Georgetown's Inflammatory Mischaracterization of Ms. Johnson's Speech Evidences Discriminatory Bias

The substance of Georgetown's investigation reveals discriminatory bias most clearly in its deliberate mischaracterization of Ms. Johnson's social media posts. Georgetown's motion exemplifies this inflammatory approach, claiming that Ms. Johnson "referred to fellow students as 'bitches' and 'dogs' and equated Jewish children to devils." Doc. 53-1 at 29 n.5. This selective, decontextualized characterization demonstrates precisely the type of discriminatory animus that motivated Ms. Johnson's termination.

As alleged in the SAC, Ms. Johnson's 2015 posts—made when she was a college freshman, eight years before her Georgetown employment—criticized "Zionist policies of occupation, apartheid, and genocide." SAC ¶¶ 167, 181. These posts constituted protected political speech responding to documented Israeli military actions against Palestinians. The posts were "deliberately stripped of their historical context" by Canary Mission's defamatory profile and subsequently weaponized by Georgetown to justify discriminatory termination. SAC ¶¶ 128, 148.

Georgetown's current characterization of this speech as targeting "Jewish children" and "fellow students" is demonstrably false and inflammatory. Doc. 53-1 at 29 n.5. The posts predated Ms. Johnson's employment by eight years and were made when she herself was a teenager responding to military violence affecting her own Palestinian community. SAC ¶ 169. Georgetown's deliberate reframing of criticism of a state's military policies as hatred of an ethnic or religious group reveals the discriminatory lens through which Georgetown viewed Ms. Johnson's Palestinian identity.

This inflammatory mischaracterization is particularly telling when contrasted with Georgetown's treatment of comparable speech by non-Palestinian employees. When Ilya Shapiro—a white, Jewish, Zionist male—posted that President Biden would nominate "a lesser Black woman" to the Supreme Court, Georgetown's own Office of Institutional Diversity, Equity, and Affirmative Action (IDEAA) concluded these tweets "could be reasonably understood, and were in fact understood by many, to disparage any Black woman the President might nominate." SAC ¶ 182. Yet Georgetown characterized Shapiro's explicitly racist statement as a matter of academic freedom requiring extensive investigation and ultimately no discipline. Georgetown afforded Shapiro 122 days of due process, legal representation, and retention. SAC ¶ 182.

In stark contrast, Georgetown characterized Ms. Johnson's teenage criticism of Zionist occupation policies—protected political speech addressing documented human rights violations—as evidence of "unprofessional conduct" warranting summary termination. Doc. 53-1 at 7; SAC ¶ 145. This disparate characterization of comparable (or less severe) speech demonstrates that Georgetown applied different standards based on the speaker's protected characteristics. Georgetown views criticism of Zionist occupation

policies by a Palestinian Muslim woman as inherently threatening and disqualifying, while viewing racist statements by a white Jewish man as worthy of protection and process.

Georgetown's reliance on inflammatory, decontextualized characterizations of eight-year-old teenage social media posts—rather than objective assessment of Ms. Johnson's actual qualifications, professional conduct, or job performance—further evidences pretext. Georgetown never questioned Ms. Johnson's qualifications during the hiring process. Georgetown never raised concerns about her ability to perform her duties during her three days of employment. Georgetown never confronted her about the Canary Mission profile of her that is prominent in every basic search. Georgetown never conducted an independent investigation into the context of her posts or the circumstances under which they were made. Instead, Georgetown immediately adopted the characterizations provided by a cyberstalking operation specifically designed to target Palestinian advocates for employment discrimination. SAC ¶¶ 126-127, 189.

This pattern of inflammatory mischaracterization, selective outrage, and immediate credence given to discriminatory sources demonstrates that Georgetown's proffered justification masks discriminatory animus. Georgetown did not terminate Ms. Johnson because of her social media posts. Georgetown terminated Ms. Johnson because she is Palestinian, Muslim, and African American, and because her protected political speech criticizing Zionist violence contradicted Georgetown's apparent institutional preference for suppressing Palestinian voices.

d)    <u>Comparator Evidence Demonstrates Discriminatory Intent</u>

Georgetown's disparate treatment of Ms. Johnson compared to similarly situated employees outside her protected classes provides powerful evidence of discriminatory intent.

While Georgetown contends that Ms. Johnson has failed to identify appropriate comparators, this argument fundamentally misapprehends the applicable legal standard.

> (1)  The Applicable Standard for Similarly Situated Employees

In D.C., employees are similarly situated when "all of the relevant aspects of their employment situations are nearly identical"—not when every conceivable detail matches. *McFarland v. George Washington Univ.*, 935 A.2d 337, 353 (D.C. 2007) (cleaned up). The inquiry "is not a mechanical comparison, but requires enough common factors to determine if intentional discrimination was at play." *Bradshaw v. Vilsack*, 560 F. Supp. 3d 101, 141 (D.D.C. 2021) (citation omitted). Courts must focus on material similarities relevant to the employment decision at issue, rather than demanding perfect identity in all respects.

The critical factors for assessing similarity include: (1) whether employees engaged in comparable conduct; (2) whether they were subject to the same standards and policies; (3) whether they shared the same or comparable decision-makers; and (4) whether there were "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 99 (D.D.C. 2015) (citation omitted); *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 578 (D.C. 2000).

Critically, employees need not hold identical job titles or identical seniority to be similarly situated for purposes of establishing discrimination. What matters is whether the *circumstances relevant to the employer's decision* are sufficiently comparable to support an inference that differential treatment was based on protected characteristics rather than legitimate factors.

(2)    Ilya Shapiro is a Valid Comparator

Shapiro is similarly situated to Ms. Johnson in all material respects relevant to Georgetown's termination decision. Both were Georgetown employees who faced disciplinary proceedings based on pre-employment social media posts that allegedly violated Georgetown's professional conduct policies and negatively impacted the Georgetown community.

**Comparable Conduct:** Like Ms. Johnson, Shapiro posted controversial statements on social media before his Georgetown employment commenced. SAC ¶ 152. Shapiro's January 26, 2022 tweet—posted five days before his February 1, 2022 start date—stated that President Biden would nominate "a lesser Black woman" to the Supreme Court rather than the more qualified Judge Srinivasan. SAC ¶ 182. Georgetown's own Office of Institutional Diversity, Equity, and Affirmative Action (IDEAA) concluded these tweets "could be reasonably understood, and were in fact understood by many, to disparage any Black woman the President might nominate." SAC ¶ 182. This conduct is directly comparable to, if not more severe than, Ms. Johnson's 2015 posts criticizing Zionist occupation policies.

**Same Standards and Policies:** Both Ms. Johnson and Shapiro were evaluated under Georgetown's professional conduct policies and faced allegations that their social media activity negatively impacted the Georgetown community. Both cases involved pre-employment speech that became known to Georgetown during or immediately after the employment relationship commenced. Both were probationary employees who had not yet completed their initial employment period when the disciplinary issues arose.

**Subject to Comparable Decision-Making Authority:** Both disciplinary decisions were made by Georgetown's senior leadership with input from Human Resources and

Georgetown's IDEAA office. The same institutional actors—Georgetown's HR department and IDEAA—participated in investigating both cases. SAC ¶ 182.

**Vastly Disparate Treatment:** Despite these similarities, Georgetown afforded Shapiro a 122-day investigation with full due process, including legal representation and extensive faculty input, before ultimately deciding to retain him with no disciplinary action. SAC ¶ 182. Ms. Johnson, by contrast, was placed on leave after three days, afforded no meaningful investigation or opportunity to respond, and terminated within 28 days. SAC ¶¶ 179, 183.

Georgetown's attempt to distinguish Shapiro on the grounds that he held a different position fundamentally misconstrues the comparator analysis. The relevant similarity is not whether two employees perform identical job functions, but whether they engaged in comparable misconduct that triggered the *same institutional policies and decision-making processes*. Here, both Shapiro and Ms. Johnson faced allegations that their pre-employment social media posts violated Georgetown's professional conduct standards and negatively impacted the university community. The fact that one held a position as "senior lecturer and executive director" while the other was "Assistant Director" is immaterial to whether their *conduct* was comparable and whether Georgetown applied its policies consistently.

Moreover, Georgetown's own treatment of Shapiro's case undermines its argument that position differences matter. Georgetown's IDEAA office explicitly determined that Shapiro's tweets "had a significant negative impact on the Georgetown Law community, including current and prospective students, alumni, staff, and faculty." SAC ¶ 182. Yet Georgetown concluded that because Shapiro "was not a Georgetown employee at the time of his tweets," he was "not properly subject to discipline for them." SAC ¶ 182. This

reasoning applies with equal—if not greater—force to Ms. Johnson, whose posts were made in 2015, eight years before her Georgetown employment, when she was a college freshman at a different institution.

The temporal similarity is particularly striking: Shapiro's problematic tweets were posted on January 26, 2022, and his employment started February 1, 2022—a gap of six days. SAC ¶ 182. Ms. Johnson's posts were from 2015, and her employment started October 30, 2023—a gap of eight years. Yet Georgetown afforded Shapiro extensive due process and ultimate retention, while summarily terminating Ms. Johnson. This disparate treatment cannot be explained by legitimate, non-discriminatory factors.

(3)    Georgetown's Distinctions Lack Merit

Georgetown argues that Shapiro cannot serve as a comparator because he held a different position and was not a probationary employee in the same sense as Ms. Johnson. This argument fails for several reasons.

First, the position Shapiro held is not materially different for purposes of the comparator analysis. Both positions required interaction with Georgetown students, faculty, and community members. Both positions required professional conduct and communication skills. Both were academic affairs positions within Georgetown's educational mission. The fact that one was at the Law School and one at the School of Foreign Service does not negate their fundamental comparability for purposes of assessing whether Georgetown applied its professional conduct policies in a discriminatory manner.

Second, Georgetown's argument regarding probationary status is a red herring. While it is true that probationary and non-probationary employees may be subject to different termination standards in some contexts, *see McKenna v. Weinberger*, 729 F.2d 783,

789-90 (D.C. Cir. 1984), that principle applies when comparing termination standards based on performance or the employer's general right to terminate. It does not apply when comparing how an employer responds to alleged policy violations—particularly alleged violations of the same policies (professional conduct and community impact) by employees at similar career stages (both at the very beginning of their Georgetown employment).

Indeed, the probationary status cuts in Ms. Johnson's favor. Shapiro's misconduct occurred *before* his employment began—precisely when Georgetown argues he was not subject to Georgetown policies. Ms. Johnson's posts also occurred *before* her employment began—eight years earlier. Georgetown's decision to discipline Ms. Johnson for pre-employment conduct while protecting Shapiro for pre-employment conduct demonstrates the very sort of inconsistency that evidences discriminatory intent.

Third, courts have repeatedly recognized that employees at different organizational levels can serve as valid comparators when the circumstances of their alleged misconduct and the employer's response are sufficiently similar. *Bradshaw v. Vilsack*, 560 F. Supp. 3d 101, 141 (D.D.C. 2021) ("It suffice[s] to show that the plaintiff[] and the comparator were similarly situated in all material respects—not in all respects." (citation omitted)). Here, the material circumstances are the existence of pre-employment social media posts that allegedly violated Georgetown policies and negatively impacted the Georgetown community. Those circumstances are nearly identical.

(4)    Additional Comparators Further Establish Discriminatory Pattern

Ms. Johnson has identified three additional comparators—Bruce Hoffman, Danielle Pletka, and Yonatan Green—each of whom engaged in conduct during their Georgetown

employment that was more severe, more recent, and more directly targeted protected classes than Ms. Johnson's 2015 posts, yet faced no discipline. SAC ¶¶ 156-165.

**Bruce Hoffman**, a tenured professor and Director of the Center for Jewish Civilization, posted racist commentary remarking on Somali diaspora in Northern Virginia and its infrastructure to "Mogadishu" and made inflammatory statements about social media creating "anti-Semites." Doc. 53-1 at 21; SAC ¶¶ 156-157. Rather than investigating or disciplining Professor Hoffman for this conduct—which invoked racist tropes about Somalia and targeted Muslim and Palestinian advocates—Georgetown promoted him to oversee "Countering Hate and Intolerance." SAC ¶ 157.

**Danielle Pletka**, an adjunct professor, labeled critics of Zionist policies, including her students and colleagues, "terrorist sympathizers" and "insubordinate morons" during her Georgetown employment. SAC ¶¶ 160-161. Georgetown took no action.

**Yonatan Green**, a Georgetown Fellow, dismissed "narratives of Palestinian displacement and suffering as baseless victimhood." SAC ¶¶ 163-164. Georgetown retained him with full privileges. SAC ¶ 164.

While Georgetown attempts to distinguish these comparators based on position and employment status, these distinctions miss the point. The relevant comparison is not whether these individuals held identical titles, but whether Georgetown applied its stated justifications for discipline—negative community impact, professional conduct concerns, and maintenance of an inclusive environment—in a consistent, non-discriminatory manner. The evidence demonstrates that Georgetown selectively enforced these standards to punish Palestinian, Muslim, and African American voices while shielding white, non-Muslim,

Zionist employees who engaged in conduct that was objectively more severe and more proximately connected to their Georgetown employment.

This pattern of selective enforcement is precisely the type of circumstantial evidence that supports an inference of discriminatory intent. As the D.C. Court of Appeals has recognized, "comparator evidence that [favored employees] in the same geographic area received more favorable treatment is relevant and fairly could support an inference of discrimination." *Bradshaw*, 560 F. Supp. 3d at 135. Here, the comparator evidence does more than support an inference—it compels the conclusion that Georgetown's proffered justifications are pretextual and that Ms. Johnson's race, religion, and national origin were the true motivating factors in her termination.

### 2.    *Count II: DCHRA Discrimination (Georgetown, Hellman, Shambaugh)*

#### a)    DCHRA Permits Individual Liability for Supervisors

The DCHRA explicitly permits individual liability against supervisors and administrators who participate in discriminatory employment decisions, including those made within the scope of their employment. Unlike Title VII, which bars individual liability, the DCHRA defines "employer" broadly to include "any person who, for compensation, employs an individual . . . any person acting in the interest of such employer, directly or indirectly." D.C. Code § 2-1401.02(10). This expansive definition allows claims against individual supervisors in their personal capacity when they engage in discriminatory conduct. *Smith v. Cafe Asia*, 598 F. Supp. 2d 45, 48-49 (D.D.C. 2009); *see also Easaw v. Newport*, 253 F. Supp. 3d 22 (D.D.C. 2017).

Courts have consistently recognized that supervisors may be classified as employers under the DCHRA when they act in the interest of the employer and

either perpetrate discriminatory acts, witness and fail to stop such acts, or receive complaints without success about the alleged discrimination. *Smith*, 598 F. Supp. 2d at 48-49. In *Smith*, the court held that individual defendants could be classified as employers because they acted in the employer's interest and either perpetrated or failed to stop discriminatory acts. *Id.*

The DCHRA has been applied to university administrators acting in their personal capacities. In *Poola v. Howard University*, the D.C. Court of Appeals held that a university dean could be considered an employer under the DCHRA based on his role in denying a professor's reappointment and access to facilities—discriminatory conduct undertaken within the scope of his employment. 147 A.3d 267, 281-82 (D.C. 2016). The court found that the dean's involvement in adverse employment decisions, his role in perpetrating alleged discriminatory acts, and his receipt of the plaintiff's complaints without remedial action all supported individual liability under the DCHRA's broad definition of "employer." *Id.*

*Alston v. District of Columbia* further confirmed that the DCHRA permits claims against educational institution officials in their personal capacities, holding that a superintendent and other school officials could be sued individually under the DCHRA for discriminatory conduct. 561 F. Supp. 2d 29, 44-45 (D.D.C. 2008). The court emphasized that the DCHRA's statutory framework supports claims against individuals responsible for discriminatory practices affecting access to educational facilities, services, or programs based on protected characteristics. *Id.*

Here, Defendants Hellman and Shambaugh acted as employers under the DCHRA because they: (1) acted in Georgetown's interest as Dean and Director, respectively; (2)

directly perpetrated discriminatory acts by politicizing Ms. Johnson's Palestinian identity, issuing defamatory communications branding her as a security threat, and terminating her employment based on protected characteristics; and (3) received Ms. Johnson's discrimination complaints without taking corrective action. Their supervisory authority over employment decisions concerning Ms. Johnson—including onboarding, administrative leave, and termination—places them squarely within the DCHRA's definition of "employer." D.C. Code § 2-1401.02(10); *Smith*, 598 F. Supp. 2d at 48-49; *Poola*, 147 A.3d at 281-82.

b)    <u>Hellman and Shambaugh Directly Participated in Discrimination</u>

Both Dean Hellman and Director Shambaugh directly participated in unlawful discrimination against Ms. Johnson based on her race (African American and Palestinian), religion (Muslim), and national origin (Palestinian), satisfying the DCHRA's requirement of discriminatory conduct motivated by protected characteristics. D.C. Code § 2-1402.11(a)(1).

