IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
ANEESA JOHNSON,
                                    CA No:  1:25-cv-01540-CRC
              Plaintiff,
                                    Washington, D.C.
                                    Thursday, February 19, 2026
v.                                  10:08 a.m.

GEORGETOWN UNIVERSITY, et al.,

              Defendants.
- - - - - - - - - - - - - - - - x
_____

                 TRANSCRIPT OF MOTION HEARING
        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:
For the Plaintiff:            **ABDEL-RAHMAN HAMED, ESQ.**
                             **HAMED LAW**
                             P.O. Box 25085
                             Washington, DC 20027
                             (202) 888-8846
                             abdelrahman@hamedlaw.com

For Georgetown Defendants:   **HENRY ADAM PLATT, ESQ.**
                             **SAUL EWING LLP**
                             1919 Pennsylvania Avenue NW
                             Suite 550
                             Washington, DC 20006
                             (202) 342-3447
                             henry.platt@saul.com

For Rachel Wolff:            **ELIZABETH P. PAPEZ, ESQ.**
                             **GIBSON, DUNN & CRUTCHER LLP**
                             1700 M Street, N.W.
                             Washington, DC 20036-4504
                             (202) 955-8608
                             epapez@gibsondunn.com

                             **LAVI MOSHE BEN DOR, ESQ.**
                             2001 Clarendon Blvd, Apt 315
                             Arlington, VA 22201
                             (610) 608-4044
                             lbendor@gibsondunn.com

CONTINUED ON NEXT PAGE

APPEARANCES (CONTINUED):

For Milstein Defendants:    **MARK IAN PINKERT, ESQ.**
                            **JASON BRETT TORCHINSKY, ESQ.**
                            **HOLTZMAN VOGEL BARAN**
                            **TORCHINSKY & JOSEFIAK PLLC**
                            119 S Monroe Street, Suite 500
                            Tallahassee, FL 32301
                            (203) 415-6665
                            mpinkert@holtzmanvogel.com
                            jtorchinsky@holtzmanvogel.com

For San Francisco           **DOUGLAS SMITH, ESQ.**
Nonprofits:                 **MANATT, PHELPS & PHILLIPS, LLP**
                            District of Columbia
                            1050 Connecticut Ave NW
                            Suite 600
                            Washington, DC 20036
                            (202) 585-6508
                            djasmith@manatt.com

For Ilya Shapiro:           **JASON CALDWELL GREAVES, ESQ.**
                            **BINNALL LAW GROUP**
                            717 King Street, Suite 200
                            Alexandria, VA 22314
                            (703) 888-1943
                            jason@binnall.com

Court Reporter:             Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 6718
                            333 Constitution Avenue, NW
                            Washington, DC  20001
                            (202) 354-3187

P R O C E E D I N G S

THE COURTROOM DEPUTY:  We are on the record with Civil Case 25-1540, *Aneesa Johnson v. Georgetown University, et al.*

Counsel, starting with the plaintiff, please approach and state your appearance for the record.

MR. HAMED:  Good morning, Judge; Abdel-Rahman Hamed for the plaintiff, Ms. Aneesa Johnson.

THE COURT:  Good morning.

Don't be shy.

MR. PLATT:  Good morning, Your Honor; Henry Platt for Defendants Georgetown University, Joel Hellman, and George Shambaugh.

THE COURT:  Okay.  Hold on one second.  Just let me get situated here.

Okay.  Mr. Platt, just so that I'm putting names to faces.

MR. PLATT:  Thank you.

THE COURT:  Good to see you.

MS. PAPEZ:  Good morning, Your Honor; Elizabeth Papez, Gibson Dunn & Crutcher, for Defendant Rachel Wolff. And I'm here with my colleague today, Lavi Ben Dor.

THE COURT:  Okay.  And by the way, if the parties are here, they're welcome to sit in front of the rail.

MR. PINKERT:  Good morning, Your Honor; Mark

Pinkert on behalf of the Milstein defendants.

THE COURT:  Okay.  Mr. Pinkert, how are you?

MR. SMITH:  Good morning, Your Honor; Douglas Smith on behalf of Jewish Community Federation of San Francisco and the Helen Diller Family Foundation, collectively the San Francisco nonprofits.

THE COURT:  Okay.  So you're with Manatt; is that right?  You're with the Manatt firm.

MR. SMITH:  Correct.  Thank you.

MR. GREAVES:  Good morning, Your Honor; Jason Greaves of Binnall Law Group on behalf of Defendant Ilya Shapiro.

THE COURT:  Okay.  Good morning.

MR. TORCHINSKY:  And, Your Honor, Jason Torchinsky of Holtzman Vogel, also for the Milstein defendants.

THE COURT:  Okay.  Good to see you.

All right.  We have quite a bit to chew over this morning.  We issued a minute order basically telling you what was most on our minds.  Hopefully you all have conferred on the left side of the courtroom to streamline the arguments as much as possible.  I'd like to start with the Georgetown defendants, and then we'll go from there.

And let's -- I'd like to argue both the motions to dismiss and the sanctions motions first; and then we'll hear from Mr. Hamed on everything; and then we'll leave time for

a brief rebuttal.  Okay?

MR. PLATT:  Thank you, Your Honor.

Henry Platt again for the Georgetown defendants, Georgetown University, Joel Hellman, and George Shambaugh.

Now, the Court has asked us to address the D.C. Circuit's recent opinion in *Joyner v. Morrison and Foerster.*

THE COURT:  Yes.  Why didn't you cite that in your briefs?

MR. PLATT:  Well, we wrote the substance of this brief several times, and when we -- it had just come out, it was written before, and we ran -- we shepherdized it, and no red flags came up, Your Honor.  In hindsight --

THE COURT:  It probably would have been a yellow flag.  It didn't overturn.

MR. PLATT:  We should have followed up more, Your Honor.

That said, we don't think that it actually changes the standard substantively in terms of what you will ultimately need to find here.

THE COURT:  Let's back up.  It doesn't change the standard that many of us applied at the pleading stage for so-called comparator liability?

MR. PLATT:  No, it does, Your Honor.

Well, let me back up.

The Court reaffirmed in *Joyner* that ultimately,

whether at trial or summary judgment, the plaintiff will have to establish that the comparators are nearly identical in all relevant respects.

THE COURT:  Fair enough.

MR. PLATT:  That was the old standard.  Okay?

What the Court changed, what they clarified, which is what your point is obviously, is that it changed the minimum level of factual detail that must be contained in a complaint to pass muster under 12(b)(6) in light of *Iqbal* and *Twombly*.

THE COURT:  Right.

MR. PLATT:  Now, just so we're clear, in this case Georgetown is not arguing that they have not alleged enough facts for the Court to determine whether or not they can plausibly state a claim here.

What we're arguing is that in this specific context of this case, drawing on judicial experience and common sense, as the Court required, the facts that she has alleged in her second amended complaint make clear that she will never be able to make a plausible claim that these comparators are nearly identical in all relevant respects.

THE COURT:  Okay.  Well --

MR. PLATT:  She has overpled, in other words. Okay?  And based on those facts, this Court can clearly find that there is no way that these people are nearly identical

in all relevant respects.

THE COURT:  Okay.  Let's focus on Mr. Shapiro.
Let's put aside the other purported comparators.  I believe
your brief was, you know, a paragraph sort of discussing or
summarily concluding almost that the two were not, you know,
similarly situated.

MR. PLATT:  Okay.

THE COURT:  Let's talk about that.

MR. PLATT:  Sure.

THE COURT:  You know, it seems to me that the
plaintiff has alleged at least some similarities based
on the findings that the two investigations found with
regard to their public statements; the fact that in both
cases the public statements were made prior to their
employment; the fact that both have, you know, at least
some, in Mr. Shapiro's case, outward-facing administrative
duties that would put him in contact with students and other
members of the --

MR. PLATT:  I'm sorry, Your Honor, I'm having
difficulty hearing you.

THE COURT:  I'm sorry.  That both have sort of
outward-facing or student-facing responsibilities.

Both sets of comments at least related to race.
I'm not going to get into, you know, how Mr. Shapiro's
comments should be understood.  I mean, obviously the nature

of the comments are different.  But based on all of those things, and there may be others -- I'm sure Mr. Hamed will add to my list, if it's incomplete -- but why don't those similarities get him above the bar at least for the pleading stage?

MR. PLATT:  Okay.  I, as you, Your Honor, will not get into trying to compare the horribleness of anybody's comments.

Mr. Shapiro was a director of the Supreme Court -- Georgetown Center for the Constitution in the law school.  Plaintiff worked in the School of Foreign Service.  Different schools.  All right.  Already, right there.

She -- I'm sorry.

THE COURT:  Notwithstanding the fact that they worked at different schools, in your view does the complaint indicate who the two decision-makers were in each case?

MR. PLATT:  Well, she --

THE COURT:  There are some references to an overarching university human resources department.  What should I conclude with respect to whether the plaintiff has pled common decision-makers, notwithstanding the fact that they are both in different departments, different schools?

MR. PLATT:  Well, she alleges that Dean Hellman, the dean of the School of Foreign Service, was the one who terminated her.  So right there.

More importantly, perhaps, Mr. Shapiro is a professor. He's an academic. The allegation in the complaint is that he was a tenured professor. She is an at-will probationary employee.

There are a dozen cases, most of which we cited in our briefs, under the old 12(b)(6) standard, but ultimately, you know, those -- we're talking apples and oranges here. You cannot compare a tenured professor, with all the academic freedom issues that reside in that, and a man, however inartfully, talking about a subject matter well within his field of expertise, as opposed to an administrative employee who is counseling students.

Students can choose not to take Mr. Shapiro's courses if they don't agree with his politics. They have no choice about who they are dealing with in terms of counselors and administrative personnel.

THE COURT: Well, Mr. Shapiro is described in the complaint as an executive director of a center in addition to being a professor and a lecturer. One would assume that that would entail some administrative duties.

MR. PLATT: Yes.

THE COURT: Somewhat akin to those that Ms. Johnson may have had in terms of dealing with students.

MR. PLATT: I think they are fundamentally different.

THE COURT:  How so?

MR. PLATT:  Well, he is --

THE COURT:  And -- or more pointedly, how so based on what's in the record before me?

MR. PLATT:  Well, what's in the record before you is he was a tenured professor.

THE COURT:  And the executive director of --

MR. PLATT:  And the executive director.  Those are additional facts.  That's true.

She is not a tenured professor.  She has no academic duties whatsoever.  She's an at-will probationary employee who is meeting with students.

There's no allegation that Mr. Shapiro, as executive director in the law school of this particular constitutional law program, had administrative duties in counseling students.  It's just not in the -- there is no allegation of that.

THE COURT:  Okay.  Ms. Johnson was terminated pursuant to the probationary policy HR-204, I believe.

MR. PLATT:  Correct, and as an at-will employee.

THE COURT:  Is there anything in the record to suggest that that same policy came into play with respect to the admonition that Mr. Shapiro received?  The plaintiff cites 204 in connection with the decision regarding Mr. Shapiro.

MR. PLATT:  Yes.

THE COURT:  I will ask him this.  It's not clear to me how, if at all, Policy 204 related to the termination or the admonition of Mr. Shapiro.

MR. PLATT:  Well, we don't believe it did.  I don't have anything in the record to say that other than the fact that she said he was a tenured professor.  So tenured professors would not be probationary, just going by what she has alleged.

THE COURT:  So Mr. -- the letter that Mr. Shapiro received from Dean Treanor is quoted, I believe, in the complaint.  I believe it's quoted in your briefs.  Is that letter -- may the Court take notice of that letter because it's referenced in the complaint and the briefs?

MR. PLATT:  May the Court -- yes, the Court may take notice of whatever the Court would like to take notice of.

THE COURT:  No, but is it appropriate for the Court to consider Dean Treanor's letter, which includes the reasons or the findings and his conclusions and whatever else is in the letter, but also it mentions the policy under which Mr. Shapiro was found not to have been subject to termination?

MR. PLATT:  If Your Honor would like, I can have my client find you a copy of the letter and do it.  It may

be available on the Internet.  It is not in the record.

He quotes -- counsel quotes part of it in his brief.  The part he quotes in his brief cites to a paragraph of the second amended complaint, which doesn't actually have the language which I think you're referring to in there.  So I don't have that letter in front of me.  I don't know exactly what it says, but if I --

THE COURT:  If you could file a copy of the letter --

MR. PLATT:  I will certainly do that, Your Honor.

THE COURT:  -- for the record.  Okay.

MR. PLATT:  But if I could briefly turn to the others in this case, because, you know, clearly we have an issue with whether Mr. Shapiro is a valid comparator, but for the others, on top of all the tenured/nontenured professor academic stuff, I think it's important to recognize that there is no allegation in the second amended complaint that Georgetown was even aware of these comments.  They do not --

THE COURT:  "These" being the other alleged comparators?

MR. PLATT:  Yes, the other comments.  The comments by Professor Hoffman and the other people that she cites.  Her counsel scoured the Internet looking for comments by Jewish Georgetown professors, which he identified as Jewish

Georgetown professors, that he found offensive.  There is no allegation that an investigation was ever conducted, that Georgetown was even aware that these comments had been made on Twitter, in the Twittersphere.  The allegation is not there.

So if the allegation is not there, if the university didn't consciously make any decisions concerning these employees, then there can be no inference of disparate treatment.  It can't say, well, you know, they didn't do something to somebody because -- about something they knew absolutely nothing about.  And there's no allegation that they did.

So I think the other rationale for disparate -- the comparators we've pretty much covered here.  In terms -- you know, the same allegations are obviously against the individual defendants.  I think it's well settled that there's no individual liability under Title VII.

The same argument goes for the D.C. Human Rights Act and the Section 1981 claims.

Now, if I could turn briefly to the retaliation claims, unless the Court wants me to --

THE COURT:  Sure.

MR. PLATT:  Sure.  The retaliation claims, they're both barred under Title VII by the failure to exhaust administrative remedies.  They're not in the charge.  And

under the D.C. Human Rights Act as far as they're against Georgetown and the other Georgetown defendants, they're obviously time-barred.

All right.  So nothing more to say about that other than the fact that the alleged protected conduct doesn't exist.  What was alleged in the complaint and in the briefs referring to the November 8, 2023, letter email from Dean Heller just didn't say what they say.  We attached it to our motion.  It's Docket 53-5.  We encourage the Court to read it.  It just doesn't say what she says it says.

THE COURT:  This is the contention regarding her being a security risk?  Is that what you're --

MR. PLATT:  Yes, Your Honor.

THE COURT:  Okay.

MR. PLATT:  And likewise, the argument that Title VII and the D.C. Human Rights Act protect political speech as protected conduct is just wrong as a matter of law. We've cited a bunch of cases on that.

THE COURT:  Okay.

MR. PLATT:  As to the hostile work environment, again, she failed to exhaust her administrative remedies. They're time-barred under the D.C. Human Rights Act, but more, she just failed to plausibly plead a prima facie case of hostile work environment.  She bases most of her argument on quotes from Dean Hellman's emails, as I just said, that

don't say what she says they say.

And also -- actually, I misspoke earlier, I'm sorry.  It was -- the November 8th letter from her counsel was the alleged retaliation, that there was protected conduct in there, it doesn't say what she says it said.

We also don't think that a bunch of academics sitting around discussing the three-week-old war in Gaza on a single occasion constitutes severe and pervasive abusive conduct as a matter of law for them.

I think our briefs more than adequately address the remaining claims having to do with, you know, false light and whatnot, intentional infliction of emotional distress.

Unless the Court has any specific questions on any of those, we'll stand on our briefs on that, and I would turn the podium over to Ms. Papez to speak to the other issues that are more common for the other defendants.

THE COURT:  Very well.  Thank you.

MR. PLATT:  Thank you, Your Honor.

THE COURT:  All right.  Good morning, Ms. Papez.

MS. PAPEZ:  Good morning, Your Honor.

THE COURT:  All right.  So before we start, I received a sanctions motion from you at about 7:00 last night.

MS. PAPEZ:  Yes, Your Honor.

THE COURT:  Why did you file it last night?

MS. PAPEZ:  A few reasons, Your Honor.  We have been going back and forth, as Your Honor may recall, from the August conference with plaintiff's counsel on grounds for withdrawing the claims at issue.

After the August conference, based on the SAC the Court allowed in September -- and this is in the history of the brief -- we did reach out to plaintiff's counsel again in the hope that, consistent with the Court's directive, he would confer with us in compliance with the Court's rules. We had another problem with lack of conference.

And then what we did was, to ensure that he had full opportunity to review our claims -- because we take the Rule 11 step very, very seriously; we wanted to be very judicious -- we allowed plaintiff to see the full panoply of arguments in our Rule 12 motions the Court ordered to be briefed in October.

We waited to see plaintiff's response, which actually did not respond to certain claims; and then we again reached out after that briefing was complete to say, "Could you again confer?  You have seen all of our cards, all of our arguments.  We've given you all of our case law. We think they squarely bar some of the claims, including like the one you already withdrew, the defamation.  The other tort claims should be withdrawn," and asked to confer

again.  And plaintiff's counsel declined.

And we allowed the full 21-day period, the cure period, to run.  And we were hoping that we might make progress there and perhaps narrow the issues or maybe moot altogether the need to appear here today.  And the plaintiff did not agree to withdraw anything.

So we wanted to put the motion on file in full transparency that we had a motion and not wait until after the hearing.  And, of course, plaintiff will have the opportunity to brief it, but we wanted to be --

THE COURT:  So, Counsel, there have been a full round of sanctions motions on the docket for months now. This hearing was noticed to consider everything at once, the merits motions and the sanctions motions.

Did you happen to consult the advisory notes to the 1993 amendments to Rule 11 before you filed a motion?

MS. PAPEZ:  In what respect, Your Honor?

THE COURT:  So had you done that, you would have read that "Ordinarily," I'm quoting, "the motion should be served promptly after the inappropriate paper is filed, and if delayed too long, may be viewed as untimely."

So the idea is to, you know, get your sanctions motions in as soon as possible after the offending papers have been filed.

I haven't read your motion, but I skimmed it, and

I didn't notice anything that has changed since the second amended complaint was filed months ago now.  And so I guess the question is, you know, given the untimeliness of it, why shouldn't the Court strike the motion?

MS. PAPEZ:  Well, a couple of reasons, Your Honor.

Number one, respectfully --

THE COURT:  And I would add, you've requested a hearing.  Are you proposing that we -- that you be heard at this hearing without giving Mr. Hamed an opportunity to respond?  Or you would want the Court to convene yet another motions hearing at some point down the line?

MS. PAPEZ:  No, of course not without --

THE COURT:  Okay.

MS. PAPEZ:  We were contemplating another hearing on the motion.  We obviously do not agree that it's untimely, and we do think some things have changed.

Again, we reached out to the plaintiff's counsel after the SAC was filed.  Did not get a response on some of the issues.  And then after the briefing was complete on our motion to dismiss -- and I want to be clear, we wanted to be very judicious.  We take the step of a Rule 11 motion very, very seriously, Your Honor.  So for our part, we wanted to see, once we laid out the arguments in the motion to dismiss, what the plaintiff's response was.

Plaintiff did not have responses to some of the

claims, and we thought, Okay, that's an opportunity to say we've briefed it.  You didn't have a response.  This is a new ground to say would you withdraw some of the claims that you've placed before the Court and are at issue in our motion so we could try to narrow the issues before the Court.  That was an appropriate, in our view, thing to do procedurally, and also a very cautious step to take before moving for sanctions.

The plaintiff did not comply.  We filed the motion.

I understand if, you know, the plaintiff's counsel wants to move to strike or to raise timeliness arguments.  He has not.

I think the course of conduct on the plaintiff's side -- and there are new facts that are set forth in that motion -- would justify at least briefing in separate consideration of that motion separate and apart from what we're here on on Rule 12 today.

THE COURT:  So your safe harbor letter was sent soon after the Court issued its minute order regarding this hearing indicating that it would entertain or was interested in the sanctions issue.  Did that have anything to do with the timing of your motion?

MS. PAPEZ:  Well, yes, we sent the safe harbor letter, as I recall, in September, then allowed the

briefing; and then sent another safe harbor allowing, on the new facts and the failure to address arguments in the Rule 12 briefing, another opportunity to cure before this hearing was scheduled and withdraw the issues and the claims against Ms. Wolff that were placed before the Court for this hearing.

That, we understood, was the purpose of that exercise, is to say, "Look, we've now exhausted our briefing and our grounds for saying we don't have a basis for these claims. Would you withdraw them and moot the need for the Court to adjudicate at least some of the claims on the Rule 12 motion."

And we did that in accordance with the rule under the safe harbor in the time you prescribed and was able -- and then we were able to get it on file before the hearing. No surprises.

THE COURT:  Okay.  So you were just being safer and more prudent than all of your colleagues?

MS. PAPEZ:  I wouldn't say that, Your Honor.  We were being very, very careful and prudent with respect to our own view in our course of dealing with the plaintiff's counsel on the claims in our case.  And the plaintiff's counsel's briefing in response to our Rule 12 arguments did concede some issues about our positions that we thought were fresh grounds that we raised in our safe harbor letter after

the motion to dismiss briefing was complete that we thought did move this case into territory that would support a motion by our client under Rule 11, which we agree with Your Honor is a different standard and a very, very serious motion.

We take the issue of a sanctions motion very seriously and in our case wanted to ensure that we felt we had given not only ample opportunity but had grounds above and beyond what we viewed to be grounds for dismissal with prejudice under Rule 12 to bring the separate sanctions motion. And that was genuinely -- that's the record. That's what we did. And there were different grounds for it that we felt put, in our case, our interactions with plaintiff beyond the Rule 12 box and into the Rule 11 box after the briefing was complete.

THE COURT: Okay. All right. Well, I've put the cart somewhat before the horse. Please proceed on the motion to dismiss issues.

MS. PAPEZ: Thank you, Your Honor.

I will briefly address the First Amendment grounds for dismissing the six counts in the SAC against Ms. Wolff, and subject to the Court's questions and with the Court's permission, my colleague, Lavi Ben Dor, will briefly address the alternative grounds, non-First Amendment grounds for dismissing those counts subject to the Court's questions.

The First Amendment ground is straightforward. The SAC is the third complaint in this case. The only conduct or facts that it pleads against Ms. Wolff are her republication of Tweets that are in the complaint in the form that plaintiff published them. No editing. No cutting. Republished them and attached to them statements of opinions. So we are squarely within this Court's and the D.C. Circuit's decisions in *Florio* on those issues.

The plaintiff on the SAC dismissed the defamation count, which was the count at issue in the *Florio* case, but has repled, and as Your Honor noted in August, a false light claim and two other tort claims, the tortious interference with contract and intentional infliction of emotional distress.

The *Farah* case from the D.C. case, and it's well settled, you can't do through the back door what you couldn't do through the front.

So dismissing the defamation count does not change the fact that all of the conduct that is pled against Ms. Wolff is protected speech and opinion of truthful factual predicate accompanied by protected opinion on a matter of public concern, and the tort claims cannot end run that under a different banner. So that's the case on the torts.

There is the aiding and abetting, the

discrimination in violation of the D.C. --

THE COURT:  So on tortious interference.  Correct me if I'm wrong, but it is not part of the plaintiff's prima facie case to allege improper conduct.  And so the question is at the pleading stage can I consider these affirmative defenses of, you know, First Amendment and she didn't do anything other than state an opinion or republicize the plaintiff's own words?  Is that a proper pleadings requirement, or is that an affirmative defense that I need to decide at summary judgment?

MS. PAPEZ:  No, Your Honor, I think that's a great question.  You know, *Florio* was a 12(b)(6).  It is absolutely a pleading stage issue whereas --

THE COURT:  *Florio* was a defamation case.

MS. PAPEZ:  Right.

THE COURT:  It was not a tortious interference case.

MS. PAPEZ:  But even for tortious interference, you have to plead some actionable, i.e., not legally protected conduct as the act of the interference.  And in this case, with respect to the First Amendment, we have other defenses Mr. Ben Dor will address.  But if the Court would prefer to go in an alternative ground, we certainly have many.

But on the First Amendment issue, the problem

here -- and it's the *Farah* point about the back door.  I mean, if one could do that and just say, Well, it's not defamation or false light, it's another tort, and I'm going to call it an affirmative defense, the only conduct that's pled as a matter of law --

THE COURT:  But tortious interference is a different -- I mean, I agree with you that false light and defamation are close cousins.  Tortious interference is a somewhat different tort or a more different tort.

MS. PAPEZ:  Sure.  But so is IIED, right?  The intentional infliction was the count, for example, at issue in *Snyder v. Phelps* that went through summary judgment, as I'm sure the Court is aware.  But in all those cases what you see that gets a complaint past the pleadings is allegations of factual conduct above and beyond what we have here; namely, a truthful republication of speech accompanied by a protected opinion.

And the reason I stress this, and I think it's easy on the pleadings here, is because the plaintiff's opposition -- and this is important -- concedes that false predicate is necessary.  The opposition concedes that.  And then she tries to plead that falsity is inherent in this decontextualization.  She makes a decontextualization argument.  That is squarely *Twombly* labeled in conclusions.  Decontextualization is if I take someone's speech and I cut

or edit it, for example.  Right?

If I make a statement, "I love free democracies, and I hate Nazi fascism," and you cut out the middle and then you call me a Nazi sympathizer because you clipped my quote and you say "I love Nazi fascism," that's clearly a false predicate.  There's decontextualization in actually editing, clipping, or altering someone's speech.

Similarly there can be decontextualization in the terms of, say, a professor at a school reading a racial epithet from Huck Finn and somebody taking that out of context and saying that was a racial slur.

So I think decontextualization is real, but it relates back to the key element here, which is, when you've got a complaint that concedes falsity is required as the predicate for all of these torts, and also concedes that the speech here was republished exactly as the plaintiff published it, and the decontextualization is the person who republished it didn't somehow divine what was in the mind or the motive of the original speaker, there is no case nor could any Court administer that standard.

So I think with respect to all of the torts, and when you look at cases like *Snyder v. Phelps* with the IEED just like a tortious interference, you need to plead facts above and beyond the core speech here that is inactionable as a matter of law.  And in *Snyder*, for example, it was like

crashing a private funeral and harassing and intimidating the family with slurs and antihomophobic slurs and putting information on the Internet that incited, you know, violence and interruption against them.

And then there was the false statements, Your Honor, on the speech. If you read *Snyder*, and you look at the complaint underlying it, there was an allegation that the maligned deceased marine was an adulterer and part of the pedophile operation of the Catholic Church. So those were statements of fact, and the Court went out of its way to say there was no proof. It was provably false that he was an adulterer. So the predicate there was false.

We don't have that here; and after three complaints, it has not been pled. So I think the answer on all three of the torts under all of the case law is that the First Amendment renders the only factual conduct by Ms. Wolff inactionable as a matter of law at the pleading stage under *Farah*, *Florio*, and the Supreme Court cases.

And with respect to the remaining cases it's the same thing. We have the aiding and abetting under the D.C. Human Rights Act --

THE COURT: I'm going to ask you to slow down just a little bit for the court reporter.

MS. PAPEZ: I apologize, Your Honor.

Those are covered in our briefs. If the Court

doesn't have questions about those on the First Amendment grounds, if I may --

THE COURT:  Sure.

MS. PAPEZ:  -- I will turn it over to my colleague, Mr. Ben Dor, so that he may address the alternative grounds for dismissal.

THE COURT:  Thank you.

Okay.  Mr. Ben Dor.

MR. BEN DOR:  Good morning, Your Honor.

THE COURT:  Good morning.  How are you?

MR. BEN DOR:  Good.  How are you?

THE COURT:  Doing well.

MR. BEN DOR:  So I'd like to pick up where my co-counsel left off --

THE COURT:  Okay.

MR. BEN DOR:  -- and address some of the other grounds for dismissal in addition to the First Amendment that we've raised that we think are the clearest alternative pathways that favor dismissal with prejudice to the claims against our client.

So on the tort claims, the statute of limitations, we believe that the claims are plainly time-barred under the D.C. law's one-year statute of limitations.  So the statute expressly covers libel and slander, but the D.C. Circuit, the D.C. Court of Appeals, has repeatedly affirmed that the

claims intertwined with libel, slander, defamation, false light, any claim like that that involves publication of false statements about another person --

THE COURT:  How is the tortious interference claim intertwined with the defamation or false light claim?

MR. BEN DOR:  Because if you look at the conduct that is alleged -- this is Paragraph 448 of the second amended complaint -- all of the conduct that is alleged is the Tweets that Ms. Wolff posted.  So she interfered by, quote, deliberately publishing viral defamatory Tweets, and then, quote, continuing the harassment campaign with subsequent --

THE COURT:  In considering whether two types of claims are intertwined, is the Court to do that in a general way or in a way that's specific to the claims in the case?

MR. BEN DOR:  We think it's --

THE COURT:  So one statute -- can one statute be intertwined for one type of claim but not for another type of claim depending on what the factual allegations are?

MR. BEN DOR:  Absolutely, Your Honor.

THE COURT:  Okay.

MR. BEN DOR:  We believe the inquiry isn't a claim-by-claim analysis, other than, of course, libel and slander that is expressly mentioned in the statute.  The inquiry is whether the claim as framed in the complaint is

intertwined with -- i.e., it does not exist separate and apart from -- the allegations of defamatory conduct.

So *Browning*, the case we cite in our briefs from the D.C. Circuit, it's a Rule 12 case, and it looks and it says that where the -- one of the claims was where it was based on conduct characterized as defamatory, and that, quote, forms the sole basis for the tortious interference claim.

THE COURT:  So even though one can tortiously interfere without using protected speech or arguably protected speech, those two claims can -- should be considered intertwined in this case?

MR. BEN DOR:  Absolutely.  And that's where *Browning* draws the line, and it said that some of the tortious interference claims that allege other conduct were not time-barred because they were not intertwined, but those that did focus on it.

THE COURT:  Okay.

MR. BEN DOR:  And we think the same goes for our other two claims.

So on the false light claim, Paragraph 47, the core allegation is Ms. Wolff, quote, published viral Tweets. And on IIED similarly, Paragraph 429, the conduct at issue is broadcasting defamatory material.

So in each of the claims, the only conduct that is

alleged in the claim that Ms. Wolff engaged in that is potentially actionable is her posting of these Tweets, and those Tweets -- you know, plaintiff repeatedly refers to them -- despite dropping the defamation claim against our client plaintiff repeatedly refers to them as defamatory Tweets.  And so the complaint itself makes clear that defamation is core to each of the complaint -- each of the tort claims as pleaded here.

On aiding and abetting, we -- similarly the statute of limitations.  So at the time of the events here, it was a one-year limitations period.  That has since changed, but this Court has held that for claims that are based on conduct before early 2025, the one-year limitations period still applies.  And here the only -- all of the potentially relevant conduct --

THE COURT:  This Court or one of my colleagues?  Is it a DDC case or...

MR. BEN DOR:  DDC, yes, your colleague, Your Honor, Judge Contreras --

THE COURT:  Not me.  Judge Contreras, okay.

MR. BEN DOR:  -- and Magistrate Judge Sharbaugh.

And on the one-year limitations period here, all of the events occurred in November 2023.  So whether you look at the conduct, the Tweets, which was November 2nd, whether you look at when Plaintiff found out about that

conduct, which is Paragraph 136, she learned of the Tweet the same day, November 2nd, and the latest possible event anywhere potentially relevant to our client is the termination on the 27th, and that the claims -- the suit here was not brought until more than a year after that.  The claims were asserted well over a year after.

