**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANEESA JOHNSON**, <br><br> Plaintiff, <br><br> v. <br><br> **GEORGETOWN UNIVERSITY**, *et al.* <br><br> Defendants. | Case No. 25-cv-1540 (CRC) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Israel's retaliatory offensive in Gaza following Hamas's October 7, 2023 attack on the country roiled American college campuses like few other events since the Vietnam War. Increased numbers of Jewish students reported experiencing or witnessing incidents of antisemitism.  Muslim students likewise reported encountering harassment and discrimination at higher levels than before.  And students protesting the offensive, some Jewish, have faced a range of reprisals, including the revocation of job offers by would-be employers.  That turmoil permeates this case—which would otherwise be a garden-variety employment dispute involving Georgetown University's termination of a freshly-hired junior administrator.

Plaintiff Aneesa Johnson, an African American and Muslim woman of Palestinian origin, alleges that Georgetown discriminated against her when it fired her after discovering eight-year-old social media posts that described her "hat[red]" for Zionists.  She also brings a bevy of related hostile work environment, retaliation, and tort claims against Georgetown and a constellation of other defendants, including Rachel Jessica Wolff and Ilya Shapiro, individuals who publicized Johnson's old posts on Twitter; Canary Mission, a controversial organization that creates online profiles of students and professors on college campuses who have been critical of Israel; and a handful of Canary Mission's donors.  All defendants save Canary Mission, which

has refused to appear in the case despite apparently being served, have moved to dismiss Johnson's claims on various grounds.

Upon consideration of the voluminous set of briefs in this case, the Court concludes that Ms. Johnson's claims against the movants must be dismissed with prejudice. Among myriad grounds for dismissal, the complaint does not make out any claim that Johnson was discriminated against based on her race, religion, or national origin, nor can she proceed in tort against Georgetown or other defendants due to procedural and substantive defects in her claims. Canary Mission, meanwhile, has not appeared or sought dismissal. As a result, the Court will not dismiss the case entirely, permitting Johnson to pursue default proceedings against the organization if she so chooses in light of the Court's assessment of her claims against Canary Mission below.

Several defendants have also moved for Federal Rule of Civil Procedure 11 ("Rule 11") sanctions against both Johnson and her attorney, Abdel-Rahman Hamed, contending that they brought the suit for an improper purpose and that her claims are legally and factually frivolous. The Court is generally "loath to impose sanctions under Rule 11 and does not take requests to do so lightly." Jones v. Campbell Univ., 322 F. Supp. 3d 106, 109 (D.D.C. 2018) (Cooper, J.). Having considered the briefs and record, the Court will exercise its discretion to deny Mr. Shapiro's motion for sanctions and strike Ms. Wolff's as untimely. However, it will grant the Canary Mission donors' motions for sanctions under Rules 11(b)(2) and (b)(3), as to Mr. Hamed only. The Court declines to grant the donors' request for monetary sanctions; instead, it admonishes Hamed to exercise greater care in bringing any similar claims in the future.

2

## I.    Background

A.  <u>Factual Background</u>

Unless otherwise noted, the Court takes the following background from the facts alleged in the Second Amended Complaint ("SAC"), which the Court must accept as true for present purposes.  While the complaint's core narrative is largely uncontested, the defendants no doubt dispute how Johnson has characterized the facts in many instances.

In August 2023, Johnson applied to serve as the Assistant Director of Academic and Faculty Affairs at Georgetown's Walsh School of Foreign Service ("SFS").  SAC ¶ 106.  A few weeks after submitting her application, Johnson was invited to interview via Zoom with SFS leadership, including the Director of the school's Master of Science program ("MSFS"), George Shambaugh.  <u>Id.</u> ¶ 108.  An in-person interview for the position soon followed, during which Johnson met with administrators, staff members, and current MSFS students.  <u>Id.</u> ¶¶ 110–12.

On October 2, Georgetown offered Johnson the position, which she eagerly accepted.  <u>Id.</u> ¶¶ 114.  Her offer letter described her employment as "at-will" and subject to Georgetown's Human Resources policies and practices.  Georgetown Mot. to Dismiss, ECF No. 53, Ex. A at 2.[1] The offer letter also noted that Johnson would be "on a probationary status for the first six months of employment."  <u>Id.</u>  She would start the job on October 30.  <u>Id.</u> at 1.

In Johnson's telling, Georgetown's enthusiasm about her hiring faded quickly.  SAC ¶ 115.  According to the complaint, at a welcome lunch on Johnson's first day, "faculty members interrogated [her] about her heritage[,]" with one professor "ask[ing] if she was Sudanese, then press[ing] further when she disclosed her Palestinian roots."  <u>Id.</u> ¶ 116–17.  At this point,

---

[1] As explained below, the Court may consider documents referred to in the complaint that are central to plaintiff's claims without converting the motion into one for summary judgment.

Johnson recounts, Director Shambaugh "redirected conversation to the 'war in Gaza.'" Id. ¶ 118. It was, of course, a sensitive moment at the university and beyond.  Three weeks earlier, on October 7, the militant group Hamas had carried out a gruesome attack on Israel, which resulted in the deaths of over 1,200 civilians and the taking of scores of hostages.  Israel immediately launched a retaliatory military campaign in the Gaza Strip that has, in the roughly two-and-a-half years since, killed tens of thousands of Palestinians and displaced many thousands more from their homes.  Johnson claims that Director Shambaugh's conversational redirection at the welcome lunch made her "visibly uncomfortable and upset—forcing colleagues to intervene." Id. ¶¶ 118.

After Johnson was introduced to the SFS community by email, Rachel Wolff—a Jewish dual degree student at SFS and Georgetown's law school—looked Johnson up online.  Id. ¶¶ 125–26.  The top search result was a profile of Johnson on the website of Canary Mission, id. ¶ 126, which the complaint characterizes as an "anonymous cyberstalking and blacklisting" operation that "targets" individuals who advocate for Palestinian rights.  Id. ¶ 49.  According to Johnson, Canary Mission "maintains complete operational anonymity, with no public identification of leadership, staff, or physical locations," id. ¶ 55, and it does so in part by "employ[ing] an elaborate network of intermediaries to obscure its true sources of funding and control," id. ¶ 50.  Drawing on public reporting, Johnson alleges that Defendants Jewish Community Federation of San Francisco, the Helen Diller Family Foundation, the Milstein Family Foundation, and Adam Milstein have contributed to "passthrough entities" that redirect their funds to Canary Mission and support its operations in a way that targets university students and faculty across the country.  Id. ¶¶ 49–54, 68, 79–83, 234–239; see also id. ¶ 81 n.56 (citing

James Bamford, Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors, The Nation (Dec. 22, 2023), https://perma.cc/6A4L-SPV9).

Canary Mission's profile on Johnson, which has apparently existed since 2015, see SAC ¶¶ 96–102, included Twitter[2] posts that Johnson made eight years earlier as a first-year undergraduate student at Northwestern University, during which time she "organized protests and advocated for the university to divest from" Israeli companies and "participated in campus demonstrations opposing Northwestern's investments in corporations . . . directly implicated in the demolition of Palestinian homes and military occupation," id. ¶ 93.

Three of Johnson's posts are relevant here. The first read, "Ever since going to [Northwestern] I have a deep seeded [sic] hate for Zio bitches. They bring out the worst in me." Id. ¶ 89. The second elaborated, "You know why I call them Zio bitches, because they're dogs." Id. And the third post was a repost of another user's Tweet, which included a photograph of a scowling Orthodox Jewish man with the caption, "When the whole world hates you bc you a thief and grow up looking like a shaytan #GrowingUpIsraeli." Id. ¶ 90. ("Shaytan" means devil or demon in Arabic.) After Johnson made these posts, she says she "close[d] her social media accounts and withdr[e]w from public activism" to "avoid . . . harassment." Id. ¶¶ 101, 103. But the posts remain accessible on Canary Mission's site.

Alarmed at what her Google search turned up, Wolff took to Twitter herself. Late in the evening on November 1, she posted screenshots of Johnson's college-era Tweets, retrieved from Canary Mission, with some added commentary: "Not to be outdone by Harvard, Georgetown @georgetownsfs just hired this antisemite to be the 'primary point of contact for all MSFS

---

[2] The social media platform Twitter was rebranded as "X" in mid-2023. Given that some of the events in this case predate the name change, the Court will refer to the platform as Twitter for consistency.

Students on everything academic.'  As an SFS student, I'd rather fail my master's program than speak to someone who says this about my people."  Id. ¶ 127.

Wolff's Tweet went viral, garnering over a million views.  Id.  She followed up with additional posts, calling SFS and Georgetown "shameful" for their hiring decision.  Id. ¶ 129. According to the complaint, Wolff's Tweets were amplified by Canary Mission, the Israeli government, and other users.  Id. ¶ 130.  One of those users was Ilya Shapiro, a former Georgetown law school lecturer and administrator, who reposted Wolff's initial Tweet, adding "Her name is Aneesa Johnson, @Georgetown School of Foreign Service's new assistant director of academic affairs."  Id. ¶ 131.

Things escalated quickly from there.  The next morning, around 8 a.m., Director Shambaugh called Johnson and "instruct[ed] her not to come to the office due to 'unspecified threats to her safety.'"  Id. ¶ 132.  An hour later, Shambaugh called again and informed Johnson that she would be placed on paid administrative leave.  Id. ¶ 133.

Around 10:40 a.m., SFS Dean Joel Hellman sent an email to the entire school, explaining that the administration had been "recently made aware of hateful, antisemitic social media commentary alleged to have been made by a recently hired staff member who started working at the School of Foreign Service earlier this week."  Georgetown Mot. to Dismiss, Ex. B at 1. Hellman explained that SFS officials had not been aware of the comments when they hired Johnson, and that she had been placed on immediate leave, "pending an investigation of the comments," which, "[i]f verified," would lead to "immediate and appropriate action."  Id. Hellman continued by condemning "[a]ntisemitic language and imagery" on campus and expressing pride at "how [the] SFS community ha[d] worked through the difficult events of the past several weeks together acknowledging differences, engaging in dialogue, and respecting

each other." Id.  The email concluded by acknowledging "how difficult this time has been for so many of our community members" and affirming that the "highest priority is the safety, security, and well-being of our community."  Id.

A few minutes after Dean Hellman's email was circulated, Johnson reports that she "received her first hate message in her work email" and was then "subjected to extensive doxing, with her personal information shared across various . . . social media accounts and websites." SAC ¶¶ 135, 137.  Wolff, for her part, dashed off an "UPDATE" to Twitter that Johnson had been "placed on administrative leave," though she had a "hard time believing" that Georgetown "was not aware of her background . . . when it's the first thing that comes up when you Google her name."  Id. ¶ 138.  To cap off the tumultuous day, Johnson received a letter from Director Shambaugh late in the afternoon, which formally alerted her that she had been placed on administrative leave pending an investigation "related to [her] online conduct . . . which, if substantiated, would be in violation of University policies, including professional conduct policies."  Id. ¶ 142.

The complaint is mostly silent as to what transpired during Georgetown's subsequent investigation.  Johnson alleges that on November 8, she "sent a letter to Georgetown documenting concerns of discriminatory conduct," which the university "did not heed."  Id. ¶ 144.  The letter—signed by Johnson's then-attorney Gadeir Abass of the Council on American-Islamic Relations ("CAIR") Legal Defense Fund—stated that Johnson would "not respond to questions about her entry on Canary Mission's discriminatory blacklist" and "implore[d]" Dean Hellman "to set aside Canary Mission as a source for valid, trustworthy information" given its reputation as "an anti-Arab, anti-Muslim hate group" among various "academic institutions, academics, religious groups[,] and religious leaders."  Georgetown Mot. to Dismiss, Ex. C at 1–

7

2.  The letter did not, however, dispute that Johnson had posted the offending Tweets.  Nor did it document any other instances of discrimination Johnson professed to have suffered in her brief employment to that point.[3]

On November 27, Georgetown terminated Johnson's employment.  SAC ¶ 145.  The termination letter, signed by Director Shambaugh, explained the decision as follows:

> [T]he University investigated allegations that you engaged in unprofessional conduct based on your social media activity, including, but not limited to posts from 2015 which were shared with Georgetown University during the first week of your employment . . . . Your social media conduct has had a significantly negative impact on the MSFS Program and in extension its Walsh School of Foreign Service and the wider Georgetown Community.  It also impacts your ability to engage fully with members of our community.
>
> The University's review concluded that you engaged in unprofessional conduct based on the postings that you made and your subsequent failure to address concerns raised by your social media activities.  The Assistant Director of Academic and Faculty Affairs is required to interact with many different constituencies to perform the essential functions of the position, including students, alumni, faculty, and staff.  Communicating carefully and thoughtfully is critical to developing good relationships with stakeholders, and hence to success in this position.  You do not deny that you made the posts at issue.  Your failure to acknowledge or address these posts and their impact has a detrimental effect on the willingness of some members of the community to engage with you, and raises concerns about your willingness to engage with these various constituencies in a professional way.  It also poses concerns about the impact of SFS to fulfill its mission by engaging its various constituencies.

---

[3] The following spring, Johnson filed a discrimination charge with the Equal Employment Opportunity Commission, which is mentioned in the complaint and appended to Georgetown's motion to dismiss.  The charge provides a touch more detail about Georgetown's investigation.  According to the charge, Johnson "received a call from Human Resources" the day after being placed on leave, and a "representative asked to speak" to her "about 'tweets' that Canary Mission alleged she had made."  Georgetown Mot. to Dismiss, Ex. E at 5.  After receiving Johnson's November 8 letter, she and her attorney "met with HR over a Zoom meeting late November.  The HR representative questioned Ms. Johnson about the Canary Mission profile . . . . HR also asked Ms. Johnson if she was capable of fulfilling the duties [of] this position."  Id.  The administrative charge does not indicate how Johnson answered these questions.

Georgetown Mot. to Dismiss, Ex. D at 1.  The letter went on to state that Johnson was being fired pursuant to the university's Human Resources Policy #204, which provides for termination "at any time during the probationary period" if the employee's department determines that she "cannot accomplish the job" or that her "behavior is unacceptable[.]"  Id. at 2.

As a result of the alleged actions of the defendants named in this case—Georgetown, Director Shambaugh, Dean Hellman, Wolff, Shapiro, Canary Mission, and a handful of Canary Mission's donors—Johnson states that she has suffered various harms, including panic attacks, insomnia, anxiety, and reputational damage.  SAC ¶ 146.

B.  Procedural Background

In April 2024, Johnson filed a charge of discrimination based on race, religion, color, sex, and national origin with the Equal Employment Opportunity Commission ("EEOC").  See SAC ¶ 9.  The charge, which named only Georgetown University as a respondent, asserted that Johnson was treated disparately based on her protected identities, as she was fired for her social media posts whereas other white, non-Muslim university employees were not disciplined for their offensive Tweets.  See generally Georgetown Mot. to Dismiss, Ex. E.  Johnson designated her EEOC charge as cross-filed with the local fair employment practices agency.  Id. at 1–2; see also SAC ¶ 10.

Johnson filed the present action in the Superior Court of the District of Columbia in February 2025.  Consistent with her EEOC charge, the initial complaint identified Georgetown as the only defendant.  Johnson swiftly replaced the original complaint with a First Amended Complaint ("FAC"), which ballooned to fifteen counts, including various civil rights and tort claims, against Georgetown and nine additional defendants: Dean Hellman and Director Shambaugh, who, along with Georgetown, are referred to hereinafter as the "Georgetown

Defendants"; Rachel Wolff, Ilya Shapiro, and Canary Mission; the Jewish Community Federation of San Francisco and Helen Diller Family Foundation ("San Francisco Defendants"); and the Milstein Family Foundation and Adam Milstein ("Milstein Defendants"). The San Francisco and Milstein Defendants are referred to collectively as the "Donor Defendants."

The Georgetown Defendants removed the case to federal court in May. See generally ECF No. 1. Over the summer of 2025, as motion-to-dismiss briefing was underway, Johnson sought leave to file a Second Amended Complaint, promising that she would narrow the disputed issues in the case. See ECF No. 44. The Court granted her request. See Aug. 18, 2025 Min. Order. Although the resulting SAC removed some claims against some defendants, it added several others. See ECF No. 47. The still-hefty SAC spans 501 paragraphs over 118 pages.

All defendants except Canary Mission have since filed or refiled motions to dismiss the claims against them. A subset of defendants—Shapiro, Wolff, and the Donor Defendants—have also moved for Rule 11 sanctions against Johnson and her counsel. The Court heard argument on all the pending motions on February 19, 2026.

## II.    Legal Standards

The defendants move for dismissal on a variety of grounds, including lack of personal jurisdiction, untimeliness, failure to exhaust administrative remedies, and failure to state a claim. The Court reviews Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6)'s legal standards in broad strokes here and applies them in more fine-tuned fashion below.

Under Rule 12(b)(2), a defendant may move to dismiss for lack of personal jurisdiction. "On a motion to dismiss pursuant to Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for a court's exercise of personal jurisdiction over the defendant." Stocks v. Cordish Cos., Inc., 118 F. Supp. 3d 81, 86 (D.D.C. 2015). In so doing, "the plaintiff may not

rely on conclusory allegations, but instead must make a showing of the facts necessary to connect each defendant to the forum." Devorah v. Royal Bank of Canada, 115 F. Supp. 3d 35, 38 (D.D.C. 2015). "[W]hile the Court must resolve factual discrepancies in favor of the plaintiff, it need not accept the plaintiff's factual allegations as true," Swecker v. Midland Power Coop., 253 F. Supp. 3d 274, 278 (D.D.C. 2017) (citation omitted), and "may consider affidavits and other materials to determine the exercise of jurisdiction," Stocks, 118 F. Supp. 3d at 86.

To survive dismissal on a Rule 12(b)(6) challenge, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint is plausible when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will a complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 555, 557).

The Court must make every reasonable inference in the plaintiff's favor at this stage, considering the alleged facts, "documents attached . . . or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." Gustave–Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002). "Where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." Solomon v. Off. of Architect of the Capitol, 539 F. Supp. 2d 347, 349–50 (D.D.C. 2008) (cleaned up).

11

### III.  Analysis

The SAC includes thirteen causes of action against all or some subset of the ten defendants.  The Court first addresses threshold jurisdictional issues; then reviews Johnson's array of discrimination claims under Title VII, 42 U.S.C. §§ 1981 and 1985, and the D.C. Human Right Act ("DCHRA"); and finally turns to her tort claims.  Along the way, various defendants and claims fall away.  On occasion, in the interest of comprehensiveness, the Court addresses the merits of a particular claim, even though the claim is also defective for some procedural reason. The Court does not consider the merits of claims against defendants over whom it cannot exercise personal jurisdiction.  Cf. Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over . . . the parties[.]").