Dean Hellman engaged in multiple acts of direct discrimination. On November 2, 2023, he published a mass email to over 1,200 members of the School of Foreign Service community that falsely implied Ms. Johnson posed a "security threat," stating "We take all threats to our community seriously." This communication was disseminated before any investigation concluded and was designed to ostracize Ms. Johnson based on anti-Palestinian and anti-Muslim stereotypes.

Hellman's email amplified the discriminatory harassment campaign targeting Ms. Johnson's protected characteristics while lending institutional authority to false accusations of antisemitism without affording her due process. His conduct exhibited discriminatory intent, as evidenced by his immediate acceptance of racially charged allegations without

investigation—in stark contrast to his protection of white faculty who engaged in racist conduct. Hellman's actions were motivated by anti-Palestinian, anti-Muslim, and anti-African American animus, as demonstrated by the disparate treatment between Ms. Johnson and similarly situated white, non-Muslim employees who retained their positions despite comparable or more egregious misconduct.

Director Shambaugh initiated discriminatory treatment during Ms. Johnson's welcome lunch on October 30, 2023, when he interrogated her about her Palestinian heritage and immediately redirected conversation to the "war in Gaza," reducing her identity and the suffering of her people to a racist trope. This conduct created a hostile environment from Ms. Johnson's first day of employment based on her protected Palestinian identity.

Shambaugh escalated his discriminatory conduct by placing Ms. Johnson on administrative leave on November 2, 2023, without due process and based solely on third-party allegations amplified through Canary Mission's cyberstalking profile. He characterized Ms. Johnson's eight-year-old social media posts as creating "safety concerns," thereby implying violent tendencies without factual basis and relying on dehumanizing stereotypes about African Americans, Muslims, and Palestinians.

Shambaugh participated in Ms. Johnson's termination decision while failing to conduct adequate investigation or provide the contextual analysis afforded to white comparators. His actions demonstrated discriminatory animus through his disparate treatment of Ms. Johnson compared to white faculty who engaged in more serious misconduct without facing similar swift adverse action.

           c)      Ms. Johnson was "Similarly Situated" to Protected Comparators

Ms. Johnson has sufficiently alleged that she was treated less favorably than similarly situated employees outside her protected classes, thereby establishing the comparative evidence necessary for her DCHRA discrimination claim. Under the DCHRA, a plaintiff must demonstrate that "employees who were not members of protected class were not subjected to similar treatment." *Lempres v. CBS Inc.*, 916 F. Supp. 15 (D.D.C. 1996). While "similarly situated" requires comparison to employees with nearly identical circumstances, courts recognize that exact identity is not required—substantial similarity in relevant respects suffices. *See McFarland v. George Washington University*, 935 A.2d 337, 353 (D.C. 2007).

As previously explained, Ms. Johnson has identified multiple white, non-Muslim, non-Palestinian comparators who engaged in misconduct targeting protected classes yet received dramatically different treatment from Georgetown. These comparators demonstrate that Georgetown applied a discriminatory double standard: punishing Palestinian advocacy and Muslim identity while shielding racist and discriminatory conduct by favored white, Zionist faculty. The disparate treatment is particularly stark given that Ms. Johnson's decades-old social media posts—made as a teenager criticizing state policies— resulted in immediate termination, while comparators' recent, explicitly racist conduct targeting protected classes resulted in either extensive due process followed by retention or no adverse action whatsoever.

This pattern of disparate treatment supports a plausible inference that Georgetown's stated reasons for Ms. Johnson's termination were pretextual and that the true motivation was discrimination based on her race, religion, and national origin. The comparative

evidence demonstrates that Georgetown "weaponized university policies to suppress Palestinian voices while shielding discriminatory conduct by favored faculty," establishing the similarly-situated analysis required under the DCHRA.

### 3. Count III: DCHRA Aiding and Abetting (All Defendants)

#### a) Legal Standard for Aiding and Abetting Liability

Under D.C. Code § 2-1402.62, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so."

The leading case concerning the aiding and abetting provision is *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873 (D.C. 1998). In *Wallace*, the D.C. Court of Appeals held that partners of a law firm could be held individually liable under the DCHRA for both direct violations of the statute as employers and for aiding and abetting the law firm's discrimination by carrying out the allegedly discriminatory acts. *Id.* at 888. Looking to standards for aiding and abetting in the criminal context, the Court stated that an aider and abettor is one who in some sort associates himself with the venture, participates in it as something he wishes to bring about, and seeks by his action to make it succeed. *Id.* The Court explained that even if the individual partners are not employers, and thus not principals in the alleged discrimination, they could be liable under the aiding and abetting provision if "they participated in the discrimination and sought to make it succeed." *Id.*

The statute's language—"aid, abet, invite, compel, or coerce"—encompasses various forms of culpable participation in discrimination. *King v. Triser Salons, LLC*, 815 F. Supp. 2d 328, 331-332 (D.D.C. 2011). A supervisory defendant may be liable when "they knew or should have known about the discriminatory conduct and failed to stop it." *Id.* at 332.

However, the provision is not limited to passive failure to intervene; it extends to active participation in facilitating discriminatory acts.

To establish liability under D.C. Code § 2-1402.62, Plaintiff must demonstrate: (1) an underlying unlawful discriminatory act by a principal actor; (2) knowledge of the discriminatory nature of the conduct; and (3) substantial assistance or active participation that furthered the discrimination. *Wallace*, 715 A.2d at 888. The aiding and abetting clause is designed to prohibit individuals from assisting others in discriminating, retaliating, or creating a hostile work environment. *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 157 (D.D.C. 2014).

As detailed below, Georgetown University's termination of Ms. Johnson constitutes the underlying discriminatory act that all Defendants aided and abetted through their coordinated, purposeful conduct.

b)      <u>Wolff Aided and Abetted by Initiating Harassment Campaign</u>

Defendant Rachel Jessica Wolff aided and abetted Georgetown University's discriminatory conduct by initiating a coordinated harassment campaign specifically designed to compel Ms. Johnson's termination based on her Palestinian, Muslim, and African American identity. SAC ¶¶ 221-23. Wolff's actions constituted "inviting" and "compelling" discrimination under § 2-1402.62 through deliberate, targeted conduct calculated to achieve a discriminatory result.

On November 1, 2023, Wolff—a Georgetown student with no supervisory authority over Ms. Johnson—deliberately searched for and amplified Canary Mission's eight-year-old defamatory profile of Ms. Johnson through viral tweets garnering more than 1.2 million views. SAC ¶¶ 126-27. Wolff's conduct was not mere commentary; it was a calculated

campaign explicitly identifying Ms. Johnson's position and workplace at Georgetown University, creating massive public doxxing that sought and ultimately led to Ms. Johnson's termination. SAC ¶ 222.

Wolff's timing reveals discriminatory intent. The harassment campaign began within hours of Ms. Johnson's introductory email to the MSFS community—an email that disclosed Ms. Johnson's Palestinian heritage. SAC ¶¶ 116-18, 125-27. Wolff specifically targeted Ms. Johnson after learning she was Palestinian, weaponizing that protected characteristic by amplifying content from Canary Mission, an organization that systematically targets Palestinians, Muslims, and people of color for employment discrimination. SAC ¶¶ 15, 126, 232.

Wolff's conduct satisfies each element of aiding and abetting liability. First, Georgetown's termination of Ms. Johnson based on her race, religion, and national origin constitutes the underlying discriminatory act. SAC ¶¶ 176-93, 220. Second, Wolff had knowledge of the discriminatory nature of her conduct—she explicitly profiled Ms. Johnson as a Muslim woman of Palestinian descent and deliberately amplified content designed to damage employment prospects based on protected advocacy. SAC ¶¶ 15, 222-23. Third, Wolff provided substantial assistance by initiating the viral campaign that created the pretextual justification Georgetown wielded to terminate Ms. Johnson. SAC ¶¶ 138, 222, 240.

The temporal sequence demonstrates causation. Wolff's tweets on November 1 at 10:17 PM garnered over 1.2 million views within hours. SAC ¶ 127. By November 2 at 8:22 AM—less than ten hours later—Director Shambaugh placed Ms. Johnson on administrative leave. SAC ¶ 132. By 2:40 PM that same day, Georgetown had formalized the

administrative leave pending investigation. SAC ¶ 138. Within 25 days, Georgetown terminated Ms. Johnson's employment. SAC ¶ 145. This demonstrates that Wolff's conduct directly "compel[led]" Georgetown's discriminatory action. D.C. Code § 2-1402.62.

Wolff's substantial assistance extended beyond the initial tweets. She continued amplifying the harassment campaign on November 2, posting updates about Ms. Johnson's administrative leave and defending the Canary Mission dossier as a legitimate source—thereby legitimizing Georgetown's reliance on discriminatory targeting materials. SAC ¶ 138. This ongoing conduct demonstrates that Wolff "sought by h[er] action to make [the discrimination] succeed." *Wallace*, 715 A.2d at 888.

Wolff cannot escape liability by claiming she merely expressed opinions about publicly available information. Her conduct crossed the line from protected speech to actionable discrimination by: (1) explicitly identifying Ms. Johnson's workplace and position; (2) directing the harassment campaign at Georgetown's hiring decision with the stated purpose of compelling action; (3) coordinating with a known discriminatory targeting operation (Canary Mission); and (4) maintaining the campaign after Georgetown responded with adverse employment action. SAC ¶¶ 127-31, 138, 222-23.

The "invite" and "compel" language of § 2-1402.62 encompasses precisely this type of third-party conduct designed to pressure an employer into discriminatory action. Wolff associated herself with the venture of terminating Ms. Johnson, participated in it through her viral campaign, and sought to make it succeed through continued amplification—satisfying the *Wallace* standard for aiding and abetting liability. 715 A.2d at 888.

      c)      <u>Shapiro Aided and Abetted by Amplifying Harassment Campaign</u>

Defendant Ilya Shapiro aided and abetted the discriminatory campaign by amplifying Canary Mission and Wolff's defamatory content to his 500,000 followers, exponentially increasing pressure on Georgetown to terminate Ms. Johnson based on her protected characteristics. SAC ¶¶ 224-26. As a former Georgetown employee with substantial social media influence and ongoing connections to the Georgetown community, Shapiro's amplification constituted knowing and substantial assistance to the discrimination.

Shapiro's retweet included his own call to action seeking Ms. Johnson's termination. SAC ¶ 225. He explicitly identified Ms. Johnson's name, position, and Georgetown affiliation, stating: "Her name is Aneesa Johnson, Georgetown School of Foreign Service's new assistant director of academic affairs." SAC ¶ 131. This was not passive sharing of information—it was deliberate identification designed to direct Georgetown's attention to an employee Shapiro sought to have removed based on her protected political speech and identity.

Shapiro's conduct provided substantial assistance to the discrimination in multiple ways. First, his prominence as a constitutional scholar and former Georgetown faculty member lent credibility and institutional weight to the harassment campaign. SAC ¶¶ 19, 131. Second, his massive platform (500,000 followers) exponentially multiplied the reach and pressure of Wolff's initial tweets. SAC ¶ 224. Third, his explicit naming of Ms. Johnson and her position directed the campaign specifically at Georgetown's employment relationship with her. SAC ¶ 225.

Shapiro acted with actual knowledge of the campaign's discriminatory purpose. As a former Georgetown employee and prominent Zionist personality, Shapiro understood that amplifying Canary Mission's targeting of a Palestinian Muslim woman would create institutional pressure for termination. SAC ¶¶ 224-26. His retweet occurred within hours of Wolff's initial post, demonstrating coordination and common purpose. SAC ¶¶ 127, 131. The temporal proximity—Wolff's tweet at 10:17 PM on November 1 and Shapiro's amplification shortly thereafter, followed by Georgetown's adverse action by 8:22 AM on November 2—establishes the causal chain of aiding and abetting. SAC ¶¶ 127, 131-33.

Shapiro cannot claim ignorance of the discriminatory nature of Canary Mission's operations or the campaign against Ms. Johnson. The SAC alleges that Shapiro, as a sophisticated legal commentator and former Georgetown faculty member, was well aware that: (1) Canary Mission systematically targets Palestinians, Muslims, and people of color for employment discrimination, SAC ¶¶ 16, 230-32; (2) amplifying such content to hundreds of thousands of followers would create massive employment pressure, SAC ¶ 224; and (3) Georgetown was particularly vulnerable to such campaigns given the heightened political climate following October 7, 2023, SAC ¶¶ 100, 125.

The aiding and abetting statute's "compel" prong applies with particular force to Shapiro. His amplification compelled Georgetown to respond to the viral campaign by lending it institutional legitimacy and exponentially expanding its reach. SAC ¶ 240(a). Georgetown's swift response—placing Ms. Johnson on leave within hours of Shapiro's amplification—demonstrates that his conduct was a substantial factor in causing the discriminatory termination. SAC ¶¶ 132-33, 240.

Shapiro's position as a former Georgetown employee who retained significant influence within the Georgetown community distinguishes his conduct from ordinary public commentary. His institutional connections and constitutional law expertise made his participation particularly effective in compelling Georgetown's discriminatory response. SAC ¶¶ 19, 224-26. This institutional positioning, combined with his massive platform and explicit call to action, satisfies the substantial assistance requirement for aiding and abetting liability under *Wallace*, 715 A.2d at 888.

d)     Milstein and San Francisco Defendants Aided by Funding Canary Mission Infrastructure

Defendants Tuvia Milsztein (Adam Milstein), Adam and Gila Milstein Family Foundation, Helen Diller Family Foundation, and Jewish Community Federation of San Francisco aided and abetted Georgetown University's discriminatory conduct by funding and operating Canary Mission's cyberstalking operations that directly enabled Ms. Johnson's termination. SAC ¶¶ 233-39. This funding was not general support but specific financial assistance that enabled Canary Mission to maintain Ms. Johnson's defamatory profile as the top Google search result for her name for almost ten years—the exact dossier Georgetown weaponized to justify her termination. SAC ¶ 235.

The funding Defendants' conduct satisfies the aiding and abetting standard through coordinated financial support provided with knowledge and intent to facilitate employment discrimination. As documented in Al Jazeera's "The Lobby USA," Eric Gallagher of The Israel Project identifies Adam Milstein and his foundation as funders of Canary Mission with the explicit intent to "label American supporters of Palestinian rights as antisemitic and target them through 'name-and-shame' campaigns," demonstrating deliberate intent to facilitate discriminatory employment actions. SAC ¶ 234.

The Milstein Defendants' funding established the infrastructure that made the discrimination possible. Without their financial support, Canary Mission could not have: (1) created and maintained the defamatory dossier on Ms. Johnson that appeared as the top search result, SAC ¶¶ 102, 126, 235; (2) ensured the profile remained searchable and prominent for nearly a decade, SAC ¶ 235; or (3) provided the weaponized content that Wolff amplified and Georgetown relied upon to justify termination, SAC ¶¶ 127, 230-31, 240. This financial assistance was substantial and essential to the discriminatory scheme.

The funding Defendants acted with specific discriminatory intent. Milstein, who is "an internationally recognized operative for the American Israel Public Affairs Committee (AIPAC)," facilitates coordination with the Apartheid Ministry of Strategic Affairs in occupied Palestine to suppress Palestinian advocacy at U.S. institutions, including Georgetown. SAC ¶ 236. This establishes his direct intent to compel discriminatory actions against Palestinian advocates like Ms. Johnson. The funding relationship was not passive philanthropy—it was active coordination with discriminatory targeting operations designed to damage employment prospects based on protected characteristics.

The Helen Diller Family Foundation and Jewish Community Federation of San Francisco similarly aided and abetted Georgetown's discrimination by providing $100,000 in funding to Canary Mission through foreign Zionist Apartheid intermediaries like Megamot Shalom and the Central Fund of Israel. SAC ¶ 237. This coordinated financial support was not passive contribution but active aiding of Canary Mission's explicitly discriminatory, racist, and criminal operations, as both foundations were aware of Canary Mission's stated purpose to damage the employment prospects of Palestinian rights advocates. SAC ¶ 238.

The use of anonymous intermediaries demonstrates consciousness of wrongdoing and intent to obscure involvement in facilitating discrimination. SAC ¶ 239. The foundations' use of Megamot Shalom and the Central Fund of Israel demonstrates their intent to obscure their role in facilitating employment discrimination while maintaining plausible deniability for their discriminatory funding activities. SAC ¶ 239. This deliberate structure of indirect funding through foreign entities does not insulate them from aiding and abetting liability—it demonstrates sophisticated participation in a discriminatory scheme.

The causal nexus between the funding Defendants' conduct and Ms. Johnson's termination is direct and substantial. Georgetown explicitly relied on Canary Mission's profile as justification for investigating and ultimately terminating Ms. Johnson. SAC ¶¶ 126-27, 145, 189. Wolff discovered the profile through a Google search, where it appeared as the top result due to the funding Defendants' support for Canary Mission's operations. SAC ¶¶ 102, 126. Georgetown's termination letter referenced the "social media activity, including, but not limited to posts from 2015 which were shared with Georgetown University during the first week of [Ms. Johnson's] employment"—the exact posts preserved and weaponized by the Canary Mission infrastructure the funding Defendants maintained. SAC ¶ 145.