THE COURT:  Okay.

MR. BEN DOR:  And our client was not named in the EEOC charge, the D.C. Office of Human Rights charge, so there are no tolling concerns.

THE COURT:  Okay.

MR. BEN DOR:  And then on our -- on the statutory claims -- so there's a 1981 claim against our client and a 1985(3) claim against our clients.  And for each of those, they claim on -- they fail on threshold grounds.

So Section 1981, there is a lack of authority.  So plaintiff pleads expressly that Ms. Wolff, quote, was not Ms. Johnson's supervisor or employer and had no authority over her employment relationship.  That's Paragraph 463 of the amended complaint.

And the cases we cite in our brief from DDC from the Tenth Circuit that we cite, a Northern District of Texas case, in our reply brief, that sort of canvasses this area. Courts have consistently held that the defendant has to have authority in some way over the employment relationship such

as being a supervisor, a manager, some sort of authority over employment. And here, admittedly, you know, the complaint itself admits Ms. Wolff was an outsider to plaintiff's relationship with Georgetown, had no authority over that relationship, and thus is not a proper defendant under 1981.

THE COURT: So one third party cannot aid and abet an employer's 1981 violation?

MR. BEN DOR: Yes, Your Honor, that's what the cases have held.

And then on Section 1985(3), there is the lack of a conspiracy here. So even at the pleadings stage, courts in this district have held that -- we cite the *Black Lives Matter* D.C. case. We cite several other cases, such as the *Ashborn* case, that say that even at the pleadings stage you have to allege something, some sort of facts to support the inference that there was an agreement, a meeting of the minds, a conspiratorial agreement formed. And there's no plausible factual allegation in the complaint that our client had any interaction with the other defendants, much less formed some sort of an agreement with them, so --

THE COURT: So one can't infer or generously infer a conspiracy through parallel and contemporaneous actions here?

MR. BEN DOR: Right. And that's the teaching of

*Twombly*.

THE COURT: I'm asking.

MR. BEN DOR: Oh, sorry. Yes, that is our view. That is what *Twombly* says, is that parallel conduct even at the 12(b) stage is not sufficient. You need to do more to support the inference. To rebut the plausible alternative inference that this was just parallel conduct, you need to allege something to support an inference that this was actually coordination and agreement, a meeting of the minds, and the mere accusation of a, quote, Zionist conspiracy, as alleged repeatedly in the complaint, these sort of generic conclusory accusations that all these defendants conspired does not suffice under *Twombly* and under *Iqbal* because you need some sort of facts, some sort of details, to support the inference.

So whether you look at direct allegations of an agreement or other facts supporting circumstantial evidence, there's just none of that as to our client.

THE COURT: Okay.

MR. BEN DOR: And finally we'd ask that the Court dismiss with prejudice. We believe that's appropriate here because there are multiple threshold grounds that bar these claims that cannot be resolved through further pleadings. So be that the First Amendment, be that the statute of limitations issue, be that the lack of authority issues, all

of those cannot be overcome by further pleading, particularly given the opportunities that plaintiff has had to amend.

We believe that the continuation of the suit itself has a chilling effect on our client's First Amendment rights.  For that reason, we'd ask the Court to dismiss with prejudice.

THE COURT:  Okay.  Thank you.

MR. BEN DOR:  Thank you, Your Honor.

THE COURT:  Next up.

MR. PINKERT:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. PINKERT:  Mark Pinkert for the Milstein defendants.

THE COURT:  Good morning, Mr. Pinkert.

MR. PINKERT:  Good morning.

If it's okay, I'll focus you on the Rule 11 arguments and will try to streamline it with Mr. Greaves and Mr. Smith as well.

THE COURT:  Sure.

MR. PINKERT:  We understand that the Court takes Rule 11 very seriously and is not going to issue sanctions lightly.  We take these motions very seriously ourselves. But in this case we think Rule 11 sanctions are warranted because, frankly, the claims against our clients are

outrageous, Your Honor.

THE COURT:  Okay.  So you're named in the aiding and abetting and civil rights conspiracy.

MR. PINKERT:  Civil rights conspiracy.

THE COURT:  Okay.

MR. PINKERT:  And we think there are four bases for sanctions.

The first is that there is no reasonable argument in any existing law for the claims against the Rule 11 movant.  Not only is there no cause of action, there are multiple clear legal bars that counsel either ignores or in some cases concedes or cites the binding precedent that precludes his claim and yet maintains the lawsuit anyways.

In addition, we think the evidence is clear that this lawsuit was brought for improper purposes.

THE COURT:  All right.  Let's start there.

MR. PINKERT:  Sure.

THE COURT:  Since that's the first prong of Rule 11.

MR. PINKERT:  Yes.

THE COURT:  As I read your papers, you are asking me to infer an improper purpose from the combination of the lack of basis, factual and legal, for the claims which is Part (b) and (c) of the rule, and statements that Mr. Hamed has made on Facebook and other social media platforms that

are clearly protected by the First Amendment, as your clients have or, you know, the defense generally has said about the texts that the plaintiff complains of.  Right?

And so I'm a little comfortable -- a little uncomfortable divining someone's intent through their protected speech.  And so if that's all you've got, why shouldn't I just decide this based on Subsections (b) and (c)?

MR. PINKERT:  Well, an improper purpose, Your Honor.  We are not saying that Mr. Hamed is not free to say whatever he wants on LinkedIn.  None of the defendants are here today trying to stop him from doing that.

We are inferring his intent of improper purpose not only based --

THE COURT:  I'm sorry.  I don't mean (b) and (c), (b)(2) and (b)(3).  Go ahead.

MR. PINKERT:  If you look at his statements on LinkedIn that he wants to harm Zionists, eradicate them, ensure that they never know sleep, and then in the pleadings go and say these are Zionist conspirators, Zionist operatives.  So I think it's safe to use that evidence as a motive here.  Often motive is inferred from someone's speech.

We're not stopping him from saying that.  We -- what he cannot do is drag us into court because our clients

are prominent Jews and Zionists in the community.  And even if you put aside the LinkedIn posts, the complaint itself and all of the pleadings, the political diatribes referring to criminal conspiracy, criminal Zionist conspiracy when none of the alleged co-conspirators have ever even spoken to one -- there's not even a single allegation that they've ever spoken to one another.

The *Black Lives Matter* that my friend here mentions, there were officials in a room there talking and even that wasn't enough.

Here the only thing that connects the alleged co-conspirators is that they're Zionists.  This is, frankly, a classic anti-Semitic trope, Your Honor, that because these are prominent Zionists who support the State of Israel and support the Jewish community, that they are engaged in a shadowy conspiracy.  You don't even have --

THE COURT:  I've read your briefs.

MR. PINKERT:  Okay.  So that would be the improper purpose.

The third and fourth reason, Your Honor, is there have been several examples of litigation misconduct in this case, violating court orders and court rules, violating or misrepresentations to the Court, misleading citations, as Georgetown pointed out earlier.

And finally, we think that Rule 11 sanctions are

required because the deterrence is required.  The Milstein defendants, Mr. Hamed has sued them in the Northern District of Georgia on a similar theory --

THE COURT:  Where is that case procedurally?  Have any decisions been made either on the merits or on the sanctions issues?

MR. PINKERT:  Not all of the defendants in that case have been served.  My client, the Milstein defendants, we've fully briefed the motion to dismiss and another motion for sanctions there.  So that is recently ripe, both of those motions.

THE COURT:  Okay.  Do you have hearings scheduled, or no?

MR. PINKERT:  Not yet.

And I did want to focus a little bit on the lack of any grounding in law, which, again, you can decide sanctions based on that.  I think to do that I do want to -- and I know you've read the briefs, but I just want to quickly recap the allegations against the Rule 11 movants and sort of what this whole case is about.

So as you know, in 2015, Ms. Johnson makes a series of posts on Twitter.  We haven't stated on the record yet today, but one of those posts is a picture of an orthodox Jew.  You've seen it.

THE COURT:  I've seen it many times.

MR. PINKERT:  Okay.  Canary Mission captures her posts, and it reposts them in 2015.

Ms. Shapiro [sic] reposts Ms. Johnson's Tweet, as Ms. Papez pointed out in her opinion, which we think she's absolutely entitled to do.

Mr. Shapiro then reposts Defendant Wolff's Tweets adding only her name and job title, nothing else.

And so that brings us to the nonprofits, the Milstein defendants and San Francisco nonprofits.  These are charitable nonprofit organizations based in California who, as I said earlier, support the Jewish community.  There is not one allegation in the complaint that any of them ever spoke to Ms. Johnson, that they spoke about her to anyone, that they posted anything on Twitter about her, or even directed or instructed anyone to post anything about her.

There's also not a single allegation that they spoke to anyone at Georgetown about anything, much less about her, and they did not communicate with each other at any given point.

The only conduct that the Milstein defendants are accused of, according to a 2018 *Al Jazeera* article, someone said that Adam Milstein is the guy who funds Canary Mission.  This is the website in 2015.

THE COURT:  Plaintiff cites reporting in *The Forward*, he cites reporting in the nation, that these were

not simply one-off donations but a continuing series of donations up to the present that involve not only donations but also strategic consulting or discussions about strategy of Canary Mission.

I'm not saying that it's this case, but certainly Canary Mission's recent activities have been subject to some, dare I say, widespread criticisms, not just by activist groups but by more moderate, so to speak. I don't want to label anybody, but folks like J Street and Erwin Chemerinsky, according to the plaintiff.

And I guess the question is would -- is it so far-fetched or frivolous to attempt to link a donor under those circumstances to torts committed on the other end, knowingly by a group like Canary Mission, you know, if, in fact, it is doxxing, so to speak -- and I'm not sure exactly what that means, I will ask Mr. Hamed about that -- or interfering with employment relationships of folks who are simply going to a protest to exercise their First Amendment right to say how they feel about Israel's perpetration of the war.

You know, if there is a plausible basis for alleging that a donor not only supports those activities, but also is engaged in, you know, strategizing and knows that the activities and perhaps would like the activities to take place -- I'm not saying that your client is in that situation, but if there were a factual basis based on

reporting to implicate a donor in the actions of a principal, particularly one who has chosen not to appear in this jurisdiction or other jurisdictions to account for those allegations, what's so far-fetched about that.

I'm not saying that it states a claim. Okay? But from a sanctions perspective, is that so beyond the pale that, you know, someone should be imposed -- you know, the Court should impose monetary sanctions or other sanctions?

MR. PINKERT: It is, Your Honor, under the claims that are stated because none of the elements are --

THE COURT: Okay. So your response is that's not this case.

MR. PINKERT: Well, even let's assume that it is, and these articles are from 2018 and 2019.

THE COURT: Okay.

MR. PINKERT: So putting aside the statute of limitations and the timeliness, you said Canary Mission accused of torts, and we disagree with the premise that if Ms. Johnson goes into the public square, and the Supreme Court in the *Packingham* case and in *Moody* says, "Twitter, for better or worse, is the modern public square," and she publishes something to the world, a website is absolutely allowed to repost that.

THE COURT: So that's not this case. It's not doxxing in the sense of publicizing private facts or

publicizing someone's home address or telephone number.  And so you're distinguishing the hypothetical that I spun out --

MR. PINKERT:  I'm sorry.  I misunderstood.

The hypothetical is doxxing or revealing private information or reaching out to an employer and interfering with the contract.

THE COURT:  Or defamation.

MR. PINKERT:  Or defamation.  But that is not this case.

THE COURT:  Okay.

MR. PINKERT:  The Canary Mission's conduct, which is clear from the complaint, is simply that they reposted her own Tweets and, as Ms. Papez said, didn't distort them or anything like that.

And I would just add, Your Honor, you know, whether one finds that offensive in some respect, for better or worse, this is the modern public square.  There are lots of websites that do just that on both ends of the political aisle, on both ends of the Israel-Gaza debate.  There is, in fact, an Anti-Canary Mission where my client has a profile on that.  That is the rough and tumble of the First Amendment public square.

And so I'm distinguishing your hypothetical because --

THE COURT:  What's the line between the rough and

tumble of the public square and conduct that is legally actionable, in your view?

MR. PINKERT:  Well, I think first you would need to be able to state the elements of the cause of action. And I'm happy to walk through the --

THE COURT:  Or more appropriately, in the sanctions context, you know, an argument that existing law could be or should be expanded to include some of the more arguably unsavory elements of what has been reported?

MR. PINKERT:  Yes, and I do want to get to that point.  And I direct you to counsel's response to the Rule 11 motion at Page 8.  That's Docket Entry 62.  And he repeatedly says that Courts haven't caught up to this reality.  He says he wants to devise novel theories of accountability.  Courts have not acknowledged the need to re-evaluate old precedence in light of modern technological realities.  But he doesn't make any arguments from any existing case law as to why that should happen.

He essentially says, "I think there's a social problem.  It's not fair that my client can say whatever she wants, but then have that be repeated.  So I want the Court to invent a tort."

He says that.

THE COURT:  Well, there have been some states who have passed antidoxxing tort laws, correct, that would be

aimed at similar types of conduct?

MR. PINKERT:  I'm not sure, Your Honor.  But even if they have, they would still have to contend with the First Amendment to the extent in this case there's no actual revealing of unwanted private information.  It's just reposting of her public Tweets.

The Rule 11 doesn't allow a litigant to say, you know, "I want the defendants to be liable.  There's a social problem.  We feel that we've been wronged.  And so you should invent new civil rights law."

That, if anything, is the role of Congress.  And counsel has not made any reasonable arguments based on Section 1985(3) or under the D.C. Human Rights Act.

And let me just make a few points on Section 1985(3).  We've heard today that there's no plausible allegation of a conspiracy, no agreement to participate in any unlawful act if the manifestation of this conspiracy is just Tweeting.  This is essentially people Tweeting back and forth on Twitter.  That cannot be the object of an unlawful conspiracy.  I'd also say there's no civil rights violation.

The Supreme Court in *Novotny* says that the object of the 1985 conspiracy employment discrimination, that is foreclosed by Title VII.  We've cited that case multiple times.  Mr. Hamed even cites it in his briefing at Docket Entry 63 at 81 in support of his case.  But he never offers

any explanation as to why, when he says this is a cut-and-dry employment case, why the *Novotny* case doesn't squarely foreclose his 1985(3) allegation.

So we've got clear Supreme Court law that he refuses to address to make an argument from existing law that there's a basis to distinguish it and that it should be overruled, that there's scholarship, that there's a dissent he can rely on.  Nothing.

And the last point I'll make on 1985 is you need racial animus.  The very first line of the motion to dismiss opposition is that she said she's being targeted for her protected political speech.  So this notion that this is based on race, the entire theory of her case is that people are criticizing her political speech.

So there's just no plausible 1985 claim.

The D.C. Human Rights Act claim, she's not -- the plaintiff does not comport with any case where someone who lacks supervisory authority or relationship with the employer can aid and abet employment discrimination.  She cites the *Wallace* case where they're partners at the law firm, I believe it's Skadden Arps.  They were alleged to have participated in the discriminatory conduct.

Here, there's not even an allegation that any of the Rule 11 movants contacted Georgetown.  Even -- again, even knew she existed.  So our clients just have nothing to

do whatsoever with this employment dispute, and they're being dragged into court.

And so we think those two claims -- there's no possibility that either the civil rights conspiracy or the D.C. Human Rights Act claim, the aiding and abetting, could go forward, could ever possibly succeed, and he doesn't make successful arguments.

THE COURT:  Okay.  Assume for the sake of argument that I agree with you that there's been some variant of a Rule 11 violation here.  Why should the Court jump straight to monetary sanctions or reimbursement of costs and fees as you all have suggested?

Obviously Rule 11 is meant to deter.  It's not meant to punish.  As I understand it, this is the first suit of this nature.  There may be another one close in line down in Atlanta, but in light of those considerations, why wouldn't sanctions short of monetary sanctions be more appropriate?

MR. PINKERT:  For a few reasons, Your Honor.

First, for deterrence.  As I said, there's already been one copycat lawsuit, and we believe that the --

THE COURT:  Well, I don't -- I mean, there have been no judicial findings.  That lawsuit is in front of a judge in Atlanta.  I'm not sure who the judge is.  Perhaps that judge -- I suspect there's sanctions motions down there

as well -- could make a determination as to whether it's, in fact, a copycat suit and the same violations that have been noted here, if any are noted, have been repeated there.

Why wouldn't that be a better order of operations given the purpose of the rule?

MR. PINKERT:  Well, because -- well, I would say first, you know, the copycat litigation is not the only reason to award monetary sanctions here.  You see a lot of lawyers in the room.  A lot of people have been dragged into this lawsuit.  A lot of time and resources have been spent over the last year.  There have been three iterations of this complaint.  There have been violations of the court rules.  The case, we believe, has been dragged on unnecessarily, and we believe the process is the punishment.

THE COURT:  Now I have another sanctions motion.

Anyway...

MR. PINKERT:  Your Honor, I know you said you're uncomfortable with looking at Mr. Hamed's LinkedIn.  He wants to make sure that Zionists do not know sleep.  He wants to punish -- impose a tax because our clients -- because of our religious or political beliefs, however you conceive of it.  He's identified people who are Zionists who have no connection to Ms. Johnson's employment dispute, and he's gone after them and is draining their resources.  That is the point.  And that is why deterrence is required.

And also so that, you know, these are -- not only does he not have claims under 1985 and the D.C. Human Rights Act, what I didn't get to is that he's maintaining this lawsuit in the face of several clear bars to suit in the face of personal -- clear lack of personal jurisdiction, the First Amendment, statute of limitations.

And, again, the notion that a donor to -- an indirect donor to the Canary Mission can be held liable for Canary Mission speech without anything more than just that allegation in a 2018 article, if you donate to any charity, you don't automatically become a member of a conspiracy with that charity and then liable for all of its conduct ten years later.

So it's not just the punishment --

THE COURT:  Plenty of charitable donors have faced allegations not too distinct from that.  And I believe Mr. Hamed may tell me that that's the -- sort of the legal framework that he had in mind when he tried to bring in the donors here.

MR. PINKERT:  I do not see any allegations in the complaint of alter ego or veil-piercing based on control, shell companies, anything like that.  So it cannot be enough just to donate.  You would need far more than has been alleged.

THE COURT:  Of course.  Okay.

MR. PINKERT:  So if there are any other questions?

THE COURT:  Wrap it up.

MR. PINKERT:  I'll pass it on to Mr. Greaves.

THE COURT:  All right.  Next up.

MR. GREAVES:  Thank you, Your Honor; Jason Greaves on behalf of Ilya Shapiro.

THE COURT:  Mr. Greaves.

MR. GREAVES:  And I will attempt not to belabor anything --

THE COURT:  Okay.  Thank you.

MR. GREAVES:  -- that has already been addressed.

My client is nearly identically situated as Ms. Wolff in this case, so everything that they've argued obviously applies, and I adopt the able arguments of my co-counsel there.

What I was here to sort of address is --

THE COURT:  You have a personal jurisdiction argument that Ms. Wolff does not have, correct?

MR. GREAVES:  That's true.  The Milstein defendants also have a personal jurisdiction argument, and we've adopted that as well.

THE COURT:  Okay.

MR. GREAVES:  And I guess the other distinguishing characteristic to my client is he actually has an affidavit in the record refuting any basis for personal jurisdiction

in this case and also refuting any speculative notion that he was involved in any conspiracy because he's sworn on the record he had no idea who this plaintiff was, who Ms. Wolff was, before any of this took place; and so there's even less of a reason for him to be in this lawsuit.

But, again, I'm not going to belabor the dismissal aspect of this case. I think that's already very well briefed. My intent was to touch on Rule 11, the improper purpose, which has already been addressed a bit by Mr. Pinkert, and I want to emphasize here the words of my mentor out of law school. One of my mentors was Judge Jonathan Thacher out of the Fairfax County Circuit Court. He was well known for coming down harshly on litigants and their attorneys for abuse of the judicial process or frustration of the judicial purpose.

THE COURT: So there is an abuse of process claim that you all could have brought as a counterclaim, correct?

MR. GREAVES: Correct.

THE COURT: And you didn't do that.

MR. GREAVES: No, Your Honor. We didn't find it necessary or expeditious to do so.

But specifically -- and while my wording was a little bit inartful there, but specifically talking about the frustration of judicial purpose, which is this Court's touchstone for imposition of sanctions, and the words that

Judge Thacher was famous for telling litigants before imposing sanctions in the Virginia equivalent was "The courtroom is a place not for the airing of grievances.  It is a place for the articulation of causes of action based on law and on fact.  If you want to air your grievances, go to your church or your mosque or your synagogue."

And so the improper purpose here, I wish we didn't even have to address it because, as Your Honor noted, you don't need to go there to impose sanctions, at least as to Mr. Hamed.  It's different for the plaintiff herself, because the rule restricts the imposition of monetary sanctions against her unless there --

THE COURT:  Let's touch on that point for a minute.  What evidence or facts would the Court rely on to extend the pleading here and attribute it to Ms. Johnson?

MR. GREAVES:  Your Honor, the evidence for that -- the combination here, and Mr. Pinkert already touched on this, but it is a combination of the words of the plaintiff herself, the underlying Tweets here.

THE COURT:  When she was a freshman in college eight years ago?

MR. GREAVES:  Yes, but as pled in the Georgetown pleadings, Your Honor, and as pled by Ms. Johnson herself through the incorporated documents, the letters, you know, all the stuff that went on at the Georgetown, you know,

termination, it is noteworthy here.  It is important to recognize that she was not fired, at least as Georgetown articulates, because of Tweets that she made ten years earlier.  She was fired because she stood by those Tweets.

It is inferable --

THE COURT:  That's not quite fair.  She was fired both because of the Tweets and, as I understand it, being advised by counsel, different counsel, she chose not to discuss them or address them to the tribunal that had been set up.  Isn't that more fair for whatever reason?

MR. GREAVES:  You can characterize it that way, Your Honor.  I would characterize it as to this date she has not refuted or denounced or said anything about a change in her views.  And the complaint itself continues to double and triple down on those views.  So I think that the Court can infer that she's unapologetic for those views, and so it is inferable that her choice to make the allegations that she's made in this complaint, which are just filled with anti-Zionist rhetoric, her stated and to date, you know, unapologetic hatred for Zionism and her chosen counsel's public statements, all of those things combined -- I'm not going to belabor all of that -- they do combine to be able to infer an improper purpose not just of counsel but of the plaintiff herself.

I do understand the Court's reticence to infer --

you know, to divine what someone thinks in their mind. However, the cumulative facts in this case just simply cannot be ignored. And I do want to emphasize the deterrent requirement. Your Honor mentioned, Why should I do monetary sanctions? Why should I jump there when I can just dismiss this complaint?

THE COURT: Or some lesser sanction.

MR. GREAVES: I'm not sure what lesser sanction would deter future lawsuits like this, especially in the ideological environment that we are currently in. To do anything less I think would just invite more of this type of lawsuit, not necessarily from this plaintiff or from this attorney, but from any, you know, opportunistic, well-funded -- let's say some other nonprofit organization wants to, you know, make a point against some idealogical opponent, and they file a lawsuit. As long as there's no monetary sanctions, what have they done? They've wasted time. They've wasted time and resources --

THE COURT: They've been found in violation of Rule 11, which is what they've done, which is no small --

MR. GREAVES: I understand.

THE COURT: -- no small finding.

MR. GREAVES: It is not, Your Honor. But it is a message to potential future litigants that this is not acceptable in this Court. To make even a finer point is to

imagine this case reversed, right?

Imagine that Ms. Johnson, at her university, found out one of her academic advisors, you know, a Jewish Israeli person, had Tweeted that they hate Palestinian Muslims, that they're dogs.  She would be justifiably outraged, just as Ms. Wolff was outraged, and she would have been perfectly within her rights to call out that kind of hate speech, because that's what it is, it is hate speech.

And it would be ridiculous for that academic advisor to throw up their hands and say, "Well, this is just pro-Israel speech."  That's -- to imagine this case reversed, to imagine Ms. Johnson then being brought into a lawsuit because she spoke her mind because of justifiable outrage over hate speech, it's just -- it boggles the mind to really even imagine.

But you could imagine any number of iterations of how this type of lawsuit could be abused; and this Court should send a message by saying that that's not going to be tolerated.

THE COURT:  Great.  Thank you.

MR. GREAVES:  Thank you, Your Honor.

THE COURT:  Good morning.

MR. SMITH:  Thank you, Your Honor.  I'm the last up.  Douglas Smith on behalf of the San Francisco nonprofits.

THE COURT:  Okay.

MR. SMITH:  I will try not to belabor --

THE COURT:  Are you from San Francisco?

MR. SMITH:  I am not.  I am special appearing. I'm local.

THE COURT:  Okay.  Welcome.

MR. SMITH:  Your Honor, I don't want to repeat any of the comments made here by counsel.  I do want to incorporate the comments from Ms. Wolff's counsel on the limits of aiding and abetting liability, the limits of civil rights conspiracy liability, and the comments from the Milstein defendants' counsel on the improper purpose.

I do want to talk about what makes my clients unique in this situation.  They might be the most attenuated defendants here.

There is -- in the second amended complaint there is one allegation made against them that they made one donation in 2016 that ended up in the hands of Canary Mission.  From this single allegation plaintiff starts two causes of action, aiding and abetting, and civil rights conspiracy.  These are plainly foreclosed.  And I want to focus on personal jurisdiction, why it does not exist here.

The San Francisco nonprofits have no presence in D.C.  They have no employees.  They do not do any work here. They derive no revenue from here.  They're entirely based in

California.

Plaintiff attempts to satisfy the D.C. long-arm statute by saying in the motion to dismiss opposition, quote, that they engage in a persistent course of conduct in the District by systematically funding Canary Mission's cyberstalking operations that specifically targeted D.C.-based individuals and institutions.

A single donation in 2016 cannot be considered persistent course of conduct; and the evidence submitted with plaintiff's opposition, a purported investigation of the Canary Mission, actually undermines this point of targeting D.C.  The investigation revealed that 148 profiles were somehow D.C.-connected out of 18,000 profiles.  That's at Page 11 of the opposition, that there are 18,000 profiles.  So this is -- less than 1 percent of the Canary Mission profiles are D.C. connected.

As an afterthought, plaintiff also throws in conspiracy jurisdiction, but that also fails.  The Courts in this district have said that elements of conspiracy jurisdiction require awareness and knowledge of the co-conspirators' acts in the forum.  And I think here it's important to note the timeline of events.

You noted earlier that Ms. Johnson was a freshman in college in 2015 at Northwestern University in Illinois. That's where she Tweeted from.

Shortly thereafter in 2015, the second amended complaint alleges that her profile appeared on Canary Mission.

The next year, the only allegation of a donation by my clients occurred in 2016, presumably while she was a sophomore at Northwestern University in Illinois.

Absent from the second amended complaint is that she later moved to D.C. and applied for employment at Georgetown. If she had moved to Texas and applied for employment there and lost her job, we'd be in a Texas court. They'd be arguing that there's personal jurisdiction over this California nonprofit there based on her moving to Texas. If she had moved to Florida, same situation.

Personal jurisdiction does not rest with where she moves to; it must be foreseeable. And at the time of this donation, there was no foreseeability. So that undercuts any of the notion of personal jurisdiction.

We've raised this issue repeatedly with counsel. We've had a meet and confer. We've raised this issue. There was no substantive response. We raised it -- we provided a safe harbor letter with a complete draft of our Rule 11 motion on the first amended complaint. There was no substantive discussion of that except for a revised -- a revision of the complaint which forced -- but that did not cure the defects, and it forced us to file this motion.

So we believe we have given the plaintiff every opportunity to course correct, and instead they have doubled down; and that is why we have been forced to file a sanction motion and seek sanctions.

THE COURT:  Okay.  Thank you.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  Why don't we take a five- or ten-minute break.  We've been going a little bit.  And then we'll come back and hear from Mr. Hamed.

We'll stand in recess.

(Recess taken)

THE COURT:  All right.  Mr. Hamed, the floor is yours.

So I know we've been at this for a while.  I don't want to deprive you of the opportunity to speak your mind on whatever you'd like to, but I would prefer to focus on the two issues that I flagged, the discrimination claim against Georgetown and the range of sanctions issues, but without limiting your ability to address the Court on whatever you see fit.  Okay.

MR. HAMED:  Thank you, Judge.

So Georgetown's motion is built on precisely what the error in *Joyner* condensed, employing a nearly identical summary judgment standard into a Rule 12(b)(6).

All Ms. Johnson needs to do is plead enough facts

about the comparators and the relevant context that make it discrimination, and that's exactly what Ms. Johnson did here.

THE COURT:  Well, she's got to plead enough facts to convince me that it is possible that after discovery she will be able to show that they are almost identical.  And the question is, you know, how have you done that?  We went through some of the similarities, but there are a lot of differences as well.

So address why you think the similarities push you above the pleadings bar in light of the differences.

MR. HAMED:  I'm happy to do that, Judge.

There is a difference between meaningful relationship and identical.  What Georgetown is arguing here is that similarities that are meaningful in respect are exactly the same as having the same title, tenure, position, salary, whatever it may be.

That's certainly not the case.  The Courts don't read that to be mechanical in that way, 1s and zeros.

In terms of Ms. Johnson pleading enough facts to show the similarities within a meaningful respect that make this a comparator, that's there.

So actually Ms. Johnson is closer to, like, the case in *Brown* that is cited in *Joyner* of the black law professor alleging that she and a white comparator were both

tenured candidates evaluated by the same decision-maker. The comparators had -- the comparator had weaker scholarship.

THE COURT:  But two professors up for tenure is a wholly different kettle of fish than an entry-level administrative employee and a professor who you characterize as a tenured professor.  I don't know if he actually had tenure or not.  But you've alleged in Paragraph 433, I believe, that he's a tenured Georgetown professor.

Those are two completely different positions with different standards, different expectations, different responsibilities on a range of issues.

MR. HAMED:  Understood, Judge.

THE COURT:  Not to mention that they were in two different schools with two different supervisors who communicated the disciplinary decisions independently of one another.

MR. HAMED:  Understood, Your Honor.

THE COURT:  How are they possibly at the end of the day almost identically related?

MR. HAMED:  So the tenure is mentioned only once, and that is by mistake, but I have no basis that he was a tenured professor.

What we do know based on Georgetown's website as well as Shapiro's --

THE COURT:  Well, he's a professor, correct?

MR. HAMED:  He was a senior lecturer.  He was an executive director of the Center for Constitution.

THE COURT:  Well, he's lecturing to students, I take it?

MR. HAMED:  That is correct.  He's lectured -- he has an administrative role as a director of the center, a public-facing role with the students.  He's also lecturing the students.  There was a massive outrage by the student body regarding his comments before he was brought in to the university, and at no point did the university characterize Shapiro's statements as racist or derogatory in the initial press releases and emails to the school community.

It did say that -- at the end of the investigation, it did mention that Shapiro's statements may be viewed as offensive to a segment of the community.  However, because -- and they were using the same policy, Policy 204, the same policy that was used for Johnson was used for Shapiro to evaluate his speech.

THE COURT:  Well, I'm not -- what evidence is there of that?

Well, you've cited 204.  That's incorporated -- it's referenced in your complaint so I can consider it, and it's the probationary employee policy.