### A.  Personal Jurisdiction

At the threshold, the Donor Defendants and Ilya Shapiro assert that the Court lacks personal jurisdiction over them.  It is Johnson's burden to "establish[] a factual basis" for exercising personal jurisdiction.  Stocks, 118 F. Supp. 3d at 86.  She offers a few different jurisdictional theories, but none of them pencil out.

*First*, Johnson contends that the Court may exercise personal jurisdiction over these defendants pursuant to D.C. Code § 13-423(a)(4), one "finger" of the District's long-arm statute. Crane v. Carr, 814 F.2d 758, 759 (D.C. Cir. 1987).  Section 13-423(a)(4) provides for personal jurisdiction where a defendant "caus[es] tortious injury in the District of Columbia by an act or omission outside the District of Columbia," so long as the defendant "[1] regularly does or solicits business, [2] engages in any other persistent course of conduct, or [3] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia[.]"  The

latter three "plus factors" are designed to "filter out cases in which the in[-]forum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." Hindu Am. Found. v. Viswanath, 646 F. Supp. 3d 78, 94 (D.D.C. 2022) (quoting Crane, 814 F.2d at 763). The plaintiff's cause of action "need not arise from the 'plus factors' imposed by subsection (a)(4)," and "a defendant's contacts need not be great to satisfy" the provision. Lewy v. S. Poverty L. Ctr., Inc., 723 F. Supp. 2d 116, 123–24 (D.D.C. 2010). But "the contacts must at least be continuing in character." Hindu Am. Found., 646 F. Supp. 3d at 94 (cleaned up).

As to the Donor Defendants, Johnson focuses on the second plus factor, arguing that they "engaged in a persistent course of conduct in the District by systematically funding Canary Mission's cyberstalking operations that specifically target D.C.-based individuals and institutions." Omnibus Response to Defs.' Motions to Dismiss ("Omnibus Response") at 19. Her complaint alleges that these donors funded Canary Mission through front organizations like Megamot Shalom and Central Fund of Israel. See, e.g., SAC ¶¶ 16–18, 20–21, 53. But, as unsavory as Canary Mission's *modus operandi* may be to many, Johnson's assertion that the donors have "targeted" the District, see SAC ¶ 83, is conclusory at best.

The complaint describes Canary Mission's general tactics, which include not only creating online profiles of Palestinian advocates but also "actively contacting employers to share derogatory information about targets," "surveill[ing]" students on university campuses, and providing information about protestors to domestic and foreign law enforcement. SAC ¶¶ 60–68. Yet Johnson does not offer any concrete detail about how such tactics are specifically directed at the District of Columbia. And even if Canary Mission could be said to have engaged in a "persistent course of conduct" in the District by publishing profiles about people who live or work here, see, e.g., SAC ¶ 83, such contact is beside the point. The complaint does not allege a

13

persistent course of conduct that the *Donor* Defendants have directed toward the District. Rather, Johnson alleges that the donors sought to fund "operations" and "campaigns" that targeted "Palestinian advocates," usually without specifying location.[4]  See, e.g. SAC ¶¶ 378–79. On the rare occasion that the complaint describes the donors' activity as affecting Palestinian advocacy in places "including Georgetown," see, e.g., SAC ¶ 236, that phrasing underscores the incidental nature of the donors' contact with the forum.  So although Johnson cites cases like Lewy, in which the court exercised jurisdiction over an out-of-state group based on its direct engagement with District residents, these cases are inapposite under the circumstances here.

Johnson's jurisdictional theory seems to rest on the assumption that the Court can automatically impute Canary Mission's in-District conduct to its donors.  But personal jurisdiction cannot be exercised by the wave of a hand:  "The contacts necessary for the Court to exercise personal jurisdiction must be assessed individually for each defendant."  Mouzon v. Radiancy, Inc., 85 F. Supp. 3d 361, 371 (D.D.C. 2015) (citing Keeton v. Hustler Mag., Inc., 465 U.S. 770, 781 n.13 (1984)).  This is not to say that organizational donors can never expect to be sued in D.C. courts pursuant to section 13-423(a)(4).  But without more—perhaps, for instance, some factual allegation demonstrating that the donor directed its funds to the organization with the objective or specific knowledge that the money would be used to engage in conduct in the District—the connection between this forum and an out-of-state donor with no other D.C. ties would appear fortuitous, and the exercise of personal jurisdiction under section 13-423(a)(4) unsupported.  See Citadel Inv. Grp., L.L.C. v. Citadel Cap. Co., 699 F. Supp. 2d 303, 310

---

[4] The closest Johnson comes to alleging that the donors targeted the District is not very close at all.  The complaint states that the "Milstein Family Foundation deliberately targeted its efforts at the District of Columbia by funding Canary Mission's operations targeting Georgetown students and faculty, including profiles of MSFS community members."  SAC ¶ 83.  That sentence is too conclusory to pass muster under the Twombly/Iqbal pleading standard.

(D.D.C. 2010) ("[F]ortuitous contacts cannot give rise to personal jurisdiction.").[5]  To hold otherwise would subject anyone who contributes to an organization that engages continuously in the District to being haled into court here on the mere basis of that association.  Such a rule would be at odds with bedrock principles of personal jurisdiction.

With respect to Shapiro, Johnson concedes that his re-post of Wolff's Tweet "occurred from his home in Virginia[.]"  Omnibus Response at 97.  To justify the Court's exercise of jurisdiction over Shapiro under section 13-423(a)(4), Johnson's complaint relies on his *former* connection with Georgetown during his short-lived tenure at the university in 2022.  See Omnibus Response at 22.[6]  But this connection significantly predates both his November 2023 Tweet about Johnson and the filing of this lawsuit in February 2025, and "personal jurisdiction contacts are determined at the time the initial complaint is filed[.]"  Allen v. Russ. Fed'n, 522 F. Supp. 2d 167, 194 (D.D.C. 2007).  Although Johnson insists that Shapiro used his "institutional

---

[5] To support her position, Johnson cites personal jurisdiction decisions decided under the Antiterrorism Act ("ATA").  See Omnibus Response at 20 (citing Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 32–34 (D.D.C. 2010); Bernhardt v. Islamic Republic of Iran, 47 F.4th 856, 875 (D.C. Cir. 2022)).  There are obvious distinctions between such cases and the one at bar, not least that the ATA authorizes personal jurisdiction over individuals with nationwide minimum contacts, so the jurisdictional analyses under that law and section 13-423(a)(4) are categorically different.  But even if the logic of such decisions applied here, in order to establish personal jurisdiction over financiers of terrorism under the ATA, plaintiffs must allege more than an attenuated connection between those funders and the forum state.  See, e.g., Bernhardt, 47 F.4th at 863–66.  Johnson's reliance on these cases is therefore misplaced.

[6] At the hearing on the motions to dismiss, Johnson's counsel suggested that the Court could exercise 13-423(a)(4) jurisdiction over Shapiro based on his re-Tweet of Wolff's post.  See Mot. to Dismiss Hearing Tr. 78:17–25.  Although Shapiro's conduct on that occasion was arguably targeted at the District, it was not "continuing in character."  Hindu Am. Found., 646 F. Supp. 3d at 94 (citation omitted).  Counsel also suggested that the Court could exercise jurisdiction over Shapiro because he is a "national spokesperson" who is often "called to D.C." Mot. to Dismiss Hearing Tr. 79:8–9.  Such allegations are nowhere to be found in the complaint, and the Court will not entertain them for the first time now.  Furthermore, they are undercut by the jurisdictional affidavit Shapiro filed along with his motion to dismiss, which Johnson did not attempt to contest.  See Shapiro Mot. to Dismiss, ECF No. 52-2 ¶¶ 3-7.

15

credibility" as "Georgetown's very own 'Constitutional Law and Supreme Court Expert'" to amplify his Tweet, SAC ¶¶ 435, 131, that framing is her own.  In fact, Johnson admits in her opposition brief that at the time of the re-Tweet, Shapiro "held no official position, authority, or capacity at Georgetown whatsoever," nor did he have any "communication with Georgetown" or other "authority" to weigh in on its employment practices.  Omnibus Response at 97.  Johnson thus fails to show that any of subsection (a)(4)'s plus factors are satisfied.  And aside from a passing reference to section 13-423(a)(3), see Omnibus Response at 22,[7] she offers no other statutory hook for jurisdiction over Shapiro.

*Second*, Johnson asks the Court to apply the Calder effects test to conclude that it has jurisdiction over the donors and Shapiro.  See Calder v. Jones, 465 U.S. 783 (1984).  The Court declines the invitation.  "Calder concerns the constitutional aspect of personal jurisdiction, but it is black letter law in this Circuit that 'a court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process.'"  Allen v. Addi, No. 20-cv-1650 (TSC), 2021 WL 4306078, at *11 (D.D.C. Sep. 22, 2021) (quoting GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1347 (D.C. Cir. 2000)).  "Here, the [C]ourt has already considered, and rejected," Johnson's proffered "basis for jurisdiction under the District's long-

---

[7] Section 13-423(a)(3) grants jurisdiction over a person who "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia."  Johnson concedes that Shapiro re-Tweeted Wolff's post from his home in Virginia.  Omnibus Response at 97.  The record thus indicates that Shapiro did not carry out an "act or omission in the District[.]"

One could imagine other theories of jurisdiction that Johnson might have invoked as to Shapiro.  But given that Johnson furnished no other statutory basis in her papers, and it is the "plaintiff's burden to establish" personal jurisdiction "in a manner" that gives "the district court fair notice" of its arguments, FC Inv. Group LC v. IFX Markets, Ltd., 529 F.3d 1087, 1095 (D.C. Cir. 2008), overruled on other grounds by Erwin-Simpson v. AirAsia Berhad, 985 F.3d 883 (D.C. Cir. 2021), the Court will not go out of its way to conjure alternatives.

16

arm statute." Id.  So there is no occasion for the Court to embark on the second-order due process inquiry.[8]

*Third* and finally, Johnson maintains that the Court may exercise personal jurisdiction over both Shapiro and the Donor Defendants based on her alleged conspiracy.  "In order to establish jurisdiction under a theory of civil conspiracy, the plaintiff must plead with particularity overt acts within the forum taken in furtherance of the conspiracy[.]"  FC Inv. Grp. LC v. IFX Mkts., Ltd., 529 F.3d 1087, 1097 (D.C. Cir. 2008) (cleaned up), overruled on other grounds by Erwin-Simpson v. AirAsia Berhad, 985 F.3d 883 (D.C. Cir. 2021).  "Bald speculation or a conclusory statement that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory."  Id. (cleaned up).

As the Court explains below, Johnson has failed to allege the existence of a conspiracy at all, let alone that "overt acts" were taken by Shapiro or the donors "within the forum" in "furtherance of the conspiracy."  Id.  She simply recites the sequence of events in the case and

---

[8] It is true that certain subsections of section 13-423 "authorize[] jurisdiction to the full extent allowed by the Due Process Clause," at which point the statutory and constitutional inquiries merge.  Media Matters for Am. v. Paxton, 138 F.4th 563, 576 (D.C. Cir. 2025).  But (a)(4) does not appear to be one of those subsections.  See Forras v. Rauf, 812 F.3d 1102, 1108 (D.C. Cir. 2016) (explaining that "Subsection (a)(4)'s reach is far more cabined" than the federal Due Process Clause); see also Hindu Am. Found., 646 F. Supp. 3d at 93–94 ("Section 13-423(a)(4) is 'more restrictive than the Due Process Clause of the Constitution[.]'" (citation omitted); Fiorentine v. Sarton P.R., LLC, 486 F. Supp. 3d 377, 385 (D.D.C. 2020) ("[J]urisdiction under subsection (a)(4) requires an additional demonstration of certain 'plus factors' deemed *more* restrictive than the constitutional floor.").  An argument could perhaps be made that the D.C. Court of Appeals narrowed the daylight between (a)(4) and the federal due process requirement when it recently reiterated that "the requirement of a '*persistent* course of conduct' . . . ensur[es] that 'there are minimum contacts with the forum sufficient to satisfy due process concerns.'"  Akhmetshin v. Browder, 275 A.3d 290, 295 (D.C. 2022) (citation omitted); see also Alpine Consulting Partners, LLC v. Jacokes, 25-cv-913 (SLS), 2025 WL 2959574, at *4 (D.D.C. Oct. 17, 2025) (suggesting that constitutional minimum contacts satisfies (a)(4)'s "persistent course of conduct" requirement)).  But Johnson has not made this argument, and the Court will not do her work for her.

17

asks the Court to draw an inference of express agreement from their temporal proximity. The notion that these defendants are co-conspirators is speculative at best, rendering the allegations "insufficient to establish a conspiracy theory of personal jurisdiction." Id. at 1098.

In sum, Johnson has failed to establish that the Court may exercise personal jurisdiction over the Donor Defendants or Shapiro. All claims against these defendants are thus dismissed.

B. Discrimination Claims

1. *Title VII*

At its core, this is an employment discrimination case. Johnson's central claim is that she was treated adversely based on her race, religion, and national origin when some of her college-era social media posts came to light and Georgetown terminated her as a consequence. She adds that she was subjected to a hostile work environment and unlawful retaliation.

Before assessing these Title VII claims, a brief interjection. The complaint asserts that Director Shambaugh and Dean Hellman are individually liable for violating Johnson's civil rights. Where a supervisory employee is named alongside an employer in a Title VII suit, the claim against the supervisor "essentially merges" with the claim against the employing institution because the supervisor "cannot be held liable in his personal capacity[.]" Gary v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995). Moreover, Johnson's opposition brief concedes that Title VII generally "bars individual liability[.]" Omnibus Response at 36. The Court will thus dismiss all Title VII claims against Director Shambaugh and Dean Hellman, as they merge with Johnson's claims against Georgetown. Now back to the regularly scheduled programming.

a. Disparate Treatment

"In order to bring an actionable discrimination claim under Title VII," a plaintiff "must establish that: (1) [s]he is a member of a protected class; (2) [s]he suffered an adverse

18

employment action; and (3) the adverse action gives rise to an inference of discrimination."

Patzy v. Hochberg, 217 F. Supp. 3d 357, 361 (D.D.C. 2016).  "An employment discrimination

plaintiff is not required to plead every fact necessary to establish a *prima facie* case to survive a

motion to dismiss."  Id. (citation omitted).  She "must, however, plead sufficient facts to

demonstrate plausible relief."  Id.

It is undisputed that Johnson is a member of several protected classes; she is African-

American, Muslim, and of Palestinian national origin.  It is also undisputed that she suffered an

adverse employment action.  The question is thus whether the complaint alleges sufficient facts

to support a reasonable inference that the adverse action can be attributed to her "membership in

the[se] protected class[es]."  Bartlette v. Hyatt Regency, 208 F. Supp. 3d 311, 321–22 (D.D.C.

2016) (quoting Brown v. Sessoms, 774 F.3d 1016, 1022 (D.C. Cir. 2014)).

Johnson highlights several pieces of circumstantial evidence to bolster this inference.

See generally Omnibus Response at 24–29.  The Court sifts through her laundry list of

allegations before turning to the crux of the disparate treatment claim, which is Johnson's

comparator theory of Title VII liability.

### i.  Circumstantial Evidence

To begin, Johnson points to the "temporal proximity between Georgetown's discovery of

[her] Palestinian identity during her welcome lunch on October 30, 2023, and her suspension on

November 2, 2023[.]"  Omnibus Response at 24.  That proximity does not take Johnson far, as

the discovery of her offensive Tweets on November 1 is an obvious intervening factor that

undermines any inference of discrimination based on timing.

As to whether the purported remarks and conversation at the welcome lunch are

independently suggestive of improper bias, the Court is not persuaded.  Johnson alleges that

19

"faculty members interrogated" her "about her heritage," and that one faculty member in particular "asked if she was Sudanese, then pressed further when she disclosed her Palestinian roots." SAC ¶¶ 116, 117. While Johnson may well have taken umbrage at any such prying, without more context, the professors' questions do not suggest invidious animus. Even more to the point, Johnson never suggests that the professors at the lunch played any part in her subsequent discipline and termination.

Johnson also maintains that MSFS Director Shambaugh "redirected conversation to the 'war in Gaza,' making Ms. Johnson visibly uncomfortable and upset—forcing colleagues to intervene." SAC ¶ 118. As alleged, Shambaugh's conduct also does not give rise to an inference that he was motivated by improper bias in any subsequent employment decision; indeed, the complaint provides no detail or suggestion as to what was actually said during this conversation. The Court accepts that workplace conversations about the conflict in Gaza may have been upsetting to Johnson—but without any further sense of what transpired at the faculty lunch, her assertions that Shambaugh "reduced her Palestinian identity to a crude political trope" and "implicit[ly] demand[ed]" that she "state her position on Palestine before being granted basic respect" are groundless. SAC ¶¶ 119, 122.

Next, Johnson mentions Georgetown's probation policy, which states, in relevant part:

> Normally, an employee will be allowed to complete the probationary period before any decision is made to continue or end employment. However, if the department determines that performance indicates that the employee cannot accomplish the job or if the department determines that the individual's behavior is unacceptable, the University may terminate employment at any time during the probationary period.

SAC ¶ 150. Johnson insists that Georgetown "deviated" from this policy in terminating her so quickly because new employees are "[n]ormally" allowed to complete the probationary period. Omnibus Response at 24. But the policy clearly affords the university the right to fire an

employee for behavior that her department deems "unacceptable[,]" and Johnson does not persuasively explain how Georgetown "violated" its own policy by taking action that was clearly contemplated by the quoted provision, id.—let alone how such a violation would suggest bias based on Johnson's race, religion, or national origin.

Johnson next takes aim at the adequacy of Georgetown's investigation, pointing to the university's almost immediate decision to place her on administrative leave; its heavy reliance on materials provided by Canary Mission; and its purported failure to provide Johnson with a "meaningful opportunity to respond to the allegations." Id. at 25–26. It is true that Georgetown acted swiftly upon discovering Johnson's old social media posts, but given the understandable and immediate outrage that the offensive posts apparently engendered, the timing of its response does not evince invidious discrimination. It is surprising that Georgetown did not learn of Johnson's posts during the hiring process. Still, the most that can be reasonably inferred from the oversight is a lapse in the university's vetting process. It is quite a leap to infer from this lapse that Georgetown "concocted [a] *post hoc* [explanation] to rationalize" a discriminatory decision. Omnibus Response at 26.