The funding Defendants cannot claim lack of knowledge or innocent support for Canary Mission's operations. The organization's discriminatory purpose is explicit: "to ensure that today's radicals are not tomorrow's employees." SAC ¶ 231. Canary Mission's systematic targeting of Palestinian, Muslim, and African American advocates—80% of its profiles target people of color—demonstrates its intent to facilitate employment discrimination based on protected characteristics. SAC ¶ 232. The funding Defendants'

financial support, provided with knowledge of this discriminatory mission, constitutes substantial assistance in furtherance of the discrimination. *Wallace*, 715 A.2d at 888.

Under the DCHRA's broad language prohibiting any person from aiding, abetting, inviting, compelling, or coercing discriminatory acts, the funding Defendants' financial infrastructure support falls squarely within the statute's reach. D.C. Code § 2-1402.62. By funding the creation and maintenance of discriminatory dossiers specifically designed to damage employment prospects, the funding Defendants "invite[d]" and "compel[led]" Georgetown's discriminatory termination of Ms. Johnson. Their conduct was an essential link in the causal chain leading to the discrimination, satisfying the substantial assistance requirement for aiding and abetting liability.

> e)    Georgetown Supervisors Aided by Legitimizing Discriminatory Narrative

Defendants Joel Hellman and George Shambaugh, acting as Georgetown University supervisors, aided and abetted the discriminatory campaign by legitimizing and amplifying the false antisemitism narrative without conducting any meaningful investigation. SAC ¶¶ 227-29. As supervisors with authority over Ms. Johnson's employment, their participation in the discrimination takes on heightened significance under the DCHRA's aiding and abetting provision.

Dean Hellman aided the discrimination by sending a November 2, 2023 email to over 1,200 MSFS community members falsely implying Ms. Johnson—an African American Palestinian Muslim woman—posed a security threat and spreading defamatory content about her protected political speech when she was a teenager in college, thereby inviting further discriminatory treatment. SAC ¶ 228. The email stated "We take all threats

to our community seriously," language designed to associate Ms. Johnson's Palestinian identity with violence and danger. SAC ¶¶ 205-06, 250.

Hellman's email amplified the discriminatory harassment in multiple ways. First, it legitimized Wolff's viral campaign by adopting its framing of Ms. Johnson as a threat rather than as a victim of discrimination. SAC ¶ 228. Second, it broadcast that framing to the entire SFS community, exponentially multiplying the harassment and ostracization Ms. Johnson faced. SAC ¶¶ 205, 250. Third, it did so before any investigation began or concluded and before Ms. Johnson was even informed of the allegations against her, demonstrating bias against her based on her protected characteristics rather than objective assessment of her conduct. SAC ¶ 206.

The discriminatory nature of Hellman's conduct is evident in the disparate treatment comparison. Hellman's immediate characterization of Ms. Johnson's conduct as "threatening" contrasts sharply with Georgetown's protection of Ilya Shapiro's racist statements, revealing discriminatory animus based on Ms. Johnson's Palestinian, Muslim, and African American identity. SAC ¶ 207. While Shapiro received a 122-day investigation with full due process for racist tweets posted three days before employment began, Hellman branded Ms. Johnson a threat within 72 hours based on eight-year-old tweets criticizing Israeli state policies. SAC ¶¶ 182-83, 206-07.

Hellman's actions were motivated by discriminatory intent, as evidenced by his immediate adoption of racist anti-Palestinian narratives without investigation and his failure to afford Ms. Johnson the same presumption of innocence granted to non-Palestinian, non-Muslim employees. SAC ¶ 208. As Dean with supervisory authority, Hellman's participation in the discrimination was both direct (through his own discriminatory email)

and facilitative (by providing institutional legitimacy to the external harassment campaign). *Wallace*, 715 A.2d at 888.

Director Shambaugh aided the discrimination through a pattern of conduct beginning with Ms. Johnson's first day and continuing through her termination. During Ms. Johnson's October 30, 2023 welcome lunch, Shambaugh redirected conversation to the war in Gaza immediately upon learning of Ms. Johnson's Palestinian heritage, reducing her identity to a crude political trope and causing her visible emotional distress. SAC ¶¶ 210, 248. This initial discrimination set the stage for Shambaugh's subsequent facilitation of her termination.

On November 2, 2023, at 8:22 AM and 9:43 AM, Shambaugh placed Ms. Johnson on administrative leave without due process, based solely on Rachel Wolff's viral tweet containing decontextualized material from Canary Mission's discriminatory profile. SAC ¶ 211. Shambaugh's precipitous action—within hours of the viral campaign and without any investigation—demonstrates that he was responding to the coordinated harassment rather than conducting an objective assessment of Ms. Johnson's qualifications or conduct.

Shambaugh told colleagues that Ms. Johnson's social media posts posed "safety concerns," implying violent tendencies without factual basis and further ostracizing her based on anti-Palestinian and anti-Muslim stereotypes. SAC ¶ 212. This characterization directly adopted and legitimized the discriminatory framing advanced by Wolff, Shapiro, and Canary Mission, thereby aiding their harassment campaign. By translating external harassment into official university action, Shambaugh provided the crucial link between the discriminatory campaign and Ms. Johnson's actual termination.

Shambaugh participated in Ms. Johnson's termination decision, asserting she could no longer perform her role based on falsified characterizations of her protected political speech. SAC ¶ 213. His discriminatory intent is demonstrated by his immediate politicization of Ms. Johnson's Palestinian identity, his reliance on third-party harassment materials targeting her protected characteristics, and his failure to afford her the due process provided to non-Palestinian, non-Muslim employees. SAC ¶ 214.

As supervisors, Hellman and Shambaugh had heightened responsibility under the DCHRA's aiding and abetting provision. *King*, 815 F. Supp. 2d at 332. Their conduct went beyond passive failure to prevent discrimination—they actively participated in and legitimized the discriminatory campaign through official university communications and actions. This active participation, combined with their supervisory authority, makes them paradigmatic aiders and abettors under *Wallace*'s standard: they "associate[d themselves] with the venture, participate[d] in it as something [they] wish[ed] to bring about, and s[ought] by [their] action to make it succeed." 715 A.2d at 888 (citation omitted).

The causal connection between the supervisors' conduct and Ms. Johnson's termination is direct and substantial. Each Defendant's conduct directly contributed to Georgetown University's discriminatory termination of Ms. Johnson by: (a) creating or amplifying the defamatory content used to justify her termination (Wolff, Shapiro, Canary Mission); (b) providing institutional legitimacy to false accusations (Hellman, Shambaugh); and (c) funding the cyberstalking infrastructure that made the harassment campaign possible (Milstein entities, Diller Foundation, Jewish Community Federation). SAC ¶ 240.

But for Defendants' coordinated aiding and abetting conduct, Georgetown University would not have possessed the pretextual justification for Ms. Johnson's

discriminatory termination, as her actual conduct and qualifications warranted retention under Georgetown's own policies. SAC ¶ 241. Defendants' actions violated D.C. Code § 2-1402.62 by systematically compelling Georgetown University to engage in unlawful employment discrimination based on Ms. Johnson's race (African American and Arab), religion (Muslim), and national origin (Palestinian), causing her severe economic and emotional harm. SAC ¶ 242.

The coordinated nature of Defendants' conduct—from funding Canary Mission's infrastructure, to initiating and amplifying viral harassment campaigns, to legitimizing discriminatory narratives through official university channels—demonstrates a comprehensive scheme to aid and abet discrimination against Ms. Johnson based on her protected characteristics. Each defendant played a distinct but essential role in compelling Georgetown's discriminatory termination, satisfying the DCHRA's prohibition on aiding, abetting, inviting, compelling, or coercing unlawful discriminatory practices. D.C. Code § 2-1402.62.

### 4. Count IV: Title VII Hostile Work Environment (Georgetown, Hellman, Shambaugh)

#### a)    Harassment was Severe and Pervasive

Title VII makes it an unlawful employment practice to subject an employee to a discriminatorily hostile or abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Ms. Johnson readily satisfies the threshold requirement that the harassment directed at her was severe and pervasive enough to alter the terms and conditions of her employment. *Harris* establishes that the standard is not whether the harassment was continuous or permanent, but whether the conduct was sufficient that a reasonable person

would perceive the workplace as hostile or abusive. *Id.* at 22. Evaluating the totality of circumstances Ms. Johnson's experiences clearly meet this exacting standard.

The frequency and severity of the harassment in an incredibly short time span distinguish this case from the isolated incidents courts typically reject. Within her first three days of employment, Ms. Johnson experienced targeted interrogation about her Palestinian heritage at her welcome lunch—questioning so intense that it brought her to tears and required colleague intervention. This was not a passing reference to her background, but a deliberate "interrogation," marking her as different and undesirable from her first moments at Georgetown. SAC ¶¶ 1-2, 247-248.

Director Shambaugh's redirection of conversation to "the war in Gaza" during this same welcome event further demonstrates the severity of supervisory harassment. By deliberately pivoting discussion toward Ms. Johnson's national origin and religion during her inaugural university gathering, Shambaugh engaged in conduct that no reasonable person would characterize as casual or incidental. The temporal context amplifies the severity: this occurred mere weeks after the October 7, 2023 attacks, ensuring that any Palestinian identity would be politicized, fraught with explicit religious and national origin implications, and laden with hostile assumptions. *69 Causes of Action 2d 235, § 15* (adverse conduct must be viewed in context).

Most significantly, Georgetown's administration immediately weaponized the Canary Mission dossier—a blacklist explicitly designed to target Palestinian advocates—transforming isolated social media posts from a college freshman into a rationale for expedited termination. Dean Hellman's mass email to over 1,200 members of the School of Foreign Service community on November 2, 2023, further demonstrates institutional

severity. By falsely implying that Ms. Johnson posed a "security threat" to the entire academic community, Hellman accomplished through official channels what third-party harasser Rachel Wolff could not: the public branding of Ms. Johnson as dangerous based on her protected characteristics. SAC ¶¶ 58-64, 208-209. This type of public defamation through institutional authority constitutes particularly severe harassment. *Cause-of-Action for Supervisor Racial Harassment Under Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.)*, 69 Causes of Action 2d 235, § 15 (harassment by supervisor carrying heightened severity).

The severity analysis must account for harassment affecting objective and subjective employment conditions. Ms. Johnson was placed on paid administrative leave within hours of the harassment campaign's initiation, effectively barred from the workplace and stripped of her basic job responsibilities. This tangible alteration of employment terms— accompanied by institutional ostracism, public professional damage, and complete isolation from colleagues and student-mentees—constitutes precisely the type of severe employment action Title VII prohibits. 42 U.S.C. § 2000e-2(a)(1); *Faragher v. City of Boca Raton*, 524 U.S. 775, 785 (1998).

Here, Ms. Johnson experienced multiple severe acts of harassment in rapid succession, compounded by supervisory participation and institutional amplification. The harassment was not confined to private interpersonal interactions but became official university policy through Hellman's public email and Georgetown's rapid investigation and termination. Under this cumulative analysis, the harassment was unquestionably severe. *69 Causes of Action 2d 235, § 15.*

b)    Harassment was Based on Protected Characteristics

The causal nexus between Ms. Johnson's protected characteristics and the harassment is unmistakable and requires only straightforward factual analysis. The harassment explicitly targeted three intersecting protected classifications: national origin (Palestinian), religion (Muslim), and race (African American). 42 U.S.C. § 2000e-2(a)(1); *Cause-of-Action for Supervisor Racial Harassment Under Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.)*, 69 Causes of Action 2d 235, § 9.

Director Shambaugh's deliberate redirection of conversation to "the war in Gaza" immediately upon learning of Ms. Johnson's Palestinian heritage exemplifies national origin discrimination. 42 U.S.C. § 2000e-2(a)(1). There is no conceivable non-discriminatory rationale for a supervisor to steer discussion toward a geopolitical conflict involving the employee's country of origin during the employee's first day, particularly in a context where the employee has just disclosed that identity. This was not a discussion initiated by Ms. Johnson; it was supervisor-initiated, supervisor-directed, and designed to force Ms. Johnson to engage with a politicized version of her own identity. SAC ¶¶ 247-248; *69 Causes of Action 2d 235, § 9.*

Georgetown's rapid pivot toward the Canary Mission dossier demonstrates institutional discrimination targeting Ms. Johnson's national origin, religion, and race. The Canary Mission explicitly frames Palestinian advocacy as the basis for its cyberstalking profiles. SAC ¶¶ 49-58. By weaponizing this blacklist to justify termination, Georgetown reduced Ms. Johnson's entire professional identity to her national origin and advocacy positions. The connection is direct: Ms. Johnson was targeted because she is Palestinian, because she is Muslim, and because these identities were weaponized against her through an

explicitly discriminatory cyberstalking operation. *42 U.S.C. § 2000e-2(a)(1)*; *Cause-of-Action for Supervisor Racial Harassment Under Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.)*, 69 Causes of Action 2d 235, § 9.

The religious animus component emerges from the deliberate framing of Palestinian identity through explicitly Jewish institutional markers. As Ms. Johnson's allegations acknowledge, the harassment and termination cannot be separated from the October 7, 2023 temporal context, when anti-Muslim discrimination and targeting of Palestinian advocacy intensified substantially. Hellman's email—sent before any investigation concluded— suggests security concerns arising specifically from Ms. Johnson's religious and national origin identity during a period of heightened religious and national tensions. SAC ¶¶ 58-64, 208-209; 42 U.S.C. § 2000e-2(a)(1).

### c)    Georgetown Had Actual Knowledge and Failed to Remediate

Georgetown is liable because it possessed unquestionable actual knowledge of the harassment through three independent channels: direct supervisory participation, Ms. Johnson's formal discrimination complaint, and the public nature of the harassment campaign. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Director Shambaugh, as a supervisory agent, initiated harassment during the welcome lunch and controlled the institutional response thereafter. Shambaugh's actions constitute direct participation in discrimination by a supervisor with authority over Ms. Johnson. SAC ¶¶ 210-214. Hellman, as Dean of the Walsh School of Foreign Service, issued a mass email that itself constituted harassment and demonstrated full awareness of the allegations affecting Ms. Johnson. SAC ¶¶ 58-64.

Ms. Johnson filed a formal discrimination complaint on November 8, 2023, explicitly documenting the discriminatory conduct she experienced based on her protected characteristics. SAC ¶¶ 9, 290. This complaint provided Georgetown with unambiguous notice of hostile environment allegations. Rather than investigating Ms. Johnson's complaints in good faith and implementing remedial measures to stop the harassment, Georgetown proceeded immediately toward termination—a response that itself constitutes retaliation, as addressed in Counts VI and VII.

Georgetown's failure to remediate was complete and systematic. The University took no corrective action following the welcome lunch interrogation. It took no steps to investigate or address Director Shambaugh's redirection of conversation toward the "war in Gaza." Upon receiving Hellman's mass email falsely characterizing Ms. Johnson as a security threat, the University did not reprimand Hellman, investigate his statements, or protect Ms. Johnson from the reputational harm. Instead, Georgetown leveraged these official actions to justify termination. SAC ¶¶ 1-6, 58-64, 208-209. *69 Causes of Action 2d 235, § 20.*

Under the *Faragher-Ellerth* framework, an employer's duty includes reasonable care to prevent harassment through written policies and prompt investigation, coupled with correction of harassing behavior. *Faragher*, 524 U.S. 775, 806-07; *69 Causes of Action 2d 235, § 19*. Georgetown satisfied none of these obligations. The University failed to investigate Shambaugh's conduct, failed to prevent or remedy Hellman's defamatory email, and failed to protect Ms. Johnson from the known harassment campaign. These failures demonstrate that Georgetown did not exercise the reasonable care required by Title VII. *69 Causes of Action 2d 235, § 20.*

**5.**      ***Count V: DCHRA Hostile Work Environment (Georgetown, Hellman, Shambaugh)***

a)      <u>Incorporates Title VII Analysis with DCHRA-Specific Elements</u>

As previously stated, the DCHRA extends liability in ways Title VII does not, permitting direct individual liability for supervisors and agents who engage in discriminatory conduct, regardless of the employer's remedial measures. *Liu v. Georgetown Univ.*, 2024 WL 4362128, at *10 (recognizing broader DCHRA individual liability); D.C. Code § 2-1402.61.

Ms. Johnson satisfies all requirements for a DCHRA hostile work environment claim. The factual predicate—severe and pervasive harassment based on national origin, religion, and race—remains identical to the Title VII analysis above. SAC ¶¶ 1-7, 247-275. The harassment altered the terms and conditions of her employment through immediate suspension, administrative leave, professional isolation, and ultimate termination. Georgetown, through its agents Shambaugh and Hellman, participated directly in the harassment and failed to remediate. SAC ¶¶ 58-64, 210-214.

b)      <u>Defendants Hellman and Shambaugh's Direct Participation</u>

Hellman and Shambaugh engaged in conduct that, standing alone and independent of Georgetown's vicarious liability, violates the DCHRA. Their direct participation in harassment and discriminatory decision-making creates individual liability.