Do you allege that Mr. Shapiro was either a

tenured or senior lecturer and developed head of the constitutional center?  Have you alleged that he was a probational -- probationary employee?

MR. HAMED:  He falls under -- based on the HR policies, there isn't a definition in terms of which type of employees would fall under that other than in the beginning, the first six months, it is an evaluation for a newly employed or an incoming employee.

In this particular case the statements were made six days prior to Shapiro's start date at Georgetown, and in the case of -- and the university gave him an opportunity -- gave him a full investigation.  He asked that he would not sit down for any face-to-face questioning, but everything would be in writing.  He asked that his attorney would be the person that the school would communicate with.

And they gave him that.  The investigation went on for the entire semester, over almost 200 days, until they reached the conclusion that the communication policy that applies to the Georgetown community, the same policy that they used in order to terminate Ms. Johnson, did not apply in the case of Shapiro because it happened prior to his employment at Georgetown.

THE COURT:  If you read Dean Treanor's letter, which has been liberally cited by both sides, it says that HR Policy 401, not Probationary Policy 204, is the

applicable policy, and that that policy did not apply because he had not yet started when he Tweeted what he did.

So do you allege that notwithstanding Dean Treanor's letter that applies HR Policy 401, that the operable policy under which the decision was made not to sanction Mr. Shapiro was 204?

MR. HAMED:  No.  It is 401.

THE COURT:  Okay.

MR. HAMED:  What I'm saying is that --

THE COURT:  So where is 401 mentioned with respect to Ms. Johnson?

MR. HAMED:  So in Ms. Johnson's letter, they mention her communication speech and its impact on the Georgetown community and her ability to continue her work as a representative of the Georgetown program.

That language, that posture, comes from the 401 policy.

THE COURT:  Okay.

MR. HAMED:  And what we have is what's written, the official communication that was written.  But then there was also the meeting that happened that's unfortunately, like, not recorded or I have no idea what kind of recording Georgetown has on their end where they do mention her statement violating a Georgetown communication policy in terms of, like, respecting different views and whatnot.

THE COURT:  In a meeting with Ms. Johnson?

MR. HAMED:  A meeting with Ms. Johnson by HR.  The people who -- the body that was responsible to investigate and look into the supervisory body that was responsible to look into Shapiro's conduct was an HR body, and it's the same body, the same HR body and function that looked into Ms. Johnson's --

THE COURT:  Okay.  So your allegations are that the university-wide HR department investigated both employees -- and correct me if I'm wrong -- and, based on those findings, Dean Treanor made one decision as to Mr. Shapiro and Dean Hellman made a decision with respect to Ms. Johnson?

MR. HAMED:  Yes, with the exception that the deans were not the ones to make the decision.

THE COURT:  Who made the decision?

MR. HAMED:  HR --

THE COURT:  Who do you allege -- where do you allege who were the decision-makers in both cases?

MR. HAMED:  Well, we allege --

THE COURT:  Do you allege that?  And where?  In what paragraph?

MR. HAMED:  What we allege, Judge, is that the decision was communicated by.

THE COURT:  Okay.

MR. HAMED:  But the ultimate decision-maker where the investigation happened, where the policies --

THE COURT:  Usually --

MR. HAMED:  -- that's HR.

THE COURT:  -- in an employment context, and we get a lot of employment cases, Counsel --

MR. HAMED:  Yes, Judge.

THE COURT:  -- there's an investigation, and then the results of the investigation go to a decision-maker whose job it is to assess, you know, whether -- you know, what's the appropriate sanction, if any, for the results of the investigation.

Now, where have you alleged that HR writ large is the decision-maker in both cases as opposed to the two deans?

MR. HAMED:  Whether it's spelled out specifically, Judge, I -- it's not -- I don't -- I'm not sure if it's spelled out specifically --

THE COURT:  Okay.

MR. HAMED:  -- in the complaint in that way.

THE COURT:  So you're asking me to infer from the allegation that someone in HR was involved in both investigations, that HR was the ultimate decision-maker as opposed to the two deans?

MR. HAMED:  In terms of decision-making, it's not

just left to whoever the supervisor is, the direct supervisor is, the director of the program or whatever it may be, or the dean of the law school.

There is always an HR component --

THE COURT:  That may be so, but, Counsel, it is your complaint.

MR. HAMED:  That is correct.

THE COURT:  You've got to allege it.  All right.

MR. HAMED:  I am alleging that.  I am alleging it.

THE COURT:  You can't allege it now.

MR. HAMED:  No, no, no, I'm not alleging it now. It is alleged.  If not specifically explicitly, in that language --

THE COURT:  Okay.

MR. HAMED:  -- it is alleged enough to plausibly infer that.

THE COURT:  We'll take another look at your complaint.  Okay.

MR. HAMED:  Yes, Judge.

THE COURT:  All right.  Any other similarities?

MR. HAMED:  Just that both statements -- the statement that Mr. Shapiro made was six days before he started.  The statement that Ms. Johnson made was eight years, when she was a freshman.  That statement was deleted within 24 hours of it being made.  And because of the

doxxing and the threats that she received as a freshman, she immediately ceased any kind of presence on social media.

The only place that this is captured is it's captured on Canary Mission.  The reason she was targeted by Canary Mission, as many of the people that are on Canary Mission are targeted, is because of her position on Palestine and her opposition to the occupation, the apartheid and genocide that's happening in Palestine.  She was in the leadership of the Students for Justice in Palestine at her university, and just like all of the leaders at that university were targeted by Canary Mission.

The statements are not a matter of -- like Mr. Pinkert was saying, that these were simply restatements of her statements, and there's nothing more to it than just that.  They are taken out of context.  They are editorialized --

THE COURT:  They were her statements, regardless of when she made them and when she may have taken them down.  You don't debate that they are her statements, correct?

MR. HAMED:  Her statements are the ones that are mentioned in the complaint.  Her statements are not what is captured and mischaracterized on the Canary Mission website.  So there's --

THE COURT:  What other than her posts are on the Canary Mission website that Ms. Wolff reTweeted?

MR. HAMED:  I'm not -- Judge, I'm not going to get into that, but it's available there.

THE COURT:  So you're saying that there is additional context?

MR. HAMED:  There is missing --

THE COURT:  There's missing context?

MR. HAMED:  There's missing context.

THE COURT:  She could have explained that, and she apparently did not.

MR. HAMED:  She did not because as --

THE COURT:  And that fact is in the record.

MR. HAMED:  That is correct.  That is correct.

She did not for a very basic reason, Judge.  She was under the advice of counsel not to discuss it.  This was a statement that was made when she was a freshman.  There is something --

THE COURT:  She could have explained that, right?

MR. HAMED:  Judge, there's nothing that she could have said that could have made this any better.

THE COURT:  How do you know?

MR. HAMED:  Because Mr. --

THE COURT:  Part of the reason for her termination was that she failed to address the statement.  That was one of the two bases cited in the letter to her, right?

MR. HAMED:  What happened is that she asked for an

investigation, and instead of giving her an investigation, they said they'd give her one opportunity right now to provide an explanation to the statement.

Mr. Greaves said it. He said -- when he stood before the Court today, he said she did not say anything to show she changed her views. So the position of anybody who was --

THE COURT: She was given an opportunity -- it's clear from the EEOC charge -- to explain her past Tweets, and she chose for whatever reason not to take it. So from Georgetown's perspective -- and after all, this is an employment discrimination dispute, right? -- you have a facially offensive Tweet or set of Tweets, and you have a sender who is unwilling, for whatever reason, to contextualize or explain how to mitigate them in any way. What's the university supposed to do?

MR. HAMED: It was a statement that was -- so it was on the call that she was terminated. "You're about to be terminated. Do you want to give an explanation to your Tweet?"

This is not a meaningful process. This is not an investigation. This is not an opportunity to --

THE COURT: How long between the -- you know, Ms. Wolff's Tweet and the ultimate termination? Almost three weeks, right?

MR. HAMED: The ultimate termination, it was 25 days. She was put on leave within less than 12 hours.

In terms of the --

THE COURT: And Mr. Shapiro was put on leave while the university investigated him.

MR. HAMED: Treated completely different, Judge.

THE COURT: Okay.

MR. HAMED: He was given --

THE COURT: Okay. I see your point.

All right. Do you want to address the merits of any of the other claims or defendants' arguments as to the merits?

MR. HAMED: In terms of the Wolff Rule 11 motions, I received the first letter on July 17th of 2025. I received the second letter on September 11th of 2025. I did respond to Wolff's counsel letting her know that essentially it was drop the case or else, and we believed -- we took into consideration everything that was mentioned in each Rule 11 letter in drafting the second amended complaint, and it's our position that we stand by that complaint.

And January 26, 2026, was Wolff's counsel's third letter for the Rule 11 motion. And I note that that was the first time there was an attachment of an actual Rule 11 motion; and it was addressing the same things that were mentioned in the motion to dismiss, asking the same

questions repeatedly about, you know, We're telling you to drop this or else, or else, or else.  We've already said that we're standing by these claims.

In terms of --

THE COURT:  But isn't that the purpose of the safe harbor letter, to say we're going to move for sanctions if you don't withdraw the claims that the nonmovant finds improper, right?

MR. HAMED:  That is correct, Judge.

THE COURT:  Okay.

MR. HAMED:  In terms of the notice and their estimation of what they believe to be wrongdoing, that came back on July 17th of 2025.  In their motion to dismiss the second amended complaint, Wolff's counsel mentions in their motion that there's nothing different from the first amended complaint.  So -- and I do believe that any back-and-forth between plaintiff and defendants regarding the scheduling of the Rule 11 motion before or after the motion to dismiss, and the appropriateness of that, I do believe the Court did mention if any defendants are going to be filing a Rule 11 motion, file it by this date.

THE COURT:  Okay.  What I would like for you to do is I will give you an opportunity to move to strike the Wolff motion for sanctions based on the -- based on untimeliness and what I read from the 1993 amendments -- the

advisory notes to the 1993 amendments to Rule 11.  All right?  I don't --

MR. HAMED:  Understood, Judge.

THE COURT:  This is a new issue.  I don't know if there is case law authority or secondary source authority that interprets what a reasonable time after the offending pleading is or promptly after the offending pleading.  I'm not -- whatever the language is.  And if you would like to move to strike on untimeliness grounds, I'll give you an opportunity to do that, and Ms. Wolff will have an opportunity to reply.  Okay?

MR. HAMED:  Thank you, Judge.

In terms also --

THE COURT:  But get that in by next week.  I had planned to wrap all of this up at the same time, and I'd prefer not to have that lingering.

MR. HAMED:  Understood, Judge.

THE COURT:  Okay.

MR. HAMED:  In terms of Wolff's counsel representing to the Court that we conceded arguments because we did not address specific arguments that were raised in Ms. Wolff's motion to dismiss, we submitted an omnibus response.  A lot of the defendants raised the same bases for the claims that were raised, and we did not concede anything.  It was discussed for the sake of brevity and

efficiency that when it was discussed that argument was discussed with one defendant.  We also applied it to the other defendants.

In terms to Ms. Wolff's counsel's arguments on First Amendment grounds, again, they said that the Tweets that Ms. Wolff made do not arise to actionable conduct, that it was simply a reTweet of something that is in the public domain and exists.  That is certainly not the characterization that we agree with.

The complaint is clear in alleging that Ms. Wolff identified Ms. Johnson by name.  She even before that claimed --

THE COURT:  Does the original Canary Mission post not identify Ms. Johnson by name?

MR. HAMED:  It does.  But in addition to that, Ms. Wolff, in her own writing, does identify Ms. Johnson by name.  And not just that, but she also goes through the trouble of explaining her thought process that, when she received the welcome email to the department, something was suspicious.  It's not clear what was suspicious.

THE COURT:  I'm sorry, Ms. -- who is describing her thought process?

MR. HAMED:  Ms. Wolff.

THE COURT:  Okay.

MR. HAMED:  So Wolff in the Tweet explains her

thought process.  She said when she received the introduction email by Ms. Johnson to the department, she was suspicious.  She Googled her name.  Immediately found her on Canary Mission, and then that was the impetus for the posting.

She identified where Ms. Johnson works.  She tagged Ms. Johnson's employers, not just Georgetown University but the specific program and school.  She called for people to reach out to pressure the university to fire her.  She celebrated the firing after it happened.  There are comments by Ms. -- on Ms. Wolff's Tweets that are saying -- that are congratulating her, telling her, good job.

This is certainly not a matter of somebody simply restating something, "Hey, guys, I'm reTweeting a Tweet," and that's that.

And the same applies with Shapiro's Tweet.  He could have just reTweeted Wolff's Tweet, which is -- that was the driving factor here.  Canary Mission's Twitter handle did not post something independent of Ms. Wolff's Tweet.  In fact, Shapiro reTweeted Wolff.  There are thousands who reTweeted Wolff.

Canary Mission at the end of it did reTweet Wolff, and Wolff has since deleted the original Tweet, so you don't have a record of it if you go back to the link that we provided.  Clear-cut incitement.

As a result, Ms. Johnson received death threats. She was terminated from her job without receiving a meaningful process for this investigation to move forward.

This immediate allegation, a foregone conclusion -- not an allegation, but this foregone conclusion that she's an antiSemite based on a political statement of opinion that was made as a freshman on a Tweet that has since been deleted on an account that does not exist and has not existed since her freshman year.  So this is not a --

THE COURT:  There are a number of questions, Counsel.

MR. HAMED:  Yes, sir.

THE COURT:  But fundamentally, if Ms. Johnson's posts are arguably statements of her opinion protected by the First Amendment, why aren't Ms. Wolff's and Mr. Shapiro's likewise?  How are they possibly actionable as torts?

MR. HAMED:  There's a huge difference.  There is a -- there is a matter of expressing an opinion about something that is happening halfway across the world, and that's it.  And there is a glaring difference in what Wolff and Shapiro did here.

Identifying Ms. Johnson, her employers, calling on people to fire her, congratulating each other for a job well done in getting her terminated, that is completely different

than somebody expressing an opinion and saying, you know, "Go donate to the IDF" or "Go support" whatever.  That's -- there's a clear difference there in terms of how this is actionable and Ms. Johnson's is not.

THE COURT:  So let's put the shoe on the other foot.  Okay?

MR. HAMED:  Yes, Judge.

THE COURT:  The Southern Poverty Law Center publishes a Hate Watch website, and they name and shame folks who have engaged in neoNazi activity, white nationalist activity, militia activity, antisemitic activity, racist activity in their view, and they do it to call attention to folks that they feel have, you know, violated some basic community tenets.

Have they committed torts, or is that a public service?

MR. HAMED:  It's --

THE COURT:  Have they violated people's civil rights, or is that a public service?

MR. HAMED:  It's --

THE COURT:  Now I'm not talking about what Canary Mission may be doing seven years later in the context of student protests.  Okay?  But back in 2015, when this post was apparently created, how is that any different than what the Southern Poverty Law Center does?

MR. HAMED:  The Southern Poverty Law Center is an educational platform, and for every single statement that it provides there is a direct quote.  It's not -- it's just educating people.  It's not calling on people --

THE COURT:  It was her direct quotes.  I mean, I get she was 18, but it's -- no one has told me those weren't her words.

MR. HAMED:  I understand that, Judge.

THE COURT:  Okay.

MR. HAMED:  But there's a difference between a platform that exists purely for the purpose of causing economic injury to people based on their protected characteristics.

THE COURT:  Okay.

MR. HAMED:  And this is not something that happened with Canary Mission today.  It was established for that very purpose.  And we do talk about the genesis of Canary Mission back in 2015 for that very purpose.

This is not some obscure operation that nobody knows where it's coming from.  The Southern Poverty Law Center has been criticized in terms of its postings.  They have reviewed some of its postings.  They have changed their position on certain organizations and individuals based on the feedback that it's receiving.  This is a completely transparent process.  There is no comparison between the

educational purpose of the Southern Poverty Law Center and interests that it has and what Canary Mission's doing here.

THE COURT:  Okay.  A couple of questions.

On the claims against Mr. Shapiro, there's a personal jurisdiction argument.  You are proceeding under D.C. long-arm statute 13-423(a)(4), I understand, which is the provision that allows Courts to assert jurisdiction for causing tortious activity in the District by an act outside of the District when certain plus factors are present.  And it seems to be that the allegation is that you are alleging that Mr. Shapiro engages in some persistent course of conduct in D.C.  Am I getting that right?

MR. HAMED:  Yes, Judge.  So Mr. Shapiro knew --

THE COURT:  So it's (a)(4) that you're proceeding under?

MR. HAMED:  Yes, Judge.

But Mr. Shapiro knew that his target was in D.C., the employer that he was calling on people to reach out to in order to fire and pressure into firing, calling on alumni to call out -- to call Georgetown with regards to their, you know, donations in funding and their demands.  Mr. Shapiro knew that he was targeting an individual in D.C., an institution in D.C., in order to violate the civil rights of somebody who is employed in D.C. and to interfere with a contract that is in D.C.

THE COURT:  Okay.  But are there allegations that -- other than your allegation that he used his former position at Georgetown in order to do the things that you've just clicked off?  Is there any other allegation that he derived substantial revenues from D.C. or engaged in a persistent course of conduct or course of dealing in D.C.?  I'm not sure I saw those.

MR. HAMED:  Mr. Shapiro is a national spokesperson who is called to D.C. on multiple events to come and speak and --

THE COURT:  Is that in your complaint?

MR. HAMED:  It is, I believe, in my complaint, Judge.

THE COURT:  Okay.  Again, we'll check the complaint.

MR. HAMED:  Yes, Judge.

THE COURT:  Okay.

All right.  Address the charity donors' Rule 11 motions, particularly the San Francisco defendants.  As counsel pointed out, I believe you allege one donation in 2016.  I believe you further allege that the San Francisco donors indicated that they would be withdrawing their support from Canary Mission in 2018.

How does one donation made in 2016 and withdrawn in -- or future donations withdrawn in 2018 possibly connect

them to a conspiracy to post Ms. Johnson's Tweets a year before 2016 and her termination on the completely other side of the country, you know, six years later in 2023 or whatever it was?

MR. HAMED:  The framework of Canary Mission is described in I believe quite a lot of detail or enough detail for the Court to appreciate that the funding mechanism of Canary Mission in a discrete way.  I mean, what counsel said, he said an indirect donation.  The word "indirect" speaks volumes here.  This is not something where I have a church or I have some kind of nonprofit that does some good work, and part of its work is something that may be gray, and I want to support the things that are charitable and commendable by everybody in society.

Canary Mission's very purpose, from its origination, its video, the funding, the indirect funding mechanisms that were created for it, it exists based on its own representations for the very malicious purpose of interfering with the civil rights of students, of professionals, of individuals and organizations based on protected characteristics.

THE COURT:  Right.  And --

MR. HAMED:  The very fact --

THE COURT:  -- your view is that a single donation years ago that was withdrawn plausibly suggests a conspiracy

between that donor and Canary Mission and Georgetown to do in Ms. Johnson?

MR. HAMED:  In terms of Canary Mission --

THE COURT:  Regardless of whether the donation was direct or indirect.

MR. HAMED:  Yes, Judge.

There is nobody that's going to donate -- so through this indirect mechanism, the San Francisco defendants were very explicit in their 990s saying "for Canary Mission."  That's typically a mistake because that's not how the funding typically happens.

But it says, "Here is an intermediary I want to make sure that millions of dollars are going to, and I want to make sure that this hundred thousand dollars goes directly to Canary Mission."

There is no -- in terms of the loop -- the loops that you have to go through in order to get that donation where you want it to go when you know exactly what the purpose of Canary Mission is, you're definitely part of that conspiracy.

And Canary Mission is very clear in terms of its targeting across the country, including D.C.

Now, they never withdrew that $100,000 after they were called out by The Forward through investigative journalism.  They said, "Okay, we're not going to be making

any future donations."

But all of these donations are -- what I have here in front of me are mistakes that were telling on 990s. But there is massive funding that is happening beyond what is being -- beyond what, you know, I was able to see on the 990s. And that funding is for one purpose. It's for -- it's to ensure the result that Ms. Johnson suffered; the violation of her civil rights, her termination based on protected characteristics, her not receiving a meaningful process in this, this mob mentality to force Georgetown's hands or having Georgetown and some employees buy into this conspiracy in order to terminate her.

THE COURT: Okay.

MR. HAMED: And I will note to the Court, she's yet to find any employment. I mean, Canary Mission's result is still very much on top. Nobody wants to experience what Georgetown had to experience. And she's -- as somebody who is very much early in her career, the injury that she is suffering right now is incredible.

THE COURT: So apart from opposing the motion to dismiss on the merits, when it comes to sanctions, I read your opposition to the sanctions motions, and correct me if I'm wrong, but rather than defend the factual or legal basis of the respective claims, as I read it, your essential argument is that you are attempting to push the envelope on

tort liability for so-called doxxing.  All right.

Is that fair?

MR. HAMED:  No, Judge.

THE COURT:  Okay.

MR. HAMED:  So I did not --

THE COURT:  I heard a lot about expanding tort liability for doxxing and the things that that Canary Wharf [sic} has at least been recently accused of.

MR. HAMED:  I mean, that is -- that part is correct.  But it's not that --

THE COURT:  Do you want --

MR. HAMED:  It's not that I refused to get into the substance of the legal claims.  Those were going to be addressed in the motion to dismiss.

THE COURT:  That was my point.

MR. HAMED:  So I made a conscious decision, yes.

THE COURT:  So if I'm looking to your defense of the particular claims, I'm to look at your opposition to those claims in your motion to dismiss, in your opposition to the motion to dismiss?

MR. HAMED:  That's correct.

THE COURT:  So on the extension of the -- of tort law to include the types of things that Canary Wharf has been criticized for, why is that this case?  We got into it a little bit before, but as I look at the image, it was --

you know, it was basically what she put on social media that was then reTweeted by Ms. Wolff after one Google search.

That's different from publicizing someone's home telephone number or certainly physical intimidation as Canary Mission has been accused of more recently.  Even if one could read your complaint as a good-faith attempt or nonfrivolous attempt to expand tort law to include, quote-unquote, doxxing, how is that this case?

MR. HAMED:  Judge --

THE COURT:  Or stated differently, you know, what basis in, you know, legal literature, dissenting opinions, secondary sources, state law would suggest that the conduct that you've alleged of the defendants here with respect to Ms. Johnson, okay, that there's a basis for extending liability under existing tort law?

MR. HAMED:  I think the facts speak for itself in terms of how intricate this web is.  This termination did not come from a vacuum.  I don't believe that the Courts have been able to appreciate the injury that happens with -- you know, through the Internet.  For example, Your Honor just mentioned they didn't put out her address or phone number.  But you don't need to put an address or phone number today in order to identify somebody's location and phone number.  She received threatening phone calls and messages even though nothing was mentioned in terms of a

phone number.

It's enough that you have the image of the individual, you have the name of the individual, you have the place of employment of the individual.  That is more than enough today on the Internet to identify where this person lives, have lived, what phone numbers they've had, what emails.

THE COURT:  So your position is that no one could reTweet an offensive Tweet that identifies the sender without exposing themselves to some tort liability?

MR. HAMED:  That's not -- that's not what I'm saying.  I'm saying that --

THE COURT:  So if you, on your own Twitter, you know, put up a racist Tweet, and I reTweeted it, I would be subject to some sort of expanded doxxing liability because your original Tweet says who you are and has your picture on it?

MR. HAMED:  That's not true.

THE COURT:  Okay.

MR. HAMED:  I mean, that's absolutely -- and that's not the statement.

THE COURT:  So flesh it out for me.

MR. HAMED:  Well, that's not the facts of this case.

THE COURT:  Okay.

MR. HAMED:  This is not a situation of -- first of all, there was no racist Tweet.  So I want to make that absolutely clear.

THE COURT:  That was my hypothetical.

MR. HAMED:  I understand, Judge.

What we do have is a Tweet by somebody that has lived, suffered, continues to live and suffer, under this, and her family, under -- the current occupation apartheid regime made a political statement.  Because of that political statement, she was doxxed by Canary Mission, got a bunch of threats back then, deleted it, completely decided -- swore off social media, and then the only capture of this is on Canary Mission.

Then you have not somebody who is innocently, "Oh, Georgetown hired this person," and then there's a link, and that's that.  Wolff did not restate --

THE COURT:  But, Counsel, I mean, if you were a student at that school and you discovered the post, are you saying Ms. Wolff was not reasonably upset by that?

MR. HAMED:  Whether she's upset by it or not is one thing.  But attacking her and getting millions of people and the institutional -- this black hole of an institution that is Canary Mission and its funders to bear down upon Ms. Johnson and Georgetown in order to get her terminated as -- in that context as part of a very intense series of cases

that are similar to this that are happening to students and professors and professionals in that context, then you open yourself up for liability.

THE COURT:  Okay.  I understand.  Anything else?

MR. HAMED:  No, Judge.

THE COURT:  Okay.  Brief rebuttal, Counsel.

MR. PLATT:  Thank you, Your Honor.  I'll be very, very brief.

THE COURT:  Is Georgetown Googling potential hires these days?

MR. PLATT:  No, no, Your Honor.

THE COURT:  I would suggest it might.

MR. PLATT:  Yes, I see -- I would think so, although I think that would bring more liability on some theories that I've heard today.

But I just wanted to say that we have found Judge [sic] Treanor's letter.  We will file that with the Court today.  It is not under the probationary period, Policy 204.

I also have found Policy 204.  If the Court would like, I can put that on the record because it's clearly referred to continually in the complaint.  And just so the record is clear --

THE COURT:  Well, I guess the question is, because Mr. Shapiro was so soon in his tenure, so recent in his tenure, even though Dean Treanor's letter did not mention

the probationary policy, is it reasonable to infer, as I took counsel to argue, that that policy applied to him as well?

MR. PLATT:  I understand, Your Honor, which is why I'm suggesting I will put the policy in the record which says that this policy does not apply to senior-level executive, senior level professional, and certain academic and administrative and professional positions.

THE COURT:  Fair enough.  Thank you.

MR. PLATT:  Other than that, Your Honor, unless the Court has any further questions, I'd prefer not to delve into whether or not they were facially racist Tweets going in.  Thank you.

MS. PAPEZ:  Thank you, Your Honor.

First to Your Honor's question, I knew we diligenced this rule, but I wanted to make sure I had it in front of me, and I want to make sure I've fully answered the Court's question on the record.

THE COURT:  Okay.

MS. PAPEZ:  We couldn't file any order saying we had to file a motion by a particular date, and we did look at the note Your Honor pointed us to, and I have it in front of me now.  It says the rule leaves for resolution on a case-by-case basis.  The question is to when a motion for violation of the rule should be served and when, if filed,

it should be decided.

But the critical language I think Your Honor noted is ordinarily a motion should be served promptly after the inappropriate paper is filed.  And what I wanted to say, Your Honor, is the inappropriate paper addressed in our Rule 11 motion is the plaintiff's opposition to our motion to dismiss, and we actually say that in Docket 75-1 on Page 1. We explain that the inappropriate paper was the opposition to the motion for the reasons counsel stated.

We did file a Rule 11 letter in September right after the second amended complaint, and we took the position that it was no different than the FAC.

Plaintiff's counsel disagreed.  He said, "My new complaint is different."

Your Honor, we take Rule 11 so seriously.  It is a different bar.  Filing something and saying somebody filed it for an improper purpose or it's legally frivolous or baseless is a different bar than Rule 12.  So when he took that position, we said, "Okay, we'll wait to see what you have to say."

And when he filed his motion to dismiss op, and we'll see this in Docket 75-1, we said on Page 1 we're responding to that pleading, and we think that pleading is the thing that moved us over from no basis to state a claim, which is Rule 12, into the Rule 11 box, that higher

standard, because he didn't respond to some of the arguments. And we have this on Pages 11 and 12 of that brief.

And counsel's response today that he filed --

THE COURT: I mean, I haven't read your motion. I'll read it.

MS. PAPEZ: Okay.

THE COURT: But wasn't his opposition filed months ago?

MS. PAPEZ: It was filed at the end of October. And we started preparing another letter, Rule 11, coincident with our Rule 12 reply. Then there were the holidays in December. We served it. He had the cure period, and he still didn't withdraw and brought us in here.

So we feel like we are well within the rule. We were being extrajudicious about not going to that next level standard until we had clear grounds from his pleadings, and he said here today, "Well, I filed an omnibus."

Ms. Wolff is not an omnibus. She is a human being. He brought a claim against her specifically.

THE COURT: I got it, Counsel.

MS. PAPEZ: So we had to do that.

THE COURT: I understand your argument.

MS. PAPEZ: I hear counsel's points about the burden of this case on individuals. Our client has been

under that burden.  And one thing I'd say finally on -- sorry.

THE COURT:  Go ahead, finish.

MS. PAPEZ:  -- on *Florio.*  And when we look at it -- it's Docket 47, but the complaint -- this is Pages, you'll see it, 38 -- 37, 38, 39.  It's just all of the plain and protected speech that Your Honor talked about in *Florio.*  It wasn't just the photo.

Recall in *Florio*, and the D.C. Circuit said that the First Amendment doesn't say you can't republish the photo and say take from it what you will or you can republish the Tweet and you can say take from it what you will.

*Florio* says it was protected to say this is the face of systemic racism.  This appears to be a Nazi salute.  And all of those people got fired from their jobs, and the D.C. Circuit said it's protected.  That is all we have here is --

THE COURT:  After I said it.

MS. PAPEZ:  Yes, after Your Honor said it, affirming Your Honor.  And all we have here -- and we waited to hear what was different from the doxxing, and I think the argument here today has confirmed public information, protected speech, burden, and chilling as this case goes on. And we, Your Honor -- I just would say for the record, we're

trying to be respectful, judicious, as well as timely in going to that second bar.  And we would be pleased, Your Honor, to brief the remaining issues.

THE COURT:  Let's see if we get a motion to strike.

Let me ask you about another type of burden.

MS. PAPEZ:  Okay.

THE COURT:  Who bears the burden to establish Rule 11 sanctions?  Is it the movant?  And does it differ between Prongs 1, 2, and 3?

MS. PAPEZ:  Well, my understanding under Rule 11(b) is that the movant does have to have a good-faith basis to present facts and meet the burden of saying "I am showing that the pleading was for -- the claim was for an improper purpose, harassment."

THE COURT:  Okay.

MS. PAPEZ:  And I think the second prong is no legal basis or good-faith legal argument, and then no factual basis, so --

THE COURT:  So the second two prongs are more objective.  The Court could impose sanctions on that basis sua sponte.

But on Prong 1, when it comes to divining what is in someone's mind, and the Court has to rely on circumstantial evidence, you know, I think the burden might

come into play in something like that.  How am I to know?  Right?  Without, you know, an email saying "I'm going to file this suit because I want to get these such-and-suches."  Right?

MS. PAPEZ:  Potentially, Your Honor.  And that's why in our case I have to say, and we were very careful to say, we've gone back and back and back with him and said, "Look, here's why it's not different."

"It is different."

"Okay.  Show us what's different."

Nothing's different.  It's still frivolous.

So we said, "Well, would you withdraw this so we don't have to come and burden Your Honor and put our client through this more?"

And he comes in here, and we get an omnibus, and things that are not in the complaint.  So we were really trying to build a correct record on it because I think it is very difficult for Your Honor to divine.  And I'm speaking only for our case.  So I think that may be a complication for facts that are not present here.