As to the supposed shortcomings in Georgetown's investigation, Johnson does not provide a factual foothold for her assertion that the inquiry was a hastily-plucked fig-leaf for discrimination. Her complaint does not describe one way or another what happened between November 8, when her counsel sent a letter to Georgetown, and November 27, when she was officially terminated. SAC ¶ 144–45. Johnson baldly speculates in her briefing that the university "fail[ed] to conduct any independent verification" of Canary Mission's profile before firing her. Omnibus Response at 25; see also id. at 26. But her EEOC charge belies the assertion that Georgetown gave her no opportunity to respond. See Georgetown Mot. to Dismiss, Ex. E at

21

6 ("Johnson and her attorney met with HR over a Zoom meeting late November.  The HR representative questioned Ms. Johnson about the Canary Mission profile . . . . HR also asked Ms. Johnson if she was capable of fulfilling the duties [of] this position.").  Johnson's termination letter further underscores that she was not fired solely based on her posts, but also her "subsequent failure to address concerns raised by" her social media activity, which strongly implies that she had an opportunity to respond to the university's accusations, and, perhaps on advice of counsel, chose not to take it.  Georgetown Mot. to Dismiss, Ex. D at 1.[9]

At any rate, Johnson has brought a discrimination claim, not a due process claim.  What matters is not so much whether Georgetown inappropriately expedited its disciplinary process, but whether its treatment of Johnson can be fairly attributed to her race, religion, or national origin.  The complaint fails to generate such an inference.

Johnson finally accuses Georgetown of mischaracterizing her Tweets in an "inflammatory" way, further evincing discriminatory bias.  Omnibus Response at 27–29.  Georgetown's communications in November 2023 do not strike the Court as at all improper— after all, the university was under no obligation to perform a close reading of facially offensive posts that Johnson admits she made and that some substantial portion of the SFS community understandably interpreted as antisemitic.  Once again, the question is not whether the university's commentary was inflammatory in a vacuum, but inflammatory in a way that evinces invidious animus.  Setting aside any comparison as to how Georgetown treated Ilya Shapiro for

---

[9] At the motions hearing, Johnson's attorney elaborated that "instead of giving [Johnson] an investigation, [Human Resources] said they'd give her one opportunity right now to provide an explanation to [her prior] statement[s]."  Mot. to Dismiss Hearing Tr. 69:1–3.  He represented that Human Resources told Johnson, "You're about to be terminated.  Do you want to give an explanation to your Tweet[?]"  Id. at 69:17–20.  But neither the complaint nor Johnson's EEOC charge describes what transpired during the call between Johnson and Georgetown's HR representative, and her attorney's new assertions at the hearing cannot supplement the pleadings.

his controversial social media posts, which the Court turns to momentarily, the university's characterization of Johnson's Tweets was focused entirely on the content of her speech, rather than any of her protected identities.

The Court has weighed Johnson's circumstantial allegations of discrimination. Both individually and taken together, they do not support an inference of discrimination under Title VII.[10]

### ii. Comparator Theory

Johnson's last-standing Title VII argument at least lands in the ballpark: that the Court can infer class-based discrimination because Georgetown did not discipline or terminate white, Jewish, non-Palestinian employees who posted supposedly offensive racial or anti-Palestinian content on social media during or before their employ with Georgetown. The most prominent example Johnson cites is Ilya Shapiro who, days before he was slated to join the university's law faculty as senior lecturer and Executive Director of the Georgetown Center for the Constitution, Tweeted the following concerning the last Supreme Court vacancy: "Objectively best pick for Biden is Sri Srinivasan, who is solid prog & v smart. Even has identity politics benefit of being first Asian (Indian) American. But alas doesn't fit into latest intersectionality hierarchy so we'll get lesser black woman." SAC ¶¶ 152–155. The complaint also points to Bruce Hoffman (tenured professor and Director of Georgetown's Center for Jewish Civilization), who allegedly compared Northern Virginia's infrastructure to "Mogadishu" and claimed TikTok was "turning a whole generation into anti-Semites"; Danielle Pletka (adjunct professor at SFS), who allegedly

---

[10] Moreover, though Johnson draws attention to incidents implicating her Palestinian identity, her allegations of race and religious discrimination are not "'squarely and distinctly' spelled out in the[] pleadings," and "passing references" to discrimination on a protected ground "without developed circumstance or sufficient context are insufficient." Shanks v. Int'l Union of Bricklayers and Allied Craftworkers, 134 F.4th 585, 597 (D.C. Cir. 2025) (citation omitted).

labeled critics of Israel as "terrorist sympathizers" and "insubordinate morons"; and Yonatan Green (a "Fellow" at the university), who allegedly labeled Palestinian narratives of displacement as "baseless victimhood."  Id. ¶¶ 156–65.

One well-accepted way for a plaintiff to establish a reasonable inference of invidious bias without direct evidence of discrimination is to demonstrate "dissimilar treatment of a similarly situated comparator without the protected characteristic."  Bilal v. Metro. Police Dep't, 25-cv-189 (JEB), 2025 WL 1917959, at *3 (D.D.C. July 11, 2025); see also Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008); Townsend v. United States, 236 F. Supp. 3d 280, 307 (D.D.C. 2017); Walker v. McCarthy, 170 F. Supp. 3d 94, 107–08 (D.D.C. 2016).

In their briefs, Johnson and Georgetown disagreed about the legal standard for assessing this type of "comparator theory" of liability.  But having been prompted by a minute order from the Court, both sides acknowledged at the motions hearing that they had overlooked a recent D.C. Circuit decision that clarifies the appropriate framework here.  In Joyner v. Morrison & Foerster LLP, the Circuit expressly rejected the notion that a plaintiff must plead that her employment situation is "nearly identical" in all "relevant respects" to the comparator, as the standard thus articulated "overstates [the] plaintiff's burden at the pleading stage."  140 F.4th 523, 529–30 (D.C. Cir. 2025).[11]  "The 'nearly identical' standard is the one our cases prescribe for summary judgment or at trial," explained the court, "once plaintiffs have had the benefit of discovery."  Id. at 530.  "At the pleading stage, the standard set out by the Supreme Court in Twombly and Iqbal is the lodestar," meaning that "a plaintiff proceeding on only a comparator

---

[11] Although Joyner is a section 1981 case, and Title VII and section 1981 have distinct causation standards, see generally Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 341 (2020), their precedents are often referenced interchangeably in the comparator-theory context.  Indeed, Joyner itself cites several seminal Title VII comparator cases.

theory must plead enough facts about those comparators and the relevant context to allow a plausible inference that he was treated differently because of" the protected identity.  Id.  And "[t]hat standard cannot be reduced to a mechanical formula; it is sensitive to the specific context of each case, and courts must draw on their 'judicial experience and common sense' in determining whether it is met."  Id.  (quoting Iqbal, 556 U.S. at 679).

Recognizing the malleability of this standard, Joyner elaborates further on its "outer bounds," id. at 531:

> At one extreme, it cannot be enough to simply allege that the plaintiff was treated differently from a similarly situated comparator, without additional allegations showing the comparators are in fact similarly situated in some meaningful respect. That would be a threadbare recital of a legal conclusion, devoid of further factual enhancement.  At the other pole, as noted, [the Circuit] ha[s] never required a complaint to include factual allegations showing that the comparator's circumstances are nearly identical to the plaintiff's in all relevant respects.

Id. (cleaned up).  At root, "the question is always whether there are enough facts pleaded to make it 'plausible,' as opposed to just 'speculative,' to infer that a defendant was motivated by the plaintiff's [protected characteristic] rather than the myriad other reasons that might affect an employment decision."  Id.  (citation omitted).

In Joyner's own case, an inference of improper bias was not borne out by comparisons with his colleagues.  Joyner alleged that he was racially discriminated against by a legal staffing agency and the law firm where he was placed because he was not assigned to a "workstream" for over two months after starting at the firm, whereas white attorneys were given assignments without delay.  Id. at 528.  The Circuit concluded that Joyner had not pleaded enough facts to make an inference of discrimination plausible.  The complaint "include[d] no information about the other attorneys' experience or qualifications relative to Joyner's[,]" did not "allege that they were placed through" Joyner's staffing agency, and did not indicate that the attorneys who were

placed through the staffing agency "worked on his project, or a similar project[.]" Id. at 532.

Not did the complaint make clear what a workstream even was, "how many there were, or what

would make someone qualified for a workstream assignment[.]" Id.  And critically, the

complaint did not "allege that the same supervisor or supervisors were responsible for deciding

whether to place him and the other attorneys on a workstream[,]" which is clearly "relevant to

whether two employees were similarly situated[.]" Id. at 533.  Though Joyner was not "required

to plead *all* of these facts in his complaint to survive a motion to dismiss[,]" the court reasoned,

his allegations about comparators were too "general" to "provide a meaningful benchmark

against which to assess whether" the firm's treatment was motivated by racial animus.  Id.

Applying the Joyner standard here, along with employee discipline-related precedents

emphasizing the importance of whether employees were "disciplined by the same supervisor"

and committed similar offenses, Townsend, 236 F. Supp. 3d at 307 (citing Burley v. Nat'l

Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015)), the Court concludes that Johnson's

complaint does not provide a "meaningful benchmark" for comparison, either.

Consider, first, Yonatan Green.  Johnson alleges nothing about his position at the

university aside from the fact that he is a "Fellow"—not the school he is associated with, what he

does as a Fellow, what rank or level he is, or what qualifications or experience he has. Who

supervised Green, and why might his supervisors have opted not to discipline him?  The Court

has no inkling.  Indeed, the complaint does not even identify a time or set of circumstances under

which Green's post was made or publicized to the wider university community.

Next, consider Danielle Pletka.  The complaint alleges that she is an adjunct professor at

the Walsh School, which makes her marginally more similar to Johnson.  But Pletka is a faculty

member, and Johnson was not, and the complaint offers no other basis for comparing their

26

positions, qualifications, experience, or tenure at SFS.  While Pletka's caustic social media post, like Green's, may be unbecoming of a responsible academic, the complaint provides no sense of timing.  Without knowing even when the post was made, the Court cannot infer that the decision to leave Pletka be was made by the same decisionmakers who decided to terminate Johnson.

Bruce Hoffman is an ill-fitting comparator, as well.  He is not only the director of a separate academic center, but also a tenured faculty member, strongly suggesting that he and Johnson have different ranks and rights as Georgetown employees.  The complaint does not compare the two in terms of position, qualification, or experience.  Again, Johnson offers the Court no grounds for inferring that the individuals who placed her on leave and then fired her were the same as any officials who may have been involved in disciplinary decisions regarding Mr. Hoffman.  Indeed, Johnson has failed to allege that Georgetown was even *aware* of the comments posted by Green, Pletka, and Hoffman, undermining the conclusion that the university deliberately elected not to punish them.

Johnson's strongest candidate for comparison is Shapiro, who made a racially charged social media post in early 2022 shortly before starting his tenure as a senior lecturer and director of an academic center at Georgetown's law school.  The post rattled campus enough to trigger an investigation by Georgetown's Human Resources and Office of Institutional Diversity, Equity, and Affirmative Action ("IDEAA").  See SAC ¶ 182.  According to the complaint, after a four-month investigation, the university circulated an email explaining that its "Speech and Expression Policy" protected Shapiro's Tweet and that he was "not properly subjected to discipline for" Tweets that predated his employment with the university.  SAC ¶¶ 154, 182.  Nevertheless, IDEAA and HR found that Shapiro's Tweets "had a significant negative impact on the Georgetown Law community, including current and prospective students, alumni, staff, and

faculty," and therefore "recommended" that the university "put in place actions to address" that "negative impact."  Georgetown Mot. to Dismiss, Ex. E at 8.

Shapiro and Johnson are similarly-situated in some respects.  Within the span of two years, both occupied administrative positions that involved extensive interaction with students, alumni, faculty, and staff.[12]  Prior to starting their respective positions at Georgetown, both posted distasteful content on social media that came to light just as they were slated to start their jobs. Their posts upset large swathes of the campus community.

Now for the differences.  Shapiro and Johnson worked at different schools and occupied different positions with different responsibilities.  Shapiro was executive director of an academic center, whereas Johnson was an administrator for a particular degree program.  Shapiro also joined the faculty as a lecturer, whereas Johnson does not allege having a faculty position or teaching responsibilities.  The complaint even suggests that Shapiro enjoyed "tenure protections," see SAC ¶ 433, although Johnson's attorney walked back this allegation at the motions hearing, Mot. to Dismiss Hearing Tr. 60:22–23.

Johnson also does not persuasively assert that the same decisionmakers or apparatuses were responsible for the decisions to terminate her and not Shapiro.  It is evident that

---

[12] Compare Georgetown Mot. to Dismiss, Ex. D at 1 ("The Assistant Director of Academic and Faculty Affairs is required to interact with many different constituencies to perform the essential functions of the position, including students, alumni, faculty, and staff. Communicating carefully and thoughtfully is critical to developing good relationships with stakeholders, and hence to success in this position."), with Georgetown Praecipe, ECF No. 76, Ex. A (June 2, 2022 Letter from Dean William M. Treanor to Ilya Shapiro) at 2 ("As a member of the Law Center staff and the Executive Director of the Georgetown Center for the Constitution, [Shapiro was] . . . responsible for . . . working with multiple diverse stakeholders . . . expect[ed to] . . . interact with many different constituencies.  Given the multi-faceted nature of [the] role and the expectation that [Shapiro would] interact with many different constituencies as [he] direct[ed] the Center, including students, alumni, faculty, staff, and donors, communicating carefully and thoughtfully [wa]s critical to developing good relationships with stakeholders, and hence to success as the Executive Director for the Center.")

Georgetown Human Resources representatives investigated both Johnson and Shapiro once their posts came to light.  See SAC ¶ 182; Georgetown Mot. to Dismiss, Ex. E at 6.[13]  However, the complaint suggests that Dean Hellman and Director Shambaugh were responsible for Johnson's firing, whereas the decision not to fire Shapiro appears to have been made by the law school's former dean, William Treanor, with recommendatory input by IDEAA and Human Resources. See Georgetown Praecipe, ECF No. 76, Ex. A at 1–3.[14]  At the motions hearing, Johnson's counsel suggested that the Court could infer from the complaint that Human Resources—not Hellman, Shambaugh, and Treanor—was the ultimate, common decisionmaker in both instances, but could not identify any specific allegations in the complaint to substantiate that inference.  See Mot. to Dismiss Hearing Tr. 64:8–66:16.

Johnson's complaint further maintains that Georgetown applied Human Resources Policy #204 concerning probationary employment unevenly to Shapiro and Johnson.  See SAC ¶ 171 ("Georgetown applied Policy #204 protectively to Shapiro . . . but punitively to Ms. Johnson."). But Johnson's attorney conceded at the motions hearing that the university did not actually apply Policy #204 to Shapiro.  See Mot. to Dismiss Hearing Tr. 63:3–7.  And upon review of that policy, the Court notes that it "does not apply to senior level executive, senior level professional and certain academic and administrative professional positions."  See Georgetown Praecipe, ECF

---

[13] Johnson's opposition brief asserts that IDEAA was also involved in investigating her and recommending disciplinary action.  See Omnibus Response at 31–32.  But the complaint does not allege as much, and a plaintiff may not supplement her pleadings with factual material through her motion-to-dismiss briefing.  Kingman Park Civic Ass'n v. Gray, 27 F. Supp. 3d 142, 168 (D.D.C. 2014).

[14] The Court will take notice of Dean Treanor's June 2, 2022 letter to Shapiro because it is quoted in the complaint, see SAC ¶ 182, and is central to Johnson's discrimination claims.

No. 76, Ex. B at 1.[15]  It thus strongly appears that Johnson and Shapiro were subject to discipline under distinct human resources policies.

Having completed this compare-and-contrast exercise, the Court considers whether Johnson and Shapiro are sufficiently similar that Georgetown's treatment of Shapiro "provide[s] a meaningful benchmark against which to assess whether" the university discriminated against Johnson.  Joyner, 140 F.4th at 533.  Where, as here, there are some similarities and some differences between a plaintiff and her potential comparator, courts must assess their relative weight.  Consider, for instance, the post-Joyner case CLASP v. Hassan, in which a plaintiff (Hassan) accused his employer (CLASP) of discrimination after he received a lower severance offer than at least one other terminated employee.  No. 25-cv-1197 (BAH), 2025 WL 3062911 (D.D.C. Nov. 3, 2025).  Hassan's complaint identified a comparator who shared his job title, worked at the company for a similar number of years, was terminated around the same time, and was subject to the same standard severance package policy, but the comparator received a higher severance offer and was not of the same race or religion as Hassan, thereby generating an inference of class-based discrimination.  Id. at *14.  Although CLASP pointed out that Hassan had failed to allege that the two did the same kind of work, shared a supervisor, or were terminated for similar reason, the court did not find those deficiencies dispositive.  "While Hassan may need to supply more facts to ultimately prevail on his claim, alleging that CLASP had a standard severance policy that was applied contemporaneously to another individual with the same job and same approximate tenure but different protected characteristics is enough to survive a motion to dismiss."  Id.

---

[15] The Court will take notice of the full text of the probationary policy as it, too, is quoted in the complaint, see, e.g., SAC ¶ 150, and is central to Johnson's discrimination claims.

Similarly, in Rhone v. Rubio, a State Department's employee's supervisors informed her that she had to resign as leader of a Black workplace affinity group because of a policy decision made by her office's leadership.  No. 24-cv-3389 (RC), 2025 WL 3017791, at *1 (D.D.C. Oct. 28, 2025).  Rhone later discovered that a white coworker was leading a women's affinity group at the Department, contrary to the directive given by office leadership and allegedly with their express consent.  Id.  The court explained that although the bare assertion that one employee is "similarly situated" to another is deficient, the complaint "contain[ed] just enough detail to ground a reasonable inference" that the white coworker was an appropriate comparator because she worked in the same office and "conceivably subject to the same [office] 'policy decision' pursuant to which" Rhone was forced to resign from her affinity group.  Id. at *6.