Director Shambaugh, as a supervisory agent with authority over Ms. Johnson's day-to-day work environment, personally initiated the discriminatory interrogation about Ms. Johnson's Palestinian heritage during the welcome lunch. He deliberately steered conversation toward the "war in Gaza," forcing Ms. Johnson to process her national origin identity through a politicized lens within minutes of her employment. These actions

constitute direct discrimination based on national origin. D.C. Code § 2-1402.11; SAC ¶¶ 247-248, 210-214.

Dean Hellman compounded and institutionalized the discrimination through his mass email to 1,200+ community members on November 2, 2023. By falsely characterizing Ms. Johnson as a "security threat" to the university community—language that explicitly dehumanizes individuals by invoking safety concerns tied to their protected status—Hellman engaged in conduct designed to ostracize, humiliate, and justify discriminatory termination. SAC ¶¶ 58-64, 208-209. This email was distributed before any investigation concluded, demonstrating that Hellman's statements were not investigative findings but prejudgmental expressions of discriminatory animus. D.C. Code § 2-1402.11.

Both Defendants' participation in the termination decision—based on pretextual grounds and implemented in retaliation for Ms. Johnson's protected discrimination complaint—makes them individually liable under the DCHRA for discriminatory conduct. D.C. Code § 2-1402.11, § 2-1402.61.

### 6.    *Count VI: Title VII Retaliation (Georgetown, Hellman, Shambaugh)*

#### a)    Ms. Johnson Engaged in Protected Activity

Title VII protects employees from retaliation when they oppose practices made unlawful by Title VII or participate in investigations and proceedings thereunder. 42 U.S.C. § 2000e-3(a); *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, at 2 (Aug. 25, 2016) (guidance on protected activity definition). Ms. Johnson engaged in quintessential protected activity: she filed a formal discrimination complaint with Georgetown documenting discriminatory conduct based on her protected characteristics.

On November 8, 2023, represented by counsel from the Council on American-Islamic Relations Legal Defense Fund, Ms. Johnson filed a written complaint with

Georgetown explicitly detailing discriminatory conduct she experienced based on her protected characteristics as an African American, Muslim, Palestinian woman. SAC ¶ 290. This complaint identified three discrete instances of discrimination: (1) the discriminatory interrogation about her Palestinian heritage during the welcome lunch; (2) Director Shambaugh's inappropriate redirection of conversation toward the "war in Gaza," which reduced her Palestinian identity to a political issue; and (3) the University's participation in and amplification of a coordinated harassment campaign targeting her based on her protected characteristics. 42 U.S.C. § 2000e-3(a).

Ms. Johnson's November 8 complaint constitutes protected activity under Title VII. She opposed discriminatory conduct by explicitly documenting it and demanding investigation and remediation. She participated in Georgetown's investigatory process by providing detailed factual allegations and subjecting herself to questioning during the "investigation" that followed. Importantly, the complaint was specific, detailed, and unambiguous—it could not reasonably be misunderstood as anything other than a formal discrimination charge. 42 U.S.C. § 2000e-3(a); *Dudley v. Washington Metropolitan Area Transit Auth.*, 924 F. Supp. 2d 141, 153-54 (D.D.C. 2013).

The fact that Ms. Johnson's complaint did not use the precise terminology later employed in her formal EEOC charge (such as "hostile work environment" as a formalized legal claim) is immaterial. Title VII protects substantive opposition to discriminatory conduct regardless of the technical language employed. *Ellis v. Georgetown University Hospital*, 631 F. Supp. 2d 71, 79 (D.D.C. 2009) (holding that the absence of the word "retaliation" does not preclude the claim if the substance of the allegations reasonably suggests retaliation); *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, at 2.

Ms. Johnson clearly identified discriminatory conduct based on protected characteristics and requested investigation, which is the *sine qua non* of protected activity. 42 U.S.C. § 2000e-3(a).

### b)    Adverse Employment Actions

Georgetown took substantial adverse employment actions against Ms. Johnson following her November 8 discrimination complaint. These actions included: (1) immediate administrative leave on November 2, 2023; (2) a rapid, prejudgment "investigation" that predated any good-faith inquiry; (3) false branding as a "security threat" through Hellman's mass email; (4) professional isolation and ostracism through university-sanctioned communications; and (5) termination on November 27, 2023, only nineteen days after her discrimination complaint. SAC ¶¶ 1-7, 58-64, 290-291.

Administrative leave constitutes an adverse employment action by itself, as it strips the employee of essential job duties, access to the workplace, and collegial relationships. The subsequent termination is an undeniable adverse action. Together, these actions constituted a dramatic alteration of Ms. Johnson's employment terms and conditions.

### c)    Causal Connection

The temporal proximity between Ms. Johnson's protected activity and the adverse employment actions satisfies the "but-for" causation standard Title VII requires. Ms. Johnson filed her discrimination complaint on November 8, 2023. Georgetown terminated her employment on November 27, 2023—only nineteen days later. This temporal proximity, standing alone, establishes a strong inference of retaliation. *Cf. Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019); *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, at 10.

The causal connection is further demonstrated by the sequence of events. Ms. Johnson was placed on administrative leave within hours of Wolff's viral tweet on November 2—before any "investigation" began. SAC ¶¶ 1-7. The University informed her of this investigation on the same day. Between November 2 and November 8, Georgetown conducted what it characterized as an "investigation" of Ms. Johnson's social media posts, despite having known of those posts since November 1 at the latest. This compressed timeline suggests predetermined termination rather than genuine investigation.

Critically, the causal connection is also established through pretextual reasoning. Georgetown claimed Ms. Johnson was terminated for "unprofessional conduct" based on 2015 social media posts made when she was a college freshman. SAC ¶¶ 60-63, 290-291. Yet Georgetown's own Policy #204 requires that employees "normally be allowed to complete the probationary period" absent severe misconduct. Eight-year-old social media posts, authored before employment and previously unknown to Georgetown, do not constitute "severe misconduct" justifying expedited termination of a probationary employee.

The pretextual nature of Georgetown's rationale becomes evident through comparative analysis. Ilya Shapiro, a Jewish Zionist employee at Georgetown Law, posted racist tweets attacking Northern groups three days before his employment commenced. Rather than summarily terminating Shapiro, Georgetown provided him a 122-day investigation and full due process protections. SAC ¶ 330. Bruce Hoffman, another Georgetown employee, engaged in racist rhetoric comparing geographic areas to conflict zones. Hoffman faced no discipline whatsoever. SAC ¶ 330. Other comparators engaged in discriminatory conduct without consequence.

Yet Ms. Johnson—whose social media posts addressed systemic oppression she experienced—was terminated within three weeks, without meaningful investigation, due process, or opportunity to respond. This disparate treatment exposes the pretextual nature of Georgetown's stated reasons and demonstrates that the true motivation for termination was retaliatory animus against Ms. Johnson's protected discrimination complaint. *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, at 10.

### 7. Count VII: DCHRA Retaliation (Georgetown, Hellman, Shambaugh)

#### a) Incorporates Title VII Analysis with DCHRA-Specific Elements

The DCHRA prohibits retaliation for opposing discriminatory conduct or participating in discrimination investigations. D.C. Code § 2-1402.61; *Liu v. Georgetown Univ.*, 2024 WL 4362128, at *11 (D.D.C. Sep. 30, 2024). Ms. Johnson satisfies all elements of a DCHRA retaliation claim. She opposed discriminatory conduct through her November 8, 2023 discrimination complaint. Georgetown retaliated by placing her on administrative leave, conducting a predetermined investigation, and terminating her employment. The temporal proximity and pretextual justification establish causation.

The DCHRA analysis parallels Title VII but extends protection more broadly through individual defendant liability. As discussed above, the DCHRA permits direct claims against Hellman and Shambaugh based on their personal participation in retaliatory conduct.

#### b) Defendants Hellman and Shambaugh's Direct Participation

Hellman and Shambaugh directly participated in the retaliatory animus against Ms. Johnson. Director Shambaugh, prior to any investigation, informed colleagues that Ms. Johnson's social media posts posed "safety concerns"—characterization that branded her as

dangerous and justified accelerated termination procedures. SAC ¶¶ 210-214. Shambaugh made this determination without factual basis, relying solely on third-party misrepresentations rather than objective analysis of a Georgetown employee's conduct. D.C. Code § 2-1402.61.

Dean Hellman's November 2 mass email to 1,200 community members represents the apex of direct retaliatory conduct. Sent before any investigation concluded, the email falsely implied Ms. Johnson posed a security threat—language designed to ostracize her, damage her professional reputation, and justify her termination as a security measure rather than discrimination. SAC ¶¶ 58-64, 208-209. Hellman's email was not investigative reporting; it was defamatory characterization designed to publicly destroy Ms. Johnson's professional standing and forestall any possibility of her remaining employed or advancing in her career. D.C. Code § 2-1402.61.

Both Defendants' participation in the termination decision—based on pretextual grounds and implemented in retaliation for Ms. Johnson's protected discrimination complaint—makes them individually liable under the DCHRA for retaliatory discrimination. *Liu*, 2024 WL 4362128, at *11; D.C. Code § 2-1402.61.

### C. Ms. Johnson has Adequately Stated Federal Civil Rights Claims

#### 1. Count VIII: 42 U.S.C. § 1981 Race Discrimination (Georgetown Defendants, Wolff)

##### a) Section 1981 Protects Against Discrimination in Contractual Relations

Section 1981 guarantees all persons "the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges,

terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). This protection extends against "impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

Ms. Johnson possessed an enforceable employment contract with Georgetown University, which constituted a contractual relationship protected under Section 1981. *See Mekuria v. Bank of Am.*, 883 F. Supp. 2d 10, 13 (D.D.C. 2011) (Section 1981 "prohibits private parties from engaging in racial discrimination in the making and enforcing of contracts," including "contracts between individuals and commercial entities"). To establish a Section 1981 claim, a plaintiff must identify "(1) an impaired contractual relationship, § 1981(b), under which [she] has rights," followed by "(2) injuries flowing from a racially motivated breach of that contractual relationship." *Id.* (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 480 (2006)).

Ms. Johnson's employment contract with Georgetown was impaired when the University terminated her employment after only three days based on her race (African American and Arab) and national origin (Palestinian). Georgetown's conduct directly interfered with Ms. Johnson's right to "make and enforce contracts" and to enjoy "all benefits, privileges, terms, and conditions of the contractual relationship" on the same basis as white citizens. 42 U.S.C. § 1981(b).

   b) <u>Ms. Johnson Alleged Racial Animus Sufficient for Section 1981</u>

Section 1981 "can be violated only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982). A plaintiff establishes purposeful discrimination through direct or circumstantial evidence of the defendant's discriminatory intent. *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 318 (D.D.C.

2018). Discriminatory statements by the employer or other attitudes suggesting that the decisionmaker harbors discriminatory animus constitute probative evidence of intentional discrimination. *Id.* at 321.

Ms. Johnson has alleged substantial evidence of racial animus motivating Georgetown's adverse employment actions:

**First**, Georgetown's decisionmakers immediately politicized Ms. Johnson's Palestinian identity during her welcome lunch on October 30, 2023, interrogating her about her heritage and forcing discussion of the Gaza war upon learning of her Palestinian roots. This conduct reduced Ms. Johnson to a political stereotype based on her race and national origin, causing visible distress requiring colleague intervention.

**Second**, Georgetown terminated Ms. Johnson within three days of employment based solely on eight-year-old social media posts criticizing Israeli state policies—posts that constituted protected political speech regarding state-sponsored violence against Palestinians. Georgetown's reliance on Canary Mission's racist cyberstalking profile, which explicitly targets Palestinian, Arab, Muslim, and African American advocates for discriminatory employment actions, demonstrates institutional endorsement of racial targeting.

**Third**, Georgetown's stark disparate treatment of similarly situated employees establishes discriminatory intent. Georgetown afforded Ilya Shapiro—a white, male, Jewish, Zionist employee who made racist tweets targeting African American women—a 122-day investigation with full due process and ultimate retention. *Compare* SAC ¶¶ 152-155. In contrast, Georgetown terminated Ms. Johnson—an African American, Palestinian,

Muslim woman—within 28 days without meaningful investigation or due process. *Id.* ¶¶ 166-175.

**Fourth**, the temporal proximity between Georgetown learning of Ms. Johnson's Palestinian identity (October 30, 2023 welcome lunch) and her suspension (November 2, 2023) and termination (November 27, 2023) supports an inference of discriminatory intent. *See Said*, 317 F. Supp. 3d at 323 (temporal proximity between protected activity and adverse action supports inference of discriminatory animus).

**Fifth**, Georgetown weaponized its Human Resources Policy 204 in a racially discriminatory manner by denying Ms. Johnson the probationary period completion "normally" afforded to employees while granting white comparators extensive due process despite misconduct. SAC ¶¶ 150, 171-172. This selective enforcement demonstrates that Georgetown applied facially neutral policies with discriminatory purpose.

The cumulative evidence—discriminatory statements, reliance on racist blacklists, disparate treatment, suspicious timing, and pretextual justifications—establishes that racial animus was the but-for cause of Georgetown's breach of Ms. Johnson's employment contract.

c)    Non-Employer Defendants are Proper Section 1981 Defendants

Section 1981 liability extends beyond direct employers to individuals and entities who intentionally interfere with contractual rights based on race. Individual Defendants may be held liable under Section 1981 when they are personally involved in the discrimination by having directly participated in the alleged discriminatory acts. *Weaver v. Gross*, 605 F. Supp. 210, 212 (D.D.C. 1985). "Officers, directors and employees of a corporation may become personally liable when they intentionally cause an infringement of

the rights secured by § 1981, regardless of whether the corporation may also be held liable." *Id.*

**Georgetown Supervisory Defendants (Hellman, Shambaugh):** Defendants Joel Hellman and George Shambaugh are properly liable under Section 1981 because they directly participated in racially motivated conduct that impaired Ms. Johnson's contractual relationship with Georgetown.

Hellman, as Dean of the Walsh School of Foreign Service, published a mass email to over 1,200 community members on November 2, 2023, falsely characterizing Ms. Johnson as a security threat by stating "We take all threats to our community seriously"—language designed to associate her Palestinian identity with violence and danger. SAC ¶¶ 134, 205-208. This defamatory communication amplified the racially targeted harassment campaign and provided institutional legitimacy to false antisemitism accusations without investigation, demonstrating discriminatory animus based on Ms. Johnson's race and national origin.

Shambaugh, as Director of the MSFS Program, immediately politicized Ms. Johnson's Palestinian identity during her October 30, 2023 welcome lunch by redirecting conversation to the Gaza war, reducing her identity to a political trope and causing visible emotional distress. SAC ¶¶ 127-131, 209-214. On November 2, 2023, Shambaugh placed Ms. Johnson on administrative leave without due process based solely on Wolff's viral tweet containing decontextualized material from Canary Mission's discriminatory profile. *Id.* Shambaugh also told colleagues that Ms. Johnson's social media posts "posed safety concerns," falsely implying violent tendencies without factual basis and weaponizing anti-Palestinian and anti-Muslim stereotypes. *Id.*

Both Hellman and Shambaugh's conduct directly interfered with Ms. Johnson's ability to perform her employment contract and enjoy its benefits on the same basis as white employees. Their racially motivated actions were not mere negligence but intentional discrimination designed to legitimate Georgetown's termination of an African American, Palestinian, Muslim woman.

**Non-Employer Defendant Wolff:** Rachel Jessica Wolff is properly liable under Section 1981 despite not being Ms. Johnson's employer because she intentionally interfered with Ms. Johnson's contractual relationship through racially motivated conduct.

Wolff deliberately searched for and targeted Ms. Johnson immediately upon learning of her Palestinian identity through her introductory email to the Georgetown community. SAC ¶¶ 125-129. On November 1, 2023, Wolff initiated a targeted harassment campaign by posting a defamatory tweet that weaponized Canary Mission's racist cyberstalking profile, garnering over 1.2 million views within hours. *Id.* Wolff's tweet explicitly identified Ms. Johnson's position and workplace at Georgetown, creating a massive public doxxing campaign designed to compel Ms. Johnson's termination. *Id.* ¶¶ 130, 222-223.

Wolff's conduct was specifically calculated to interfere with Ms. Johnson's employment contract based on racial animus. The temporal proximity—Wolff's tweet posted within hours of Ms. Johnson's introductory email and Georgetown placing Ms. Johnson on administrative leave within 24 hours—establishes direct causation between Wolff's racially motivated interference and Georgetown's breach of the employment contract. SAC ¶¶ 138, 361-363.

Nothing about Section 1981 expressly limits its application to individuals in privity of contract—the question is whether the defendant participated in the impairment of the

contract. § 1981(c). And here, Wolff's actions were not passive observation but active, intentional interference with Ms. Johnson's contractual rights. By weaponizing a racist blacklist targeting Palestinian advocates and amplifying it to millions with explicit reference to Ms. Johnson's Georgetown employment, Wolff acted with discriminatory purpose to deprive Ms. Johnson of the same right to contract enjoyed by white citizens. This conduct directly caused Georgetown's racially motivated breach of Ms. Johnson's employment contract, establishing Wolff's liability under Section 1981.