But thank you so much, Your Honor, for the time today.

MR. PINKERT:  Thank you, Your Honor.  Just a couple of quick points.

Mr. Hamed said that the arguments -- when he

didn't defend the legal basis for his claims in the Rule 11 opposition, that you can find them in the motion to dismiss, in many cases he didn't even address the argument, so -- in the motion to dismiss, so the statute of limitations argument, he simply didn't address as to any of the Rule 11 movants.  And he says, "Well, I just sort of extend -- I did an omnibus argument, and I've extended that."

We don't think you can do that with the statute of limitations when the conduct is different.

I'd point to Paragraph 14 of his declaration against Rule 11 sanctions.  He acknowledges that since the 1940s, for about 100 years, there has been a long line of cases like *Florio* recognizing that calling someone an antiSemite is not actionable.  So he's actually acknowledged that very long line of cases and has not -- today did not defend his claims in the face of that precedent, did not explain how you can distinguish any of the cases, why they should be overruled.  And then he said, "The facts speak for themselves.  You know, we feel really hurt."

That is not a legitimate grieving, Your Honor, and I think your point -- your hypothetical about SPLC, his response that that's educational but Canary Mission is evil, this is a total viewpoint.  Essentially his view of the First Amendment is viewpoint discrimination.  If it aligns with his client's political views, it's educational.  If

it's doing the same thing, then it's tortious.

And I think, unless the Court has any other questions, that is it for Milstein.

THE COURT:  Thank you.

MR. PINKERT:  Thank you.

MR. GREAVES:  Your Honor, just two quick points.

Mr. Hamed kind of casually throws out with regard to Mr. Shapiro that his Tweet was clear-cut incitement.  The term "incitement" is a very well-defined term in U.S. jurisprudence, and it means specifically that it is something that is directed to inciting imminent lawless action, and it is speech that is likely to incite such action.  There is nothing even approaching that here.  So I just wanted to address that sort of casual thing that he tossed out there.

And then as to personal jurisdiction, I did just scan the second amended complaint.  You know, I typed in my client's name --

THE COURT:  What is your take on his assertion of personal jurisdiction?  What basis is he attempting to --

MR. GREAVES:  He has not asserted any basis.  And his claim today to address something about him being a national spokesperson called into D.C. is patently false.  That is not in the second amended complaint anywhere.  It's not been in any of his pleadings.

And even if it were true and it were alleged, it wouldn't matter because as Your Honor correctly knows, there are specific things that you have to allege in order to invoke the long-arm statute, one of them being --

THE COURT:  Okay.  Well, let's say -- and perhaps not for the motion to dismiss, but for sanctions purposes, you know, can the Court infer that for someone who lives just across the river who has a lot of activities, presumably in D.C., who is a quasi-public figure, that there may have been a nonfrivolous basis for an argument that the Court has personal jurisdiction?

MR. GREAVES:  Your Honor, living in Virginia.

THE COURT:  Not just that, but...

MR. GREAVES:  Your Honor, it is frivolous to allege just because someone lives in Virginia and sometimes comes to D.C. that he is subject to the jurisdiction of the Court without anything more.  Which, again, he doesn't even allege that.  But even if he did allege it, it would still be frivolous, especially in the fact -- and this is the important piece -- that we provided him with the affidavit refuting all of these specific bases for jurisdiction early in this case.  When we filed our first motion for sanctions on our first amended complaint, which is still ripe, Your Honor, that motion was -- I believe it was in June, June of last year.  So he has known that we have specifically, you

know, refuted these bases for personal jurisdiction, and he's never once responded to that or elaborated in his complaint to respond to that.

THE COURT:  All right.

MR. GREAVES:  So --

THE COURT:  But had he pled personal jurisdiction differently and requested jurisdictional discovery as to whether Mr. Shapiro, although he lives in Virginia, has continuous contacts or earns substantial sums of money from activities in D.C., that -- do you disagree that that may have been a nonfrivolous basis to at least request discovery on?

MR. GREAVES:  In the face --

THE COURT:  To test the representations in the affidavit?

MR. GREAVES:  Your Honor, I don't think so.

THE COURT:  Okay.

MR. GREAVES:  But that's not this case, so...

THE COURT:  Okay.  Thank you.

MR. SMITH:  Thank you, Your Honor.  I have nothing further to add other than to adopt the arguments by Mr. Pinkert on rebuttal, especially regarding the conceded points in the opposition to the motion to dismiss, completely not addressing our arguments on statute of limitations.

The second amended complaint makes allegations that there are continuing violations due to new viewing of Web pages, renewing statute of limitations.  That argument has been rejected by the D.C. Circuit.  We raised that in our motion.  There has been no opposition argument on that point, so we believe it's conceded.

THE COURT:  Okay.  You did not mention in your opening argument that the 2018 commitment to rescind -- I'm not sure if it was to rescind the $100,000 donation or simply not to make further donations.  Mr. Hamed has made a representation that there was no rescission.

Is there anything in the record currently before the Court for this particular motion that sheds light on that 2018 statement other than the reports in I think *The Nation* or maybe *Mother Jones* or something publication?

MR. SMITH:  Paragraph 67 of the second amended complaint, Footnote 43, is an article that mentions -- that is in the record that in 2018 they promised to not make any more donations.

THE COURT:  Okay.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  All right.  Anything else, Counsel?

All right.  The Court will take the motions under advisement, and we will endeavor to get something out sooner rather than later.  All right.  Safe travels back home if

anyone's from out of town.

(Whereupon the hearing was

adjourned at 12:27 p.m.)


**CERTIFICATE OF OFFICIAL COURT REPORTER**


I, LISA A. MOREIRA, RDR, CRR, do hereby

certify that the above and foregoing constitutes a true and

accurate transcript of my stenographic notes and is a full,

true and complete transcript of the proceedings to the best

of my ability.

Dated this 27th day of February, 2026.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

**$**

**$100,000** [2] - 81:23, 98:9

**/**

**/s/Lisa** [1] - 99:14

**1**

**1** [5] - 56:15, 89:7, 89:22, 92:10, 92:23
**100** [1] - 94:12
**1050** [1] - 2:8
**10:08** [1] - 1:5
**11** [39] - 16:14, 17:16, 18:21, 21:3, 21:14, 34:17, 34:22, 34:24, 35:9, 35:19, 37:25, 38:19, 43:12, 44:7, 45:24, 46:10, 46:13, 50:8, 53:20, 56:14, 57:22, 70:13, 70:19, 70:22, 70:23, 71:18, 71:20, 72:1, 79:18, 89:6, 89:10, 89:15, 89:25, 90:2, 90:11, 92:9, 94:1, 94:5, 94:11
**11(b** [1] - 92:12
**119** [1] - 2:4
**11th** [1] - 70:15
**12** [13] - 16:16, 19:18, 20:3, 20:12, 20:23, 21:10, 21:14, 29:4, 70:2, 89:18, 89:25, 90:2, 90:12
**12(b** [1] - 33:5
**12(b)(6** [2] - 6:9, 9:6
**12(b)(6)** [2] - 23:12, 58:24
**12:27** [1] - 99:3
**13-423(a)(4** [1] - 78:6
**136** [1] - 31:1
**14** [1] - 94:10
**148** [1] - 56:12
**1700** [1] - 1:20
**17th** [2] - 70:14, 71:13
**18** [1] - 77:6
**18,000** [2] - 56:13, 56:14
**19** [1] - 1:4
**1919** [1] - 1:16
**1940s** [1] - 94:12
**1981** [5] - 13:19, 31:13, 31:16, 32:6, 32:8
**1985** [4] - 44:22, 45:9, 45:15, 48:2
**1985(3** [4] - 31:14,

32:11, 44:13, 45:3
**1985(3)** [1] - 44:15
**1993** [3] - 17:16, 71:25, 72:1
**1:25-cv-01540-CRC** [1] - 1:3
**1s** [1] - 59:19

**2**

**2** [1] - 92:10
**200** [2] - 2:12, 62:17
**20001** [2] - 2:18, 99:17
**20006** [1] - 1:17
**2001** [1] - 1:23
**20027** [1] - 1:13
**20036** [1] - 2:9
**20036-4504** [1] - 1:20
**2015** [7] - 38:21, 39:2, 39:23, 56:24, 57:1, 76:23, 77:18
**2016** [6] - 55:18, 56:8, 57:5, 79:21, 79:24, 80:2
**2018** [8] - 39:21, 41:14, 48:10, 79:23, 79:25, 98:8, 98:14, 98:18
**2019** [1] - 41:14
**202** [5] - 1:13, 1:17, 1:21, 2:10, 2:18
**2023** [3] - 14:7, 30:23, 80:3
**2025** [4] - 30:13, 70:14, 70:15, 71:13
**2026** [3] - 1:4, 70:21, 99:12
**203** [1] - 2:5
**204** [8] - 10:24, 11:3, 61:18, 61:22, 62:25, 63:6, 87:18, 87:19
**21-day** [1] - 17:2
**22201** [1] - 1:23
**22314** [1] - 2:13
**24** [1] - 66:25
**25** [1] - 70:1
**25-1540** [1] - 3:3
**25085** [1] - 1:12
**26** [1] - 70:21
**27th** [2] - 31:4, 99:12
**2nd** [2] - 30:24, 31:2

**3**

**3** [1] - 92:10
**315** [1] - 1:23
**32301** [1] - 2:4
**333** [2] - 2:17, 99:16
**342-3447** [1] - 1:17
**354-3187** [1] - 2:18

**37** [1] - 91:6
**38** [2] - 91:6
**39** [1] - 91:6

**4**

**401** [5] - 62:25, 63:4, 63:7, 63:10, 63:16
**415-6665** [1] - 2:5
**429** [1] - 29:23
**43** [1] - 98:17
**433** [1] - 60:8
**448** [1] - 28:7
**463** [1] - 31:19
**47** [2] - 29:21, 91:5

**5**

**500** [1] - 2:4
**53-5** [1] - 14:9
**550** [1] - 1:16
**585-6508** [1] - 2:10

**6**

**600** [1] - 2:9
**608-4044** [1] - 1:24
**610** [1] - 1:24
**62** [1] - 43:12
**63** [1] - 44:25
**67** [1] - 98:16
**6718** [2] - 2:17, 99:16

**7**

**703** [1] - 2:13
**717** [1] - 2:12
**75-1** [2] - 89:7, 89:22
**7:00** [1] - 15:23

**8**

**8** [2] - 14:7, 43:12
**81** [1] - 44:25
**888-1943** [1] - 2:13
**888-8846** [1] - 1:13
**8th** [1] - 15:3

**9**

**955-8608** [1] - 1:21
**990s** [3] - 81:9, 82:3, 82:6

**A**

**a)(4** [1] - 78:14
**a.m** [1] - 1:5
**Abdel** [1] - 3:7
**ABDEL** [1] - 1:11
**Abdel-Rahman** [1] - 3:7

**ABDEL-RAHMAN** [1] - 1:11
**abdelrahman@ hamedlaw.com** [1] - 1:14
**abet** [2] - 32:7, 45:19
**abetting** [7] - 22:25, 26:20, 30:9, 35:3, 46:5, 55:10, 55:20
**ability** [3] - 58:19, 63:14, 99:11
**able** [9] - 6:20, 20:14, 20:15, 43:4, 49:14, 52:22, 59:6, 82:5, 84:19
**absent** [1] - 57:7
**absolutely** [8] - 13:11, 23:13, 28:20, 29:13, 39:5, 41:22, 85:20, 86:3
**abuse** [2] - 50:14, 50:16
**abused** [1] - 54:17
**abusive** [1] - 15:8
**academic** [7] - 9:2, 9:9, 10:11, 12:16, 54:3, 54:9, 88:7
**academics** [1] - 15:6
**acceptable** [1] - 53:25
**accompanied** [2] - 22:21, 24:16
**accordance** [1] - 20:13
**according** [2] - 39:21, 40:10
**account** [2] - 41:3, 75:8
**accountability** [1] - 43:15
**accurate** [1] - 99:9
**accusation** [1] - 33:10
**accusations** [1] - 33:12
**accused** [4] - 39:21, 41:18, 83:8, 84:5
**acknowledged** [2] - 43:15, 94:14
**acknowledges** [1] - 94:11
**act** [3] - 23:20, 44:17, 78:8
**Act** [9] - 13:19, 14:1, 14:16, 14:22, 26:21, 44:13, 45:16, 46:5, 48:3
**action** [6] - 35:10, 43:4, 51:4, 55:20, 95:12, 95:13
**actionable** [7] - 23:19, 30:2, 43:2, 73:6,

75:16, 76:4, 94:14
**actions** [2] - 32:23, 41:1
**activist** [1] - 40:8
**activities** [6] - 40:6, 40:21, 40:23, 96:8, 97:10
**activity** [6] - 76:10, 76:11, 76:12, 78:8
**acts** [1] - 56:21
**actual** [2] - 44:4, 70:23
**ADAM** [1] - 1:15
**Adam** [1] - 39:22
**add** [4] - 8:3, 18:7, 42:15, 97:21
**adding** [1] - 39:7
**addition** [4] - 9:18, 27:17, 35:14, 73:15
**additional** [2] - 10:9, 68:4
**address** [25] - 5:5, 15:10, 20:2, 21:20, 21:23, 23:22, 27:5, 27:16, 42:1, 45:5, 49:16, 51:8, 52:9, 58:19, 59:10, 68:23, 70:10, 72:21, 79:18, 84:21, 84:22, 94:3, 94:5, 95:14, 95:22
**addressed** [4] - 49:11, 50:9, 83:14, 89:5
**addressing** [2] - 70:24, 97:24
**adequately** [1] - 15:10
**adjourned** [1] - 99:3
**adjudicate** [1] - 20:11
**administer** [1] - 25:20
**administrative** [10] - 7:16, 9:12, 9:16, 9:20, 10:15, 13:25, 14:21, 60:6, 61:7, 88:8
**admits** [1] - 32:3
**admittedly** [1] - 32:2
**admonition** [2] - 10:23, 11:4
**adopt** [2] - 49:14, 97:21
**adopted** [1] - 49:21
**adulterer** [2] - 26:8, 26:12
**advice** [1] - 68:14
**advised** [1] - 52:8
**advisement** [1] - 98:24
**advisor** [1] - 54:10
**advisors** [1] - 54:3
**advisory** [2] - 17:15, 72:1
**affidavit** [3] - 49:24, 96:20, 97:15

**affirmed** [1] - 27:25
**affirming** [1] - 91:21
**afterthought** [1] - 56:17
**ago** [4] - 18:2, 51:21, 80:25, 90:9
**agree** [7] - 9:14, 17:6, 18:15, 21:3, 24:7, 46:9, 73:9
**agreement** [6] - 32:17, 32:18, 32:21, 33:9, 33:17, 44:16
**ahead** [2] - 36:16, 91:3
**aid** [2] - 32:7, 45:19
**aiding** [7] - 22:25, 26:20, 30:9, 35:2, 46:5, 55:10, 55:20
**aimed** [1] - 44:1
**air** [1] - 51:5
**airing** [1] - 51:3
**aisle** [1] - 42:19
**akin** [1] - 9:22
**AI** [1] - 39:21
**al** [2] - 1:6, 3:4
**Alexandria** [1] - 2:13
**aligns** [1] - 94:24
**allegation** [27] - 9:2, 10:13, 10:17, 12:17, 13:2, 13:4, 13:6, 13:11, 26:7, 29:22, 32:19, 37:6, 39:12, 39:16, 44:16, 45:3, 45:23, 48:10, 55:17, 55:19, 57:4, 65:22, 75:4, 75:5, 78:10, 79:2, 79:4
**allegations** [13] - 13:15, 24:15, 28:19, 29:2, 33:16, 38:19, 41:4, 48:16, 48:20, 52:17, 64:8, 79:1, 98:1
**allege** [19] - 23:4, 29:15, 32:16, 33:8, 61:25, 63:3, 64:18, 64:19, 64:20, 64:21, 64:23, 66:8, 66:10, 79:20, 79:21, 96:3, 96:15, 96:18
**alleged** [23] - 6:13, 6:19, 7:11, 11:9, 12:20, 14:5, 14:6, 15:4, 28:7, 28:8, 30:1, 33:11, 37:5, 37:11, 45:21, 48:24, 60:8, 62:2, 65:13, 66:12, 66:15, 84:13, 96:1
**alleges** [2] - 8:23, 57:2
**alleging** [7] - 40:21,

59:25, 66:9, 66:11, 73:10, 78:10
**allow** [1] - 44:7
**allowed** [5] - 16:7, 16:15, 17:2, 19:25, 41:23
**allowing** [1] - 20:1
**allows** [1] - 78:7
**almost** [5] - 7:5, 59:6, 60:20, 62:17, 69:24
**alter** [1] - 48:21
**altering** [1] - 25:7
**alternative** [5] - 21:24, 23:23, 27:6, 27:18, 33:6
**altogether** [1] - 17:5
**alumni** [1] - 78:19
**amend** [1] - 34:3
**amended** [19] - 6:19, 12:4, 12:17, 18:2, 28:8, 31:20, 55:16, 57:1, 57:7, 57:22, 70:19, 71:14, 71:15, 89:11, 95:17, 95:24, 96:23, 98:1, 98:16
**Amendment** [20] - 21:20, 21:24, 22:1, 23:6, 23:21, 23:25, 26:16, 27:1, 27:17, 33:24, 34:5, 36:1, 40:18, 42:22, 44:4, 48:6, 73:5, 75:15, 91:10, 94:24
**amendments** [3] - 17:16, 71:25, 72:1
**ample** [1] - 21:8
**analysis** [1] - 28:23
**Aneesa** [2] - 3:3, 3:8
**ANEESA** [1] - 1:2
**animus** [1] - 45:10
**answer** [1] - 26:14
**answered** [1] - 88:17
**anti** [2] - 37:13, 52:18
**Anti** [1] - 42:20
**Anti-Canary** [1] - 42:20
**anti-Semitic** [1] - 37:13
**antidoxxing** [1] - 43:25
**antihomophobic** [1] - 26:2
**antiSemite** [2] - 75:6, 94:14
**antisemitic** [1] - 76:11
**anyway..** [1] - 47:16
**anyways** [1] - 35:13
**apart** [3] - 19:17, 29:2, 82:20
**apartheid** [2] - 67:8,

86:8
**apologize** [1] - 26:24
**Appeals** [1] - 27:25
**appear** [2] - 17:5, 41:2
**appearance** [1] - 3:6
**APPEARANCES** [2] - 1:11, 2:1
**appeared** [1] - 57:2
**appearing** [1] - 55:4
**apples** [1] - 9:7
**applicable** [1] - 63:1
**applied** [5] - 5:21, 57:8, 57:9, 73:2, 88:2
**applies** [5] - 30:14, 49:14, 62:19, 63:4, 74:16
**apply** [3] - 62:20, 63:1, 88:6
**appreciate** [2] - 80:7, 84:19
**approach** [1] - 3:6
**approaching** [1] - 95:13
**appropriate** [5] - 11:18, 19:6, 33:21, 46:18, 65:11
**appropriately** [1] - 43:6
**appropriateness** [1] - 71:19
**Apt** [1] - 1:23
**area** [1] - 31:23
**arguably** [3] - 29:10, 43:9, 75:14
**argue** [2] - 4:23, 88:2
**argued** [1] - 49:13
**arguing** [4] - 6:13, 6:16, 57:11, 59:14
**argument** [23] - 13:18, 14:15, 14:24, 24:24, 35:8, 43:7, 45:5, 46:8, 49:18, 49:20, 73:1, 78:5, 82:25, 90:23, 91:23, 92:18, 94:3, 94:5, 94:7, 96:10, 98:3, 98:5, 98:8
**arguments** [20] - 4:21, 16:16, 16:22, 18:23, 19:12, 20:2, 20:23, 34:18, 43:17, 44:12, 46:7, 49:14, 70:11, 72:20, 72:21, 73:4, 90:2, 93:25, 97:21, 97:24
**arise** [1] - 73:6
**Arlington** [1] - 1:23
**arm** [3] - 56:2, 78:6, 96:4

**Arps** [1] - 45:21
**article** [3] - 39:21, 48:10, 98:17
**articles** [1] - 41:14
**articulates** [1] - 52:3
**articulation** [1] - 51:4
**ashborn** [1] - 32:15
**aside** [3] - 7:3, 37:2, 41:16
**aspect** [1] - 50:7
**assert** [1] - 78:7
**asserted** [2] - 31:6, 95:21
**assertion** [1] - 95:19
**assess** [1] - 65:10
**assume** [3] - 9:19, 41:13, 46:8
**at-will** [2] - 10:11, 10:20
**Atlanta** [2] - 46:16, 46:24
**attached** [2] - 14:8, 22:6
**attachment** [1] - 70:23
**attacking** [1] - 86:21
**attempt** [4] - 40:12, 49:8, 84:6, 84:7
**attempting** [2] - 82:25, 95:20
**attempts** [1] - 56:2
**attention** [1] - 76:13
**attenuated** [1] - 55:14
**attorney** [2] - 53:13, 62:14
**attorneys** [1] - 50:14
**attribute** [1] - 51:15
**August** [3] - 16:4, 16:6, 22:11
**authority** [9] - 31:16, 31:18, 31:25, 32:1, 32:4, 33:25, 45:18, 72:5
**automatically** [1] - 48:11
**available** [2] - 12:1, 68:2
**Ave** [1] - 2:8
**Avenue** [3] - 1:16, 2:17, 99:16
**award** [1] - 47:8
**aware** [3] - 12:18, 13:3, 24:13
**awareness** [1] - 56:20

**B**

**b)(2** [1] - 36:16
**b)(3)** [1] - 36:16
**back-and-forth** [1] - 71:16

**banner** [1] - 22:23
**bar** [7] - 8:4, 16:23, 33:22, 59:11, 89:16, 89:18, 92:2
**BARAN** [1] - 2:3
**barred** [5] - 13:24, 14:3, 14:22, 27:22, 29:16
**bars** [2] - 35:11, 48:4
**based** [30] - 6:24, 7:11, 8:1, 10:3, 16:6, 29:6, 30:13, 36:7, 36:14, 38:17, 39:10, 40:25, 44:12, 45:13, 48:21, 51:4, 55:25, 56:7, 57:12, 60:24, 62:4, 64:10, 71:24, 75:6, 77:12, 77:23, 80:17, 80:20, 82:8
**baseless** [1] - 89:18
**bases** [6] - 14:24, 35:6, 68:24, 72:23, 96:21, 97:1
**basic** [2] - 68:13, 76:14
**basis** [22] - 20:9, 29:7, 35:23, 40:20, 40:25, 45:6, 49:25, 60:22, 82:23, 84:11, 84:14, 88:24, 89:24, 92:13, 92:18, 92:19, 92:21, 94:1, 95:20, 95:21, 96:10, 97:11
**bear** [1] - 86:23
**bears** [1] - 92:8
**become** [1] - 48:11
**BEFORE** [1] - 1:9
**beginning** [1] - 62:6
**behalf** [5] - 4:1, 4:4, 4:11, 49:6, 54:24
**belabor** [4] - 49:8, 50:6, 52:22, 55:2
**beliefs** [1] - 47:21
**BEN** [20] - 1:22, 27:9, 27:11, 27:13, 27:16, 28:6, 28:16, 28:20, 28:22, 29:13, 29:19, 30:18, 30:21, 31:8, 31:12, 32:9, 32:25, 33:3, 33:20, 34:9
**Ben** [5] - 3:22, 21:23, 23:22, 27:5, 27:8
**best** [1] - 99:10
**better** [4] - 41:21, 42:16, 47:4, 68:19
**between** [8] - 42:25, 59:13, 69:23, 71:17, 77:10, 77:25, 81:1, 92:9
**beyond** [7] - 21:9,

21:14, 24:15, 25:24,
41:6, 82:4, 82:5
**binding** [1] - 35:12
**Binnall** [1] - 4:11
**BINNALL** [1] - 2:12
**bit** [7] - 4:17, 26:23,
38:15, 50:9, 50:23,
58:8, 83:25
**Black** [2] - 32:13, 37:8
**black** [2] - 59:24,
86:22
**Blvd** [1] - 1:23
**body** [6] - 61:10, 64:3,
64:4, 64:5, 64:6
**boggles** [1] - 54:14
**Box** [1] - 1:12
**box** [3] - 21:14, 89:25
**break** [1] - 58:8
**BRETT** [1] - 2:2
**brevity** [1] - 72:25
**brief** [13] - 5:1, 5:10,
7:4, 12:3, 16:8,
17:10, 31:21, 31:23,
87:6, 87:8, 90:3,
92:3
**briefed** [4] - 16:17,
19:2, 38:9, 50:8
**briefing** [10] - 16:20,
18:19, 19:16, 20:1,
20:3, 20:8, 20:23,
21:1, 21:15, 44:24
**briefly** [4] - 12:12,
13:20, 21:20, 21:23
**briefs** [11] - 5:8, 9:6,
11:12, 11:14, 14:7,
15:10, 15:15, 26:25,
29:3, 37:17, 38:18
**bring** [3] - 21:10,
48:18, 87:14
**brings** [1] - 39:8
**broadcasting** [1] -
29:24
**brought** [7] - 31:5,
35:15, 50:17, 54:12,
61:10, 90:14, 90:20
**Brown** [1] - 59:24
**browning** [1] - 29:3
**Browning** [1] - 29:14
**build** [1] - 93:17
**built** [1] - 58:22
**bunch** [3] - 14:18,
15:6, 86:11
**burden** [8] - 90:25,
91:1, 91:24, 92:6,
92:8, 92:13, 92:25,
93:13
**but..** [1] - 96:13
**buy** [1] - 82:11

# C

**CA** [1] - 1:3
**CALDWELL** [1] - 2:11
**California** [3] - 39:10,
56:1, 57:12
**campaign** [1] - 28:11
**Canary** [47] - 39:1,
39:22, 40:4, 40:6,
40:14, 41:17, 42:11,
42:20, 48:8, 48:9,
55:18, 56:5, 56:11,
56:15, 57:2, 67:4,
67:5, 67:11, 67:22,
67:25, 73:13, 74:4,
74:18, 74:22, 76:21,
77:16, 77:18, 78:2,
79:23, 80:5, 80:8,
80:15, 81:1, 81:3,
81:10, 81:15, 81:19,
81:21, 82:15, 83:7,
83:23, 84:5, 86:10,
86:13, 86:23, 94:22
**candidates** [1] - 60:1
**cannot** [10] - 9:8,
22:22, 32:7, 33:23,
34:1, 36:25, 44:19,
48:22, 53:3, 56:8
**canvasses** [1] - 31:23
**capture** [1] - 86:12
**captured** [3] - 67:3,
67:4, 67:22
**captures** [1] - 39:1
**cards** [1] - 16:21
**career** [1] - 82:18
**careful** [2] - 20:20,
93:6
**cart** [1] - 21:17
**case** [74] - 6:12, 6:17,
7:16, 8:16, 12:13,
14:23, 16:22, 20:22,
21:2, 21:7, 21:13,
22:2, 22:10, 22:15,
22:23, 23:4, 23:14,
23:17, 23:21, 25:19,
26:15, 28:15, 29:3,
29:4, 29:12, 30:17,
31:23, 32:14, 32:15,
34:24, 37:22, 38:4,
38:8, 38:20, 40:5,
41:12, 41:20, 41:24,
42:9, 43:18, 44:4,
44:23, 44:25, 45:2,
45:13, 45:17, 45:20,
47:13, 49:13, 50:1,
50:7, 53:2, 54:1,
54:11, 59:18, 59:24,
62:9, 62:11, 62:21,
70:17, 72:5, 83:24,
84:8, 85:24, 88:24,

90:25, 91:24, 93:6,
93:19, 96:22, 97:18
**Case** [1] - 3:3
**case-by-case** [1] -
88:24
**cases** [19] - 7:14, 9:5,
14:18, 24:13, 25:22,
26:18, 26:19, 31:21,
32:10, 32:14, 35:12,
64:19, 65:6, 65:14,
86:25, 94:3, 94:13,
94:15, 94:17
**casual** [1] - 95:14
**casually** [1] - 95:7
**Catholic** [1] - 26:9
**caught** [1] - 43:13
**causes** [2] - 51:4,
55:20
**causing** [2] - 77:11,
78:8
**cautious** [1] - 19:7
**ceased** [1] - 67:2
**celebrated** [1] - 74:10
**center** [5] - 8:10, 9:18,
61:3, 61:7, 62:2
**Center** [5] - 76:8,
76:25, 77:1, 77:21,
78:1
**certain** [4] - 16:19,
77:23, 78:9, 88:7
**certainly** [7] - 12:10,
23:23, 40:5, 59:18,
73:8, 74:13, 84:4
**CERTIFICATE** [1] -
99:5
**certify** [1] - 99:8
**change** [3] - 5:20,
22:18, 52:13
**changed** [7] - 6:6, 6:7,
18:1, 18:16, 30:12,
69:6, 77:22
**changes** [1] - 5:17
**characteristic** [1] -
49:24
**characteristics** [3] -
77:13, 80:21, 82:9
**characterization** [1] -
73:9
**characterize** [4] -
52:11, 52:12, 60:6,
61:11
**characterized** [1] -
29:6
**charge** [4] - 13:25,
31:9, 69:9
**charitable** [3] - 39:10,
48:15, 80:14
**charity** [3] - 48:10,
48:12, 79:18
**check** [1] - 79:14

**Chemerinsky** [1] -
40:10
**chew** [1] - 4:17
**chilling** [2] - 34:5,
91:24
**choice** [2] - 9:15,
52:17
**choose** [1] - 9:13
**chose** [2] - 52:8, 69:10
**chosen** [2] - 41:2,
52:20
**CHRISTOPHER** [1] -
1:9
**Church** [1] - 26:9
**church** [2] - 51:6,
80:11
**Circuit** [7] - 27:24,
29:4, 31:22, 50:12,
91:9, 91:17, 98:4
**Circuit's** [2] - 5:6, 22:8
**circumstances** [1] -
40:13
**circumstantial** [2] -
33:17, 92:25
**citations** [1] - 37:23
**cite** [6] - 5:7, 29:3,
31:21, 31:22, 32:13,
32:14
**cited** [7] - 9:5, 14:18,
44:23, 59:24, 61:22,
62:24, 68:24
**cites** [8] - 10:24, 12:3,
12:23, 35:12, 39:24,
39:25, 44:24, 45:20
**civil** [11] - 35:3, 35:4,
44:10, 44:20, 46:4,
55:10, 55:20, 76:18,
78:23, 80:19, 82:8
**Civil** [1] - 3:3
**claim** [29] - 6:15, 6:20,
22:12, 28:2, 28:4,
28:5, 28:18, 28:19,
28:23, 28:25, 29:8,
29:21, 30:1, 30:4,
31:13, 31:14, 31:15,
35:13, 41:5, 45:15,
45:16, 46:5, 50:16,
58:17, 89:24, 90:20,
92:14, 95:22
**claim-by-claim** [1] -
28:23
**claimed** [1] - 73:12
**claims** [51] - 13:19,
13:21, 13:23, 15:11,
16:5, 16:13, 16:19,
16:23, 16:25, 19:1,
19:3, 20:4, 20:10,
20:11, 20:22, 22:12,
22:22, 27:19, 27:21,
27:22, 28:1, 28:14,