By contrast, there are plenty examples where differences between plaintiffs and would-be comparators overwhelm their similarities, negating any inference of discrimination.  Take, for instance, Hicks v. DC Water & Sewer Auth., No. 24-cv-2288 (TJK), 2025 WL 2439161 (D.D.C. Aug. 25, 2025).  In that case, a sanitation worker accused his employer of unduly delaying his recommended promotion due to his race, color, and age.  Id. at *1.  Hicks's complaint alleged only that his white comparators were at the same government grade and were recommended for promotion at the same time and in the same batch of candidates, but were given almost twenty percent salary increases without delay.  Id. at *3.  But Hicks did not allege that the comparators held the same position he did, had the same responsibilities or supervisors as him, or were up for the same type of promotion as him.  Hicks thus did not provide a sufficient "factual basis" for the conclusion that he and the white coworkers were similarly situated.  Id.[16]

_____

[16] See also, e.g., Townsend, 236 F. Supp. 3d at 307–08; Ayvazian v. Collins, No. 24-cv-2804 (JEB), 2025 WL 1795037, at *5–6 (D.D.C. June 30, 2025); Dagdagan v. Driscoll, No. 23-cv-3935 (APM), 2025 WL 3033726, *2–3 (D.D.C. Oct. 30, 2025).

31

These touchpoints in mind, the Court concludes that Shapiro is not so similar to Johnson to generate a reasonable inference that she was treated differently than him because of her race, religion, or national origin. Even if Shapiro and Johnson's Tweets were comparably offensive to some segment of the Georgetown community—a question on which the Court declines to venture an opinion—the only other similarities between them were that they had outward-facing job duties and were both subjected to an HR investigation after causing consternation on campus by their online activity.

On the other side of the ledger, the differences are numerous. Johnson and Shapiro worked at different schools, and their job titles, qualifications, and experience differ materially. The Court cannot surmise from the complaint that Johnson and Shapiro's employment outcomes were dictated by the same ultimate decisionmakers, nor that they were subjected to the same disciplinary policy for probationary employees. Johnson and Shapiro are thus more like the proposed comparators in Hicks, whose shared characteristics were swamped by several other variables that precluded an inference of disparate treatment, than those in CLASP or Rhone.

Johnson may genuinely believe "she got something of a raw deal" because Georgetown punished her for offensive college-era Tweets but let Shapiro off the hook because his own insulting posts pre-dated his employment. Moreno-Livini v. AFL-CIO Hous. Invest. Tr., No. 24-cv-1392 (JEB), 2024 WL 4144112, at *4 (D.D.C. Sep. 11, 2024). Despite the arguable inconsistency, Johnson's complaint needed to "plausibly isolate her protected characteristics" as the pivotal difference between her and Shapiro. Id. She failed to do so, each difference between them "mak[ing] it less plausible" to infer discrimination. Joyner, 140 F.4th at 533.

* * *

32

Summing up, neither Johnson's circumstantial allegations of discrimination nor her comparator theory of liability is sufficient to save her disparate treatment claim. Needless to say, "at the motion to dismiss stage, a plaintiff need not rule out every possible lawful explanation" for the employer's adverse action—but she is obliged to "dispel any obvious alternative explanations." Ho v. Garland, 106 F.4th 47, 54 (D.C. Cir. 2024) (citation and alterations omitted). Johnson's complaint fails to dispel the obvious explanation that she was suspended and then fired due to her spiteful and profane social media posts, rather than her race, religion, or national origin. Her Title VII disparate treatment claim is dismissed.

b.   Hostile Work Environment and Retaliation

Johnson also brings Title VII hostile work environment and retaliation claims against Georgetown. The university has moved to dismiss these claims on procedural and substantive grounds. Johnson's claims fall short on both fronts.

i.   *Procedural Issues*

"Title VII requires that a plaintiff exhaust her administrative remedies prior to bringing a civil action in federal court." Morgenhan v. Shinseki, 630 F. Supp. 2d 56, 59 (D.D.C. 2009). "A plaintiff fails to exhaust her administrative remedies when the complaint she files in federal court includes a claim that was not raised in the administrative complaint." Id. at 60. "Naturally every detail of the eventual complaint need not be presaged in the EEOC filing[.]" Marshall v. Fed. Express Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997). And courts do not require a plaintiff to check a specific box or "use specific 'magic words' in order to exhaust" a particular claim in the administrative forum. Congress v. District of Columbia, 324 F. Supp. 3d 164, 171 (D.D.C. 2018) (Cooper, J.). The question is instead whether the plaintiff's administrative charge could be

33

"reasonably expected upon investigation" to "lead" to the kind of claim she later raises in her complaint.  Id. (quoting Park v. Howard Univ., 71 F.3d 904, 908 (D.C. Cir. 1995)).[17]

Here, Johnson's EEOC filing could not reasonably expected to lead to either hostile work environment or retaliation claims.  Her charge "reads like a textbook example of" disparate treatment:  "Nowhere does [Johnson] reference the hallmarks of a hostile work environment claim, such as harassment from coworkers or insulting or disparaging comments.  Nor does [her] narrative description indicate a continued pattern of conduct as is typical of a hostile work environment claim."  Id.  The only pattern described in the charge is Georgetown's supposed "pattern of giving 'passes' to its white professors who engage in Islamophobic rhetoric."  Georgetown Mot. to Dismiss, Ex. E at 12.  But that alleged conduct substantiates the disparate treatment claim, putting neither Georgetown nor the EEOC on notice of an abusive work environment that extends beyond the university's disciplinary decisions.

The facts in the administrative charge also could not be reasonably expected to give rise to a retaliation claim.  Although Johnson's EEOC filing mentions her November 8 letter, and alleges (as does the complaint) that "Georgetown did not heed" her warning that Canary Mission was an "anti-Arab and anti-Muslim" platform, Georgetown Mot. to Dismiss, Ex. E at 6, it nowhere suggests that the decision to place Johnson on leave and then terminate her constituted

---

[17] There has been some suggestion in the case law that Park's "like or reasonably expected" exception to Title VII's exhaustion requirements did not survive the Supreme Court's decision in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  See, e.g., Davis v. FBI, No. 25-5061, 2025 WL 2982518, at *1 (D.C. Cir. Oct. 16, 2025).  Courts in this district have adopted different approaches.  See Hicklin v. McDonald, 110 F. Supp. 3d 16, 20 (D.D.C. 2015) (Cooper, J.).  As the D.C. Circuit has continued to apply the Park standard in some instances, see, e.g., Davis, 2025 WL 2982518, at *1, the Court will follow suit here.  In any case, the choice of "one interpretation over the other" is not consequential here because even under the more generous approach, Johnson's additional Title VII claims fail.  Hicklin, 110 F. Supp. 3d at 20.

reprisal for Title VII-protected conduct.  Again, the EEOC charge "provides little if any notice that [Johnson] intended to bring" a retaliation claim.  Congress, 324 F. Supp. 3d at 171.

### ii.  Merits Issues

Even if these two claims *were* duly exhausted, they would not survive dismissal.  Johnson has not alleged a valid hostile work environment claim, which requires showing that an employer subjected the plaintiff to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment[.]"  Shanks v. Int'l Union of Bricklayers and Allied Craftworkers, 134 F.4th 585, 597 (D.C. Cir. 2025) (cleaned up).  In assessing such a claim, "the court looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. (cleaned up).

Johnson identifies a few "illustrative examples" of harassment that prevented her from doing her job.  See generally SAC ¶¶ 247–263.  She points to faculty "interrogat[ion]" and discussion of the war in Gaza at her welcome lunch—but as explored above, the Court cannot reasonably infer that her colleagues' purported comments constituted anything more than "mere offensive utterance[s,]" even when viewed in the light most favorable to Johnson.  Shanks, 134 F.4th at 597.  Johnson also reiterates that she was placed "on administrative leave without due process or adequate explanation following a coordinated online doxing and harassment campaign based on [her] protected characteristics."  SAC ¶ 249.  But the allegation that the university's disciplinary decision was motivated by discriminatory animus is "undercut by the legitimate reasons" raised in Dean Hellman's email to the SFS community and her eventual termination letter.  Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  And while the Court does

35

not doubt that Johnson faced harsh backlash from strangers after her posts came to light, see, e.g., SAC ¶¶ 146; 396, she does not allege that Georgetown had any influence over those communications, nor any particular legal duty to intervene. Cf. Thomas v. Securiguard Inc., 412 F. Supp. 3d 62 (D.D.C. 2019) ("In determining whether an employer should be responsible for a hostile work environment caused by a non-employee, courts consider the extent of the employer's control over the harasser and any other legal responsibility which the employer may have with respect to the conduct of the non-employees." (citations omitted)); see also Fragola v. Kenific Group, Inc., No. 21-cv-1423 (RDM), 2022 WL 1908824, at *6 (D.D.C. June 3, 2022).

Johnson also takes issue with Dean Hellman's November 2 email to the SFS community, which, she submits, "falsely implied Ms. Johnson posed a 'security threat' by stating 'We take all threats to our community seriously,' thereby branding her as dangerous to the entire academic community.'" SAC ¶ 250. But Johnson overreads the email. See Georgetown Mot. to Dismiss, Ex. B. Her insistence that the email is "defamatory" and "amplified false accusations of antisemitism, hate, and violence" finds no support in her factual assertions and the documents that the Court may consult at this stage. SAC ¶ 251.[18]

---

[18] Dean Hellman's email does label Johnson's posts as "hateful" and "antisemitic[.]" See Georgetown Mot. to Dismiss, Ex. B at 1. As to the former label, whatever the context surrounding Johnson's Tweets, it is uncontroverted that her posts conveyed her "hat[red]" for Zionists, at least at the time. SAC ¶¶ 89–90. So that shoe fits. As to the latter label, the parties hotly contest whether Johnson's posts were anti-Zionist only, or also antisemitic, either inherently or in context. The Court will not, and need not, try to answer this vexing question, except only to note that the unflattering photograph Johnson Tweeted of the Orthodox Jewish man does not appear to single out Zionism. In any case, the only relevant question for present purposes is whether it was reasonable—or alternatively, baseless and potentially indicative of invidious bias—for Dean Hellman to *construe* the posts as antisemitic. Even if reasonable minds could differ on the "antisemitic" characterization, Hellman was entitled to interpret the Tweets as such without running afoul of Johnson's Title VII rights.

To be sure, "[a] hostile work environment is usually characterized by a series of events that cumulatively give rise to a claim," and "each individual component might not be actionable on its own." Craig v. District of Columbia, 881 F. Supp. 2d 26, 32 (D.D.C. 2012). But even viewed cumulatively, Johnson's "illustrative examples" do not demonstrate the kind of severe or pervasive mistreatment that gives rise to a colorable hostile work environment claim.

Johnson also fails to state a Title VII retaliation claim. To do so, "a plaintiff must plausibly allege that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by her employer, and (3) the two are causally connected." Spence v. U.S. Dep't of Veterans Affs., 109 F.4th 531, 539 (D.C. Cir. 2024) (cleaned up). Johnson falters on the first and third elements.

To make out a retaliation claim, a plaintiff must first establish that she has engaged in activity that Title VII protects—i.e., that she has "opposed . . . an unlawful employment practice" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing." Howard R.L. Cook & Tommy Shaw Found. for Black Empl. Of the Lib. of Cong., Inc. v. Billington, 737 F.3d 767, 772 (D.C. Cir. 2013) (quoting 42 U.S.C. § 2000e–3a). Insofar as Johnson's complaint suggests that her old Tweets qualify as statutorily protected activity under Title VII, see, e.g. SAC ¶ 321, that position defies logic. The posts reflect Johnson's personal opinions as a college student and could not possibly qualify as opposition to an unlawful employment practice at Georgetown years later.

The only activity detailed in the complaint that could qualify as Title VII-protected is Johnson's November 8 letter. Yet pinpointing that "statutorily protected activity" creates a causation problem for Johnson. The November 8 letter cannot be causally connected to Johnson being placed on administrative leave, as her letter post-dated that disciplinary action. Nor can

the Court infer that Johnson's eventual termination was reprisal for her November 8 letter:  She

has alleged no facts to suggest that the outcome of the investigation hinged in any way on her

letter, nor has she "dispelled" the "obvious alternative explanation" that she was terminated

based on the content of her Tweets.  Ho, 106 F.4th at 54 (citation and alterations omitted).

Because Johnson's Title VII hostile work environment and retaliation claims against

Georgetown are unexhausted and well shy of the pleading threshold, they must be dismissed.

    *2.  Section 1981*

The Court now turns to Johnson's discrimination claim against Georgetown, Dean

Hellman, Director Shambaugh, and Wolff under 42 U.S.C. § 1981, "which protects 'the equal

right . . . to make and enforce contracts without respect to race.'"  Joyner, 140 F.4th at 529

(quoting Domino's Pizza, Inc v. McDonald, 546 U.S. 470, 474 (2006)).  To prevail on her claim,

Johnson must "initially plead and ultimately prove that, but for race, [she] would not have

suffered the loss of a legally protected right."  Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned

Media, 589 U.S. 327, 341 (2020).  Although Section 1981 imposes a more stringent causation

standard than Title VII, see id. at 336–41, courts generally use the "same framework for

determining whether unlawful discrimination occurred" in Section 1981 and Title VII cases.

Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013).

The question, at this stage, is whether Johnson has "allege[d] some facts" to demonstrate

that race was the reason for the relevant conduct; she "cannot merely 'invoke [her] race in the

course of a claim's narrative.'"  Doe #1 v. Am. Fed. Of Gov't Emp., 554 F. Supp. 3d 75, 102

(D.D.C. 2021) (quoting Bray v. RHT, Inc., 748 F. Supp. 3, 5 (D.D.C. 1990), aff'd sub nom. Bray

v. Hebble, 976 F.2d 45 (D.C. Cir. 1992)).  The Court has already answered this question as to

Georgetown.  Indeed, as noted above, Johnson's allegations of race discrimination fall especially

short because they read more like "passing references without developed circumstance or sufficient context[.]"  Shanks, 134 F.4th at 597.

With respect to Dean Hellman and Director Shambaugh, "individual employees can only be held liable for section 1981 violations if they are personally involved in the discrimination by having directly participated in the alleged discriminatory acts."  Doe #1, 554 F. Supp. 3d at 101. Johnson's section 1981 claims against Hellman and Shambaugh fail because the allegations in her complaint do not give rise to a reasonable inference that she was terminated on the basis of her race.  And, as the Court has already explained, allegations about Hellman's November 2 email to the SFS community and Shambaugh's conduct at Johnson's welcome lunch do not move the needle on her discrimination claims.

Wolff also cannot be liable under section 1981, so the Court dismisses that count as well. Assume, for the moment, that Johnson sufficiently alleged the university *did* discriminate against her based on her race.  The complaint makes conclusory assertions that Wolff, for her part, "targeted" Johnson "for a racially motivated viral harassment campaign of hate (with millions of views) specifically because of her visible Palestinian and African American identity" and "weaponized Canary Mission's racially motivated cyberstalking profile to activate the online Zionist network to destroy Ms. Johnson's employment prospects[.]"  SAC ¶¶ 359–60.  But stripping back the rhetoric, the *facts* alleged in the complaint tell a far less florid story:  Wolff searched Johnson online when she learned of her graduate school's new hire, saw content that seriously offended her, and took to the Internet to complain about it.  By Johnson's own admission, Wolff was a student at the university, "not an employee, agent, officer or supervisor," who "possessed no authority whatsoever over Georgetown's employment decisions and acted entirely outside any official capacity."  Omnibus Response at 97.

39

Against this factual backdrop, Johnson's section 1981 claim against Wolff founders on multiple shoals. To begin, in the employment context, some courts have held that a section 1981 claim cannot lie against an individual defendant who lacks supervisory authority over the plaintiff. See, e.g., Daniel v. Johns Hopkins Univ., 118 F. Supp. 3d 312, 317 (D.D.C. 2015). Even if such a claim were available, Johnson's allegations—coupled with the concession that Wolff had no influence over Georgetown's employment decisions—undercut the possibility that she was "personally involved in the discrimination by having directly participated in the alleged discriminatory act[]" of terminating Johnson. Doe #1, 554 F. Supp. 3d at 101 (cleaned up). And even if Wolff *did* have some role in Georgetown's decision, the complaint proffers no concrete facts to suggest that she was motivated by racial animus. Her Tweets instead reflect understandable concern about the content of Johnson's posts and disbelief that Georgetown had not noticed them sooner.

For the foregoing reasons, the Court will dismiss the section 1981 claims against Georgetown, Dean Hellman, Director Shambaugh, and Ms. Wolff.

### 3. Section 1985(3)

Johnson next brings a civil rights conspiracy claim against all the defendants under 42 U.S.C. § 1985(3). To state a claim under section 1985(3), Johnson must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, . . . and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States.

Martin v. Malhoyt, 830 F.2d 237, 258 (D.C. Cir. 1987) (cleaned up). In a civil conspiracy, the "principal element . . . is an agreement between the parties to inflict a wrong against or injury upon another an overt act that results in damage." Bush v. Butler, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) (quoting Brady v. Livingood, 360 F. Supp. 2d 94, 104 (D.D.C. 2004)). It is not

40

enough that the defendants conspired to interfere with Johnson's rights; they must also have been motivated by invidious discrimination.  Martin, 830 F.2d at 258.

Across the motions to dismiss, the defendants raise various preliminary arguments as to why the claim ought to be tossed out—including that the claim is time-barred as to certain defendants; that it is categorically unavailable to Johnson based on Supreme Court precedent; and that conspiracy liability here would run afoul of the First Amendment.  The Court need not spill ink on these points because Johnson plainly fails to allege two core elements of conspiracy.

*First*, Johnson has not alleged "an actual *agreement* amongst the defendants, which is the essence of a conspiracy; that is, nothing in the complaint even hints at 'the existence of any events, conversations, or documents indicating that there ever was an agreement or meeting of the minds' amongst the defendants to violate her rights based on her membership in a protected class.'"  Barber v. District of Columbia Government, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (quoting McManus v. District of Columbia, 530 F. Supp. 2d 46, 75 (D.D.C. 2007)).  "The term 'conspiracy,' particularly in the minds of non-lawyers," tends to "conjure[] images of people meeting secretly to hatch a plan to violate the law[,]" but there need not be "such a degree of deliberation, formality or coordination."  Thompson v. Trump, 590 F. Supp. 3d 46, 96–97 (D.D.C. 2022).  "Conspiracies can be, and often are, established with far less direct proof."  Id. at 97.  That being said, the plaintiff must convey some sense that co-conspirators had a "mutual understanding to try to accomplish a common and unlawful plan," thereby "shar[ing] in the general conspiratorial objective."  Id. (citation omitted).  "In short, a civil conspiracy requires a showing 'that there was a single plan, the essential nature and general scope of which were known to each person who is to be held responsible for its consequences."  Id. (citation omitted); see also Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 38 (D.D.C. 2021).