### 2.    Count IX: 42 U.S.C. § 1985(3) Conspiracy (All Defendants)

Defendants' motions to dismiss Count IX fundamentally misunderstand both the nature of conspiracy pleading and the scope of § 1985(3)'s protections. Ms. Johnson has adequately alleged each element of a civil rights conspiracy: (1) an agreement among Defendants, (2) motivated by class-based animus against her as a Palestinian, Muslim, and African American woman, (3) overt acts in furtherance of that conspiracy, and (4) resulting injury to her employment rights.

### a)    Ms. Johnson Alleged Agreement Among Co-Conspirators

Defendants erroneously contend that Ms. Johnson must plead direct evidence of explicit communications or meetings to establish a conspiracy. This rigid standard conflicts with established precedent recognizing that conspiracies are clandestine by nature and rarely evidenced by explicit agreements. *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 39 (D.D.C. 2021) ("[C]ourts have to infer an agreement from indirect evidence in most civil conspiracy cases.").

Ms. Johnson has plausibly alleged a meeting of the minds through detailed factual allegations demonstrating coordinated conduct. The SAC alleges that Canary Mission— funded by Defendants Milstein Foundation, Helen Diller Family Foundation, and Jewish

Community Federation of San Francisco—created and maintained a cyberstalking profile targeting Ms. Johnson specifically because of her Palestinian identity and advocacy. SAC ¶¶ 16-21, 49-83, 96-102. This profile was then weaponized by Defendant Wolff, a Georgetown student, who disseminated it on November 1, 2023, at 10:17 PM, generating over 1.2 million views. SAC ¶¶ 125-27. Within hours, Defendant Shapiro amplified Wolff's tweet to his 500,000+ followers. SAC ¶ 131. By November 2, 2023, at 8:22 AM—less than twelve hours later—Georgetown placed Ms. Johnson on administrative leave. SAC ¶ 133.

This temporal coordination—combined with the shared objective of suppressing Palestinian advocacy through employment retaliation—demonstrates the existence of an agreement. Moreover, the SAC alleges strategic coordination between Canary Mission and its funders to target Palestinian advocates for employment discrimination. SAC ¶¶ 49-83, 237-39, 371-73. Canary Mission explicitly markets itself to employers stating: "These individuals are applying for jobs within your company. It is your duty to ensure today's radicals are not tomorrow's employees." SAC ¶ 58. This evidences a shared understanding among funders, Canary Mission, Georgetown, and individual conspirators that the cyberstalking profiles would be weaponized for employment discrimination—a clear meeting of the minds regarding the conspiracy's unlawful objective.

b)      <u>Zionist Conspiracy Motivated by Racial Animus</u>

Defendants contend that Ms. Johnson has failed to allege the requisite "racial, or perhaps otherwise class-based, invidiously discriminatory animus" required by *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). This argument ignores both the explicit allegations of discriminatory targeting and the intersectional nature of the animus directed at Ms. Johnson.

The SAC alleges that Ms. Johnson was targeted *specifically because* she is a visibly Palestinian, Muslim, and African American woman who advocates for Palestinian human rights. SAC ¶¶ 1, 11, 23-48, 359, 363, 378-87. This conspiracy was motivated by animus against Palestinians as a national origin group, Muslims as a religious class, and African Americans as a racial class. SAC ¶¶ 381-87. Each of these characteristics constitutes a cognizable class under § 1985(3). *See Griffin*, 403 U.S. at 102 n.9 (expressly leaving open whether § 1985(3) reaches class-based animus beyond race); *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 853 (1983) (acknowledging that § 1985(3) may reach conspiracies motivated by animus based on "race, religion, or national origin").

The conspiracy's discriminatory character is further evidenced by Georgetown's disparate treatment of Ms. Johnson compared to white, Jewish, and Zionist employees who engaged in far more egregious conduct. While Ms. Johnson was terminated within days for decade-old tweets, Georgetown protected and retained individuals like Ilya Shapiro (who amplified attacks against her), Bruce Hoffman (who advocated genocide against Palestinians), and others who made overtly racist statements targeting protected groups. SAC ¶¶ 155-86. This differential treatment—punishing Palestinian advocacy while shielding anti-Palestinian racism—exposes the invidiously discriminatory animus animating the conspiracy.

Defendants' attempt to recharacterize this as mere "political" or "ideological" disagreement, rather than racial and religious animus, fails. As the SAC extensively details, the conspiracy targeted Ms. Johnson not for abstract political views, but *because of her identity* as a Palestinian Muslim woman and the threat her visible presence in a position of

authority posed to Zionist efforts to suppress Palestinian voices. SAC ¶¶ 42-48, 378-87. The very purpose of Canary Mission—funded by Defendants—is to ensure that advocates for Palestinian rights "are not tomorrow's employees" by creating permanent dossiers that follow them throughout their careers. SAC ¶¶ 49-83. This systematic effort to exclude Palestinians and their advocates from employment opportunities based on national origin, religion, and race satisfies the class-based animus requirement.

c)    Ms. Johnson Adequately Pled Overt Acts in Furtherance of Zionist Conspiracy

Defendants contend that the SAC fails to allege specific overt acts by each conspirator. This argument misapprehends conspiracy law. Under § 1985(3), a plaintiff need not prove that *every* conspirator committed an overt act; rather, liability attaches once the plaintiff establishes that "one or more persons engaged [in the conspiracy] do, or cause to be done, any act in furtherance of the object of such conspiracy." 42 U.S.C. § 1985(3) (emphasis added).

The SAC alleges multiple, specific overt acts by various conspirators in furtherance of the shared objective of depriving Ms. Johnson of her employment rights:

**Funding Defendants (Milstein Foundation, Diller Foundation, Jewish Community Federation):** Provided financial support to Canary Mission through intermediaries, enabling the creation and maintenance of cyberstalking profiles targeting Palestinian advocates. SAC ¶¶ 17-18, 20-21, 50-53, 80-83, 237-39, 371. This funding was not passive philanthropy but active participation in a coordinated system designed to facilitate employment discrimination.

**Canary Mission:** Created and continuously maintained Ms. Johnson's profile, which was algorithmically optimized to appear prominently in employment-related

searches, with the explicit purpose of ensuring she would not secure employment. SAC ¶¶ 49-83, 96-102, 371-72.

**Defendant Wolff:** Amplified Ms. Johnson's Canary Mission profile within hours of her hiring announcement, generating over 1.2 million views, and directly triggering Georgetown's discriminatory response. SAC ¶¶ 125-31.

**Defendant Shapiro:** Amplified Wolff's tweet to his 500,000+ followers, exponentially increasing pressure on Georgetown to terminate Ms. Johnson. SAC ¶ 131.

**Georgetown Defendants (Georgetown University, Hellman, Shambaugh):** Responded to the coordinated harassment campaign by placing Ms. Johnson on leave within hours, conducting a pretextual investigation, and terminating her employment. SAC ¶¶ 132-45.

These allegations describe a coordinated sequence of acts, each advancing the conspiracy's objective of depriving Ms. Johnson of employment based on her protected characteristics. *See Thompson*, 590 F. Supp. 3d at 125 (finding overt acts adequately pleaded where complaint alleged coordinated conduct by multiple actors advancing shared objective); *Black Lives Matter D.C.*, 544 F. Supp. 3d at 45-46 (overt acts include public statements and coordinated conduct that furthered alleged conspiracy).

> d)    Zionist Conspiracy Resulted in Injury and Deprivation of Rights

The final element—injury to person or property, or deprivation of rights—is clearly satisfied. Ms. Johnson suffered concrete and continuing injury as a direct result of the conspiracy: (1) termination of her employment after only three days, SAC ¶ 145; (2) loss of income and professional opportunities, SAC ¶¶ 146-54; (3) severe emotional distress, including trauma requiring ongoing mental health treatment, SAC ¶¶ 280-300; and (4)

ongoing reputational harm that continues to impair her employment prospects, SAC ¶¶ 391-400.

These injuries resulted from the deprivation of Ms. Johnson's federally protected rights, including her right to equal protection under the Fourteenth Amendment, her right to contract under 42 U.S.C. § 1981, and her rights under District of Columbia employment discrimination law. *See Griffin*, 403 U.S. at 102-03 (§ 1985(3) reaches conspiracies to deprive victims of "equal enjoyment of rights secured by the law to all"); *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979) (§ 1985(3) provides remedy for conspiracies to interfere with rights protected against private interference).

Defendants' assertion that Ms. Johnson's termination resulted merely from Georgetown's independent business judgment, rather than from the conspiracy, defies both law and logic. The SAC alleges—and discovery will prove—that Georgetown acted in direct response to the coordinated campaign orchestrated by Defendants. SAC ¶¶ 369-73, 375-77. The temporal proximity between Wolff's tweet (November 1, 10:17 PM), Shapiro's amplification (November 1, 11:07 PM), and Georgetown's decision to place Ms. Johnson on leave (November 2, 8:22 AM) demonstrates causation.

### D.    Ms. Johnson Has Adequately Stated Contract Claims

#### 1.    *Count X: Breach of Employment Contract and Implied Covenant of Good Faith and Fair Dealing (Georgetown University)*

##### a)    Valid Employment Contract Existed

On October 2, 2023, Georgetown extended Ms. Johnson a written offer of employment as Assistant Director of Academic and Faculty Affairs in the Master of Science in Foreign Service (MSFS) Program at the Walsh School of Foreign Service, which Ms. Johnson accepted on the same date. SAC ¶¶ 106, 114; Doc. 53-3 (Exhibit A) (October 2,

2023 offer letter). The offer letter specified Ms. Johnson's position, salary ($60,000 annually), benefits, work schedule, and start date of October 30, 2023—all essential terms of an employment contract. Exhibit A (offer letter specifying position, salary, benefits, schedule, start date, and conditions of employment). Ms. Johnson commenced work on that date and entered into a binding contractual relationship with Georgetown. SAC ¶ 116 (Ms. Johnson attended welcome lunch on October 30, 2023, her first day of employment). The parties thus formed a valid employment contract by mutual agreement.

        b)        <u>Implied Covenant Arises from Employment Relationship</u>

District of Columbia law provides that every employment contract contains an implied covenant of good faith and fair dealing. *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006). This covenant requires that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Id.* The implied covenant is particularly robust in the employment context, where good faith performance emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981); *Allworth*, 890 A.2d at 202. The covenant excludes conduct involving bad faith—including evasion of the spirit of the bargain, lack of diligence, willful rendering of imperfect performance, and interference with the other party's performance. *Id.* An employer breaches the implied covenant when it evades the spirit of the employment agreement through subterfuge, evasion, or conduct wholly inconsistent with the parties' reasonable expectations. *Id.*

c)    Georgetown Breached Covenant Through Bad Faith Conduct

Georgetown's conduct demonstrates egregious breach of the implied covenant of good faith and fair dealing. First, Georgetown incorporated its Human Resources policies into Ms. Johnson's employment contract by explicit reference in her offer letter. Doc. 53-3 at 3 ("In accordance with Georgetown University Human Resources policies, you will be classified as and be subject to applicable policies and practices for regular staff employees, including those set forth in the Human Resources Policies"). Policy 204 states that employees "normally" will be allowed to complete their probationary period before termination decisions are made—establishing a contractual expectation of procedural fairness and due process that Georgetown knew Ms. Johnson relied upon. SAC ¶ 403 (citing HR Policy 204: "Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment"). By incorporating this policy into the offer letter, Georgetown agreed to provide Ms. Johnson the opportunity to complete her probationary period absent extraordinary circumstances.

Second, Georgetown failed to investigate Ms. Johnson's discrimination complaint filed November 8, 2023—a fundamental breach of fair dealing. SAC ¶¶ 144, 266 (Ms. Johnson submitted November 8, 2023 discrimination complaint; Georgetown disregarded it and terminated her November 27, 2023). Ms. Johnson submitted a written complaint documenting discriminatory conduct based on her protected characteristics, yet Georgetown disregarded this complaint and proceeded directly to termination without meaningfully investigating her allegations. SAC ¶ 268 (Georgetown failed to investigate Ms. Johnson's discrimination complaints and proceeded with termination). This constituted bad faith

failure to cooperate in Ms. Johnson's performance and a refusal to afford the procedural protections inherent in the probationary employment framework.

Third, Georgetown amplified and legitimized a coordinated harassment campaign targeting Ms. Johnson rather than protecting her from it. Within hours of the viral social media campaign, Dean Joel Hellman sent a mass email to over 1,200 MSFS community members falsely branding Ms. Johnson as a security threat by stating "we take all threats to our community seriously"—language designed to associate her Palestinian identity with danger and violence. SAC ¶ 134; Doc. 54-4 (Dean Hellman's November 2, 2023 email stating "we take all threats to our community seriously"). This public stigmatization, made before investigation or due process, constituted egregious breach of the employer's duty of good faith by actively participating in discriminatory harm.

Fourth, Georgetown applied its probationary employment procedures in a racially discriminatory manner, thereby violating its own policies through pretextual application. SAC ¶¶ 182–187 (comparator evidence showing white, Jewish, Zionist employees received 122-day investigations, full due process, and were retained despite more egregious conduct). While Policy 204 requires investigation and substantiation before termination, Georgetown conducted a cursory 25-day investigation without affording Ms. Johnson opportunity to meaningfully respond. By contrast, Georgetown afforded Ilya Shapiro (a white, Jewish, Zionist male) a 122-day investigation with full due process for racist tweets posted contemporaneously with his employment—demonstrating that Georgetown's stated commitment to procedural fairness was applied selectively based on race, national origin, and religion. *Id.*

d)     <u>Georgetown Breached Contract by Terminating Without Just Cause</u>

Under District of Columbia employment law, an employer breaches an at-will employment contract only when it violates its own express contractual terms or policies. *Strass v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1013 (D.C. 2000) ("a personnel manual that states specific preconditions that must be met before employment will be terminated is sufficiently clear to rebut the presumption of at-will employment").

Here, Georgetown's Human Resources Policy 204 explicitly establishes preconditions for termination during probation: an employee's behavior must be found "unacceptable" and this determination must be "substantiated." SAC ¶ 403 (HR Policy 204 states "if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior is unacceptable, the University may terminate employment at any time during the probationary period"). Georgetown failed to satisfy these contractual preconditions. The termination letter asserts only that Ms. Johnson's social media conduct "had a significantly negative impact" on the community and affected her "ability to engage fully"—vague, conclusory characterizations wholly devoid of substantiation that she could not perform her job functions or engaged in genuinely unacceptable behavior warranting immediate termination. Doc. 53-6 (termination letter stating conduct "had a significantly negative impact" and "impacts her ability to engage fully"—conclusory language lacking substantiation of failure to perform essential job functions).

Moreover, Georgetown's reliance on eight-year-old social media posts from Ms. Johnson's teenage years—none of which Ms. Johnson authored while employed at Georgetown—fails to constitute legitimate "unacceptable behavior" during probation under

any reasonable interpretation of Policy 204. The policy contemplates termination for deficient work performance, insubordination, or serious misconduct occurring during the employment relationship itself, not retroactive discipline for protected political speech preceding employment. Georgetown's termination thus violated the express terms of Policy 204 and breached Ms. Johnson's contract.

e)    "At-Will" Employment Does Not Bar Contract Claims Where University Policies Create Contractual Obligations

Defendants contend that Ms. Johnson, as an at-will employee, has no claim for breach of contract based on termination. This argument fails. While at-will employment creates a presumption that either party may terminate the relationship without cause, this presumption is rebutted where an employer incorporates specific preconditions for termination into its written policies. *Strass*, 744 A.2d at 1013; *Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12, 16 (D.C. 1996).

When an employer adopts written policies for consistent application to terms of employment, it creates an environment in which the employee reasonably believes such policies are established and binding. *Strass*, 744 A.2d at 1013 (quoting *Toussaint v. Blue Cross Blue Shield of Mich.*, 292 N.W.2d 880, 892 (Mich. 1980)). Personnel manuals stating specific preconditions for termination are sufficiently clear to rebut the presumption of at-will employment—particularly where, as here, the policies are (1) expressly incorporated into the offer letter, (2) made available to the employee, (3) written in mandatory language ("may terminate at any time"), and (4) establish objective preconditions ("if the department determines performance is deficient" or "behavior is unacceptable"). *See Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813, 817 (D.C. 1991).

Here, Georgetown explicitly incorporated HR policies into Ms. Johnson's offer, stating she would "be subject to applicable policies and practices for regular staff employees, including those set forth in the Human Resources Policies." Doc. 53-3 at 3. Policy 204 uses mandatory language regarding the probationary period and establishes objective preconditions for termination. Ms. Johnson reasonably relied on these policies when accepting the position at a modest salary, believing Georgetown had contractually bound itself to afford her the procedural protections Policy 204 provides. *Strass*, 744 A.2d at 1013 (employment at modest salary with reliance on promised protections supports contractual interpretation). By adopting written policies with specific preconditions, Georgetown chose, in its own interest, to create an environment in which employees believe policies are fair and applied uniformly—thereby converting the at-will presumption into an implied contract for termination only for just cause as defined by Policy 204. *Id.* at 1013 ("By adopting written policies for consistent application to the terms of employment, the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee" (citation omitted)).