28:15, 29:5, 29:11,
29:15, 29:20, 29:25,
30:8, 30:12, 31:4,
31:6, 31:13, 33:23,
34:25, 35:9, 35:23,
41:9, 46:3, 48:2,
70:11, 71:3, 71:7,
72:24, 78:4, 82:24,
83:13, 83:18, 83:19,
94:1, 94:16
**Clarendon** [1] - 1:23
**clarified** [1] - 6:6
**classic** [1] - 37:13
**clear** [21] - 6:12, 6:19,
11:2, 18:20, 30:6,
35:11, 35:14, 42:12,
45:4, 48:4, 48:5,
69:9, 73:10, 73:20,
74:25, 76:3, 81:21,
86:3, 87:22, 90:17,
95:8
**clear-cut** [2] - 74:25,
95:8
**clearest** [1] - 27:18
**clearly** [5] - 6:24,
12:13, 25:5, 36:1,
87:20
**clicked** [1] - 79:4
**client** [17] - 11:25,
21:3, 27:20, 30:5,
31:3, 31:8, 31:13,
32:20, 33:18, 38:8,
40:24, 42:20, 43:20,
49:12, 49:24, 90:25,
93:13
**client's** [3] - 34:5,
94:25, 95:18
**clients** [8] - 31:14,
34:25, 36:2, 36:25,
45:25, 47:20, 55:13,
57:5
**clipped** [1] - 25:4
**clipping** [1] - 25:7
**close** [2] - 24:8, 46:15
**closer** [1] - 59:23
**co** [5] - 27:13, 37:5,
37:12, 49:14, 56:20
**co-conspirators** [2] -
37:5, 37:12
**coincident** [1] - 90:11
**colleague** [4] - 3:22,
21:23, 27:5, 30:18
**colleagues** [2] - 20:18,
30:16
**collectively** [1] - 4:6
**college** [2] - 51:20,
56:24
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 2:8
**combination** [3] -

35:22, 51:17, 51:18
**combine** [1] - 52:22
**combined** [1] - 52:21
**comfortable** [1] - 36:4
**coming** [2] - 50:13, 77:20
**commendable** [1] - 80:14
**comments** [14] - 7:23, 7:25, 8:1, 8:8, 12:18, 12:22, 12:24, 13:3, 55:8, 55:9, 55:11, 61:10, 74:11
**commitment** [1] - 98:8
**committed** [2] - 40:13, 76:15
**common** [3] - 6:18, 8:21, 15:17
**communicate** [2] - 39:18, 62:15
**communicated** [2] - 60:16, 64:24
**communication** [4] - 62:18, 63:13, 63:20, 63:24
**Community** [1] - 4:4
**community** [8] - 37:1, 37:15, 39:11, 61:13, 61:16, 62:19, 63:14, 76:14
**companies** [1] - 48:22
**comparator** [5] - 5:22, 12:14, 59:22, 59:25, 60:2
**comparators** [7] - 6:2, 6:21, 7:3, 12:21, 13:14, 59:1, 60:2
**compare** [2] - 8:7, 9:8
**comparison** [1] - 77:25
**complains** [1] - 36:3
**complaint** [62] - 6:9, 6:19, 8:15, 9:3, 9:18, 11:12, 11:14, 12:4, 12:18, 14:6, 18:2, 22:2, 22:4, 24:14, 25:14, 26:7, 28:8, 28:25, 30:6, 30:7, 31:20, 32:3, 32:19, 33:11, 37:2, 39:12, 42:12, 47:12, 48:21, 52:14, 52:18, 53:6, 55:16, 57:2, 57:7, 57:22, 57:24, 61:23, 65:20, 66:6, 66:18, 67:21, 70:19, 70:20, 71:14, 71:16, 73:10, 79:11, 79:12, 79:15, 84:6, 87:21, 89:11, 89:14, 91:5, 93:16,

95:17, 95:24, 96:23, 97:3, 98:1, 98:17
**complaints** [1] - 26:14
**complete** [6] - 16:20, 18:19, 21:1, 21:15, 57:21, 99:10
**completely** [7] - 60:10, 70:6, 75:25, 77:24, 80:2, 86:11, 97:24
**compliance** [1] - 16:10
**complication** [1] - 93:19
**comply** [1] - 19:9
**component** [1] - 66:4
**comport** [1] - 45:17
**concede** [2] - 20:24, 72:24
**conceded** [3] - 72:20, 97:22, 98:6
**concedes** [5] - 24:20, 24:21, 25:14, 25:15, 35:12
**conceive** [1] - 47:22
**concern** [1] - 22:22
**concerning** [1] - 13:7
**concerns** [1] - 31:10
**conclude** [1] - 8:20
**concluding** [1] - 7:5
**conclusion** [3] - 62:18, 75:4, 75:5
**conclusions** [2] - 11:20, 24:24
**conclusory** [1] - 33:12
**condensed** [1] - 58:23
**conduct** [39] - 14:5, 14:17, 15:5, 15:9, 19:14, 22:3, 22:19, 23:4, 23:20, 24:4, 24:15, 26:16, 28:6, 28:8, 29:2, 29:6, 29:15, 29:23, 29:25, 30:13, 30:15, 30:24, 31:1, 33:4, 33:7, 39:20, 42:11, 43:1, 44:1, 45:22, 48:12, 56:4, 56:9, 64:5, 73:6, 78:12, 79:6, 84:12, 94:9
**conducted** [1] - 13:2
**confer** [4] - 16:10, 16:21, 16:25, 57:19
**conference** [3] - 16:4, 16:6, 16:11
**conferred** [1] - 4:20
**confirmed** [1] - 91:23
**congratulating** [2] - 74:12, 75:24
**Congress** [1] - 44:11
**connect** [1] - 79:25
**connected** [1] - 56:16

**Connecticut** [1] - 2:8
**connection** [2] - 10:24, 47:23
**connects** [1] - 37:11
**conscious** [1] - 83:16
**consciously** [1] - 13:7
**consider** [4] - 11:19, 17:13, 23:5, 61:23
**consideration** [2] - 19:17, 70:18
**considerations** [1] - 46:16
**considered** [2] - 29:12, 56:8
**considering** [1] - 28:13
**consistent** [1] - 16:9
**consistently** [1] - 31:24
**conspiracy** [23] - 32:12, 32:23, 33:10, 35:3, 35:4, 37:4, 37:16, 44:16, 44:17, 44:20, 44:22, 46:4, 48:11, 50:2, 55:11, 55:21, 56:18, 56:19, 80:1, 80:25, 81:20, 82:12
**conspiratorial** [1] - 32:18
**conspirators** [3] - 36:20, 37:5, 37:12
**conspirators'** [1] - 56:21
**conspired** [1] - 33:12
**constitutes** [2] - 15:8, 99:8
**Constitution** [4] - 2:17, 8:10, 61:3, 99:16
**constitutional** [2] - 10:15, 62:2
**consult** [1] - 17:15
**consulting** [1] - 40:3
**contact** [1] - 7:17
**contacted** [1] - 45:24
**contacts** [1] - 97:9
**contained** [1] - 6:8
**contemplating** [1] - 18:14
**contemporaneous** [1] - 32:23
**contend** [1] - 44:3
**contention** [1] - 14:11
**context** [12] - 6:17, 25:11, 43:7, 59:1, 65:5, 67:15, 68:4, 68:6, 68:7, 76:22, 86:25, 87:2
**contextualize** [1] -

69:15
**continually** [1] - 87:21
**continuation** [1] - 34:4
**continue** [1] - 63:14
**CONTINUED** [2] - 1:25, 2:1
**continues** [2] - 52:14, 86:7
**continuing** [3] - 28:11, 40:1, 98:2
**continuous** [1] - 97:9
**contract** [3] - 22:13, 42:6, 78:25
**Contreras** [2] - 30:19, 30:20
**control** [1] - 48:21
**convene** [1] - 18:10
**convince** [1] - 59:5
**COOPER** [1] - 1:9
**coordination** [1] - 33:9
**copy** [2] - 11:25, 12:8
**copycat** [3] - 46:21, 47:2, 47:7
**core** [3] - 25:24, 29:22, 30:7
**correct** [20] - 4:9, 10:20, 23:2, 43:25, 49:18, 50:17, 50:18, 58:2, 61:1, 61:6, 64:10, 66:7, 67:19, 68:12, 71:9, 82:22, 83:10, 83:21, 93:17
**correctly** [1] - 96:2
**costs** [1] - 46:11
**counsel** [31] - 3:5, 12:2, 12:24, 15:3, 16:4, 16:8, 17:1, 18:17, 19:11, 20:22, 27:14, 35:11, 44:12, 49:15, 52:8, 52:23, 55:8, 55:9, 55:12, 57:18, 68:14, 70:16, 71:14, 72:19, 79:20, 80:9, 88:2, 89:9, 89:13, 90:21
**Counsel** [7] - 17:11, 65:6, 66:5, 75:11, 86:17, 87:6, 98:22
**counsel's** [7] - 20:23, 43:11, 52:20, 70:21, 73:4, 90:4, 90:24
**counseling** [2] - 9:12, 10:16
**counselors** [1] - 9:16
**count** [4] - 22:10, 22:18, 24:11
**counterclaim** [1] - 50:17
**country** [2] - 80:3, 81:22

**counts** [2] - 21:21, 21:25
**County** [1] - 50:12
**couple** [3] - 18:5, 78:3, 93:24
**course** [12] - 17:9, 18:12, 19:14, 20:21, 28:23, 48:25, 56:4, 56:9, 58:2, 78:11, 79:6
**courses** [1] - 9:14
**Court** [66] - 2:16, 2:16, 5:5, 5:25, 6:6, 6:14, 6:18, 6:24, 8:9, 11:13, 11:15, 11:16, 11:19, 13:21, 14:9, 15:14, 16:7, 16:16, 18:4, 18:10, 19:4, 19:6, 19:20, 20:5, 20:11, 23:22, 24:13, 25:20, 26:18, 26:25, 27:25, 28:14, 30:12, 30:16, 33:20, 34:6, 34:21, 37:23, 41:8, 41:20, 43:21, 44:21, 45:4, 46:10, 50:12, 51:14, 53:25, 54:17, 58:19, 69:5, 71:19, 72:20, 80:7, 82:14, 87:17, 87:19, 88:11, 92:21, 92:24, 95:2, 96:11, 96:17, 98:13, 98:23, 99:15
**court** [10] - 26:10, 26:23, 36:25, 37:22, 46:2, 47:12, 52:15, 57:10, 96:7
**COURT** [239] - 1:1, 3:9, 3:14, 3:19, 3:23, 4:2, 4:7, 4:13, 4:16, 5:7, 5:13, 5:20, 6:4, 6:11, 6:22, 7:2, 7:8, 7:10, 7:21, 8:14, 8:18, 9:17, 9:22, 10:1, 10:3, 10:7, 10:18, 10:21, 11:2, 11:10, 11:18, 12:8, 12:11, 12:20, 13:22, 14:11, 14:14, 14:19, 15:18, 15:20, 15:22, 16:1, 17:11, 17:18, 18:7, 18:13, 19:19, 20:17, 21:16, 23:2, 23:14, 23:16, 24:6, 26:22, 27:3, 27:7, 27:10, 27:12, 27:15, 28:4, 28:13, 28:17, 28:21, 29:9, 29:18, 30:16, 30:20, 31:7, 31:11, 32:7, 32:22, 33:2,

33:19, 34:8, 34:10, 34:12, 34:15, 34:20, 35:2, 35:5, 35:16, 35:18, 35:21, 36:15, 37:17, 38:4, 38:12, 38:25, 39:24, 41:11, 41:15, 41:24, 42:7, 42:10, 42:25, 43:6, 43:24, 46:8, 46:22, 47:15, 48:15, 48:25, 49:2, 49:4, 49:7, 49:10, 49:17, 49:22, 50:16, 50:19, 51:13, 51:20, 52:6, 53:7, 53:19, 53:22, 54:20, 54:22, 55:1, 55:3, 55:6, 58:5, 58:7, 58:12, 59:4, 60:4, 60:14, 60:19, 61:1, 61:4, 61:20, 62:23, 63:8, 63:10, 63:18, 64:1, 64:8, 64:16, 64:18, 64:21, 64:25, 65:3, 65:5, 65:8, 65:19, 65:21, 66:5, 66:8, 66:10, 66:14, 66:17, 66:20, 67:17, 67:24, 68:3, 68:6, 68:8, 68:11, 68:17, 68:20, 68:22, 69:8, 69:23, 70:4, 70:7, 70:9, 71:5, 71:10, 71:22, 72:4, 72:14, 72:18, 73:13, 73:21, 73:24, 75:10, 75:13, 76:5, 76:8, 76:18, 76:21, 77:5, 77:9, 77:14, 78:3, 78:14, 79:1, 79:11, 79:14, 79:17, 80:22, 80:24, 81:4, 82:13, 82:20, 83:4, 83:6, 83:11, 83:15, 83:17, 83:22, 84:10, 85:8, 85:13, 85:19, 85:22, 85:25, 86:4, 86:17, 87:4, 87:6, 87:9, 87:12, 87:23, 88:9, 88:19, 90:5, 90:8, 90:21, 90:23, 91:3, 91:19, 92:4, 92:8, 92:16, 92:20, 95:4, 95:19, 96:5, 96:13, 97:4, 97:6, 97:14, 97:17, 97:19, 98:7, 98:20, 98:22, 99:5
**Court's** [9] - 16:9, 16:10, 21:22, 21:25, 22:7, 50:24, 52:25, 88:18
**Courthouse** [2] - 2:17,

99:15
**courtroom** [2] - 4:20, 51:3
**COURTROOM** [1] - 3:2
**courts** [3] - 31:24, 32:12, 43:15
**Courts** [5] - 43:13, 56:18, 59:18, 78:7, 84:18
**cousins** [1] - 24:8
**covered** [2] - 13:14, 26:25
**covers** [1] - 27:24
**crashing** [1] - 26:1
**created** [2] - 76:24, 80:17
**criminal** [2] - 37:4
**critical** [1] - 89:2
**criticisms** [1] - 40:7
**criticized** [2] - 77:21, 83:24
**criticizing** [1] - 45:14
**CRR** [3] - 2:16, 99:7, 99:14
**CRUTCHER** [1] - 1:19
**Crutcher** [1] - 3:21
**cumulative** [1] - 53:2
**cure** [4] - 17:2, 20:3, 57:25, 90:13
**current** [1] - 86:8
**cut** [5] - 24:25, 25:3, 45:1, 74:25, 95:8
**cut-and** [1] - 45:1
**cutting** [1] - 22:6
**cyberstalking** [1] - 56:6

### D

**D.C** [44] - 1:4, 5:5, 13:18, 14:1, 14:16, 14:22, 22:8, 22:15, 23:1, 26:20, 27:23, 27:24, 27:25, 29:4, 31:9, 32:14, 44:13, 45:16, 46:5, 48:2, 55:24, 56:2, 56:6, 56:12, 56:16, 57:8, 78:6, 78:12, 78:17, 78:22, 78:23, 78:24, 78:25, 79:5, 79:6, 79:9, 81:22, 91:9, 91:17, 95:23, 96:9, 96:16, 97:10, 98:4
**D.C.-connected** [1] - 56:13
**dare** [1] - 40:7
**date** [5] - 52:12, 52:19, 62:10, 71:21, 88:21

**Dated** [1] - 99:12
**days** [5] - 62:10, 62:17, 66:22, 70:2, 87:10
**DC** [6] - 1:13, 1:17, 1:20, 2:9, 2:18, 99:17
**DDC** [3] - 30:17, 30:18, 31:21
**dealing** [4] - 9:15, 9:23, 20:21, 79:6
**Dean** [10] - 8:23, 11:11, 11:19, 14:8, 14:25, 62:23, 63:3, 64:11, 64:12, 87:25
**dean** [2] - 8:24, 66:3
**deans** [3] - 64:14, 65:15, 65:24
**death** [1] - 75:1
**debate** [2] - 42:19, 67:19
**deceased** [1] - 26:8
**December** [1] - 90:13
**decide** [3] - 23:10, 36:7, 38:16
**decided** [2] - 86:11, 89:1
**decision** [17] - 8:16, 8:21, 10:24, 60:1, 63:5, 64:11, 64:12, 64:15, 64:16, 64:19, 64:24, 65:1, 65:9, 65:14, 65:23, 65:25, 83:16
**decision-maker** [5] - 60:1, 65:1, 65:9, 65:14, 65:23
**decision-makers** [3] - 8:16, 8:21, 64:19
**decision-making** [1] - 65:25
**decisions** [4] - 13:7, 22:8, 38:5, 60:16
**declaration** [1] - 94:10
**declined** [1] - 17:1
**decontextualization** [7] - 24:23, 24:25, 25:6, 25:8, 25:12, 25:17
**defamation** [12] - 16:24, 22:9, 22:18, 23:14, 24:3, 24:8, 28:1, 28:5, 30:4, 30:7, 42:7, 42:8
**defamatory** [5] - 28:10, 29:2, 29:6, 29:24, 30:5
**defects** [1] - 57:25
**defend** [3] - 82:23, 94:1, 94:16

**defendant** [3] - 31:24, 32:5, 73:2
**Defendant** [3] - 3:21, 4:11, 39:6
**Defendants** [4] - 1:7, 1:15, 2:2, 3:12
**defendants** [26] - 4:1, 4:15, 4:22, 5:3, 13:16, 14:2, 15:17, 32:20, 33:12, 34:14, 36:11, 38:2, 38:7, 38:8, 39:9, 39:20, 44:8, 49:20, 55:15, 71:17, 71:20, 72:23, 73:3, 79:19, 81:9, 84:13
**defendants'** [2] - 55:12, 70:11
**defense** [4] - 23:9, 24:4, 36:2, 83:17
**defenses** [2] - 23:6, 23:22
**defined** [1] - 95:9
**definitely** [1] - 81:19
**definition** [1] - 62:5
**delayed** [1] - 17:21
**deleted** [4] - 66:24, 74:23, 75:8, 86:11
**deliberately** [1] - 28:10
**delve** [1] - 88:11
**demands** [1] - 78:21
**democracies** [1] - 25:2
**denounced** [1] - 52:13
**department** [4] - 8:19, 64:9, 73:19, 74:2
**departments** [1] - 8:22
**deprive** [1] - 58:15
**DEPUTY** [1] - 3:2
**derive** [1] - 55:25
**derived** [1] - 79:5
**derogatory** [1] - 61:12
**described** [2] - 9:17, 80:6
**describing** [1] - 73:21
**despite** [1] - 30:4
**detail** [3] - 6:8, 80:6, 80:7
**details** [1] - 33:14
**deter** [2] - 46:13, 53:9
**determination** [1] - 47:1
**determine** [1] - 6:14
**deterrence** [3] - 38:1, 46:20, 47:25
**deterrent** [1] - 53:3
**developed** [1] - 62:1
**devise** [1] - 43:14
**diatribes** [1] - 37:3

**differ** [1] - 92:9
**difference** [5] - 59:13, 75:18, 75:21, 76:3, 77:10
**differences** [2] - 59:9, 59:11
**different** [37] - 8:1, 8:12, 8:15, 8:22, 9:25, 21:4, 21:12, 22:23, 24:7, 24:9, 51:10, 52:8, 60:5, 60:10, 60:11, 60:15, 63:25, 70:6, 71:15, 75:25, 76:24, 84:3, 89:12, 89:14, 89:16, 89:18, 91:22, 93:8, 93:9, 93:10, 93:11, 94:9
**differently** [2] - 84:10, 97:7
**difficult** [1] - 93:18
**difficulty** [1] - 7:20
**diligenced** [1] - 88:16
**Diller** [1] - 4:5
**direct** [6] - 33:16, 43:11, 66:1, 77:3, 77:5, 81:5
**directed** [2] - 39:15, 95:11
**directive** [1] - 16:9
**directly** [1] - 81:15
**director** [8] - 8:9, 9:18, 10:7, 10:8, 10:14, 61:3, 61:7, 66:2
**disagree** [2] - 41:18, 97:10
**disagreed** [1] - 89:13
**disciplinary** [1] - 60:16
**discovered** [1] - 86:18
**discovery** [3] - 59:5, 97:7, 97:11
**discrete** [1] - 80:8
**discrimination** [7] - 23:1, 44:22, 45:19, 58:17, 59:2, 69:12, 94:24
**discriminatory** [1] - 45:22
**discuss** [2] - 52:9, 68:14
**discussed** [3] - 72:25, 73:1, 73:2
**discussing** [2] - 7:4, 15:7
**discussion** [1] - 57:23
**discussions** [1] - 40:3
**dismiss** [25] - 4:24, 18:20, 18:24, 21:1, 21:18, 33:21, 34:6,

38:9, 45:10, 53:5, 56:3, 70:25, 71:13, 71:18, 72:22, 82:21, 83:14, 83:19, 83:20, 89:7, 89:21, 94:2, 94:4, 96:6, 97:23
**dismissal** [5] - 21:9, 27:6, 27:17, 27:19, 50:6
**dismissed** [1] - 22:9
**dismissing** [3] - 21:21, 21:25, 22:18
**disparate** [2] - 13:8, 13:13
**dispute** [3] - 46:1, 47:23, 69:12
**dissent** [1] - 45:7
**dissenting** [1] - 84:11
**distinct** [1] - 48:16
**distinguish** [2] - 45:6, 94:17
**distinguishing** [3] - 42:2, 42:23, 49:23
**distort** [1] - 42:13
**distress** [2] - 15:13, 22:14
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [6] - 2:8, 31:22, 38:2, 56:5, 78:8, 78:9
**district** [2] - 32:13, 56:19
**divine** [3] - 25:18, 53:1, 93:18
**divining** [2] - 36:5, 92:23
**djasmith@manatt. com** [1] - 2:10
**Docket** [6] - 14:9, 43:12, 44:24, 89:7, 89:22, 91:5
**docket** [1] - 17:12
**documents** [1] - 51:24
**dogs** [1] - 54:5
**dollars** [2] - 81:13, 81:14
**domain** [1] - 73:8
**donate** [4] - 48:10, 48:23, 76:2, 81:7
**donation** [11] - 55:18, 56:8, 57:4, 57:16, 79:20, 79:24, 80:9, 80:24, 81:4, 81:17, 98:9
**donations** [9] - 40:1, 40:2, 78:21, 79:25, 82:1, 82:2, 98:10, 98:19
**done** [5] - 17:18,

53:17, 53:20, 59:7, 75:25
**donor** [6] - 40:12, 40:21, 41:1, 48:7, 48:8, 81:1
**donors** [3] - 48:15, 48:19, 79:22
**donors'** [1] - 79:18
**door** [2] - 22:16, 24:1
**Dor** [5] - 3:22, 21:23, 23:22, 27:5, 27:8
**DOR** [20] - 1:22, 27:9, 27:11, 27:13, 27:16, 28:6, 28:16, 28:20, 28:22, 29:13, 29:19, 30:18, 30:21, 31:8, 31:12, 32:9, 32:25, 33:3, 33:20, 34:9
**double** [1] - 52:14
**doubled** [1] - 58:2
**DOUGLAS** [1] - 2:7
**Douglas** [2] - 4:3, 54:24
**down** [10] - 18:11, 26:22, 46:15, 46:25, 50:13, 52:15, 58:3, 62:13, 67:18, 86:23
**doxxed** [1] - 86:10
**doxxing** [9] - 40:15, 41:25, 42:4, 67:1, 83:1, 83:7, 84:8, 85:15, 91:22
**dozen** [1] - 9:5
**draft** [1] - 57:21
**drafting** [1] - 70:19
**drag** [1] - 36:25
**dragged** [3] - 46:2, 47:9, 47:13
**draining** [1] - 47:24
**drawing** [1] - 6:17
**draws** [1] - 29:14
**driving** [1] - 74:18
**drop** [2] - 70:17, 71:2
**dropping** [1] - 30:4
**dry** [1] - 45:2
**due** [1] - 98:2
**Dunn** [1] - 3:21
**DUNN** [1] - 1:19
**duties** [4] - 7:17, 9:20, 10:11, 10:15

**E**

**early** [3] - 30:13, 82:18, 96:21
**earns** [1] - 97:9
**easy** [1] - 24:19
**economic** [1] - 77:12
**edit** [1] - 25:1
**editing** [2] - 22:5, 25:7

**editorialized** [1] - 67:16
**educating** [1] - 77:4
**educational** [4] - 77:2, 78:1, 94:22, 94:25
**EEOC** [2] - 31:9, 69:9
**effect** [1] - 34:5
**efficiency** [1] - 73:1
**ego** [1] - 48:21
**eight** [2] - 51:21, 66:23
**either** [4] - 35:11, 38:5, 46:4, 61:25
**elaborated** [1] - 97:2
**element** [1] - 25:13
**elements** [4] - 41:10, 43:4, 43:9, 56:19
**ELIZABETH** [1] - 1:19
**Elizabeth** [1] - 3:20
**email** [4] - 14:7, 73:19, 74:2, 93:2
**emails** [3] - 14:25, 61:13, 85:7
**emotional** [2] - 15:12, 22:13
**emphasize** [2] - 50:10, 53:3
**employed** [2] - 62:8, 78:24
**employee** [8] - 9:4, 9:12, 10:12, 10:20, 60:6, 61:24, 62:3, 62:8
**employees** [5] - 13:8, 55:24, 62:6, 64:10, 82:11
**employer** [4] - 31:18, 42:5, 45:19, 78:18
**employer's** [1] - 32:8
**employers** [2] - 74:7, 75:23
**employing** [1] - 58:23
**employment** [18] - 7:15, 31:19, 31:25, 32:2, 40:17, 44:22, 45:2, 45:19, 46:1, 47:23, 57:8, 57:10, 62:22, 65:5, 65:6, 69:12, 82:15, 85:4
**encourage** [1] - 14:9
**end** [7] - 22:22, 40:13, 60:19, 61:14, 63:23, 74:22, 90:10
**endeavor** [1] - 98:24
**ended** [1] - 55:18
**ends** [2] - 42:18, 42:19
**engage** [1] - 56:4
**engaged** [5] - 30:1, 37:15, 40:22, 76:10, 79:5
**engages** [1] - 78:11

**ensure** [4] - 16:12, 21:7, 36:19, 82:7
**entail** [1] - 9:20
**entertain** [1] - 19:21
**entire** [2] - 45:13, 62:17
**entirely** [1] - 55:25
**entitled** [1] - 39:5
**entry** [1] - 60:5
**Entry** [2] - 43:12, 44:25
**entry-level** [1] - 60:5
**envelope** [1] - 82:25
**environment** [3] - 14:20, 14:24, 53:10
**epapez@ gibsondunn.com** [1] - 1:21
**epithet** [1] - 25:10
**equivalent** [1] - 51:2
**eradicate** [1] - 36:18
**error** [1] - 58:23
**Erwin** [1] - 40:9
**especially** [3] - 53:9, 96:19, 97:22
**ESQ** [8] - 1:11, 1:15, 1:19, 1:22, 2:2, 2:2, 2:7, 2:11
**essential** [1] - 82:24
**essentially** [4] - 43:19, 44:18, 70:16, 94:23
**establish** [2] - 6:2, 92:8
**established** [1] - 77:16
**estimation** [1] - 71:12
**et** [2] - 1:6, 3:4
**evaluate** [2] - 43:16, 61:19
**evaluated** [1] - 60:1
**evaluation** [1] - 62:7
**event** [1] - 31:2
**events** [4] - 30:10, 30:23, 56:22, 79:9
**evidence** [8] - 33:17, 35:14, 36:21, 51:14, 51:16, 56:9, 61:20, 92:25
**evil** [1] - 94:22
**EWING** [1] - 1:15
**exactly** [6] - 12:7, 25:16, 40:15, 59:2, 59:16, 81:18
**example** [4] - 24:11, 25:1, 25:25, 84:20
**examples** [1] - 37:21
**except** [1] - 57:23
**exception** [1] - 64:14
**executive** [6] - 9:18, 10:7, 10:8, 10:14, 61:3, 88:7

**exercise** [2] - 20:8, 40:18
**exhaust** [2] - 13:24, 14:21
**exhausted** [1] - 20:8
**exist** [4] - 14:6, 29:1, 55:22, 75:8
**existed** [2] - 45:25, 75:9
**existing** [5] - 35:9, 43:7, 43:18, 45:5, 84:15
**exists** [3] - 73:8, 77:11, 80:17
**expand** [1] - 84:7
**expanded** [2] - 43:8, 85:15
**expanding** [1] - 83:6
**expectations** [1] - 60:11
**expeditious** [1] - 50:21
**experience** [3] - 6:17, 82:16, 82:17
**expertise** [1] - 9:11
**explain** [4] - 69:9, 69:15, 89:8, 94:17
**explained** [2] - 68:8, 68:17
**explaining** [1] - 73:18
**explains** [1] - 73:25
**explanation** [3] - 45:1, 69:3, 69:19
**explicit** [1] - 81:9
**explicitly** [1] - 66:12
**exposing** [1] - 85:10
**expressing** [2] - 75:19, 76:1
**expressly** [3] - 27:24, 28:24, 31:17
**extend** [2] - 51:15, 94:6
**extended** [1] - 94:7
**extending** [1] - 84:14
**extension** [1] - 83:22
**extent** [1] - 44:4
**extrajudicious** [1] - 90:16

**F**

**FAC** [1] - 89:12
**face** [7] - 48:4, 48:5, 62:13, 91:15, 94:16, 97:13
**face-to-face** [1] - 62:13
**Facebook** [1] - 35:25
**faced** [1] - 48:16
**faces** [1] - 3:17

**facially** [2] - 69:13, 88:12
**facie** [2] - 14:23, 23:4
**facing** [4] - 7:16, 7:22, 61:8
**fact** [16] - 7:13, 7:15, 8:14, 8:21, 11:7, 14:5, 22:19, 26:10, 40:14, 42:20, 47:2, 51:5, 68:11, 74:20, 80:23, 96:19
**factor** [1] - 74:18
**factors** [1] - 78:9
**facts** [22] - 6:14, 6:18, 6:24, 10:9, 19:15, 20:2, 22:3, 25:23, 32:16, 33:14, 33:17, 41:25, 51:14, 53:2, 58:25, 59:4, 59:20, 84:16, 85:23, 92:13, 93:20, 94:18
**factual** [10] - 6:8, 22:21, 24:15, 26:16, 28:19, 32:19, 35:23, 40:25, 82:23, 92:19
**fail** [1] - 31:15
**failed** [3] - 14:21, 14:23, 68:23
**fails** [1] - 56:18
**failure** [2] - 13:24, 20:2
**fair** [6] - 6:4, 43:20, 52:6, 52:10, 83:2, 88:9
**Fairfax** [1] - 50:12
**faith** [3] - 84:6, 92:12, 92:18
**fall** [1] - 62:6
**falls** [1] - 62:4
**false** [14] - 15:11, 22:11, 24:3, 24:7, 24:20, 25:6, 26:5, 26:11, 26:12, 28:1, 28:3, 28:5, 29:21, 95:23
**falsity** [2] - 24:22, 25:14
**Family** [1] - 4:5
**family** [2] - 26:2, 86:8
**famous** [1] - 51:1
**far** [4] - 14:1, 40:11, 41:4, 48:23
**far-fetched** [1] - 41:4
**Farah** [3] - 22:15, 24:1, 26:18
**fascism** [2] - 25:3, 25:5
**favor** [1] - 27:19
**February** [2] - 1:4, 99:12
**Federation** [1] - 4:4