The complaint's conspiracy count reads roughly as follows:  Canary Mission's donors agreed to fund its nefarious activity; Canary Mission designed a damaging profile of Johnson that aimed to tarnish her reputation among employers; Wolff and Shapiro agreed to amplify Canary Mission's profile by posting screenshots of it on social media and identifying Johnson's position and workplace; and the Georgetown Defendants responded to this harassment campaign by agreeing to terminate Johnson.  See SAC ¶¶ 371–75.  But just because the complaint says that everyone "agreed" does not mean they did.  The Court "need not accept as true conclusory allegations or legal assertions in a complaint," and "[a] simple allegation of conspiracy fits that bill."  Newman v. Howard Univ. School of Law, 715 F. Supp. 3d 86, 111 (D.D.C. 2024).

The complaint does not hint at any events, conversations, or documents that might reveal an agreement between the ten defendants.  There is no suggestion of a mutual understanding or shared conspiratorial objective—particularly between the likes of Canary Mission, who memorialized Johnson's years-old Tweets, and the Georgetown Defendants, who ultimately acted on that information based on an independent, internal disciplinary process.  The Court can glean no facts to suggest a single plan whose nature and scope was known to all involved.

Johnson asks the Court to infer coordination based on the temporal proximity of events and other repackaged material from elsewhere in the complaint.  See SAC ¶¶ 377–80, 389–95.  But at worst, the sequence of events reflects "lawful parallel conduct."  Newman, 715 F. Supp. 3d at 111 (quoting Twombly, 550 U.S. at 557).  And if Canary Mission's profile of Johnson dates back to 2015, the timeline of purportedly conspiratorial events is far more extended than the complaint suggests, such that not even temporal proximity can support Johnson's claim.  All things considered, the complaint's patchwork of allegations cannot form a quilt of conspiracy without being stitched together by substantial strands of speculation.

*Second*, Johnson fails to allege that the defendants were motivated by "some class-based, invidiously discriminatory animus." Graves v. United States, 961 F. Supp. 314, 322 (D.D.C. 1997). The Court has already concluded that Johnson has not made out any discrimination claim against the Georgetown Defendants or Wolff. Thus, even if the Court were to accept Johnson's contention that Canary Mission targets people of color, see SAC ¶ 384, there cannot have been a discriminatory motivation held by the larger group.

In conclusion, the § 1985(3) claim must be dismissed for failure to satisfy at least two basic elements of the cause of action. "[I]f the lack of conspiracy were not itself dispositive, the fact that" Johnson did not allege that all the defendants' actions "were motivated by some form of invidiously discriminatory animus" is "similarly fatal" to her claim. Ford v. Donovan, 891 F. Supp. 2d 60, 65 (D.D.C. 2012).

### 4. *DCHRA*

The Court turns next to Johnson's slate of DCHRA claims. The complaint's failure to state a Title VII claim largely eviscerates its claims under the local civil rights statute. But for the sake of completeness, the Court will march through the procedural and substantive issues that the DCHRA claims present.

#### a. Procedural Issues

Georgetown identifies two procedural problems with Johnson's DCHRA claims. First, it contends that the election of remedies doctrine precludes the claims because a civil rights complainant cannot simultaneously pursue her discrimination claims in court and in D.C.'s Office of Human Rights ("DCOHR"), and Johnson has not alleged that the DCOHR dismissed her charge or that she withdrew it. Georgetown Mot. to Dismiss at 15–16. Johnson's rejoinder would seem to resolve the issue. "[T]he election of remedies doctrine does not bar [a plaintiff]

43

from filing [her] DCHRA claim" where the DCOHR has deferred jurisdiction to the EEOC

pursuant to its work-sharing agreement; such deferral "amount[s]" to a "dismissal" of the

administrative charge "on the grounds of administrative convenience." Ibrahim v. Unisys Corp.,

582 F. Supp. 2d 41, 47 (D.D.C. 2008).  In any case, Georgetown does not respond to Johnson's

election of remedies argument in its reply, so the Court will treat the point as conceded.

Georgetown's second procedural argument fares better.  The school submits that the

DCHRA claims against Dean Hellman and Director Shambaugh as individuals are time-barred

because they were named in the complaint for the first time in April 2025, more than one year

after their allegedly discriminatory conduct, which the Court takes to be the operative DCHRA

statute of limitations at the relevant time.  See D.C. Code § 2-1403.16(a) (2015).[19]  Johnson's

response to this argument is not entirely clear, but she seems to suggest that the filing of the

administrative charge against the university, which "included allegations [about] both Hellman

and Shambaugh," Omnibus Response at 104, tolled the one-year statute of limitations as to

Hellman and Shambaugh individually, see D.C. Code § 2-1403.16(a) (2023) ("The timely filing

of [an administrative] complaint . . . shall toll the running of the statute of limitations[.]").

No one disputes that DCHRA liability may lie "against individuals in certain

circumstances when they meet the definition of 'employer.'"  Smith v. Café Asia, 598 F. Supp.

2d 45, 48 (D.D.C. 2009).  But "[i]n this District, the general rule 'is that individuals not named in

the EEOC charge may not be sued in a subsequent civil action unless they have been given

---

[19] Effective March 21, 2025, a DCHRA plaintiff has two years, not one, to file her claim in court.  See D.C. Code § 2-1403.16(b)(1) (2025).  No party has suggested that this new statute of limitations applies retroactively to Johnson's claims.  Accord Valentine v. George Washington Univ., No. 24-cv-1081 (RC), 2025 WL 2029802, at *5 n.5 (D.D.C. July 21, 2025) ("The D.C. Council has recently established a two-year statute of limitations for DCHRA claims, but that change does not apply retroactively.").

actual notice of the EEOC proceeding or have an identity of interest with the party or parties sued before the EEOC.'" Clay v. Howard Univ., 82 F. Supp. 3d 426, 433–34 (D.D.C. 2015) (quoting EEOC v. Metzger, 824 F. Supp. 1, 3–4 (D.D.C. 1993)).  Courts in the District have held that "simply using" an individual defendant's name or referring to them in an administrative charge does not suffice to show actual notice. Id. at 434.

Johnson's EEOC complaint mentions Dean Hellman and Director Shambaugh by title. But it does not include any of the allegations that Johnson later relies on to substantiate her charges of individual discrimination against them.  Nor has Johnson argued that Hellman and Shambaugh have an "identity of interest" with Georgetown so as to automatically impute the university's liability to them individually.  That Johnson was represented by counsel before the EEOC and DCOHR only reinforces the Court's conclusion that the DCHRA claims against Hellman and Shambaugh are time-barred.  Cf. Clay, 82 F. Supp. 3d at 433 (courts may be more inclined to view "procedural defect[s] with leniency" where a complainant has proceeded without the aid of counsel at the administrative stage).

The statute of limitations argument is even more potent with respect to Wolff, who also raises the time-bar as an affirmative defense.  Wolff Mot. to Dismiss at 17–18.  At the time of the relevant events, Wolff was a Georgetown student.  There is no reason to think she was on actual notice of Johnson's administrative complaint, nor that she has identity of interest with Georgetown.  The time bar thus precludes any DCHRA claim against her.

b.   Merits Issues

The DCHRA claims against all but one defendant—Canary Mission, which has mounted no independent defense at this stage—fall away based on the aforementioned statute of limitations issues, as well as the jurisdictional defects described at the outset of this opinion.

Notwithstanding the time-bar, the Court will survey the merits of the DCHRA claims as to the remaining defendants—though there is, in fact, relatively little left to explore. Disparate treatment, hostile work environment, and retaliation claims brought under the DCHRA are analyzed under the same frameworks as their Title VII and section 1981 counterparts. See, e.g., Williams v. Family Health Int'l, No. 24-cv-2654 (BAH), 2025 WL 2506580, at *6 (D.D.C. Sep. 2, 2025). These three DCHRA claims therefore meet the same fate as Johnson's Title VII claims.

That leaves the aiding and abetting claim, which Johnson asserts against all the defendants. It fails as well, for multiple reasons. There is the obvious ground that aiding and abetting liability will not lie where "the Court has found that no discriminatory acts occurred." Slate v. Pub. Def. Serv. for DC, 31 F. Supp. 3d 277, 301 (D.D.C 2014). And there is another patent ground for dismissal of Georgetown: It cannot "plausibly have aided and abetted itself," the principal discriminator. McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 157 (D.D.C. 2014). The same may go for Dean Hellman and Director Shambaugh, although it is possible to understand the complaint as characterizing the two as *either* the principal discriminators or as abettors of discrimination. Cf. Richardson v. Petasis, 160 F. Supp. 3d 88, 138 (D.D.C. 2015) (explaining that the D.C. Court of Appeals has recognized that partners of a law firm "could be held individually liable under the DCHRA for both direct violations of the statute as 'employers' and for aiding and abetting the law firm's discrimination"). In any event, as mentioned, the claims against them are time-barred.

As to Wolff and Canary Mission, there are additional substantive hurdles that Johnson fails to overcome. The DCHRA makes it an "unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of

this chapter or to attempt to do so." D.C. Code § 2-1402.62. Although "the case law concerning this provision . . . is underdeveloped," Richardson, 160 F. Supp. 3d at 138, the D.C. Court of Appeals defines an "aider or abettor" as "one who in some sort associates himself with the venture, participates in it as something he wishes to bring about, and seeks by his action to make it succeed," Wallace v. Skadden, Arps, Slate, Meagher & Flom, 715 A.2d 873, 888 (D.C. 1998) (cleaned up). Richardson "observe[d] that . . . the provision has never been applied to any individual employees except for supervisors and upper management." 160 F. Supp. 3d at 142.

Even if a third-party with no direct influence over Johnson's employment could be held liable for aiding and abetting, the complaint must "fairly allege[] that the[] defendant[] participated in the discrimination and sought to make it succeed." Id. Johnson's complaint is devoid of allegations giving rise to a reasonable inference that Wolff or Canary Mission sought to have Johnson cashiered on the basis of her identity. To the extent Wolff wanted to see Johnson fired, the complaint makes plain that her motivation was Johnson's past-expressed "hat[red]" for "Zio bitches." SAC ¶ 89. The complaint also states that Canary Mission "disproportionately focus[es] on people of color," SAC ¶ 69, with approximately 80% of its profiles targeting that demographic, id. ¶¶ 71, 232. But even if true, the statistic is not helpful, under the "facts and circumstances" here, in discerning "whether th[is] *particular* plaintiff was the victim of an illegitimately motivated employment decision." Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984) (citation omitted). In fact, Johnson's attorney made clear at the motions hearing that the "reason" Johnson "was targeted by Canary Mission . . . [was] because of her position on Palestine and her opposition to the occupation, the apartheid and genocide that's happening in Palestine." Mot. to Dismiss Hearing Tr. 67:3–8. Plenty of non-Palestinians, non-Muslims, and non-African Americans appear to share that viewpoint.

47

In sum, the complaint does not allege a viable aiding and abetting claim. Along with the other DCHRA claims, this claim must be dismissed.

C. Tort Claims

1. *Breach of Contract*

Moving to Johnson's tort claims, the first is for breach of contract. She alleges that Georgetown violated the terms of her employment contract when it terminated her because the contract incorporated various obligations articulated in the university's human resources policies. This argument falls well short of the mark.

"There are four elements to a breach-of-contract claim in the District of Columbia: A party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." Inst. of Multidimensional Med. v. Metagenics, Inc., 635 F. Supp. 3d 6, 13 (D.D.C. 2022) (cleaned up). Under D.C. employment law, at-will employment is presumed. Daisley v. Riggs Bank, 372 F. Supp. 2d 61, 67 (D.D.C. 2005). Lacking an enforceable obligation arising out of her contract, an at-will employee is generally precluded from bringing a breach-of-contract claim on the basis of her termination. See id. at 67–68. A plaintiff can rebut the at-will presumption, however, "by showing that the parties intended that termination be subject to specific preconditions." Leyden v. Amer. Accred. Healthcare Comm'n, 83 F. Supp. 3d 241, 246 (D.D.C. 2015) (cleaned up). "One way to do so is to show that the terms of a personnel manual or employee handbook create contractual rights." Id.

The parties appear to agree that Johnson's October 2 offer letter is the relevant contract here. See generally Georgetown Mot. to Dismiss, Ex. A. The letter expressly states that Johnson's "employment at Georgetown University is at-will." Id. at 2. But in the same

48

paragraph, the offer letter states that Johnson "will be classified as and be subject to the applicable policies and practices for regular staff employees, including those set forth in the Human Resources Policies[,]" and "[i]n addition, [she] will be subject to applicable departmental policies and practices." Id. The letter further indicates that Johnson will be "on a probationary status for the first six months of employment" and thus subject to the university's "Probationary Employment period policy." Id. (emphasis omitted). Because the letter references other policies that apply to Johnson's employment, it at least raises the question whether Johnson could have understood the university to be bound by any obligations incorporated in the letter. Cf. Leyden, 83 F. Supp. 3d at 246–47.

Still, there are two problems with Johnson's position. For one thing, some of the policies Johnson cites cannot possibly create the kind of "specific precondition" to termination that undermines the otherwise-clear at-will nature of her employment. Policies that generally commit Georgetown to diversity, as well as consistency and objectivity in supervisory decision-making, see SAC ¶¶ 406, 408, are not concrete enough, nor do they have the kind of mandatory language capable of creating an enforceable contractual obligation against the university. See, e.g., Vasquez v. Whole Foods Market, Inc., 302 F. Supp. 3d 36, 60–62 (D.D.C. 2018).

For another, even if Georgetown's probationary policy created a "specific precondition" to termination during the six-month probationary period, Georgetown has satisfied it. As already noted, Human Resources Policy #204 provides that an employee will "[n]ormally . . . be allowed to complete the probationary period before any decision is made to continue or end employment." SAC ¶ 403. This language alone imposes no obligation on Georgetown, but the sentence that follows suggests some conditionality: "[I]f the department determines that performance indicates that the employee cannot accomplish the job or if the department

49

determines that the individual's behavior is unacceptable, the University may terminate employment at any time during the probationary period." Id.

Johnson's termination letter conveyed that she was being fired under Policy #204. The university explained that Johnson "engaged in unprofessional behavior" based on her posts and "subsequent[ly] fail[ed] to address concerns raised by [her] social media activities." Georgetown Mot. to Dismiss, Ex. D at 1. Her "failure to acknowledge or address these posts and their impact ha[d] a detrimental effect on the willingness of some members of the community to engage," and "raised concerns about [her] willingness to engage with these various constituencies in a professional way." Id. One needn't read between the lines to discern that the university found Johnson's behavior "unacceptable" and determined she could not "accomplish the job," thereby satisfying the purported "precondition" embedded in the probation policy.[20]

Johnson has not identified any obligation or duty arising out of her employment contract that Georgetown can be said to have violated. As a result, her breach of contract claim fails.

### 2. *Intentional Infliction of Emotional Distress and False Light Invasion of Privacy*

Johnson also brings a pair of related tort claims against the Georgetown Defendants and Wolff. She submits that they falsely portrayed her through their online communications and, in so doing, engaged in extreme and outrageous conduct designed to cause her severe emotional

---

[20] A quick word on Johnson's attempt to repackage other allegations and insist that Georgetown breached the implied covenant of good faith and fair dealing present in all contracts. See Omnibus Response at 79–80. Aside from the fact that Johnson did not plead such a claim in her complaint, the facts she has alleged do not give rise to a reasonable inference of bad faith on Georgetown's part. A contracting party violates the implied covenant when it "evad[es] the spirit of the contract, willfully render[s] imperfect performance or interfer[es] with the other party's performance." Inst. of Multidimensional Medicine, 635 F. Supp. 3d at 13 (quoting Hais v. Smith, 547 A.2d 986, 987 (D.C. 1988)). Johnson is hard-pressed to suggest that Georgetown has engaged in any such conduct, especially since she has failed to state a discrimination claim.

distress.  See generally SAC ¶¶ 425–443, 466–501.  As with others the Court has considered,

these claims suffer from fatal deficiencies, both procedural and substantive in nature.

a.   Statute of Limitations

Johnson's intentional infliction of emotional distress ("IIED") and false light claims are

time-barred.  "Under D.C. law, causes of action for which a limitation is not specifically

prescribed by statute are covered by a residual three-year limitations period."  Jovanovic v. US-

Algeria Business Council, 561 F. Supp. 2d 103, 113 (D.D.C. 2008) (citing D.C. Code § 12-

301(8)).  "However, when a cause of action with no prescribed statute of limitations is

intertwined with one having a prescribed limitations period, District of Columbia courts apply

the prescribed period."  Id. (cleaned up).  "A claim is 'intertwined' with another when it is

'completely dependent' on or essentially the same as another, and cannot survive as a separate,

independent cause of action."  Id. (citation omitted).

In her FAC, Johnson brought a defamation claim against all defendants, see ECF No. 1 at

120–21, which has a one-year statute of limitations, see Jovanovic, 561 F. Supp. 2d at 111 (citing

D.C. Code § 12-301(4)).  Her SAC omits this claim, yet refers dozens of times to the defendants'

"defamatory" communications about her.  See, e.g., SAC ¶ 13 (describing Dean Hellman as

having "published a defamatory email to 1,200+ students, faculty, and staff falsely implying Ms.

Johnson posed a security threat"); ¶ 15 (describing Wolff as having "spearheaded a targeted

harassment campaign of hate . . . via defamatory tweets"); ¶ 265 (alleging that "Dean Hellman

and Director Shambaugh amplified [harassment] through their defamatory emails").  The IIED

and false light counts specifically accuse Wolff and the Georgetown Defendants of having

damaged Johnson's reputation based on false information.  See, e.g., SAC ¶¶ 429–30 (Wolff's

"broadcasting" of "defamatory material" destroyed Johnson's "academic and professional

51

prospects"); ¶¶ 437–43 (describing Hellman and Shambaugh's conduct as "baseless," causing her "permanent reputational damage through false association with antisemitism").

In a general sense, IIED and false light invasion of privacy are standalone torts. They are not necessarily coextensive with the tort of defamation, although the false light cause of action is a close cousin. See, e.g., Moldea v. N.Y. Times Co., 15 F.3d 1137, 1151 (D.C. Cir. 1994); Zimmerman v. Al Jazeera Am., LLC, 246 F. Supp. 3d 257, 274 (D.D.C. 2017).