### f) Causation and Damages

Causation is established by the direct causal connection between Georgetown's contractual breaches and Ms. Johnson's termination. Georgetown (1) failed to provide the investigation and due process promised by Policy 204; (2) disregarded Ms. Johnson's discrimination complaint; (3) amplified harassment through defamatory communications; and (4) applied termination policies in a racially discriminatory manner. Each breach

directly caused Ms. Johnson's unlawful termination. Ms. Johnson suffered concrete damages flowing directly from these breaches:

**Economic Damages**: Loss of salary ($60,000 annually from November 27, 2023 forward), benefits, health insurance, retirement contributions, and career advancement opportunities in higher education administration. Ms. Johnson lost approximately $25,000 in wages alone during the 5+ months following termination and remains unable to secure comparable employment due to the reputational harm Georgetown inflicted.

**Reputational Harm**: Georgetown's public termination and defamatory characterization of Ms. Johnson—coupled with the viral social media campaign it amplified—created permanent professional damage. Ms. Johnson's name remains associated with false accusations of antisemitism, with Canary Mission's defamatory profile appearing as the top Google search result for her name, destroying her prospects for academic and professional employment. SAC ¶¶ 189, 235 (Canary Mission profile appears as top Google search result for Ms. Johnson's name).

**Lost Career Trajectory**: As an education professional with advanced degrees and prior experience, Ms. Johnson reasonably expected a career trajectory in higher education administration. Georgetown's breaches destroyed this opportunity, forcing her to pursue alternative employment and permanently diminishing her career prospects and earning potential.

**Emotional Distress**: Ms. Johnson suffered severe documented psychological injury including panic attacks, insomnia, anxiety, and emotional trauma directly resulting from Georgetown's breach of its contractual duty to act in good faith and afford her procedural fairness.

**Non-Economic Damages**: Breach of the implied covenant of good faith and fair dealing warrants compensation for emotional distress, humiliation, and injury to reputation sustained by Ms. Johnson as a direct result of Georgetown's egregious violation of its contractual obligations to treat her fairly. *Allworth*, 890 A.2d at 202; *Hais*, 547 A.2d at 987–88.

Georgetown's material breaches of both express and implied contractual terms, committed with reckless disregard for Ms. Johnson's contractual rights, entitle her to full compensatory damages and appropriate equitable relief.

**E.      Ms. Johnson Has Adequately Stated Tort Claims**

**1.      *Count XI: Intentional Infliction of Emotional Distress (Georgetown Defendants, Shapiro, Wolff)***

a)      <u>Defendants' Conduct was Extreme and Outrageous</u>

To prevail on an intentional infliction of emotional distress ("IIED") claim under D.C. law, a plaintiff must demonstrate that the defendant engaged in "extreme and outrageous conduct" that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Goolsby v. D.C.*, 354 F. Supp. 3d 69, 83 (D.D.C. 2019). Generally, a case of intentional infliction of emotional distress is established when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998).

Ms. Johnson's allegations establish conduct that far exceeds this threshold. Georgetown's conduct was intentionally designed to amplify and legitimize a coordinated harassment campaign rather than protect Ms. Johnson from it. Within hours of Wolff's viral

attack reaching 1.2 million views, Georgetown placed Ms. Johnson on administrative leave without explanation or investigation. Dean Hellman then sent a mass email to over 1,200 community members falsely branding Ms. Johnson a security threat by stating "We take all threats to our community seriously"—statements that Hellman knew were baseless given Georgetown's retention and protection of faculty members who had engaged in significantly more egregious misconduct.

Georgetown's conduct was particularly outrageous because it represented a complete institutional abandonment of its responsibility to protect a vulnerable employee. Despite possessing full knowledge that Ms. Johnson was the target of a coordinated doxing campaign involving death threats and mass harassment targeting her protected characteristics, Georgetown chose not to investigate but to amplify, not to protect but to legitimize, and not to defend but to terminate. The stark departure from Georgetown's treatment of Ilya Shapiro—a white male faculty member who received a four-month paid investigation, full due process, and legal representation for racist tweets—exposes the extreme and outrageous nature of the differential treatment.

George Shambaugh's conduct was particularly egregious. Shambaugh told colleagues that Ms. Johnson's social media posts created "safety concerns" and implied violent tendencies without any factual basis whatsoever, thus relying on dehumanizing and racist stereotypes about Palestinians, Muslims, and African Americans to justify further ostracization. This inflammatory characterization lent credibility to the false narrative that Ms. Johnson posed a threat to campus safety, contributing directly to institutional retaliation.

Similarly, Rachel Wolff and Ilya Shapiro engaged in extreme and outrageous conduct by weaponizing decontextualized social media posts and orchestrating a targeted doxing campaign. Wolff's conduct was systematically calculated to cause maximum harm: she deliberately researched Ms. Johnson's background, located a defamatory cyberstalking profile maintained by a third-party organization, and weaponized this material through viral tweets that explicitly identified Ms. Johnson's full name, position, and workplace—information designed to incite mass harassment and professional destruction. Shapiro, leveraging his position as a former Georgetown faculty member and his platform of 500,000 followers, deliberately chose to amplify Wolff's defamatory content to maximize the reputational damage and pressure on Georgetown to discriminate against Ms. Johnson. This conduct—systematically researching, packaging, and broadcasting defamatory material to millions with the specific intent to destroy someone's livelihood—represents malicious, predatory behavior that would cause any reasonable member of the community to exclaim, "Outrageous!" *See, e.g.*, *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 140 (D.D.C. 2019).

b)      <u>Conduct was Intentional and Reckless</u>

The second element of an IIED claim requires that the defendant's extreme and outrageous conduct be "intentional or reckless." *Goolsby*, 354 F. Supp. 3d at 83. The evidence establishes both intent and recklessness by every defendant.

Regarding Georgetown, Dean Hellman's email was sent before any investigation concluded and before Ms. Johnson was even informed of the allegations against her, demonstrating discriminatory intent rather than legitimate institutional concern. The timing and content of Hellman's communications—occurring within hours of the viral harassment

campaign and designed to cast Ms. Johnson as a security threat—constitute intentional amplification of the harassment. George Shambaugh's characterizations of Ms. Johnson's social media posts as creating "safety concerns" were made without factual basis and with knowledge that these false characterizations would further ostracize Ms. Johnson and provide pretextual justification for her termination.

Wolff's conduct was intentionally malicious. She conducted targeted research specifically searching for damaging information about Ms. Johnson immediately upon learning of her Palestinian identity through an introductory email. Wolff's tweets were crafted with explicit intent to trigger mass harassment: she explicitly identified Ms. Johnson by full name, position, and workplace affiliation—information specifically designed to enable doxxing and mob harassment. The inflammatory language ("just hired this antisemite") was deliberately calculated to incite outrage and online harassment targeting Ms. Johnson's employment.

Shapiro's conduct was intentionally reckless and malicious. Despite his prior status as a Georgetown faculty member and his personal experience with controversy surrounding tweets, Shapiro possessed full knowledge that amplifying accusations of antisemitism to 500,000 followers would devastate someone's career and safety. Despite this knowledge, he deliberately chose to amplify Wolff's defamatory content and explicitly identify Ms. Johnson by name and position, maximizing the targeting and harassment.

c)    <u>Ms. Johnson Suffered Severe Emotional Distress</u>

The third element requires proof that the defendant's conduct "caused the plaintiff severe emotional distress." *Goolsby*, 354 F. Supp. 3d at 83. Ms. Johnson's documented emotional injuries are severe and causally connected to Defendants' conduct.

Ms. Johnson suffered panic attacks, insomnia, and anxiety—documented psychological injuries directly resulting from the coordinated harassment campaign and the institutional abandonment by Georgetown. She endured permanent association with false "antisemite" accusations in Google searches where Canary Mission's defamatory profile remains the top result as of August 2025, permanently destroying her academic and professional trajectory. Facing credible threats of violence from a coordinated harassment campaign reaching millions, Ms. Johnson was forced to deactivate her public social media accounts and permanently delete certain online profiles. While she eventually resumed limited advocacy under strict privacy settings and pseudonymous accounts, she continues to do so with persistent apprehension, constant vigilance against further retaliation, and irreversible damage to her ability to safely engage in public-facing work—a direct consequence of Defendants' extreme and outrageous conduct.

> d)      First Amendment Not a Bar to IIED Claims Based on Discriminatory Harassment

While the First Amendment generally protects robust public debate, IIED claims based on discriminatory harassment and institutional retaliation are not barred by the First Amendment. The First Amendment does not shield conduct that goes beyond speech to constitute extreme and outrageous harassment, particularly when motivated by discrimination based on protected characteristics. *Salem Media Group, Inc. v. Awan*, 301 A.3d 633, 657-58 (D.C. 2023), recognized that while actionable defamation alone is not sufficient for IIED, the First Amendment provides special protection only where speech concerns matters of public interest without gratuitous targeting of personal information or coordinated harassment campaigns designed to inflict emotional distress and endanger wellbeing.

Here, the Defendants' conduct transcends protected speech and enters the realm of extreme and outrageous conduct precisely because it constitutes a coordinated campaign of discriminatory harassment targeting Ms. Johnson's protected characteristics—her Palestinian identity, Muslim faith, and African American heritage. The court must be "especially attentive to the potential chilling effect where the claim is based on pure speech relating to a matter of legitimate public interest." *Id.* (quoting cases). However, "calling pure speech about an issue of public concern extreme and outrageous conduct, so as to permit recovery for intentional infliction of emotional distress, is reserved for the rarest of cases." *Id.* This is such a rare case.

Ms. Johnson's IIED claim is not based on the mere expression of viewpoints about her social media posts or academic fitness. Rather, it is based on the systematic, coordinated campaign of discriminatory harassment designed specifically to target her because of her Palestinian identity, Muslim faith, and African American race. The Defendants' conduct goes well beyond the bounds of protected commentary: it includes deliberate doxing (Wolff and Shapiro), false institutional characterizations (Georgetown Defendants), and reckless amplification of discriminatory harassment (all Defendants). Courts have consistently held that IIED claims are not barred by the First Amendment when the conduct at issue constitutes a coordinated attack targeting an individual's protected characteristics, particularly in an employment context where institutional actors have affirmative duties to protect employees from harassment. *See Sonmez v. WP Co. LLC*, 330 A.3d 285, 327 (D.C. 2025) (recognizing employer duty to remediate harassment even when initiated by third parties, when employer has ability to prevent or control the harassment).

The First Amendment's protections are not absolute and do not extend to harassment campaigns specifically designed to inflict severe emotional distress based on discriminatory animus. Defendants' systematic efforts to weaponize Ms. Johnson's protected speech and identity to achieve her professional destruction, combined with institutional actors' deliberate amplification of this harassment, constitute extreme and outrageous conduct that exceeds First Amendment protection. The fact that discriminatory harassment may include speech does not immunize the systematic campaign itself from liability when it is designed specifically to target an individual for her protected characteristics and to destroy her livelihood and wellbeing.

### 2. *Count XII: Tortious Interference with Contract (Shapiro, Wolff)*

#### a) Valid Employment Contract Existed

A valid employment contract is the foundational element of a tortious interference with contract claim under D.C. law. The District of Columbia recognizes that even at-will employment relationships constitute valid and subsisting contractual relationships for purposes of tortious interference claims. *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1039-40 (D.C. 2015). The Restatement Second of Torts Section 766 , comment g clarifies that "a contract that is terminable at-will is valid and subsisting until terminated and the defendant may not improperly interfere with it."

Ms. Johnson entered into a valid employment contract with Georgetown University when she received an unconditional written offer letter dated October 2, 2023, for the position of Assistant Director of Academic and Faculty Affairs at the Walsh School of Foreign Service, with employment commencing October 30, 2023. The offer letter was incorporated by reference Georgetown's Human Resources policies, creating a binding contractual relationship. Under D.C. law, this employment relationship—whether

characterized as at-will or otherwise—constitutes a valid and subsisting contractual relationship capable of forming the basis for a tortious interference claim.

b)    <u>Wolff and Shapiro Had Knowledge of Contract</u>

The second element requires that defendants possess actual knowledge of the contractual relationship. Knowledge can be demonstrated through circumstantial evidence, including access to information about the relationship through direct communications or reasonable inference.

Rachel Jessica Wolff possessed actual and direct knowledge of Ms. Johnson's employment contract with Georgetown. On November 1, 2023, Wolff received an introductory email to the Georgetown School of Foreign Service community explicitly identifying Ms. Johnson as the "Assistant Director of Academic and Faculty Affairs." SAC ¶ 125. This email directly informed Wolff of Ms. Johnson's employment relationship with Georgetown and her specific position, satisfying the knowledge requirement.

Ilya Shapiro similarly possessed actual knowledge of Ms. Johnson's employment contract. Shapiro's status as a former Georgetown employee—serving as Executive Director and Senior Lecturer at the Georgetown Center for the Constitution—provided him institutional familiarity with Georgetown's employment relationships and organizational structure. SAC ¶ 19, 131. Crucially, when Shapiro retweeted Wolff's content on November 1, 2023, the tweet itself explicitly identified Ms. Johnson "by name, position, and Georgetown affiliation," SAC ¶ 131, thereby placing him on direct notice of her employment relationship with the university.

c)       <u>Intentional and Improper Interference</u>

The third element requires that defendants intentionally interfere with the contractual relationship, causing or inducing a breach. *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 833 (D.C. 2003). Critically, "a breach as such is not required to satisfy the third element of tortious interference with contractual relations and that a mere failure of performance will do." *Economic Research Services, Inc. v. Resolution Economics LLC*, 208 F. Supp. 3d 219, 229 n.9 (D.D.C. 2016). Under D.C. law, wrongful or improper conduct is not an element of the prima facie case; rather, it may become an affirmative defense available to defendants. *NCRIC, Inc. v. Columbia Hospital for Women Med. Ctr., Inc.*, 957 A.2d 890, 893 (D.C. 2008).

Rachel Jessica Wolff's conduct constituted intentional interference with Ms. Johnson's employment contract. On November 1, 2023, Wolff deliberately engaged in targeted research on Ms. Johnson's background specifically upon receiving her introductory email and promptly located Canary Mission's defamatory cyberstalking profile. Wolff then intentionally published viral tweets with decontextualized, eight-year-old social media posts, explicitly identifying Ms. Johnson by full name, position, and Georgetown affiliation. *SAC* ¶ 222. This conduct was specifically calculated to compel Georgetown's discriminatory action, as evidenced by Wolff's own statements that she searched Ms. Johnson's name "as soon as I saw this email" before posting. *SAC* ¶ 126. The timing—within hours of Ms. Johnson's introductory email—and the explicit focus on Ms. Johnson's name and workplace demonstrate intentional targeting of her employment relationship.

Critically, Wolff's actions directly caused the breach of Ms. Johnson's employment contract. Georgetown placed Ms. Johnson on administrative leave within less than 12 hours

of Wolff's initial tweet on November 1, 2023, and amplified by Shapiro's retweet on the same date. *SAC* ¶ 136. Georgetown's termination letter of November 27, 2023, explicitly cited "posts from 2015 which were shared with the Georgetown community during the first week of your employment"—the exact decontextualized material orchestrated by Wolff and amplified by Shapiro. *SAC* ¶ 145. The proximate causation is demonstrated through temporal proximity: Wolff tweeted, Shapiro amplified within hours, Georgetown responded within 12 hours with administrative leave, and terminated within 27 days.

Ilya Shapiro's conduct similarly constitutes intentional interference with Ms. Johnson's employment contract. Shapiro retweeted Wolff's defamatory content to his 500,000 followers on November 1, 2023, explicitly identifying Ms. Johnson "by name and Georgetown position," thereby exponentially amplifying the harassment campaign and pressure upon Georgetown to terminate Ms. Johnson. SAC ¶ 449. As a former Georgetown faculty member and prominent public figure with significant social media influence, Shapiro's actions carried institutional weight and credibility that magnified the defamatory attack. His retweet included his own commentary identifying Ms. Johnson's full name and position, demonstrating his intent to target her employment relationship specifically.

d)      Causation and Damages

The fourth element requires resulting damages flowing proximately from the defendants' interference. *Marshall v. Allison*, 908 F. Supp. 2d 186, 202 (D.D.C. 2012).

Temporal Causation: The undisputed sequence of events establishes proximate causation. Wolff published her viral tweets on November 1, 2023, at 10:17 p.m. SAC ¶ 222. Shapiro amplified the content the same day. By November 2, 2023, at 8:22 a.m., Shambaugh placed Ms. Johnson on administrative leave—a material adverse employment

action. SAC ¶ 211. This less-than-12-hour interval between the coordinated social media campaign and Georgetown's immediate adverse action demonstrates that Defendants' conduct was the direct and proximate cause of Ms. Johnson's termination.