**feedback** [1] - 77:24
**fees** [1] - 46:11
**felt** [2] - 21:7, 21:13
**fetched** [2] - 40:12, 41:4
**few** [3] - 16:2, 44:14, 46:19
**field** [1] - 9:11
**figure** [1] - 96:9
**file** [13] - 12:8, 16:1, 17:7, 20:15, 53:16, 57:25, 58:3, 71:21, 87:17, 88:20, 88:21, 89:10, 93:3
**filed** [15] - 17:16, 17:20, 17:24, 18:2, 18:18, 19:9, 88:25, 89:4, 89:16, 89:21, 90:4, 90:8, 90:10, 90:18, 96:22
**filing** [2] - 71:20, 89:16
**filled** [1] - 52:18
**finally** [3] - 33:20, 37:25, 91:1
**findings** [4] - 7:12, 11:20, 46:23, 64:11
**finer** [1] - 53:25
**finish** [1] - 91:3
**Finn** [1] - 25:10
**fire** [3] - 74:9, 75:24, 78:19
**fired** [4] - 52:2, 52:4, 52:6, 91:16
**firing** [2] - 74:10, 78:19
**firm** [2] - 4:8, 45:21
**First** [20] - 21:20, 21:24, 22:1, 23:6, 23:21, 23:25, 26:16, 27:1, 27:17, 33:24, 34:5, 36:1, 40:18, 42:21, 44:4, 48:6, 73:5, 75:15, 91:10, 94:24
**first** [17] - 4:24, 35:8, 35:18, 43:3, 45:10, 46:14, 46:20, 47:7, 57:22, 62:7, 70:14, 70:23, 71:15, 86:1, 88:15, 96:22, 96:23
**fish** [1] - 60:5
**fit** [1] - 58:20
**five** [1] - 58:7
**FL** [1] - 2:4
**flag** [1] - 5:14
**flagged** [1] - 58:17
**flags** [1] - 5:12
**flesh** [1] - 85:22
**floor** [1] - 58:12
**Florida** [1] - 57:13

**Florio** [10] - 22:8, 22:10, 23:12, 23:14, 26:18, 91:4, 91:7, 91:9, 91:14, 94:13
**focus** [6] - 7:2, 29:17, 34:17, 38:15, 55:22, 58:16
**Foerster** [1] - 5:6
**folks** [4] - 40:9, 40:17, 76:10, 76:13
**followed** [1] - 5:15
**foot** [1] - 76:6
**Footnote** [1] - 98:17
**FOR** [1] - 1:1
**force** [1] - 82:10
**forced** [3] - 57:24, 57:25, 58:3
**foreclose** [1] - 45:3
**foreclosed** [2] - 44:23, 55:21
**foregoing** [1] - 99:8
**foregone** [2] - 75:4, 75:5
**foreign** [1] - 8:11
**Foreign** [1] - 8:24
**foreseeability** [1] - 57:16
**foreseeable** [1] - 57:15
**form** [1] - 22:5
**formed** [2] - 32:18, 32:21
**former** [1] - 79:2
**forms** [1] - 29:7
**forth** [4] - 16:3, 19:15, 44:19, 71:16
**forum** [1] - 56:21
**Forward** [2] - 39:25, 81:24
**forward** [2] - 46:6, 75:3
**Foundation** [1] - 4:5
**four** [1] - 35:6
**fourth** [1] - 37:20
**framed** [1] - 28:25
**framework** [2] - 48:18, 80:5
**Francisco** [10] - 2:7, 4:5, 4:6, 39:9, 54:24, 55:3, 55:23, 79:19, 79:21, 81:8
**frankly** [2] - 34:25, 37:12
**free** [2] - 25:2, 36:10
**freedom** [1] - 9:9
**fresh** [1] - 20:25
**freshman** [7] - 51:20, 56:23, 66:24, 67:1, 68:15, 75:7, 75:9
**friend** [1] - 37:8

**frivolous** [5] - 40:12, 89:17, 93:11, 96:14, 96:19
**front** [7] - 3:24, 12:6, 22:17, 46:23, 82:3, 88:17, 88:22
**frustration** [2] - 50:15, 50:24
**full** [7] - 16:13, 16:15, 17:2, 17:7, 17:11, 62:12, 99:9
**fully** [2] - 38:9, 88:17
**function** [1] - 64:6
**fundamentally** [2] - 9:24, 75:13
**funded** [1] - 53:14
**funders** [1] - 86:23
**funding** [8] - 56:5, 78:21, 80:7, 80:16, 81:11, 82:4, 82:6
**funds** [1] - 39:22
**funeral** [1] - 26:1
**future** [4] - 53:9, 53:24, 79:25, 82:1

## G

**Gaza** [2] - 15:7, 42:19
**general** [1] - 28:14
**generally** [1] - 36:2
**generic** [1] - 33:11
**generously** [1] - 32:22
**genesis** [1] - 77:17
**genocide** [1] - 67:8
**genuinely** [1] - 21:11
**George** [2] - 3:13, 5:4
**GEORGETOWN** [1] - 1:6
**Georgetown** [41] - 1:15, 3:3, 3:12, 4:22, 5:3, 5:4, 6:13, 8:10, 12:18, 12:25, 13:1, 13:3, 14:2, 32:4, 37:24, 39:17, 45:24, 51:22, 51:25, 52:2, 57:9, 58:18, 59:14, 60:9, 62:10, 62:19, 62:22, 63:14, 63:15, 63:23, 63:24, 74:7, 78:20, 79:3, 81:1, 82:11, 82:17, 86:15, 86:24, 87:9
**Georgetown's** [4] - 58:22, 60:24, 69:11, 82:10
**Georgia** [1] - 38:3
**GIBSON** [1] - 1:19
**Gibson** [1] - 3:21
**given** [9] - 16:22, 18:3, 21:8, 34:2, 39:19,

47:5, 58:1, 69:8, 70:8
**glaring** [1] - 75:21
**good-faith** [3] - 84:6, 92:12, 92:18
**Google** [1] - 84:2
**Googled** [1] - 74:3
**Googling** [1] - 87:9
**gray** [1] - 80:13
**great** [2] - 23:11, 54:20
**GREAVES** [24] - 2:11, 4:10, 49:5, 49:8, 49:11, 49:19, 49:23, 50:18, 50:20, 51:16, 51:22, 52:11, 53:8, 53:21, 53:23, 54:21, 95:6, 95:21, 96:12, 96:14, 97:5, 97:13, 97:16, 97:18
**Greaves** [6] - 4:11, 34:18, 49:3, 49:5, 49:7, 69:4
**grievances** [2] - 51:3, 51:5
**grieving** [1] - 94:20
**ground** [3] - 19:3, 22:1, 23:23
**grounding** [1] - 38:16
**grounds** [17] - 16:4, 20:9, 20:25, 21:8, 21:9, 21:12, 21:20, 21:24, 27:2, 27:6, 27:17, 31:15, 33:22, 72:9, 73:5, 90:17
**group** [1] - 40:14
**Group** [1] - 4:11
**GROUP** [1] - 2:12
**groups** [1] - 40:8
**guess** [4] - 18:2, 40:11, 49:23, 87:23
**guy** [1] - 39:22
**guys** [1] - 74:14

## H

**halfway** [1] - 75:20
**Hamed** [16] - 3:8, 4:25, 8:2, 18:9, 35:24, 36:10, 38:2, 40:16, 44:24, 48:17, 51:10, 58:9, 58:12, 93:25, 95:7, 98:10
**HAMED** [90] - 1:11, 1:12, 3:7, 58:21, 59:12, 60:13, 60:18, 60:21, 61:2, 61:6, 62:4, 63:7, 63:9, 63:12, 63:19, 64:2, 64:14, 64:17, 64:20, 64:23, 65:1, 65:4,

65:7, 65:16, 65:20, 65:25, 66:7, 66:9, 66:11, 66:15, 66:19, 66:21, 67:20, 68:1, 68:5, 68:7, 68:10, 68:12, 68:18, 68:21, 68:25, 69:17, 70:1, 70:6, 70:8, 70:13, 71:9, 71:11, 72:3, 72:12, 72:17, 72:19, 73:15, 73:23, 73:25, 75:12, 75:18, 76:7, 76:17, 76:20, 77:1, 77:8, 77:10, 77:15, 78:13, 78:16, 79:8, 79:12, 79:16, 80:5, 80:23, 81:3, 81:6, 82:14, 83:3, 83:5, 83:9, 83:12, 83:16, 83:21, 84:9, 84:16, 85:11, 85:18, 85:20, 85:23, 86:1, 86:5, 86:20, 87:5

**Hamed's** [1] - 47:18

**handle** [1] - 74:19

**hands** [3] - 54:10, 55:18, 82:11

**happy** [2] - 43:5, 59:12

**harassing** [1] - 26:1

**harassment** [2] - 28:11, 92:15

**harbor** [7] - 19:19, 19:24, 20:1, 20:14, 20:25, 57:21, 71:6

**harm** [1] - 36:18

**harshly** [1] - 50:13

**hate** [6] - 25:3, 54:4, 54:7, 54:8, 54:14, 76:9

**hatred** [1] - 52:20

**head** [1] - 62:1

**hear** [4] - 4:24, 58:9, 90:24, 91:22

**heard** [4] - 18:8, 44:15, 83:6, 87:15

**hearing** [12] - 7:20, 17:9, 17:13, 18:8, 18:9, 18:11, 18:14, 19:21, 20:3, 20:6, 20:15, 99:2

**HEARING** [1] - 1:9

**hearings** [1] - 38:12

**held** [5] - 30:12, 31:24, 32:10, 32:13, 48:8

**HELD** [1] - 1:9

**Helen** [1] - 4:5

**Heller** [1] - 14:8

**Hellman** [4] - 3:12, 5:4, 8:23, 64:12

**Hellman's** [1] - 14:25

**Henry** [2] - 3:11, 5:3

**HENRY** [1] - 1:15

**henry.platt@saul. com** [1] - 1:18

**hereby** [1] - 99:7

**herself** [4] - 51:10, 51:19, 51:23, 52:24

**higher** [1] - 89:25

**hindsight** [1] - 5:12

**hired** [1] - 86:15

**hires** [1] - 87:9

**history** [1] - 16:7

**Hoffman** [1] - 12:23

**hold** [1] - 3:14

**hole** [1] - 86:22

**holidays** [1] - 90:12

**HOLTZMAN** [1] - 2:3

**Holtzman** [1] - 4:15

**home** [3] - 42:1, 84:3, 98:25

**Honor** [87] - 3:11, 3:20, 3:25, 4:3, 4:10, 4:14, 5:2, 5:12, 5:16, 5:23, 7:19, 8:6, 11:24, 12:10, 14:13, 15:19, 15:21, 15:25, 16:2, 16:3, 17:17, 18:5, 18:22, 20:19, 21:4, 21:19, 22:11, 23:11, 26:6, 26:24, 27:9, 28:20, 30:19, 32:9, 34:9, 34:11, 35:1, 36:10, 37:13, 37:20, 41:9, 42:15, 44:2, 46:19, 47:17, 49:5, 50:20, 51:8, 51:16, 51:23, 52:12, 53:4, 53:23, 54:21, 54:23, 55:7, 58:6, 60:18, 84:20, 87:7, 87:11, 88:4, 88:10, 88:14, 88:22, 89:2, 89:5, 89:15, 91:7, 91:20, 91:21, 91:25, 92:3, 93:5, 93:13, 93:18, 93:21, 93:23, 94:20, 95:6, 96:2, 96:12, 96:14, 96:24, 97:16, 97:20, 98:21

**Honor's** [1] - 88:15

**HONORABLE** [1] - 1:9

**hope** [1] - 16:9

**hopefully** [1] - 4:19

**hoping** [1] - 17:3

**horribleness** [1] - 8:7

**horse** [1] - 21:17

**hostile** [2] - 14:20, 14:24

**hours** [2] - 66:25, 70:2

**HR** [13] - 62:4, 62:25,

63:4, 64:2, 64:5, 64:6, 64:9, 64:17, 65:4, 65:13, 65:22, 65:23, 66:4

**HR-204** [1] - 10:19

**Huck** [1] - 25:10

**huge** [1] - 75:18

**human** [3] - 8:19, 31:9, 90:19

**Human** [9] - 13:18, 14:1, 14:16, 14:22, 26:21, 44:13, 45:16, 46:5, 48:2

**hundred** [1] - 81:14

**hurt** [1] - 94:19

**hypothetical** [5] - 42:2, 42:4, 42:23, 86:4, 94:21

## I

**i.e** [2] - 23:19, 29:1

**IAN** [1] - 2:2

**idea** [3] - 17:22, 50:3, 63:22

**idealogical** [1] - 53:15

**identical** [6] - 6:2, 6:21, 6:25, 58:23, 59:6, 59:14

**identically** [2] - 49:12, 60:20

**identified** [4] - 12:25, 47:22, 73:11, 74:6

**identifies** [1] - 85:9

**identify** [4] - 73:14, 73:16, 84:23, 85:5

**identifying** [1] - 75:23

**ideological** [1] - 53:10

**IDF** [1] - 76:2

**IEED** [1] - 25:22

**ignored** [1] - 53:3

**ignores** [1] - 35:11

**IIED** [2] - 24:10, 29:23

**Illinois** [2] - 56:24, 57:6

**Ilya** [3] - 2:11, 4:11, 49:6

**image** [2] - 83:25, 85:2

**imagine** [6] - 54:1, 54:2, 54:11, 54:12, 54:15, 54:16

**immediate** [1] - 75:4

**immediately** [2] - 67:2, 74:3

**imminent** [1] - 95:11

**impact** [1] - 63:13

**impetus** [1] - 74:4

**implicate** [1] - 41:1

**important** [5] - 12:16, 24:20, 52:1, 56:22,

96:20

**importantly** [1] - 9:1

**impose** [4] - 41:8, 47:20, 51:9, 92:21

**imposed** [1] - 41:7

**imposing** [1] - 51:2

**imposition** [2] - 50:25, 51:11

**improper** [13] - 23:4, 35:15, 35:22, 36:9, 36:13, 37:18, 50:8, 51:7, 52:23, 55:12, 71:8, 89:17, 92:15

**IN** [1] - 1:1

**inactionable** [2] - 25:24, 26:17

**inappropriate** [4] - 17:20, 89:4, 89:5, 89:8

**inartful** [1] - 50:23

**inartfully** [1] - 9:10

**incite** [1] - 95:12

**incited** [1] - 26:3

**incitement** [3] - 74:25, 95:8, 95:9

**inciting** [1] - 95:11

**include** [3] - 43:8, 83:23, 84:7

**includes** [1] - 11:19

**including** [2] - 16:23, 81:22

**incoming** [1] - 62:8

**incomplete** [1] - 8:3

**incorporate** [1] - 55:9

**incorporated** [2] - 51:24, 61:22

**incredible** [1] - 82:19

**independent** [1] - 74:19

**independently** [1] - 60:16

**indicate** [1] - 8:16

**indicated** [1] - 79:22

**indicating** [1] - 19:21

**indirect** [6] - 48:8, 80:9, 80:10, 80:16, 81:5, 81:8

**individual** [6] - 13:16, 13:17, 78:22, 85:3, 85:4

**individuals** [4] - 56:7, 77:23, 80:20, 90:25

**infer** [10] - 32:22, 35:22, 52:16, 52:23, 52:25, 65:21, 66:16, 88:1, 96:7

**inferable** [2] - 52:5, 52:17

**inference** [6] - 13:8, 32:17, 33:6, 33:7,

33:8, 33:15

**inferred** [1] - 36:22

**inferring** [1] - 36:13

**infliction** [3] - 15:12, 22:13, 24:11

**information** [4] - 26:3, 42:5, 44:5, 91:23

**inherent** [1] - 24:22

**initial** [1] - 61:12

**injury** [3] - 77:12, 82:18, 84:19

**innocently** [1] - 86:14

**inquiry** [2] - 28:22, 28:25

**instead** [2] - 58:2, 69:1

**institution** [2] - 78:23, 86:22

**institutional** [1] - 86:22

**institutions** [1] - 56:7

**instructed** [1] - 39:15

**intense** [1] - 86:25

**intent** [3] - 36:5, 36:13, 50:8

**intentional** [3] - 15:12, 22:13, 24:11

**interaction** [1] - 32:20

**interactions** [1] - 21:13

**interested** [1] - 19:21

**interests** [1] - 78:2

**interfere** [2] - 29:10, 78:24

**interfered** [1] - 28:9

**interference** [11] - 22:12, 23:2, 23:16, 23:18, 23:20, 24:6, 24:8, 25:23, 28:4, 29:7, 29:15

**interfering** [3] - 40:16, 42:5, 80:19

**intermediary** [1] - 81:12

**Internet** [5] - 12:1, 12:24, 26:3, 84:20, 85:5

**interprets** [1] - 72:6

**interruption** [1] - 26:4

**intertwined** [7] - 28:1, 28:5, 28:14, 28:18, 29:1, 29:12, 29:16

**intimidating** [1] - 26:1

**intimidation** [1] - 84:4

**intricate** [1] - 84:17

**introduction** [1] - 74:2

**invent** [2] - 43:22, 44:10

**investigate** [1] - 64:3

**investigated** [2] - 64:9, 70:5

**investigation** [14] -
13:2, 56:10, 56:12,
61:15, 62:12, 62:16,
65:2, 65:8, 65:9,
65:12, 69:1, 69:22,
75:3
**investigations** [2] -
7:12, 65:23
**investigative** [1] -
81:24
**invite** [1] - 53:11
**invoke** [1] - 96:4
**involve** [1] - 40:2
**involved** [2] - 50:2,
65:22
**involves** [1] - 28:2
**Iqbal** [2] - 6:9, 33:13
**Israel** [3] - 37:14,
42:19, 54:11
**Israel's** [1] - 40:19
**Israel-Gaza** [1] - 42:19
**Israeli** [1] - 54:3
**issue** [15] - 12:14,
16:5, 19:4, 19:22,
21:6, 22:10, 23:13,
23:25, 24:11, 29:23,
33:25, 34:22, 57:18,
57:19, 72:4
**issued** [2] - 4:18,
19:20
**issues** [15] - 9:9,
15:17, 17:4, 18:19,
19:5, 20:4, 20:24,
21:18, 22:8, 33:25,
38:6, 58:17, 58:18,
60:12, 92:3
**iterations** [2] - 47:11,
54:16
**itself** [6] - 30:6, 32:3,
34:5, 37:2, 52:14,
84:16

**J**

**January** [1] - 70:21
**Jason** [3] - 4:10, 4:14,
49:5
**JASON** [2] - 2:2, 2:11
**jason@binnall.com**
[1] - 2:14
**Jazeera** [1] - 39:21
**Jew** [1] - 38:24
**Jewish** [6] - 4:4,
12:25, 37:15, 39:11,
54:3
**Jews** [1] - 37:1
**job** [6] - 39:7, 57:10,
65:10, 74:12, 75:2,
75:24
**jobs** [1] - 91:16

**Joel** [2] - 3:12, 5:4
**Johnson** [34] - 3:3,
3:8, 9:23, 10:18,
38:21, 39:13, 41:19,
51:15, 51:23, 54:2,
54:12, 56:23, 58:25,
59:2, 59:20, 59:23,
61:18, 62:20, 63:11,
64:1, 64:2, 64:13,
66:23, 73:11, 73:14,
73:16, 74:2, 74:6,
75:1, 75:23, 81:2,
82:7, 84:14, 86:24
**JOHNSON** [1] - 1:2
**Johnson's** [9] - 31:18,
39:3, 47:23, 63:12,
64:7, 74:7, 75:13,
76:4, 80:1
**Jonathan** [1] - 50:12
**Jones** [1] - 98:15
**JOSEFIAK** [1] - 2:3
**journalism** [1] - 81:25
**Joyner** [4] - 5:6, 5:25,
58:23, 59:24
**jtorchinsky@
holtzmanvogel.
com** [1] - 2:6
**judge** [6] - 46:24,
46:25, 68:1, 68:18,
84:9
**Judge** [30] - 3:7,
30:19, 30:20, 30:21,
50:11, 51:1, 58:21,
59:12, 60:13, 64:23,
65:7, 65:17, 66:19,
68:13, 70:6, 71:9,
72:3, 72:12, 72:17,
76:7, 77:8, 78:13,
78:16, 79:13, 79:16,
81:6, 83:3, 86:5,
87:5, 87:16
**JUDGE** [1] - 1:10
**judgment** [4] - 6:1,
23:10, 24:12, 58:24
**judicial** [5] - 6:17,
46:23, 50:14, 50:15,
50:24
**judicious** [3] - 16:15,
18:21, 92:1
**July** [2] - 70:14, 71:13
**jump** [2] - 46:10, 53:5
**June** [2] - 96:24
**jurisdiction** [20] -
41:3, 48:5, 49:17,
49:20, 49:25, 55:22,
56:18, 56:20, 57:11,
57:14, 57:17, 78:5,
78:7, 95:16, 95:20,
96:11, 96:16, 96:21,
97:1, 97:6

**jurisdictional** [1] -
97:7
**jurisdictions** [1] - 41:3
**jurisprudence** [1] -
95:10
**justice** [1] - 67:9
**justifiable** [1] - 54:13
**justifiably** [1] - 54:5
**justify** [1] - 19:16

**K**

**kettle** [1] - 60:5
**key** [1] - 25:13
**kind** [5] - 54:7, 63:22,
67:2, 80:11, 95:7
**King** [1] - 2:12
**knowingly** [1] - 40:13
**knowledge** [1] - 56:20
**known** [2] - 50:13,
96:25
**knows** [3] - 40:22,
77:20, 96:2

**L**

**label** [1] - 40:9
**labeled** [1] - 24:24
**lack** [7] - 16:11, 31:16,
32:11, 33:25, 35:23,
38:15, 48:5
**lacks** [1] - 45:18
**laid** [1] - 18:23
**language** [5] - 12:5,
63:16, 66:13, 72:8,
89:2
**large** [1] - 65:13
**last** [6] - 15:23, 16:1,
45:9, 47:11, 54:23,
96:25
**latest** [1] - 31:2
**Lavi** [2] - 3:22, 21:23
**LAVI** [1] - 1:22
**law** [27] - 8:10, 10:14,
10:15, 14:17, 15:9,
16:22, 24:5, 25:25,
26:15, 26:17, 35:9,
38:16, 43:7, 43:18,
44:10, 45:4, 45:5,
45:20, 50:11, 51:5,
59:24, 66:3, 72:5,
83:23, 84:7, 84:12,
84:15
**LAW** [2] - 1:12, 2:12
**Law** [6] - 4:11, 76:8,
76:25, 77:1, 77:20,
78:1
**law's** [1] - 27:23
**lawless** [1] - 95:11
**laws** [1] - 43:25

**lawsuit** [11] - 35:13,
35:15, 46:21, 46:23,
47:10, 48:4, 50:5,
53:12, 53:16, 54:13,
54:17
**lawsuits** [1] - 53:9
**lawyers** [1] - 47:9
**lbendor@
gibsondunn.com** [1]
- 1:24
**leaders** [1] - 67:11
**leadership** [1] - 67:9
**learned** [1] - 31:1
**least** [10] - 7:11, 7:15,
7:23, 8:4, 19:16,
20:11, 51:9, 52:2,
83:8, 97:11
**leave** [3] - 4:25, 70:2,
70:4
**leaves** [1] - 88:23
**lectured** [1] - 61:6
**lecturer** [3] - 9:19,
61:2, 62:1
**lecturing** [2] - 61:4,
61:8
**left** [3] - 4:20, 27:14,
66:1
**legal** [9] - 35:11,
35:23, 48:17, 82:23,
83:13, 84:11, 92:18,
94:1
**legally** [3] - 23:19,
43:1, 89:17
**legitimate** [1] - 94:20
**less** [6] - 32:21, 39:17,
50:4, 53:11, 56:15,
70:2
**lesser** [2] - 53:7, 53:8
**letter** [27] - 11:10,
11:13, 11:19, 11:21,
11:25, 12:6, 12:9,
14:7, 15:3, 19:19,
19:25, 20:25, 57:21,
62:23, 63:4, 63:12,
68:24, 70:14, 70:15,
70:19, 70:22, 71:6,
87:17, 87:25, 89:10,
90:11
**letters** [1] - 51:24
**letting** [1] - 70:16
**level** [5] - 6:8, 60:5,
88:6, 88:7, 90:16
**liability** [11] - 5:22,
13:17, 55:10, 55:11,
83:1, 83:7, 84:15,
85:10, 85:15, 87:3,
87:14
**liable** [3] - 44:8, 48:8,
48:12
**libel** [3] - 27:24, 28:1,

28:23
**liberally** [1] - 62:24
**light** [12] - 6:9, 15:12,
22:11, 24:3, 24:7,
28:2, 28:5, 29:21,
43:16, 46:16, 59:11,
98:13
**lightly** [1] - 34:23
**likely** [1] - 95:12
**likewise** [2] - 14:15,
75:16
**limitations** [13] -
27:21, 27:23, 30:10,
30:11, 30:13, 30:22,
33:25, 41:17, 48:6,
94:4, 94:9, 97:25,
98:3
**limiting** [1] - 58:19
**limits** [2] - 55:10
**line** [7] - 18:11, 29:14,
42:25, 45:10, 46:15,
94:12, 94:15
**lingering** [1] - 72:16
**link** [3] - 40:12, 74:24,
86:15
**LinkedIn** [4] - 36:11,
36:18, 37:2, 47:18
**LISA** [1] - 99:7
**Lisa** [1] - 2:16
**list** [1] - 8:3
**literature** [1] - 84:11
**litigant** [1] - 44:7
**litigants** [3] - 50:13,
51:1, 53:24
**litigation** [2] - 37:21,
47:7
**live** [1] - 86:7
**lived** [2] - 85:6, 86:7
**Lives** [2] - 32:13, 37:8
**lives** [4] - 85:6, 96:7,
96:15, 97:8
**living** [1] - 96:12
**LLP** [3] - 1:15, 1:19,
2:7
**local** [1] - 55:5
**location** [1] - 84:23
**long-arm** [3] - 56:2,
78:6, 96:4
**look** [16] - 20:8, 25:22,
26:6, 28:6, 30:24,
30:25, 33:16, 36:17,
64:4, 64:5, 66:17,
83:18, 83:25, 88:21,
91:4, 93:8
**looked** [1] - 64:6
**looking** [3] - 12:24,
47:18, 83:17
**looks** [1] - 29:4
**loop** [1] - 81:16
**loops** [1] - 81:16

**lost** [1] - 57:10
**love** [2] - 25:2, 25:5

## M

**Magistrate** [1] - 30:21
**maintaining** [1] - 48:3
**maintains** [1] - 35:13
**maker** [5] - 60:1, 65:1, 65:9, 65:14, 65:23
**makers** [3] - 8:16, 8:21, 64:19
**malicious** [1] - 80:18
**maligned** [1] - 26:8
**man** [1] - 9:9
**manager** [1] - 32:1
**Manatt** [2] - 4:7, 4:8
**MANATT** [1] - 2:7
**manifestation** [1] - 44:17
**marine** [1] - 26:8
**Mark** [2] - 3:25, 34:13
**MARK** [1] - 2:2
**massive** [2] - 61:9, 82:4
**material** [1] - 29:24
**Matter** [2] - 32:14, 37:8
**matter** [11] - 9:10, 14:17, 15:9, 22:22, 24:5, 25:25, 26:17, 67:12, 74:13, 75:19, 96:2
**mean** [12] - 7:25, 24:2, 24:7, 36:15, 46:22, 77:5, 80:8, 82:15, 83:9, 85:20, 86:17, 90:5
**meaningful** [6] - 59:13, 59:15, 59:21, 69:21, 75:3, 82:9
**means** [2] - 40:16, 95:10
**meant** [2] - 46:13, 46:14
**mechanical** [1] - 59:19
**mechanism** [2] - 80:8, 81:8
**mechanisms** [1] - 80:17
**media** [4] - 35:25, 67:2, 84:1, 86:12
**meet** [2] - 57:19, 92:13
**meeting** [6] - 10:12, 32:17, 33:9, 63:21, 64:1, 64:2
**member** [1] - 48:11
**members** [1] - 7:18
**mentality** [1] - 82:10
**mention** [7] - 60:14, 61:15, 63:13, 63:23,

71:20, 87:25, 98:7
**mentioned** [9] - 28:24, 53:4, 60:21, 63:10, 67:21, 70:18, 70:25, 84:21, 84:25
**mentions** [4] - 11:21, 37:9, 71:14, 98:17
**mentor** [1] - 50:11
**mentors** [1] - 50:11
**mere** [1] - 33:10
**merits** [5] - 17:14, 38:5, 70:10, 70:12, 82:21
**message** [2] - 53:24, 54:18
**messages** [1] - 84:25
**middle** [1] - 25:3
**might** [4] - 17:3, 55:14, 87:12, 92:25
**militia** [1] - 76:11
**millions** [2] - 81:13, 86:21
**Milstein** [12] - 2:2, 4:1, 4:15, 34:13, 38:1, 38:8, 39:9, 39:20, 39:22, 49:19, 55:12, 95:3
**mind** [7] - 25:18, 48:18, 53:1, 54:13, 54:14, 58:15, 92:24
**minds** [3] - 4:19, 32:18, 33:9
**minimum** [1] - 6:8
**minute** [4] - 4:18, 19:20, 51:14, 58:8
**mischaracterized** [1] - 67:22
**misconduct** [1] - 37:21
**misleading** [1] - 37:23
**misrepresentations** [1] - 37:23
**missing** [3] - 68:5, 68:6, 68:7
**Mission** [37] - 39:1, 39:22, 40:4, 40:14, 41:17, 42:20, 48:8, 48:9, 55:19, 56:11, 56:16, 57:3, 67:5, 67:6, 67:11, 67:22, 67:25, 73:13, 74:4, 74:22, 76:22, 77:16, 77:18, 79:23, 80:5, 80:8, 81:1, 81:3, 81:10, 81:15, 81:19, 81:21, 84:5, 86:10, 86:13, 86:23, 94:22
**mission** [1] - 67:4
**Mission's** [7] - 40:6, 42:11, 56:5, 74:18,

78:2, 80:15, 82:15
**misspoke** [1] - 15:2
**mistake** [2] - 60:22, 81:10
**mistakes** [1] - 82:3
**misunderstood** [1] - 42:3
**mitigate** [1] - 69:15
**mob** [1] - 82:10
**moderate** [1] - 40:8
**modern** [3] - 41:21, 42:17, 43:16
**monetary** [7] - 41:8, 46:11, 46:17, 47:8, 51:11, 53:4, 53:17
**money** [1] - 97:9
**Monroe** [1] - 2:4
**months** [4] - 17:12, 18:2, 62:7, 90:8
**moody** [1] - 41:20
**moot** [2] - 17:4, 20:10
**Moreira** [2] - 2:16, 99:14
**MOREIRA** [1] - 99:7
**morning** [18] - 3:7, 3:9, 3:11, 3:20, 3:25, 4:3, 4:10, 4:13, 4:18, 15:20, 15:21, 27:9, 27:10, 34:11, 34:12, 34:15, 34:16, 54:22
**Morrison** [1] - 5:6
**MOSHE** [1] - 1:22
**mosque** [1] - 51:6
**most** [4] - 4:19, 9:5, 14:24, 55:14
**mother** [1] - 98:15
**motion** [65] - 14:9, 15:23, 17:7, 17:8, 17:16, 17:19, 17:25, 18:4, 18:15, 18:20, 18:21, 18:23, 19:5, 19:10, 19:16, 19:17, 19:23, 20:12, 21:1, 21:3, 21:5, 21:6, 21:11, 21:18, 38:9, 43:12, 45:10, 47:15, 56:3, 57:22, 57:25, 58:4, 58:22, 70:22, 70:24, 70:25, 71:13, 71:15, 71:18, 71:21, 71:24, 72:22, 82:20, 83:14, 83:19, 83:20, 88:21, 88:24, 89:3, 89:6, 89:9, 89:21, 90:5, 92:4, 94:2, 94:4, 96:6, 96:22, 96:24, 97:23, 98:5, 98:13
**MOTION** [1] - 1:9
**motions** [15] - 4:23,