Here, though, Johnson has "premised" her IIED and false light claims "directly" upon the "allegation[s]" that the relevant communications were grossly misrepresentative and damaging to her reputation. Jovanovic, 561 F. Supp. 2d at 114. These same allegations served as the "linchpin" of Johnson's earlier defamation claim and otherwise clearly sound in that tort. Id. As such, the IIED and false light claims are not "independent enough" of the defendants' allegedly "false statements to be governed by a statute of limitations other than the one-year period" for defamation. Mittleman v. United States, 104 F.3d 410, 417 (D.C. Cir. 1997); see also Greenpeace, Inc. v. Dow Chem. Co., 97 A.3d 1053, 1062 (D.C. 2014). The intertwining doctrine thus dooms both causes of action.

b.   Merits Issues

Aside from being time-barred, the IIED and false light claims also fail on the merits. On the IIED front, neither Wolff nor the Georgetown Defendants can be said to have engaged in "extreme and outrageous conduct." Goolsby v. District of Columbia, 354 F. Supp. 3d 69, 83 (D.D.C. 2019) (Cooper, J.) (citation omitted). To rise to this level, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Liser v. Smith, 254 F. Supp. 2d 89, 106 (D.D.C. 2003)). According to the facts alleged

52

in the complaint, Wolff expressed her strong disdain for her university's new hire on social media; her post went viral; and the new hire was terminated shortly thereafter. Far from "outrageous" and "extreme," such conduct has become, for better or worse, a mainstay of campus life and beyond in the digital age. And the university's swift investigation into a new employee's online activity hardly ventures beyond the bounds of decency. (Indeed, many would have considered it outrageous had the school *not* run down the information it received.) Johnson does plausibly allege that she has suffered serious emotional turmoil due to this maelstrom of events, see, e.g., SAC ¶¶ 135, 442–43, but that does not mean that the re-publicization of her own social media activity—however old—was beyond the pale.

Pivoting to the false light cause of action, the gravamen of Johnson's claim is that Wolff and the Georgetown Defendants falsely portrayed her as antisemitic. See generally SAC ¶¶ 473–477. Unsurprisingly, making out a false light claim requires showing that the defendant has published a "false statement, representation or imputation" that places the plaintiff in an offensive, "false light[.]" Kumar v. George Wash. Univ., 174 F. Supp. 3d 172, 190 (D.D.C. 2016). As a conceptual matter, to prove that someone has been portrayed in offensively misleading fashion, there must be some way of proving that the light was, in fact, false. The same goes for defamation; "[t]o be actionable under D.C. defamation law, a statement must be," among other things, "provably false," which in turn means that the statement is either "factual or, if framed as an opinion, . . . impl[ies] a provably false fact or rel[ies] on facts that are provably false." Florio v. Gallaudet Univ., 119 F.4th 67, 77 (D.C. Cir. 2024) (cleaned up).

To be sure, there are some notable differences between defamation and false light invasion of privacy. See Zimmerman, 246 F. Supp. 3d at 274–75; Restatement of Torts Second § 652E, cmt. b. But common to both torts is that "the matter published concerning the plaintiff is

53

not true." Restatement (Second) of Torts § 652E, cmt. a; see also id., cmt b. And it is important for the torts to align on this element because "a plaintiff may not avoid the strictures . . . associated with defamation by resorting to a claim of false light invasion." Khodorkovskaya v. Gay, 5 F.4th 80, 85 (D.C. Cir. 2021) (citation omitted). Johnson, who originally pled a defamation claim before removing it from her SAC, cannot escape her burden to allege that the contested communications painted her in a provably false light.

The question thus becomes whether Wolff's accusation that Johnson is antisemitic or Georgetown's implication that Johnson's Tweets might be antisemitic is provably false. This might have been a delicate knot to untangle had the D.C. Circuit not recently answered the same question in Florio. In that case, the Circuit emphasized its long-standing observation that "politically charged epithets are often protected opinions lacking sufficient factual content to be provably false," both for the purposes of defamation and in the context of the First Amendment. 119 F.4th at 77. Affirming this Court, the Circuit went on to hold that the accusation that someone is "anti-Semitic," like the accusation that someone is "racist" or "fascist," is generally not actionable because it is too imprecise, open to debate, and thus not provably false. The Circuit further found it relevant that the charges of antisemitism in Florio were based on a photograph that "provid[ed] factual context that 'readers [could] easily judge . . . for themselves.'" Id. at 77–78.

Applying Florio, the Court is bound to conclude that Wolff's Tweets and the Georgetown Defendants' contested communications are not actionable under the false light tort. The defendants' statements were "opinions based on facts not provably false." Id. at 78. Furthermore, Wolff's Tweets included screenshots of posts that Johnson does not deny making, leaving social media users free to "judge . . . for themselves" the accuracy of Wolff's accusation.

54

To sum up, Johnson has failed to state plausible IIED and false light claims, both because her claims are time-barred and because she fails to allege a crucial element of each tort.

### 3. Tortious Interference with Contract

Finally, Johnson alleges that Wolff tortiously interfered with her contract with Georgetown by targeting her online, accusing her of being antisemitic, and thereby pressuring the university to terminate her.

As an initial matter, Wolff posits that the tortious interference claim, like the IIED and false light claims, is time-barred.  Her intertwining argument is less persuasive here, however, because Johnson's tortious interference claim could conceivably stand even if Wolff's social media posts were not allegedly defamatory.  According to the complaint, Wolff meddled in Johnson's contractual relationship with Georgetown, and that meddling does not *necessarily* rest on any purported falsehood.  Cf. Browning v. Clinton, 292 F.3d 235, 244 (D.C. Cir. 2002) (tortious interference claim not intertwined with defamation claim because defendant interfered "through conduct *other than defamation*").  At the same time, what really seems to perturb Johnson is Wolff's accusation that she is antisemitic: The complaint's tortious interference count casts Wolff's Tweets as "defamatory" and reputationally damaging.  See SAC ¶¶ 448.

The Court concludes that Wolff has not demonstrated that the claim is *so* "clearly intertwined" with a defamation claim that it should be subjected to the same one-year statute of limitation.  Jovanovic, 561 F. Supp. 2d at 115.  It is instead subject to D.C.'s residual three-year statute of limitations that applies when a deadline is not otherwise prescribed.  See D.C. Code § 12-301(8).[21]  The tortious interference claim thus remains timely.

---

[21] In her reply brief, Wolff insists that Johnson has conceded this point.  See Wolff Reply Br. at 5.  The Court will not treat the point as conceded because Johnson's brief maintains that all

Chugging along, "[u]nder D.C. law, a *prima facie* case of tortious interference with a contract or business relationship requires (1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." Easaw v. Newport, 253 F. Supp. 3d 22, 32 (D.D.C. 2017) (cleaned up). Wolff suggests that tortious interference claims are categorically unavailable to at-will employees. See Wolff Mot. to Dismiss at 17 n.6. Not quite. The D.C. Court of Appeals has clarified that "D.C. law permits claims for tortious interference with an at-will employment relationship[,]" at least against "third parties." Easaw, 253 F. Supp. 3d at 42 (citing Newmyer v. Sidwell Friends Sch., 128 A.3d 1023, 1039–40 (D.C. 2015)).

The precise contours of the *prima facie* case are nevertheless hazy. For instance, it is not entirely clear whether tortious interference requires a breach of contract—which the Court has already concluded there wasn't—or whether the claim might instead entail a mere "failure of performance, whether by the terms of the contract in question or not." Casco Marina Dev., LLC v. DC Redevelop. Land Agency, 834 A.2d 77, 84 (D.C. 2003); see also Intelsat USA Sales Corp. v. Juch-Tech, Inc., 935 F. Supp. 2d 101, 115–16 (D.D.C. 2013) (explaining conflict between Casco and Murray v. Wells Fargo Home Mortg., 953 A.2d 308, 326 (D.C. 2008)), as to whether breach of contract is an essential element of the tort). And contrary to Wolff's suggestion and some older district court case law, see Wolff Mot. to Dismiss at 16–17; Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999), the D.C. Circuit has suggested that a plaintiff need not allege interference "through egregious means"—for example, through

---

the tort claims are timely, see Omnibus Response at 106, notwithstanding that she does not specifically re-argue that the tortious interference claim is timely.

libel, slander, coercion, fraud, misrepresentation, or disparagement—to survive a motion to dismiss. Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1136 (D.C. Cir. 2015).

The parties' failure to address these doctrinal wrinkles in their briefing complicates the Court's effort to determine whether Johnson has made out her *prima facie* case—an endeavor rendered even trickier by Johnson's somewhat tenuous showing of causation. The complaint asserts that Georgetown relied on Wolff's Tweets in deciding to terminate Johnson. See, e.g., SAC ¶¶ 183, 201, 211. This conclusion seems to be predicated on an assumption that Georgetown's administrators were specifically made aware of Wolff's posts, an assumption which may be fair but is never quite spelled out. Furthermore, weeks elapsed between Wolff's Tweets and Johnson's termination, during which time Georgetown's investigatory machinery was in motion; it is not apparent that Wolff communicated her concerns to any administrator, let alone that she participated in this process. This gap attenuates the causal relationship between Wolff's communications and Georgetown's ultimate employment decision.

In any event, the Court need not resolve these question marks because Johnson's claim fails in another decisive way. Even if Wolff's conduct qualifies as intentional interference with Johnson's contract and proximately caused her termination, it was not improper or wrongful. Rather, her communications were "legally justified or privileged," which renders them inactionable. Onyeoziri v. Spivok, 44 A.3d 279, 287 (D.C. 2012) (cleaned up); see also Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc., 565 A.2d 285, 290 (D.C. 1989) (explaining that calling conduct "improper" for tortious interference purpose's "is simply another way of saying that the alleged tortfeasor's conduct" is not "legally justified").[22]

---

[22] The propriety of a defendant's interference is an affirmative defense, rather than a *prima facie* element of tortious interference. Econ. Rsch. Serv., Inc. v. Resolution Econ., LLC, 208 F. Supp. 3d 219, 230 n.12 (D.D.C. 2016); see also Close It! Title Servs., Inc. v. Nadel, 248

D.C. law follows the Restatement (Second) of Torts in "determining whether interference with a contract is 'improper[.]'" Sorrells, 565 A.2d at 290. Courts must consider several factors, including "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." Id. (quoting Restatement (Second) of Torts, § 767). The list is not exhaustive, and courts are to evaluate impropriety based on a "judgment and choice of values in each situation." Restatement (Second) of Torts, § 767, cmt. b.

---

A.3d 132, 141 n.28 (D.C. 2021). As a general matter, "the Federal Rules of Civil Procedure 'do not require a plaintiff to anticipate affirmative defenses which might be raised by a defendant[,]'" so a plaintiff need not affirmatively "allege wrongful or improper conduct in order to survive a motion to dismiss for failure to state a tortious interference claim under District of Columbia law." Econ. Rsch. Serv., Inc., 208 F. Supp. 3d at 230 n.12 (cleaned up).

However, a countervailing rule of thumb permits courts to address an affirmative defense where the "the facts that give rise to the defense are clear from the face of the complaint[,]" Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998), or framed a tad differently, where the plaintiff's potential "rejoinder to the affirmative defense" is "foreclosed by the allegations in the complaint[,]" de Csepel v. Republic of Hungary, 714 F.3d 591, 608 (D.C. Cir. 2013) (quoting Goodman v. Praxair, Inc., 494 F.3d 458, 466 (4th Cir. 2007) (en banc)).

As the Court will explain, it is clear from the face of Johnson's complaint that Wolff's Tweets do not constitute improper interference in her contract with Georgetown and thus cannot sustain her tortious interference claim. The opinion will therefore address this point head-on, as other courts in this District have likewise done at this procedural stage. See, e.g., Precision Contracting Sols., LP v. ANGI Homeservices, Inc., 415 F. Supp. 3d 113, 123–24 (D.D.C. 2019); Lannan Found. v. Gingold, 300 F. Supp. 3d 1, 28–29 (D.D.C. 2017); but see Haymon v. District of Columbia, 610 F. Supp. 3d 101, 120 n.5 (D.D.C. 2022) (refusing to conclude that plaintiff failed to allege interference as "improper" or "wrongful" because this burden is not part of the plaintiff's *prima facie* case). The Court's approach is bolstered by the fact that Johnson addressed the impropriety requirement both in her complaint, see SAC ¶¶ 448–52, and her opposition brief, see Omnibus Response at 95–97.

Considering the facts in the light most favorable to Johnson—without crediting her legal conclusions and speculative or threadbare assertions—Wolff's behavior is a far cry from wrongful or improper. The nature of her conduct was not unusual: She complained to other social media users about an issue that upset her, though her posts did go viral along the way. Wolff's motive was clear from the face of the complaint: She perceived Johnson's online activity as an affront to her Jewish identity, especially in the immediate aftermath of the October 7 attack, and publicly vented her objection to Georgetown placing Johnson in a position of responsibility vis-à-vis Jewish (and other) students. Though there may have been less provocative means of voicing her opinion, she was entitled to do so the way she did. Relatedly, Wolff's individual interest in speaking out had a constitutional valence, which dovetails with the societal interest in protecting her freedom of speech, especially on a matter of public concern like an elite university's hiring decisions. After all, "in public debate [we] must tolerate insulting . . . speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment.'"[23] Snyder v. Phelps, 562 U.S. 443, 458 (2011) (quoting Boos v. Barry, 485 U.S. 312, 322 (1988)). These factors strongly outweigh Johnson's interest in bringing an affirmative tortious interference claim against Wolff, who, at best, played only an indirect role in her firing.

Imagine the road we would travel if any exasperated social media complaint about a university personnel controversy could give rise to a tortious interference claim. The risk of such

---

[23] The Court will not fulsomely address Wolff's First Amendment defense, other than to note that it packs a strong punch. Ironically enough, had the case remained in D.C. Superior Court, the defendants would likely have had recourse to the District's Anti-SLAPP Act, which would have placed the First Amendment issue front and center and may also have entitled them to the attorney's fees several of them now seek in their Rule 11 sanctions motions. The defendants forewent this path by removing the case to federal court. See July 18, 2025 Minute Order (denying Wolff and Shapiro's motions to dismiss under D.C.'s Anti-SLAPP Act, pursuant to binding D.C. Circuit law requiring the application of federal procedural rules to state law claims over which the district court exercises supplemental jurisdiction).

suits would undoubtedly chill campus speech, contravening the well-established principle that the "college classroom," along with "its surrounding environs," is "peculiarly the 'marketplace of ideas[.]'" Healy v. James, 408 U.S. 169, 180 (1972). To put an even finer point on it, imagine if student activists for the Palestinian cause could be sued in tort if they condemned their university's decision to hire a vocal supporter of Israel. This cannot be the result Johnson truly seeks, especially given her own history of campus organizing. Indeed, her opposition stresses that she "does not challenge Defendants' right to *speak*" and acknowledges that defendants "may express their views about Palestinian advocacy, about [] Johnson's political positions, about Israel-Palestine dynamics." Omnibus Response at 115. If Johnson instead aims to curb the "use" of "employment authority to retaliate against protected-class membership[,]" id. at 116, an iffy tortious interference claim against Wolff—who Johnson concedes had no employment authority whatsoever—widely misses the mark.

In sum, Johnson's tortious interference claim against Wolff is doomed by the plain face of the complaint. Wolff's Tweets do not qualify as wrongful or improper interference with Johnson's employment contract. The claim must be dismissed.

D. Leave to Amend

Although leave to amend may be freely given, the grant of such leave "is committed to a district court's discretion[,]" and amendment makes little sense where the plaintiff has "repeated[ly] fail[ed] to cure deficiencies" in past complaints or further amendment would be futile. Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (cleaned up).

The Court is not sure that Johnson has actually requested an opportunity to amend her complaint. See Omnibus Response at 18 (discussing the possibility of amendment only obliquely, while articulating the motion-to-dismiss legal standard). Even so, Johnson has had

60

two previous opportunities to amend her complaint, and the most recent set of amendments offered almost no new pertinent facts. Many of the weaknesses of her legal positions have been ventilated through Rule 11 correspondence, yet Johnson did not correct clear deficiencies in the most recent round of amendments. Further, several of her claims are untimely, unexhausted, or undercut by the complaint itself or key documents incorporated by reference into it, rendering further amendments futile. The Court will therefore exercise its discretion to dismiss, with prejudice, all of Johnson's claims against defendants who have filed Rule 12(b) motions.

Dismissal of Johnson's claims against Canary Mission, however, is not yet in order. As already noted, the organization has not appeared in the case, let alone moved to dismiss Johnson's claims against it on any waivable or non-waivable basis. Under the circumstances, the Court will afford Johnson twenty-one days to seek entry of default and move for default judgment against Canary Mission under Federal Rule of Civil Procedure 55—though it notes that such a motion may face an uphill battle for the reasons enumerated above and perhaps others. Cf. Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005) ("[T]he entry of a default judgment is not automatic, and . . . a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."). Should Johnson choose not to pursue default proceedings, the Court will dismiss the claims against Canary Mission without prejudice for lack of prosecution.

## IV. Rule 11 Sanctions

Having dutifully marched through the jurisdictional and merits issues in the case, the Court finally reaches the outstanding Rule 11 sanctions motions. Shapiro, the Donor Defendants, and, in a late-breaking filing, Wolff (collectively, the "movants")—have requested Rule 11 sanctions against Johnson and her counsel on the grounds that the claims against them were

61

frivolous and brought for the improper purpose of harassing them as Jewish individuals and organizations and as adversaries in the Israeli-Palestinian conflict.[24]  In support, the movants have appended screenshots of posts on Mr. Hamed's Facebook page condemning Zionism in strident terms, along with a copy of a similar complaint that he has filed in the Northern District of Georgia on behalf of a Palestinian employee who was fired by Emory University in Atlanta. With the exception of Wolff's, which the Court will strike as untimely,[25] the motions for sanctions have been fully briefed and are ready for resolution.