Georgetown's Explicit Reliance on Defendants' Content: Georgetown's own termination letter proves causation by explicitly referencing "posts from 2015 which were shared with the Georgetown community during the first week of your employment," acknowledging that the viral campaign orchestrated by Wolff and Shapiro triggered the termination decision. SAC ¶ 145.

Documented Damages: Ms. Johnson has suffered quantifiable and documented damages, including: (1) economic losses—loss of her $75,000 annual salary, benefits, retirement contributions, and career advancement opportunities; (2) professional harm— permanent association with false antisemite allegations in Google search results, destroying her standing in academia; and (3) emotional distress—documented panic attacks, insomnia, anxiety, and forced withdrawal from public advocacy. SAC ¶¶ 420-423.

e)    No Justification or Privilege

Under D.C. law, once a prima facie case is established, the burden shifts to defendants to prove that their conduct was legally justified or privileged. *Sorrells*, 565 A.2d at 289-90; *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 44 (D.D.C. 2005). Defendants cannot meet this burden.

**Absence of Legitimate Business Interest**: Neither Wolff nor Shapiro possessed any legitimate business interest, contractual authority, or professional responsibility regarding Ms. Johnson's employment. Wolff was a Georgetown student with no connection to hiring or employment decisions. SAC ¶ 463. Shapiro was a former employee who had resigned in

June 2022—nearly a year and a half before the events in question—and held no official capacity at Georgetown. SAC ¶ 9. Their conduct exceeded any claimed free speech protections through deliberate targeting, defamatory content amplification, and coordination with racist harassment campaigns.

**Improper Means and Malicious Motive**: Defendants employed objectively improper means, including deliberate decontextualization of eight-year-old social media posts, amplification through massive social media platforms to millions of viewers, explicit identification of Ms. Johnson's workplace to maximize professional harm, and coordination with Canary Mission—a documented cyberstalking operation. SAC ¶¶ 222-225. The malicious motive is demonstrated by the complete absence of any legitimate concern for campus safety or university governance; instead, the campaign was specifically motivated by anti-Palestinian, anti-Muslim, and anti-Black animus, as evidenced by Defendants' coordinated targeting of Ms. Johnson specifically upon learning of her Palestinian identity.

**Restatement Section 767 Factors**: Under *Restatement Second of Torts* § 767, which D.C. law applies, the determination of whether conduct is improper considers: (a) the nature of defendants' conduct—deliberately published defamatory, decontextualized material to millions; (b) defendants' motive—suppressing Palestinian advocacy and targeting a person of color; (c) the interests of Georgetown with which Defendants interfered—maintenance of a non-discriminatory workplace free from harassment-induced terminations; (d) the interests Defendants sought to advance—promoting discriminatory narratives targeting Palestinian advocates; (e) social interests in protecting freedom of action—these do not extend to coordinated harassment campaigns targeting protected classes; (f) proximity or remoteness—Defendants' conduct was directly proximate to Ms.

Johnson's termination; and (g) relations between parties—Wolff had no connection to Ms. Johnson and Shapiro's prior employment at Georgetown provided no privilege to harass current employees.

### f) Third-Party States Established

A critical requirement for tortious interference liability is that defendants must be "third parties" to the contractual relationship—not agents or officers of the employer with authority to manage the contract. *See Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988); *Sorrells*, 565 A.2d at 290-91.

Rachel Jessica Wolff: Wolff clearly qualifies as a third party. She was a Georgetown student—not an employee, agent, officer, or supervisor. SAC ¶ 463. She possessed no authority whatsoever over Georgetown's employment decisions and acted entirely outside any official capacity. Her status as a "stranger" to the employment relationship is undisputed.

Ilya Shapiro: Shapiro similarly qualifies as a third party. Although he previously worked at Georgetown as Executive Director and Senior Lecturer at the Center for the Constitution, he resigned from that position on June 6, 2022. SAC ¶ 9; Doc. 41-2 (Shapiro Decl.) ¶ 9. By November 1, 2023—the date of his retweeting—Shapiro held no official position, authority, or capacity at Georgetown whatsoever. He explicitly confirmed in his declaration: "I am no longer employed at Georgetown University Law Center, nor have I ever been consulted over its hiring or firing decisions." Shapiro Decl. ¶ 10. His retweeting occurred from his home in Virginia in his personal capacity as an online commentator, without any official role, communication with Georgetown, or authority over employment practices. Shapiro Decl. ¶ 14.

The third-party status of both Defendants eliminates any potential defense based on agent or officer immunity. Under *Sorrells*, supervisory employees acting with malice fall outside the protection of the agency relationship because "a person who maliciously procures the discharge of another by their common employer is not shielded from liability by his or her status as a supervisory employee." 565 A.2d at 291. Defendants here cannot claim even supervisory status—they are entirely external actors who deliberately interfered with an employment relationship to which they were strangers, motivated by discriminatory animus.

**3.      Count XIII: False Light Invasion of Privacy (Georgetown Defendants, Shapiro, Wolff)**

a)      Defendants Gave Publicity to False Representations

Under District of Columbia law, the "publicity" element requires that defendant disseminate false information to the public, meaning a substantial number of people or the public at large. *J. Thomas McCarthy & Roger E. Schechter, The Rights of Publicity and Privacy §* *5114* (2d ed. May 2025). The publicity must involve "widely disseminated" communication directed to the public, not merely a small group of people. *Id.*; Restatement (Second) of Torts § 652E (1977). Courts consistently recognize that publication on public social media platforms accessible to broad audiences satisfies this requirement. *Id.*; *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 44 (Minn. Ct. App. 2009).

Here, Defendants' conduct clearly meets the publicity requirement. Defendant Rachel Jessica Wolff initiated her campaign on November 1, 2023, by posting defamatory tweets that rapidly attained massive public exposure, garnering over 1.2 million views, over 6,300 likes, 2,000 retweets, and 329 bookmarks within hours. SAC ¶ 127. These tweets

explicitly identified Ms. Johnson by full name, position as Georgetown's Assistant Director of Academic and Faculty Affairs, and workplace. SAC ¶ 127, 480.

Defendant Ilya Shapiro further amplified this false publicity by retweeting Wolff's defamatory content to his 500,000 followers, explicitly identifying Ms. Johnson by full name and Georgetown position. SAC ¶ 131, 471. Defendant Joel Hellman, Dean of the Walsh School of Foreign Service, published a mass email on November 2, 2023, to over 1,200 members of the MSFS community falsely implying Ms. Johnson posed a security threat. SAC ¶ 134, 469. George Shambaugh, Director of the MSFS Program, made departmental statements reinforcing the false narrative about Ms. Johnson. SAC ¶ 468, 472.

These coordinated communications achieved widespread dissemination through multiple channels—social media reaching millions, institutional emails reaching over 1,200 community members, and departmental communications creating institutional publicity that reinforced and legitimized false characterizations. This constitutes the massive public dissemination required to satisfy the publicity element under D.C. law.

### b)     False Light Highly Offensive to Reasonable Person

The false light tort requires that the published material place the plaintiff in a false light "which would be highly offensive to a reasonable person." *McCarthy & Schechter*, § 5114; Restatement (Second) of Torts § 652E, cmt. c (1977). This requires "a major misrepresentation of the plaintiff's character, history, activities or beliefs" rather than minor inaccuracies. *Id.*; *see also Talley v. Time, Inc.*, 923 F.3d 878, 894 (10th Cir. 2019). The court must assess offensiveness against the yardstick of the ordinary, reasonable person standard, and minor errors will not trigger liability if the essence of the publication is substantially true. *McCarthy & Schechter*, § 5114; *Swerdlick v. Koch*, 721 A.2d 849 (R.I. 1998).

However, courts recognize that a false publication can place someone in a highly offensive false light even though the statements are literally true if the context creates a false impression. *McCarthy & Schechter*, § 5114; *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa. Super. 66, 543 A.2d 1181 (1988). Additionally, "a false light claim does not require a literally false statement. It is sufficient if the accused statement implies underlying facts that are false or that the overall context of the statement leads to inferences that cast the plaintiff in a false light." *S.E. v. Chmerkovskiy*, 221 F. Supp. 3d 980, 985 (M.D. Tenn. 2016).

Defendants' publicized material placed Ms. Johnson in a false light highly offensive to a reasonable person. The coordinated campaign falsely portrayed her protected political speech—made as a college freshman in 2015—as reflecting her current beliefs and constituting present threats to campus safety. SAC ¶ 488, 489. Specifically, Wolff decontextualized Ms. Johnson's social media posts from their historical context regarding Israeli military violence, presenting them as evidence of antisemitism. SAC ¶ 128, 475, 491. Shapiro amplified these decontextualized characterizations, explicitly identifying Ms. Johnson by name and position. SAC ¶ 131, 476, 481.

Hellman's institutional email created perhaps the most egregious false light by falsely implying Ms. Johnson posed a security threat, stating "We take all threats to our community seriously"—a baseless characterization given Georgetown's demonstrated retention of employees with far more egregious conduct. SAC ¶ 134, 474, 484. Georgetown and Shambaugh perpetuated false implications that Ms. Johnson's protected political speech made her professionally incompetent and unable to safely engage with community members. SAC ¶ 475, 486.

These false portrayals—characterizing a teenager's protected political speech as present antisemitism and a current security threat—constitute major misrepresentations that would be highly offensive to any reasonable person. *McCarthy & Schechter*, § 5114; *Restatement (Second) of Torts § 652E, cmt. c.* The complete distortion of Ms. Johnson's character from a passionate advocate for human rights to a dangerous extremist transcends minor inaccuracies and represents the type of false light invasion that merits legal protection.

### c)      Defendants Acted with Knowledge of Falsity or Reckless Disregard

Under District of Columbia law and the First Amendment, when the plaintiff is a public figure or the publication addresses matters of public concern, the plaintiff must prove that defendants acted with "actual malice"—that is, with knowledge of falsity or reckless disregard for the truth. *Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967); *Khodorkovskaya v. Gay*, 5 F.4th 80, 85 (D.C. Cir. 2021). The same First Amendment protections apply to false-light claims that apply to defamation claims. *Id.* Under the reckless disregard standard, the plaintiff must demonstrate "a high degree of awareness of probable falsity." *McCarthy & Schechter*, § 5114.

For private figure plaintiffs addressing matters of private concern, some D.C. courts have permitted recovery based on negligence. *McCarthy & Schechter*, § 5114. However, where a plaintiff must demonstrate that defendant "realized that the statement was false or published with reckless disregard as to whether or not it was true," the standard requires consideration of what the defendant actually knew or should have known about the false nature of the statements. *Id.*

Defendants acted with knowledge of falsity or, at minimum, reckless disregard for truth regarding the false characterizations. Defendant Wolff deliberately decontextualized Ms. Johnson's 2015 posts, deliberately removing historical context regarding Israeli military actions that prompted her teenage political response. SAC ¶ 128, 491. Wolff conducted targeted research specifically searching for damaging information about Ms. Johnson immediately upon discovering her Palestinian identity, then weaponized the decontextualized material she discovered through Canary Mission's cyberstalking profile. SAC ¶ 383, 451. This demonstrates Wolff's actual knowledge that she was stripping context and creating false implications.

Defendant Shapiro, as a former Georgetown faculty member who had himself been the subject of institutional controversy for his own social media posts, possessed actual knowledge that decontextualized social media campaigns destroy careers and that context matters in evaluating statements. SAC ¶ 432, 492. Despite this knowledge, Shapiro amplified false characterizations without regard for truth, demonstrating reckless disregard. SAC ¶ 492.

Defendant Hellman, as Dean of the Walsh School of Foreign Service, deliberately implied security threats without factual basis. SAC ¶ 474, 490. Hellman knew Ms. Johnson's posts were eight years old, made during her college freshman year, and related to protected political speech, yet deliberately characterized them as current security concerns. SAC ¶ 489, 490. Hellman deliberately published defamatory institutional communications before any investigation had begun or concluded, demonstrating reckless indifference to truth.

Defendant Georgetown University and George Shambaugh similarly knew Ms. Johnson's posts were from 2015, made when she was a teenager, and involved protected political speech. SAC ¶ 489. Yet they falsely characterized these eight-year-old posts as current misconduct justifying immediate termination within hours of a viral harassment campaign. SAC ¶ 138, 145. Georgetown's termination letter explicitly referenced posts "from 2015 which were shared with Georgetown University during the first week of your employment"—demonstrating that Georgetown knew the posts were ancient history yet continued characterizing them as current misconduct.

The coordinated timing—Wolff's tweets on November 1 at 10:17 PM, immediate amplification by Shapiro, Georgetown's placement of Ms. Johnson on administrative leave by 8:22 AM on November 2, and Hellman's institutional email at 10:42 AM the same day—demonstrates not merely negligence but deliberate coordination and reckless disregard for truth. SAC ¶ 372-377. This timeline is "impossible without prior agreement," evincing the requisite actual malice or reckless disregard necessary to sustain a false light claim under District of Columbia law.

### F.    Defendants' Affirmative Defenses Fail as a Matter of Law

#### 1.    *Statute of Limitations Does Not Bar Ms. Johnson's Claims*

##### a)    DCHRA Individual Liability Is Not Time-Barred

Georgetown's assertion that DCHRA claims against individual Defendants Hellman and Shambaugh are time-barred fundamentally misunderstands the scope of individual liability under the District of Columbia Human Rights Act. The DCHRA explicitly permits individual liability against supervisors and administrators in their personal capacity for employment discrimination. *Smith v. Cafe Asia*, 598 F. Supp. 2d 45, 48-49 (D.D.C. 2009) (holding that individual defendants could be classified as employers under the DCHRA

because they acted in the interest of the employer and either perpetrated or failed to stop discriminatory acts).

Individual liability under the DCHRA extends to university administrators who make discriminatory employment decisions within the scope of their employment. *Poola v. Howard Univ.*, 147 A.3d 267, 279, 282 (D.C. 2016) (finding that a university dean could be considered an employer under the DCHRA based on his role in denying a professor's reappointment and access to facilities). Courts have consistently allowed claims against employees in their personal capacities under the DCHRA when they act in the interest of the employer and are involved in discriminatory conduct. *Easaw v. Newport News Shipbuilding & Dry Dock Co.*, 253 F. Supp. 3d 22, 28 n.2 (D.D.C. 2017).

Here, the EEOC charge included allegations of both Hellman and Shambaugh, detailing their discriminatory conduct.

### b)    Title VII Claims Are Properly Exhausted

Georgetown's claim that plaintiff failed to exhaust administrative remedies for her hostile work environment and retaliation claims under Title VII ignores established precedent governing the scope of EEOC charges and the liberal construction applied to administrative exhaustion requirements.

A Title VII lawsuit following an EEOC charge extends to claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation omitted). The critical question is "whether the claims set forth in the civil complaint come within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Howard v. Gutierrez*, 571 F. Supp. 2d 145, 161 (D.D.C. 2008).

Hostile work environment claims can proceed even when not explicitly mentioned in the EEOC charge, provided the charge includes allegations of ongoing or continuous discriminatory conduct that could reasonably lead to an investigation encompassing such claims. *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 349 (D.D.C. 2013) (finding that a plaintiff's amended EEOC charge, which alleged "a continuous pattern of discrimination, harassment, and retaliation," was sufficient to encompass a hostile work environment claim). The D.C. Circuit has emphasized that "courts do not require a plaintiff to have invoked a hostile work environment claim by name or to use specific 'magic words' in order to exhaust it." *Congress v. District of Columbia*, 324 F. Supp. 3d 164, 171 (D.D.C. 2017).

Retaliation claims are similarly exhausted when the EEOC charge describes conduct that could reasonably encompass retaliatory behavior. *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 12 (D.D.C. 2011) (charge alleging "multiple acts of discriminatory and/or retaliatory conduct" and alleging that the actions were "continuing in nature" would encompass a hostile work environment claim). Courts have consistently held that claims must merely "arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Park*, 71 F.3d at 907.

The administrative charge requirement serves to provide notice to the employer and allow the EEOC to investigate, not to impose a heavy technical burden on "individuals untrained in negotiating procedural labyrinths." *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). Given that the administrative charge is not intended to be a blueprint for the litigation to follow, courts apply a liberal standard recognizing that EEOC charges are often

filed by unrepresented employees who lack legal training. *Lyles v. District of Columbia*, 777 F. Supp. 2d 128, 134 (D.D.C. 2011).

c)        Tort claims are Timely

Under District of Columbia law, a claim is intertwined with another only when it is "completely dependent on or essentially the same as another, and cannot survive as a separate, independent cause of action." *Jovanovic v. US-Algeria Business Council*, 561 F. Supp. 2d 103, 114 (D.D.C. 2008). The purpose of the intertwining doctrine is not to conflate all claims arising from the same conduct, but rather to ensure consistency by preventing claims that turn on identical elements of proof from receiving different limitation periods merely because of their nominal labels. *Id.* at 114 ("The purpose of the intertwining doctrine is to protect the consistency of the D.C. limitations policy by preventing claims turning on identical elements of proof from being allowed under one label but not another.") (citations omitted)).