4:24, 16:16, 17:12, 17:14, 17:23, 18:11, 34:23, 38:11, 46:25, 70:13, 79:19, 82:22, 98:23
**motive** [3] - 25:19, 36:22
**movant** [3] - 35:10, 92:9, 92:12
**movants** [3] - 38:19, 45:24, 94:6
**move** [6] - 19:12, 21:2, 71:6, 71:23, 72:9, 75:3
**moved** [4] - 57:8, 57:9, 57:13, 89:24
**moves** [1] - 57:15
**moving** [2] - 19:8, 57:12
**mpinkert@ holtzmanvogel. com** [1] - 2:5
**MR** [211] - 3:7, 3:11, 3:18, 3:25, 4:3, 4:9, 4:10, 4:14, 5:2, 5:9, 5:15, 5:23, 6:5, 6:12, 6:23, 7:7, 7:9, 7:19, 8:6, 8:17, 8:23, 9:21, 9:24, 10:2, 10:5, 10:8, 10:20, 11:1, 11:5, 11:15, 11:24, 12:10, 12:12, 12:22, 13:23, 14:13, 14:15, 14:20, 15:19, 27:9, 27:11, 27:13, 27:16, 28:6, 28:16, 28:20, 28:22, 29:13, 29:19, 30:18, 30:21, 31:8, 31:12, 32:9, 32:25, 33:3, 33:20, 34:9, 34:11, 34:13, 34:16, 34:21, 35:4, 35:6, 35:17, 35:20, 36:9, 36:17, 37:18, 38:7, 38:14, 39:1, 41:9, 41:13, 41:16, 42:3, 42:8, 42:11, 43:3, 43:10, 44:2, 46:19, 47:6, 47:17, 48:20, 49:1, 49:3, 49:5, 49:8, 49:11, 49:19, 49:23, 50:18, 50:20, 51:16, 51:22, 52:11, 53:8, 53:21, 53:23, 54:21, 54:23, 55:2, 55:4, 55:7, 58:6, 58:21, 59:12, 60:13, 60:18, 60:21, 61:2, 61:6, 62:4, 63:7, 63:9, 63:12, 63:19,

64:2, 64:14, 64:17, 64:20, 64:23, 65:1, 65:4, 65:7, 65:16, 65:20, 65:25, 66:7, 66:9, 66:11, 66:15, 66:19, 66:21, 67:20, 68:1, 68:5, 68:7, 68:10, 68:12, 68:18, 68:21, 68:25, 69:17, 70:1, 70:6, 70:8, 70:13, 71:9, 71:11, 72:3, 72:12, 72:17, 72:19, 73:15, 73:23, 73:25, 75:12, 75:18, 76:7, 76:17, 76:20, 77:1, 77:8, 77:10, 77:15, 78:13, 78:16, 79:8, 79:12, 79:16, 80:5, 80:23, 81:3, 81:6, 82:14, 83:3, 83:5, 83:9, 83:12, 83:16, 83:21, 84:9, 84:16, 85:11, 85:18, 85:20, 85:23, 86:1, 86:5, 86:20, 87:5, 87:7, 87:11, 87:13, 88:4, 88:10, 93:23, 95:5, 95:6, 95:21, 96:12, 96:14, 97:5, 97:13, 97:16, 97:18, 97:20, 98:16, 98:21
**MS** [29] - 3:20, 15:21, 15:25, 16:2, 17:17, 18:5, 18:12, 18:14, 19:24, 20:19, 21:19, 23:11, 23:15, 23:18, 24:10, 26:24, 27:4, 88:14, 88:20, 90:7, 90:10, 90:22, 90:24, 91:4, 91:20, 92:7, 92:11, 92:17, 93:5
**multiple** [4] - 33:22, 35:11, 44:23, 79:9
**Muslims** [1] - 54:4
**must** [2] - 6:8, 57:15
**muster** [1] - 6:9

## N

**N.W** [1] - 1:20
**name** [8] - 39:7, 73:11, 73:14, 73:17, 74:3, 76:9, 85:3, 95:18
**named** [2] - 31:8, 35:2
**namely** [1] - 24:16
**names** [1] - 3:16
**narrow** [2] - 17:4, 19:5
**nation** [2] - 39:25, 98:15
**national** [2] - 79:8, 95:23

**nationalist** [1] - 76:11
**nature** [2] - 7:25, 46:15
**Nazi** [4] - 25:3, 25:4, 25:5, 91:15
**nearly** [5] - 6:2, 6:21, 6:25, 49:12, 58:23
**necessarily** [1] - 53:12
**necessary** [2] - 24:21, 50:21
**need** [14] - 5:19, 17:5, 20:10, 23:9, 25:23, 33:5, 33:7, 33:14, 43:3, 43:15, 45:9, 48:23, 51:9, 84:22
**needs** [1] - 58:25
**neoNazi** [1] - 76:10
**never** [5] - 6:20, 36:19, 44:25, 81:23, 97:2
**new** [7] - 19:3, 19:15, 20:2, 44:10, 72:4, 89:13, 98:2
**newly** [1] - 62:7
**NEXT** [1] - 1:25
**next** [5] - 34:10, 49:4, 57:4, 72:14, 90:16
**night** [2] - 15:24, 16:1
**nobody** [3] - 77:19, 81:7, 82:16
**non** [1] - 21:24
**non-First** [1] - 21:24
**none** [4] - 33:18, 36:11, 37:5, 41:10
**nonfrivolous** [3] - 84:7, 96:10, 97:11
**nonmovant** [1] - 71:7
**nonprofit** [4] - 39:10, 53:14, 57:12, 80:11
**nonprofits** [5] - 4:6, 39:8, 39:9, 54:25, 55:23
**Nonprofits** [1] - 2:7
**Northern** [2] - 31:22, 38:2
**Northwestern** [2] - 56:24, 57:6
**note** [4] - 56:22, 70:22, 82:14, 88:22
**noted** [6] - 22:11, 47:3, 51:8, 56:23, 89:2
**notes** [3] - 17:15, 72:1, 99:9
**noteworthy** [1] - 52:1
**nothing** [11] - 13:11, 14:4, 39:7, 45:8, 45:25, 67:14, 68:18, 71:15, 84:25, 95:13, 97:20
**nothing's** [1] - 93:11
**notice** [5] - 11:13,

11:16, 18:1, 71:11
**noticed** [1] - 17:13
**notion** [4] - 45:12, 48:7, 50:1, 57:17
**notwithstanding** [3] - 8:14, 8:21, 63:3
**novel** [1] - 43:14
**November** [5] - 14:7, 15:3, 30:23, 30:24, 31:2
**Novotny** [2] - 44:21, 45:2
**number** [9] - 18:6, 42:1, 54:16, 75:10, 84:4, 84:22, 84:23, 84:24, 85:1
**numbers** [1] - 85:6
**NW** [4] - 1:16, 2:8, 2:17, 99:16

## O

**object** [2] - 44:19, 44:21
**objective** [1] - 92:21
**obscure** [1] - 77:19
**obviously** [7] - 6:7, 7:25, 13:15, 14:3, 18:15, 46:13, 49:14
**occasion** [1] - 15:8
**occupation** [2] - 67:7, 86:8
**occurred** [2] - 30:23, 57:5
**October** [2] - 16:17, 90:10
**OF** [3] - 1:1, 1:9, 99:5
**offending** [3] - 17:23, 72:6, 72:7
**offensive** [5] - 13:1, 42:16, 61:16, 69:13, 85:9
**offers** [1] - 44:25
**office** [1] - 31:9
**official** [2] - 63:20, 99:15
**OFFICIAL** [1] - 99:5
**Official** [1] - 2:16
**officials** [1] - 37:9
**often** [1] - 36:22
**old** [4] - 6:5, 9:6, 15:7, 43:16
**omnibus** [5] - 72:22, 90:18, 90:19, 93:15, 94:7
**on..** [1] - 30:17
**ON** [1] - 1:25
**once** [4] - 17:13, 18:23, 60:21, 97:2
**one** [46] - 3:14, 8:24, 9:19, 16:24, 18:6,

24:2, 27:23, 28:17, 28:18, 29:5, 29:9, 30:11, 30:13, 30:16, 30:22, 32:7, 32:22, 37:6, 37:7, 38:23, 39:12, 40:1, 41:2, 42:16, 46:15, 46:21, 50:11, 54:3, 55:17, 60:16, 64:11, 68:23, 69:2, 73:2, 77:6, 79:20, 79:24, 82:6, 84:2, 84:6, 85:8, 86:21, 91:1, 96:4
**one-off** [1] - 40:1
**one-year** [4] - 27:23, 30:11, 30:13, 30:22
**ones** [2] - 64:15, 67:20
**op** [1] - 89:21
**open** [1] - 87:2
**opening** [1] - 98:8
**operable** [1] - 63:5
**operation** [2] - 26:9, 77:19
**operations** [2] - 47:4, 56:6
**operatives** [1] - 36:21
**opinion** [10] - 5:6, 22:20, 22:21, 23:7, 24:17, 39:4, 75:7, 75:14, 75:19, 76:1
**opinions** [2] - 22:7, 84:11
**opponent** [1] - 53:16
**opportunistic** [1] - 53:13
**opportunities** [1] - 34:2
**opportunity** [15] - 16:13, 17:10, 18:9, 19:1, 20:3, 21:8, 58:2, 58:15, 62:11, 69:2, 69:8, 69:22, 71:23, 72:10, 72:11
**opposed** [3] - 9:11, 65:14, 65:24
**opposing** [1] - 82:20
**opposition** [16] - 24:20, 24:21, 45:11, 56:3, 56:10, 56:14, 67:7, 82:22, 83:18, 83:19, 89:6, 89:8, 90:8, 94:2, 97:23, 98:5
**or..** [1] - 30:17
**oranges** [1] - 9:7
**order** [13] - 4:18, 19:20, 47:4, 62:20, 78:19, 78:23, 79:3, 81:17, 82:12, 84:23, 86:24, 88:20, 96:3

**ordered** [1] - 16:16
**orders** [1] - 37:22
**ordinarily** [2] - 17:19, 89:3
**organization** [1] - 53:14
**organizations** [3] - 39:10, 77:23, 80:20
**original** [4] - 25:19, 73:13, 74:23, 85:16
**origination** [1] - 80:16
**orthodox** [1] - 38:24
**ourselves** [1] - 34:23
**outrage** [2] - 54:14, 61:9
**outraged** [2] - 54:5, 54:6
**outrageous** [1] - 35:1
**outside** [1] - 78:8
**outsider** [1] - 32:3
**outward** [2] - 7:16, 7:22
**outward-facing** [2] - 7:16, 7:22
**overarching** [1] - 8:19
**overcome** [1] - 34:1
**overpled** [1] - 6:23
**overruled** [2] - 45:7, 94:18
**overturn** [1] - 5:14
**own** [6] - 20:21, 23:8, 42:13, 73:16, 80:18, 85:13

## P

**p.m** [1] - 99:3
**P.O** [1] - 1:12
**Packingham** [1] - 41:20
**PAGE** [1] - 1:25
**Page** [4] - 43:12, 56:14, 89:7, 89:22
**pages** [1] - 98:3
**Pages** [2] - 90:2, 91:5
**pale** [1] - 41:6
**Palestine** [3] - 67:7, 67:8, 67:10
**Palestinian** [1] - 54:4
**panoply** [1] - 16:15
**paper** [4] - 17:20, 89:4, 89:5, 89:8
**papers** [2] - 17:23, 35:21
**Papez** [5] - 3:21, 15:16, 15:20, 39:4, 42:13
**PAPEZ** [30] - 1:19, 3:20, 15:21, 15:25, 16:2, 17:17, 18:5,

18:12, 18:14, 19:24, 20:19, 21:19, 23:11, 23:15, 23:18, 24:10, 26:24, 27:4, 88:14, 88:20, 90:7, 90:10, 90:22, 90:24, 91:4, 91:20, 92:7, 92:11, 92:17, 93:5
**Paragraph** [7] - 28:7, 29:21, 29:23, 31:1, 31:19, 60:8, 94:10
**paragraph** [4] - 7:4, 12:3, 64:22, 98:16
**parallel** [3] - 32:23, 33:4, 33:7
**part** [10] - 12:2, 12:3, 18:22, 23:3, 26:8, 68:22, 80:12, 81:19, 83:9, 86:25
**Part** [1] - 35:24
**participate** [1] - 44:16
**participated** [1] - 45:22
**particular** [5] - 10:14, 62:9, 83:18, 88:21, 98:13
**particularly** [3] - 34:2, 41:2, 79:19
**parties** [1] - 3:23
**partners** [1] - 45:20
**party** [1] - 32:7
**pass** [2] - 6:9, 49:3
**passed** [1] - 43:25
**past** [2] - 24:14, 69:9
**patently** [1] - 95:23
**pathways** [1] - 27:19
**pedophile** [1] - 26:9
**Pennsylvania** [1] - 1:16
**people** [16] - 6:25, 12:23, 44:18, 45:13, 47:9, 47:22, 64:3, 67:5, 74:9, 75:24, 77:4, 77:12, 78:18, 86:21, 91:16
**people's** [1] - 76:18
**percent** [1] - 56:15
**perfectly** [1] - 54:6
**perhaps** [5] - 9:1, 17:4, 40:23, 46:24, 96:5
**period** [7] - 17:2, 17:3, 30:11, 30:14, 30:22, 87:18, 90:13
**permission** [1] - 21:23
**perpetration** [1] - 40:19
**persistent** [4] - 56:4, 56:9, 78:11, 79:6
**person** [6] - 25:17,

28:3, 54:4, 62:15, 85:6, 86:15
**personal** [15] - 48:5, 49:17, 49:20, 49:25, 55:22, 57:11, 57:14, 57:17, 78:5, 95:16, 95:20, 96:11, 97:1, 97:6
**personnel** [1] - 9:16
**perspective** [2] - 41:6, 69:11
**pervasive** [1] - 15:8
**PHELPS** [1] - 2:7
**Phelps** [2] - 24:12, 25:22
**PHILLIPS** [1] - 2:7
**phone** [6] - 84:21, 84:22, 84:24, 85:1, 85:6
**photo** [2] - 91:8, 91:11
**physical** [1] - 84:4
**pick** [1] - 27:13
**picture** [2] - 38:23, 85:16
**piece** [1] - 96:20
**piercing** [1] - 48:21
**PINKERT** [33] - 2:2, 3:25, 34:11, 34:13, 34:16, 34:21, 35:4, 35:6, 35:17, 35:20, 36:9, 36:17, 37:18, 38:7, 38:14, 39:1, 41:9, 41:13, 41:16, 42:3, 42:8, 42:11, 43:3, 43:10, 44:2, 46:19, 47:6, 47:17, 48:20, 49:1, 49:3, 93:23, 95:5
**Pinkert** [8] - 4:1, 4:2, 34:13, 34:15, 50:10, 51:17, 67:13, 97:22
**place** [6] - 40:24, 50:4, 51:3, 51:4, 67:3, 85:4
**placed** [2] - 19:4, 20:5
**plain** [1] - 91:6
**plainly** [2] - 27:22, 55:21
**plaintiff** [34] - 3:5, 3:8, 6:1, 7:11, 8:11, 8:20, 10:24, 16:15, 17:5, 17:9, 18:25, 19:9, 21:14, 22:5, 22:9, 25:16, 30:3, 30:5, 31:17, 34:2, 36:3, 39:24, 40:10, 45:17, 50:3, 51:10, 51:18, 52:24, 53:12, 55:19, 56:2, 56:17, 58:1, 71:17

**Plaintiff** [3] - 1:3, 1:11, 30:25
**plaintiff's** [17] - 16:4, 16:8, 16:18, 17:1, 18:17, 18:24, 19:11, 19:14, 20:21, 20:22, 23:3, 23:8, 24:19, 32:4, 56:10, 89:6, 89:13
**planned** [1] - 72:15
**platform** [2] - 77:2, 77:11
**platforms** [1] - 35:25
**Platt** [3] - 3:11, 3:16, 5:3
**PLATT** [39] - 1:15, 3:11, 3:18, 5:2, 5:9, 5:15, 5:23, 6:5, 6:12, 6:23, 7:7, 7:9, 7:19, 8:6, 8:17, 8:23, 9:21, 9:24, 10:2, 10:5, 10:8, 10:20, 11:1, 11:5, 11:15, 11:24, 12:10, 12:12, 12:22, 13:23, 14:13, 14:15, 14:20, 15:19, 87:7, 87:11, 87:13, 88:4, 88:10
**plausible** [6] - 6:20, 32:19, 33:6, 40:20, 44:15, 45:15
**plausibly** [4] - 6:15, 14:23, 66:15, 80:25
**play** [2] - 10:22, 93:1
**plead** [6] - 14:23, 23:19, 24:22, 25:23, 58:25, 59:4
**pleaded** [1] - 30:8
**pleading** [13] - 5:21, 8:4, 23:5, 23:13, 26:17, 34:1, 51:15, 59:20, 72:7, 89:23, 92:14
**pleadings** [12] - 23:8, 24:14, 24:19, 32:12, 32:15, 33:23, 36:19, 37:3, 51:23, 59:11, 90:17, 95:25
**pleads** [2] - 22:3, 31:17
**pleased** [1] - 92:2
**pled** [7] - 8:21, 22:19, 24:5, 26:14, 51:22, 51:23, 97:6
**plenty** [1] - 48:15
**PLLC** [1] - 2:3
**plus** [1] - 78:9
**podium** [1] - 15:16
**point** [17] - 6:7, 18:11, 24:1, 39:19, 43:11,

45:9, 47:25, 51:13, 53:15, 53:25, 56:11, 61:11, 70:9, 83:15, 94:10, 94:21, 98:6
**pointed** [4] - 37:24, 39:4, 79:20, 88:22
**pointedly** [1] - 10:3
**points** [5] - 44:14, 90:24, 93:24, 95:6, 97:23
**policies** [2] - 62:5, 65:2
**policy** [18] - 10:19, 10:22, 11:21, 61:17, 61:18, 61:24, 62:18, 62:19, 63:1, 63:5, 63:17, 63:24, 87:18, 88:1, 88:2, 88:5, 88:6
**Policy** [6] - 11:3, 61:18, 62:25, 63:4, 87:19
**political** [10] - 14:16, 37:3, 42:18, 45:12, 45:14, 47:21, 75:6, 86:9, 86:10, 94:25
**politics** [1] - 9:14
**position** [9] - 59:16, 67:6, 69:6, 70:20, 77:23, 79:3, 85:8, 89:11, 89:19
**positions** [3] - 20:24, 60:10, 88:8
**possibility** [1] - 46:4
**possible** [4] - 4:21, 17:23, 31:2, 59:5
**possibly** [4] - 46:6, 60:19, 75:16, 79:25
**post** [6] - 39:15, 73:13, 74:19, 76:23, 80:1, 86:18
**posted** [2] - 28:9, 39:14
**posting** [2] - 30:2, 74:5
**postings** [2] - 77:21, 77:22
**posts** [6] - 37:2, 38:22, 38:23, 39:2, 67:24, 75:14
**posture** [1] - 63:16
**potential** [2] - 53:24, 87:9
**potentially** [4] - 30:2, 30:15, 31:3, 93:5
**Poverty** [5] - 76:8, 76:25, 77:1, 77:20, 78:1
**precedence** [1] - 43:16

**precedent** [2] - 35:12, 94:16
**precisely** [1] - 58:22
**precludes** [1] - 35:13
**predicate** [5] - 22:21, 24:21, 25:6, 25:15, 26:12
**prefer** [4] - 23:23, 58:16, 72:16, 88:11
**prejudice** [4] - 21:10, 27:19, 33:21, 34:7
**premise** [1] - 41:18
**preparing** [1] - 90:11
**prescribed** [1] - 20:14
**presence** [2] - 55:23, 67:2
**present** [4] - 40:2, 78:9, 92:13, 93:20
**press** [1] - 61:13
**pressure** [2] - 74:9, 78:19
**presumably** [2] - 57:5, 96:9
**pretty** [1] - 13:14
**prima** [2] - 14:23, 23:3
**principal** [1] - 41:2
**private** [4] - 26:1, 41:25, 42:4, 44:5
**pro** [1] - 54:11
**pro-Israel** [1] - 54:11
**probational** [1] - 62:3
**probationary** [8] - 9:4, 10:11, 10:19, 11:8, 61:24, 62:3, 87:18, 88:1
**Probationary** [1] - 62:25
**problem** [4] - 16:11, 23:25, 43:20, 44:9
**procedurally** [2] - 19:7, 38:4
**proceed** [1] - 21:17
**proceeding** [2] - 78:5, 78:14
**proceedings** [1] - 99:10
**process** [10] - 47:14, 50:14, 50:16, 69:21, 73:18, 73:22, 74:1, 75:3, 77:25, 82:10
**professional** [2] - 88:7, 88:8
**professionals** [2] - 80:20, 87:2
**professor** [16] - 9:2, 9:3, 9:8, 9:19, 10:6, 10:10, 11:7, 12:16, 12:23, 25:9, 59:25, 60:6, 60:7, 60:9, 60:23, 61:1

**professors** [5] - 11:8, 12:25, 13:1, 60:4, 87:2
**profile** [2] - 42:20, 57:2
**profiles** [4] - 56:12, 56:13, 56:15, 56:16
**program** [4] - 10:15, 63:15, 66:2, 74:8
**progress** [1] - 17:4
**prominent** [2] - 37:1, 37:14
**promised** [1] - 98:18
**promptly** [3] - 17:20, 72:7, 89:3
**Prong** [1] - 92:23
**prong** [2] - 35:18, 92:17
**Prongs** [1] - 92:10
**prongs** [1] - 92:20
**proof** [1] - 26:11
**proper** [2] - 23:8, 32:5
**proposing** [1] - 18:8
**protect** [1] - 14:16
**protected** [20] - 14:5, 14:17, 15:4, 22:20, 22:21, 23:20, 24:17, 29:10, 29:11, 36:1, 36:6, 45:12, 75:14, 77:12, 80:21, 82:9, 91:7, 91:14, 91:17, 91:24
**protest** [1] - 40:18
**protests** [1] - 76:23
**provably** [1] - 26:11
**provide** [1] - 69:3
**provided** [3] - 57:21, 74:25, 96:20
**provides** [1] - 77:3
**provision** [1] - 78:7
**prudent** [2] - 20:18, 20:20
**public** [16] - 7:13, 7:14, 22:22, 41:19, 41:21, 42:17, 42:22, 43:1, 44:6, 52:21, 61:8, 73:7, 76:15, 76:19, 91:23, 96:9
**public-facing** [1] - 61:8
**publication** [2] - 28:2, 98:15
**publicizing** [3] - 41:25, 42:1, 84:3
**published** [3] - 22:5, 25:17, 29:22
**publishes** [2] - 41:22, 76:9
**publishing** [1] - 28:10
**punish** [2] - 46:14,

111

47:20
**punishment** [2] -
47:14, 48:14
**purely** [1] - 77:11
**purported** [2] - 7:3,
56:10
**purpose** [23] - 20:7,
35:22, 36:9, 36:13,
37:19, 47:5, 50:9,
50:15, 50:24, 51:7,
52:23, 55:12, 71:5,
77:11, 77:17, 77:18,
78:1, 80:15, 80:18,
81:19, 82:6, 89:17,
92:15
**purposes** [2] - 35:15,
96:6
**pursuant** [1] - 10:19
**push** [2] - 59:10, 82:25
**put** [16] - 7:3, 7:17,
17:7, 21:13, 21:16,
37:2, 70:2, 70:4,
76:5, 84:1, 84:21,
84:22, 85:14, 87:20,
88:5, 93:13
**putting** [3] - 3:16,
26:2, 41:16

## Q

**quasi** [1] - 96:9
**quasi-public** [1] - 96:9
**questioning** [1] -
62:13
**questions** [10] - 15:14,
21:22, 21:25, 27:1,
49:1, 71:1, 75:10,
78:3, 88:11, 95:3
**quick** [2] - 93:24, 95:6
**quickly** [1] - 38:19
**quite** [3] - 4:17, 52:6,
80:6
**quote** [10] - 25:5,
28:10, 28:11, 29:7,
29:22, 31:17, 33:10,
56:4, 77:3, 84:7
**quoted** [2] - 11:11,
11:12
**quotes** [5] - 12:2, 12:3,
14:25, 77:5
**quoting** [1] - 17:19

## R

**race** [2] - 7:23, 45:13
**Rachel** [2] - 1:19, 3:21
**racial** [3] - 25:9, 25:11,
45:10
**racism** [1] - 91:15
**racist** [5] - 61:12,
76:12, 85:14, 86:2,

88:12
**RAHMAN** [1] - 1:11
**Rahman** [1] - 3:7
**rail** [1] - 3:24
**raise** [1] - 19:12
**raised** [9] - 20:25,
27:18, 57:18, 57:19,
57:20, 72:21, 72:23,
72:24, 98:4
**ran** [1] - 5:11
**range** [2] - 58:18,
60:12
**rather** [2] - 82:23,
98:25
**rationale** [1] - 13:13
**RDR** [3] - 2:16, 99:7,
99:14
**re** [1] - 43:16
**re-evaluate** [1] - 43:16
**reach** [3] - 16:8, 74:9,
78:18
**reached** [3] - 16:20,
18:17, 62:18
**reaching** [1] - 42:5
**read** [15] - 14:10,
17:19, 17:25, 26:6,
35:21, 37:17, 38:18,
59:19, 62:23, 71:25,
82:21, 82:24, 84:6,
90:5, 90:6
**reading** [1] - 25:9
**reaffirmed** [1] - 5:25
**real** [1] - 25:12
**realities** [1] - 43:17
**reality** [1] - 43:14
**really** [3] - 54:15,
93:16, 94:19
**reason** [11] - 24:18,
34:6, 37:20, 47:8,
50:5, 52:10, 67:4,
68:13, 68:22, 69:10,
69:14
**reasonable** [4] - 35:8,
44:12, 72:6, 88:1
**reasonably** [1] - 86:19
**reasons** [5] - 11:20,
16:2, 18:5, 46:19,
89:9
**rebut** [1] - 33:6
**rebuttal** [3] - 5:1, 87:6,
97:22
**recap** [1] - 38:19
**received** [10] - 10:23,
11:11, 15:23, 67:1,
70:14, 70:15, 73:19,
74:1, 75:1, 84:24
**receiving** [3] - 75:2,
77:24, 82:9
**recent** [3] - 5:6, 40:6,
87:24

**recently** [3] - 38:10,
83:8, 84:5
**recess** [1] - 58:10
**Recess** [1] - 58:11
**recognize** [2] - 12:17,
52:2
**recognizing** [1] -
94:13
**record** [22] - 3:2, 3:6,
10:4, 10:5, 10:21,
11:6, 12:1, 12:11,
21:11, 38:22, 49:25,
50:3, 68:11, 74:24,
87:20, 87:22, 88:5,
88:18, 91:25, 93:17,
98:12, 98:18
**recorded** [1] - 63:22
**recording** [1] - 63:22
**red** [1] - 5:12
**referenced** [2] - 11:14,
61:23
**references** [1] - 8:18
**referred** [1] - 87:21
**referring** [3] - 12:5,
14:7, 37:3
**refers** [2] - 30:3, 30:5
**refused** [1] - 83:12
**refuses** [1] - 45:5
**refuted** [2] - 52:13,
97:1
**refuting** [3] - 49:25,
50:1, 96:21
**regard** [2] - 7:13, 95:7
**regarding** [6] - 10:25,
14:11, 19:20, 61:10,
71:17, 97:22
**regardless** [2] - 67:17,
81:4
**regards** [1] - 78:20
**regime** [1] - 86:9
**reimbursement** [1] -
46:11
**rejected** [1] - 98:4
**related** [3] - 7:23, 11:3,
60:20
**relates** [1] - 25:13
**relationship** [6] -
31:19, 31:25, 32:4,
32:5, 45:18, 59:14
**relationships** [1] -
40:17
**releases** [1] - 61:13
**relevant** [6] - 6:3, 6:21,
7:1, 30:15, 31:3,
59:1
**religious** [1] - 47:21
**rely** [3] - 45:8, 51:14,
92:24
**remaining** [3] - 15:11,
26:19, 92:3

**remedies** [2] - 13:25,
14:21
**renders** [1] - 26:16
**renewing** [1] - 98:3
**repeat** [1] - 55:7
**repeated** [2] - 43:21,
47:3
**repeatedly** [7] - 27:25,
30:3, 30:5, 33:11,
43:13, 57:18, 71:1
**repled** [1] - 22:11
**reply** [3] - 31:23,
72:11, 90:12
**reported** [1] - 43:9
**Reporter** [3] - 2:16,
2:16, 99:15
**REPORTER** [1] - 99:5
**reporter** [1] - 26:23
**reporting** [3] - 39:24,
39:25, 41:1
**reports** [1] - 98:14
**repost** [1] - 41:23
**reposted** [1] - 42:12
**reposting** [1] - 44:6
**reposts** [3] - 39:2,
39:3, 39:6
**representation** [1] -
98:11
**representations** [2] -
80:18, 97:14
**representative** [1] -
63:15
**representing** [1] -
72:20
**republication** [2] -
22:4, 24:16
**republicize** [1] - 23:7
**republish** [2] - 91:10,
91:12
**republished** [3] - 22:6,
25:16, 25:18
**request** [1] - 97:11
**requested** [2] - 18:7,
97:7
**require** [1] - 56:20
**required** [5] - 6:18,
25:14, 38:1, 47:25
**requirement** [2] - 23:9,
53:4
**rescind** [2] - 98:8, 98:9
**rescission** [1] - 98:11
**reside** [1] - 9:9
**resolution** [1] - 88:23
**resolved** [1] - 33:23
**resources** [4] - 8:19,
47:10, 47:24, 53:18
**respect** [13] - 8:20,
10:23, 17:17, 20:20,
23:21, 25:21, 26:19,
42:16, 59:15, 59:21,