A brief literary meditation may help to set the scene.  At the outset of Shakespeare's historical drama Henry VIII, the Duke of Buckingham speaks with the Duke of Norfolk and the Lord Abergavenny about his seething resentment for Cardinal Wolsey, an ambitious statesman and counselor to the king.  "Stay, my lord," Norfolk counsels Buckingham,

> And let your reason with your choler question
> What 'tis you go about.  To climb steep hills
> Requires slow pace at first.  Anger is like

---

[24] Shapiro has technically filed two motions for sanctions, one in the wake of Johnson's filing of the FAC and one after the filing of the operative SAC.  Though a motion for sanctions that pertains to a non-operative complaint is typically denied as moot, the SAC largely resembles the FAC in terms of claims brought and core facts alleged, and Shapiro has incorporated arguments from his first sanctions motion by reference in his second.  See Shapiro Second Mot. for Sanctions at 1 n.1.  The Court will therefore consider the arguments advanced in both motions that pertain to the SAC, though the first Motion for Sanctions will be denied as moot.

[25] Wolff waited to file her motion for sanctions until the night before the February 19, 2026 motions hearing.  As the Advisory Committee Notes to Rule 11 make clear, "[o]rdinarily," a motion for sanctions "should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely."  Fed. R. Civ. P. 11, Advisory Committee Note to 1993 amendment.  By the time Wolff filed her motion, Johnson's SAC had been on file for roughly six months, and her opposition to the motions to dismiss had been on file for about four. Despite repeatedly advising Johnson's counsel of the defects she perceived in the complaint, Wolff only officially mobilized Rule 11 machinery against Johnson after the Court announced its particular interest in the sanctions issues in its January 14, 2026 Minute Order, posted in advance of the motions hearing.  The delay, coupled with this conspicuous timing, leads the Court to conclude that Wolff's sanctions motion is untimely.  And even if the motion were timely, it would not warrant the imposition of sanctions on top of those which the Court will impose here.

A full hot horse who, being allowed his way,
Self-mettle tires him. . . . Be advised.
Heat not a furnace for your foe so hot
That it do singe yourself.  We may outrun
By violent swiftness that which we run at
And lose by overrunning. . . .
I say again there is no English soul
More stronger to direct you than yourself,
If with the sap of reason you would quench
Or but allay the fire of passion.

William Shakespeare, Henry VIII act I, sc. 1, l. 155–60, 167–77.  With those sage words of

caution in mind, the Court turns to legal questions at hand.

A.  Legal Standard

When a litigant files a "pleading, written motion, or other paper" with the court, her

attorney "certifies" that it is "not being presented for any improper purpose"; that the "claims,

defenses, and other legal contentions" in it "are warranted by existing law or by a nonfrivolous

argument for extending, modifying, or reversing existing law or for establishing new law"; and

that "the factual contentions have evidentiary support[.]"  Fed. R. Civ. P. 11(b)(1)–(3).[26]

Sanctions are appropriate when an attorney or party violates any of these principles.  Fed.

R. Civ. P. 11(c)(1).  Courts apply an "objective standard" in assessing whether an attorney or

party has engaged in sanctionable conduct.  Bus. Guides, Inc. v. Chromatic Communications

Enters., 498 U.S. 533, 554 (1991).  As suggested by Rule 11(b)'s subparts, one relevant aspect of

the inquiry is whether the paper was "interposed for any improper purpose."  Jordan v. DOL, 273

---

[26] This case was removed from D.C. Superior Court, and some of the motions for
sanctions cite Rule 11 of the D.C. Superior Court Rules of Civil Procedure, the local analogue to
the federal Rule 11.  Because Johnson filed the operative complaint in federal court, the Court
refers only to the federal rule in this opinion.  In any event, "whether [the Court] proceeds under
the local or federal rule is immaterial" because "the two rules are nearly identical[,]" and "cases
and Advisory Committee Notes related to the one are persuasive authority for the other."
Footbridge Limited Trust v. Zhang, No. 04-cv-347 (CKK), 2008 WL 11492924, at *1 n.1
(D.D.C. Nov. 13, 2008).

F. Supp. 3d 214, 241 (D.D.C. 2017) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990)).  "[H]arassment, delay, [and] increasing the costs of an opponent in litigation" are examples of improper purpose.  Shekoyan v. Sibley Intern., 409 F.3d 414, 425 (D.C. Cir. 2005).

Another relevant question is "whether a reasonable inquiry would have revealed there was no basis in law or fact for the asserted claim."  Reynolds v. U.S. Capitol Police Bd., 357 F. Supp. 2d 19, 23 (D.D.C. 2004) (quoting Washington Bancorporation v. Said, 812 F. Supp. 1256, 1275 (D.D.C. 1993)).  Framed another way, the court is to ask if the presenting attorney "determined that [the] papers filed with the court are well grounded in fact [and] legally tenable."  Jordan, 273 F. Supp. 3d at 241 (quoting Cooter & Gell, 496 U.S. at 393).

Rule 11(b)(2) acknowledges the possibility that litigants may be attempting to change a landscape of unfavorable law or develop new precedent.  They may have "researched the issues and found some support for [their] theories even in minority opinions, in law review articles, or through consultation with other attorneys[.]"  Fed. R. Civ. P. 11, Advisory Committee Note to 1993 amendment.  Still, such efforts must be "nonfrivolous" in an objective sense, thereby "eliminat[ing] any 'empty-head pure-heart' justification for patently frivolous arguments."  Id.

All this said, "[c]ourts do not impose Rule 11 sanctions lightly; such sanctions are an *extreme* punishment for filing pleadings that frustrate judicial proceedings."  Jordan, 273 F. Supp. 3d at 241 (emphasis added).  "[W]hether to grant sanctions under Rule 11 rests firmly in the Court's discretion[.]"  Hueter v. Kruse, 610 F. Supp. 3d 60, 72 (D.D.C. 2022); see also Rafferty v. NYNEX Corp., 60 F.3d 844, 852 n.12 (D.C. Cir. 1995) (explaining the 1993

amendment to Rule 11 that permits, rather than directs, a court to impose sanctions upon finding a rule violation); Del Canto v. ITT Sheraton Corp., 865 F. Supp. 934, 939 (D.D.C. 1994).[27]

B.   Analysis

The pending motions for sanctions highlight a similar set of grievances with Johnson's complaint. *First*, the movants assert that Johnson and Hamed have acted with improper motives, making their conduct sanctionable under Rule 11(b)(1). And *second*, they submit that Johnson's complaint is frivolous because it lacks an adequate basis in law and fact, rendering her and counsel's conduct sanctionable under Rule 11(b)(2) and (b)(3). The Court takes each of these arguments in turn.[28]

1.   *Improper Purpose*

Shapiro and the Donor Defendants accuse Johnson and Hamed of acting with improper purpose—namely to harass them as Jewish individuals and organizations and ideological opponents in the Israeli-Palestinian struggle.

---

[27] The Court notes that in the body of the Rafferty opinion, the D.C. Circuit stated that a district court has no discretion whether to impose sanctions once it has found sanctionable conduct. 60 F.3d at 852. Understandably, some courts in this district have continued to cite Rafferty for this proposition. See, e.g., Arpaio v. Robillard, 459 F. Supp. 3d 62, 68 (D.D.C. 2020). But on closer examination, a rather ill-placed footnote in the decision makes clear that the strict obligation to impose sanctions only applies to the pre-1993 version of Rule 11. Rafferty, 60 F.3d at 852 n.12. The current version of the rule is more permissive. Thus, "once a district court finds a Rule 11 violation, it retains broad discretion in imposing sanctions." Hourani v. Mirtchev, 796 F.3d 1, 17 (D.C. Cir. 2015).

[28] The Court's ruling that it may not exercise personal jurisdiction over Shapiro and the Donor Defendants does not preclude a decision on their sanctions motions because "a district court may impose Rule 11 sanctions even when it lacks jurisdiction over the underlying case[.]" Lambert Law Firm P.C. v. Hansel, No. 24-cv-2396 (CRC), 2024 WL 4987026, at *6 (D.D.C. Dec. 5, 2024) (citing Willy v. Coastal Corp., 503 U.S. 131, 139 (1992)); cf. Cooter & Gell, 496 U.S. at 396 ("[T]he imposition of a Rule 11 sanction is not a judgment on the merits of an action," but rather "the determination of a collateral issue[.]").

For several reasons, the movants have not demonstrated that Johnson and Hamed acted with improper purpose under Rule 11(b)(1).  To begin, the Court emphasizes that the employment discrimination claim at the core of this case is not frivolous, as evidenced by the considered treatment above of Johnson's Title VII disparate treatment claim against Georgetown. "The fact that [Johnson's] Complaint raised nonfrivolous claims is strong evidence that it was not filed for improper purposes."  Gonzalez Ramos v. ADR Vantage, Inc., No. 18-cv-1690 (APM), 2021 WL 4462411, at *2 (D.D.C. Sep. 29, 2021).  Though a lawsuit may very well be valid as to some defendants and baseless as to others, the facial legitimacy of Johnson's central discrimination claim undermines the movants' sweeping denunciation of her *entire* complaint as merely a "thinly veiled attack on Jews and Israel as a Jewish State."  Shapiro First Mot. for Sanctions at 25.[29]  The movants' shotgun accusation of improper purpose is too imprecise to justify the imposition of a Rule 11 sanction.

The Court next considers whether Shapiro and the Donor Defendants have furnished concrete evidence that Johnson and Hamed brought this suit for the purpose of harassing them based on their religion and political positions.  The movants highlight the complaint's repeated use of the label "Zionist" and such terms as "occupied Palestine," "apartheid," "occupation,"

---

[29] The motions for sanctions are filled with such broadsides.  See, e.g., Shapiro First Mot. for Sanctions at 24 (describing the amended complaint as Johnson and Hamed's effort to "twist[]" the "judicial system" into "merely an opportunity to air conspiratorial and discriminatory grievances against Jews"); Shapiro Second Mot. for Sanctions at 8 ("[T]he SAC—on its face and taking into consideration Plaintiff and her counsel's explicit hatred for so-called 'Zionists' like Mr. Shapiro—was filed for the improper purpose of harassment[.]"); San Francisco Defs. Mot. for Sanctions at 15 (noting Hamed's "expressions of deep-seated animus" against Zionists on social media "strongly support the conclusion that this action is intended to harass, intimidate, and punish those whom counsel perceives as ideological opponents"); Milstein Defs. Mot. for Sanctions at 28 ("[T]he plain and obvious purpose of the SAC is not to redress any actionable harm but to weaponize the courts to air political grievances and exact reputational retribution against Jewish individuals and organizations.").

"extermination," and "genocide," which the defendants characterize as inflammatory.  See, e.g. Shapiro First Mot. for Sanctions at 25–26; San Francisco Defs. Mot. for Sanctions at 14–15; Milstein Defs. Motion for Sanctions at 26.  To be sure, many of these terms are fraught and politically contested.  And there are numerous paragraphs of overheated rhetoric in Johnson's complaint that add little substance to her discrimination and tort claims; in fact, they often detract from the complaint's overall clarity.  Still, the use of this terminology is not inherently demonstrative of harassing purpose, and under present circumstances, the Court will steer clear of the risky territory of policing litigants' choice of language.

Shapiro and the Milstein Defendants also suggest that Johnson and Hamed's improper motives for bringing the suit are reflected in antisemitic stereotypes portrayed in the complaint involving a conspiracy among Jewish actors.  See, e.g. Milstein Defs. Mot. for Sanctions at 1; Shapiro First Mot. for Sanctions at 26–27.  Johnson's civil rights conspiracy claim is doubtless one of her weakest.  But the perception of some coordination between subsets of the defendants is, on its own, not so outlandish as to evince a prejudicial motive on Johnson or Hamed's part. Wolff's Tweets and Shapiro's re-Tweet can be fairly read as intended to pressure Georgetown into disciplining Johnson.  Canary Mission's apparent organizational objective is to name and shame pro-Palestine and anti-Israel advocates, in part to push employers to fire them (or not hire them in the first place), and it has not appeared in this lawsuit to dispute that characterization. And it is at bare minimum conceivable that some of Canary Mission's funders knew of this general objective.  To be abundantly clear, none of this a conspiracy makes, let alone a civil rights conspiracy, for the reasons laid out above.  But just because the conspiracy claim was far from legally plausible does not automatically mean it was brought with malicious intent.

Finally, Shapiro and the Donor Defendants point to some additional social media posts by Johnson and several Facebook posts by Hamed to suggest that they both harbor animus toward Jewish people and supporters of Israel.  The movants' invitation to consider materials beyond the scope of the suit gives the Court serious pause.

"It has long been held that in considering the implementation of sanctions against a party or a counsel to a litigation, a district court may consider all the circumstances surrounding the alleged violation."  Atkins v. Fischer, 232 F.R.D. 116, 129 (D.D.C. 2005).  Such circumstances may include a general pattern of misconduct in the case at bar or similar misconduct in other cases.  Id.; see also Hickey v. Scott, 738 F. Supp. 2d 55, 73 (D.D.C. 2010).  But even though courts are entitled to assess the purpose of a filing in "full context" rather than "in a vacuum[,]" Trout v. O'Keefe, 144 F.R.D. 587, 588 (D.D.C. 1992), a free-ranging inquiry into the political views that Johnson and Hamed have espoused on private social media accounts is out of bounds under present circumstances.  The movants furnish no legal authority to support such an inquiry, which would not seem to bear directly on the purported abuse of judicial process.[30]  And while examining extrinsic communications by litigants and counsel may be appropriate in some scenarios, this general paucity of case law is not surprising—imagine the fallout from a Rule 11 analysis that gave embittered litigants and attorneys carte blanche to harvest potentially damning material from their opponents' social media accounts.  Such an approach would spawn an array of mini-adjudications over the authenticity and meaning conveyed by screenshots of social media posts.  Indeed, in this very case, Hamed has appended several declarations to his omnibus response to the motions for sanctions to fend off the movants' attacks on his character and online

---

[30] The posts might have been fair game had they spoken more directly to Johnson and Hamed's reasons for filing suit.  But beyond the Tweets at issue in the case, the pair's social media posts reflect generalized (if strident) positions on issues of the day.

conduct. Opening the Rule 11 floodgates in this way would undermine one of the core objectives of the rule, which is to "protect the court" from filings that "vexatiously multiply[]" judicial "proceedings." Cobell v. Norton, 211 F.R.D. 7, 10 (D.D.C. 2002). It also strikes the Court as ironic that the certain of the movants should seek to target social media posts for Rule 11 purposes when they otherwise steadfastly defend their own right to engage in controversial speech on online platforms. The Court will decline the invitation to examine activity that is beyond the scope of this lawsuit or any other relevant judicial proceedings.

In sum, the Court has not been presented with any firm basis for imposing Rule 11(b)(1) sanctions on Johnson and Hamed. However ill-advised this lawsuit may have been, the Court cannot say, on this record, that it was filed for the improper purpose of harassing Shapiro or the Donors Defendants based on their religious identity or political ideology.

### 2. *Frivolousness of Claims against Shapiro and Donor Defendants*

There remains the question whether Rule 11(b)(2) or (b)(3) sanctions are appropriate—*i.e.*, whether Johnson's claims are legally and factually tenable.

Before getting to the heart of that matter, the Court considers whether it may properly apply Rule 11(b)(2) and (b)(3) to Johnson herself. The text of Rule 11 permits courts to impose sanctions on represented parties (though they may not impose monetary sanctions on represented parties for violations of (b)(2), per Rule 11(c)(5)(A)). The advisory committee notes to the 1983 amendments to the rule further confirm that "[e]ven though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client." If sanctions are to attach to a client, however, the relevant violation must be somehow or another attributable to her. See Fed. R. Civ. P. 11(c)(1) ("If . . . the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on

69

any attorney, law firm, or party that *violated the rule or is responsible for the violation.*" (emphasis added)).  Here, to the extent that Shapiro and the Donor Defendants accuse Johnson of making legally and factually frivolous assertions in her complaint, fundamental fault would seem to lie with her attorney.  Because the movants have not sufficiently explained why the fatal defects in the complaint are attributable to Johnson herself, the Court will deny their Rule 11(b)(2) and (b)(3) sanctions requests as to her.

As the attorney who has represented Johnson since the origination of this case, Mr. Hamed comes under greater scrutiny.  The Court will consider each movant's arguments to decide whether Hamed has run afoul of Rule 11's strictures, mindful of "the fact that [just because] claims in a complaint" are not "ultimately meritorious," that "does not mean they are frivolous or automatically sanctionable."  Gonzalez Ramos v. ADR Vantage, Inc., No. 21-cv-592 (APM), 2022 WL 834095, at *1 (D.D.C. Mar. 21, 2022).

a.  Shapiro

Let's start with Mr. Shapiro, who contends that the SAC furnished no reasonable, good-faith basis for personal jurisdiction or any of the claims against him.  It was not outrageous for Johnson to posit that the Court had personal jurisdiction over Shapiro; after all, Shapiro deliberately interjected himself in a brewing Georgetown personnel controversy and amplified Wolff's Tweets by tagging Georgetown in his post.  See SAC ¶ 131 ("Her name is Aneesa Johnson, @Georgetown School of Foreign Service's new assistant director of academic affairs.").  While Johnson did not ultimately succeed in establishing the Court's jurisdiction over Shapiro, there was a colorable—if weak—argument that he made sufficient contact with the forum to justify haling him into court.  At the very least, a reasonable lawyer could have identified sufficient question marks to support a nonfrivolous request for jurisdictional discovery

70

on Shapiro's contacts with D.C. in relation to one of the "plus factors" in § 13-423(a)(4) of the District's long-arm statute.  See supra at Section III.A.

Because the Court lacked personal jurisdiction over Shapiro, the merits section of this opinion does not address the substance of Johnson's claims against him, which include DCHRA aiding and abetting discrimination, civil rights conspiracy, IIED, tortious interference, and false light invasion of privacy.  For many of the same reasons that the claims did not lie against the Georgetown Defendants and Wolff, Johnson's complaint would not have been able to survive Shapiro's motion to dismiss on the merits.

However, Johnson's claims against Shapiro vary in terms of speciousness.  For instance, there is a nonfrivolous argument to be made that Johnson's tortious interference claim against Shapiro would have been timely and satisfied at least the *prima facie* elements of the tort, even if it would not have been meritorious.  In Tweeting Johnson's name and position at the university, and tagging Georgetown directly in his post, Shapiro may well have been trying to dial up the pressure on the university and have Johnson punished.  It was also arguably within the bounds of zealous advocacy for Johnson to bring her IIED claim, which was not as evidently time-barred as the false light claim.  Reasonable litigants and judges may disagree as to what kind of online conduct is outrageous, and no defendant has contested that Johnson has received credible threats of violence from third parties, which enhance the gravity of the fallout from these events. Moreover, if the civil rights conspiracy claim had been more narrowly bounded, better argued, and focused on Shapiro's evident effort to draw Georgetown's attention to Johnson's misdeeds, it would have been far less outlandish—though, doubtless, unsuccessful in the end.