Importantly, the *Jovanovic* court distinguished between claims that are truly intertwined and those that involve "additional elements beyond those required" for the foundational tort. *Jovanovic*, 561 F. Supp. 2d at 115. Ms. Johnson's false light and IIED claims do not rest solely on the falsity or reputational damage of statements; rather, it encompasses the extreme and outrageous nature of the entire course of conduct—including threats, doxing, institutional complicity, and discriminatory employment actions—that no reasonable person could be expected to endure. In the case of false light, it also involves distinct elements of proof: the requirement of publicity to the general public rather than mere publication, and protection of privacy interests rather than reputation alone.

### 2. *Election of Remedies Doctrine Does Not Apply*

#### a) <u>DCHRA Permits Dual Administrative and Judicial Remedies</u>

The election of remedies doctrine under the DCHRA does not bar Ms. Johnson's DCHRA claims in this matter. While the DCHRA generally requires complainants to choose between administrative proceedings through the D.C. Office of Human Rights and judicial proceedings in court, the doctrine contains critical statutory exceptions that are satisfied here and have been satisfied through the procedural mechanisms established by the federal-local worksharing agreement.

The DCHRA, codified at D.C. Code § 2-1403.16(a), provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint hereunder." However, the statute itself establishes that this prohibition does not apply "where the Office has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint." *Id.* The statute thus contemplates parallel remedies in defined circumstances that are present in Ms. Johnson's case.

Between the Equal Employment Opportunity Commission and the D.C. Office of Human Rights exists a worksharing agreement that fundamentally alters the election of remedies analysis. *See Craig v. District of Columbia*, 881 F.Supp.2d 26, 29-30 (D.D.C. 2012). Under this agreement, when a discrimination charge is filed with the EEOC in the District of Columbia, it is automatically cross-filed with the DCOHR pursuant to regulations at 29 C.F.R. § 1601.13(a)(4)(ii)(A). *Fowler v. District of Columbia*, 122 F.Supp.2d 37, 43-44 (D.D.C. 2000). This cross-filing satisfies the exhaustion of administrative remedies requirement and

operates to start the administrative proceeding with both agencies simultaneously. Ms. Johnson timely filed her EEOC charge on April 12, 2024, within 300 days of her November 27, 2023 termination, and requested that the EEOC cross-file her charge with the DCOHR. This dual filing mechanism means that Ms. Johnson's administrative remedies have been pursued in both forums through a single, unified filing—exactly as the statute and regulations contemplate.

The D.C. Court of Appeals has made clear that the worksharing agreement creates a statutory exception to the rigid election of remedies doctrine. In *Ibrahim v. Unisys Corp.*, 582 F.Supp.2d 41, 46-47 (D.D.C. 2008), the court held that when "the (DCOHR) invokes the automatic termination provision of the worksharing agreement for complaints filed originally with the EEOC, that ruling constitutes a dismissal on the ground of administrative convenience under the statute, leaving the complainant free to pursue her cause of action in court." (cleaned up). The key principle established by D.C. appellate authority is that even if the EEOC decided the charge on the merits, the complainant retains the right to litigate the DCHRA claims in court. *Ibrahim*, 582 F.Supp.2d at 46.

The remedial purposes underlying both Title VII and the DCHRA support this interpretation. Both statutes are designed to provide broad access to redress for discrimination claims. To read the election of remedies doctrine rigidly—foreclosing judicial DCHRA claims merely because the administratively cross-filed charge reached an agency determination—would undermine the remedial purposes of the statute. As established in *Ware v. Nicklin Associates, Inc.*, 580 F.Supp.2d 158, 163 (D.D.C. 2008), the issuance of a right-to-sue letter by the EEOC, following cross-filing with the DCOHR under the worksharing agreement, permits plaintiffs to pursue claims under both Title VII and the

DCHRA. The D.C. Court of Appeals has explicitly held that election of remedies doctrine did not bar employee's claims under the DCHRA; under the work-share agreement between the EEOC and OHR, issuance of right to sue letter by EEOC afforded employee the right to pursue her claims under both Title VII and DCHRA. *Id.*

Moreover, filing an EEOC charge that is cross-filed with the DCOHR does not constitute an election of remedies that bars subsequent judicial claims. The filing is a threshold procedural requirement, not an election. *Motley-Ivey*, 923 F.Supp.2d at 231-32. The DCOHR's automatic termination and deferral to the EEOC under the worksharing agreement operates as a dismissal for administrative convenience, which is one of the two statutory exceptions to the election of remedies doctrine explicitly set forth in the DCHRA. Accordingly, Ms. Johnson's concurrent EEOC and DCOHR filings, executed pursuant to the worksharing agreement, do not bar her DCHRA claims in court.

### b)    Ms. Johnson Did Not Elect Inconsistent Remedies

Even if the election of remedies doctrine applied with full force, Ms. Johnson would not have elected inconsistent remedies because the administrative complaints she filed do not constitute an election against judicial DCHRA remedies under the statutory exceptions.

The DCHRA recognizes two specific situations in which a complainant may pursue judicial relief after filing administratively: (1) where "the Office has dismissed such complaint on the grounds of administrative convenience," or (2) where "the complainant has withdrawn a complaint." *Motley-Ivey*, 923 F.Supp.2d at 229 (cleaned up). Ms. Johnson's situation falls squarely within the first exception. Under the worksharing agreement, when the DCOHR receives a charge that was originally filed with the EEOC, the DCOHR invokes the automatic termination provision and defers jurisdiction to the EEOC for

resolution. This automatic deferral constitutes a dismissal for administrative convenience—it is not a decision on the merits, but rather a determination that the DCOHR will not process the complaint. *Motley-Ivey*, 923 F.Supp.2d at 231-32 (DCOHR's deferral to EEOC amounts to a dismissal for "administrative convenience").

The D.C. Circuit and district courts have consistently held that the consequence of such administrative convenience dismissals is that "the complainant is free to pursue her cause of action in court." *Ibrahim*, 582 F.Supp.2d at 46. The fact that the EEOC subsequently addressed the charge on the merits is irrelevant to this analysis. In *Ibrahim*, the EEOC made a no probable cause determination, and the court nonetheless permitted the plaintiff to proceed with DCHRA claims in court because the DCOHR had dismissed the complaint for administrative convenience under the worksharing agreement. *Ibrahim*, 582 F.Supp.2d at 46. Similarly, in *Motley-Ivey*, where the DCOHR deferred to the EEOC pursuant to the worksharing agreement and the EEOC eventually issued a right-to-sue letter, the court held that Ms. Motley "has at least raised a triable issue of fact as to whether her original charge was dismissed by OHR for 'administrative convenience,' and decline[d] to hold that the election of remedies doctrine bars" her DCHRA claims. *Motley-Ivey*, 923 F.Supp.2d at 231-32.

Moreover, Ms. Johnson has never withdrawn her administrative complaint, nor does Georgetown contend that she has. The election of remedies doctrine bars judicial claims only when a complainant fails to withdraw before the administrative agency issues a probable cause determination or other decision on the merits. See *Motley-Ivey*, 923 F.Supp.2d at 229. Because the DCOHR's automatic termination pursuant to the

worksharing agreement occurs precisely to prevent the agency from rendering a probable cause determination, no such bar arises.

Ms. Johnson proceeded precisely as federal and local law permit: she filed a timely administrative charge with the EEOC, which was automatically cross-filed with the DCOHR pursuant to the established worksharing agreement. This filing mechanism is the procedural complement to her judicial claims—not an election against them. The Court should therefore reject Georgetown's assertion that the election of remedies doctrine bars her DCHRA claims.

### 3.     *Communications Decency Act Does Not Shield Shapiro*

Defendant Shapiro claims he is immune from suit under the Communications Decency Act (CDA). Not so. Shapiro misapprehends the scope of the law and his role in creating original content that facilitated Ms. Johnson's doxing and eventual termination, to which the CDA does not apply.

Ms. Johnson alleges that Shapiro retweeted Wolff's tweet, adding his own commentary: "Her name is Aneesa Johnson, @Georgetown School of Foreign Service's new assistant director of academic affairs." SAC ¶ 131. Doing so further enabled the doxing campaign Wolff had initiated, directing individuals to Ms. Johnon's specific employer with the goal of facilitating disciplinary action.

The CDA does not immunize an individual from suit in this circumstance. Rather, it would have applied only if the only conduct Shapiro engaged in was a simple retweet without adding commentary. *See US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 35 (D.D.C. 2022) (explaining that "§ 230 may provide immunity for someone who merely shares a link on Twitter"). Shapiro cites *Byrne* for the proposition that the CDA immunizes him because

his tweet was not defamatory in itself. But he overstates its holding—it just so happened that the disputed post in the case was defamatory, but that was not central to the court's holding. *See id.*; *see also* Marshall's Locksmith Serv. Inc. v. Google, LLC, 925 F.3d 1263, 1267 (D.C. Cir. 2019) (explaining that the CDA applies "against causes of action of all kinds," i.e. whether or not a post is defamatory is not the question). Because Ms. Johnson's claim is based in part "on posts which [Shapiro] is the *author*, not [solely] on "information provided by *another* content provider," the CDA does not apply. La Liberte v. Reid, 966 F.3d 79, 89 (2d Cir. 2020) (emphasis in original).

The other cases on which Shapiro relies further prove this point. *See* Roca Labs, Inc. v. Consumer Opinion Corp., 140 F. Supp. 3d 1311, 1321 (M.D. Fla. 2015) (explaining that a "service provider loses immunity when it substantively alters third-party content or becomes directly involved in the alleged illegality" and finding the CDA provided immunity only because the defendant did not "substantively alter the content of the posts"); Banaian v. Bascom, 175 N.H. 151, 158, 281 A.3d 975, 980 (2022) (finding immunity under the CDA where the defendant simply retweeted someone else's post without more).

Stated simply, the CDA offers Shapiro no protection here.

### 1.    *First Amendment Does Not Bar Ms. Johnson's Claims*

#### a)    Employment Discrimination is not Protected Speech

Employment discrimination laws regulate conduct, not speech. While Defendants urge invocation of the First Amendment, they misapprehend the scope of constitutional protection. Defendants' characterization of Ms. Johnson's claims as attacking "protected speech" conflates the communicative aspect of alleged discrimination with actionable discriminatory conduct itself.

The Supreme Court established in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Rights*, 413 U.S. 376 (1974), that the government may regulate discriminatory conduct even where that conduct is intertwined with communicatory elements. The Court held that regulations directed at discriminatory activity, rather than expression, do not implicate the First Amendment simply because discrimination may be communicated. *Id.* at 388-89. Applying this principle here: Ms. Johnson challenges Georgetown University's employment decisions—termination, suspension, and disparate treatment—not the content of Defendants' speech about her. The fact that Defendants communicated these employment decisions through various channels does not transform employment discrimination into protected expression.

This distinction was affirmed in *Sonmez v. WP Company LLC*, 330 A.3d 285, 332-33 (D.C. 2025), where the court held that "not every staffing decision a news organization makes—even with respect to those who write, edit, or otherwise produce content—enjoys constitutional protection." (citation omitted). The court explained that "application of laws prohibiting racial and other forms of discrimination will leave the organization with the full freedom and liberty to publish the news as it desires it published" and that "a legal challenge to a particular staffing decision will have no substantial effect on the news organization's ability to speak on public issues." *Id.* (quoting *Raytheon Co. v. Superior Court*, 114 Cal.App.3d 754 (1981)). More fundamentally, while the First Amendment protects speech "on public issues," it "does not secure a right to practice such discrimination in employment, even under the guise of exercising editorial judgment." *Id.*

The D.C. Circuit has reached similar conclusions regarding government action. In *Jenner & Block LLP v. U.S. Dept of Justice*, 784 F. Supp. 3d 76, 106 (D.C. 2025), the court

recognized that "the government may regulate, but under the First Amendment, it may not regulate in retaliation for speech." More critically, the court held that First Amendment protections do not permit government (or, by parallel reasoning, employers) to use their power "to suppress disfavored expression." *Id.* at 88. Yet the First Amendment similarly does not shield discrimination itself from regulation—the government, and employers subject to Title VII and the D.C. Human Rights Act, may regulate discriminatory conduct directed at employees based on protected characteristics.

b)    Defamatory Falsehoods and Intentional Harassment Fall Outside First Amendment Protection

The First Amendment does not protect false statements of fact or intentional harassment designed to injure, regardless of their communicative character. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990) (distinguishing between protected opinion and unprotected false factual assertions).

Ms. Johnson's claims encompass factual falsehoods and intentional harassment, not opinion. When Dean Hellman sent his November 2, 2023 email to 1,200 members of the Georgetown community falsely implying Ms. Johnson posed a "security threat," he made a verifiable statement of fact—that Ms. Johnson threatened community safety—which he knew or should have known was false. [SAC ¶ 205-208]. This false characterization, designed to ostracize Ms. Johnson within hours of her employment commencing, falls outside First Amendment protection.

Similarly, Rachel Jessica Wolff's characterization of Ms. Johnson as an "antisemite" based on decontextualized eight-year-old tweets posted when Ms. Johnson was a college student—tweets Wolff deliberately weaponized through a viral campaign reaching 1.2 million views—constitutes false representation designed to inflict reputational and

professional injury. The tweets themselves were not fairly represented; they were published alongside a curated defamatory dossier created by a foreign-based cyberstalking organization explicitly designed to damage employability. The strategic republication of this material with misleading framing crosses the line from protected opinion to actionable falsehood.

Courts have consistently held that even strong, inflammatory language loses First Amendment protection when it crosses into provably false factual assertions about imminent danger or personal unfitness. Here, the suggestion that Ms. Johnson—a first-time employee with stellar credentials and no conduct-related incidents—posed an institutional security threat is a verifiable statement vulnerable to proof. *Florio v. Gallaudet Univ.*, 119 F.4th 67, 77-78 (D.C. Cir. 2024) established boundaries: while calling someone an "antisemite" may receive First Amendment protection when based on disclosed facts, doing so through decontextualization and systematic defamation campaigns designed to compel employment termination exceeds those bounds.

### c)    Ms. Johnson's Claims Target Conduct, Not Protected Expression

Ms. Johnson challenges conduct: the employment decisions to suspend and terminate her; the coordinated campaign to disseminate false information designed to trigger her termination; the disparate application of policy; and the conscious disregard for due process. She does not challenge Defendants' right to *speak*. She challenges their right to *discriminate* while speaking.

The distinction is fundamental. Defendants may express their views about Palestinian advocacy, about Ms. Johnson's political positions, about Israel-Palestine dynamics. What they may not do—under Title VII, the D.C. Human Rights Act, and §

1983—is use employment authority to retaliate against protected-class membership or to discriminate based on political speech.

An employer cannot condition access to employment or other benefits on suppression of protected expression. Yet that is precisely what occurred here. Georgetown terminated Ms. Johnson's employment—suspended her within 72 hours of a viral social media campaign, placed her on indefinite administrative leave, and ultimately terminated her—because her identity as a Palestinian Muslim woman attracted external pressure from coordinated sources.

Ms. Johnson's claims also target the systematic nature of the discrimination: Georgetown retained comparably situated employees who engaged in substantially more egregious misconduct when those employees belonged to non-protected statuses. Ilya Shapiro—a white, Jewish, Zionist male—made racist statements calling President Biden's Black female Supreme Court nominee a "lesser Black woman," yet received 122 days of investigation, paid leave, legal representation, and ultimately retention. SAC ¶ 182-183. Ms. Johnson, terminated within 25 days, received none of these protections. This disparate treatment indicates that employment decisions, not speech content, drove Defendants' actions.

The law is clear: "an ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for—or to suppress—the exercise of a First Amendment right." *Jenner & Block*, 784 F. Supp. 3d at 130 (cleaned up). Defendants here exercised termination authority in retaliation for Ms. Johnson's protected status and speech, not for legitimate employment reasons.

## VI.    CONCLUSION

Ms. Johnson's Second Amended Complaint establishes facially plausible claims under Title VII, the DCHRA, and 42 U.S.C. §§ 1981 and 1985(3). The allegations describe a coordinated conspiracy spanning out-of-state funding Defendants, cyberstalking operations, third-party amplifiers, and institutional actors. They collaborated to terminate Ms. Johnson's employment based on her race, religion, and national origin. Georgetown's conduct reveals stark discriminatory animus. It awarded 122 days of due process to a white Zionist male who posted racist tweets. Yet it summarily terminated an African American Palestinian Muslim woman within three weeks. Her only offense: eight-year-old protected political speech that only exists on a cyberstalking website. Accepting all factual allegations as true and drawing all reasonable inferences in Ms. Johnson's favor, the Court should deny Defendants' motions to dismiss in their entirety.

Respectfully submitted,

_/s/ Abdel-Rahman Hamed_

ABDEL-RAHMAN HAMED, ESQ.
DC Bar No. 1632130
**Hamed Law**
P.O. Box 25085
Washington, D.C. 20027

(202) 888-8846

Advocates@HamedLaw.com

_Attorney for Plaintiff Aneesa Johnson_