63:10, 64:12, 84:13
**respectful** [1] - 92:1
**respectfully** [1] - 18:6
**respecting** [1] - 63:25
**respective** [1] - 82:24
**respects** [3] - 6:3,
6:21, 7:1
**respond** [5] - 16:19,
18:10, 70:16, 90:1,
97:3
**responded** [1] - 97:2
**responding** [1] - 89:23
**response** [11] - 16:18,
18:18, 18:24, 19:2,
20:23, 41:11, 43:11,
57:20, 72:23, 90:4,
94:22
**responses** [1] - 18:25
**responsibilities** [2] -
7:22, 60:12
**responsible** [2] - 64:3,
64:4
**rest** [1] - 57:14
**restate** [1] - 86:16
**restatements** [1] -
67:13
**restating** [1] - 74:14
**restricts** [1] - 51:11
**result** [3] - 75:1, 82:7,
82:15
**results** [2] - 65:9,
65:11
**retaliation** [3] - 13:20,
13:23, 15:4
**reticence** [1] - 52:25
**reTweet** [3] - 73:7,
74:22, 85:9
**reTweeted** [6] - 67:25,
74:17, 74:20, 74:21,
84:2, 85:14
**reTweeting** [1] - 74:14
**revealed** [1] - 56:12
**revealing** [2] - 42:4,
44:5
**revenue** [1] - 55:25
**revenues** [1] - 79:5
**reversed** [2] - 54:1,
54:12
**review** [1] - 16:13
**reviewed** [1] - 77:22
**revised** [1] - 57:23
**revision** [1] - 57:24
**rhetoric** [1] - 52:19
**ridiculous** [1] - 54:9
**Rights** [9] - 13:18,
14:1, 14:16, 14:22,
26:21, 44:13, 45:16,
46:5, 48:2
**rights** [14] - 31:9, 34:6,
35:3, 35:4, 44:10,

44:20, 46:4, 54:7, 55:11, 55:20, 76:19, 78:23, 80:19, 82:8
**ripe** [2] - 38:10, 96:23
**risk** [1] - 14:12
**river** [1] - 96:8
**role** [3] - 44:11, 61:7, 61:8
**Room** [2] - 2:17, 99:16
**room** [2] - 37:9, 47:9
**rough** [2] - 42:21, 42:25
**round** [1] - 17:12
**Rule** [50] - 16:14, 16:16, 17:16, 18:21, 19:18, 20:2, 20:11, 20:23, 21:3, 21:10, 21:14, 29:4, 34:17, 34:22, 34:24, 35:9, 35:18, 37:25, 38:19, 43:11, 44:7, 45:24, 46:10, 46:13, 50:8, 53:20, 57:22, 58:24, 70:13, 70:19, 70:22, 70:23, 71:18, 71:20, 72:1, 79:18, 89:5, 89:10, 89:15, 89:18, 89:25, 90:11, 90:12, 92:8, 92:11, 94:1, 94:5, 94:11
**rule** [8] - 20:13, 35:24, 47:5, 51:11, 88:16, 88:23, 88:25, 90:15
**rules** [3] - 16:10, 37:22, 47:13
**run** [2] - 17:3, 22:22

**S**

**SAC** [5] - 16:6, 18:18, 21:21, 22:2, 22:9
**safe** [9] - 19:19, 19:24, 20:1, 20:14, 20:25, 36:21, 57:21, 71:5, 98:25
**safer** [1] - 20:17
**sake** [2] - 46:8, 72:25
**salary** [1] - 59:17
**salute** [1] - 91:15
**San** [10] - 2:7, 4:4, 4:6, 39:9, 54:24, 55:3, 55:23, 79:19, 79:21, 81:8
**sanction** [5] - 53:7, 53:8, 58:3, 63:6, 65:11
**sanctions** [43] - 4:24, 15:23, 17:12, 17:14, 17:22, 19:8, 19:22, 21:6, 21:10, 34:22,

34:24, 35:7, 37:25, 38:6, 38:10, 38:17, 41:6, 41:8, 43:7, 46:11, 46:17, 46:25, 47:8, 47:15, 50:25, 51:2, 51:9, 51:12, 53:5, 53:17, 58:4, 58:18, 71:6, 71:24, 82:21, 82:22, 92:9, 92:21, 94:11, 96:6, 96:22
**satisfy** [1] - 56:2
**SAUL** [1] - 1:15
**saw** [1] - 79:7
**scan** [1] - 95:17
**scheduled** [2] - 20:4, 38:12
**scheduling** [1] - 71:17
**scholarship** [2] - 45:7, 60:3
**school** [11] - 8:10, 8:11, 8:24, 10:14, 25:9, 50:11, 61:13, 62:15, 66:3, 74:8, 86:18
**schools** [4] - 8:12, 8:15, 8:22, 60:15
**scoured** [1] - 12:24
**search** [1] - 84:2
**second** [20] - 3:14, 6:19, 12:4, 12:17, 18:1, 28:7, 55:16, 57:1, 57:7, 70:15, 70:19, 71:14, 89:11, 92:2, 92:17, 92:20, 95:17, 95:24, 98:1, 98:16
**secondary** [2] - 72:5, 84:12
**section** [1] - 44:14
**Section** [4] - 13:19, 31:16, 32:11, 44:13
**security** [1] - 14:12
**see** [16] - 3:19, 4:16, 16:15, 16:18, 18:23, 24:14, 47:8, 48:20, 58:20, 70:9, 82:5, 87:13, 89:19, 89:22, 91:6, 92:4
**seek** [1] - 58:4
**segment** [1] - 61:16
**semester** [1] - 62:17
**Semitic** [1] - 37:13
**send** [1] - 54:18
**sender** [2] - 69:14, 85:9
**senior** [4] - 61:2, 62:1, 88:6, 88:7
**senior-level** [1] - 88:6
**sense** [2] - 6:18, 41:25

**sent** [3] - 19:19, 19:24, 20:1
**separate** [4] - 19:16, 19:17, 21:10, 29:1
**September** [4] - 16:7, 19:25, 70:15, 89:10
**series** [3] - 38:22, 40:1, 86:25
**serious** [1] - 21:4
**seriously** [6] - 16:14, 18:22, 21:7, 34:22, 34:23, 89:15
**served** [5] - 17:20, 38:8, 88:25, 89:3, 90:13
**service** [3] - 8:11, 76:16, 76:19
**Service** [1] - 8:24
**set** [3] - 19:15, 52:10, 69:13
**sets** [1] - 7:23
**settled** [2] - 13:16, 22:16
**seven** [1] - 76:22
**several** [4] - 5:10, 32:14, 37:21, 48:4
**severe** [1] - 15:8
**shadowy** [1] - 37:16
**Shambaugh** [2] - 3:13, 5:4
**shame** [1] - 76:9
**Shapiro** [34] - 2:11, 4:12, 7:2, 8:9, 9:1, 9:17, 10:13, 10:23, 10:25, 11:4, 11:10, 11:22, 12:14, 39:3, 39:6, 49:6, 61:19, 61:25, 62:21, 63:6, 64:12, 66:22, 70:4, 74:20, 75:22, 78:4, 78:11, 78:13, 78:17, 78:21, 79:8, 87:24, 95:8, 97:8
**Shapiro's** [10] - 7:16, 7:24, 9:13, 60:25, 61:12, 61:15, 62:10, 64:5, 74:16, 75:16
**Sharbaugh** [1] - 30:21
**sheds** [1] - 98:13
**shell** [1] - 48:22
**shepherdized** [1] - 5:11
**shoe** [1] - 76:5
**short** [1] - 46:17
**shortly** [1] - 57:1
**show** [4] - 59:6, 59:21, 69:6, 93:10
**showing** [1] - 92:14
**shy** [1] - 3:10
**sic** [3] - 39:3, 83:8,

87:17
**side** [3] - 4:20, 19:15, 80:2
**sides** [1] - 62:24
**similar** [3] - 38:3, 44:1, 87:1
**similarities** [7] - 7:11, 8:4, 59:8, 59:10, 59:15, 59:21, 66:20
**similarly** [4] - 7:6, 25:8, 29:23, 30:9
**simply** [9] - 40:1, 40:17, 42:12, 53:2, 67:13, 73:7, 74:13, 94:5, 98:10
**single** [7] - 15:8, 37:6, 39:16, 55:19, 56:8, 77:2, 80:24
**sit** [2] - 3:24, 62:13
**sitting** [1] - 15:7
**situated** [3] - 3:15, 7:6, 49:12
**situation** [4] - 40:25, 55:14, 57:13, 86:1
**six** [5] - 21:21, 62:7, 62:10, 66:22, 80:3
**Skadden** [1] - 45:21
**skimmed** [1] - 17:25
**slander** [3] - 27:24, 28:1, 28:24
**sleep** [2] - 36:19, 47:19
**slow** [1] - 26:22
**slur** [1] - 25:11
**slurs** [2] - 26:2
**small** [2] - 53:20, 53:22
**Smith** [3] - 4:4, 34:19, 54:24
**SMITH** [11] - 2:7, 4:3, 4:9, 54:23, 55:2, 55:4, 55:7, 58:6, 97:20, 98:16, 98:21
**Snyder** [4] - 24:12, 25:22, 25:25, 26:6
**so-called** [2] - 5:22, 83:1
**so..** [1] - 97:18
**social** [6] - 35:25, 43:19, 44:8, 67:2, 84:1, 86:12
**society** [1] - 80:14
**sole** [1] - 29:7
**someone** [8] - 39:21, 41:7, 45:17, 53:1, 65:22, 94:13, 96:7, 96:15
**sometimes** [1] - 96:15
**somewhat** [3] - 9:22, 21:17, 24:9

**soon** [3] - 17:23, 19:20, 87:24
**sooner** [1] - 98:24
**sophomore** [1] - 57:6
**sorry** [9] - 7:19, 7:21, 8:13, 15:3, 33:3, 36:15, 42:3, 73:21, 91:2
**sort** [15] - 7:4, 7:21, 31:23, 32:1, 32:16, 32:21, 33:11, 33:14, 38:20, 48:17, 49:16, 85:15, 94:6, 95:14
**source** [1] - 72:5
**sources** [1] - 84:12
**Southern** [5] - 76:8, 76:25, 77:1, 77:20, 78:1
**speaker** [1] - 25:19
**speaking** [1] - 93:18
**speaks** [1] - 80:10
**special** [1] - 55:4
**specific** [7] - 6:16, 15:14, 28:15, 72:21, 74:8, 96:3, 96:21
**specifically** [9] - 50:22, 50:23, 56:6, 65:16, 65:18, 66:12, 90:20, 95:10, 96:25
**speculative** [1] - 50:1
**speech** [24] - 14:16, 22:20, 24:16, 24:25, 25:7, 25:16, 25:24, 26:6, 29:10, 29:11, 36:6, 36:23, 45:12, 45:14, 48:9, 54:7, 54:8, 54:11, 54:14, 61:19, 63:13, 91:7, 91:24, 95:12
**spelled** [2] - 65:16, 65:18
**spent** [1] - 47:10
**SPLC** [1] - 94:21
**spoken** [2] - 37:5, 37:7
**spokesperson** [2] - 79:8, 95:23
**sponte** [1] - 92:22
**spun** [1] - 42:2
**square** [5] - 41:19, 41:21, 42:17, 42:22, 43:1
**squarely** [4] - 16:23, 22:7, 24:24, 45:2
**stage** [8] - 5:21, 8:5, 23:5, 23:13, 26:18, 32:12, 32:15, 33:5
**stand** [3] - 15:15, 58:10, 70:20
**standard** [9] - 5:18, 5:21, 6:5, 9:6, 21:4,

25:20, 58:24, 90:1, 90:17
**standards** [1] - 60:11
**standing** [1] - 71:3
**start** [4] - 4:21, 15:22, 35:16, 62:10
**started** [3] - 63:2, 66:23, 90:11
**starting** [1] - 3:5
**starts** [1] - 55:19
**State** [1] - 37:14
**state** [6] - 3:6, 6:15, 23:7, 43:4, 84:12, 89:24
**statement** [15] - 25:2, 63:24, 66:22, 66:23, 66:24, 68:15, 68:23, 69:3, 69:17, 75:6, 77:2, 85:21, 86:9, 86:10, 98:14
**statements** [20] - 7:13, 7:14, 22:6, 26:5, 26:10, 28:3, 35:24, 36:17, 52:21, 61:12, 61:15, 62:9, 66:21, 67:12, 67:14, 67:17, 67:19, 67:20, 67:21, 75:14
**STATES** [2] - 1:1, 1:10
**states** [2] - 41:5, 43:24
**States** [1] - 99:15
**statute** [17] - 27:21, 27:23, 28:17, 28:24, 30:10, 33:24, 41:16, 48:6, 56:3, 78:6, 94:4, 94:8, 96:4, 97:24, 98:3
**statutory** [1] - 31:12
**stenographic** [1] - 99:9
**step** [3] - 16:14, 18:21, 19:7
**still** [7] - 30:14, 44:3, 82:16, 90:14, 93:11, 96:18, 96:23
**stood** [2] - 52:4, 69:4
**stop** [1] - 36:12
**stopping** [1] - 36:24
**straight** [1] - 46:10
**straightforward** [1] - 22:1
**strategic** [1] - 40:3
**strategizing** [1] - 40:22
**strategy** [1] - 40:3
**streamline** [2] - 4:20, 34:18
**Street** [4] - 1:20, 2:4, 2:12, 40:9
**stress** [1] - 24:18

**strike** [5] - 18:4, 19:12, 71:23, 72:9, 92:5
**student** [4] - 7:22, 61:9, 76:23, 86:18
**student-facing** [1] - 7:22
**students** [12] - 7:17, 9:12, 9:13, 9:23, 10:12, 10:16, 61:4, 61:8, 61:9, 67:9, 80:19, 87:1
**stuff** [2] - 12:16, 51:25
**sua** [1] - 92:22
**subject** [7] - 9:10, 11:22, 21:22, 21:25, 40:6, 85:15, 96:16
**submitted** [2] - 56:9, 72:22
**Subsections** [1] - 36:7
**subsequent** [1] - 28:12
**substance** [2] - 5:9, 83:13
**substantial** [2] - 79:5, 97:9
**substantive** [2] - 57:20, 57:23
**substantively** [1] - 5:18
**succeed** [1] - 46:6
**successful** [1] - 46:7
**such-and-suches** [1] - 93:3
**suches** [1] - 93:3
**sued** [1] - 38:2
**suffer** [1] - 86:7
**suffered** [2] - 82:7, 86:7
**suffering** [1] - 82:19
**suffice** [1] - 33:13
**sufficient** [1] - 33:5
**suggest** [3] - 10:22, 84:12, 87:12
**suggested** [1] - 46:12
**suggesting** [1] - 88:5
**suggests** [1] - 80:25
**suit** [6] - 31:4, 34:4, 46:14, 47:2, 48:4, 93:3
**Suite** [4] - 1:16, 2:4, 2:9, 2:12
**summarily** [1] - 7:5
**summary** [4] - 6:1, 23:10, 24:12, 58:24
**sums** [1] - 97:9
**supervisor** [4] - 31:18, 32:1, 66:1, 66:2
**supervisors** [1] - 60:15
**supervisory** [2] -

45:18, 64:4
**support** [12] - 21:2, 32:16, 33:6, 33:8, 33:14, 37:14, 37:15, 39:11, 44:25, 76:2, 79:23, 80:13
**supporting** [1] - 33:17
**supports** [1] - 40:21
**supposed** [1] - 69:16
**Supreme** [5] - 8:9, 26:18, 41:19, 44:21, 45:4
**surprises** [1] - 20:16
**suspect** [1] - 46:25
**suspicious** [3] - 73:20, 74:3
**swore** [1] - 86:12
**sworn** [1] - 50:2
**sympathizer** [1] - 25:4
**synagogue** [1] - 51:6
**systematically** [1] - 56:5
**systemic** [1] - 91:15

**T**

**tagged** [1] - 74:7
**Tallahassee** [1] - 2:4
**target** [1] - 78:17
**targeted** [5] - 45:11, 56:6, 67:4, 67:6, 67:11
**targeting** [3] - 56:12, 78:22, 81:22
**tax** [1] - 47:20
**teaching** [1] - 32:25
**technological** [1] - 43:16
**telephone** [2] - 42:1, 84:4
**ten** [3] - 48:12, 52:3, 58:7
**tenets** [1] - 76:14
**Tenth** [1] - 31:22
**tenure** [6] - 59:16, 60:4, 60:8, 60:21, 87:24, 87:25
**tenured** [11] - 9:3, 9:8, 10:6, 10:10, 11:7, 60:1, 60:7, 60:9, 60:23, 62:1
**tenured/nontenured** [1] - 12:15
**term** [2] - 95:9
**terminate** [2] - 62:20, 82:12
**terminated** [7] - 8:25, 10:18, 69:18, 69:19, 75:2, 75:25, 86:24
**termination** [10] -

11:3, 11:23, 31:4, 52:1, 68:22, 69:24, 70:1, 80:2, 82:8, 84:17
**terms** [23] - 5:18, 9:15, 9:23, 13:14, 25:9, 59:20, 62:5, 63:25, 65:25, 70:3, 70:13, 71:4, 71:11, 72:13, 72:19, 73:4, 76:3, 77:21, 81:3, 81:16, 81:21, 84:17, 84:25
**territory** [1] - 21:2
**test** [1] - 97:14
**Texas** [4] - 31:22, 57:9, 57:10, 57:13
**texts** [1] - 36:3
**Thacher** [2] - 50:12, 51:1
**THE** [241] - 1:1, 1:1, 1:9, 3:2, 3:9, 3:14, 3:19, 3:23, 4:2, 4:7, 4:13, 4:16, 5:7, 5:13, 5:20, 6:4, 6:11, 6:22, 7:2, 7:8, 7:10, 7:21, 8:14, 8:18, 9:17, 9:22, 10:1, 10:3, 10:7, 10:18, 10:21, 11:2, 11:10, 11:18, 12:8, 12:11, 12:20, 13:22, 14:11, 14:14, 14:19, 15:18, 15:20, 15:22, 16:1, 17:11, 17:18, 18:7, 18:13, 19:19, 20:17, 21:16, 23:2, 23:14, 23:16, 24:6, 26:22, 27:3, 27:7, 27:10, 27:12, 27:15, 28:4, 28:13, 28:17, 28:21, 29:9, 29:18, 30:16, 30:20, 31:7, 31:11, 32:7, 32:22, 33:2, 33:19, 34:8, 34:10, 34:12, 34:15, 34:20, 35:2, 35:5, 35:16, 35:18, 35:21, 36:15, 37:17, 38:4, 38:12, 38:25, 39:24, 41:11, 41:15, 41:24, 42:7, 42:10, 42:25, 43:6, 43:24, 46:8, 46:22, 47:15, 48:15, 48:25, 49:2, 49:4, 49:7, 49:10, 49:17, 49:22, 50:16, 50:19, 51:13, 51:20, 52:6, 53:7, 53:19, 53:22, 54:20, 54:22, 55:1, 55:3, 55:6, 58:5, 58:7, 58:12,

59:4, 60:4, 60:14, 60:19, 61:1, 61:4, 61:20, 62:23, 63:8, 63:10, 63:18, 64:1, 64:8, 64:16, 64:18, 64:21, 64:25, 65:3, 65:5, 65:8, 65:19, 65:21, 66:5, 66:8, 66:10, 66:14, 66:17, 66:20, 67:17, 67:24, 68:3, 68:6, 68:8, 68:11, 68:17, 68:20, 68:22, 69:8, 69:23, 70:4, 70:7, 70:9, 71:5, 71:10, 71:22, 72:4, 72:14, 72:18, 73:13, 73:21, 73:24, 75:10, 75:13, 76:5, 76:8, 76:18, 76:21, 77:5, 77:9, 77:14, 78:3, 78:14, 79:1, 79:11, 79:14, 79:17, 80:22, 80:24, 81:4, 82:13, 82:20, 83:4, 83:6, 83:11, 83:15, 83:17, 83:22, 84:10, 85:8, 85:13, 85:19, 85:22, 85:25, 86:4, 86:17, 87:4, 87:6, 87:9, 87:12, 87:23, 88:9, 88:19, 90:5, 90:8, 90:21, 90:23, 91:3, 91:19, 92:4, 92:8, 92:16, 92:20, 95:4, 95:19, 96:5, 96:13, 97:4, 97:6, 97:14, 97:17, 97:19, 98:7, 98:20, 98:22
**themselves** [2] - 85:10, 94:19
**theories** [2] - 43:14, 87:15
**theory** [2] - 38:3, 45:13
**thereafter** [1] - 57:1
**They've** [1] - 53:18
**they've** [6] - 37:6, 49:13, 53:17, 53:19, 53:20, 85:6
**thinks** [1] - 53:1
**third** [4] - 22:2, 32:7, 37:20, 70:21
**thousand** [1] - 81:14
**thousands** [1] - 74:21
**threatening** [1] - 84:24
**threats** [3] - 67:1, 75:1, 86:11
**three** [5] - 15:7, 26:13, 26:15, 47:11, 69:25
**three-week-old** [1] -

15:7
**threshold** [2] - 31:15, 33:22
**throw** [1] - 54:10
**throws** [2] - 56:17, 95:7
**Thursday** [1] - 1:4
**time-barred** [4] - 14:3, 14:22, 27:22, 29:16
**timeline** [1] - 56:22
**timeliness** [2] - 19:12, 41:17
**timely** [1] - 92:1
**timing** [1] - 19:23
**title** [2] - 39:7, 59:16
**Title** [4] - 13:17, 13:24, 14:15, 44:23
**today** [18] - 3:22, 17:5, 19:18, 36:12, 38:23, 44:15, 69:5, 77:16, 84:23, 85:5, 87:15, 87:18, 90:4, 90:18, 91:23, 93:22, 94:15, 95:22
**tolerated** [1] - 54:19
**tolling** [1] - 31:10
**took** [5] - 50:4, 70:17, 88:2, 89:11, 89:18
**top** [2] - 12:15, 82:16
**Torchinsky** [1] - 4:14
**TORCHINSKY** [3] - 2:2, 2:3, 4:14
**tort** [16] - 16:25, 22:12, 22:22, 24:3, 24:9, 27:21, 30:8, 43:22, 43:25, 83:1, 83:6, 83:22, 84:7, 84:15, 85:10
**tortious** [12] - 22:12, 23:2, 23:16, 23:18, 24:6, 24:8, 25:23, 28:4, 29:7, 29:15, 78:8, 95:1
**tortiously** [1] - 29:9
**torts** [8] - 22:24, 25:15, 25:21, 26:15, 40:13, 41:18, 75:17, 76:15
**tossed** [1] - 95:15
**total** [1] - 94:23
**touch** [2] - 50:8, 51:13
**touched** [1] - 51:17
**touchstone** [1] - 50:25
**town** [1] - 99:1
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 99:9, 99:10
**transparency** [1] - 17:8
**transparent** [1] - 77:25

**travels** [1] - 98:25
**Treanor** [2] - 11:11, 64:11
**Treanor's** [5] - 11:19, 62:23, 63:4, 87:17, 87:25
**treated** [1] - 70:6
**treatment** [1] - 13:9
**trial** [1] - 6:1
**tribunal** [1] - 52:9
**tried** [1] - 48:18
**tries** [1] - 24:22
**triple** [1] - 52:15
**trope** [1] - 37:13
**trouble** [1] - 73:18
**true** [6] - 10:9, 49:19, 85:18, 96:1, 99:8, 99:10
**truthful** [2] - 22:20, 24:16
**try** [3] - 19:5, 34:18, 55:2
**trying** [4] - 8:7, 36:12, 92:1, 93:17
**tumble** [2] - 42:21, 43:1
**turn** [4] - 12:12, 13:20, 15:16, 27:4
**Tweet** [19] - 31:1, 39:3, 69:13, 69:20, 69:24, 73:25, 74:14, 74:16, 74:17, 74:20, 74:23, 75:7, 85:9, 85:14, 85:16, 86:2, 86:6, 91:12, 95:8
**Tweeted** [3] - 54:4, 56:25, 63:2
**Tweeting** [2] - 44:18
**Tweets** [21] - 22:4, 28:9, 28:10, 29:22, 30:2, 30:3, 30:6, 30:24, 39:6, 42:13, 44:6, 51:19, 52:3, 52:4, 52:7, 69:9, 69:13, 73:5, 74:11, 80:1, 88:12
**Twitter** [7] - 13:4, 38:22, 39:14, 41:20, 44:19, 74:18, 85:13
**Twittersphere** [1] - 13:4
**two** [19] - 7:5, 7:12, 8:16, 22:12, 28:13, 29:11, 29:20, 46:3, 55:19, 58:17, 60:4, 60:10, 60:14, 60:15, 65:14, 65:24, 68:24, 92:20, 95:6
**Twombly** [5] - 6:10, 24:24, 33:1, 33:4,

33:13
**type** [6] - 28:18, 53:11, 54:17, 62:5, 92:6
**typed** [1] - 95:17
**types** [3] - 28:13, 44:1, 83:23
**typically** [2] - 81:10, 81:11

## U

**U.S** [2] - 2:17, 95:9
**ultimate** [4] - 65:1, 65:23, 69:24, 70:1
**ultimately** [3] - 5:19, 5:25, 9:6
**unapologetic** [2] - 52:16, 52:20
**uncomfortable** [2] - 36:5, 47:18
**under** [35] - 6:9, 9:6, 11:21, 13:17, 13:24, 14:1, 14:22, 20:13, 21:3, 21:10, 22:23, 26:15, 26:18, 26:20, 27:22, 32:6, 33:13, 40:12, 41:9, 44:13, 48:2, 62:4, 62:6, 63:5, 68:14, 78:5, 78:15, 84:15, 86:7, 86:8, 87:18, 91:1, 92:11, 98:23
**undercuts** [1] - 57:16
**underlying** [2] - 26:7, 51:19
**undermines** [1] - 56:11
**understood** [6] - 7:25, 20:7, 60:13, 60:18, 72:3, 72:17
**unfortunately** [1] - 63:21
**unique** [1] - 55:14
**UNITED** [2] - 1:1, 1:10
**United** [1] - 99:15
**University** [6] - 3:3, 3:12, 5:4, 56:24, 57:6, 74:8
**UNIVERSITY** [1] - 1:6
**university** [12] - 8:19, 13:7, 54:2, 61:11, 62:11, 64:9, 67:10, 67:11, 69:16, 70:5, 74:9
**university-wide** [1] - 64:9
**unlawful** [2] - 44:17, 44:19
**unless** [5] - 13:21, 15:14, 51:12, 88:10,

95:2
**unnecessarily** [1] - 47:14
**unquote** [1] - 84:8
**unsavory** [1] - 43:9
**untimeliness** [3] - 18:3, 71:25, 72:9
**untimely** [2] - 17:21, 18:16
**unwanted** [1] - 44:5
**unwilling** [1] - 69:14
**up** [18] - 5:12, 5:15, 5:20, 5:24, 27:13, 34:10, 40:2, 43:13, 49:2, 49:4, 52:10, 54:10, 54:24, 55:18, 60:4, 72:15, 85:14, 87:3
**upset** [2] - 86:19, 86:20

## V

**VA** [2] - 1:23, 2:13
**vacuum** [1] - 84:18
**valid** [1] - 12:14
**variant** [1] - 46:9
**veil** [1] - 48:21
**veil-piercing** [1] - 48:21
**video** [1] - 80:16
**view** [8] - 8:15, 19:6, 20:21, 33:3, 43:2, 76:12, 80:24, 94:23
**viewed** [3] - 17:21, 21:9, 61:16
**viewing** [1] - 98:2
**viewpoint** [2] - 94:23, 94:24
**views** [6] - 52:14, 52:15, 52:16, 63:25, 69:6, 94:25
**VII** [4] - 13:17, 13:24, 14:16, 44:23
**violate** [1] - 78:23
**violated** [2] - 76:14, 76:18
**violating** [3] - 37:22, 63:24
**violation** [7] - 23:1, 32:8, 44:20, 46:10, 53:19, 82:8, 88:25
**violations** [3] - 47:2, 47:12, 98:2
**violence** [1] - 26:3
**viral** [2] - 28:10, 29:22
**Virginia** [4] - 51:2, 96:12, 96:15, 97:8
**VOGEL** [1] - 2:3
**Vogel** [1] - 4:15

**volumes** [1] - 80:10

## W

**wait** [2] - 17:8, 89:19
**waited** [2] - 16:18, 91:21
**walk** [1] - 43:5
**Wallace** [1] - 45:20
**wants** [10] - 13:21, 19:12, 36:11, 36:18, 43:14, 43:21, 47:19, 47:20, 53:14, 82:16
**war** [2] - 15:7, 40:19
**warranted** [1] - 34:24
**Washington** [7] - 1:4, 1:13, 1:17, 1:20, 2:9, 2:18, 99:17
**wasted** [2] - 53:17, 53:18
**watch** [1] - 76:9
**weaker** [1] - 60:2
**Web** [1] - 98:3
**web** [1] - 84:17
**website** [6] - 39:23, 41:22, 60:24, 67:22, 67:25, 76:9
**websites** [1] - 42:18
**week** [2] - 15:7, 72:14
**weeks** [1] - 69:25
**welcome** [3] - 3:24, 55:6, 73:19
**well-defined** [1] - 95:9
**Wharf** [2] - 83:7, 83:23
**whatnot** [2] - 15:12, 63:25
**whatsoever** [2] - 10:11, 46:1
**whereas** [1] - 23:13
**white** [2] - 59:25, 76:10
**whole** [1] - 38:20
**wholly** [1] - 60:5
**wide** [1] - 64:9
**widespread** [1] - 40:7
**wish** [1] - 51:7
**withdraw** [7] - 17:6, 19:3, 20:4, 20:10, 71:7, 90:14, 93:12
**withdrawing** [2] - 16:5, 79:22
**withdrawn** [4] - 16:25, 79:24, 79:25, 80:25
**withdrew** [2] - 16:24, 81:23
**Wolff** [34] - 1:19, 3:21, 20:5, 21:21, 22:3, 22:20, 26:17, 28:9, 29:22, 30:1, 31:17, 32:3, 49:13, 49:18,

50:3, 54:6, 67:25, 70:13, 71:24, 72:10, 73:6, 73:10, 73:16, 73:23, 73:25, 74:20, 74:21, 74:22, 74:23, 75:21, 84:2, 86:16, 86:19, 90:19

**wolff's** [1] - 74:11

**Wolff's** [12] - 39:6, 55:9, 69:24, 70:16, 70:21, 71:14, 72:19, 72:22, 73:4, 74:17, 74:19, 75:15

**word** [1] - 80:9

**wording** [1] - 50:22

**words** [6] - 6:23, 23:8, 50:10, 50:25, 51:18, 77:7

**works** [1] - 74:6

**world** [2] - 41:22, 75:20

**worse** [2] - 41:21, 42:17

**wrap** [2] - 49:2, 72:15

**writ** [1] - 65:13

**writing** [2] - 62:14, 73:16

**written** [3] - 5:11, 63:19, 63:20

**wrongdoing** [1] - 71:12

**wronged** [1] - 44:9

**wrote** [1] - 5:9

## Y

**year** [11] - 27:23, 30:11, 30:13, 30:22, 31:5, 31:6, 47:11, 57:4, 75:9, 80:1, 96:25

**years** [8] - 48:13, 51:21, 52:3, 66:24, 76:22, 80:3, 80:25, 94:12

**yellow** [1] - 5:13

**yourself** [1] - 87:3

## Z

**zeros** [1] - 59:19

**Zionism** [1] - 52:20

**Zionist** [5] - 33:10, 36:20, 37:4, 52:19

**Zionists** [6] - 36:18, 37:1, 37:12, 37:14, 47:19, 47:22