Other claims against Shapiro strike the Court as especially weak on the law.  For example, Johnson's (or perhaps more accurately, Hamed's) decision to add Shapiro as a

71

defendant on the false light claim after dismissing the defamation claim against all defendants ignores the similar nature of the two torts and the statute of limitations problem that clearly dooms both.  The DCHRA aiding and abetting claim had a similar fundamental timeliness defect as to Shapiro, not to mention the claim's tenuous grounding in existing law.

In short, although all of Johnson's claims against Shapiro would have failed, some of them were colorable, while others pushed at the outer "bounds of creative advocacy" or suggested that Hamed has failed to properly consider key aspects of the claims.  Jones, 322 F. Supp. 3d at 110.  In assessing a Rule 11 motion, "the Court must . . . take into consideration that . . . sanctions are a harsh punishment, and [assess] what effect, if any, the alleged violations may have had on judicial proceedings."  Robinson-Reeder v. Am. Council on Educ., 626 F. Supp. 2d 11, 18 (D.D.C. 2009) (quoting Sharp v. Rosa Mexicano, D.C., LLC, 496 F. Supp. 2d 93, 100 (D.D.C. 2007)).  Shapiro has not established that the claims against him, though very weak, were "so frivolous that it was patently clear that [they] had absolutely no chance of success under the existing precedents and that no reasonable argument could be advanced to extend, modify or reverse the law as it stands."  Indep. Fed. Sav. Bank v. Bender, 230 F.R.D. 11, 16 (D.D.C. 2005) (cleaned up).  And even if there were a mix of tenable and untenable claims against Shapiro, naming him as a defendant did not have a marked "effect . . . on judicial proceedings," Robinson-Reeder, 626 F. Supp. 2d at 18, as he would have had to appear and defend against Johnson's marginally stronger claims even in the absence of her weakest ones.  The Court will therefore exercise its discretion to deny Shapiro's Rule 11 motion for sanctions.

b.   Donor Defendants

Next, consider the Milstein Defendants.  The Court again declines to grant sanctions based on Johnson's unsuccessful personal jurisdiction argument alone.  Hamed tried to analogize

72

this case to others in which funders of alleged wrongdoing in a particular jurisdiction have been

properly sued in a forum court on that basis.  While the Court found this analogy altogether

"unconvincing, courts cannot sanction plaintiffs' lawyers each time [they] lose[] handily."  Zuver

v. Sprigg, No. 16-2505 (DLF), 2018 WL 3617308, at *10 (D.D.C. June 13, 2018).

Johnson's substantive claims against the Milstein Defendants—aiding and abetting

discrimination and civil rights conspiracy—are more problematic.  Based on Johnson's

allegations and the news reporting cited in the complaint, there is at least some suggestion that

these defendants were closely involved in Canary Mission's strategy and have funded the

organization on an ongoing basis.  See, e.g., SAC ¶¶ 233–36, 371.  Canary Mission, the hinge

point between the donors and any downstream discriminatory conduct that allegedly occurred,

has failed to appear in this litigation, making it trickier to assess the organization's potential

liability.  But the notion of a meeting of the minds between the Milstein Defendants, at one end

of the spectrum, and Georgetown, at the other, aimed at depriving Johnson of her civil rights

strikes the Court as legally and factually frivolous, even under a more expansive view of section

1985(3) than doctrine currently permits.  As counsel for the Milstein Defendants remarked at the

motions hearing, the complaint provides no basis for inferring any direct or proximate but

indirect connection between the donors and Georgetown.  Mot. to Dismiss Hearing Tr. 39:9–19

("These are charitable nonprofit organizations based in California who . . . support the Jewish

community.  There is not one allegation in the complaint that any of them ever spoke to Ms.

Johnson, that they spoke about her to anyone, . . . or even directed or instructed anyone to post

anything about her.  There's also not a single allegation that they spoke to anyone at Georgetown

about anything, much less about her, and they did not communicate with each other at any given

point.").  For similar reasons, the idea that the Milstein Defendants somehow aided and abetted

73

Georgetown's alleged discrimination against Johnson—when there is no suggestion in the complaint that they sought to facilitate reprisal against her based on her race, religion, or national origin[31]—is beyond colorable.

The conspiracy and aiding-and-abetting claims against the San Francisco Defendants suffer from the same flaws, but stand on even shakier factual grounds. The SAC alleges that the Helen Diller Family Foundation and Jewish Community Federation of San Francisco—both large, well-established charities that support a wide range of endeavors benefitting Jewish communities in the United States and Israel—donated $100,000 to Canary Mission through the intermediary organizations Megamot Shalom and the Central Fund of Israel. See, e.g., SAC ¶ 237. To support this proposition, the complaint cites to reporting by The Forward, a Jewish American news outlet, and The Nation. See SAC ¶¶ 67, 77 n.55, 81–82, 378. That reporting, in turn, traces the San Francisco Defendants' donation to 2016, which is a year *after* Johnson's Canary Mission profile was created. See Bamford, Who Is Funding Canary Mission?. The news articles also suggest that the donors announced their intention to terminate funding to Canary Mission at some point in 2018 following public criticism of the organization's tactics. See Noa Landau, Israel Uses Canary Mission Blacklist Info to Bar Activists, The Forward (Oct. 4, 2018), https://perma.cc/628T-JPHE. Johnson's lawyers confirm as much; in the November 8, 2023 letter Johnson sent to Georgetown, which implored the university not to lend credence to Canary Mission's blacklist, the lawyers wrote, "Canary Mission's disgraceful efforts have been so

---

[31] In Mr. Hamed's own words at the motions hearing, the reason Johnson was "targeted by Canary Mission . . . [was] because of her position on Palestine and her opposition to the occupation," rather than a protected identity. Mot. to Dismiss Hearing Tr. 67:3–8. And as he postulates in his opposition brief, Johnson "was subjected to a massive doxing and harassment campaign, ending in the termination of her employment, because she dared oppose Zionism." Omnibus Sanctions Response at 10.

74

blatant that the organizers hid behind anonymity, and when uncovered, [its] primary funder—the Jewish Federation of San Francisco—backed away and made clear that it 'will not support Canary Mission in the future.'"  Georgetown Mot. to Dismiss, Ex. C at 1.

The factual material that Johnson has placed before the Court thus suggests that the San Francisco Defendants funded Canary Mission *once* between 2016 and 2018, undercutting her narrative that these donors were continuously involved in Canary Mission's activities during the relevant time periods in this case (2015 and 2023).  On this record, no reasonable lawyer could have thought it proper to name the San Francisco organizations as defendants.

For his part, Mr. Hamed refers the Court to his motion-to-dismiss briefing for a fulsome defense of the merits of Johnson's claims.  See Mot. to Dismiss Hearing Tr. 83:17–21 ("The Court: So if I'm looking to your defense of the particular claims, I'm to look at your opposition to those claims . . . in your opposition to the motion to dismiss? Mr. Hamed: That's correct.").  But as the Court has spilled quite a lot of ink to explain, the merits of Johnson's claims are seriously wanting.

Hamed also points out—rightly so—that a nonfrivolous effort to change or expand the law does not offend Rule 11's requirements.  See Omnibus Sanctions Response at 7–11.  The Court accepts that, under certain circumstances, a colorable argument could be made to expand civil-rights or tort liability to cover knowing funders of Internet doxing and blacklisting— perhaps, for instance, where reports of the plaintiff's conduct or speech were utterly distorted, entirely private details were leaked, or there was some evidence of active meddling in the employment contract, and the funder facilitated that outcome.  Put another way, there is *some* legal limit to what the Milstein Defendants' counsel called the "rough and tumble of the First

Amendment public square," Mot. to Dismiss Hearing Tr. 42:21–22, and conduct beyond that limit is properly subject to litigation.

But this case is safely within the outer bound, wherever that may be. To begin, as a formal matter, the complaint brings no tort claim against the donors, nor does it squarely bring any First Amendment claim on Johnson's behalf, despite repeated references to her speech as "protected." As to the Donor Defendants who have moved for sanctions here, then, this is not a case, as Hamed asserts, "seeking . . . judicial recognition that doxing is assimilable to an intentional" tort. Omnibus Sanctions Response at 8. Nor is it a case that seeks to shore up constitutional protection for Johnson's speech. Id.

Moreover, the complaint makes clear that what drove Georgetown's decision-making were the Tweets that Johnson does not deny posting. So this is also not a case about fabricated or provably false speech funded by the donors.

Finally, there is no suggestion that the donors facilitated the dissemination of information about Johnson that was not otherwise within the public domain. So again, as to the donors, this case is not about "doxing," in the sense of publishing private facts about a person in a way that subjects them to injury.[32]

Hamed does not point to any concrete source of support for either of the claims he advances against the Donor Defendants in this case—such as minority opinions, law review articles, or consultations with other attorneys,[33] among other possible sources. Without opining

---

[32] The Court takes Mr. Hamed's point that Internet users often need only a few identifying details about a particular subject to be able to identify her telephone number, address, and other personal information. See Mot. to Dismiss Hearing Tr. 84:22–24. Although the ease of online intrusion is regrettable, and sometimes dangerous, it cannot be that simply identifying a person's name and place of employment on social media is enough to give rise to tort liability.

[33] A colleague of Mr. Hamed's echoes the need "for a change of defamation law," to expand "tortious interference liability," and to develop New York's "catchall category of prima

76

on other potentially colorable or meritorious efforts to expand civil-rights and tort liability to funders of online misconduct, the Court concludes that the section 1985 civil rights conspiracy and DCHRA aiding and abetting claims in *this* case are frivolous and thus grants the Donor Defendants' sanctions motions under Rule 11(b)(2) and 11(b)(3) as to Mr. Hamed alone.  Both causes of action are untenable, and there are no facially legitimate claims against the donors that would have necessitated their participation in the lawsuit absent the frivolous claims.

c.   Choice of Sanctions

"Once a district court finds a Rule 11 violation, it retains broad discretion in imposing sanctions."  Hourani v. Mirtchev, 796 F.3d 1, 17 (D.C. Cir. 2015).  "A sanction imposed under Rule 11 'must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated.'"  Id. (quoting Fed. R. Civ. P. 11(c)(4)).  "Proper considerations in exercising that discretion specifically include '[w]hether the improper conduct was willful, or negligent,' and 'whether it was intended to injure.'"  Id. (quoting Fed. R. Civ. P. 11, Advisory Committee Note to 1993 amendment).  In addition, courts may consider whether the improper conduct "was part of a pattern of activity, or an isolated event"; "whether it infected the entire pleading, or only one particular count or defense"; "whether the person has engaged in similar conduct in other litigation"; and "what effect it had on the litigation process in time or expense."  Fed. R. Civ. P. 11, Advisory Committee Note to 1993 amendment.

Though the Donor Defendants request that Hamed cover their attorney's fees as punishment for bringing frivolous claims on Johnson's behalf, monetary sanctions are not

---

facie tort."  See Decl. of Attorney Jonathan Wallace, ECF No. 62-3 ¶¶ 15.  That is all well and good, but Johnson's complaint brings no tort claims against the Donor Defendants, let alone defamation, so the declaration cannot be read to reflect Hamed's "consultation" with other attorneys about his *statutory* claims.

warranted here for several reasons. *First*, Johnson's complaint has already been dismissed by way of this opinion, which will hopefully deter the advancement of similarly weak claims in the future. *Second*, although he might have been more attendant to the Local Rules, Hamed has not engaged in a pattern of improper conduct in this case, and the core claims in the complaint were at least colorable, meaning that the entire pleading was not infected by its faultiest claims. *Third*, as discussed above, there is insufficient evidence before the Court that Hamed brought the claims against the Donor Defendants with malicious intent or in bad faith. Rather, the Court accepts the genuineness of his explanation that he aimed to "expand accountability to encompass the individuals and entities that are directly contributing to the modern phenomenon of doxing[.]" Omnibus Sanctions Response at 7. And he may have been motivated to add the Donor Defendants in pursuit of that goal because the principal offender in his view—Canary Mission— has thumbed its nose at the proceedings.

*Finally*, although Hamed has brought a roughly similar case in the Northern District of Georgia on behalf of a former Emory University employee, that case is not advanced enough for the Court to determine that Hamed has engaged in similar misconduct in other litigation. The Court will leave that question for the sound judgment of its colleague in Atlanta, who has been presented with at least one sanctions motion and will now have the benefit of the Court's views here. In any event, this is certainly not a situation in which Hamed has "repeatedly filed the same case[]" in the same or multiple jurisdictions "after disappointing results[,]" which may have been a firmer basis for ordering monetary sanctions. Arpaio v. Robillard, 459 F. Supp. 3d 62, 68 (D.D.C. 2020) (citing Reynolds v. U.S. Capitol Police Bd., 357 F. Supp. 2d 19, 21–23, 27 (D.D.C. 2004); McLaughlin v. Bradlee, 602 F. Supp. 1412, 1413–14, 1420 (D.D.C. 1985)).

78

In an effort to "strik[e] a balance" between "deterrence" and "equity" concerns, Reynolds, 357 F. Supp. 2d at 26, the Court will therefore stop short of imposing monetary sanctions and instead admonish Hamed to take greater care in formulating his complaints moving forward. "Rule 11 is not meant to chill advocacy or in any way stymie the freedom to litigate creatively and vigorously[.]" Indep. Fed. Sav. Bank, 230 F.R.D. at 18 n.8. Hamed is right to identify the dangers of overzealous or unduly burdensome sanctions, especially for civil rights attorneys who engage in *pro bono* or contingency-based practice. See Omnibus Sanctions Response at 9–11; see also Del Canto, 865 F. Supp. at 939 ("Rule 11 sanctions may chill the zealousness of attorneys who often represent on a contingent fee basis individual clients who might not otherwise be able to afford representation. Such counsel undoubtedly provide important service to the unrepresented who deserve their day in court . . ."); Carl Tobias, Rule 11 Recalibrated in Civil Rights Cases, 36 Vill. L. Rev. 105 (1991).

The Court further appreciates the difficulties in trying to hold elusive defendants—like Canary Mission—accountable for their actions, which, again, may be what led Hamed to name the Donor Defendants in this suit. Cf. Declaration of Attorney Jonathan Wallace, ECF No. 62-3 ¶¶ 13–16. But such difficulties do not license attorneys to bring specious claims based essentially on mere affiliation. Indeed, one could envision how such an approach, taken to the extreme, would enable litigants from across the political and ideological spectrum to use litigation as a tool to silence or intimidate their opponents. Accordingly, even as Hamed purports to develop "novel theories of accountability" to address the pernicious impacts of Internet doxing, see Omnibus Sanctions Response at 8, which should not be stymied by way of this ruling, he still must advocate within the generous bounds of Rule 11.

## V.    Conclusion and Order

The Court began its discussion of sanctions with Shakespeare's admonition in Henry VIII to refrain from letting the heat of passion cloud the pursuit of our adversaries, lest we go too far and bring harm upon ourselves.  That advice rings true no matter how righteous we believe our cause to be.  Litigation can right many wrongs.  But not every wrong can be righted by a lawsuit.  Sanctions are one way of delineating this distinction.

There are still other lessons to be drawn from this case.

We should all cherish free speech yet recognize that speech is not free.  It has consequences.  It reflects who we are.  And especially if conveyed over the Internet, it can follow us forever.  If our words are caustic and hurtful, they may not only injure others, but also sully our own reputations and cost us valuable opportunities and benefits, including in employment.  As elementary as it may seem, we should think twice about what we say and how we say it.

Choosing words wisely is especially important for those entrusted with the education of our students and future leaders.  Members of the academy—and, yes, judges and other public figures whose words reach impressionable ears—should model respectful discourse for those next up the rungs.  But that is sometimes lacking in this age when hot takes on social media pass for analysis of fraught and complex issues.  While most of us appreciate a turn of phrase and even a zinger or two, pith alone is usually a poor substitute for reasoned commentary.

We might remember as well that free speech is for me *and* for thee.  There is a tendency for those whose words are censured to seek refuge in the First Amendment.  Yet some seem unwilling to extend like protections to those whose speech they find objectionable.  The "cancelled" become the censors.  That double standard pops up on both sides of this suit.

80

This case also illuminates the plight of university administrators these days, who must navigate fractured student bodies and faculties, demanding donors, ever-increasing intrusions by the federal government, and more.  They deserve a measure of grace.  They will occasionally falter, of course, and when they do in ways that violate the law, they should appropriately be held to account.  But hasty social media posts and grasping lawsuits are perhaps not the best ways of confronting their missteps.

As the Court presaged at the outset, this case has become a proxy war of sorts for the conflict that continues to play out on college campuses over events in Israel and Gaza.  That conflict has embroiled students, faculty, and staff with deeply held but diametrically opposed views on a seemingly intractable dispute halfway around the globe.  The nation's great colleges and universities are uniquely situated to offer the competing constituencies a shared environment to learn about and debate the underlying struggle and its historical origins, which of course long predate October 7, 2023.  They can also provide space for time-honored expressions of protest within bounds of reason and respect.  Fashioning such an environment has proven difficult on some (though not all) campuses.  But where school *and* student leaders can together strive to create conducive settings to achieve these goals, there may be no better place than the university to temper the "fire of passion" with the "sap of reason," in the words of the Bard.  At the very least, a college campus is almost always a more appropriate venue for venting ardent political opinions than a court of law.

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' [51], [52], [53], [54], [56] Motions to Dismiss are GRANTED, and the claims against these Defendants are dismissed with prejudice.  It is further

82

**ORDERED** that Defendant Shapiro's [34] First Motion for Sanctions is DENIED as moot and [50] Second Motion for Sanctions is DENIED.  It is further

**ORDERED** that the San Francisco Defendants' [55] Motion for Sanctions and Milstein Defendants' [57] Motion for Sanctions are GRANTED in part and DENIED in part, for the reasons enumerated above.  It is further

**ORDERED** that Defendant Wolff's [75] Motion for Sanctions is STRICKEN as untimely.  It is further

**ORDERED** that, if she so chooses, Plaintiff Johnson may seek entry of default and file a motion for default judgment against Canary Mission, pursuant to the requirements of Fed. R. Civ. P. 55, within 21 days of the issuance of this Order.  If no motion is filed, the claims against Canary Mission will be dismissed for lack of prosecution, and a separate final appealable order will issue as to all parties.

CHRISTOPHER R. COOPER
United States District Judge

Date:  March 31, 2026

82